UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL S. MARCELLIN, individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, deceased, <br><br>         Plaintiffs, <br><br>   v. <br><br> HP, INC., and STAPLES, INC., <br><br>         Defendants. | **Civ. No. 1:21-cv-00704-JLS-HKS** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HP, INC.'S MOTION FOR A PROTECTIVE ORDER PREVENTING PLAINTIFFS FROM TAKING THE VIRTUAL DEPOSITION OF MR. DAVID PIPHO**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................................... ii

SUMMARY OF THE FACTS ALLEGED IN THE COMPLAINT..............................................1

ARGUMENT ...........................................................................................................................9

CONCLUSION.......................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bertolini-Mier v. Upper Valley Neurology Neurosurgery, P.C.*,
  2019 WL 5691884 (D. Vt. Nov. 4, 2019) ............................................................9

*Chen-Oster v. Goldman, Sachs & Co.*,
  293 F.R.D. 557 (S.D.N.Y. 2013) ........................................................................9

*Huseby, LLC v. Bailey*,
  2021 WL 3206776 (D. Conn. July 29, 2021).......................................................9

*Joseph v. Gnutti Carlo S.p.A.*,
  2016 WL 4083433 (S.D.N.Y. July 25, 2016)...................................................9, 10

*Nespresso USA, Inc. v. Williams-Sonoma, Inc.*,
  2021 WL 942736 (S.D.N.Y. Mar. 12, 2021) .......................................................9

*Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*,
  2017 WL 10221320 (S.D.N.Y. Feb. 27, 2017) ...................................................9

**OTHER SOURCES**

Fed. R. Civ. P. 26(b)(1) ....................................................................................9

Fed. R. Civ. P. 30(b)(6) .................................................................................3, 10

Fed. R. Civ. P. 37(B).......................................................................................10

## SUMMARY OF THE FACTS ALLEGED IN THE COMPLAINT

This case arises out of a tragic fire that occurred in the early morning hours of January 24, 2020, which resulted in the death of Charles Hollowell and severe and permanent emotional injuries to Plaintiff Carol Marcellin.  On that night, Plaintiff Carol Marcellin was awakened by the sound of the smoke detector at her home located at 192 Bells Brook Road, Ceres, New York, in Allegheny County.  Decedent, Charles Hollowell, her longtime companion, who was physically disabled, was asleep with her at the time.  After waking him, she went to see where the smoke was coming from and saw the HP laptop she had purchased from Staples on fire and throwing off sparks that had started the rest of the room on fire.  When she returned to the bedroom, she tried to get Mr. Hollowell into his wheelchair, but he fell to the floor, and she was unable to get him up.  She was unable to get to a phone in the house so crawled out to contact emergency services through the OnStar service in her vehicle.  She could not get OnStar to connect so had to drive a distance from the home before getting through.  When she returned, the fire was consuming the home and there was no way to go back in.  First responders were also unable to save Mr. Hollowell who perished in the fire.

What remained of the HP laptop was inspected by experts for both Plaintiffs and Defendants.  It was discovered that the fire began when the battery in the laptop exploded.  It was also discovered that the battery that exploded was not an original HP battery-pack but was a replacement battery that was inserted after original manufacture.  The replacement battery lacked connections to safety features that would have prevented overcharging, which was concluded by the experts to be the cause of the fire.  Plaintiffs' experts were able to find information publicly available that indicated the laptop's initial warranty period began in 2010.  Therefore, it was

1

assumed the laptop was originally purchased that year.  Markings on the battery pack indicated it was manufactured in 2014.

All of Plaintiff Carol Marcellin's records were destroyed in the fire, including any receipts from the purchase of the laptop.  She had no recollection of ever purchasing a replacement battery for this device.  Because of the lack of documentation and because she is advanced in age and her memory has also been affected by the trauma of the events leading to her companion's death, it was difficult to confirm when the laptop had been purchased from Staples.  When the complaint was filed, it was assumed based on the available information that she had purchased the laptop new from Staples in approximately 2010 and had forgotten she had replaced the battery sometime later.

Because Plaintiff Carol Marcellin could not recall exactly when she purchased the subject laptop from Staples and no records could be located confirming that she had ever purchased a replacement battery, it was then theorized that she may have purchased a refurbished laptop sometime around 2014 or 2015 that already had the replacement battery in it.  Plaintiffs had demanded records from both Defendants seeking clarification of this issue and subsequently filed a motion to compel production of such records when Defendants failed to produce any such records.  While that motion was pending, Defendant HP produced additional records suggesting that Plaintiff Carol Marcellin registered the warranty for the laptop with HP sometime in 2011.  HP also produced records that the original sale of the laptop was to Defendant Staples.  These records supported the original premise that Plaintiff Carol Marcellin purchased the laptop new from Staples and that she or someone had replaced the battery with the counterfeit replacement battery at some point after 2014.

Plaintiffs served a notice pursuant to Fed. R. Civ. P. 30(b)(6) on Defendant HP and conducted the deposition of Mr. Lee Atkinson, the representative produced by HP to testify on behalf of the corporation on the topics listed in the notice, which included the following topic:

4. HP's knowledge of counterfeit replacement batteries on the market that were being sold for use in Pavilion Series Laptop computers prior to the date of the **Incident,** including contact with third-party battery suppliers regarding safety and design of counterfeit replacement batteries;

Mr. Atkinson testified that HP was aware for many years prior to the fire that caused the death of Decedent and the psychological injuries to Plaintiff Carol Marcellin that counterfeit batteries were being sold to HP laptop owners at the end of the useful life of their original batteries and these counterfeit batteries lacked safety features that had resulted in catastrophic fires caused by the batteries overheating.  Plaintiffs' counsel then asked the following series of questions about HP's actions once it had acquired this knowledge:

```
98:7  Q    Just so that I am clear, your efforts
98:8  to do this, this process of investigating
98:9  unauthorized battery packs for use in the HP
98:10 Pavilion, was that done for purposes of litigation
98:11 only?
98:12      A    Yes.
98:13      Q    So, other than your efforts to study
98:14 unauthorized battery packs and whatever functionality
98:15 they had, that you did in litigation, you are not
98:16 aware of any similar process going on within HP where
98:17 unauthorized battery packs were being studied for
98:18 purposes of, say, safety and warning consumers not to
98:19 use these products?
98:20      A    Well, I am not aware of any other study
98:21 with an HP for these other -- for these other battery
98:22 packs.
98:23 Q    Right.
98:24       Have you --
98:25       Did you inquire as to whether --
99:1        Did you take any action in preparation
99:2  for today to find out whether there was some other
99:3  unit within HP that was doing that function outside
99:4  of purely for litigation?
```

99:5          MR. BETKE:  Or would you know as part
99:6     of your work?
99:7          A    I am not aware of any other study
99:8  for -- any other study on unauthorized battery packs.
99:9          Q    But my question is did you inquire of
99:10  anyone else in the company to find out if there is
99:11  something you are unaware of that is actually
99:12  occurring with these unauthorized battery packs are
99:13  being studied for purposes other than litigation?
99:14          Did you inquire of anyone about that
99:15  topic?
99:16          A    No.  I've had discussions with other
99:17  people on this, but I am not aware of any other
99:18  activity that actually -- to actually analyze these
99:19  battery packs.
99:20          Q    When you say you've had discussions,
99:21  again, I don't want to know any discussions you had
99:22  with lawyers, but, in other words, have you had any
99:23  discussions within the company, generally outside of
99:24  litigation process, about the potential hazards
99:25  associated with using these unauthorized battery
100:1  packs because they lack certain safety features?
100:2          A    Yes.
100:3          Q    And when did you have those
100:4  conversations and with whom again outside of
100:5  litigation context?
100:6          A    The question about how we can -- about
100:7  what me might be able to do to discourage use of
100:8  third-party batteries.
100:9          Q    Yes.
100:10          So, that's what I understood the
100:11  concept was, but my question is, who did you discuss
100:12  that with and when?
100:13          A    I talked to a few people over the last
100:14  four years on this.  Last four years on this.
100:15          Q    So, we have when.
100:16          Who were the few people that you
100:17  talked to?
100:18          A    Another person who -- I have to name a
100:19  name, David Pipho.
100:20          Q    Do you know how to spell that, please?
100:21          A    P-I-P-H-O.
100:22          Q    Where in the HP system is Mr. Pipho
100:23  housed?
100:24          A    He works in quality.  HP quality group.
100:25          Q    Where is that located?

101:1      A    In Houston.

101:2      Q    Can you recall the name of anyone else
101:3  that you had this conversation with?

101:4      A    Yes.  With -- no.  I am trying to
101:5  remember specifically.  I can't remember a name
101:6  that -- I am trying to remember a specific
101:7  conversation that I had with someone.  But at least I
101:8  am trying to remember specific discussion.

101:9      Q    You are having trouble remembering who
101:10  you talked to?

101:11     A    Yeah.  I am trying to put in context --
101:12  I am trying to remember a specific conversation and
101:13  how -- and what exactly we talked about.

101:14     Q    So, the only name that you can give me
101:15  is Mr. Pipho?

101:16     A    Yes.  Right now, yes.

101:17     Q    With regard to your discussions with
101:18  Mr. Pipho, do you know if any action was taken by HP
101:19  to further those discussions after you had the
101:20  discussion with Mr. Pipho?

101:21     A    I don't know if there -- I don't know
101:22  if there is anymore further action.  No, I dont
101:23  know.

101:24     Q    Do you remember why it was that you
101:25  chose Mr. Pipho to discuss this particular topic
102:1  with?

102:2      A    I am aware of other incidents we had
102:3  with after market batteries or third -- or
102:4  unauthorized batteries.

102:5      Q    I am sorry.  I didn't catch your
102:6  answer.

102:7           You are saying that you knew he was
102:8  aware of that problem as well?

102:9      A    Yes.

102:10     Q    And how did you understand that he was
102:11  aware of this problem in addition to you being aware
102:12  of it?

102:13     A    I don't remember how.

102:14     Q    Did you communicate with Mr. Pipho any
102:15  of the knowledge that you had gained from your
102:16  analysis of the unauthorized battery packs in
102:17  litigation?

102:18     A    Litigation, yes.  Roughly.

102:19     Q    So, in other words, you gained certain
102:20  knowledge from your work on a particular legal case
102:21  about the functionality or lack of functionality of

102:22  some of these unauthorized battery packs and that
102:23  information you then used to have this discussion
102:24  with Mr. Pipho?
102:25      A    Yes.
103:1       Q    And your goal in doing that was to see
103:2  if there was something that HP could do to prevent
103:3  those types of unauthorized battery packs that lacked
103:4  that functionality from operating in the HP systems?
103:5       A    Yes.
103:6       Q    Did you have this discussion with
103:7  Mr. Pipho one time or multiple times?
103:8       A    Probably multiple times.
103:9       Q    And did Mr. Pipho ever communicate back
103:10  to you what, if anything, he or others at HP were
103:11  doing to address the concerns that you had raised?
103:12      A    We discussed ideas about what might be
103:13  possible, yes.
103:14      Q    Did you communicate with Mr. Pipho
103:15  information about the lack of safety functionality
103:16  you were finding inside of these unauthorized
103:17  third-party battery packs?
103:18      A    I did.
103:19      Q    What did you convey to him on that
103:20  topic?
103:21      A    That these battery packs are void of
103:22  even authentic reporting.  That the battery packs
103:23  are -- some of these battery packs will sacrifice
103:24  multiple standard safety features.
103:25      Q    And some of those standard safety
104:1  features would be the thermal protection shutdown
104:2  process that we talked about?
104:3       A    Yes.  The -- sacrifice almost
104:4  everything that HP would require for a battery pack.
104:5       Q    And that would include the cell
104:6  balancing function as well?
104:7       A    Yes.
104:8       Q    And even though these battery packs --
104:9  these counterfeit unauthorized battery packs lacked
104:10  all of those safety functions, they were still able
104:11  to function within the HP Pavilion Series laptops?
104:12      A    Yes.
104:13      Q    And you have been aware of this and HP
104:14  has been aware of this you said over four years?
104:15      A    I am thinking about five or six years.
104:16  The prevalence of the uses has become significant.
104:17      Q    To your knowledge, has Mr. --

6

104:18          Is it Pipho, did you say?
104:19     A     Yes.
104:20     Q     Has Mr. Pipho communicated back to you
104:21  any effort within HP to provide information to
104:22  purchasers of HP laptops of this danger that you are
104:23  describing of these completely functional battery
104:24  packs lacking all of the safety devices HP requires
104:25  that would work in an HP Pavilion laptop?
105:1          MR. BETKE:  Did you say beyond the
105:2       pop-up that he referred to earlier?
105:3          MR. SCHWARZ:  Well, I am asking about
105:4       previously manufactured --
105:5          Withdraw that question.
105:6     Q     When did the pop-up that you
105:7  described -- meaning, a message that the computer
105:8  operator would see on the screen about the potential
105:9  that the battery pack that was in the computer was an
105:10  unauthorized HP device -- when did that pop-up first
105:11  appear or first become available on a newly
105:12  manufactured HP laptop computer?
105:13     A     In 2019.
105:14     Q     So, prior to that, was there any
105:15  message that an operator prior to units manufactured
105:16  prior to 2019, was there any message that a user of
105:17  an HP laptop, a Pavilion laptop computer, would
105:18  receive in the event that an unauthorized battery
105:19  pack lacking safety functions was installed in that
105:20  computer?
105:21          MR. BETKE:  You are now talking about a
105:22       pop-up, not in the materials that they get
105:23       with the machine?  You are talking about,
105:24       like, on the computer a pop-up?
105:25          MR. SCHWARZ:  Yes, and we will get into
106:1       the materials.  I am talking about the
106:2       pop-up that you brought up a few minutes
106:3       ago and Mr. Atkinson described.
106:4     A     Before that there was no message when a
106:5  non HP battery was -- when a battery that didn't
106:6  identify as HP was installed.
106:7     Q     What was the --
106:8          We will get to that.  I will leave that
106:9  for now.
106:10          I withdraw that question.
106:11          To your knowledge, was any information
106:12  about the concerns that you raised with Mr. Pipho
106:13  ever communicated to registered owners of HP laptop

7

106:14   computers that lacked this pop-up?
106:15         MS. MASTRIANO:  Form.
106:16      A    You mean for previous customers?  I
106:17   think that goes to the material that we had before.
106:18   But no, there has been -- I don't know of any other
106:19   communication from HP on these aftermarket batteries.
106:20      Q    So, I think you said that you became
106:21   acutely aware of this problem in the last five or six
106:22   years, correct?
106:23      A    Yes.
106:24      Q    And when you became acutely aware of
106:25   this problem of these completely functional battery
107:1   packs lacking safety devices were out there being
107:2   used as replacement batteries for HP, did you find
107:3   that there were others within the company that were
107:4   aware of this problem even before you were?
107:5      A    No.  I think that -- my sense is that
107:6   around 2017 is when the company -- when the other
107:7   people in the battery group decided to have -- we
107:8   might benefit from some message.  I wasn't part of
107:9   that original group.

(Schwarz Declaration, Ex. A at 98-107).

Thereafter, on September 13, 2023, Plaintiffs served a deposition notice on HP to take Mr. Pipho's deposition.  No formal objection to this notice was ever served until this motion was filed. Several emails were sent by HP's defense counsel questioning why Mr. Pipho was a potentially relevant witness and the above quoted testimony was provided to satisfy this query.  Several meet and confer conferences were also held during which the same issues were discussed and the same testimony was referenced.  Each time, the parties discussed the issue but failed to agree on the potential relevance of Mr. Pipho's testimony.  Finally, Plaintiffs' counsel provided an ultimatum that either HP would offer dates to produce Mr. Pipho or move for a protective order.  A deadline was set for doing one or the other, but that deadline was extended by consent.  Finally, Defendant HP filed the current motion.

## ARGUMENT

The scope of discovery is broad, limited only by relevance, privilege, and proportionality. Fed. R. Civ. P. 26(b)(1).  Relevance under Rule 26 "is an extremely broad concept."  *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 561 (S.D.N.Y. 2013) (internal quotation and citation omitted).  "Once relevance has been shown, it is up to the responding party to justify curtailing discovery."  *Id.*

The standard for demonstrating relevance is "not heavy."  *Nespresso USA, Inc. v. Williams-Sonoma, Inc.*, No. 119CV4223LAPKHP, 2021 WL 942736, at *2 (S.D.N.Y. Mar. 12, 2021).  While proportionality should be focused on the importance of the issues and the alleged burden, not solely an opposing party's assertions about the facts: "a responding party may not deny a contested factual allegation and then claim that its denial renders discovery into that topic 'of no marginal utility' and therefore 'disproportionate.'  If that were the rule, it would be difficult to see how anyone would ever get any discovery."  *Huseby, LLC v. Bailey*, No. 3:20-CV-00167 (JBA), 2021 WL 3206776, at *8 (D. Conn. July 29, 2021) (rejecting argument that discovery request was not proportional based on declaration regarding witness's employment status).

With respect to burden, a party seeking a protective order must specifically identify the alleged burden.  *Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*, No. 15CV4428ALCKNF, 2017 WL 10221320, at *5 (S.D.N.Y. Feb. 27, 2017); *Bertolini-Mier v. Upper Valley Neurology Neurosurgery, P.C.*, No. 5:16-CV-35, 2019 WL 5691884, at *6 (D. Vt. Nov. 4, 2019).  The burden on a party to produce an employee for a deposition, standing alone, is not unduly burdensome.  "The possibility that depositions of [the defendant's] employees would cover much of the same information contained in documents produced by [the defendant] does not make this discovery unreasonably cumulative.  Nor is there reason to be concerned about needless burden or expense,

given that both parties . . . may appear at . . . depositions telephonically or through video-conference." *Joseph v. Gnutti Carlo S.p.A.*, No. 15-CV-8910 (AJN), 2016 WL 4083433, at *2 (S.D.N.Y. July 25, 2016).

Plaintiffs have taken a single deposition in this case of Mr. Lee Atkinson, the witness HP produced in response to the notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6).  Mr. Pipho was identified by Mr. Atkinson as another HP employee with whom he discussed the dangers he discovered of these counterfeit battery packs that had caused fires in HP laptops because they lacked essential safety features.  It would not be burdensome to produce Mr. Pipho virtually as requested.  Moreover, taking two depositions of a party defendant is certainly not disproportional to the gravity of this case or the damages at issue.

## CONCLUSION

In light of the foregoing, Defendant HP's motion for a protective order preventing Plaintiffs from taking the virtual deposition of Mr. Pipho should be in all respects denied and Plaintiffs should be awarded reasonable expenses pursuant to Fed. R. Civ. P. 37(B), together with such other and further relief as the Court deems just and proper.

DATED:  February 16, 2024

<div style="margin-left:40%">

*/s/ Stephen G. Schwarz*
FARACI LANGE, LLP
1882 South Winton Road, Suite 1
Rochester, NY  14618
Phone: (585) 325-5150
Email: sschwarz@faraci.com

*Attorneys for Plaintiffs*

</div>