UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---

CAROL S. MARCELLIN, individually, and as
Co-Administrator of the Estate of Charles E.
Hollowell, deceased, and JESSICA
HOLLOWELL-McKAY, as Co-Administrator
of the Estate of Charles E. Hollowell, deceased,

        Plaintiffs,

        v.

HP, INC., and STAPLES, INC.,

        Defendants.

**Civ. No. 1:21-cv-00704-JLS**

---

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SANCTIONS AND TO STRIKE**

Defendant HP Inc. hereby submits this memorandum of law in support of its motion for

sanctions and to strike against the plaintiffs Carol Marcellin and Jessica Hollowell-McKay under

Rule 37 of the Federal Rules of Civil Procedure.

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ................................................................................. 5

BACKGROUND OF CHANGING FACTS .......................................................... 6

    I.   The Purchase of the HP Notebook ........................................................... 6

    II.  The Replacement Battery in the HP Notebook ....................................... 9

    III. The Replacement Battery in in the Non-Existent Compaq Laptop ................................. 10

    IV. The Compaq Laptop ............................................................................. 12

    V.  The Untimely Second Expert Reports and Sham Declaration ........................................... 13

LEGAL STANDARDS ...................................................................................... 15

ARGUMENT ................................................................................................... 17

    I.   The Second Reports Exceed the Scope of Proper Rebuttal, and the Sham Declaration Contradicts Plaintiff's Sworn Testimony.......................................................... 17

    II.  Admission of the Second Reports and Sham Declaration Would Result in Prejudice Against HP ................................................................................................. 22

    III. There Is No Opportunity for HP to Cure the Prejudice that Would Result from Admission of the Second Reports and Sham Declaration................................... 23

    IV. Admission of the Second Reports and Sham Declaration Would Disrupt an Orderly and Efficient Trial.............................................................................. 24

    V.  The Plaintiff's Improper Disclosures and Evasive and Incomplete Disclosures Were Not Inadvertent ........................................................................... 24

    VI. HP Is Entitled to Dismissal of the Plaintiff's Complaint, or, in the Alternative, An Award of Expenses and Attorneys' Fees Incurred for the Plaintiff's Failure to Disclose........... 25

CONCLUSION................................................................................................. 27

# TABLE OF AUTHORITIES

## Cases

*American Cash Card Corp. v. AT&T Corp.*, 2000 U.S. App. LEXIS 6318, at *15-16 (2d Cir. Apr. 6, 2000) .................................................................................................................... 26

*Brune v. Time Warner Entertainment Co.*, 2004 U.S. Dist. LEXIS 25144, 2004 WL 2884611 at *2 (S.D.N.Y. Dec. 14, 2004) (Wood, J.) ............................................................................ 17

*Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (Ackerman, J.) .......................... 17, 18

*Ebbert v. Nassau Co.*, 2008 U.S. Dist. LEXIS 74213 at *13-14 (E.D.N.Y. Sept. 26, 2008) (Tomlinson, J.) .................................................................................................................. 18, 24

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996) ........................................... 17

*In re Bear Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.*, 263 F. Supp. 3d 446, 452 (S.D.N.Y. 2017) (Sweet, J.) ....................................................................................................... 16

*In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) .................................... 17, 20

*In re Zimmer M/L Taper Hip Prosthesis*, No. 2859, 2021 U.S. Dist. LEXIS 72049, at *34-35 (S.D.N.Y. Apr. 14, 2021) (Crotty, J.) ................................................................................... 16

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988) .... 26

*Klipsch Group, Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 623 (2d Cir. 2018) ................... 26

*Lidle v. Cirrus Design Corp.*, 2009 U.S. Dist. LEXIS 118850, *14-15 (S.D.N.Y. Dec. 18, 2009) (Pitman, J.) ................................................................................................. 17, 18, 19, 20

*Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988) .............................................. 16

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ........................... 17

*Roberts v. Bennaceur*, 658 F. App'x 611, 614-614 (2d Cir. 2016) .............................................. 26

*Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986). ........................................................ 26

*Sentry Ins. A Mut. Co. v. Brand Mgt., Inc.*, 295 F.R.D. 1, 14 (E.D.N.Y. 2013) (Mann, J.) ......... 17

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) ........................... 25

*Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) ............ 16

**Rules**

Fed. R. Civ. P. 37(b)(2)(A) ................................................................................. 17

Fed. R. Civ. P. 37(c)(1) ..................................................................................... 16

Federal Rule of Civil Procedure 26(a)(2)(B)(i) .............................................. 15, 20, 23

Federal Rule of Civil Procedure 26(a)(2)(c)(ii) ................................................ 15

Federal Rule of Civil Procedure 26(e)(2)(B) ................................................... 15

## SUMMARY OF ARGUMENT

"Everyone is entitled to their own opinions, but not their own facts."
– Senator Daniel Patrick Moynihan

Unfortunately, this case involves a party that seemingly believes that they can change the facts to suit their case and, accordingly, has done so over and over. The plaintiff was deposed twice in this case, on July 7, 2023, and on July 9, 2024. Nevertheless, on January 3, 2025, after plaintiff's expert disclosures and HP's expert disclosures, the plaintiff submitted a declaration under penalty of perjury that contradicts her testimony about critical facts about her discovery of the fire. She then disclosed two new expert reports that attempt to fix problems in the plaintiff's case in chief that had been highlighted in defendants' expert reports. The new expert reports exceed the bounds of proper rebuttal and rely on the plaintiff's sham declaration. As such, they should be stricken.

This is part of a pattern of plaintiff changing facts to suit her case. The plaintiff alleged she bought her HP notebook new in 2010 and responded in discovery she never replaced its battery. Once her expert determined the aftermarket battery in the HP notebook was made in 2015, and the day before her deposition, she changed the facts–she actually bought the notebook refurbished in 2015. **After her deposition, it turned out that she knew all along she had purchased it in 2011**. She also responded in discovery she had bought a replacement battery for her Compaq laptop in July 2015 which was in the office closet at the time of the fire. After HP asked to inspect the Compaq and battery, she changed the facts again. She did not buy a battery for the Compaq in July 2015, and the Compaq and battery could not be produced because it was destroyed by fire. These were her new facts, even though her experts testified they looked for the Compaq and never found it, and plaintiff's counsel stated her experts did find it.

The Court should not condone the Plaintiffs' playing fast and loose with the facts in this

serious case – conduct made more egregious by her 11th hour sham declaration changing her sworn testimony incorporated into non-rebuttal reports of her experts. Accordingly, the Court should sanction the plaintiff and dismiss plaintiffs' complaint. To the extent the Court does not dismiss plaintiff's case, the Court should strike the additional newly disclosed expert reports and declaration, and HP should be awarded expenses and attorneys' fees.

**BACKGROUND OF CHANGING FACTS**

### I.      The Purchase of the HP Notebook

In the complaint. plaintiffs alleged that Carol Marcellin purchased the notebook "in or about 2010" and that she was not warned concerning "the dangers of purchasing after-market replacement batteries." Dkt. # 1 ¶¶ 10, 38. Plaintiff "assumed based on the available information that she had purchased the laptop new from Staples in approximately 2010 and had forgotten she had replaced the battery sometime later." Dkt. # 47-3 at 5.

Later, HP produced records that showed the HP notebook was registered for a warranty in 2011, and Plaintiff's responses stated she purchased it at that time. *See* Dkt. 27-1 at 9. Her responses also stated **she bought a replacement battery for her Compaq** notebook on July 22, 2015, but never replaced the battery in her HP notebook. *Id.* at 14.

However, there was a problem with plaintiff's story. The aftermarket battery found in the HP notebook has a manufacture date of 2015 on it. This is undisputed. Thus, it begged the question –how did a 2015 aftermarket battery get into plaintiff's HP notebook, if she bought the HP notebook in 2010 or 2011 (like she said in her complaint and answers to interrogatories) if she did not change the battery (which she denies doing). Of course, the truth is the only available option in our system of justice and, therefore, this would be a problem for her case.

Undeterred, late in the afternoon on the day before her deposition on March 16, 2023, plaintiff stated, through her attorney, that the HP notebook was actually purchased from Staples

used in 2015, not 2010–a change the plaintiff has never explained, but aligns perfectly with the date of manufacture of the aftermarket battery, providing a possible party other than Carol Marcellin to blame for its installation. Plaintiff's counsel stated via email, "In prepping my clients today we discovered an error in Plaintiffs Complaint". Dkt. # 25-10 at 6. Later Plaintiff argued she "could not recall exactly when she purchased the subject laptop" and so "*theorized* that she may have purchased a refurbished laptop sometime around 2014 or 2015." (emphasis added) Dkt. 47-3 at 5. To date, Plaintiff has offered no case law to support the use of "theory" to adduce facts in a case. Coincidentally, this factual "theory" seemingly solved a significant factual problem with her case. The 2015 aftermarket battery in the HP computer that caused the fire could now be attributed to the seller (Staples)! And, just like that, plaintiff's case was back on track.

Again, all this conflicted with the documentation that HP had previously produced showing that the HP notebook computer was registered for a warranty in March 2011. Dkt. # 25-10 at 3. Yet, plaintiff feigned disbelief of the warranty documentation and claimed there was no proof she was the warranty registrant. *Id.* at 2. Plaintiff's counsel argued that plaintiff "had no documents reflecting when the laptop was purchased" and further incredibly claimed HP was "aware that Plaintiff was not the person that had the original warranty, so you knew or should have known she didn't purchase it new." *See* Ex. A to Levites Decl. at 1; Dkt. # 25-10 at 3 Plaintiff even insisted she **never** believed the notebook was purchased in 2011. ("Q. Earlier on during this case, was it your belief that you purchased it in 2011? A: No. Q. At any time did you believe that you purchased it in 2011? A. No.").

Ultimately, the plaintiff moved to compel further discovery on the issue and to seek sanctions against HP.  During the pendency of this motion, HP undertook time-consuming and

costly searches of additional offline archival data sources for additional information concerning Carol Marcellin's product registration flow. On January 11, 2024, HP produced additional records establishing that the notebook was delivered to Staples on February 21, 2011, and registered for a warranty **by Carol Marcellin** on March 5, 2011. As plaintiff conceded, "[w]hile that motion was pending, Defendant HP produced additional records suggesting that Plaintiff Carol Marcellin registered the warranty for the laptop with HP sometime in 2011." Dkt. #47-3 at 5. Once the evidence established definitively that the plaintiff's computer was purchased new from Staples in 2011, not refurbished in 2015, HP was then forced to incur still further the additional cost of indemnifying Staples for its attorneys' fees and costs incurred during the period plaintiff insisted she bought the HP notebook refurbished from Staples.

Plaintiff's expected effort to dismiss her inaccurate statements as mere "mistakes" or "misunderstandings" is belied by further evidence that HP uncovered in this case. On or about January 29, 2024, HP obtained the underlying fire loss claim file from plaintiff's home insurer. Importantly, that insurer indicated it had previously provided the file to plaintiff. See Ex. B to Levites Decl. at 1 ("We've attached documents we previously provided to our insured."). Thus, it cannot be argued that plaintiff did not have these documents all along. The claim file was of significance because it "revealed that plaintiff stated in the property inventory she submitted to her insurer after the fire that she purchased the HP laptop from Staples in 2011." Dkt. #48-2, p. 5. **The property inventory in plaintiff's own hand was dated February 3, 2020, 10 days after the fire**. Thus, as of February 2020, plaintiff knew she had purchased the HP notebook in 2011. Further, given the fact that this document was in her or her counsel's possession it should have served as a "reminder" to her as to when she purchased it. Shockingly, this document was never produced by plaintiff in her discovery responses. But for defendants subpoenaing this file

from the homeowner insurer, defendants may not have ever uncovered this fact. Simply put, this information, was known and was available to plaintiff all along, but she never disclosed it and, worse yet, denied it and tried to change the facts shown by it.

## II.    The Replacement Battery in the HP Notebook

During discovery, the parties determined the battery in the plaintiff's notebook was not the battery that had been sold with the HP notebook. Dkt. # 50 at 2. Specifically, plaintiff's expert discovered that the battery was manufactured in 2015. See Ex. C to Levites Decl. at 6 ("Markings on the battery pack printed circuit board appear to indicate this battery pack was manufactured in 2015, which is more than four years after the subject laptop was manufactured."). This fact is not disputed.

However, the plaintiff responded in each of her four sets of verified discovery responses and testified in both of her depositions under oath that she never replaced the battery in her HP notebook or otherwise modified it. *See* Ex. D to Levites Decl. at 101-102 (First Deposition) ("Q. So when the incident occurred, the same battery was in it that came with it when you bought it, correct? A. Yes, definitely. Q. And it was never changed? A. No."); Ex. E to Levites Decl. at 8-9 (Second Deposition); Dkt. # 27-1 at 10 (First Interrogatory Responses); Dkt. # 25-15 at 10 (Second Interrogatory Responses), Dkt. # 39-3 at 15 (Third Interrogatory Responses); Ex. F to Levites Decl. at 13 (Fourth Interrogatory Responses).

This is the apparent motive for plaintiff to change her story on the eve of her deposition from purchasing the HP notebook **new** in **2011** to purchasing the HP notebook **refurbished** in **2015.** This would suggest that the retailer, and not plaintiff, could have installed the aftermarket battery. To date, the plaintiff has identified no reason for the sudden change in her story, other than her counsel's "misunderstanding."

Of course, HP subsequently proved that the plaintiff registered the HP notebook warranty

herself in March 2011, and called it the "2011 HP laptop" in her handwritten insurance inventory herself in February 2020.  To this day, neither plaintiff nor any of her experts have been able to explain how that replacement aftermarket battery in her HP notebook came to be purchased and installed in her computer. The brazenness of plaintiff's conduct is exemplified by her expert's position: that it is simply "irrelevant where or who or how that battery was in the laptop." *See* Ex. G to Levites Decl. at 197 ("To me, no offense, it was irrelevant where or who or how that battery was in that laptop. What is relevant is the relationship of that battery to the laptop. Q. Okay. Would you agree that me and Steve have a mystery then, as to how it got in there? MR. SCHWARZ: I think it's irrelevant, too."). This stands in stark contrast to the Court's (and defendants') view that this is a "crucial issue" in the case. Dkt. # 50 at 14.

### III.    The Replacement Battery in in the Non-Existent Compaq Laptop

On March 9, 2022, plaintiff stated in discovery responses that she purchased a replacement battery for her older Compaq laptop on July 22, 2015[1] from factoryoutletstore.com for $16.17. ECF 42-1 at 6.

On September 27, 2023, after HP moved to compel further discovery concerning that replacement battery, the plaintiff amended her responses to state that she did not "believe this specific purchase was for such a Compaq replacement battery pack based on the date of the purchase and the amount of the purchase." *See* Ex. H to Levites Decl. at 5. Of course, this explanation does not hold water: the date of the factoryoutletstore.com purchase and the amount

---

[1] Given the tangled and confusing web weaved by plaintiff it bears repeating that the aftermarket battery in the HP computer that plaintiff claims started the fire was itself manufactured in 2015. In other words, the alleged defective battery was made just months before plaintiff's online battery purchase in July of 2015 that she, suddenly, changed to *not an online battery p*urchase. No explanation for this change has ever been provided aside from generic "memory" or "mistake" explanations. However, the only reasonable inference is that plaintiff's discovery  answer that she purchased an aftermarket battery in 2015 for $16 coupled with the fact that the HP aftermarket battery had a manufacture date of earlier in 2015 created a significant problem for plaintiff's case since it would be  clear circumstantial evidence that despite her denials, plaintiff herself had replaced the battery in the HP notebook with the batter she admitted to purchasing in 2015.

of the factoryoutletstore.com purchase were known to the plaintiff at the time of her original responses over a year earlier. If the date and amount did not indicate a battery purchase by plaintiff, why did she identify as such in discovery in the first place?

In response to HP's request to inspect that replacement battery she admits purchasing (just not in 2015 from factoryoutletstore.com), the plaintiff replied, "this request refers to a battery pack purchased for the 1990s vintage Compaq computer, which was destroyed in the fire and is no longer in the possession of Plaintiffs so it cannot be produced." *See* Ex. I to Levites Decl.

Plaintiffs did not, and cannot, offer any explanation as to how this "vintage computer" completely disappeared in the fire.

On HP's cross motion to compel further discovery on this issue, the Court granted HP's motion and ordered plaintiff "to provide clear information on a crucial issue in this case: what aftermarket battery did Marcellin or someone else purchase for either the HP laptop that allegedly caused the fatal fire or for some other computer in the home?" Dkt. # 50 at 14. On May 14, 2024, in response to the Order, plaintiff amended her responses yet again, stating that she searched all her account records and had "not found any evidence reflecting a purchase of a replacement battery." *See* Ex. F to Levites Decl. at 11. Thus, the Plaintiff responded to this Court's Order to "provide clear information on the crucial issue in this case" by doing the opposite - not providing any information at all and, in fact, withdrawing previously provided information. Plaintiff was also ordered to appear for a second deposition on July 9, 2024, where she reiterated that she never replaced the battery in her HP notebook. *See* Ex. E to Levites Decl. at 8-9. However, at her deposition, Plaintiff now testified she *did* purchase a replacement battery for her Compaq at some point before the fire, which she had installed in the Compaq, which was

in her office closet at the time of the fire with that replacement battery installed. *Id.* at 9-10.

## IV.    The Compaq Laptop

The plaintiff testified repeatedly at her Court-ordered second deposition that her Compaq laptop (with a replacement battery she had installed) was in the office closet at the time of the fire. *See* Ex. D to Levites Decl. at 89; Ex. E to Levites Decl. at 9. When asked to produce it she responded that the Compaq and the replacement battery she installed "were destroyed by the fire and are no longer in possession of Plaintiffs so cannot be produced." Ex. I to Levites Decl.

At the time of its cross motion to compel, HP argued that these responses were at variance with the facts in the case, because neither party identified or examined any Compaq laptop remains during the joint scene and laboratory examinations, and the temperature required to incinerate the computer is inconsistent with a fire that did not incinerate other electronic components in the closet. Dkt. # 42-3 at 5. After HP's motion to compel was granted, plaintiff served amended discovery reiterating again that the Compaq "was stored in a closet where the fire occurred and was destroyed in that fire." *See* Ex. F to Levites Decl. at 17.

During expert depositions, *every* expert deposed who attended the joint scene examination testified that they did not identify or examine any Compaq computer or component thereof. Specifically, Plaintiff's electrical and fire and origin experts specifically testified that the plaintiff's testimony concerning the Compaq was inconsistent with their investigations, because neither of them ever found the Compaq or any part of it or the battery pack remains in the closet. *See* Ex. J to Levites Decl. at 130 ("There was no physical evidence of any computer or battery pack remains in the closet"); Ex. L to Levites Decl. at 219-220 ("There was nothing in the closet. There is no older laptop in the closet, or in the hallway debris that was collected for inspection.")

Notwithstanding the foregoing, during the deposition of HP's warnings expert, plaintiff's

counsel stated on the record for the first time that his fire expert <u>did find</u> the Compaq computer and even had photographs of it. *See* Ex. G to Levites Decl. at 215. Yet, at his deposition, Plaintiff's fire expert denied this and stated he did not find the Compaq and had no photographs of it. *See* Ex. J to Levites Decl. at 130-1.

To date, despite being ordered to provide information on the "crucial issue" of "what aftermarket battery did Marcellin or someone else purchase for either the HP laptop that allegedly caused the fatal fire or for some other computer in the home," plaintiff has produced no evidence concerning: [1] the replacement battery in her HP computer at the time of the fire that she insists she did not purchase or install; [2] the replacement battery she testified she installed in her Compaq which was in the office at the time of the fire, but was never located by anyone thereafter; or [3] the mysterious Compaq vintage computer which is, quite literally, the only thing to have been "completely destroyed" in the fire. Thus, on one hand, plaintiff has a HP computer (she bought in 2011) with an aftermarket battery (made in 2015) in it that she contends caused this fire but can offer no explanation on how *that* battery got in it or who put it in there. But, on the other hand, the Compaq computer *that she admits buying an aftermarket battery for and installing in it,* has disappeared and cannot be produced for inspection and examination (except that plaintiff counsel stated on the record that it was found by his expert and photographed).

## V.      The Untimely Second Expert Reports and Sham Declaration

The plaintiff disclosed expert reports including from his electrical and battery experts on October 16, 2024. *See* Exs. C, K to Levites Decl. Plaintiff's battery expert Steve Martin PhD opined that based on his review of Marcellin's testimony describing the scene of the fire, together with his inspection and review of the fire expert's analysis, that the fire in this case was caused by cell overcharge or overvoltage in the battery pack in the HP notebook resulting in

thermal runaway. *See* Ex. C to Levites Decl. at 23. Plaintiff's fire expert Jason Karasinski, IAAI-CFI, NAFI- CFEI opined that based on his investigation, including his review of the physical evidence and Marcellin's testimony, that the cause of the fire was a failure of the HP pavilion system including the battery pack, which resulted in the ejection of hot battery material that ignited combustibles in the closet during the incipient phase of the fire. *See* Ex. K to Levites Decl. at 47.

HP disclosed its expert reports on December 6, 2024. *See* Levites Decl. ¶¶ 14-15. HP's expert reports included the disclosure of fire expert Tim Myers and battery expert Quinn Horn, who opined based on Marcellin's testimony concerning the intensity of the fire she discovered and their review of the evidence that the HP notebook was not the cause of the fire. Instead, the HP notebook was a victim of a pre-existing fire that caused the battery pack to go into thermal runaway. *See id.*

Though the evidence upon which HP's experts relied was available to plaintiff's experts at the time of their reports, including plaintiff's testimony at two depositions, together with four sets of her discovery responses verified under oath, on January 3, 2025, plaintiff served two new expert reports from Martin and Karasinski, purportedly for rebuttal but in fact to correct oversights in the plaintiff's case in chief. *See* Exs. M, N to Levites Decl. As it turns out, on December 17, 2024, Karasinski submitted written questions for plaintiff inquiring into that which was covered by prior depositions, including "Did you enter the room?" *See* Ex. O to Levites Decl. The apparent purpose of these questions was to solicit the plaintiff to change her testimony.

Karasinski then relied in his second report on a **new, supplemental declaration** from the plaintiff created based on her responses to those questions, adducing for the first time,

*contradictory* evidence concerning the intensity of the fire when she discovered it on the night of January 24, 2020. *See* Ex. P to Levites Decl. Thus, again, when the facts are not good for her, Plaintiff simply changes the facts. Plaintiffs new sham declaration changes facts that were called out by defendants' experts to permit Karasinski to proffer a second report (so-called rebuttal report) to correct problem in plaintiffs' case. Specifically, whereas Marcellin's *testimony* demonstrated she observed the room when it was at full involvement of the fire, the sham declaration states otherwise.

With Karasinski relying on this apparently sham declaration for his second report, Martin in turn relied on Karasinski for his second report. Because the second expert reports exceed the scope of proper rebuttal, and because the plaintiff's declaration upon which they rely contradicts the plaintiff's prior deposition testimony, prejudicing HP, it hereby moves to strike the reports and declaration. Because the improper disclosures are part and parcel of a pattern of evasive discovery responses by plaintiff, HP hereby moves for sanctions.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 26(e)(2)(B) requires a party who has responded to an interrogatory or request for production to "supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

Federal Rule of Civil Procedure 26(a)(2)(B)(i) requires that an expert's initial report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Federal Rule of Civil Procedure 26(a)(2)(c)(ii), on the other hand, allows the admission of rebuttal testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." However, "[a] rebuttal expert report is not the

proper place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice. Nor is a rebuttal report an opportunity to correct oversights in the party's case in chief." *In re Zimmer M/L Taper Hip Prosthesis*, No. 2859, 2021 U.S. Dist. LEXIS 72049, at \*34-35 (S.D.N.Y. Apr. 14, 2021) (Crotty, J.) (quotations and citations omitted).

"If the challenged reports exceed the bounds of proper rebuttal, the court must decide whether to strike the reports. *See* Fed. R. Civ. P. 37(c)(1)." *Id.* Concerning preclusion of expert reports, in determining whether preclusion is appropriate, courts must consider: "(1) the reasons for the delay in providing the evidence; (2) the importance of the evidence precluded; (3) the prejudice to the opposing party from having to address the new evidence; and (4) the possibility of a continuance." *In re Bear Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.*, 263 F. Supp. 3d 446, 452 (S.D.N.Y. 2017) (Sweet, J.), *citing Softel, Inc. v. Dragon Med. and Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997); *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988). None of these factors are dispositive, and "each factor is to be balanced against the others in making the determination." *In re Bear Stearns, supra* at 452.

Rule 37(b) of the Federal Rules of Civil Procedure permits the following additional discovery sanctions:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order
except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). "In deciding which sanction to impose, courts consider: (1) the

willfulness of the acts of the noncompliant party or the reason for noncompliance; (2) the

efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the

noncompliant party had been warned of the consequences of noncompliance." *Sentry Ins. A*

*Mut. Co. v. Brand Mgt., Inc.*, 295 F.R.D. 1, 14 (E.D.N.Y. 2013) (Mann, J.) (citations omitted).

The "sham issue of fact" doctrine prohibits a party from defeating summary judgment

simply by submitting a declaration that contradicts the party's previous sworn testimony. *In re*

*Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (striking sham declaration); *see*

*also Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not

create an issue of fact by submitting an declaration in opposition to a summary judgment motion

that, by omission or addition, contradicts the affiant's previous deposition testimony."); *Perma*

*Research & Dev. Co. v. Singer Co*., 410 F.2d 572, 578 (2d Cir. 1969) ("[i]f a party who has been

examined at length on deposition could raise an issue of fact simply by submitting an declaration

contradicting his own prior testimony, this would greatly diminish the utility of summary

judgment as a procedure for screening out sham issues of fact.").

## ARGUMENT

**I.    The Second Reports Exceed the Scope of Proper Rebuttal, and the Sham**
**Declaration Contradicts Plaintiff's Sworn Testimony**

"Rebuttal evidence is confined to new matters adduced by the defense and not to repetition

of the plaintiff's theory of the case." *Lidle v. Cirrus Design Corp*., 2009 U.S. Dist. LEXIS 118850,

*14-15 (S.D.N.Y. Dec. 18, 2009) (Pitman, J.), *citing Brune v. Time Warner Entertainment Co*.,

2004 U.S. Dist. LEXIS 25144, 2004 WL 2884611 at *2 (S.D.N.Y. Dec. 14, 2004) (Wood,

J.); *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) (Ackerman, J.) ("Rebuttal evidence

is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party. It is not an opportunity for the correction of any oversights in the plaintiff's case in chief."); *Ebbert v. Nassau Co.*, 2008 U.S. Dist. LEXIS 74213 at *13-14 (E.D.N.Y. Sept. 26, 2008) (Tomlinson, J.) (striking rebuttal expert report containing material that should have been in initial report).

*First*, a rebuttal report is not an opportunity to correct oversights in the party's case in chief. *Lidie, supra* at * 4, *citing Crowley, supra* at 551. Carol Marcellin was the sole surviving occupant of the house on the night of the fire. As such, it was no secret that she potentially possessed information important to the fire investigation. As plaintiffs 'fire investigator Karasinski, had unfettered access to Carol from the day of the fire in 2020 to the time he proffered his first report in 2025. Indeed, Karasinski admits that he could have spoken to Ms. Marcellin anytime. *See* Ex. J to Levites Decl. at 19-22. Yet, Karasinski never spoke to plaintiff prior to preparing his first report. *Id.* at 22. Presumably, he found her two depositions given in this case sufficient to render his opinions. Notwithstanding his access, it was only after defendants proffered their fire investigator's expert report that Karasinski elected to "submit written questions" to Ms. Marcellin on December 17, 2024. These written questions asked basic fire investigation questions that he could have, and should have, asked her previously and included in plaintiffs' first expert report. Worse yet, Karasinski did not get answers directly from Ms. Marcellin but, instead, received "her" answers via the sham declaration prepared by her attorney. *Id.* at 24-5. Yet even a cursory review of the questions sent by Karasinski to plaintiffs' attorney show that they are not new, unforeseeable questions that plaintiffs could not have anticipated in their case in chief but are, instead, fundamental fire investigation questions. *See, e.g.* Ex. O to Levites Decl. ("Did you enter the room where the fire originated? If so how far in? Was anything

in the closet on fire at the time you entered the room the first time? Could you see the laptop in question from the doorway?").

To state the obvious, plaintiffs' fire investigator asking the sole surviving witness from a house fire "Did you enter the room where the fire originated?" is not the stuff of rebuttal. In fact, many, if not all, of these questions that plaintiffs' fire investigator asked to her attorney, apparently for the first time in January of 2025, were already asked of Carol at her two depositions under oath in this case. It is apparent that the only reason to re-ask these basic questions to Carol–in writing, through her attorney in 2025 — was not to garner answers to unforeseeable information for rebuttal but, instead, to invite plaintiff (through written communication to her attorney and not subject to any cross-examination) to provide "better" answers for her case. This is not "rebuttal," but another blatant attempt to bend the factual record to suit plaintiffs' case as opposed to going fairly where the evidence leads.

*Second*, Karasinski's second report "merely rehashes the conclusions reached in [his] opening report," while relying on the additional evidence not adduced by way of any of the plaintiff's prior deposition testimony or her sworn discovery responses. *See Lidle, supra* at *15. Specifically, Karasinski's first report opined that the fire was discovered by plaintiff in its incipient phase. *See* Ex. K to Levites Decl. at 45. Karasinski's second report, purportedly relying on plaintiff's sham declaration, reaches the same conclusion: Marcellin's declaration statements "support the fact that Ms. Marcellin discovered the incident failure during the incipient stage." *See* Ex. M to Levites Decl. at 8. Equally, Martin's first report conceded that if a lithium-ion cell is brought to the initiating temperature of 70º–90º C in an insulated environment, it will self-heat to the point of thermal runaway[2], but opined that the fire in this case was caused by cell overcharge

---

[2] This is an important point because it is supportive of HP's position that the battery pack was the victim of an on-going fire and not the cause of the fire.

or over-voltage resulting in thermal runaway. *See* Ex. C to Levites Decl. at 11, 22. Martin's second report, relying on Karasinski's second report, reaches the same conclusion: a thermal layer "could not have provided a sufficient heat source to independently provoke thermal runaway reactions" and "the evidence is entirely consistent with cell-level thermal runaway occurring internally from an overcharge, over voltage and/or overtemperature condition." *See* Ex. N to Levites Decl. at 4, 16.

There is no reason that Karasinski and Martin could not have obtained whatever information from Marcellin before their initial reports were drafted, indeed, they both conceded this fact. Ex. G to Levites Decl. at 79-80; Ex. J to Levites Decl. at 19-22. Yet, they only did so after the problems with their opinions were clearly laid bare, "and plaintiffs' gamesmanship in this regard is precisely what the Rules were intended to prevent." *Lidle, supra* at *17, citing Fed. R. Civ. P. 26(a)(2)(B) ("The [expert's] report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness in forming them."). Accordingly, each of Martin's and Karasinski's second reports "does not qualify as a reply or rebuttal report" and should be stricken. *Id.*

*Third*, the sham declaration upon which Karasinski and in turn Martin relied contains contradictions that are "unequivocal and inescapable," "unexplained" and "central to the claim at issue." *In re Fosamax Prods. Liab. Litig., supra* at 194. First, the plaintiff changed her testimony concerning the sequence of events around her discovery of the fire. Comparing plaintiff's deposition testimony, cited by Karasinski in his first report, with plaintiff's sham declaration, cited in Karasinski's second report, the changes are apparent. *Compare* Ex. D to Levites Decl. at 123-5; Ex. P to Levites Decl. As an initial matter, in her deposition testimony, plaintiff testified that she first thought the furnace might have caused the fire, but on exiting her bedroom "saw a glow

of the of the fire *moving from that room* where the laptop was." *See* Ex. D to Levites Decl. at 124. Then, in her sham declaration, plaintiff stated that after exiting her bedroom she decided to look at the furnace as the possible source of the fire, opening the door to the furnace–purporting to adduce apparently contradictory and previously unknown facts in the case to assist Karasinski in eliminating the oven furnace as a cause of the fire. *See* Ex. P to Levites Decl. ¶ 2; Ex. M to Levites Decl. at 5.

Then, in her deposition the plaintiff testified that when she stepped to go down the hall to the office, she saw "the glow of the fire," then "immediately backtracked" to the kitchen for the fire extinguisher. Ex. D to Levites Decl. at 124. However, in her sham declaration, she stated, for the first time, that she **did not** see a glow of fire from the office which made her immediately backtrack for the fire extinguisher. Instead, she reached the doorway of the office, where she saw "projectiles shooting upward out of the laptop computer" with the wall blackening and the armoire melting, and only at that point did she go back for a fire extinguisher. Ex. P to Levites Decl. ¶ 3. Thus, plaintiff offers additional contradictory facts to bolster the hypothesis that the fire was in its incipient phase when she discovered it and, as such, the HP computer and only the HP computer could have caused the fire.

The internal inconsistencies in the plaintiff's declaration and with her own evidence in this case make plain it is a sham. Specifically, in her declaration, the plaintiff claims that on both her initial arrival at the office doorway and when she returned with the fire extinguisher, she could see into the office closet and was able to observe the development of the fire there. Ex. P to Levites Decl. ¶¶ 4, 6 ("I again observed that there was no smoke, flames or heat coming from the closet."). However, in the same breath plaintiff states she could not enter the office on both occasions due to the fire. Ex. P to Levites Decl. ¶¶ 5-6 ("I did not enter the room at that point because of the

flying projectiles"; "I did not advance any farther into the room than the hallway entrance."). Either way, as plaintiffs' own expert, Karasinski, admitted **it would not be possible to see into the closet from the hallway**. Ex. K to Levites Decl. at 285 ("You can't see the interior of the closet unless you walk in that two or three feet"). Plaintiff thus offers more contradictory testimony concerning her discovery of the fire.

The Court should not permit the plaintiff to adduce contradictory facts by way of sham declaration after the close of fact discovery and after the disclosure of defendants' experts' reports merely to spin the facts to bolster her experts' improper rebuttal and manufacture issues of fact. That the plaintiff's declaration is a sham is borne out by the written questions provided by Karasinski to plaintiff for the creation of the affidavit: each of the questions was "prepared based on the reports authored by the opposing side" and is plainly calculated to adduce better factual evidence for plaintiffs including "Did you enter the room where the fire originated?; If so how far in? Was anything in the closet on fire at the time you entered the room the first time? Could you see the laptop in question from the doorway?" Ex. O to Levites Decl. That is, the plaintiff plainly testified at her deposition she did not enter the room where the fire originated: she saw the glow of flames from that room immediately when she entered the hallway and retreated for the fire extinguisher. Ex D. to Levites Decl. at 124-5. On her return, she could not enter the room, because the fire had spread to the ceiling, walls, and floor. *Id.* at 202. Yet, despite this plain testimony, Karasinski inquires whether she entered the office, how far she entered, and what she observed concerning the HP laptop and the closet at that time in a bald attempt to adduce contradictory testimony in the form of the sham declaration. The motion should be granted, and the second reports and the declaration should be stricken.

## II.    Admission of the Second Reports and Sham Declaration Would Result in Prejudice Against HP

The prejudice to HP in the Plaintiff's improper expert disclosures and sham declaration is significant. Fact discovery is now closed. The plaintiff was deposed, and HP's 30(b)(6) and fact witnesses have been deposed. All the parties' experts have been disclosed and deposed. Prior to the date of her sham declaration and second expert reports, the plaintiff could have supplemented her discovery responses, which she otherwise amended four times, to state that contrary to her prior sworn answers, the most recent of which was served May 21, 2024, she did **not** observe flames coming out of the HP laptop. In this case, HP would have developed the factual record differently. Specifically, HP would have queried the Plaintiff at greater length concerning the exact timing and sequence of her discovery of the fire–and would have done so at the Court-ordered second deposition of the plaintiff–to foreclose the possibility of this later contradictory declaration.

HP would also have proceeded with expert discovery differently. HP's experts could have addressed the points that the plaintiff's experts improperly brought forward in their second reports and that could have and should have raised in the first reports. There is no way to know how HP's expert opinions would have developed had the plaintiff timely supplemented her discovery responses or brought forward all the opinions upon which her experts would rely in their initial reports as required under Rule 26(a)(2)(B)(i). Simply put, the Plaintiff did not pursue any of this evidence until HP served its expert disclosures. The motion to strike should be granted.

### III.    There Is No Opportunity for HP to Cure the Prejudice that Would Result from Admission of the Second Reports and Sham Declaration

Here, with all discovery completed and the dispositive motion deadline at hand, a modification of the scheduling order to allow HP to conduct additional factual and expert discovery will not provide an opportunity to cure the prejudice. HP has conducted multiple days of depositions and forensic examinations in respect of the plaintiff's previously articulated theories of fire causation. HP was required to litigate the scope of further fact depositions after the

deposition of its corporate designee. Dkt. # 43. HP has expended significant time and costs in respect of this discovery–as has the Court–all of which must be reviewed, reassessed and revisited in view of the Plaintiff's improper expert disclosures.

## IV. Admission of the Second Reports and Sham Declaration Would Disrupt an Orderly and Efficient Trial

Further, such a modification of the scheduling order, which HP would require to conduct additional factual and expert discovery, would necessarily delay both dispositive motions and trial. "While there may be no direct disruption of trial, this prejudice cannot be cured by further discovery at this juncture." *Ebbert, supra* at *42. That is, discovery has closed some time ago and HP has briefed summary judgment. *See id.* Further, while the Court could so modify the scheduling order to permit HP needed additional discovery, this would in effect reward the plaintiff's failure to disclose and delay resolution of the case. The motion should be granted.

## V. The Plaintiff's Improper Disclosures and Evasive and Incomplete Disclosures Were Not Inadvertent

The plaintiffs' improper submission of additional expert reports and declarations containing new material was "not inadvertent." *Ebbert, supra* at *42. And plaintiff's conduct must be viewed within the context of a persistent pattern of evasive and incomplete disclosures.

Plaintiff claimed the HP notebook was purchased in 2015, despite documentation showing it was registered for a warranty in 2011, and insisted that HP "knew or should have known she didn't purchase it new." Dkt. # 25-9 at 3. Plaintiff sought the Court's intervention and sanctions against HP, claiming "We have just figured that out and could have known it sooner if either defendant had actually responded to our discovery demands in good faith." *Id.* HP then expended significant time and resources to determine conclusively that Carol Marcellin registered the warranty for the HP notebook herself in March 2011. After doing so, HP obtained the plaintiff's insurance claim file, which was in her possession and never produced by plaintiffs, showing that

**she knew all along the computer was purchased in 2011**, despite her representations to counsel and the Court.

Plaintiff first claimed she bought a replacement battery for her Compaq on July 22, 2015, then decided that purchase was for a different, unrelated computer peripheral, although she did purchase and install a replacement battery in her Compaq at some earlier date. She also testified repeatedly that the replacement battery she bought was for her older Compaq laptop, not her HP notebook. Either way, neither she nor anyone else has identified any evidence that the Compaq computer or replacement battery exists, although everyone, including her experts, expected to find it in the closet where she left it at the time of the fire.

Plaintiff also testified repeatedly that, although all parties agree the battery in her HP notebook was a replacement battery, she never bought or installed a replacement battery for her HP notebook. To date, neither she nor anyone else has come forward with a competent explanation of how the replacement battery that plaintiff alleges caused this fire came to be installed in her computer. Her improper expert disclosures and evasive and incomplete disclosures in this case have not been inadvertent. Plaintiff never has provided "clear information on a crucial issue in this case: what aftermarket battery did Marcellin or someone else purchase for either the HP laptop that allegedly caused the fatal fire or for some other computer in the home?" Dkt. # 50 at 14. The motion to strike the improper expert disclosures and sham declaration and for sanctions in favor of HP should be granted.

## VI.   HP Is Entitled to Dismissal of the Plaintiff's Complaint, or, in the Alternative, An Award of Expenses and Attorneys' Fees Incurred for the Plaintiff's Failure to Disclose

While the sanction of dismissal is considered a "drastic remedy" imposed only in "extreme circumstances," *see Shcherbakovskiy v. Da Capo Al Fine, Ltd*., 490 F.3d 130, 140 (2d Cir. 2007), dismissal is warranted where a party engages in willful or bad faith conduct or where a party

refuses to obey court orders. *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc*., 845 F.2d 1172, 1176 (2d Cir. 1988), *citing Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986). Indeed, courts in this Circuit have granted significant monetary sanctions and the sanction of dismissal and default judgment for willful discovery violations. *See Roberts v. Bennaceur*, 658 F. App'x 611, 614-614 (2d Cir. 2016) (affirming default judgment in the amount of $8,136,222.60 as a discovery sanction where, over a two-year period, the defendants "willfully refused to comply with numerous court orders regarding financial discovery and disclosure of assets" and demonstrated bad faith by offering "misrepresentations" and "inadequate explanations"); *Klipsch Group, Inc. v. ePRO E-Commerce Ltd*., 880 F.3d 620, 623 (2d Cir. 2018) ( "no error" where district court awarded $2.7 million in sanctions where defendant "engaged in persistent discovery misconduct" including failing to timely disclose responsive documents, restricting a discovery vendor's access to electronic data, and failing to impose adequate litigation hold even after the court directed it to do so, resulting in the loss of data and documents.); *John B. Hull, Inc*., *supra* at 1175-76 (affirming sanction of dismissal where party failed to comply with discovery orders); *American Cash Card Corp. v. AT&T Corp*., 2000 U.S. App. LEXIS 6318, at *15-16 (2d Cir. Apr. 6, 2000) (dismissal affirmed where plaintiffs violated discovery orders).

Here, every factor in the case militates in favor of dismissal of the plaintiff's complaint. First, the plaintiff has refused to comply with the Order of the Court compelling her to provide "clear information" concerning the "crucial" issue of the replacement battery in her HP notebook, which warned her of the consequences of noncompliance. Dkt. # 50 at 14. Second, her behavior is apparently intentional, and the reason for her noncompliance is to change the facts that do not suit her. Third, lesser sanctions are unlikely to deter such a plaintiff, who has demonstrated this noncompliance since the outset of this litigation–nearly 4 years. An order of dismissal should

accordingly enter. *See Sentry, supra* at 14.

Federal Rule of Civil Procedure 37(b)(2)(C) provides that the instead of or in addition to the orders above, the Court must order the disobedient party, their counsel, or both to pay the reasonable expenses including attorneys' fees caused by the disobedient party's failure, unless it is substantially justified, or other circumstances make such an award unjust. As an alternative remedy to dismissal, HP and Staples seek the costs of [1] HP's indemnification of Staples for attorney's fees and costs by Staples incurred during the period in which plaintiff wrongly insisted she purchased her notebook refurbished from Staples in 2015, instead of new in 2011 as she knew all along; [2] HP and Staples' oppositions to plaintiff's now apparently frivolous motion to compel information known to her all along, together with the cost of bringing a cross-motion to compel her discovery responses; [3] HP's extensive and additional efforts to respond to further prove to plaintiff that she registered her warranty in 2011 and purchased her computer then, even though she knew all along she had done so.

The plaintiff's failures are not substantially justified here: whether it was the failure to supplement her discovery responses or the failure to timely disclose her expert's affirmative opinions, such failures cannot be justified by "confusion" as she has repeatedly indicated in this case when it appears to be convenient to do so. No other circumstances make such an award unjust. Thus, the Court should award HP the reasonable fees of bringing this motion and addressing the plaintiff's failures.

## CONCLUSION

The Plaintiff's sham declaration and second set of expert reports are an obvious tactic, and of a piece with the plaintiff's failures to disclose in this case dating back to its inception. The Court should strike the declaration and reports and enter sanctions for plaintiff's failures to comply with the rules of discovery. The motion should be granted.

Respectfully Submitted,
HP INC.,
STAPLES, INC.,
By their attorneys,

*Ben Levites*

Respectfully submitted,
Benjamin H. Levites, 5557046
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
blevites@coughlinbetke.com

Jaclyn S. Wanemaker
Smith Sovik Kendrick & Sugnet P.C.
6245 Sheridan Drive
Suite 218
Williamsville, NY 14221
315-474-2911
Fax: 315-474-6015
Email: jwanemaker@smithsovik.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to all counsel of record on Monday, May 12, 2025.

*Ben Levites*

Benjamin Levites