Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------X
CAROL S. MARCELLIN, individually, and as
Co-Administrator of the Estate of Charles
E. Hollowell, deceased, and JESSICA
HOLLOWELL-McKAY, as Co-Administrator of the
Estate of Charles E. Hollowell, deceased,

                            PLAINTIFFS,

        -against-     Case No.:
                 1:21-cv-00704-JLS

HP, INC., and STAPLES, INC.,

                            DEFENDANTS.
-----------------------------------------X

                    DATE:  March 27, 2025
                    TIME:  10:08 A.M.


        VIRTUAL DEPOSITION of the
Non-Party, JASON T. KARASINSKI, taken by
the Defendant, pursuant to a Court Order
and to the Federal Rules of Civil
Procedure, before Miriam Schweke, a Notary
Public of the State of New York.



```
 1
 2    A P P E A R A N C E S:
 3
 4    FARACI LANGE, LLP
          Attorneys for the Plaintiffs
 5        CAROL S. MARCELLIN, individually, and as
          Co-Administrator of the Estate of Charles
 6        E. Hollowell, deceased, and JESSICA
          HOLLOWELL-McKAY, as Co-Administrator of
 7        the Estate of Charles E. Hollowell,
          deceased,
 8        28 East Main Street, Suite 1100
          Rochester, New York 14614
 9        BY:  STEPHEN SCHWARZ, ESQ.
10
      COUGHLIN & BETKE
11        Attorneys for the Defendants
          HP, INC., and STAPLES, INC.
12        175 Federal Street, Suite 1450
          Boston, Massachusetts 02110
13        BY:  BENJAMIN LEVITES, ESQ.
14
      ALSO PRESENT:
15    Jaclyn Wanemaker
                    *         *         *
16
17
18
19
20
21
22
23
24
25
```



1

2    F E D E R A L   S T I P U L A T I O N S

3

4

5    IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20   IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *     *     *     *

25



```
 1                    J. KARASINSKI
 2    J A S O N   T.   K A R A S I N S K I,
 3    called as a witness, having been first duly
 4    sworn by a Notary Public of the State of
 5    New York, was examined and testified as
 6    follows:
 7    EXAMINATION BY
 8    MR. LEVITES:
 9         Q.    Please state your name for the
10    record.
11         A.    Jason T. Karasinski.
12         Q.    What is your address?
13         A.    7317 State Route 4, Sodus
14    Point, New York 14555.
15         Q.    Mr. Karasinski, we briefly met
16    off the record, my name is Ben Levites, I
17    represent the Defendant Hp and Staples in
18    this case.  Also present we have the court
19    reporter.  Ms. Schweke and, of course,
20    Attorney Schwarz, I'll be asking you
21    questions of a lawsuit filed by Carol
22    Marcellin and Jessica Hollowell-McKay
23    concerning a fire on January 24, 2020, at
24    the residence of Carol Marcellin and
25    Charles Hollowell and Attorney Schwarz may
```



```
 1                  J. KARASINSKI
 2   as well.  So my first question for you
 3   today, sir, is do you understand we're here
 4   today concerning Ms. Marcellin's lawsuit in
 5   respect to the fire at her residence on
 6   January 24, 2020?
 7        A.    Yes.
 8             MR. LEVITES:  Just
 9        housekeeping, Steve, do you agree to
10        the ordinary stipulations?
11             MR. SCHWARZ:  Yes.
12             MR. LEVITES:  And the Zoom
13        stipulations, we're all okay with
14        this proceeding remotely and the oath
15        being sworn remotely?
16             MR. SCHWARZ:  Yes.
17             THE WITNESS:  As far as
18        stipulations, I want to read and
19        sign, so I don't know if that's your
20        northerly customary stipulations.
21             MR. LEVITES:  That was my next
22        question.
23             THE WITNESS:  Okay.
24             MR. LEVITES:  So please make a
25        note of that, Ms. Schweke.
```



Page 6

1                    J. KARASINSKI

2        Q.    Okay, so you have familiarity

3    with the deposition process?

4        A.    Yes, sir.

5        Q.    So how many times have you been

6    deposed previously, if you know?

7        A.    A lot.  I don't remember how

8    many times.

9        Q.    More than 50?

10        A.    Not more than 50.

11        Q.    More than --

12        A.    Probably closer -- more than

13    20, yeah.

14        Q.    Okay.  Yeah, so somewhere

15    between 20 and 50?

16        A.    Yeah, that's fine.

17        Q.    Okay.  So I'll go through these

18    as quickly as we can because you've heard

19    them at least 20 times.  The goal today is

20    to produce a transcript that reads question

21    and answer, question and answer and so on.

22    Is that okay?

23        A.    Yes.

24        Q.    So in a normal conversation I

25    appreciate when you anticipate the rest of



1                    J. KARASINSKI

2    my question and normally I would appreciate

3    that, but because we need that transcript

4    to read question and answer, you'll need to

5    allow me to finish asking the question

6    before giving your answer.  So if I hold my

7    hand up while asking a question, I'm not

8    trying to be rude, I'm just letting you

9    know I'm still finishing asking the

10   question.  Is that okay?

11        A.    Yes.

12        Q.    Equally, if you're giving an

13   answer, I'll make every effort not to

14   interrupt your answer and begin another

15   question before you finish, and if I do,

16   please let me know that you weren't

17   finished.  Is that okay?

18        A.    I will.

19        Q.    Then this is extra important

20   because we're on Zoom, do you agree not to

21   use your cellphone or any electronic

22   devices during the deposition when we're

23   not on a break?

24        A.    Correct.

25        Q.    Do you have any notes or



Page 8

1                    J. KARASINSKI

2    documents with you right now?

3         A.    I have my report and my

4    rebuttal report --

5         Q.    Okay.

6         A.    -- and the local Fire Marshal's

7    report.

8         Q.    Do you agree not to refer to

9    any notes or documents other than those we

10   review together while we're, you know, in

11   the deposition?

12        A.    Correct, yes.

13        Q.    Is there anyone else present in

14   the room with you right now?

15        A.    No, sir.

16        Q.    You've been doing a great job

17   so far but if you continue doing verbal

18   answers because the reporter won't capture

19   that; is that all right?

20        A.    Yes.

21        Q.    I may ask you a question that's

22   confusing, you can always tell me that you

23   didn't understand it and you'd like me to

24   repeat it or rephrase it, but if you do not

25   tell me that you didn't understand it and



```
 1                    J. KARASINSKI
 2  then you proceed to answer it, it will be
 3  assumed that you did understand the
 4  question.  Is that okay?
 5       A.    Yes.
 6       Q.    We can take a break at any time
 7  or for any reason, my only request is that
 8  if I just ask you a question that you
 9  answer it before we do so.  Is that okay?
10       A.    Yes.
11       Q.    Without telling me the
12  substance of any conversations you might
13  have had with Attorney Schwarz or anyone
14  from his team, what did you to prepare for
15  today's deposition?
16       A.    I reviewed my report, I
17  reviewed my rebuttal and I reviewed the
18  local Fire Marshal's report.
19       Q.    Those are the three documents
20  you have with you right now?
21       A.    Yes, sir.
22       Q.    Did you meet with anyone?
23       A.    When?  I guess, could you be
24  more specific?
25       Q.    In preparation for the
```



Page 10

                    J. KARASINSKI
1
2    deposition, I apologize.
3         A.    No, I have not met with
4    anybody.
5         Q.    Have you spoken with this case
6    about anyone other than Attorney Schwarz
7    and your colleague, Mr. Litzinger?
8              (Whereupon, an off-the-record
9         discussion was held.)
10        A.    I guess we have to repeat the
11   question, there's a lot going on in between
12   there.
13        Q.    Yes, I apologize.  So my
14   question was, have you spoken with this
15   case about anyone other than Attorney
16   Schwarz and Mr. Litzinger?
17        A.    In totally, like, since the
18   date of loss?
19        Q.    Yes.
20        A.    Talked to the local fire
21   marshals, I've talked to the experts that
22   were on site, obviously I have talked to
23   the experts that Hp sent to my facility for
24   the lab exam.  So, yes.  I guess the
25   answer's yes.



```
 1                    J. KARASINSKI
 2        Q.     Is there anyone else other than
 3   the local fire department, the experts on
 4   site at the scene examination and those at
 5   the facility for the lab examination?
 6        A.     Not that I can recall at this
 7   point, no.
 8        Q.     I guess taking each of those
 9   groups in turn, do you remember what you
10   spoke to with the local fire department
11   about?
12        A.     The local fire department was
13   on site for our joint scene exam.
14        Q.     Do you remember what they told
15   you and you told them?
16        A.     I believe the investigator's
17   name was Jeff Luckey and he went over his
18   investigation and statements provided by
19   the living occupant, Carol.
20        Q.     Then setting aside the experts
21   from Hp, were there any other experts other
22   than Mr. Litzinger and the Hp experts with
23   whom you spoken about this case?
24        A.     On site I think you should have
25   a sign-in sheet but I believe there are
```



Page 12

                    J. KARASINSKI

1
2    people there from FFA as well as NEFCO, the
3    local law enforcement was there, the local
4    fire marshal was there, Brent was there for
5    your side at the scene exam.
6         Q.    Do you remember what, if any,
7    conversations you had with the
8    investigators from FFA and NEFCO?
9         A.    No, we processed the site,
10   everyone agreed on the room of origin,
11   everyone agreed that the ignition source
12   was something to do with a laptop and we
13   collected all that evidence and we left.
14        Q.    Okay, did you take any
15   medication today, sir?
16        A.    No.
17        Q.    Are you able it sit through
18   this deposition and answer questions?
19        A.    Yes.
20        Q.    I'll make every effort to
21   finish before the end of day but we have
22   lot of your report to get to, so I'll be as
23   quick as I can.
24        A.    No worries.  It there was an
25   early morning for me, I'm good.



Page 13

1                    J. KARASINSKI

2        Q.    I appreciate that.  Yeah, wow,

3    you're on a time difference so thank you

4    for accommodating us.

5              Can you reviews documents if I

6    display them on the screen here?

7        A.    Yes.

8        Q.    Are you familiar with Hp as a

9    company?

10       A.    I'm familiar that they make

11   laptops, other than that, not really, no.

12       Q.    Okay.  Have you ever had any Hp

13   products yourself?

14       A.    Of course, yes.

15       Q.    Laptops or something else?

16       A.    Laptops.

17       Q.    When was the last time you had

18   an Hp product, if you remember?

19       A.    We go back and forth between Hp

20   and Dell for laptops for the company but

21   I'm not really sure, I don't remember the

22   last time I had an actual Hp laptop.

23       Q.    You're using a Dell now, fair

24   to say?

25       A.    I'm using a Dell now, correct.



                    J. KARASINSKI
1
2       Q.    You would agree that part of
3  the scientific method in a case like this
4  is to test the adequacy and accuracy of
5  your hypotheses?
6       A.    Yes.
7       Q.    Would you agree that the use of
8  an appliance should be well understood
9  before it was identified as the cause of a
10 fire?
11      A.    Can you repeat that question,
12 I'm sorry?
13      Q.    Yes.  Would you agree that the
14 use and operation of an appliance should be
15 well understood before it's identified as
16 the cause of a fire?
17      A.    I would agree in part.
18 Sometimes when we look at items we may not
19 know what they are or have never used that
20 item before but after we do our inspection,
21 do our lab exam and forensically, you know,
22 examine the evidence as well as with the
23 X-rays or CTs, that I would have a pretty
24 good understanding on how that piece of
25 equipment operates.



1                    J. KARASINSKI

2        Q.    So you may not have the

3    understanding and the use in operation

4    and -- of an appliance at the outset of

5    your investigation but you would expect to

6    by the conclusion of your investigation?

7        A.    With that and following the

8    scientific method, so we're typically

9    always in the data collection phase,

10   correct, until we develop our hypothesis,

11   test our hypothesis and then select a final

12   hypothesis, yes.

13       Q.    Would you agree that the degree

14   of damage to an appliance is not an

15   adequate indication of origin?

16       A.    Well, that determines on a

17   couple different factors but that's one

18   factor, but, you know, if you have a fire

19   that originates in appliance, depending on

20   what those secondary field packages are,

21   adjacent to that or near that can change

22   the fire dynamics of that situation.  But

23   in part, I would agree with that, yes.

24       Q.    And that's because an appliance

25   can be damaged in a fire?  In other



Page 16

                    J. KARASINSKI
1
2   words --
3        A.    Yes.
4        Q.    -- damaged instead of causing
5   the fire?
6        A.    Yes, in some instances, of
7   course.
8        Q.    Okay.  Would you say it's more
9   so in instances where an appliance has a
10  field load in it, like a battery pack in a
11  notebook computer?
12       A.    I'm not sure I understand your
13  question, can you rephrase it?
14       Q.    Sure.  So would you agree that
15  in some instances an appliance can be
16  damaged as a result of a fire as opposed to
17  causing the fire, right?
18       A.    Yes.  My understanding of the
19  question you're asking if an appliance can
20  be damaged from fire attack verses cause,
21  and the answer is yes, yes.
22       Q.    So my follow-up question to
23  that is, is it more likely that an
24  appliance -- I'm sorry.  Now I'm seeing how
25  I unartfully phrased.



J. KARASINSKI

```
 1
 2              And it's consistent with that
 3    fact that some appliances have fuel in them
 4    and some don't, right?
 5         A.    I guess you would need to
 6    define fuel, I'm not sure what you're
 7    asking.
 8         Q.    Well, a notebook battery pack
 9    has fuel for a fire, right?
10         A.    Yes.
11         Q.    Ms. Marcellin was deposed on
12    July 7, '23 and July 9, '24, correct?
13         A.    I believe so, yes.
14         Q.    Do you remember when you were
15    retained in this case?
16         A.    I'm not sure the exact date
17    that we were contacted, obviously it was
18    post-fire, and it was after the insurance
19    company did initial inspection, I believe
20    NEFCO, because that was the signage on the
21    laptop.  At the time of my inspection I'm
22    not sure how long after their inspection
23    when we were retained.
24         Q.    But you were retained shortly
25    after the fire and certainly prior to your
```



1                    J. KARASINSKI

2    initial scene examination, right?

3          A.    Yes.

4          Q.    Did you have any questions that

5    came to mind that weren't answered Ms.

6    Marcillin's depositions that you wanted to

7    ask her?

8          A.    Yes.

9          Q.    What questions were those?

10         A.    Those questions were derived

11   after receiving the reports and my review

12   from Exponent that brought up items that

13   were not asked during those depositions and

14   I wanted to get clarification to those

15   items for a potential rebuttal report.

16         Q.    So did you have any questions

17   that came to mind that weren't answered by

18   her depositions prior to your initial

19   report?

20         A.    No, not really, actually,

21   because of the conversations that were had

22   on site with the additional experts,

23   everyone was in the agreement on the room

24   of origin, everyone was in agreement what

25   evidence was collected and none of the



Page 19

                    J. KARASINSKI
 1
 2   parties asked for any additional evidence
 3   to be collected at the site.
 4        Q.    So it's because of your
 5   conversations with people at the site
 6   during your initial exam that you had no
 7   additional questions for Ms. Marcellin in
 8   respect of her depositions that you wanted
 9   to ask her before preparing your October
10   14, '24 report?
11        A.    Correct.  I didn't have any
12   additional questions until receiving the --
13   again the Exponent reports that brought up
14   issues that I did not address because
15   everyone was in agreement of the area of
16   origin on site so I wanted to get clarity
17   for those questions from Carol in
18   preparation of my rebuttal report.
19        Q.    Did you, yourself, ever
20   interview Ms. Marcellin?
21        A.    No, I did not interview her
22   personally, based on the evidence and the
23   description from the locals, as well as
24   reviewing the report, I felt that I had
25   enough information at that time but because



Page 20

1                    J. KARASINSKI

2    of some of the instances that Exponent

3    addressed in their report, I wanted to get

4    clarification from Carol on some of those

5    items.

6        Q.    So -- but you didn't interview

7    her in respect to creating the supplemental

8    declaration that you're referring to,

9    right?

10        A.    I have not interviewed her,

11    I -- I try to respect the attorney/client

12    privilege and I would send in my questions

13    or call and ask them to -- for follow-up

14    questions with her, based on my review and

15    following the scientific method and still

16    continuing to collect that data to follow

17    that scientific method.

18        Q.    So is it your ordinary practice

19    not to interview someone like Ms. Marcillin

20    and to forward your inquiries to their

21    counsel in a case such as this?

22        A.    Typically when it involves a

23    fatality if they're represented by an

24    attorney I will normally just go through

25    the attorney versus interviewing them just



1                    J. KARASINSKI
2    because of emotional state and what they
3    went through.  Typically the attorney that
4    they have has a rapport with them and I
5    would go through them to ask those
6    questions of their client or their insured,
7    depending on whom I'm there representing.
8        Q.    Does your answer change if it's
9    a case different from this one that doesn't
10   involve a fatality?
11       A.    Can you repeat that?  I didn't
12   understand that question.
13       Q.    Yes.  So you said that you
14   normally don't conduct interviews in a case
15   like this that involves a fatality because
16   of the emotional state; is that correct?
17       A.    That's correct and also if
18   they're represented by an attorney, then I
19   would go through the attorney.  But if
20   they're not represented, then I would
21   interview them, yes.
22       Q.    Okay.  If it was someone who is
23   represented by an attorney but it wasn't a
24   death case, same answer?
25       A.    Same answer, yes.



Page 22

                    J. KARASINSKI

1

2      Q.    So as long as the person's

3  represented by counsel you're not going to

4  interview?

5      A.    Unless the attorney allows it

6  or recommends it.  I mean, I've always just

7  gone through the attorney to get my

8  questions answered.

9      Q.    Do you know if Attorney Schwarz

10  allowed it or recommended it in this case?

11      A.    I've never asked to interview

12  Carol personally.

13      Q.    You work for Ms. Marcellin,

14  that's correct?

15      A.    I work for Faraci Lange, that's

16  who retained me.

17      Q.    As you sit here today are there

18  any questions you would have liked to have

19  ask Ms. Marcellin if you were given the

20  chance?

21      A.    Not at this point, maybe during

22  the deposition I may have questions, but at

23  this point, no, I don't have any additional

24  questions for her.

25      Q.    Okay.  You said you reviewed



Page 23

```
 1                    J. KARASINSKI
 2   her witness statement prior to this
 3   deposition as well, right?
 4        A.    Yes.
 5        Q.    And then you reviewed her first
 6   deposition testimony transcript?
 7        A.    Not in preparation for the
 8   deposition, I do not review her
 9   depositions, no.
10        Q.    But in preparation of your
11   report you reviewed her testimony?
12        A.    Yes.
13        Q.    Did you review her second
14   deposition transcript?
15        A.    Yes.
16        Q.    Did you review the Affidavit of
17   the Plaintiff, the Supplemental Declaration
18   that we've been talking about, did you see
19   that?
20        A.    Say again.
21             MR. SCHWARZ:  You faded out.
22        Q.    I'm sorry.  I apologize, I'll
23   move a little closer.  The Supplemental
24   Declaration we've been talking about, did
25   you review that before Ms. Marcellin
```



Page 24

1                   J. KARASINSKI

2    executed it?

3         A.    I don't know what you mean by

4    executed it.

5         Q.    Did you have the opportunity to

6    see a draft of that Affidavit or did you

7    see it after she signed it?

8         A.    I believe I saw it after it was

9    signed.

10        Q.    Do you know when she signed it?

11        A.    I don't recall that, no.

12        Q.    I think you described the

13   circumstances of its creation as you had

14   some additional questions that you directed

15   to counsel after receipt of the Exponent

16   reports in this case?

17        A.    Yes.

18        Q.    So do you understand that

19   Attorney Schwarz interviewed Ms. Marcillin

20   to create that Affidavit?

21        A.    Yes, I provided questions to

22   them to ask her after receiving that

23   report, yes.

24        Q.    Okay.  So other than the

25   witness statement to the local



                         J. KARASINSKI
1    investigators, the deposition transcripts
2    and the Supplemental Declaration, the
3    Affidavit, are you aware of any other
4    statements from Ms. Marcillin that were
5    memorialized?
6         A.    I'm not aware of any other
7    witness statements from her other than
8    those.
9         Q.    Okay.  I think you testified
10   the reason that you never took a statement
11   from her was that the evidence that you had
12   in front of you was sufficient to come to
13   your conclusions in your initial report; is
14   that correct?
15        A.    Well, I mean, I reviewed her
16   statement that she provided to the local
17   authorities, and I felt that that was
18   sufficient at that point.  But again, I
19   didn't write a report until after the lab
20   exam and the amount of data that was
21   collected to actually form an opinion to
22   follow the scientific method.
23        Q.    Understood.  So it was the
24   statements that were taken by local



Page 26

1                    J. KARASINSKI
2    investigators, together with the scientific
3    process you followed in the months after
4    your initial scene exam through the
5    laboratory exam and the preparation of your
6    report is the reason why you never took a
7    statement from her?
8         A.    Correct, but I reviewed the
9    statements that she gave in her two
10   depositions as well as the interview
11   provided by the local authorities and the
12   follow-up questions I had after receiving
13   the reports that were provided by Exponent.
14        Q.    Understood.  Do you know if
15   Ms. Marcellin had any issues with respect
16   to her memory?
17        A.    I'm not aware of any memory
18   issues from Carol at all.
19        Q.    Do you know whether she needed
20   to change her answers in this case
21   previously?
22             MR. SCHWARZ:  Object to the
23        form of the question.  If you want to
24        tell him what you're talking about, I
25        certainly would think that would be



Page 27

                    J. KARASINSKI

1
2          appropriate, but your general
3          statement of changing her answers
4          is -- is inappropriate.  And I think
5          what you're referring to is the
6          interrogatory answers which were
7          actually verified by the other
8          Plaintiff, Ms. Hollowell --
9          McKay-Hollowell [sic] not by Carol
10         Marcellin, so you're incorrect in
11         your statement.
12         You can answer the question if you
13         understand it, Jason.
14    Q.    Did you understand the
15    question?
16    A.    Can you repeat the question?
17    Q.    Yes, absolutely.  My question
18    was, are you aware whether she needed to
19    change her answers in this case previously?
20         MR. SCHWARZ:  Same objection.
21    A.    I'm not aware of Carol changing
22    any of her answers in this.
23    Q.    Okay.  Did you find her
24    statements -- meaning her statements to
25    local investigators, her deposition



Page 28

1                    J. KARASINSKI
2    testimony, and the Supplemental
3    Declaration, did you find them to be
4    consistent with one another?
5         A.    From what I reviewed, yeah, I
6    believe they were consistent and they were
7    consistent with what was observed at the
8    fire scene.
9         Q.    Okay.  So you said from what
10   you reviewed, did you mean you reviewed
11   something less than all of those statements
12   or having reviewed all of the statements
13   you found them to be consistent with one
14   another?
15        A.    After reviewing all the
16   statements that I had been provided.
17        Q.    You just said you also said
18   found her statements to be consistent with
19   the physical evidence that you
20   investigated?
21        A.    I found her statements to be
22   consistent with the physical evidence that
23   was observed at the site, yes.
24        Q.    There was nothing that was
25   inconsistent with the physical evidence you



Page 29

```
 1                    J. KARASINSKI
 2   found?
 3        A.    Not that I -- not that I saw at
 4   the site, no.
 5        Q.    Did you find Ms. Marcellin's
 6   statements to be credible?
 7        A.    Yes.
 8        Q.    Do you have any notes that you
 9   prepared in respect of her various
10   statements?
11        A.    No.  Other than what was
12   provided and was published in my report and
13   rebuttal, no.
14        Q.    Understood.  I deposed your
15   client Mr. Litzinger and when I asked him
16   that question he testified that the one
17   inconsistency he could think of was that
18   Ms. Marcellin testified that the compact
19   computer was in her closet at the time of
20   the fire but he never saw any indication
21   that the compact was there in the closet or
22   anywhere else during the scene examination.
23   Do you agree with that testimony?
24        A.    Yeah, we did not find any
25   physical evidence of a compact computer in
```



                        J. KARASINSKI
1
2   the closet, period, as she suggested, as
3   well as a vacuum cleaner that was not in
4   the closet as well.
5        Q.    So would that be an
6   inconsistency between her statements and
7   the physical evidence you found?
8        A.    I guess your term inconsistency
9   is a little bit extraordinary because I
10  couldn't tell you what is in my closet in
11  my house, so based on her statements to me,
12  it's still consistent.  She believed it was
13  there, we didn't find it and the physical
14  evidence doesn't support that.
15       Q.    Okay.  So but she was quite
16  certain it was there, it wasn't just a
17  belief, right?
18       A.    Correct.  And I didn't inform
19  her that we didn't find it in there to give
20  her an opportunity to let me know if it's
21  somewhere else in the structure, but the
22  physical evidence and the remains found in
23  the closet area did not support that there
24  was a compact computer there or -- and
25  there was also not a vacuum cleaner in that



```
 1                    J. KARASINSKI
 2    closet.
 3        Q.    So you wouldn't call it an
 4    inconsistency, is there some other word I
 5    can use, you know --
 6        A.    Well, I guess -- I guess --
 7        Q.    -- in your testimony in the
 8    physical evidence; is that fair?
 9        A.    I guess -- I think
10    inconsistency is a little bit too strong
11    because, like I said, I don't -- maybe you
12    remember what's in your closet in a room
13    that you never go in anymore but I don't
14    remember what's in my kids' closets or a
15    bedroom that we don't really access
16    anymore.  I wouldn't remember what was in
17    that closet, so to me that's -- that's a
18    form of witness statements and the physical
19    evidence shows that it wasn't there and to
20    me that's not an inconsistency, that's just
21    her not recollecting what was in the
22    closet.
23        Q.    So I asked you earlier if you
24    knew if she had any troubles with her
25    memory and you were just saying that you
```



1                    J. KARASINSKI

2    wouldn't anticipate or recollect if it was

3    or wasn't in her closet, does that refresh

4    your recollection and your testimony in

5    respect of whether she had any issues with

6    her memory?

7          A.    No.  Again, I mean, I just --

8    you're having issues with your memory and

9    not remembering what is in a closet, I

10   don't think that's an inconsistency, I

11   think that's just an oversight and she

12   believed it was there and when we didn't

13   find it, it was, okay, it's not in here, so

14   we moved on with our investigation.

15         Q.    So with the understanding that

16   you wouldn't characterize this as an

17   inconsistency, did you see anything else

18   like this in the case, meaning,

19   Ms. Marcellin believed it to be one way and

20   you discovered that it was some other way?

21         A.    Again, that's following the

22   scientific method and that's, you know,

23   going through interviews and that is a

24   typical oversight that we see regularly

25   when we're doing interviews and we're going



```
 1                    J. KARASINSKI
 2   through physical evidence that they believe
 3   something was there and it wasn't there.
 4        Q.    My question for you, Mr.
 5   Karasinski, is, is there any other
 6   oversight like this that you saw in the
 7   case?
 8        A.    Not that I can recall, unless
 9   you have something specific you would want
10   to discuss, no.
11        Q.    Yeah, so all you can recall
12   sitting here is the vacuum cleaner and the
13   compact as oversight?
14        A.    At this point, yes, unless you
15   have something else you want to discuss.
16        Q.    Okay.  Is there anyone else at
17   FRT that knows anything else about this
18   incident?
19        A.    What do you mean if there's
20   anyone else that knows anything about this
21   incident?
22        Q.    So you and Mr. Litzinger worked
23   on this case, is there anyone else at FRT
24   that you worked with?
25        A.    Well, we have a team of people
```



Page 34

                    J. KARASINSKI
 1
 2   so there would have been evidence techs
 3   there, whoever did the CTs, who did the
 4   X-rays, who participated in the joint lab
 5   exam.  Yeah, so there's -- there's a lot of
 6   people that know about this case.
 7        Q.    Okay.  So you have the CT
 8   technicians, the joint laboratory exam
 9   technicians and then FRT support in respect
10   of preparing the report --
11        A.    Yes.
12        Q.    -- is that fair to say?
13        A.    Yes, that's a fair statement.
14        Q.    Is there any overlap between
15   those three general groups of support on
16   your team that I've just laid out?
17        A.    I guess define what you mean by
18   overlap.
19        Q.    So are some of the people
20   helping on your laboratory exam, are those
21   the same people conducting the CT exam and
22   helping with the preparation of the report
23   or are they three different groups of
24   people?
25        A.    Well, based on our lab



Page 35

                    J. KARASINSKI
1
2    accreditation with ISO that would be
3    different -- different people, different
4    job descriptions.
5        Q.    Okay.  So it's a pretty big
6    team that would have helped bring this
7    report together?
8        A.    Yes.
9        Q.    Ten or 12 people, more?
10       A.    Well, when you say put the
11   report together, no, I mean, that would be
12   myself, Andy but we utilize the support
13   staff to take the X-rays, utilize the
14   support staff and the CT technician to take
15   the CT images, and we review those images
16   and then we obviously have evidence techs
17   that sifted the debris that we secured from
18   the site and then we had evidence techs
19   that would assist with the joint lab exam
20   at our facility in Upstate New York.
21       Q.    Okay.  So you and Mr. Litzinger
22   prepared the report but you had assistance
23   in all of the analysis that you just
24   describe, and my question is, is the total
25   group of people, inclusive of you and Mr.



```
 1                   J. KARASINSKI
 2   Litzinger, that worked on the science to
 3   underwrite the report and the preparation
 4   of the report, how many people would you
 5   say that is, ten people or more, fewer?
 6        A.    Probably ten or less, not
 7   including whoever reviewed the reports.
 8        Q.    Okay.  If you could just give
 9   me a very brief summary of your educational
10   background from high school to your highest
11   level of attainment?
12        A.    I have a high school degree
13   from Marion Central School and I have a --
14   I went to Morrisville University for one
15   year and I transferred to Lambuth
16   University where I obtained my four-year
17   degree.
18        Q.    What was that degree in?
19        A.    That degree was in business, I
20   believe, a minor in marketing.
21        Q.    Do you have any licenses or
22   certificates?
23        A.    I am a certified fire
24   investigator through IAAI, I'm a certified
25   fire investigator through NAFI, which is
```



```
 1                J. KARASINSKI
 2    the National Association of Fire
 3    Investigators and I have multiple PI
 4    licenses throughout the country.
 5          Q.    Are you a professional
 6    engineer?
 7          A.    I am not.
 8          Q.    Do you have any professional
 9    background in computer design?
10          A.    I do not.
11          Q.    Have you ever been enlisted in
12    the military?
13          A.    I have not.
14          Q.    Have you ever been involved in
15    a civil lawsuit, meaning personally,
16    meaning someone sued you or you sued them?
17          A.    No.
18          Q.    How about criminal proceedings,
19    any charges been brought against you?
20          A.    No, sir.
21          Q.    Any other lawsuits,
22    arbitrations, mediations, again, personal
23    to you?
24          A.    No.
25          Q.    If you could give me, as you
```



1                    J. KARASINSKI
2    did with your educational experience, a
3    brief summary of your employment experience
4    from the time of your graduation from
5    Lambuth to the present.
6         A.    Can we just make my CV an
7    exhibit and go through it?  It's not a game
8    of memorization, I don't have that
9    memorized, but --
10        Q.    Of course, no.  I'm not asking
11   for years and everything like that, if you
12   could just give me a brief summary of how
13   you got to where you are.  I don't need to
14   know the month and year you left one
15   position or another or anything like that.
16        A.    All right.  So I believe I
17   graduated 1995.  From there I obtained a
18   job in New Jersey with an insurance company
19   as a property adjuster.  From that I took a
20   job at Liberty Mutual in 1998, I believe,
21   and I worked at Liberty Mutual from 1998
22   until I left in 2008.  Or, no, I'm sorry,
23   2014, when I was at Liberty Mutual I was a
24   large law specialist and then from there
25   Liberty Mutual sent me to all of my



Page 39

```
 1                    J. KARASINSKI
 2   training for fire investigation and I
 3   actually received an award at Liberty
 4   Mutual for starting their internal fire
 5   investigation and when I left I believe I
 6   had about 30 employees all over the United
 7   States that did fire investigation that
 8   reported to myself.  And then I opened Fire
 9   Research & Technology in 2014 and then
10   that's where we are at today.  I have
11   facilities at two labs in Florida -- one in
12   West Palm, one in Sarasota -- and then we
13   have our forensic facility also in Upstate
14   New York and we have approximately, I don't
15   know, 45, 50 employees.
16        Q.    Thank you, Mr. Karasinski.
17              MR. LEVITES: I'm just noting
18         for the record we were just joined by
19         my colleague Jackie Wanemaker who is
20         also counsel for the Defendants in
21         this case.  She'll be sitting in our
22         deposition for a little bit as her
23         schedule permits.
24              MS. WANEMAKER:  Thank you.
25         Good morning, everyone.  I'm going to
```



Page 40

                         J. KARASINSKI
1
2          turn off my audio now.
3          Q.    So, Mr. Karasinski, have you
4    ever worked in computer manufacturing?
5          A.    No, sir.
6          Q.    Battery pack design?
7          A.    What do you mean by battery
8    pack design?
9          Q.    Have you ever worked in battery
10   pack design?
11         A.    No, sir.
12         Q.    Have you ever worked in battery
13   cell design?
14         A.    No, sir.
15         Q.    Do you have any background in
16   pack and cell manufacturing?
17         A.    When you say -- I guess when
18   you say background it's a little confusing
19   because we look at computers regularly at
20   fire scenes so I'm not --
21         Q.    Beyond your experience of
22   examining computers at fire scenes, do you
23   have any professional experience in battery
24   pack and cell manufacturing?
25         A.    No.



Page 41

1                    J. KARASINSKI

2          Q.     Have you ever written any peer

3    review articles about notebook computers?

4          A.     No, not -- not any white

5    papers, no.  I have written Power Points

6    that I presented that include battery

7    packs, as well as computers as potential

8    ignition sources but not written any white

9    papers, no.

10         Q.     Then same question, have you

11   written any peer review articles concerning

12   lithium ion batteries?

13         A.     Power Points only, no white

14   papers.

15         Q.     Have you ever been in a

16   notebook computer manufacturing facility?

17         A.     No.

18         Q.     Have you ever been in a battery

19   manufacturing facility?

20         A.     Yes.

21         Q.     When was that?

22         A.     I've been in multiple for

23   fires, so some in New York, I think I was

24   at a facility in Texas, I think another

25   facility in Florida, but not specifically



Page 42

J. KARASINSKI

1

2    for Hp.  And these were -- I guess let me

3    rephrase that, they were recycling

4    facilities that caught on fire with

5    batteries.  That's what they handled was

6    lithium ion batteries.

7        Q.    Okay.  So you weren't in a

8    battery manufacturing plant but you've been

9    in multiple battery recycling facilities?

10       A.    Correct, yes.

11       Q.    What did they do at the battery

12   recycling facilities?

13       A.    Well, that's an interesting

14   question, Counsellor.  They dispose of

15   them, they -- typically it's -- the

16   disposal process is inappropriate but they

17   don't really have guidance on how to

18   properly dispose of them so we see a lot of

19   fires in these recycling plants based on

20   how they store those cells before they are

21   dismantled and put into reproduction and

22   dismantled basically.

23       Q.    So you've responded to these

24   fires in these plants because of how the

25   cells are getting stored improperly; is



Page 43

1                    J. KARASINSKI

2   that fair to say?

3       A.    Yeah.  I mean, a lot of these

4   recycling plants they'll -- they just throw

5   all the cells into dumpsters really, which

6   is obviously a hazard so they have quite a

7   few fires.  They try to do what they can

8   with, you know, surveillance video as while

9   as suppression systems above those items

10  but, you know, how they're disposing of

11  them prior to recycling them is -- is

12  definitely an issue that we have run into

13  multiple times in our facility.

14      Q.    So tossing the cells in a

15  dumpster, that's dangerous because it's

16  abuse of the cells, right?

17      A.    Yeah, correct, and you've

18  got -- you'll have cells that are making

19  connections with other cells that shouldn't

20  be making those connections so you can

21  cause thermal runaway that could cause a --

22  a fire within those dumpsters based on how

23  they're disposing those before they

24  actually recycle them.

25      Q.    So they're the physical abuse



Page 44

1                          J. KARASINSKI

2    aspect with the dumpsters that makes it

3    dangerous, right, that's one aspect?

4          A.    That's one aspect, yes.

5          Q.    Then another aspect that you

6    just mentioned is the possibility for

7    shorting when multiple cells connect with

8    one another in the pile?

9          A.    When they come -- when the

10   connections come into contact with each

11   other, yes.

12         Q.    Then you talked about the

13   storage conditions generally, are there

14   other aspects of the storage conditions

15   that make it dangerous in a battery

16   recycling facility?

17         A.    Yes, the kinds if they're

18   storing them, obviously, inside what those

19   temperatures are, if they're stored outside

20   are those dumpster covered, are they -- are

21   they, you know, available to the elements

22   outside in the weather, the rain, snow,

23   sleet, whatever's going on outside or are

24   they properly covered and staying dry.  So

25   there's multiple instances on how those



Page 45

```
 1                    J. KARASINSKI
 2    cells are handled and stored that are
 3    dangerous, you know, and can cause
 4    fire-related issues or thermal runaway and
 5    whatever.
 6         Q.    Understood.  So you said that
 7    one of the issues you look at is if they're
 8    being stored inside, the indoor storage
 9    temperature.  So how does the indoor
10    storage temperature affect the risk of
11    thermal runaway?
12         A.    Can you repeat that?
13         Q.    Yeah, not a problem.  So you
14    just told me that the -- one of things that
15    you look at in these recycling facility
16    fires if the batteries were stored indoors,
17    what the temperature of the storage was; is
18    that right?
19         A.    Well, that's not -- I guess
20    what I'm saying if they're stored inside
21    they're not out in the elements of the
22    weather.  You know, if they're inside then
23    you would assume that they had some sort of
24    ambient temperature that they are going to
25    be consistent with, you know, but if
```



Page 46

                        J. KARASINSKI

1

2    they're outside in Upstate New York, if

3    it's in the middle of summer it could be 90

4    degrees, if it's in January there could be

5    3 feet of snow on the ground and it could

6    be minus 20 degrees, so by them storing

7    them in a facility, that ambient

8    temperature would remain consistent.

9         Q.    Did you ever have any cases

10   where it was too hot inside the facility,

11   like, they weren't running the air

12   conditioning or something like that?

13        A.    No, sir.

14        Q.    So you -- in the battery fires

15   that you respond to at these recycling

16   facilities, the indoor air temperature was

17   never a factor in the fire; is that fair to

18   say?

19        A.    No, the ambient temperature was

20   not an issue with the fire.

21        Q.    Okay.  Was it a factor in any

22   of the cases where they were outside, like,

23   when you mentioned maybe it's 90 degrees

24   outside and they're left in a dumpster

25   outside?



Page 47

                    J. KARASINSKI
1

2          A.    No, I don't -- I don't -- no, I
3    mean, we're not going to get -- we're not
4    going to reach temperatures that would
5    affect, you know, batteries sitting in a
6    dumpster outside, you know, 95 degrees,
7    100 degrees, you know, but the issue is
8    obviously water, when they move the
9    dumpsters obviously the cells move and then
10   they can come in contact with each other,
11   and, you know, through that they can make
12   contact and then go into the thermal
13   runaway based on those connections that
14   they're making as they're moving those
15   dumpsters around the facilities.
16         Q.    So the indoor air temperature
17   isn't coming into play in your analysis of
18   the major recycling fires and the outdoor
19   area temperature isn't coming into your
20   analysis of these -- these recycling fires;
21   is that fair to say?
22         A.    Yes, that would be fair to say.
23         Q.    Okay.  Have you ever obtained a
24   patent?
25         A.    Have I ever what?



1                    J. KARASINSKI

2        Q.    Obtained a patent.

3        A.    No, I've not obtained any

4   patents.

5        Q.    Have you ever been qualified in

6   any court as an expert on human factors?

7        A.    Not that I can recall but when

8   we are talking about warnings and

9   fire-related issues, I have to review those

10  to see if those products are being used

11  properly or not, so I have testified to

12  whether they followed the proper use of

13  those as it relate to fire.  But

14  specifically been called as a human factors

15  expert, that would be no, but I do review

16  warnings which is part of our process,

17  right, to review to see if that product was

18  being used properly or improperly at the

19  time of the event or prior to the event.

20       Q.    Yeah, so you would look at the

21  warnings to determine if product was being

22  misused in your investigation, right?

23       A.    That is typical, yes.

24       Q.    Did you do that here?

25       A.    Yes.



Page 49

1                    J. KARASINSKI

2         Q.    Okay.  Do you remember what the

3    warnings were in this case?

4         A.    Not offhand but we can review

5    them if you want to pull them up and make

6    it an exhibit, but the computer, that was

7    outside of my scope, I was not retained to

8    have any opinions based on the laptop or

9    the failure of the laptop.

10        Q.    Okay.  But are you offering any

11   opinions on the warnings in this case?

12        A.    No, sir.

13        Q.    Okay.  Do you hold yourself out

14   as an expert on product warnings?

15        A.    Well, I guess I review warnings

16   and I testify on warnings and if they were

17   followed, I've not been told I'm not an

18   expert in warnings but we review them --

19   the actual fire-related warnings with that

20   product.  We have to review those to see if

21   they were used in the product correctly or

22   not.

23        Q.    So I guess it's similar to your

24   answer in respect to human factors, right?

25   You know, your analysis necessarily



Page 50

                              J. KARASINSKI
1
2    involves looking at warnings to see if a
3    product was used in a proper way or not,
4    but my question is, have you ever offered
5    an opinion specific to warnings?  Have you
6    ever been designated a warnings expert?
7         A.    I've not been designated as a
8    warning expert but I given opinions on
9    warnings.
10        Q.    Okay.  Is there anything in
11   your educational background that
12   particularly qualifies you to testify as an
13   expert in respect to warnings rather than
14   fire investigation?
15        A.    Well, I do presentations all
16   over the country and, you know, that's one
17   of the items that we discuss with those
18   Power Points and presentations is to review
19   those warnings to see if that product is
20   being utilized properly, improperly, and we
21   also re-review those warnings, correct to
22   see if there is anything that should be
23   warned for that maybe was not and at that
24   point, you know, based on that, I would
25   give a recommendation to our client that



Page 51

```
                      J. KARASINSKI
 1
 2   they may need to get a warnings expert.
 3   So, you know, what you're looking at --
 4   when you're looking at warnings you're
 5   also -- you're looking at, okay, has this
 6   product been recalled and if so, is that
 7   warning lifted, why it's been recalled and
 8   is it appropriate.
 9        Q.    So you said that you would --
10   when you look at whether someone should
11   have been warned but wasn't, you may make a
12   recommendation that a party needs to retain
13   a warnings expert and my question is, did
14   you do so in this case?
15        A.    I had not advised the -- my
16   client that we needed to bring on a
17   computer battery expert because that was
18   outside of my scope and what I was asked to
19   do and they retained a computer battery
20   expert.  I'm not aware if he has any
21   warnings experience or not.
22        Q.    You mentioned whether -- you
23   would look at whether a product's been
24   recalled and whether that's listed in a
25   warning, did you do that in this case?
```



Page 52

1                    J. KARASINSKI
2         A.    Of course.
3         Q.    Was this product recalled?
4         A.    No.
5         Q.    Fair to say you hold yourself
6    as an expert in fire investigation
7    principally?
8         A.    Of course, yes.
9         Q.    And you're a cause of origin
10   expert?
11        A.    Origin and cause, yes.
12        Q.    I apologize, origin and cause.
13        A.    You got to get them to origin
14   before you get to cause.
15        Q.    That does makes sense.  So your
16   colleague Mr. Litzinger testified that you
17   analyze fire patterns and fire dynamics; is
18   that fair to say?
19        A.    Yes.
20        Q.    Okay.  How about analyzing
21   notebook computer design, do you do that?
22        A.    Again, that was outside the
23   scope of my investigation in this case.  I
24   do not analyze any design issues with the
25   computer or the battery manufacturer


MAGNA
LEGAL SERVICES

Page 53

```
 1                J. KARASINSKI
 2   themselves.
 3        Q.    You're not a mechanical
 4   engineer, right?
 5        A.    I am not a mechanical -- I'm
 6   not a degreed mechanical engineer but we
 7   deal with mechanical engineering on a daily
 8   basis.
 9        Q.    Understood.  You say you're
10   member of NFPA, that's where you are right
11   now, right?
12        A.    I am a member of NFPA, I am
13   a -- I sit on NFPA 921 as a technical
14   member, principal, as I sit as well on NFPA
15   1321 as a technical principal member as
16   well.
17        Q.    Are you a member of NAFI as
18   well?  I think you said you were, right?
19        A.    Yes, NAFI, National Association
20   of Fire Investigators, yes.
21        Q.    Have you published any peer
22   review articles on origin and cause of fire
23   of investigations?
24        A.    Yes.
25        Q.    You would consider the NFPA 921
```



Page 54

1                        J. KARASINSKI

2      to be the authoritative and accepted guide

3      on the subject of fire investigation,

4      right?

5           A.    Yes, I would consider NFPA 921

6      as a guide, yes.

7           Q.    Would you consider it as an

8      authoritative and accepted guide?

9           A.    Well, it's the best guide that

10     we have right now to follow currently and

11     it's peer reviewed as -- and reviewed by

12     multiple experts all over the country.

13          Q.    So is it not authoritative?

14          A.    It is authoritative, yes.

15          Q.    And is it not accepted?

16          A.    It is a generally accepted

17     guide, yes.

18          Q.    Okay.  So you would say it is

19     authoritative and accepted guide?

20          A.    Yes.

21          Q.    The same question in respect

22     Kirk's Fire Investigation, would you

23     consider that an authoritative and accepted

24     guide on the subject of fire investigation?

25          A.    I would consider that a



Page 55

1                    J. KARASINSKI

2    resource, not a guide.

3        Q.    Would you consider it an

4    authoritative and accepted resource?

5        A.    I would consider it a resource,

6    not authoritative.

7        Q.    So you wouldn't consider Kirk's

8    Fire Investigation to be authoritative?

9        A.    I would -- we use that

10   regularly and we use that as a resource

11   when we're investigating fires or we want

12   to research something that we're not aware

13   of or something that might be published.

14   We use a lot of resources.  We use Kirk's,

15   we use the Ignition Handbook, we use NFPA

16   921, we use NFPA 1033.  There are multiple

17   sources that we use, I don't know that I

18   would call them authoritative, you know I

19   would consider NFPA 921 based on its listed

20   as a guide and I would not -- and I'd say

21   it's advisory, right, you know.  If I'm

22   going to go do a room and contents fire I

23   don't need to review the wild lands

24   chapter.

25       Q.    Okay.  So I understand what



Page 56

                        J. KARASINSKI

1

2   you're saying, not every section of every

3   treatise is going to be relevant to your

4   inquiry and perhaps the word authoritative

5   is the reason for your objection to the

6   question.  So is it fair to --

7        A.   Let's just say advisory, not

8   authoritative, that's all.

9        Q.   Is it fair to say that Kirk's

10  is a generally accepted guide or treatise

11  on fire investigation?

12       A.   Again, I would say Kirk's is a

13  resource that we use on a regular basis

14  with other resources.

15       Q.   But you can't say one way or

16  another what other fire investigators like

17  yourself would consider it to be generally

18  accepted?

19       A.   Well, you still have to, you

20  know, analyze what they're saying and

21  whether that's correct or not.  I mean,

22  that's why when we talk about 921 as a

23  advisory document, right, that's a peer

24  review document and that goes out to public

25  comments, so anybody that's in fire



                    J. KARASINSKI

1

2    investigation can make a comment to change

3    something in NFPA 921 or make a correction

4    if something is incorrect, or the amount of

5    testing and forensic science that we do in

6    the field might prove something to be

7    incorrect in 921 or incorrect in Kirk's or

8    incorrect in the Ignition Handbook.  So you

9    still have to be able to analyze that data

10   and determine if that's accurate or not,

11   because it may not be accurate and maybe

12   that test has never been completed before

13   and then you do the test and say, okay,

14   that's not correct, right.  So and when you

15   have experts and they've never sent in a

16   request or proposal to make a change or

17   send a letter to Kirk's and say I'm not

18   really sure about this statement that

19   you're making here, you know, have you

20   tested this or this and that.  So that's

21   why 921 being a guide and advisory and

22   being peer reviewed, that's the best guide

23   that we have in our industry right now to

24   follow and utilize.  But, again, that's why

25   I'm here at this meeting, right, in -- on



Page 58

                    J. KARASINSKI
1
2   the west coast, we're here to make changes,
3   we're here to review public input, we're
4   here to review what needs to be added or is
5   this incorrect or is this wording
6   incorrect.  So to me, that's more important
7   to me than it as a peer reviewed document
8   than you saying that it's authoritative.  I
9   would just say it's advisory and we use it
10  as a resource.
11       Q.    See, I was trying to back off
12  the word authoritative so I was trying to
13  say generally accepted --
14       A.    Oh.
15       Q.    -- but I was thinking -- was
16  that okay to use --
17       A.    Yeah, generally accepted is
18  fine, but authoritative --
19       Q.    So you would say NFPA 921 and
20  Kirk's are generally accepted; is that fair
21  to say?
22       A.    That's fair to say.
23       Q.    Okay.  And I understand your
24  testimony is that fire is an ever evolving
25  field, we know the NFPA is -- you know, and



```
 1                    J. KARASINSKI
 2    Kirk's are revised on an annual basis and
 3    there's -- you know, it's an ever moving
 4    target; is that fair to say?
 5         A.    Yes.
 6         Q.    Okay.
 7         A.    I wouldn't say -- I guess I
 8    wouldn't say target but we want to make it
 9    correct, right, it's not a target but we
10    want it to be accurate.
11         Q.    Understood.
12         A.    People are utilizing that to
13    follow the scientific method and come to an
14    hypothesis, we need to make sure that we
15    are the most current edition, is the most
16    current in fire signs in what we know know
17    today.  And in four years from now what
18    we're working on for the next edition,
19    we're making changes of things that we're
20    finding that are not correct or testing has
21    shown that that statement's not right and
22    we have to revisit that and revise that to
23    the most current fire science-related
24    issues that we have.
25         Q.    But now -- and I don't want you
```



Page 60

J. KARASINSKI

1

2    to have to do your whole conference

3    presentation right now but is there some

4    subject that is at the forefront this year

5    in respect to revisions?  Like, some

6    section of 921 that had been generated the

7    most in discussion, the most comments,

8    anything like that?

9        A.    So yesterday we worked on

10   Chapter 29, which is the Marine chapter,

11   that chapter needs a lot of work, and we

12   did a lot of public inputs with that

13   chapter.  I was a member of that task

14   group.  Yesterday we also did the Vehicle

15   Fire chapter and there were a lot of public

16   inputs on that.  And the Vehicle chapter,

17   if you haven't looked at it, doesn't really

18   include a lot of information on electrical

19   vehicles and battery-operated vehicles, so

20   there was a lot of stuff that we're adding

21   as manufacturing changes, right.  We go

22   from -- depending who you like, Biden or

23   Trump, are we going to have a gas vehicle

24   or are we going to be required to ride in a

25   battery vehicle.  So, you know, as those



Page 61

                    J. KARASINSKI

1

2    battery vehicles evolve and change with

3    design and manufacturing, we need to make

4    sure that we stay up on those issues, not

5    only from a fire cause but as well as a

6    safety issue.

7        Q.    Are there any revisions or

8    comments that are being contemplated at the

9    conference that pertain to your work in

10   this case -- the reports that you wrote in

11   this case?

12       A.    No, not that I'm aware of.

13       Q.    So you're not aware of any of

14   the sections that you cite are currently

15   under discussion for revision?

16       A.    Well, we're in the public input

17   stage --

18       Q.    Okay.

19       A.    -- right now so we're making --

20   the committee is reviewing those public

21   inputs and either approving those public

22   inputs to be added into NFPA 921 or to make

23   those changes and then that will go back

24   out for public comment once we either

25   approve or do not approve or reject a



```
 1                    J. KARASINSKI
 2   public input and then those individuals
 3   that supplied that public input, they have
 4   an opportunity then to comment back on us
 5   if maybe we didn't under what their public
 6   input comment would be.  So as it pertains
 7   to this case, I am not down there so we
 8   have not done -- I am the task group chair
 9   for the electrical chapter, as well as the
10   arc mapping chapter, which is Chapter 6,
11   Fire Patterns, but we have not gotten to
12   those sections yet so I'm not aware of what
13   those public inputs would be because I'm
14   not sitting down there at this point.
15        Q.    Okay.  Yeah, I appreciate that.
16   Only reason I ask is you cite all the
17   various sections in the NFPA, obviously
18   you're siting the most recent version so if
19   one of these were to be, you know,
20   currently being revised, it might be
21   relevant to your report.  But your
22   testimony today is that the public comment
23   section of the conference is still going on
24   so you don't even know what the changes
25   might be being suggested, contemplated
```



Page 63

                    J. KARASINSKI

1

2    until you get to that -- to the point where

3    they've all been received; is that fair to

4    say?

5        A.    Correct, and this meeting goes

6    through Friday so lots for us to review.

7        Q.    I'm going to put up as

8    Exhibit 1 your report in this case.

9              (Whereupon, October 14, 2024,

10        report was marked as Defendant's

11        Exhibit 1 for identification as of

12        this date by the Reporter.)

13       Q.    Can you see that, Mr.

14   Karasinski?

15       A.    I can.  Can you make it bigger

16   on your screen or can I look at my paper

17   copy here?

18       Q.    Yeah, and you can feel free to

19   look at your paper copy at any time.  Is

20   this better?

21       A.    Oh, that's better, yeah.  No,

22   that's fine.

23       Q.    Everything is blown up, like, I

24   only have four lines on here at a time.

25             Okay, so I've marked as



Page 64

                    J. KARASINSKI

1
2    Exhibit 1 your expert disclosure which
3    comprises your report in this matter,
4    together with your CV and references and I
5    believe you said you have this document
6    with you right now?
7         A.    Yeah, I have the paper copy,
8    yes.  And I have that paper copy of my CV
9    with me that you'll have to put that up on
10   the screen.
11        Q.    Okay.  So the report that I
12   have put up on the screen here, is that
13   your October 14, '24 report in this case?
14        A.    Can you just scroll down, I
15   only see --
16        Q.    Yeah, sure.  I'm just going to
17   scroll down a little bit and tell me to go
18   faster or slower.
19        A.    Oh, actually scroll up, you
20   mentioned the date, I just wanted to verify
21   that date.
22        Q.    Okay.
23        A.    Yeah, I'm good.  That is my
24   report, yes.
25        Q.    So for our purposes if we refer



Page 65

                         J. KARASINSKI
1
2    to your report, it's going to be the one
3    we've marked as Exhibit 1, your October 14,
4    '24 report, okay?
5         A.    Yes.
6         Q.    I'm going to mark as Exhibit 2
7    your rebuttal report.
8              (Whereupon, rebuttal report was
9         marked as Defendant's Exhibit 2 for
10         identification as of this date by the
11         Reporter.)
12        A.    Okay.
13        Q.    Dated December 31, '24.  Do you
14    see that?
15        A.    Yes.
16        Q.    So is this your December 31,
17    '24 rebuttal report?
18        A.    Appears so, yes.  Without
19    reviewing the entire document, yes.
20        Q.    So if we refer to the rebuttal
21    report it's going to be the one we just
22    identified here as Exhibit 2, is your
23    December 31, '24 report.  Okay?
24        A.    Okay.
25        Q.    Did you do any work of



Page 66

1                    J. KARASINSKI
2    significance that is not reflected in the
3    two reports we've marked as 1 and 2?
4         A.    I guess I don't know what you
5    mean by significance.
6         Q.    Significant to your opinions.
7         A.    No.  Not significant, no.
8         Q.    Did you incur any expenses of
9    significance that are not reflected in your
10   billing records?
11        A.    Our billing records should be
12   up to date except for my prep time and my
13   depo time today that gets invoiced to you.
14        Q.    Did you incur any expenses that
15   you know of in this case beyond your time
16   and things of that nature?
17        A.    I mean, when you say expenses,
18   yeah, I mean, we bought totes and things of
19   that nature to collect the evidence, so I
20   have expenses on the case that I've been
21   reimbursed for.
22        Q.    Yeah, that's my question.  So
23   we're talking evidence collection
24   materials, did you pay any lab fees?
25        A.    Well, I own the lab so there



Page 67

                        J. KARASINSKI

1

2    are no lab fees.

3        Q.    Did you pay -- was there any

4    other travel expenses or anything like

5    that?

6        A.    Just to go back and forth to

7    the scene and back.  No, otherwise I have

8    not had to travel for this.  I guess the

9    only expense, we did not have a CT at the

10   time of this loss back in 2020 so I would

11   have had that expense to send that out to a

12   company to have the computer CT'd, so that

13   would be an expense.  But we have our own

14   CT now in-house so that wouldn't be an

15   expense moving forward.

16       Q.    Okay.  I'm going to put your

17   report back up and we'll go to your CV

18   here.  Going back to Exhibit 1 and turning

19   to page 51 of your report, which is the

20   beginning of your CV.  Do you see that Mr.

21   Karasinski?

22       A.    Yes.

23       Q.    Okay.  So your CV is beginning

24   on page 51 and it goes -- I'll scroll down

25   to the bottom just so you can see where it



Page 68

```
 1                 J. KARASINSKI
 2   ends on page 64.  So with the understanding
 3   that this was your CV as of October 14,
 4   '24, was it current as of that date?
 5        A.    At the time I wrote the report
 6   it was current, but I believe you were sent
 7   the most updated version of my CV
 8   yesterday.
 9        Q.    Okay.
10        A.    As of Monday of this week.
11        Q.    I don't know if I have that.
12   Well, we'll take a look on our next break.
13             MR. SCHWARZ:   I e-mailed it to
14        you yesterday.
15             MR. LEVITES:  Must missed that,
16        Steve.  I'll take a look.
17        Q.    But before we look to the
18   updated CV, do you know off the top of your
19   head is there any meaningful updates
20   between October 14th and now?
21        A.    No, it would just be training
22   or if I presented a class.
23        Q.    Okay.  Then you have at page 53
24   of your report it begins a list of
25   testimony, it continues through to page 54.
```



Page 69

                         J. KARASINSKI
1
2    Do you see that, Mr. Karasinski?
3         A.    Yes.
4         Q.    So looking at this list, do you
5    know how many of these cases you were
6    retained on behalf of the plaintiff?
7         A.    You mean Firachi Lane
8    (phonetic) or just in general plaintiff
9    versus defendant?
10        Q.    Just in general, plaintiff
11   versus defense.
12        A.    Okay.  Well, some of them are
13   actually criminal cases too, so ...
14        Q.    Okay.  So --
15        A.    We handle first-party plaintiff
16   and we handle defense, we're probably 60/40
17   plaintiff work versus defense work, and
18   when I say plaintiff work, that's
19   subrogation as well, right, not like
20   personal injury cases.
21        Q.    Understood.  Do you do more
22   subrogation or personal injury when -- in
23   respect of the -- your consulting?
24        A.    I would say we're probably
25   60 percent subrogation plaintiff work and



Page 70

```
                          J. KARASINSKI
 1
 2   the other 40 percent is defense work.  We
 3   represent multiple manufacturers
 4   countrywide.
 5        Q.    On your list of testimony here,
 6   are any of these active matters?
 7        A.    You're kind of scrolling a
 8   little fast for me, hold on.  What page is
 9   that?
10        Q.    I'm sorry.
11        A.    No, that's all right.
12        Q.    It's page --
13        A.    I'm not a fast reader.
14        Q.    -- 54 and this -- I can show
15   you what's here on the screen now is all of
16   the cases on page 54 and then there's just
17   one extra one on the bottom page 53.  So
18   I'll just leave this page 54 up so you can
19   see all of these cases.
20        A.    Yeah, I believe that the last
21   case that I just -- yeah, that one.  I
22   believe that one has settled so I think all
23   these are closed matters.
24        Q.    Okay.  So the only one that
25   might have been active is this EDNY case
```



```
 1                 J. KARASINSKI
 2  ending 5/21 but you believe that I recently
 3  settled?
 4      A.    Yes, I believe that settled.
 5      Q.    Could you briefly give me a
 6  summary of what products -- in the cases
 7  that involve products here, which products
 8  were involved?
 9      A.    So the one that just settled
10  that involved a FPDU -- and if you don't
11  know what that is, that is a -- that is
12  what you all calls a outlet that has USB
13  ports in your furniture is called an FPDU.
14  Yeah, I've testified on arson cases, I've
15  testified in criminal cases, I've testified
16  at Grand Jury.
17      Q.    So you mentioned one case
18  involved FPDU and then you had some cases
19  that involve intentionally set fires, were
20  any of the other cases on this list involve
21  products?
22      A.    Well, yeah, I mean, if we're --
23  if it's a subrogation case then we're
24  obviously looking either at a product or a
25  person that may have been at fault for
```



Page 72

                    J. KARASINSKI
1
2    causing the fire, whether it's, you know, a
3    contractor or subcontractor or potential
4    product failure.
5        Q.    Do any other products jump to
6    mind from this list or would you need to go
7    back to your --
8        A.    I would -- yeah, I would have
9    to go back to the files. I know the one --
10   the federal court in Kentucky, that was a
11   vehicle electrical fire.  I recently
12   testified in Buffalo, New York, that's on
13   there too.  That was a big steel factory
14   fire that occurred in Buffalo, but I would
15   have to go back and look.  The state of
16   Illinois, I think that was a dust
17   explosion.  County of Onondaga, I believe
18   that was an arson case that I testified to.
19   The rest I would have to look, I'm sorry.
20       Q.    Oh, no, thank you for going
21   back pretty far from memory.  And again,
22   with the understanding that you may have to
23   look back at your records to give a
24   definitive answer, do you know if any of
25   these cases involve notebook batteries?



Page 73

J. KARASINSKI

1

2      A.    No, none of these cases involve
3  notebook batteries.
4      Q.    How about lithium ion
5  batteries?
6      A.    Yes, I have testified on cases
7  with lithium ion batteries.
8      Q.    Which of the cases was lithium
9  ion battery case?
10     A.    The New Hampshire case
11  involved a -- and I think I'm under a
12  confidential agreement because it settled,
13  so I just won't say the product name, but
14  that was a torpedo heater that was both you
15  could plug in or have batteries that would
16  run the torpedo heater.
17     Q.    Okay.  That had 18650 cells?
18     A.    Yes, you would be able to plug
19  in a battery pack to that unit to run it
20  that would involve -- that is energized by
21  18650s if you're not utilizing the power
22  from an structure to energize it.
23     Q.    Was it your opinion in that
24  case that the torpedo heater failed and
25  caused a fire?



Page 74

                    J. KARASINSKI

1

2        A.    It was, yes.  Well, let's

3   rephrase that.  When you say failed, that

4   product -- again, reviewing warnings -- was

5   recalled because the product when you have

6   lithium ion batteries in it and you set the

7   thermostat, that product could -- that

8   torpedo heater could come on when people

9   were not present.  So you could walk by

10  that product and think it's off, because

11  it's not running, but the thermostat would

12  be set and if you had -- if you were

13  energizing that unit with the batteries,

14  that thermostat could call for that unit to

15  turn on when you're not there, when the

16  thermostat calls for heat was the actual

17  recall.

18       Q.    So essentially the torpedo

19  heater was kicking on unattended and that

20  was the --

21       A.    Yes.

22       Q.    -- that was what started the

23  fire?

24       A.    Yes.

25       Q.    Okay.  So it wasn't a thermal



Page 75

                    J. KARASINSKI

1

2    runaway of the --

3         A.    Of the cells, no, no, no.

4         Q.    It was the recall, the reason

5    for the recall was the reason for the fire?

6         A.    Yes.

7         Q.    In all these cases, did you

8    render a formal written report in all of

9    them?

10        A.    I would say yes.  I wouldn't

11   have written a report, like, for testifying

12   at a Grand Jury hearing or a criminal case.

13        Q.    Understood.

14        A.    Yeah, okay.

15        Q.    All the civil matters in your

16   report would have been anticipated, it's

17   fair to say that you prepared a report in

18   those cases?

19        A.    Yes, I would have authored a

20   report, yes.

21        Q.    Okay.  Was there any case in

22   which you concluded the building electrical

23   system was the cause of the fire --

24        A.    Oh, of course.

25        Q.    -- among these cases here?



Page 76

                        J. KARASINSKI
1
2        A.    Among these cases here I don't
3   think any of them were structural
4   electrical causes.
5        Q.    So when you say that you had
6   concluded the building electrical system
7   caused the fire in previous instances are
8   you referring to your work back in Liberty?
9        A.    Well, no, our office -- our
10  firm gets anywhere from 900 to 1,200 cases
11  a year, so we deal with electrical issues
12  pretty much on a weekly basis.  Just if
13  you're asking on these specific cases that
14  I testified in court or written a report,
15  are any of these due to electrical issues,
16  I'm not aware without reviewing all of
17  them, but we deal with electrical issues on
18  a weekly basis on other fires.
19       Q.    So you have concluded that in
20  other cases that the cause of fire was the
21  building electrical system but you can't
22  say without going through your files
23  whether any of these cases listed here that
24  was the case?
25       A.    That would be a fair statement,



Page 77

1                    J. KARASINSKI

2    yes.

3              MS. LEVITES:  We do have the

4         video backup right, Ms. Schweke?

5              THE REPORTER:  Yes.

6              MR. LEVITES:  Okay, if we could

7         just refer to that for all but the

8         most critical questions that would be

9         very helpful because I know that Mr.

10        Karasinski has a very busy week and

11        we have a lot of his reports to go

12        through so I'd appreciate that.

13        Q.    So I think I still have your CV

14   up here.  You already told me, I think,

15   that there's nothing significant since the

16   date of this CV in October of '24 except

17   perhaps some presentations or instructions

18   you presented?

19        A.    Presentations or if I attended

20   a seminar, yes.

21        Q.    Right.  Is there anything in

22   this CV that you -- as you sit here today

23   that you know is either inaccurate or

24   incorrect that you'd like to clarify?

25        A.    Not that I'm aware of, no.



Page 78

                        J. KARASINSKI
1
2        Q.      Is there anything you consider
3    of import or significance the opinions you
4    rendered in this case that's not in your
5    CV?
6        A.      Not that I'm aware of, no.
7        Q.      Do you know how much you've
8    billed to date on the file?
9        A.      Oh, Counsel, I have no idea.
10       Q.      Do you know how many hours
11   you've worked?
12       A.      No, I've not reviewed any
13   billing, I don't handle billing.
14       Q.      Would you say it's more than
15   20 hours?
16       A.      Oh, absolutely.  Since 2020,
17   yes.
18       Q.      More than 50?
19       A.      I would say you're probably
20   getting close.
21       Q.      Okay.  So around 50; is that
22   fair to say?
23       A.      That would be an estimate.
24       Q.      That would be an estimate with
25   understanding you don't have your bills in



Page 79

1                    J. KARASINSKI

2    front of you?

3         A.    Yes.

4         Q.    Without telling me the

5    specifics of how you came to be retained by

6    Attorney Schwarz and his firm, could you

7    just tell me generally were you contacted

8    directly by his office, were you referred

9    by someone else, was there some other way

10   that you came to be retained in this case?

11        A.    I have been doing work for

12   Faraci Lange for several years, not a lot

13   of work, maybe one assignment maybe a year,

14   maybe two, so it's not a big client but we

15   do handle their work.

16        Q.    You would typically get

17   outreach directly from the firm because you

18   worked for them in the past?

19        A.    Yes.  On this case Matt

20   Belanger is the one that contacted myself

21   to see if I could assist with the fire

22   investigation in this matter.

23        Q.    You said you worked with Faraci

24   Lange one or two cases a year over the last

25   four or five years was it?



Page 80

1                    J. KARASINSKI

2        A.     Yeah, I would say that's a fair

3    statement.  I don't know how long but we --

4    I mean 2020, so that's five years, so I

5    would say we started maybe six or

6    seven years.  Probably handled maybe five

7    to seven cases for them in total.

8        Q.     Did any of those cases involve

9    notebook computers other than this one?

10       A.     I don't think so, no.

11       Q.     Lithium ion batteries, do any

12   of those cases involve lithium ion

13   batteries?

14       A.     I don't recall if any of them

15   involved lithium ion batteries.  We just --

16   we handle so many -- I mean, you see it on

17   the news, lithium ion batteries get blamed

18   for a lot of stuff so I don't recall if we

19   handled any lithium ion battery losses for

20   them, except for this case.

21       Q.     Then we talked about -- we went

22   through your list of cases, were the ones

23   that you were able to recall the products,

24   were any of those Faraci Lange cases?

25       A.     Can you repeat that question,



Page 81

1                    J. KARASINSKI

2     I'm sorry?

3          Q.    Yes.  So we looked at your

4     active list of testimony at page 53 and 54

5     here and you were able to recall a few of

6     the products that were involved and my

7     question is, for those cases, which I

8     believe there was the torpedo heater, there

9     was the vehicle electrical fire, there's a

10    dust explosion, arson case and the steel

11    factory fire and an FPDU case, so among

12    those cases, do you remember if any of them

13    were for Faraci Lange?

14         A.    No, none of those cases were

15    for Faraci Lange.

16         Q.    Sorry, go ahead.

17         A.    No, none of those cases as it

18    pertains to my expert testimony, none of

19    those cases were for Faraci Lange.

20         Q.    Do you remember what the

21    product were in those other five or

22    six cases you worked with Faraci on?

23         A.    Oh, I have a current explosion

24    case for them, I've handled a space heater

25    fire case from them that settled where



Page 82

J. KARASINSKI

1    there were multiple fatalities, handled a
2    lawnmower case for them.  I think that's
3    it.  And then this case.
4           Q.    Okay.  So explosion case in
5    that one, you don't know what caused it
6    yet, fair to say?
7           A.    We haven't finished our scene
8    exam yet, we were waiting for the snow to
9    melt.
10          Q.    Okay.  Then there's the space
11   heater case and the lawnmower case and you
12   can't remember any others other than that?
13          A.    Not off -- no, not off the top
14   of my head.
15          Q.    So we have up here your report
16   marked as Exhibit 1, we have your rebuttal
17   that we marked as Exhibit 2, are there any
18   other reports out there that set forth your
19   opinions or findings that are supplemental
20   or different from these reports?
21          A.    No.
22          Q.    Maybe this is a good time to
23   take a break, we've been going for
24   90 minutes.



Page 83

                    J. KARASINSKI

1

2        A.     Sounds good to me, I was just

3    going to ask for a break.

4               (Whereupon, a break was taken.)

5        Q.     So, Mr. Karasinski, I'm going

6    to turn to page 47 of your report, as I

7    indicated previously, you're free to follow

8    along on your paper copy if that's better.

9    I'm going to try to blow this up so you can

10   see everything.

11       A.     Okay.

12       Q.     So you see they're a section

13   that begins Conclusion, there?

14       A.     Yes.

15       Q.     Then there's three paragraphs

16   that follow there.  Is it fair to say that

17   these three paragraphs represent summary of

18   your opinions in this case?

19       A.     Just let me read it real quick,

20   sorry.

21       Q.     Yes.

22       A.     Yes, that's a fair statement,

23   that's a summary.

24       Q.     Okay.  Do you have any opinions

25   of significance that are not summarized on



Page 84

                         J. KARASINSKI
1
2    pages 47 and 48 there?
3         A.    I do not know.
4         Q.    Did you do any work of
5    significance in reaching your opinions on
6    pages 47, 48 that isn't reflected your
7    report?
8         A.    Can you repeat that question?
9    I'm sorry, I was trying to put this back in
10   order and I couldn't hear.
11        Q.    No problem.  My question is,
12   did you do any work with any significance
13   in reaching your opinions on pages 47 and
14   48 that are not reflected in your report?
15        A.    No, not of significance, no.
16        Q.    Now, you understand that the
17   notebook at issue is a Hp Pavilion Dv6,
18   correct?
19        A.    I don't recall the model but I
20   know it was an Hp Pavilion.
21        Q.    Okay.  So you understand it to
22   be an Hp Pavilion at least?
23        A.    Yes.
24        Q.    So for ease of reference today
25   when I talk about the Pavilion, I'm going



1                    J. KARASINSKI

2    to be referring to the model of the

3    computer and when I refer to the Marcillin

4    notebook, the one that she had, I'm going

5    to call that the Marcellin notebook.  Is

6    that okay?

7         A.    Okay.

8         Q.    With respect to the Marcellin

9    notebook, do you know when it was

10   manufactured?

11        A.    When you say the notebook, is

12   that the one that she claimed was in

13   storage in the closet?

14        Q.    No, the Marcellin notebook

15   meaning the Pavilion notebook that she had.

16        A.    I don't know -- I don't know

17   how long she had that, I don't recall.

18        Q.    Okay.

19        A.    It maybe somewhere in my notes.

20        Q.    If I told you it was

21   manufactured in December 2010, does that

22   refresh your recollection at all?

23        A.    That sounds about right.

24        Q.    The materials you reviewed in

25   your report are listed here at page 2.



Page 86

                        J. KARASINSKI

1

2      A.    Okay.

3      Q.    Is that correct?

4      A.    That's correct, yes.

5      Q.    Then you have scientific

6  references here at page 50?

7      A.    Yes.

8      Q.    Is there anything you reviewed

9  in preparation of your report here marked

10  as Exhibit 1 that's not referenced on

11  pages 2 and 50 in your report?

12      A.    No.

13      Q.    You state in page 2 that you

14  examined -- you personally examined the

15  scene on February 27, 2020; is that

16  correct?

17      A.    It appears that way, yes.

18      Q.    Do you remember doing that?

19      A.    Yeah, you have at the scene.  I

20  don't remember the exact date about if it's

21  2/27/20 it should be accurate.

22      Q.    You know it just occurs to me

23  that the world changed pretty dramatically

24  shortly after this exam, didn't it?

25      A.    Actually, it was right in the



Page 87

```
1                    J. KARASINSKI
2    middle of this exam, it was COVID, yeah.
3         Q.    So you were already masking up
4    at the exam or at least thinking about it
5    perhaps?
6         A.    Yeah, I think New York was
7    still essentially shut doubt per our
8    wonderful governor.
9         Q.    Wow.  So what generally did you
10   do during that examination?  I know there
11   were a lot of people but what were your
12   activities in the general manner?
13        A.    So when we got there initially
14   when we do our joint scene exams we'll go
15   through and give a background, that
16   background was actually given by Jeff
17   Luckey, the local fire investigator, and
18   then the other investigator that was there
19   from NEFCO, I believe, Brian is his first
20   name, I don't remember his last name but it
21   would be on the sign-in sheet, gave his
22   background because he did his initial exam
23   before the parties were put on notice.  And
24   then after that takes place we -- at that
25   point Greg Gorbit [phonetic], who was there
```



```
 1                    J. KARASINSKI
 2  for you all, requested that he be able to
 3  do a Matterport.  While Greg was doing his
 4  Matterport everyone else went along with
 5  their business and did their exterior
 6  photos and inspection and then we waited
 7  for Greg to finish.  Once Greg was done
 8  doing his Matterport scan of the structure,
 9  then all parties were allowed back into the
10  property to get their overall photographs
11  of the interior of the structure, and then
12  once everyone was done with the interior of
13  the structure, we would then reconvene back
14  outside and give a brief description on the
15  next steps on how we were going to handle
16  the removal process of any evidence, as
17  well once we did that, we went back in.  At
18  that point all parties agreed that the room
19  of origin was the office so we processed
20  the evidence in the office space with photo
21  documentation, as well as evidence tents
22  for collection, we collected that evidence,
23  we traced circuits to identify which
24  breaker was tripped in the panel box within
25  the structure, we packaged the evidence.
```



Page 89

                    J. KARASINSKI

1
2    Greg did ask that we lay out the evidence
3    in the garage for him to take better
4    photographs of, we did that for Greg, and
5    we collected the evidence and we left, and
6    then we attended a future lab exam at our
7    facility in Sodus Point, New York, at a
8    later date.
9         Q.    So that was a very helpful
10   summary, thank you for that, Mr.
11   Karasinski.
12              Now, did you perform any tests
13   in arriving at your conclusions in
14   preparing this report?
15        A.    I guess what do you mean by
16   tests?
17        Q.    Did you personally test
18   anything?
19        A.    At the scene or just do you
20   mean in general?
21        Q.    At the scene or in general.
22        A.    Still at the scene?  I'm sorry,
23   I didn't know if we were still at the scene
24   or at the lab exam.
25        Q.    Either.



Page 90

                              J. KARASINSKI
1
2       A.     Yeah, so I mean tests are
3   completed throughout the entire thing.  I
4   would consider using a meter to test to
5   determine what breaker it is, so we tested
6   that at the scene.  I would consider that
7   nondestructive, we're not manipulating
8   anything.  And then any testing we did with
9   the Keyence, CT and then, you know,
10  anything that involved after the testing of
11  the laptop, again, that was outside the
12  scope of my investigation, that's not why I
13  have retained, so ...
14      Q.     Sorry, you said Keyence?
15      A.     Keyence is 3D microscopy.
16      Q.     Okay.  So you used a meter at
17  the scene on the breaker, you did the 3D
18  microscopy and you did the CT scan, is that
19  fair to say that comprises the tests you
20  did --
21      A.     Yes, we did CT -- we did CT
22  scanning as well as X-rays, so I would
23  consider all that testing.
24      Q.     Yes.  X-rays are certainly
25  testing as well, right?



Page 91

1                    J. KARASINSKI

2          A.    I'm sorry, say again?

3          Q.    I said X-rays are certainly

4    testing as well, correct?

5          A.    Yes, yes.

6          Q.    Okay.  So we had the meter at

7    the scene, 3D microscopy, the CT and the

8    X-rays, were there any other tests that you

9    did?

10         A.    I'm not the aware of what other

11   testing they may or may not have done with

12   the laptop at the lab exam.  They may have

13   taken voltage readings of any remaining

14   cells and things of that nature, but again,

15   that was not -- that's not -- was outside

16   my scope so ...

17         Q.    Are you familiar with Linden's

18   Handbook of Batteries?

19         A.    What did you say, Linden?

20         Q.    Linden's Handbook of Batteries?

21         A.    I'm not familiar with that.

22         Q.    Did you do any battery failure

23   analysis in this case?

24         A.    Again, that was outside my

25   scope, Counselor, I didn't do any of the



Page 92

                        J. KARASINSKI
1
2    battery or computer testing whatsoever.
3         Q.    Okay.  That would have been Dr.
4    Martin?
5         A.    That would have been Steve
6    Martin, yes/
7         Q.    What's a counterfeit battery
8    pack to you?
9         A.    Non-OEM battery pack.
10        Q.    Is there any distinction
11   between a non-OEM battery pack --
12        A.    Well, to me an OEM battery pack
13   I would define that as approved and
14   manufactured by the manufacturer of the
15   actual item that it's being used it.
16        Q.    Okay.
17        A.    So if it was purchased and it's
18   knockoff non-OEM I would say then that's a
19   subsequent non-OEM battery that was
20   purchase from another entity.
21        Q.    Is there any distinction in
22   your mind between an unauthorized battery
23   and a counterfeit battery?
24        A.    Not in my mind, no, but again,
25   that's outside my scope.  That probably be



Page 93

1                    J. KARASINSKI

2  a better question for Mr. Martin.

3       Q.    As of the date of your

4  laboratory exam in October 2020, were you

5  aware that the cells in the Marcellin were

6  not original to her Hp product?

7       A.    I believe we were under the

8  impression at the scene exam that it may

9  not have an OEM battery pack but we had no

10  receipt to the confirm that so we

11  weren't -- I don't think we were able --

12  when I say we, when the lab inspection

13  occurred, I don't think we were for sure

14  yet or could make that opinion, but at the

15  lab exam I think it was determined by all

16  parties that it was a non-OEM battery pack.

17       Q.    So at least by the day after

18  the laboratory exam, October 27, 2020, you

19  came to understand at least by that date

20  the cells on the Marcellin notebook at the

21  time of the fire were not original to her

22  Hp product?

23       A.    Yes, that's a fair statement.

24  I think that based on the assistance from

25  the Hp expert that was on site, as well as



Page 94

1                      J. KARASINSKI
2     the other battery expert that was at the
3     inspection -- at the lab inspection, I
4     believe they were able to make that
5     determination.  Or confirm it I guess would
6     be a better word.
7          Q.    Would you agree that at the
8     time of the fire Ms. Marcellin's notebook
9     was not in the configuration that it was an
10    originally sold to her?
11         A.    You're going to have to
12    rephrase that.  I don't know what you mean
13    by configuration.  Configurations meaning
14    how it's sitting on the armoire or the
15    desk?
16         Q.    Okay, yes, I meant --
17    absolutely.  I mean configuration in the
18    sense that, you know, the installed
19    components and the like.
20         A.    We were under the impression
21    that she believed she purchased a battery
22    for it, but at that point we did not have
23    the receipt or know if that battery was
24    actually in that laptop until the lab exam.
25         Q.    But as you sit here today you



Page 95

                        J. KARASINSKI

1

2    agree that the laptop at the time of the

3    fire was not in the condition it was

4    originally sold?

5         A.    With a replacement battery,

6    yes.

7         Q.    Do you have any knowledge about

8    any other alterations that might have been

9    made to the computer from the time it was

10   made by Hp to the time of the fire?

11        A.    I have no knowledge of any

12   alterations except for the replaced

13   battery.

14        Q.    Did you do anything to

15   ascertain if there are any other

16   alterations?

17        A.    That would be a question for

18   Mr. Martin.

19        Q.    Ms. Marcellin stated she never

20   replaced the battery, right?

21        A.    Well, when you say, like, her,

22   like, physically replacing it or you mean

23   purchasing it?  Yeah, I don't know actually

24   put the battery back in to the laptop.  I'm

25   assuming it was her but I don't know who



Page 96

```
 1                    J. KARASINSKI
 2   did that.
 3        Q.    But you didn't ask her, right?
 4        A.    Well, we asked -- the local
 5   investigator asked her, he's the one that
 6   advised that she believed that she
 7   purchased a new battery or for it, but
 8   again, we weren't able to confirm that
 9   until we actually removed the battery from
10   the unit in question at the lab exam.
11        Q.    Do you know if the Pavilion was
12   UL listed?
13        A.    I would have to go back to my
14   photographs to look at the stickers.
15        Q.    Well, what is a UL listing?
16        A.    Underwriters Laboratories, that
17   it meets United States government
18   qualifications and safety recommendations
19   and things of that nature.
20        Q.    Do you what UL standards govern
21   consumer electronics like the Pavilion?
22        A.    Which standards, I don't recall
23   which ones exactly, no.
24        Q.    Do you recall if the battery
25   pack that was original to the Marcellin
```



Page 97

                    J. KARASINSKI

1

2   notebook was UL listed?

3       A.    I don't know that we've ever

4   seen the original battery pack for that

5   computer.

6       Q.    Do you know what --

7       A.    I would presume it is but I've

8   never seen it so I can't say 100 percent

9   without actually physically inspecting the

10  battery.

11      Q.    Do you know if UL standards

12  govern lithium ion battery packs?

13      A.    That would be a question for

14  Mr. Martin, I did not review that before

15  this deposition.

16      Q.    Do you know what tests are done

17  under the UL standards to battery packs?

18      A.    I have a general understanding

19  of those, but again, I didn't review that,

20  that would be more that was outside my

21  scope, so that would be more of a question

22  or Mr. Martin.

23      Q.    So with the understanding that

24  the question better directed to Dr. Martin

25  expertise, what's your general



Page 98

1                    J. KARASINSKI

2    understanding of the tests that are done

3    with battery packs under UL?

4         A.    So it would take measurements

5    voltage, it would look at the battery

6    management system to confirm that it's

7    probably -- it has the correct safety

8    design to it and that it meets -- based on

9    the construction and the design, that it

10   meets the UL standard.

11        Q.    Do know what specific tests

12   they do to a battery to confirm that?

13        A.    I'm not familiar with that, I

14   did not review that and that would be a

15   question for Mr. Martin.

16        Q.    Okay, that's helpful because I

17   was just about  to ask about specific tests

18   --

19        A.    I knew you were -- I knew where

20   you were going.

21        Q.    You're not going to testify

22   about the Ogden test or the projectile test

23   or anything like?

24        A.    No, sir.

25        Q.    Is that something that Dr.



Page 99

1                    J. KARASINSKI
2    Martin would know about?
3         A.    Yes.
4         Q.    Do you know the ambient
5    temperature that a 18650 cell would go into
6    thermal runaway?
7         A.    I believe some of the documents
8    I've seen is anywhere from 300F to 500F I
9    think is what I've seen before.
10        Q.    Do you know what industry of
11   standards apply to rechargeable batteries
12   for notebook computers back in December of
13   2010?
14        A.    Again, that's outside my scope,
15   that would be Mr. Martin.
16        Q.    Do you have any familiarity
17   with the IEEE standards?
18        A.    I know of the IEEE standards, I
19   didn't review those.
20        Q.    Okay.
21        A.    Again, that would be Mr.
22   Martin.
23        Q.    What's an exemplar?
24        A.    Well, there's two terms that
25   people use loosely in the industry is



1                    J. KARASINSKI

2    exemplar and a comparison, so to me an

3    exemplar would be an exact duplicate, a

4    comparison would be something that is

5    similar if we can't find the exact make,

6    model, age, you know, with a battery

7    that's -- you know, a battery -- or a

8    computer that's ten years old I'm probably

9    not going to be able to find that battery

10   to get an exemplar unless the actual

11   company -- sometimes the companies will

12   provide exemplar batteries because they'll

13   have some in-house, but to me a comparison

14   and exemplar, again, they're used loosely

15   in our industry but exemplar to me is an

16   exact identical match, a comparison is

17   something that's similar.

18        Q.    So an exemplar in this case

19   would be another Hp Pavilion, the same age

20   and condition as Ms. Marcellin and a

21   comparison might be, let's say, something

22   of the same age but they don't have a new

23   old stock battery to put in, so it's

24   obviously not the same.  So that would be a

25   comparison and the one of the same age and



                    J. KARASINSKI
1
2    condition would be an exemplar; is that
3    fair to say?
4        A.    That's fair to say.  And I
5    would say most battery manufacturers, they
6    change their BMS ports pretty regularly so
7    it would be extremely difficult to find an
8    exact exemplar unless we got it from the
9    actual manufacturer.
10       Q.    So you would really expect to
11   get a comparison, not an exemplar in a case
12   like this because of the age of the
13   product?
14       A.    That would be typical, that
15   would be a good assumption, yes.  It's not
16   impossible but, again, I mean, define
17   something typically when batteries go bad
18   in their laptops they replace them and
19   throw them out, so we don't even have, you
20   know, one laying around somewhere that we
21   could possibly find, so not a lot of those
22   for sale, used battery computer packs sale
23   online.
24       Q.    They end up in the pile at
25   the --



```
 1                    J. KARASINSKI
 2       A.    At the recycling company, see.
 3  That's what we talked background earlier.
 4  You remembered, look at that.
 5       Q.    So did you obtain any exemplars
 6  in connection with your work in this case
 7  or comparisons rather?
 8       A.    You would have to ask Mr.
 9  Martin, I didn't do any inspections of the
10  batteries, so --
11       Q.    You didn't get any exemplars
12  but Dr. Martin might have?
13       A.    Correct.  I'm not aware of us
14  getting any exemplar battery packs.
15       Q.    Did you dissemble the Marcellin
16  notebook at all?
17       A.    I was present in and out for
18  the lab exam but they did disassemble --
19  the exam was destructive at our facility,
20  they did X-ray it and then dissemble it to
21  get the remaining cells out, as well as the
22  battery management system board that was
23  still -- I believe still attached kind of
24  to the laptop.
25       Q.    When you compared the cells
```



Page 103

1                    J. KARASINSKI

2    that you excavated from the Marcillin

3    notebook, when you begin in the matter what

4    did you compare them to, if anything?

5         A.    That's a Steve Martin question.

6    That's on him, that was outside my scope of

7    my investigation, so ...

8         Q.    It's probably the same answer

9    but do you have any opinion as to what

10   caused the failure of the Marcellin

11   notebook?

12        A.    I have no opinion on that, that

13   was outside the scope of my investigation.

14        Q.    If you were asked to try and

15   figure it out would you try or would that

16   just be beyond the scope of your expertise?

17        A.    If our client asked I do -- we

18   do look at lithium ion battery packs

19   weekly, so yes, I could do that, but I was

20   not tasked with that and that was outside

21   my scope so I stayed in my lane.

22        Q.    So what would you have done if

23   you had been asked to determine what the

24   cause and failure was in the Marcellin

25   notebook?



                            J. KARASINSKI

1

2        A.    We would have continued with

3    the same process we did with the X-rays,

4    going through the battery management system

5    to determine, identify if it was a

6    replacement battery and if it was an OEM

7    from Hp or if it was purchased somewhere

8    else, we would look for those receipts and

9    from those receipts we would try to get a

10   comparison pack from wherever it was

11   purchased or even a exemplar replacement

12   pack and then we do that and we would

13   compare that to the pack in question and

14   see if there were any changes, differences

15   to it and then determine, you know, based

16   on the cell configuration what safety

17   devices were in use at the time or not in

18   use at the time within that pack.

19       Q.    Do you know and can you state

20   what the safety features of the Pavilion

21   notebook were?

22       A.    I did not review that and

23   again, that was outside the scope of my

24   investigation.

25       Q.    When you're looking at possible



Page 105

1                    J. KARASINSKI

2    product failure that's duplicated in a

3    fire, do you ordinarily look at the safety

4    features of that product?

5         A.    Well, of course.  We would like

6    at the design of the product, the safety

7    features.  Like, a simple space heater, did

8    it tip over, does it have a tip-over

9    switch, right?  So we would look at those

10   features, those safety features in any

11   product if we're looking at that as the

12   potential failure or cause of a fire.

13        Q.    But you didn't do it that in

14   this case because you weren't asked to?

15        A.    Correct.  Mr. Martin was

16   retained to handle that portion of it.

17        Q.    So you didn't review any

18   schematics for the product, right?

19        A.    That was outside the scope of

20   my investigation for this loss, yes.

21        Q.    You didn't do anything to try

22   to figure out who did manufacturer that

23   counterfeit battery pack?

24        A.    That's a question for Mr.

25   Martin.  I did not to that, no.



```
 1                    J. KARASINSKI
 2        Q.     What are the critical
 3    components of a lithium ion battery?
 4        A.     Eastbound when you say
 5    critical, I guess define critical, what do
 6    you mean?
 7        Q.     I mean --
 8        A.     Okay.  Well, you've got the
 9    safety features, right, you've got the
10    design, you've got the layout, sometimes
11    some of the battery management systems have
12    fuses to protect the cells from damage, you
13    know, where those items are stored, if
14    they're stored properly, if they're being
15    misused, mishandled and properly charged.
16    All those -- they all run in together,
17    right, when you're doing an investigation.
18        Q.     Can you just generally describe
19    the process of how a battery cell runs into
20    thermal runaway?
21        A.     Well, there's multiple --
22    there's multiple ways it can go into
23    thermal runaway.  Could be a design issue,
24    it could be improper use issue, it could be
25    overcharging, undercharging, it be could be
```



```
 1                    J. KARASINSKI
 2  damage, you know, like, I did the example
 3  of most people if you have a
 4  battery-powered drill in your house and
 5  you're using it in your garage and you drop
 6  it on the cement floor, right, that's
 7  misuse.  But when you drop that on the
 8  cement floor, you pick it back up and you
 9  hit the trigger and it still works,
10  everything's good, right?  But did you
11  damage that battery pack when you dropped
12  it, right?  So you got misuse, you got
13  overcharging, undercharging, improper
14  storage, improper use.  So there's multiple
15  ways that a pack can go into thermal
16  runaway, as well as fire attack and thermo
17  attack.
18        Q.    You talked about wild wind
19  fires, that's an example of a thermal
20  attack and an exterior fire attack, right?
21        A.    Well, no, wild wind fires like
22  what happened just in California, burned
23  down all the houses and killed the people,
24  yeah.
25        Q.    Right, but when it attacks the
```



Page 108

```
 1                    J. KARASINSKI
 2    battery facility or a Tesla battery and it
 3    goes into runaway, that's an example of an
 4    external attack?
 5         A.    Correct, yes.  Fire -- I mean
 6    all of it could be external, right?  You
 7    got fire attack, you got thermal attack
 8    from heat in fire events, again, misuse,
 9    improper use, maintenance of the actual
10    pack and like I said, damaging the pack,
11    you know, during use.
12         Q.    So you think that -- you were
13    deferring to Dr. Martin in this but you
14    didn't do anything to determine whether the
15    notebook was in the same condition at the
16    time of fire as it was at the time of sale
17    to Ms. Marcillin, correct?  My question is
18    did you do anything to determine whether
19    the notebook was in substantially the same
20    condition at the it was sold to
21    Ms. Marcellin as at the time of the fire?
22         A.    Again, that would be Mr. Martin
23    and outside my scope but the only thing
24    that I'm aware of that changed in that
25    laptop was the replacement battery pack.
```



Page 109

                    J. KARASINSKI
1
2  I'm not aware of any other changes.
3      Q.    So you talked abuse, how did
4  you rule out improper use or physical abuse
5  of the notebook as a potential cause of the
6  fire?
7      A.    You'd have to refer that back
8  to Mr. Martin, that was outside my scope.
9      Q.    So it's really for Dr. Martin
10 to say whether it was one of the various
11 causes that we talked about -- improper use
12 overcharge, undercharge, damage, fire
13 attack, thermal attack, and --
14     A.    Yeah, if we go back to your
15 question I believe you asked for examples
16 what that would be.  But, yeah, I gave you
17 examples of my familiarity with battery
18 packs and what those failures are, but Mr.
19 Martin examines that laptop and those cells
20 and that's a better question for him and
21 that was outside my scope.
22     Q.    Okay.  All right, and then on
23 page 2 of your report --
24     A.    Can you pull that back up
25 again?



1                    J. KARASINSKI

2        Q.      Yeah, absolutely.

3        A.      Sorry.

4        Q.      No, that's all right.  Do you

5    see it?

6        A.      Yes, got it.

7        Q.      So I'm looking at the

8    highlighted bullets here, it says that you

9    reviewed NFPA 921 and 1033, correct?

10       A.      Yes.

11       Q.      My question is, is it your

12   opinion that the identification of an

13   ignition source in a first fuel is

14   sufficient to determine the cause of a

15   fire?

16       A.      Well, when we're -- are you

17   talking about cause or classification?

18   Those two terms get run around too.  So

19   cause -- if we're talking about cause, that

20   is a circumstances and condition and an

21   agency that resulted in a fire or an

22   explosion of that occurring.

23   Classification is when we talk about the

24   ignition source and the sequence of events

25   that caused the fire.  So they're two



Page 111

```
 1                  J. KARASINSKI
 2   different things, classification and cause
 3   are two totally different terms.
 4        Q.    Okay.  So would the
 5   identification of your ignition source and
 6   your first fuel, that would give you enough
 7   information to determine the cause, I think
 8   is what you're saying?
 9        A.    Well, no, you have to -- in
10   following the scientific method you have
11   to, you know, analyze all that data, no,
12   not just one specific.
13             So if we're talking about the
14   ignition scenario, which is cause, what is
15   the first fuel igniting the ignition source
16   and sequence of events, right, that's what
17   causes, so that in the totality of your
18   entire investigation in all data
19   collection, that's how you would come to
20   your opinion.
21        Q.    Okay.  So when you're
22   determining that ignition sequence you have
23   to consider the competency of the ignition
24   source and the first fuel ignited, right?
25        A.    Yes.
```



1                    J. KARASINSKI

2        Q.    You need to determine if the

3    ignition source is actually competent to

4    ignite that first fuel?

5        A.    Competent and that it has

6    enough energy to ignite that first fuel.

7        Q.    Okay.  What do you consider to

8    be the first fuel of this fire?

9        A.    Well, the first fuel would be

10   the ignition source and the ignition of the

11   pack failure and the thermal runaway and

12   that would be -- it expels the contents of

13   the battery when the venting is not

14   sufficient enough to contain that stuff, so

15   went the contents of those packs can --

16   shrapnel can, you know, explode and go into

17   different directions and that is a

18   competent known ignition source within the

19   industry, and it sometimes can exceed

20   temperatures of over -- probably a 1000F.

21       Q.    So the first fuel was the

22   battery pack itself, not something in the

23   office?

24       A.    Correct.

25       Q.    So you would describe  --



Page 113

1                    J. KARASINSKI

2        A.    So I guess to clarify that, so

3    if we're talking about the fire triangle,

4    right, you have to have fuel, heat and

5    oxygen and a chemical reaction.  That's

6    basically what's occurring in a cell when

7    it fail, so that would be the ignition

8    source and a first fuel.

9        Q.    Okay, that makes medication

10   sense.  So when you're talking about the

11   ignition sequence, let's say the first item

12   to be ignited in that room, other than the

13   Hp notebook, would you call that the second

14   fuel perhaps?

15       A.    You could refer to it as the

16   secondary fuels, yes, because, like, you

17   know, when you have cells that do fail --

18   like an example, I did a fire down in Miami

19   at a very large garage and they had a

20   bicycle on charge in the middle of COVID,

21   it's, like, a fire-car garage, and that --

22   the battery went into thermal runaway and

23   expelled all over this garage and I had

24   five or six different points of origin and

25   I found battery remains in all those areas.





```
 1                   J. KARASINSKI
 2        Q.    So that's a good example and I
 3   think that will help us terminologywise, so
 4   I'm going to talk about those -- the
 5   battery contents that are expelled and then
 6   you opine cause ignition in the room of
 7   origin.  I'm going to refer to those as
 8   secondary fuels if that's okay.
 9        A.    That's okay, but you kind of
10   were fading in and out there so I didn't
11   hear your entire statement.
12        Q.    I apologize.  So I was saying
13   your testimony was helpful because you're
14   talking the case in the garage is kind of
15   like what you hypothesize happened here,
16   right?
17        A.    Correct.  I was giving you an
18   example, yes.
19        Q.    Right.  So I'm going refer to
20   that battery, that material that was
21   expelled in this case.  I'm going to talk
22   about that as secondary fuel because you --
23   or where it's landing I suppose and the
24   things that it's igniting, I'm going to
25   describe as the secondary fuel; is that
```



```
 1                  J. KARASINSKI
 2  fair to say?
 3       A.    That would be fair to say.
 4       Q.    Because it's your opinion that
 5  the battery itself was the first fuel under
 6  that NFPA 921?
 7       A.    Correct, yeah.  That meets the
 8  requirement of the fire triangle, yes.
 9       Q.    Okay.  That makes sense.  All
10  right, I'm going to go to page 6 of the
11  report.  I'm just going to zoom out so you
12  can see both of the figures here.
13       A.    Okay.
14       Q.    So you have two -- you
15  summarize here certain witness information
16  beginning with Ms. Marcellin; is that
17  correct?
18       A.    Yes.
19       Q.    In the section of your report?
20       A.    Correct.
21       Q.    So paragraph -- on page 6 you
22  have figures 5 and 6 concerning her
23  testimony about using candles and candles
24  holders and she said she hadn't use either,
25  right?
```



```
 1                    J. KARASINSKI
 2        A.    Correct.
 3        Q.    Is that consist with your
 4   examination of the scene as you recall it?
 5        A.    Yes.
 6        Q.    If she did use candles is it
 7   significant to your conclusion that she
 8   never used a candle holder?
 9        A.    I'm not sure I understand what
10   you mean by that.
11        Q.    Yeah, so Figure 5 she says she
12   didn't use candles, Figure 6 she says she
13   didn't use a cancel holder, and my question
14   is if she did use candles does the fact
15   that she wasn't a candle holder mean
16   anything in particular to you?
17        A.    Not at this time, no.
18        Q.    I'm going to put up a record
19   from the local investigators, it's one of
20   the photos that they took.
21        A.    Okay.
22        Q.    I'm putting up one of the
23   photos that the local investigators took,
24   that's Hp450 and it depicts a candle in the
25   foreground.  Do you see that, Mr.
```



Page 117

1                    J. KARASINSKI

2  Karasinski.

3        A.    Yes.

4        Q.    Does that change your opinion

5  in respect of whether there was any candles

6  in the house?

7        A.    Well, I observed candles and

8  photographed candles.  The statement by the

9  insured is that she didn't -- or by the

10  Plaintiff is that she didn't light any

11  candles and this candle in this instance is

12  not in the area of origin, it doesn't

13  support origin based on the fire patterns

14  that are observed.

15        Q.    Okay.  So this wasn't in the

16  area of origin as you concluded it, right?

17        A.    Correct.

18        Q.    But does it look like it was

19  burnt?

20        A.    It looks like it was used,

21  yeah, based on the wicks are black, yeah.

22  It hadn't been used a lot.  Based on all of

23  our candle testing that we've done in our

24  facility, it usually will burn that -- to

25  burn down to that, I mean, it's not all



                    J. KARASINSKI
1
2   directly all the way up to the top because
3   you want to be able to put the cap on it.
4   That particular candle will have a top for
5   it.  So that candle has been burned before
6   based on the soot I see on the three wicks
7   in the candle.  But again, that's not my
8   area of origin so I can eliminate that.
9        Q.    Okay.  Then going back to the
10  figures in your report, you see a Figure 5,
11  Ms. Marcellin discusses not using candles.
12  So now having seen the photograph of the
13  used candle, does that change any of your
14  opinions in this case?
15       A.    No, it does not.  I mean,
16  people have candles for decoration and
17  never use them.
18       Q.    Would you say that this is
19  another oversight by Ms. Marcellin?
20       A.    No.  Not my opinion.
21       Q.    She said she didn't use
22  candles, right, and they were all stored in
23  the back?
24       A.    Well, you're -- when she says
25  use, I consider that that did she have any



1                    J. KARASINSKI

2    candles lit at the time of fire and I would

3    say no, and that's consistent with what I

4    saw at the fire scene.

5         Q.    I understand that, Mr.

6    Karasinski, but in Figure 5 you've draw up

7    square over line 16 to 19, correct?

8         A.    Yes.

9         Q.    In line 17 and 19 she said they

10   had all been stored in a drawer in the back

11   bedroom, correct?

12        A.    Correct, yes.

13        Q.    So is it fair to say this is

14   another oversight by Ms. Marcellin?

15        A.    To me it's not an oversight,

16   again, Counselor, because people, you know,

17   don't recall.  You get -- we run into these

18   situations all the time where people say,

19   no, I didn't discard the cigarette in that

20   location and I don't smoke and then you

21   walk in the house and there's ashtrays full

22   of cigarettes.  We know you smoke, right.

23   So, again, why people say things or

24   misinterpret, but the physical evidence

25   shows that there were candles at the



Page 120

1                    J. KARASINSKI

2  property.

3       Q.    So you think Ms. Marcellin

4  misinterpreted the question or something?

5       A.    No, I just don't think she

6  recalled that all the candles weren't put

7  away.

8       Q.    She didn't remember, right?

9       A.    Yeah.  And that's something we

10  run into all the time and that's why we

11  take photographs and do a physical exam of

12  the location as well as the evidence back

13  at a lab exam to determine if we do have

14  any candle debris within that area of

15  origin or similar.

16       Q.    When you look at a witness'

17  statements and the physical evidence and

18  you compare them, is that because not

19  everyone's a great historian of a fire

20  event?

21       A.    And I just think people forget

22  and don't recall.  You know, I mean, she's

23  sleeping in the front bedroom with the

24  deceased, the back bedroom.  I mean, was

25  that ever being used?  I don't know, when's



Page 121

                    J. KARASINSKI
1
2   the last time you were in it?  I mean, I
3   have not been upstairs in my house in my
4   kids' bedrooms in a year.  I have no idea
5   what they have up there.
6        Q.    But the candle I just showed
7   you wasn't in the back bedroom, right, it
8   was in the living room?
9        A.    Yeah, correct.  But we saw
10  candles throughout the house.
11       Q.    Now on page 9 you state that
12  Ms. Marcellin never had the computer
13  serviced or had any maintenance or
14  modifications done.  Do you see that?
15       A.    Yes.
16       Q.    We talked about the aftermarket
17  battery, do you have any opinion from any
18  source as to how that battery pack got in
19  her computer?
20       A.    I do not know who installed
21  that battery pack into that computer.
22       Q.    That would be a modification,
23  right?
24       A.    I guess it depends on the
25  individual, when you're asking me with my



Page 122

                    J. KARASINSKI

1
2    background and expertise, modification to
3    me would be installing a different battery.
4    But a layman person that doesn't do what we
5    do or ask the questions that you ask, to me
6    if I'm purchasing a battery just to replace
7    it, if I'm just the normal consumer, I
8    wouldn't consider that as maintenance or
9    changing it.  To me, changing it to an
10   individual that doesn't do this on a daily
11   basis is like taking the thing apart and
12   making alterations to it.  So it just
13   depends on what she perceived that question
14   to be, and sometimes I think people just --
15   just to replace a battery pack, they're not
16   changing or altering anything within that
17   computer.
18        Q.    Well, she did also say she
19   didn't -- she, herself, never put a battery
20   pack in it, right?
21        A.    I believe that was her
22   testimony, yes.  But, again, and like I
23   said earlier, I don't know who actually put
24   the battery pack into this computer.
25        Q.    You have no evidence whatsoever



Page 123

                    J. KARASINSKI

1

2    that it was changed by anyone other than

3    Ms. Marcellin; is that fair to say?

4         A.    That's fair to say, yes.

5         Q.    Okay.  You reviewed Dr.

6    Martin's report, right?

7         A.    I did, yes.

8         Q.    You saw he concluded the

9    battery was -- that was in the Marcellin

10   notebook was manufactured in 2015?

11        A.    I believe that's correct, yes,

12   without pulling up his report.

13        Q.    You would agree with me that if

14   a notebook was made in 2010 and the battery

15   in 2015, the battery could not have been in

16   the notebook when Ms. Marcellin bought it?

17        A.    I would agree with that, yes.

18        Q.    At page 11 of the report you

19   noted that Ms. Marcellin stated no one else

20   used the notebook.  Do you see that?  It's

21   Figure 15 here.

22        A.    Oh, I'm sorry, I was at the one

23   above.  Okay.

24        Q.    So you see that, Mr.

25   Karasinski?



Page 124

1                    J. KARASINSKI
2        A.    Yes.
3        Q.    So if Ms. Marcellin didn't
4    change the battery isn't it necessarily
5    true that someone else used the notebook?
6        A.    No.
7        Q.    Well, how can both statements
8    be true?
9        A.    Well, you stated that how can
10   she say that someone else didn't use the
11   notebook.
12       Q.    Does change the battery not
13   using the notebook?
14       A.    To me the question is with the
15   word use, that to me means I opened up and
16   answered an e-mail.  That to me is use, not
17   replacing a battery.
18       Q.    So you don't know if by
19   answering that -- when you cite her
20   testimony here in Figure 15, you don't know
21   if she's indicating whether or not anyone
22   used it in any context other than used it
23   for its intended purpose; meaning they
24   checked their e-mail, they went on their
25   banking website or whatever, that's what



Page 125

                         J. KARASINSKI
1
2    you understood to mean there?
3         A.    Correct.  That's what --
4         Q.    That's why the statements are
5    consistent to you?
6         A.    Yes.
7         Q.    Okay.  So she new no one else
8    used it but that's consistent with someone
9    else possibly putting the battery in
10   because that's not really using the
11   computer per se; is that fair?
12        A.    And again, me as a consumer,
13   that question you would have to be more
14   detailed.  In using it, do you consider
15   using it installing a new battery, but that
16   question wasn't asked.  So to me use is
17   opening up the computer and actually using
18   it for its intended use, that's how I see
19   that statement.  That's my interpretation.
20        Q.    So do you think it's important
21   for you, for you to know, for your
22   opinions, who put that battery in there?
23        A.    Again, that was outside my
24   scope at that point.  I mean, that falls on
25   Mr. Martin.  I didn't do anything with that



Page 126

```
 1                    J. KARASINSKI
 2   laptop.
 3        Q.     Right, but --
 4        A.     I mean if she took -- I mean if
 5   you're talking from a plaintiff subrogation
 6   standpoint, like, if she took that to a
 7   computer store and someone else put the
 8   battery in, then that would be important
 9   but when I believe we have receipt that she
10   purchased it online and when she purchased
11   it, whoever put it in, I don't know who did
12   that.
13        Q.     All right.  Just pulling up
14   that document that you just referenced.  So
15   I'm just trying pull up the document you
16   just mentioned.
17             All right, I'm going to just
18   put up this first document and I will give
19   you the context of the second document and
20   then when we're on a break, I'll try and
21   find the actual document.  But I'm going to
22   put up right now what is the Plaintiff's
23   interrogatory -- the Plaintiff's responses
24   to the request for production.  This
25   document is dated March 9, '22, and I'll
```



Page 127

                    J. KARASINSKI
1
2    put it on the screen now.  You see that?
3         A.    Yes.
4         Q.    So I'm looking at this question
5    and answer 13.  So before I get into this
6    I'd like you to read to yourself the
7    question and answer, and before we get into
8    any questions I'm going to represent to you
9    that this question and answer were
10   subsequently changed, but this was the
11   answer that we got on March 9, '22.  So if
12   you could take a moment, Mr. Karasinski,
13   and look at that, let me know when you've
14   done so.
15             (The witness complies.)
16        Q.    Have you finished reading it,
17   Mr. Karasinski?
18        A.    Yes.
19        Q.    So is that the purchase that
20   you were previously referring to in respect
21   to the aftermarket battery?
22        A.    I'm not -- can you pull it back
23   up again.
24        Q.    Yeah, sorry.
25        A.    No, that's fine, you took it



Page 128

                        J. KARASINSKI

1

2  down.

3       Q.     Prematurely.  So earlier you

4  said that you understood there was a

5  purchase of an aftermarket battery and I'm

6  asking you if that's what I've displayed

7  here, if that's the purchase to what you

8  were referring?

9       A.     Yeah, I'm not sure if that's

10  the purchase.  I thought I remember seeing

11  some sort of, like, credit card receipt or

12  Amazon receipt.  But, yeah, I don't

13  remember the cost or what year.

14       Q.     Okay.  So would the purchase on

15  July 22, 2015, of an aftermarket battery,

16  would that be consistent with the 2015 date

17  that Dr. Martin found on the subject's

18  battery pack?

19       A.     That date would be consistent,

20  yes.

21       Q.     Did you do anything to

22  investigate this website, Factory Outlet

23  store?

24       A.     Again, no, I -- outside my

25  scope, I didn't do anything concerning the



Page 129

1                    J. KARASINSKI
2    laptop.
3        Q.    Okay.  So you didn't make any
4    investigation as to what battery was
5    purchased or when or anything like that?
6        A.    Again, that's not what I was
7    retained for, that was outside my scope.
8    That would be a Dr. Martin question.
9        Q.    Okay.  Now, at page 13 of the
10   report you'll see there's a Figure 18 -- a
11   Figure 18 and Figure 19.  Can you see
12   Figure 18 and 19 in the picture?
13       A.    I can, but that's way outside
14   my technology abilities.
15       Q.    Okay, so we have Figures 18 and
16   19 here and you'll see that in the figures
17   you note that Ms. Marcellin's 9 inch
18   compact laptop was in her office in her bag
19   and it was confirmed to be in the closet at
20   the time of the fire and you previously
21   testified it was not in the closet or
22   anywhere that you could she when you
23   visited the scene, correct?
24       A.    Correct.  We did not locate any
25   remains of a computer within the closet.



Page 130

1                    J. KARASINSKI

2        Q.     Then on page 15 at Figure 20

3    and 21 you note that Ms. Marcellin had

4    installed an aftermarket battery in her

5    compact; is that correct?

6        A.     That's what she was calling it,

7    yes.

8        Q.     So Ms. Marcellin said there was

9    an aftermarket battery, it was in the

10   closet of the office of her house at the

11   time of the fire in the compact notebook

12   but you saw no evidence of that notebook or

13   that battery during your exam, correct?

14       A.     There was no physical evidence

15   of any computer or battery pack remains in

16   the closet.

17       Q.     Did you undertake any other

18   efforts to locate that compact or that

19   battery?

20       A.     We tried to locate it within

21   our photographs and Greg Gorbit's

22   Matterport.  I believe we thought we found

23   it but then I think she that that wasn't

24   it, so I have not seen a compact computer

25   anywhere in the photographs or



Page 131

1                    J. KARASINSKI

2    documentation from the Matterport.

3         Q.    You would expect to see

4    remnants of the computer during your

5    investigation, right?

6         A.    Well, but again, I didn't open

7    every drawer and every door to look for it.

8    The compact issue or computer in there was

9    not -- this information was not available

10   when we were at the site, so besides the

11   collecting evidence that was in the closet,

12   I wasn't looking for another computer

13   besides the two that were in that room of

14   origin.

15        Q.    So it could have been somewhere

16   other than where Ms. Marcillin said or the

17   places you looked, but as far as you know,

18   it wasn't there?

19        A.    It was not in the closet, no.

20        Q.    Now, were you able to rule out

21   that Ms. Marcellin didn't put in the

22   aftermarket battery in her Pavilion

23   notebook that was at issue in this case?

24        A.    I did not ask her if she

25   installed it.



1                    J. KARASINSKI

2        Q.    Did you take any other efforts

3    -- undertake any other effort to rule out

4    that possibility?

5        A.    No, because the computer was

6    essentially -- she had no consumer

7    complaints about the computer up till the

8    date of loss besides the battery, so I --

9    it didn't concern me and we knew after the

10   lab exam that it was a replacement battery

11   based on the date stamp of the age, so

12   other than that, I don't have any opinions

13   on who installed it.

14       Q.    So we talked about a few things

15   that Ms. Marcellin was unable to recollect,

16   we talked about the compact, we talked

17   about the candles, my question is, given

18   Ms. Marcellin's recollection, do you take

19   anything that she said with a grain of

20   salt?

21       A.    No, again, that's following the

22   scientific method and collecting all the

23   data, and the physical evidence did not

24   support what she said.  So we -- that's

25   part of our process within the fire



Page 133

1                      J. KARASINSKI

2    investigation community and fire science,

3    so doing interviews and sometimes those

4    interviews are not accurate based on the

5    physical remains that we find, so it's a

6    common occurrence.

7          Q.    When you see that an interview

8    isn't accurate based on the physical

9    remains you find, how does that affect your

10   analysis of the rest of the interview?

11         A.    I still take whatever her

12   statements are and if any of them can be

13   disproved, then they're disproved, if they

14   can't be disproved, then they're disproved.

15   I mean, not finding the physical remains of

16   that computer in that closet or any other

17   battery remains in that closet for a

18   replacement battery, it wasn't there.  We

19   still have clothing that's still intact.

20   That computer was not in the closet.  So

21   that doesn't match up with her statement

22   and that is consistent and typical with

23   witness statements all the time.

24         Q.    That's because it's tough to be

25   a reliable witness in a house fire, right?



1                    J. KARASINSKI
2         A.    A house fire where someone
3    passed away, it's even more difficult, and
4    how someone could remember, I mean, I
5    graduated high school in 1991, I don't even
6    know if I had a computer in 1990.  So to
7    me, no.  I mean, that's a statement that --
8    if she hadn't used it in forever, I don't
9    remember how many years she said she hasn't
10   used that computer, I wouldn't remember
11   where it was in my house, so it doesn't
12   change anything but the physical evidence
13   supports that it was not in the closet.
14        Q.    Okay.  Where do you think
15   Ms. Marcellin was when the fire started?
16        A.    I believe her statement was
17   that she was in bed with the deceased.
18        Q.    So she was asleep with Mr.
19   Hollowell in bed?
20        A.    I believe that's her statement,
21   yes.
22        Q.    You know this just from her
23   statement or is there some other evidence
24   that you looked at as well?
25        A.    Her statement and that was also



```
 1                    J. KARASINSKI
 2    the information that was provided at the
 3    scene from the local authorities.
 4         Q.    Do you have any reason to
 5    disagree with her statement that she was
 6    asleep with Mr. Hollowell in bed at the
 7    time the fire started?
 8         A.    No, I don't have any reason to
 9    disbelieve that.
10         Q.    Thinking of going into a longer
11    section now so maybe we should just break a
12    little early for lunch.
13              (Whereupon, a break was taken.)
14         Q.    Okay.  I'm turning to page 20
15    of your report marked as Exhibit 1, Mr.
16    Karasinski, you see that?
17         A.    Yes.
18         Q.    So on this page you note that
19    Ms. Marcellin testified she was awakened by
20    a smoke alarm the morning of the fire and
21    she described what she saw in her
22    testimony; is that right?
23         A.    Yes.
24         Q.    So in this section you cite
25    here she said she woke up from the smoke
```



1                    J. KARASINSKI

2    alarm outside of her bedroom, so my

3    question to you, sir, is how long do you

4    think it would take for the fire you say

5    started in the Hp laptop to set off the

6    smoke alarm on the opposite side of house?

7         A.    Well, I think you're taking in

8    out of context, there were two smoke

9    detectors, one on the wall by the door of

10   their bedroom and one on the wall by the

11   office.  So when I say she heard the smoke

12   alarm, I'm confident it's the one that was

13   on the wall by the office, not the one in

14   the bedroom at that point.

15        Q.    Let's see, so you see on 124

16   lines 2 to 6 that you have in your --

17   displayed on your report here?

18        A.    Correct, yes.

19        Q.    So here she said she silenced

20   the alarm outside her room, right?

21        A.    Correct.

22        Q.    That was the first thing she

23   did upon waking up, right?

24        A.    The smoke alarms were

25   hardwired, so when one goes off, they all



                        J. KARASINSKI

1
2  go off.
3      Q.    So it's your testimony that the
4  one outside her bedroom was hardwired and
5  so it went off at the same time as the one
6  outside her office; is that right?
7      A.    Correct, yes.
8      Q.    I'm just going to put up Ms.
9  Marcellin's deposition testimony.  See if I
10 can find where she talked about the smoke
11 alarms.  One minute.  So I'm going to
12 direct your attention to Ms. Marcellin's
13 testimony on pages 160 to 161.  You see
14 that there, Mr. Karasinski, page 160 and
15 161?  You see that?
16     A.    I do, but can you make it
17 larger so I can read.
18     Q.    Yeah, of course.  I'm going to
19 go through it so you can actually read it.
20          Okay, so you'll see on page 160
21 of her testimony.  Do you see the testimony
22 that's listed here at lines 5 through 9,
23 Mr. Karasinski, could you read it?
24     A.    Yes.
25     Q.    Let me know when you've done



Page 138

1                    J. KARASINSKI

2   so.

3              (The witness complies.)

4        A.    Okay, I've read 5 through 9.

5        Q.    Okay.  You'll see in the

6   following lines 10 through 12, did you read

7   that?

8              (The witness complies.)

9        A.    Yes.

10       Q.    Now I'm scrolling down to lines

11  14 through 16, you see that?

12       A.    Yes.

13       Q.    I'll scroll a little further

14  down to the next page, and you see lines 11

15  through 18?

16       A.    Yes.

17       Q.    Okay.  So having reviewed this

18  testimony together, does that refresh your

19  recollection as to whether one or both or

20  neither of the smoke alarms were hardwired?

21       A.    The alarm that was outside the

22  bedroom on the wall was hardwired.  We did

23  find a battery-operated smoke alarm in the

24  office area but it did not have a battery

25  in it.



Page 139

1                    J. KARASINSKI

2        Q.    Okay.  So you found a

3  battery-operated smoke alarm in the office,

4  is that what you just said?

5        A.    Yeah, it was in the debris, it

6  was -- I don't know where it came from but

7  it was in the debris and it didn't have a

8  battery in it.  So the only two operating

9  smoke alarms were the one outside in the

10  hallway, which was hardwired and the one

11  that was adjacent to the bedroom that they

12  were sleeping in.  If you walk out their

13  bedroom door it would have been on the wall

14  to the right.

15        Q.    Okay.  Maybe I need to pull up

16  her testimony again because I think --

17        A.    Well, again, the physical

18  evidence, there were two hardwired smoke

19  detectors and there was one

20  battery-operated that we found in the

21  debris with no battery in it.

22        Q.    Okay.  But the testimony we

23  just reviewed from Ms. Marcellin was that

24  there was a battery-operated one outside

25  her bedroom, right?



Page 140

                        J. KARASINSKI

1
2        A.      No.
3                MR. SCHWARZ:    That's not what
4         it said.   The doctor said that.
5        A.      That's not what it said.
6                MR. SCHWARZ:   The doctor said
7         that.
8        A.      Yeah.
9        Q.      What does it say on lines 12 to
10   13 there, Mr. Karasinski?
11       A.      There's one just outside the
12   bedroom where they were sleeping, that
13   was -- that she believed was battery
14   operated.
15       Q.      But she was mistaken?
16       A.      Correct.
17       Q.      Okay.
18       A.      Well, it would have had a
19   battery in it because it would be battery
20   backup as well, so...  But the hallway
21   smoke alarm and the one next to their
22   master bedroom where they were sleeping at
23   the time of the event were hardwired.  The
24   only battery-operated smoke alarm I
25   found -- that we found was during the



Page 141

1                    J. KARASINSKI

2      processing of the debris and it had no

3      battery in it and that was in the office

4      space.

5           Q.    So what you're saying, Mr.

6      Karasinski, is there were three smoke

7      alarms in the house?

8           A.    There were two working smoke

9      alarms and one with no battery in it.

10          Q.    Right.  So there were three

11     total that you found?

12          A.    Three in total, yes.

13          Q.    Okay.  You're saying that the

14     hallway and the one outside her bedroom

15     were hardwired and Ms. Marcellin was

16     mistaken in respect to that battery?

17          A.    Correct, the physical evidence

18     did not support that.

19          Q.    So that was another oversight

20     in her testimony; fair to say?

21          A.    Fair to say.  But, again, my

22     wife wouldn't know if one was battery

23     powered or hardwired in my house.  So

24     again, that doesn't -- because she was

25     mistaken it doesn't change any of my



Page 142

1                    J. KARASINSKI

2    opinions.

3         Q.    That's helpful.  So with the

4    understanding that this alarm was outside

5    her bedroom and it was hardwired to the one

6    in the hallway, my question is, how long do

7    you think it would take for the fire that

8    you say started in the Hp laptop to set off

9    the smoke alarm in the hallway?

10         A.    It would be pretty quickly.  I

11   mean, the smoke would have to get down to

12   the door opening to vent out into the

13   hallway, but probably within a minute to a

14   minute and a half at the longest.

15         Q.    So it's your testimony it

16   wouldn't have been more than two minutes

17   from the time of ignition in the Marcellin

18   notebook to the time the smoke detector was

19   activated in the hallway?

20         A.    Yeah.  Again, I'm giving a

21   range, a minute and a half to two minutes,

22   yes.

23         Q.    So you're saying it wouldn't

24   exceed two minutes?

25         A.    I would have to do some



1                    J. KARASINSKI
2    calculations based on the height of the
3    smoke detector on the wall and the smoke
4    layer in the bedroom, but I would be able
5    to calculate that at a later date, yeah.
6         Q.    So you could calculate the rate
7    of smoke deposition in the compartments in
8    this fire?
9         A.    We could give you a range but
10   the smoke detectors were so badly damaged I
11   don't -- we weren't able to get any
12   manufacture information, all that, so it
13   would just be a general timeline.
14        Q.    But you don't have that general
15   timeline because you didn't do those
16   calculations?
17        A.    I haven't done those
18   calculations, no.  I could, but I have not.
19        Q.    Did you view those calculations
20   as important to your conclusions at all or
21   you didn't think they were important?
22        A.    At the time in my investigation
23   they weren't really important because the
24   smoke detector activated and alerted the
25   occupant as intended.



                    J. KARASINSKI

1

2        Q.    But the time that it would have

3   taken to set the smoke detector off is

4   relevant to your analysis of the origin and

5   cause of fire, is it not?

6        A.    I'm not sure I understand your

7   question.

8        Q.    My question is, isn't it

9   important for you to know how long the fire

10  had been going before the smoke alarm was

11  activated?

12       A.    Well, to me the important thing

13  was that it activated and alerted the

14  occupants.

15       Q.    So you testified that it would

16  have taken no more than two minutes for the

17  hall hardwired smoke alarm to go off and

18  Ms. Marcellin stated that her -- the one

19  outside her bedroom which she believed to

20  be battery operate but you've told us it's

21  hardwired went off shortly thereafter; is

22  that correct, right?

23       A.    Yes.

24       Q.    So if that's the case, similar

25  question, how long -- so you've testified



Page 145

                    J. KARASINSKI
1
2    that the alarm on her -- I think you
3    objected to the question when I asked you
4    how long would it take for the smoke to get
5    to the opposite side of the house, and the
6    reason you objected was because -- the
7    smoke alarm on the opposite side of the
8    house, the reason you objected was because
9    the one in the hallway and the one outside
10   their bedroom were hardwired, ergo the
11   hardwired one in the hallway was set off
12   first and caused the second to be tripped;
13   is that a fair summary of your testimony?
14        A.    When they are hardwired, when
15   one activates, they all activate at the
16   same time.
17        Q.    It's your testimony the one in
18   the hallway went before the one in her
19   bedroom, right?
20        A.    Correct.
21        Q.    Is that the reason why you
22   objected to my question saying how long
23   would it take for a fire you say started in
24   an Hp laptop to set off the smoke alarm on
25   the opposite side of the house?



```
 1                    J. KARASINSKI
 2              MR. SCHWARZ:   Well, I don't
 3          know if he objected, he just said
 4          that wasn't  --
 5          Q.    I apologize.  I'm not trying to
 6     be -- to use the word objection in a
 7     technical sense, I mean when I said how
 8     long would it take for a fire you say
 9     started in the Hp laptop to set a smoke
10     alarm off on the opposite side of the house
11     I believe your answer was, I don't think
12     that fairly states the evidence or
13     something to that effect because the one
14     outside her bedroom was, in fact, hardwired
15     to the other; is that right?
16          A.    Correct.
17          Q.    Okay.  The reason you said that
18     is because -- am I to correctly infer from
19     your testimony that the one outside her
20     bedroom went off because the one in the
21     hallway went off, not because smoke can
22     necessarily reach to the other side of the
23     house?
24          A.    That's correct.
25          Q.    Okay.  So with that
```


MAGNA
LEGAL SERVICES

```
 1                  J. KARASINSKI
 2   understanding, looking at her testimony
 3   that you cite here in your report at
 4   page 20, Figure 29, Ms. Marcellin stated
 5   that immediately upon waking she could
 6   smell the smoke.  So my question to you,
 7   Mr. Karasinski, is how long do you think it
 8   would take for the fire you say started in
 9   the Hp laptop to send smoke out that
10   Ms. Marcellin could smell in her bedroom on
11   the other side of the house?
12        A.    I don't have enough data to
13   answer that question right now.  I would
14   have to do some calculations.
15        Q.    What kind of calculations would
16   you need to do to figure that out?
17        A.    Well, I would need the
18   manufacturer of the smoke alarm and do the
19   research on that manufacturer, what it
20   activates at and then I would have to do
21   some fire modeling to -- well, the entire
22   structure to show the smoke layer when the
23   smoke would have actually gotten to that
24   bedroom.
25        Q.    You didn't do that in this
```



Page 148

```
 1                 J. KARASINSKI
 2    case, right?
 3         A.    I did some rough stuff on
 4    temperatures but nothing with the smoke
 5    alarms.
 6         Q.    So I think you just kind of
 7    refined your answer in respect to the smoke
 8    alarms but my -- I'm asking a slightly
 9    different question here which is that
10    Ms. Marcellin said she could smell smoke
11    when she woke up on January 24, 2020, so my
12    question is, how long would it take for to
13    smell smoke on the other side of house?
14    Would --
15         A.    I can't answer that question,
16    Counselor, I don't know what her sense of
17    smell is, you're asking me, I can't answer
18    that question.
19         Q.    Okay.
20         A.    Everybody's different.  They
21    had a cat, sometimes cats can mask the
22    smell of smoke too with their urine and
23    things of nature, so I can't -- you'd have
24    to ask her that question because I don't
25    know what her sense of smell is.  I
```


MAGNA
LEGAL SERVICES

Page 149

1                    J. KARASINSKI

2   can't -- it's too broad of a question for

3   me to answer at this point.

4        Q.    Yeah, I understand there's some

5   data limitations but I guess I'm just

6   trying to dial down on the timing here

7   because you told me it wouldn't have been

8   more than two minutes for the fire that you

9   say started in the Hp laptop to set off the

10  whole alarm.

11       A.    So to bring it into

12  perspective, with all the live burner

13  trainings that I've done and live burner --

14  and room and contents fires that I've

15  conducted, we've always included a smoke

16  detector and it goes off within seconds of

17  the fire beginning, so -- but in this case

18  because the smoke alarm is outside of the

19  bedroom, that smoke layer, the smoke is

20  going to -- so I guess how you describe it.

21  So, right, if you're filling up a pot water

22  and you fill the pot up and it overflows,

23  right, that's the same thing as what smoke

24  does.  You take that pot, you tip it upside

25  down, that smoke will fill up that pot



```
 1                    J. KARASINSKI
 2   until it can get to the ventilation
 3   opening, which in this case would be a door
 4   opening.  So I have to get that smoke
 5   outside of that room for that, but I can't
 6   do that until the smoke layer reaches below
 7   that vent opening.
 8        Q.    I get what you're saying and
 9   that's actually very helpful.  I guess what
10   I'm trying to understand -- I guess I
11   understand what you are saying, it would
12   have taken no more than two minutes for --
13   let's think of the office as a pot, right,
14   and it would take two minutes for that
15   pot -- no more than two minutes for that
16   pot to billow with smoke and for the smoke
17   to escape the office and trigger the alarm
18   in the hallway.  My question is, how much
19   longer would it fake for the smoke to
20   travel from the hallway to her bedroom in a
21   sufficient quantity that she could actual
22   smell it when she woke up?
23        A.    I can't answer that because I
24   don't know her sense of smell, so I can't
25   give you that answer.
```



Page 151

1                    J. KARASINSKI

2        Q.    Okay.  But would you be able to

3   answer for, let's say, the person -- you

4   know, the average man, the typical smeller,

5   the typical nose --

6        A.    Well, like, when I got here on

7   Monday as soon as I opened the car door to

8   the rental car, whoever was in it before me

9   was a smoker and I could smell it as soon

10  as I opened the door without even getting

11  in the car.  So again, I just can't answer

12  that question, I don't know what her sense

13  of smell is so --

14       Q.    Just taking the car as an

15  example -- sorry to cut you off.

16       A.    That's fine.  Go ahead.

17       Q.    Taking the car as an example,

18  it takes some time for you to get the

19  cigarette smell into the fabric that quick,

20  right?  It's not you light the cigarette

21  and then throw it out the window less than

22  a second later and the whole car stinks.

23  It takes some time for the smell to travel

24  throughout the car and be deposed in all

25  the nooks and crannies or whatever, right?



                        J. KARASINSKI
1
2    Maybe even a short time, but it's some
3    amount of time; is that accurate?
4         A.    Well, again, I've never smoked
5    a cigarette in my life so as soon as I open
6    something or where someone has smoked, I
7    smell it right away.  So again, but if
8    they're used to smoke smell and things of
9    that nature, I just -- I can't answer it.
10   So I feel like it's asked and answered, I
11   can't give you her sense of smell.
12        Q.    No, and I understand, you know,
13   none of us have a crystal ball, we can't
14   tell her what she could or couldn't smell.
15   I guess I'm just trying to think of it this
16   way, like, if my neighbor's barbecuing next
17   door and I'm also in my backyard, I'm not
18   going to smell the barbecue the instant he
19   lights it, it's going to take some time for
20   the smoke to waft up, then it's going to
21   waft over to my house, then I have to smell
22   it and so maybe that takes one second,
23   maybe it takes a minute, maybe it takes
24   five minutes, my question is taking that
25   analogy here, how long was it going to take



1                    J. KARASINSKI

2   her to smell that fire?

3        A.    Again, I can't answer that

4   without knowing what her sense of smell is,

5   Counselor.

6        Q.    Okay.  If I asked you to assume

7   that she was normal in every possible way,

8   would you think it would be the exact same

9   amount of time that it would take to set

10  off the smoke detector?

11       A.    I don't know even know if she

12  smelled smoke.  I mean, sometimes people

13  say they smell smoke just because they hear

14  a smoke detector going off.  So again,

15  that's a question you're going to have to

16  ask Carol, I don't have an answer for that.

17       Q.    Okay.  So you weren't relying

18  on when she claimed she smelled smoke or

19  didn't in your report because people aren't

20  particularly reliable about that; is that

21  fair to say?

22       A.    Well, again, I don't know her

23  sense of smell so to me, the smoke alarm's

24  activated, they notified the occupants of

25  the structure that there was smoke in the



Page 154

                        J. KARASINSKI

1

2    building and she went and investigated

3    that.  So to me, the smoke alarms activated

4    properly so I didn't do any other

5    investigation with the smoke alarms.

6         Q.    Okay.  So I think I understand

7    your testimony to say that the -- it was

8    the activation of the smoke alarms that was

9    important to you.  Whether she smelled them

10   or not -- and then the fact that she heard

11   them.  Whether she smelled the smoke or not

12   and when she smelled it or not, that was

13   not important to you, fair?

14        A.    That's a fair statement.

15        Q.    Okay.  Would you agree that if

16   the fire started in the office the smoke

17   would accumulate in the office till it

18   banked below the doorway opening?

19        A.    Yes, till it got to the vent

20   opening, yes.

21        Q.    Then it would spread along the

22   hallway fuming towards the remainor of the

23   home?

24        A.    Yes, because the other --

25        Q.    How many --



Page 155

1                         J. KARASINSKI

2          A.     -- the rear bedroom doors --

3     I'm sorry, are you --

4          Q.     No, please go ahead.  The rear

5     bedroom doors.

6          A.     The rear bedroom door adjacent

7     to the office, those two doors were shut so

8     the only ventilation would have taken it

9     down the hallway towards their bedroom and

10    into the living room and kitchen.

11         Q.     Okay.  How long would that

12    take?

13         A.     Which part?

14         Q.     The second part, after it had

15    banked below the doorway opening of the

16    office and was -- from the spread along the

17    hallway through the ceiling into the

18    remainder of the home?

19         A.     Without knowing the airflow and

20    fans and what other doors may or may not

21    have been open, anywhere from 15 to

22    45 seconds probably.

23         Q.     There weren't any fans on that

24    you saw, right?

25         A.     Well, there's a fan in the



1                    J. KARASINSKI

2    living room that was on the ground -- I

3    guess it was -- I guess dining room/living

4    room is kind of all the same but there was

5    a ceiling fan.  I don't know if that was

6    operating or not.

7         Q.    So the ceiling fan, it could

8    have been operating but you didn't see any

9    other fans, right?

10        A.    No, just -- that was the only

11   ceiling fan that I saw.

12        Q.    Were any windows open that you

13   saw?

14        A.    I don't remember -- no, there

15   weren't any windows open but in their

16   bedroom window that they were sleeping in,

17   I believe there was, like, an AC unit, so

18   that's not typically very airtight so that

19   would be pulling that -- the heat layer

20   that way -- in that direction with the

21   smoke as well.  Once the door was opened.

22   The bedroom door to the master bedroom.

23        Q.    Okay.  So having gone through

24   the -- kind of the basics of the airflow

25   and the fans situation in the house at the



```
 1                    J. KARASINSKI
 2    time, does that change your answer of the
 3    range you gave of 15 to 45 seconds?
 4          A.    For -- yeah, that's -- that's
 5    what I would surmise, based on the size of
 6    the house.  And again, I can do
 7    calculations on that but I did not do
 8    calculations prior to this deposition.
 9          Q.    Then you go on to cite of her
10    testimony here in 21, and you can see that
11    she says when she got to the office the
12    smoke was hovering above her already and it
13    got worse as she retreated from the office.
14    So my question, sir, is how long would you
15    expect that level of smoke deposition to
16    take?
17          A.    I can't answer the question the
18    way you asked it.  Is there more to your
19    question?
20          Q.    Yeah.  So she said the smoke
21    was hovering above her when she got to the
22    office and then it got rapidly worse as she
23    was leaving.  So she's characterizing the
24    level of smoke deposition in the office and
25    immediately outside the office at the time
```



1                    J. KARASINSKI

2    that she discovered the fire.  So my

3    question is, given the amount of smoke that

4    she's describing and observing, how long

5    would you expect the fire if you say

6    started in the Hp to have progressed to

7    produce that amount of smoke?

8        A.    I don't think the Hp computer

9    produced that amount of smoke, I think at

10   that point we already had a small fire in

11   the closet from one of the batteries that

12   expended its interior material.

13       Q.    So how long do you think the

14   fire had spread at that point in terms of

15   time?  So you say that the cell ejected and

16   gone and ignited the closet, my question

17   is, how long had the fire been burning

18   given the amount of smoke that she saw when

19   she came out?

20       A.    With the light smoke, probably

21   not very long.

22       Q.    Wouldn't you say it's one

23   minute?

24       A.    I would say anywhere from maybe

25   one to three minutes.



Page 159

```
 1                     J. KARASINSKI
 2        Q.     She, I believe --
 3        A.     And again, that smoke layer's
 4   not going to continue to bank down past
 5   that opening into the remaining house at
 6   that same level.  I guess let's just use
 7   the word when it equalizes.  So as that
 8   smoke goes out and down the hallway, it's
 9   going to continue going out and down the
10   hallway until it equalizes and it's at the
11   same level and then it will bank down
12   within that room.
13        Q.     Okay.  Do you know how loud
14   thermal runaway in the 18650 cell is?
15        A.     How loud, like --
16        Q.     Yeah, how loud --
17        A.     Yeah, I've burned cells before
18   and caused them to fail, yes.
19        Q.     How loud was it?
20        A.     Sometimes it's very loud and
21   sometimes it's not.  Sometimes it just
22   sounds like a faucet going off when the
23   flames are shooting out either one under
24   the other.
25               But there are other times when
```



1                    J. KARASINSKI
2  a cell actually ruptures, that's -- that's
3  loud, but I've also seen where cells have
4  vented and lost all their contents and you
5  can just -- you just hear it -- a hissing
6  sound and it's not very loud at all.
7        Q.    So were there ruptured cells in
8  this case?
9        A.    That would be a Mr. Martin
10 question but I believe there was one cell
11 that was ruptured, I think, if I'm
12 remembering correctly.
13       Q.    So that probably would have
14 been louder than the ones that just vented?
15       A.    That's -- that's in my
16 experience from our testing that we've done
17 at that facility -- our facility, yes.
18       Q.    Okay.  All right, I'm going to
19 go to page 23 of the report, and you exert
20 the Allegheny County fire report here,
21 page 23, Figure 31.  Do you see that, Mr.
22 Karasinski?
23       A.    Yes.
24       Q.    Now, the first line that you
25 cite here states that Mr. Hollowell was



1                    J. KARASINSKI

2    reported found lying crosswise on the bed.

3    Do you see that?

4         A.    Where Allegheny County reported

5    that, yeah.  You said where I reported it.

6    That's Allegheny County.

7         Q.    I apologize, I meant to say and

8    I hope that I said that you cited the

9    report where they had stated this, and I

10   understand that this is their report that

11   you were noting.  So --

12        A.    Can you sit a little bit closer

13   to the computer, I'm only getting, like,

14   every other word again.

15        Q.    I apologize.

16        A.    Sorry.

17        Q.    Having enough technical

18   difficulties and you're being more than ...

19              So we're looking at page 23

20   where you have cited the Allegheny report

21   and the first line of the Allegheny report

22   says that Mr. Hollowell was reported found

23   lying crosswise on bed.  Do you see that,

24   Mr. Karasinski?

25        A.    Yes.



Page 162

1                          J. KARASINSKI

2          Q.     Okay.  My question is, is this

3    consistent with Ms. Marcellin's testimony?

4          A.     Well, I believe she said he

5    fell to the floor when she was trying to

6    get him up, but I'm not so sure that he

7    couldn't have gotten himself back up on the

8    couch after she left to go call 911.

9          Q.     Do you remember if she

10   testified about whether he was able to get

11   up by himself?

12         A.     I don't remember seeing that,

13   no.  I don't remember her even being asked

14   that question.

15         Q.     All right, I'm going to go to

16   her testimony.  So this is where he's

17   talking about what you said.  You see that

18   on page 191?

19         A.     Yes.

20         Q.     Then it says here that

21   Ms. Marcellin would help him --

22         A.     Yes.

23         Q.     -- that he would try but that

24   he was not able to get up and go to the

25   bathroom by himself?



Page 163

1                    J. KARASINSKI

2        A.    Yes.

3        Q.    Okay.  So having seen that,

4    does that refresh your recollection as to

5    whether she testified as to if he was able

6    to get up on his own?

7        A.    Well, I don't think that

8    question was asked of her. She said he

9    needs help.  I mean, if you're in a house

10   fire and you fall to the floor, I'm pretty

11   sure you're going to use all your strength

12   to try to get up, so is it possible that he

13   got himself back up on the bed?  It's

14   possible.

15       Q.    Okay.  Do you think it's

16   probable?

17       A.    Well, based on her statements

18   and where he was found, it's probable.

19   Because if he was on the floor and she

20   couldn't get him up and he got himself up

21   at some point after she left, because he

22   was still on the floor when she went back

23   the second time to try to get him out.

24       Q.    Do you think it's more or less

25   probable than the possibility that



Page 164

                    J. KARASINSKI
1
2   Ms. Marcellin had another oversight in
3   respect to her testimony?
4        A.    I'm not sure there's an
5   oversight.  I still think that he could
6   have gotten himself back on the bed.  I
7   mean, you see the walker in the bedroom, so
8   uses that walker to walk, so he can still
9   use his arms.  So for me to sit here and
10  say he couldn't get himself back up on the
11  bed after she left, I mean might it's very
12  probable that he could have.
13       Q.    Okay.  So you think the
14  likeliest thing is that he got up?
15       A.    After she left to go -- got in
16  her car to go call 911.  That's the only
17  conceivable explanation I have for him to
18  be back on the bed and that's where he was
19  found because you can see the protected
20  area where his body was on the sheets.
21       Q.    That's what the Allegheny Fire
22  Department's talking about in this report?
23       A.    Can you pull it back up again,
24  I'm sorry.
25       Q.    Yeah, absolutely.



```
 1                    J. KARASINSKI
 2        A.     Actually I have it here, I
 3   can...  Yeah, they state his two feet on
 4   the floor and the rest of his body was
 5   basically on the bed.
 6        Q.     When Ms. Marcellin testified
 7   that she had to leave Mr. Hollowell seated
 8   there she had to crawl out of the room,
 9   right?
10        A.     You would have to pull up -- I
11   don't remember her saying she had to crawl
12   out of the room.  You've got to show me
13   where that's located.
14        Q.     Yeah, I'm sure I can do that.
15   See that?
16        A.     Okay.
17        Q.     So did that refresh your
18   recollection as to whether she had to crawl
19   out of the room?
20        A.     Yes.
21        Q.     If the smoke was so intense
22   that she had to crawl out of the room,
23   would you expect it to produce a witness
24   mark like the one in this case?
25        A.     By the time he was removed,
```



Page 166

1                    J. KARASINSKI

2    yes.

3         Q.    Okay.  Do you remember the

4    witness mark in this case?

5         A.    The witness mark?

6         Q.    From Mr. Hollowell.

7         A.    Yes, on the bed.

8         Q.    Yes.  Was there anything that

9    was notable to you about it?

10        A.    Just there was mostly his upper

11   body on the bed and you could see where his

12   arms were.

13        Q.    I think there's --

14        A.    Oh, I think there's a

15   photograph in the fire department report if

16   you want to pull that up.

17        Q.    How long do you think it would

18   take for the fire that you say started in

19   the Hp laptop to form a witness mark like

20   that?

21        A.    I'm not sure I can answer that

22   question because when she leaves to go call

23   911, that fire's still burning and that

24   smoke layer's still banking down within

25   that structure, the entire time she's gone



Page 167

1                    J. KARASINSKI

2    and this is a very remote location and from

3    the time until the fire department got

4    there.  So that fire evolved pretty rapidly

5    once you got full room involvement of the

6    closet space.

7        Q.    So if you did the sort of

8    calculations that we talked about before,

9    would you be able to tell us how long the

10   fire would have to be going to produce a

11   witness mark like that?

12       A.    I don't think you could do

13   that.  I'm not aware of any calculation I'd

14   be able to do because, again, as that

15   fire's progressing it's producing heat

16   again and smoke throughout the structure,

17   right, because it's not equalized, it's

18   coming out of that door and so from the

19   time that -- I don't think we've ever seen

20   a clear answer on how long she tried to get

21   him out of that structure, right, and based

22   on her saying that she's got to crawl out

23   of that bedroom space, that fire in that

24   closet space is fully involved and

25   producing that smoke layer. So if she can't



Page 168

                    J. KARASINSKI

1

2    breathe standing up, then that smoke layer

3    is already hitting the top of the bed.  So

4    once that happens you're going to have a

5    protected area just like you would if you

6    had a magazine sitting on a end table

7    somewhere in the room, you get those

8    protective areas.

9         Q.    Okay.  I'm going to put up that

10   picture you mentioned. I am going to -- the

11   two photographs Hp 423 and 424 that are of

12   the witness mark.  So this is 423.  Do you

13   see that, Mr. Karasinski?

14        A.    Yes.

15        Q.    That's the witness mark we've

16   talking about, right?

17        A.    Correct.

18        Q.    Here's another view.

19        A.    Yes.

20        Q.    Same witness mark, right?

21        A.    Yes.

22        Q.    So having seen the photographs

23   now, is there anything else that you recall

24   that was notable about the witness marks?

25        A.    No.



```
1                    J. KARASINSKI
2        Q.    Okay.  So you told me that when
3   Ms. Marcellin was -- left Mr. Hollowell
4   behind because the smoke was -- because she
5   couldn't breathe standing up, that the
6   smoke layer would have been hitting the bed
7   and you have a protected area.  So my
8   question, Mr. Karasinski, is if the smoke
9   layer was that low and it was intense
10  enough that she had to crawl out of the
11  bedroom and Mr. Hollowell was seated on the
12  floor when she did so, would you expect the
13  witness mark to look like the witness mark
14  shown here on 424 and 423?
15       A.    Yes.
16       Q.    You would expect it to look
17  like this?
18       A.    Correct, yes.
19       Q.    Okay.  So wouldn't Mr.
20  Hollowell --
21       A.    You can actually even see
22  another witness mark where the pillow would
23  move.
24       Q.    Okay.  So my question is,
25  wouldn't Mr. Hollowell have had to be in
```



                    J. KARASINSKI

1
2    this position before the deposition of
3    heavier soot in the room?
4        A.    He would have had to put
5    himself up there after she left if he was
6    still on the floor, yes.
7        Q.    Right, and my question is, if
8    the smoke and soot was so bad that she had
9    to crawl out, at that time when she crawled
10   out he was on the floor, wouldn't we expect
11   a more even distribution of smoke and soot
12   on the bed here?
13       A.    No.  Not particularly, no.  It
14   depends when he got up onto the bed.  I
15   mean, you can see the protected area, so he
16   was obviously on bed when he passed.
17       Q.    So we can agree he was on the
18   bed when he passed?
19       A.    Yes, we can agree to that.
20       Q.    So with the understanding that
21   he was on bed when he passed away, my
22   question is, if he was on the floor when
23   the smoke layer was sufficiently low that
24   Ms. Marcellin had to crawl out, would you
25   expect the witness mark to be as white as



1                    J. KARASINSKI

2    it is here?

3         A.    Yes, because she's -- if I

4    remember correctly, she's, like, like 5

5    foot 2 and she's standing up and that

6    bed -- what is the height of the bed,

7    36 inches maybe, so she's standing in the

8    smoke layer, he's not.

9         Q.    So is it your testimony that

10   the smoke layer would have to actually

11   reach the bed in order to produce soot

12   where Mr. Hollowell's witness mark was

13   ultimately found?

14        A.    Yes.

15        Q.    Okay.  So the smoke layer would

16   have to be all the way down to the bed in

17   order for this to be something other than

18   white, let's say.

19        A.    Correct.

20        Q.    Okay.  If the smoke layer was

21   all the down to the bed, wouldn't you

22   expect the bed to be burned?

23        A.    No.

24        Q.    The hot gases from the smoke

25   and the radiation from the smoke wouldn't



Page 172

```
 1                J. KARASINSKI
 2    burn the bed?
 3         A.    No, it's obviously not burnt in
 4    the picture.
 5         Q.    Right.  I'm saying if a smoke
 6    layer had descended to the level of the
 7    bed, which you're saying did not happen in
 8    this case, if that had happened, wouldn't
 9    we expect the bed to be burned?
10         A.    I'm not sure I understand your
11    question.
12         Q.    Well, you said at --
13         A.    Just because it's a smoke layer
14    doesn't mean that that smoke -- that smoke
15    layer as it's banking down, right, your
16    temperature as it's banking down is lower
17    at the lowest level than it is at the
18    ceiling level.  So as that temperature
19    decreases as it's banking down, all that's
20    occurring right now is the smoke that he's
21    breathing in and sitting there is now that
22    protected area where he was sitting on the
23    bed and that bed and the material did not
24    reach its ignition temperature from the
25    smoke layer in that room.
```



                        J. KARASINSKI

1

2      Q.    Okay.  So the right side of the

3  bed with the wheelchair that you mentioned,

4  that's were Mr. Hollowell was sleeping?

5      A.    You mean the left side where

6  the chair is?

7      Q.    No, I mean the right side.

8      A.    I believe so, yes.

9      Q.    Okay.

10     A.    I did not ask her that, whether

11  she was on that side or he was on that

12  side, but that's where he was found.

13     Q.    Okay.  Mr. Hollowell was a

14  larger gentleman, right?

15     A.    I believe so, yes.

16     Q.    Weighed over 200 pounds?

17     A.    I don't know how much he

18  weighed.

19     Q.    Okay.  Mr. Karasinski, does it

20  look like two people were sleeping in this

21  bed?

22     A.    I guess what do you mean?  It's

23  possible.

24     Q.    Does it look to you like two

25  people were sleeping in this bed?



Page 174

1                    J. KARASINSKI

2          A.    You mean is it possible that

3    once she got up she just threw the blankets

4    back over, yeah.

5          Q.    So it does look to you like two

6    people were in this bed?

7          A.    I don't know, she could have --

8    when she get up she could have just thrown

9    the blanket back over and walked out and

10   got out of the room.  So, I mean, maybe she

11   did, I don't know, but it looks like

12   somebody was there, it's not -- it's not --

13   it's messy, it's not completely made.

14         Q.    So it looks like one person was

15   there, right, at least?

16         A.    One person was there at the

17   time of the fire that's deceased now, yes.

18         Q.    Okay, I'm going to go back to

19   Ms. Marcellin's testimony at page 187 and

20   you'll see that she discusses here what

21   happened when she woke up.  Do you see

22   that?

23         A.    Yes.

24         Q.    Please take a moment to read

25   that and let me know when you've done so.



Page 175

1                   J. KARASINSKI

2              (The witness complies.)

3         A.    Okay.

4         Q.    Okay, so my question for you is

5    having reviewed this testimony on page 187,

6    does that refresh your recollection about

7    what Ms. Marcellin said in respect to the

8    covers?

9         A.    Yes.

10        Q.    Okay.  Then turning your

11   attention back to the scene photographs

12   Hp424, does that change your opinion as to

13   whether it looks to you in this picture

14   that two people were sleeping in this bed?

15        A.    It -- it's based -- I can't

16   answer that question because, I mean, is it

17   possible that when he got back up on the

18   couch that maybe he pushed them back when

19   he had his hands up, is it possible that

20   the fire department moved that when they

21   were removing his body to get him out and

22   start CPR in the garage?  I don't know what

23   it looked like before so...  I mean, I know

24   what it looks like now but I don't know

25   what --



Page 176

1                    J. KARASINSKI

2        Q.     What does it look like now to

3    you?

4        A.     It looks like someone was awake

5    or sleeping on the right side and it

6    looked -- and I don't know, it's not made

7    completely on the left side, so is it

8    possible that somebody pushed them back

9    over when they were trying to get him up

10   and get his -- get him out into the garage,

11   I just don't know what happened during the

12   fire.  To say that she misspoke or doesn't

13   recall, I don't know, I don't know what

14   that looked like before.

15       Q.     So you said this didn't look

16   totally made to you on the left side, but

17   it's certainly more made than the right,

18   you'd agree with that?

19       A.     It's certainly more made than

20   the side on the left, yes.

21       Q.     We just reviewed her testimony

22   where she said she through off the covers

23   on both sides of the bed?

24       A.     Correct.

25       Q.     Also that Mr. Hollowell was on



Page 177

                         J. KARASINSKI
1
2    the right side of bed by his wheelchair?
3         A.    Yes.
4         Q.    Okay.  So you said that maybe
5    he had essentially remade the bed or the
6    firefighters when retrieving him might of
7    remade the bed basically?
8         A.    That doesn't look like a made
9    bed to me, Counselor, but we can agree to
10   disagree.  I don't know what happened.
11        Q.    Of course.
12        A.    When you're asking me a
13   question that I can't answer because
14   because I don't know if someone pushed
15   those back when they were getting the body
16   or when the fire department was there, that
17   does not look like a made bed to me, that's
18   not a bed that I -- if I made it, that's
19   not made to me, so that's made to you,
20   that's your opinion.
21        Q.    To be clear, Mr. Karasinski,
22   this is not a made bed to me.
23        A.    Okay.
24        Q.    I am merely trying to point out
25   that to my eye, this looks like a bed that



Page 178

1                         J. KARASINSKI

2    one person was sleeping in on the right

3    side, and you agreed with me that the left

4    side certainly more made up than the right.

5    So I'm trying to deal with this visual

6    inconsistency, that she said she was in the

7    bed asleep with him, she said she through

8    the covers off on on both sides, and yet

9    looking at this picture, it doesn't look

10   like someone was in bed on that side and

11   through the covers off on that side; is

12   that fair to say?

13             MR. SCHWARZ:   No, that's your

14        interpretation, you've asked him

15        three times and he's already answer

16        that he can't say what happened after

17        the firefighters got there and they

18        removed the body.  So you can ask him

19        a hundred times, he's going to give

20        you the same answer.

21        Q.    So it's your testimony that if

22   we credit Ms. Marcellin in her deposition

23   that someone else got the other side of the

24   bed into the condition that it is that

25   we're looking at in Hp424?



1                J. KARASINSKI

2       A.    Can you repeat that question?

3    It didn't sound like a question, I thought

4    you were making a statement, I'm sorry.

5       Q.    No, I'm trying to understand

6    your testimony.  I think you said that if

7    we take Ms. Marcellin's testimony to be

8    true that she removed the covers on both

9    sides, that she was sleeping opposite Mr.

10   Hollowell and that she was sleeping on the

11   other side of the bed that somehow the

12   covers must have been pulled up basically

13   on the other side and you are saying maybe

14   Mr. Hollowell did it and maybe the fire

15   fighters did it, you don't know?

16       A.    That is correct.

17       Q.    But someone did it because it's

18   not in the condition that she said it was,

19   right?

20       A.    Yeah, I don't even -- I don't

21   have a photo of the other side of the bed,

22   maybe she was laying on top of it and had a

23   blanket on and there's a blanket laying on

24   the other side of the bed.  I -- your

25   opinion is that that's a made bed, that's



Page 180

                    J. KARASINSKI

1

2    not my opinion.  Okay, so --

3         Q.    Well, let's be clear, I've

4    stated it's not my opinion it's a made bed,

5    we agreed that one side is more made than

6    the other.  Here's the other photo of the

7    bed, I don't know if that helps you.  Does

8    that change any of your testimony?

9         A.    No.

10        Q.    You don't see any indication

11   that there was, like, she was sleeping with

12   a throw blanket, right, like you said?

13        A.    It could be on the floor on

14   that side of the bed by the window.

15        Q.    On the other side of bed there

16   could be a throw blanket --

17        A.    Where the garbage can is --

18        Q.    Okay, so --

19        A.    -- there could be a blanket on

20   the floor or she did throw them back and in

21   the time that he was on the bed still alive

22   or when the fire department was trying to

23   get him out, they could have just pushed

24   the blankets over.  I -- I -- again, I

25   don't know.



Page 181

```
 1                    J. KARASINSKI
 2       Q.    So you don't see this photo and
 3  the issues that we discussed in respect to
 4  the witness mark to be inconsistent with
 5  her testimony at all?
 6       A.    No, because I don't know what
 7  happened after she left.
 8       Q.    Okay.  But you have no reason
 9  to disbelieve what she's testified to based
10  on the images we've just reviewed?
11       A.    No.
12       Q.    Okay.  Now, when you have a
13  case with humans in the premises, it's
14  important to understand their locations and
15  movements prior to the time of the fire,
16  right?
17       A.    Yes.
18       Q.    I'm showing you some evidence
19  that Ms. Marcellin might not have been in
20  the place she said she was at the time of
21  the fire, right?
22       A.    Well, she was all over the
23  house at the time of the fire.
24       Q.    Right, but she says when she
25  woke up on the morning on the morning of
```



Page 182

```
 1                    J. KARASINSKI
 2   January --
 3        A.    20th -- 24th.
 4        Q.    -- 20th -- 24th, thank you.  I
 5   was just trying to do the years and dates.
 6   So when she woke up on the morning of
 7   January 24th she said she was in bed and
 8   what we just looked at appears to indicate
 9   that she might not have been in bed; is
10   that fair to say?
11        A.    Again, I -- that's your
12   opinion, not mine.  She could have thrown
13   the covers off --
14        Q.    Mr. Karasinski -- Mr.
15   Karasinski, is it possible, in your
16   professional opinion as a certified fire
17   investigator, that Ms. Marcellin was awake
18   when the fire alarm went off, not asleep?
19        A.    Based on her testimony, she was
20   asleep.
21        Q.    Right, but setting aside the
22   moment of her testimony and just relying on
23   your experience as a fire investigator
24   having responded to many cases, my question
25   to you is, is it possible that she was not
```



Page 183

                    J. KARASINSKI

1

2    asleep in bed at 4:00 a.m.?

3         A.    I believe she was in bed asleep

4    when she discovered -- when the smoke

5    alarms went off and she discovered the

6    fire.

7         Q.    So your testimony is it's

8    impossible?

9         A.    Anything is possible,

10   Counselor --

11        Q.    Okay.  So --

12        A.    -- but based on her statement

13   and its consistency with what we observed

14   at the site on how she woke up because of

15   the smoke alarm, got out of bed, hit the

16   silence button on the smoke alarm that was

17   on the wall and proceeded to go inspect

18   where the fire was located.  Now, I mean,

19   when you're asking if a computer -- a

20   compact computer has been in that closet

21   since 1990 and she's incorrect, I'm okay

22   with that.  But if she's telling us that

23   she woke up out of bed and that's

24   immediately what she did and it's the same

25   day she gave that statement, I put more



1                    J. KARASINSKI

2    credibility to that witness statement than

3    I do on something that may have been in the

4    closet for 20 years.

5         Q.    We talked about the date of the

6    manufacture of this computer, do you know

7    when Ms. Marcellin said she bought it?

8         A.    I don't recall when she

9    purchased the actual computer itself, no.

10   Again, that was Mr. Martin's, I didn't do

11   anything with the laptop.

12        Q.    Did you know that Ms. Marcellin

13   alleged in her complaint she purchased the

14   laptop in 2010 and later stated in an

15   interrogatory she purchased it in 2015?

16        A.    I'm not aware of that, no.

17        Q.    Does that have any -- learning

18   that fact now, does that have any effect on

19   any of your opinions in the case?

20        A.    Not as it pertains to the

21   computer because the computer was outside

22   the scope of my investigation.

23        Q.    Okay.  So this kind of goes

24   more into the compact category where you

25   don't view it as significant in respect of



Page 185

                    J. KARASINSKI

1
2    a statement that you would look at forming
3    your opinions in the case?
4        A.    Well, I would look at it to see
5    approximately how old that product was.
6    But again, anything that had to deal with
7    the laptop was the scope of Dr. Martin and
8    not myself.
9        Q.    What else did you do other than
10   reviewing Ms. Marcellin's testimony to
11   figure out where she was when the fire
12   started?
13       A.    Well, we've got the statement
14   that the locals gave us on what she did and
15   then we also have her deposition on with
16   she did, which is so -- which is consistent
17   with what she told the local fire marshals.
18       Q.    So other than reviewing her
19   statement and -- her statement to locals
20   and her deposition testimony, is there
21   anything else you did to figure out where
22   she was when the fire started?
23       A.    Just a review of where the
24   physical evidence is located.  She said she
25   went to the kitchen to get a fire



1                    J. KARASINSKI

2    extinguisher, said the fire extinguisher

3    wouldn't work, we found it, again, in the

4    kitchen on the counter so her statements

5    were consistent with what she advised the

6    local fire marshals and what states in

7    her -- in her deposition on what she did

8    when she discovered the fire and the smoke

9    alarm was activated.

10         Q.    Would you agree it's important

11   to understand what humans in the premise

12   are doing at the time a fire starts?

13         A.    Well, she advised that she was

14   sleeping.

15         Q.    Right.  I'm saying generally,

16   do you think it's important to determine

17   where -- what humans were doing and where

18   they were?

19         A.    Oh, absolutely.  When the only

20   two occupants are contending that they're

21   in the same bedroom and they're asleep,

22   there's no other occupants in the

23   structure.

24         Q.    Do you know --

25         A.    So I had any occupants -- other



Page 187

1                  J. KARASINSKI
2    residents in the structure, then they would
3    have been interviewed as well to see what
4    they were doing, but those were the only
5    two occupants in the structure and they
6    both -- well, she advised, not they both,
7    she advised that she was asleep at the time
8    and so was Charles and when she woke -- she
9    woke up because of the smoke alarm, she was
10   sleeping.
11        Q.    Do you remember why
12   Ms. Marcellin had to call 911 through her
13   OnStar system?
14        A.    Well, it's a very remote
15   location, I remember we didn't have a
16   signal there when I -- when we were there
17   doing our inspection too, so I don't know
18   that she had a good enough cell service to
19   go -- to make that phone call and I think
20   that's why she went to her car to use
21   OnStar to call 911, and I think she had an
22   issue with that so she had to drive down
23   the road as well.
24        Q.    Do you remember if she
25   testified about her land lines at all?



Page 188

1                    J. KARASINSKI

2        A.    I don't remember if she

3    testified on her land lines.

4        Q.    She testified that she was

5    unable to access a cordless phone that was

6    in the office, does that refresh your

7    recollection at all?

8        A.    I remember seeing a phone, I

9    don't remember her saying she used it

10   because she wouldn't go into the room that

11   was on fire.

12       Q.    So the phone you saw was in the

13   office?

14       A.    I believe, if I remember

15   correctly, there was one on the desk to the

16   right, I think.  I'd have to go back

17   through and look at my photograph.

18       Q.    Were there any other cordless

19   phones in the building?

20       A.    Not that I saw, but I guess I

21   wasn't really paying attention to phones.

22       Q.    So you weren't looking into

23   assessing Ms. Marcellin's testimony in

24   respect of how she made the emergency

25   calls?



Page 189

                    J. KARASINSKI

1

2       A.    No, I read her deposition on

3  how she called it, and I believe it was

4  that she didn't have a cell service in that

5  location, which we all had issues when we

6  were there doing our inspection, and then

7  she got into the car and tried to use

8  OnStar and I guess she couldn't connect

9  OnStar with the vehicle still there so then

10 she drove down the road and was able to get

11 in touch with OnStar and make the 911 call.

12      Q.    Okay.  If we look at her

13 testimony on page 115 you'll see she

14 says -- this is where she talks about her

15 cordless phone that we mentioned.  See

16 that?

17      A.    Okay.

18      Q.    So having reviewed this

19 testimony, does that refresh your

20 recollection about whether she had a

21 cordless phone in the house?

22          MR. SCHWARZ:  Ben, could you

23      show the page before that because I

24      think this is a continuation of

25      testimony.



Page 190

```
 1                    J. KARASINSKI
 2            MR. LEVITES:  Sure.
 3            (Mr. Levites complies.)
 4            MR. SCHWARZ:   I mean going up.
 5       Okay, thank you.
 6       Q.    That help, Mr. Karasinski?
 7       A.    Yup.  Yes.
 8       Q.    So she had a land line, right?
 9       A.    That's what she states, yes.
10       Q.    Okay.  If I told you that she
11   had another cordless phone that was in the
12   protected second bedroom, does that fact
13   have any significance to you?
14       A.    When there's a fire and people
15   are scared, no, it doesn't.
16       Q.    Okay.  So --
17       A.    Everyone reacts differently.
18       Q.    Okay.  So the fact that she
19   didn't use the phone that was in the
20   protected bedroom, it's neither here nor
21   there in your analysis?
22       A.    Again, that's a question for
23   her, but people do crazy things, you got a
24   fire, you got someone that can't get up on
25   their own and she doesn't want to leave and
```



Page 191

1                    J. KARASINSKI

2     that's the only way she can call 911 is to

3     get out.  She said when she was trying to

4     get him up she couldn't stand up, she had

5     to crawl out of the building.  So now

6     you're asking me if she's going to crawl to

7     the phone or exit the building?  It just

8     depends on the individual.  We all do crazy

9     things when we're scared.

10         Q.    Going to page 27 of your

11    report, there's a diagram here, Figure 37,

12    illustration of a compartment fire.  Do you

13    see that?

14         A.    Yes.

15         Q.    In developing fire in a

16    compartment, how does the hot gas layer

17    form?

18         A.    Through buoyancy.  Heat rises,

19    correct, so it will go to the ceiling and

20    as you can see on the right side of the

21    figure, you can see where it's got a little

22    header that comes down and this is what we

23    were talking about when I was talking about

24    the pot, right.  So as the fire continues

25    to grow in size and intensity in the



Page 192

                    J. KARASINSKI

1

2   closet, it starts to fill that room with

3   smoke and then that smoke will bank down

4   until it gets to the opening of the door

5   and that smoke will then start to travel

6   through the structure on, you know,

7   whatever doors are open and that will

8   continue to do that and that heat layer

9   will go out that door until that heat

10  layer's consistent and, like I said before,

11  equalizes with itself and then it will

12  continue to bank down to that room.

13       Q.    What comprises the hot gas

14  layer?

15       A.    What do you mean?  Articulates,

16  smoke, heat?

17       Q.    Yes, that's the answer I'm

18  looking for.  Are there other things?

19       A.    That's all I can recall.

20  That's all I have this right second, but

21  yeah.

22       Q.    What's the dominant form of

23  heat transfer from the hot gas layer to the

24  room in a developing compartment fire?

25       A.    Well, I would say your heat



Page 193

                    J. KARASINSKI

1

2    transfer is all three  motives of heat

3    transfer, you've got radiant heat,

4    conduction and convection.

5        Q.    Would you say one is dominant

6    or you just can't say?

7        A.    Well, they're all in play with

8    a compartment fire.  Each motive of heat

9    transfer is -- in a compartment fire you're

10   going to use all three.

11       Q.    I'm specifically talking about

12   the mechanism by which heat was transferred

13   from the hot gas layer to the rest of the

14   room.  What's the dominant motive?

15       A.    Then that would be radiant --

16   radiant heat.

17       Q.    Okay.  Couldn't the forces that

18   are depicted in this Figure 37 have caused

19   the thermal runaway that Dr. Martin

20   hypothesized took place?

21       A.    No, because she witnesses the

22   computer having an issue and smoking and

23   shrapnel coming out of the computer on fire

24   when she goes to look at the room and

25   discovers the fire and that the computer is



1                      J. KARASINSKI

2     having an issue.  So at that time that's at

3     the incipient stage.  So that heat layer --

4     she's standing up, she's not standing in

5     the heat layer.  So the answer is no, that

6     radiant heat -- we don't have enough

7     radiant heat at the time that the computer

8     begins to fail.

9          Q.     So you're testifying that the

10    forces that are depicted in Figure 37 could

11    not have caused the thermal runaway that

12    Dr. Martin hypothesizes took place because

13    of the -- Ms. Marcellin's statement; is

14    that fair to say?

15         A.     She's the one that witnessed

16    the fire and her statements are supported

17    by the physical evidence of the computer in

18    the batteries in the physical evidence that

19    we found in the room that were, as she

20    described, in the ceiling on fire and

21    bouncing everywhere.  We don't have a heat

22    layer that's going to be banking down and

23    attacking that computer at the time that

24    she discovers the fire.  Now, if she

25    doesn't discover the fire and we get to



Page 195

1                    J. KARASINSKI
2    where the heat layer is now after the fire
3    was extinguished, then my answer would be
4    different, my answer would be yes at that
5    point.  But at the point that she discovers
6    the computer that's having an issue and
7    failing and the projectiles are -- in cells
8    are leaving the computer, she is standing
9    up in that room and visually sees that,
10   there's not enough radiant heat to cause
11   that computer to go into thermal runaway.
12        Q.    Okay.  So I think you answered
13   my question, and it's Ms. Marcellin's
14   testimony that really disposes of that as a
15   possibility?
16        A.    Based on the physical evidence
17   is supported by her testimony on what she
18   saw.
19        Q.    Well, why don't take just the
20   physical evidence and setting aside her
21   testimony.  So without relying on any
22   testimony that she's given in this case,
23   does that change your question as to
24   whether the forces depicted in Figure 37
25   could have caused a thermal runaway Dr.



Page 196

                    J. KARASINSKI

1
2    Martin hypothesized to happen here?

3         A.    Only -- only later on during
4    the event when that heat layer became lower
5    to get that computer to its melting
6    temperature and to get the batteries to
7    start to decay from thermal attack to go to
8    thermal runaway.  So all I'm saying is at
9    the time she discovers this, the only thing
10   that's occurring is the laptop and the
11   batteries expending themselves out of the
12   laptop.  The physical evidence supports
13   what she's saying because we found foil,
14   end caps, positive/negative caps, we found
15   the cells that weren't no longer in the
16   computer in multiple locations in the room.
17   That supports her statement that she gave
18   on what she saw.

19        Q.    Do you agree that the rate of
20   fire growth as determined by the witness
21   statements is highly subjective?

22        A.    Absolutely.

23        Q.    Would you also agree that many
24   times witness are reporting the fire growth
25   from the time of their discovery and she



Page 197

                    J. KARASINSKI

1

2  can't really correlate the ignition time?

3      A.    Well, we just talked about when

4  the smoke detector would have been

5  activated.  So now we're going to be in

6  this room within that minute and a half to

7  two minutes of the smoke detector

8  activating and she is standing up in that

9  room.  So, I mean, you know, right, the

10 boiling temperature of water is

11 212 degrees, you're not going to stick your

12 hand in a boiling pot of the water, right,

13 at 212 degrees, so we don't even have

14 200 degrees at the ceiling level when she's

15 standing in there.  So that radiant height

16 is not going to produce enough heat

17 downward to attack that laptop to cause

18 those batteries to begin to fail and to go

19 into thermal runaway.

20          Now, as I said before, at the

21 thermal layer where it is now at 4 feet

22 down, yes, we are going to reach

23 temperatures great enough from radiant heat

24 to cause that laptop to go into thermal

25 runaway.  But at the time that she



```
 1                    J. KARASINSKI
 2  discovers it, we do not have those
 3  temperatures and they're not significant
 4  enough.
 5       Q.    So my question's a little
 6  different, separate and outside of this
 7  case and Ms. Marcellin, I'm just asking
 8  whether you would agree with the principle
 9  that many times witnesses are reporting
10  fire growth from the time of their
11  discovery which you can't directly
12  correlate with the time of ignition?
13       A.    Correct.  And she doesn't look
14  into the closet so she doesn't see a fire.
15       Q.    Eyewitness data about how fast
16  the fire grows, is that evidence that you
17  can use one way or another to support your
18  hypothesis?
19       A.    Sometimes, but it depends on
20  all the other data that you collected.
21       Q.    So you testified that you
22  believe the inhabitants of the house were
23  sleeping when the fire started, right?
24       A.    Yes.
25       Q.    You base that upon her
```



Page 199

```
 1                    J. KARASINSKI
 2   testimony, which you have no reason to
 3   disbelieve based on the evidence you
 4   reviewed?
 5        A.    Correct.
 6        Q.    On page 28, Figure 38, blowing
 7   up.  This is showing the fridge side of the
 8   kitchen.  Do you see that, Mr. Karasinski?
 9        A.    I do.
10        Q.    On the left side of the images
11   is a toaster oven, and my question is, are
12   you aware that the local investigator said
13   that the toaster often was on and glowing
14   and he unplugged it at the time he
15   responded to the fire?
16        A.    That's not a correct statement.
17        Q.    What's incorrect about that
18   statement?
19        A.    A fireman said that, not the
20   fire investigator.
21        Q.    I apologize.  So with that
22   correction, were you aware that a fireman
23   had said that the toaster oven was on, it
24   was glowing at the time he responded to the
25   fire and that he unplugged it?
```



Page 200

                    J. KARASINSKI

1

2      A.    I did see that in a handwritten

3  statement that was provided once we

4  received the local's reports from the FOIL

5  requests.

6      Q.    Why would the toaster oven be

7  on if the inhabitants of the house were

8  asleep before the fire?

9      A.    I don't know that the toaster

10  was on.  I don't even see an outlet that it

11  could be plugged into.

12      Q.    Looks like there's a couple of

13  receptacles in this photograph.

14      A.    Where?  There's a receptacle

15  behind the refrigerator.

16      Q.    I see two receptacles here

17  (indicating) and it looks like there's

18  another one right here.  You see that?

19      A.    You got to take your box away,

20  it's covering the picture.

21      Q.    You see that, looks like

22  there's a little shape here?

23      A.    Yeah, I don't know if that -- I

24  don't know if that's an outlet or not.

25      Q.    And then, if he says he



Page 201

1                    J. KARASINSKI

2    unplugged it, then why is it sitting

3    perfectly up against the wall like it is?

4         A.    I don't know that that's an

5    accurate statement.

6         Q.    Now, your testimony is that

7    Fireman Beaton [phonetic] was wrong?

8         A.    I'm not saying he was wrong,

9    but why unplug it when you can just turn it

10   off if it's on?

11        Q.    Well, whatever --

12        A.    I don't see an outlet typical

13   with these toaster ovens.  You usually only

14   have a three or four-foot cord.  So I don't

15   know if that's an outlet behind the toaster

16   oven.  I can't say that it is or it isn't.

17   It doesn't look like the same outlet that's

18   over here which has got the wood trim

19   around it for the cover plate.  I can't say

20   that that's that, it looks like it could

21   just be a shadow of the toaster oven.  So

22   if the only outlet in this kitchen is

23   behind the refrigerator, the toaster oven

24   is not going to reach that outlet.

25                    So I see that there's a plug



Page 202

                    J. KARASINSKI
1
2    there, is it possible that he unplugged the
3    refrigerator?  I just don't have enough
4    data.
5        Q.    So you're saying he might have
6    been mistaken about it being on, mistaken
7    about it being glowing and instead
8    unplugged the refrigerator?
9        A.    That's the only thing I can see
10   that's unplugged, the refrigerator, it's
11   behind the fridge.  And the cord for that,
12   for a toaster oven is not going to reach
13   from there to that outlet.
14            When you buy these toaster
15   ovens, they're going to have a three or
16   four-foot cords.  They're not going to have
17   a six-foot cord.
18       Q.    All right.  I'll take a look
19   and see if I can get some better photos of
20   the Matterport, and then we can button that
21   up after the break.  But I'd like to you
22   assume for the purposes of my next question
23   that there's an outlet directly behind the
24   toaster oven, can you do that for me?
25       A.    If Steve says I can answer a



Page 203

1                    J. KARASINSKI

2   hypothetical, that's up to Steve.

3              MR. SCHWARZ:  You can answer.

4        Q.    So assuming that the toaster

5   was indeed plugged in and glowing as

6   Mr. Beaton [phonetic] says it was, does

7   that indicate to you that someone was

8   awake?

9        A.    Someone could have had it just

10  on the oven setting, and they could have

11  accidently left it on.

12       Q.    It could have been on all

13  night?

14       A.    Could have been.  They have an

15  oven setting, you can set it at 350, 400,

16  450, and you can cook whatever you want in

17  there, just as you would in a normal oven.

18       Q.    But that would be one

19  explanation as to how beyond -- per being

20  awake would be another one, right?

21       A.    It's possible.  But her

22  statement is that she was sleeping, is it

23  possible that she used that the night

24  before they went to bed and accidentally

25  left it on, absolutely.



1                    J. KARASINSKI

2        Q.     Is it possible --

3        A.     And then the fire department --

4    and you leave it on, nobody opened it to

5    see if there was food in it.

6        Q.     Did you consider the toaster as

7    a potential ignition source in the case?

8        A.     No, it's not my area of origin

9    and there's no fire damage there.

10        Q.     So you didn't make anything of

11    the Beaton's statement one way or the

12    other?

13        A.     No, just like the other

14    statement about the furnace having a blow

15    out.  I don't even know blow out.

16        Q.     When you went to the kitchen,

17    did you notice the coffee pot was full?

18        A.     I did not notice that, that did

19    not catch my eye.

20        Q.     Now, having told you that the

21    coffee pot was full, did you make anything

22    of that?

23        A.     No, I make my coffee every

24    night the night before, so it's full and I

25    set the timer, and it starts before I wake



Page 205

1                    J. KARASINSKI
2    up.
3            So, is it possible that she
4    made it the night the night before and set
5    it on a timer and it was brewing in the
6    morning before they woke?  Yes, absolutely.
7        Q.    So it's your testimony that she
8    may have set up a timer from the night
9    before, and the coffee pot was brewing at
10   4 o'clock for them to wake up at five or
11   something like that?
12       A.    It's possible or is it possible
13   that they didn't drink the coffee from the
14   day before and that was just left there.
15       Q.    Is it also possible that
16   someone was awake at 4:00 a.m. and made the
17   coffee?
18       A.    Counsel, you keep going back to
19   that.  My statement that she said she was
20   sleeping and evidence supports that, okay?
21       Q.    Okay.
22       A.    I don't know if she left the
23   toaster oven on accidentally.  She's
24   elderly, it's possible.  I don't know if
25   they didn't finish the coffee the day



Page 206

                    J. KARASINSKI
1
2    before and she didn't she didn't clean it
3    because she doesn't clean it up that day.
4    Maybe she pours it out in the mourning when
5    she goes to make a new pot.  Maybe that was
6    left over from the day before.  It doesn't
7    mean that she was up.
8         Q.    So we are looking at page 30
9    now and you'll see a cite NFPA 921643, do
10   you see that?
11        A.    Yup.
12        Q.    It discusses the hot gas layer?
13        A.    Yes.
14        Q.    So it says that the first
15   sentence says that radiant flux from the
16   hot gas layer can produce damage to the
17   upper surfaces of contents and floor
18   covering materials, did I read that right?
19        A.    Yes.
20        Q.    So you would expect horizontal
21   materials to be more damaged than vertical
22   ones, right?
23        A.    Well, it depends what the
24   material is made of.
25        Q.    Assuming that materials are all



1                    J. KARASINSKI

2    made of same thing.

3         A.    What material are you asking me

4    that it's made of?

5         Q.    Everything in the room is made

6    of paper.  Some items are vertical, some

7    items are horizontal.  Would you expect the

8    horizontal materials to be more damaged

9    than vertical?

10        A.    Well, that's -- you would

11   expect -- if you reach the ignition of the

12   paper, then you would expect that it's

13   going to burn more regularly in a vertical

14   configuration than it's going to burn in a

15   horizontal configuration.

16        Q.    So you would expect vertical --

17        A.    So I guess, yes.  So explain

18   that, right, if I take a piece of paper, no

19   windows open, no air movement, and I light

20   the top right corner of that piece of

21   paper, that top piece of paper, that right

22   corner that you light with an open flame,

23   it is going to burn until it runs out of

24   fuel and it's going to extinguish.

25              Now, if I take that same piece



Page 208

J. KARASINSKI

1
2   of paper and I light the bottom right
3   corner, right, now, we have fuel and we
4   have the configuration, that's going to
5   allow that complete a piece of paper to
6   burn in it's entirety.
7       Q.    Okay.
8       A.    That's based that that's based
9   on the fuel configuration.
10      Q.    So would you expect that to be
11  generally true, that vertically configured
12  items would be more damaged in a
13  compartment fire like this than horizontal?
14      A.    Yeah, because the horizontal,
15  you can see, like, when we're talking about
16  the magazines and stuff like that the
17  protected areas, when they're horizontal,
18  that fuel configuration is not going to
19  support flaming combustion.
20          But now, you take that piece,
21  that horizontal magazine, and you tip that
22  magazine vertical, and you put that in the
23  same fire event or same open flame, you're
24  -- and you light the bottom of that --
25  because that fuel configuration, now, that



Page 209

```
 1                   J. KARASINSKI
 2  has time to grow and spread, because it has
 3  the heat and it has the fuel.
 4       Q.    So you mentioned the furnace,
 5  it's page 33 where you discuss the furnace.
 6       A.    Yes.
 7       Q.    Did you consider the furnace
 8  the cause of fire?
 9       A.    Absolutely.
10       Q.    How did you forensically rule
11  out the furnace?
12       A.    There's no fire damage inside
13  of room mechanical room of furnace.  There
14  was no fire damage there, it was only soot,
15  this is typical of what you would see if
16  the furnace comes on during fire event and
17  it will suck in heated gas into that layer.
18            There was no fire damage to the
19  door that was shut, and Carol also states
20  that she was hoping it was the furnace and
21  there was going to be something wrong with
22  it.  And she actually physically opened the
23  door and then saw that there was no fire
24  and that's when she went to the office
25  space.  So I'm eliminating it based on
```



Page 210

                    J. KARASINSKI
1
2   witness statements and based on fire
3   patterns.
4        Q.    So you see the following figure
5   shows the hallway floor, is that what it
6   looked like when you first showed up on the
7   scene, February 2020?
8        A.    Can you scroll up, I can't see
9   the floor.
10       Q.    Oh, I apologize, It's shown
11  right here, do you see that?
12       A.    That's how it looked when we
13  got there, yes.
14       Q.    Okay.
15       A.    So if you look at this closely
16  though, those are the contents that were
17  thrown out from the closet by the fire
18  department.
19       Q.    This was the -- this was how it
20  was when you got there?
21       A.    Yes, that room, as you can see
22  the piece of sheeting covering the door to
23  secure the door from anyone having access.
24       Q.    So you were referring to
25  sheeting here?



Page 211

                    J. KARASINSKI

1

2       A.     Yeah, that wood sheeting was --
3   I'm assuming that investigator from NEFCO
4   put it up, because that was up when I got
5   there to secure the room so no one could
6   access --
7       Q.     That sheathing here, that I'm
8   indicating in the square?
9       A.     It's in the square, but your
10  square is only covering about a quarter of
11  it.
12      Q.     Yeah, yeah, this plywood
13  figure, right?
14      A.     Yes.
15      Q.     Okay.
16      A.     You can see the louver door for
17  the furnace right next to it with no fire
18  damage.
19      Q.     So you're looking at this
20  louver door here on the left of Figure 46?
21      A.     Yes.
22      Q.     That was the physical evidence
23  that you looked at?
24      A.     Yes.
25      Q.     That's also depicted on the



Page 212

                    J. KARASINSKI
1
2    right side of Figure 45?
3         A.    Yes, with the door open.
4         Q.    Right.
5         A.    Picture below, it's closed,
6    picture above, it's broken.
7         Q.    So on the next picture, we are
8    looking at 47 now.  And the caption reads:
9    Fire damage outside office into hallway,
10   red arrow indicates the Hp laptop, do you
11   see that?
12        A.    Yes.
13        Q.    So the closet that we are
14   talking about is not visible in this
15   photograph, right?
16        A.    No, it's not, no. The inside
17   the closet, but that's the closet wall.
18        Q.    Right.
19        A.    So that's visible, but the
20   inside of the closet and the contents in
21   the closet were not visible.
22        Q.    Right, because it's around the
23   corner?
24        A.    Yes.
25        Q.    Going to page 35, you stated



Page 213

1                    J. KARASINSKI

2    that melted plastic was observed on the

3    laptop screen resulting from downward

4    dripping consistent with the computer being

5    in an open position at the time of the

6    fire.  So my question, Mr. Karasinski, is,

7    is it your opinion that the melting was

8    from gradient heat on the open key board

9    and screen?

10        A.    Yes.  Later on during the fire

11    event, when the heat layer banked down to

12    the approximately four-foot level, yes,

13    that's when it began to melt.

14        Q.    You said when the heat layer

15    banked onto that level.  So you were saying

16    the hot gas layer would have to come down

17    to the level of the laptop screen?

18        A.    No.  The heat layer, you'd have

19    radiant heat pushing down, right.  So --

20    but, again, I'm not going to get the

21    temperatures great enough to melt that

22    plastic.  I have got to have bank -- that

23    heat layer would be banking down.  So that

24    occurred later on during the fire event,

25    not at the initiation of that fire event.



1                    J. KARASINSKI

2        Q.    Then, you say that the -- that

3   there was this -- the damage observed on

4   the laptop was isolated and inconsistent

5   and of greater intensity than damage to

6   other contents in the room.  What do you

7   mean by that, Mr. Karasinski?

8        A.    So where the battery failure

9   occurred on the back of the laptop, if you

10  look at the picture where the laptop was

11  turned over, you could see the melted

12  plastic, okay, that should have been

13  protected.  So that occurred and melted by

14  the battery failure in the unit, not from

15  the radiant heat banking down on the unit.

16       Q.    So let's see if there's a

17  picture of the backside for us to look at

18  while we are talking about this.

19       A.    There it is.

20       Q.    So you're talking about the

21  damage that's depicted on the underside of

22  the Pavilion laptop in Figure 58?

23       A.    Yes.

24       Q.    Wouldn't you expect this kind

25  of damage whether if a laptop was a victim



Page 215

1                    J. KARASINSKI

2  of a fire or the start of a fire, because

3  it had a battery pack in it?

4       A.    Can you say that again, I'm

5  sorry?

6       Q.    I'm saying, wouldn't you

7  inspect this kind of damage that we are

8  looking at in Figure 58 whether the laptop

9  was the start of the fire or the victim of

10  the fire because it has a battery pack in

11  it?

12       A.    Well, if it was a victim of the

13  fire, this damage would not have occurred

14  until later on during the fire event.  So

15  again, we are talking about the timing,

16  right, so as this -- when she sees the

17  batteries expelling from the laptop, that's

18  the incipient stage of a failure.  We don't

19  have a heat layer.  We don't have radiant

20  heat banking down on this computer.

21  This -- if the computer was a victim of a

22  fire, yes, would the damage be similar, but

23  I don't have the radiant heat layer to this

24  point yet when she discovers the incipient

25  stage of the failure of the batteries of



Page 216

                    J. KARASINSKI
1
2    the Pavilion laptop.
3         Q.    So, is it fair to say that
4    you're ruling out that the laptop was the
5    victim of the fire, not notwithstanding
6    that it could suffer such damage in a
7    thermal attack because of Ms. Marcellin's
8    statements, you have these two
9    possibilities and is you're going for one
10   because of what she said, right?
11        A.    Well, no, the physical evidence
12   and what she saw supports that it's a
13   failure of the laptop and it wasn't from
14   radiant heat because she's in the room and
15   she sees it and we don't have radiant heat
16   banking down hot enough to cause this to go
17   into thermal runaway at the time she
18   discovers the fire.
19             Now, again, we talked about
20   timing, but as she's trying to get him out
21   of the house and she's driving down the
22   road to call 911, the fire is still
23   burning, correct, and now that heat layer
24   is banking down, and then that's when we
25   have the damage, the melted plastic and



```
 1                    J. KARASINSKI
 2  things of that nature to the laptop.
 3       Q.    I understand what you're saying
 4  and I understand and I think these too
 5  possible outcomes, you know, the battery
 6  could've been attacked by the fire after
 7  Ms. Marcellin -- the computer could have
 8  been attacked by the fire after
 9  Ms. Marcellin left by the hot gas layer, as
10  you're saying, or it could have been
11  earlier and you're saying you ruled out
12  this earlier possibility because of what
13  Ms. Marcellin's testimony, right?
14       A.    Based on her observations and
15  the physical evidence that we found
16  supported her statement.
17       Q.    Right.  So I'd like to focus on
18  the second part of the that.  So I know
19  that you relied on her statements which
20  were consistent with this hypothesis that
21  you have, but what's the other physical
22  evidence that you relied upon to make this
23  distinction here?
24       A.    The location of where we found
25  the cells, and the absence of any ignition
```



Page 218

1                    J. KARASINSKI

2    sources within the closet and then the only

3    evidence of an ignition source that we

4    observed in the closet was foil from one of

5    the cells that expended.  So everything,

6    it's the totality of all the data that was

7    collected and following the scientific

8    method.

9              So we're still collecting that

10   data based on her observations.  They made

11   sense.  We are now starting to locate

12   expended material from the cells, a couple

13   of cells that were blown out of the

14   computer.  And I have no ignition sources

15   to have a fire in the closet.  There's no

16   electric in the closet, there was no

17   compact computer in the closet.  There was

18   no vacuum in the closet, the only ignition

19   source that we found in the conceit was

20   foil from one of the lithium ion battery

21   cells.

22        Q.    I'm going to go back to

23   page 35.  And you say at 35 to 36 that the

24   fire patterns were consistent with fire

25   spreads from the closet to the office.  I'm



Page 219

                        J. KARASINSKI

1

2    trying to find the exact quote here, but

3    does that generally sound right?

4         A.    It does, yes.

5         Q.    I'm going to see if I can find

6    that exact quote.  But, so I guess, I'm

7    just summarizing it.  You're talking about

8    fire patterns, how you observed them.  So

9    it's fair to say that it's your opinion

10   that the closet was the secondary fuel that

11   was ignited?

12        A.    After the battery failure, yes.

13        Q.    So the first fuel was the

14   battery pack, the second fuel was in the

15   closet?

16        A.    What are the contents of the

17   closet.

18        Q.    What caused the secondary fuel

19   to be ignited?

20        A.    The foil from the cells.

21        Q.    On page 36, you also states

22   that Mr. Litzinger observed breaker number

23   four tripped and he confirmed that breaker

24   number three provided power to the

25   receptacle the laptop was reported to be



Page 220

                    J. KARASINSKI
1

2    plugged into.  So my first question, Mr.

3    Karasinski is, did you see the laptop

4    plugged in when you were on your site

5    investigation?

6         A.    I would have to go back to my

7    photos, but I believe we did observe it,

8    that it was plugged in at the time.

9         Q.    You said it was reported to be

10   plugged, so that's why I'm asking.  You see

11   that?

12        A.    Correct.

13        Q.    So you think you saw it plugged

14   in?

15        A.    I believe it's in our

16   photographs, minor at the scene.

17        Q.    Mr. Litzinger, he testified

18   about this.  He said he didn't analyze or

19   trace the only trip circuit breaker which

20   was number four, despite the fact that it

21   would've been tripped by either an

22   electrical event or local investigators.

23   So my question is, how did you rule out an

24   electrical event at breaker as an origin

25   and cause investigator?



Page 221

                    J. KARASINSKI

1

2       A.      There was no fire damage at

3  breaker number four at the panel.

4       Q.      Do you know what breaker number

5  four went to?

6       A.      I believe they tried to trace

7  it.  Again, that was outside my scope.  I

8  wasn't there to do that, but I believe they

9  tried to trace it.  And they couldn't trace

10  it.  They were getting too much feedback

11  from their circuit tracers that they were

12  trying to use.  I think they tried to use

13  two or three different circuit tracers.

14              And then, the other issue too,

15  when they were doing that, some --  when

16  you're doing that, sometimes, you have to

17  unplug things, because that could give you

18  the spec the back feeding in it, but they

19  were unable to trace that to determine

20  exactly where it went.

21      Q.      You don't think that's a data

22  gap in respect of your origin and cause

23  analysis?

24      A.      No.  I had -- we had no arcing

25  in our -- in the room of origin and that



Page 222

```
 1                    J. KARASINSKI
 2    breaker was not in the trip position.  So
 3    based on that and no arcing on the cords to
 4    the computers, those were the only circuits
 5    that were exposed to the fire event in that
 6    room.  So those were the first ones that
 7    would be susceptible to being attacked by
 8    fire.
 9         Q.    Well, it says right here that
10    breaker number four was tripped, right?
11         A.    I was talking about breaker
12    number three that we traced that went back
13    to the room of origin.
14         Q.    I'm talking about number four,
15    which is the only tripped one.
16         A.    Correct, we didn't find any
17    electrical activity in the room of origin.
18         Q.    From number four?
19         A.    I don't know if number four
20    went to -- we don't know where number four
21    went.
22         Q.    Wouldn't you like to know where
23    number four went if there was an electrical
24    event at that the receptacle that
25    corresponded with number four?
```



Page 223

1                    J. KARASINSKI

2        A.    I don't know if it was an

3   electrical event.  Like I said, it could be

4   tripped from heat, they can trip from

5   thermal heat.  They can trip if a fireman

6   or somebody's touching something, they can

7   trip.  They can trip if you shut the door

8   too hard, if you bump against it, there's

9   multiple reasons that they can trip.

10              The room of origin did not have

11  any electrical activity in it.  We traced

12  that breaker back.  We confirmed it was

13  breaker three.  Our room of origin did not

14  have any electrical ignition sources

15  besides the computer.

16       Q.    So even though this was the

17  only one that was tripped, and I can

18  represent to you, Mr. Litzinger said that

19  he ruled out heat exposure as a possible

20  trip, he testified that the two

21  possibilities were that a local first

22  responder or investigator had bumped it as

23  you suggested or there was an electrical

24  event, so the that's what he testified to.

25       A.    No, understand that.  I was



1                    J. KARASINSKI

2    just giving you examples on what could

3    cause them to trip.

4        Q.    Right.  And I'm saying, because

5    you didn't see evidence in the -- what you

6    concluded was the room of origin of an

7    electrical arc or other signs of electrical

8    ignition, you didn't think it was necessary

9    to figure out what, if anything, happened

10   at circuit breaker number four?

11       A.    No, we observed it.  We

12   documented that it was in the off position,

13   and we even collected it and that's what we

14   have and there was no electrical activity

15   in the report.

16       Q.    You didn't collect it though,

17   you only collected number three, right?

18       A.    I'm sorry, number three, sorry,

19   we documented number four.

20       Q.    Would you have collected number

21   four?

22       A.    When we didn't find any

23   electrical activity, at that point, it was

24   just a data point at that time and it still

25   doesn't have any meaning to us as it



Page 225

```
 1                    J. KARASINSKI
 2   pertains to cause for the this fire event.
 3        Q.    Number four could have gone to
 4   the office, right?
 5        A.    I don't think so.  I don't
 6   think that's the way it was running.
 7        Q.    But you don't know as you sit
 8   here today that it could or couldn't have
 9   gone there, right?
10        A.    Again, that was outside my
11   scope.  Andy was retained to do the
12   inspection of the electrical system.
13        Q.    Page 41, okay.  At Figure 56,
14   we have the image of the notebook and it's
15   your testimony that the melting on the
16   keyboard that we are looking at was damaged
17   from the fire attack after Ms. Marcellin
18   fled the residence, right?
19        A.    Not fire attack.  Radiant heat.
20        Q.    Radiant heat, thank you.  Would
21   the presence of a hot gas thermal lighter
22   damage the laptop's battery?
23        A.    Once that heat layer got low
24   enough -- got closer to the laptop, yes.
25        Q.    How low do you think the heat
```



Page 226

                    J. KARASINSKI
1
2   layer has to go to damage the laptop?
3        A.    Probably maybe afoot above
4   where it is now, probably start to see
5   melting on that laptop.
6        Q.    So a foot above the laptop,
7   that's when you'd see the melting?
8        A.    No, I said a foot above the
9   heat layer that we have marked it on in my
10  report.  If it was approximately, three
11  feet, a foot higher than that is probably
12  when you would start to see melting to this
13  laptop.
14       Q.    So, you know, like, a foot
15  higher than this red line in Figure 49?
16       A.    Yes.
17       Q.    Okay.
18       A.    So at the incipient stage of
19  the fire in full room involvement of that
20  closet, based on the quick calculations I
21  did, we're looking at a heat layer of the
22  ceiling layer within two minutes of full
23  room involvement of the closet and 700 F.
24       Q.    So, yes, I did very next photo,
25  Figure 57.  So I'm looking at the damage,



Page 227

```
 1                    J. KARASINSKI
 2   that's the red highlighted circle of the
 3   battery remains and the damage that's
 4   depicted in this close up and my question
 5   is, would you have expected the Hp laptop
 6   to have been even more damaged if it
 7   started the fire?
 8        A.    No.
 9        Q.    So, you wouldn't expect cracked
10   screen?
11        A.    No, I have -- we have had
12   laptop fires that is -- that the batteries
13   had failed and didn't ignite anything and
14   all extended out of there and there was no
15   cracking to the screen.  There was no
16   melting to the unit.  It was only melted on
17   the bottom.
18        Q.    Right.  But those weren't cases
19   where it started a big fire, right?
20        A.    Well, correct.  That's what I'm
21   saying.  So I've seen it both ways.  I've
22   seen it where it's really bad when it did
23   start a fire, because there were
24   combustible materials that ignited in an
25   adjacent to it.  Or in this case, it didn't
```



Page 228

                    J. KARASINSKI

1

2    ignite anything in an adjacent to this

3    computer, and you can see from the other

4    areas, you can actually see, I think

5    there's one solid laying on the ground

6    where you can see you can see the singed

7    carpet in front of it because it was still

8    expelling as it landed on the floor.

9        Q.    So in Figure 59, that's one of

10   the pins that you were just mentioning,

11   right?

12       A.    I don't believe that that's

13   where that was found, but that's where it

14   was the day we got there.  I believe that

15   was probably put there by the NEFCO Fire

16   Investigators.

17       Q.    This is the intact cells?

18       A.    I don't recall.  You'd have to

19   ask Mr. Martin with an intent.  But if you

20   go down in one of my photographs, you can

21   see a cell laying on the carpet, that one

22   right there.  So you can see where the

23   singed carpet.

24       Q.    Yes.

25       A.    After expelled its contents, it



Page 229

1                    J. KARASINSKI

2    was laying on the carpet.

3        Q.    So looking at the cells

4    depicted in Figures 59 and 60, did you do

5    anything other than the CT and X-ray test

6    that we talked about to test them or

7    inspect them in any way?

8        A.    Again, that's a question for

9    Mr. Martin.

10       Q.    Now, these two that we are

11   looking at Figures 59 and 60, is it your

12   opinion that these battery remains ignited

13   the secondary fuels in the fire?

14       A.    Batteries in the picture, no.

15       Q.    At Figure 60, I guess it was

16   exhumed by my last question, are you saying

17   that this battery ignited the secondary

18   fuel to the fire?

19       A.    No, I'm just using that -- I'm

20   just using that as an example, after it

21   blew out of the laptop, still producing

22   flaming combustion.  That's why you can see

23   the singed marking on the carpet, correct.

24       Q.    That's the charring that I've

25   drawn a box around this -- to the top left



Page 230

1                     J. KARASINSKI

2    of the battery remains depicted in this

3    Figure 60?

4         A.    Yes.

5         Q.    Does it look like the carpet

6    was ignited in the flames there?

7         A.    No.

8         Q.    Just charred, right?

9         A.    Just charred.  But carpet has

10   fire ambers in it.  So it will -- and

11   again, when we are talking about the -- you

12   had a very good question about the fuel

13   configuration, right, we have to remember

14   that this is horizontal, right.  So as soon

15   as the flaming combustion completes or

16   finishes with this cell, if it did ignite

17   the carpet, it would self-extinguish.

18        Q.    The configuration -- the

19   explanation you gave on configuration makes

20   a lot of sense in the example that you were

21   describing, but could you -- I'm having

22   trouble squaring it with -- the image I

23   have in my layman's mind of radiant heat,

24   okay, you're lying on the beach, you didn't

25   wear suntan lotion, you didn't wear a hat,



Page 231

1                    J. KARASINSKI
2   you know, maybe your back heats up a little
3   bit but it's protected.  It's your front
4   that's completely scorched, right, from top
5   to bottom, I'll be red.  If I do the exact
6   same day, exact same situation, but I'm
7   just walking around, right, it's going to
8   be my nose, my face, my shoulders,
9   everything that's, you know, exposed to the
10  sun, that's what goes to get burned the
11  most.
12              So to me, it looks like in the
13  example of the sun as radiant heat, the
14  horizontal item is getting more damaged
15  rather than the vertical.  So I und3erstand
16  what you're saying, but could you out
17  square these two -- the problem I'm having
18  if I'm even articulating it in any way to
19  you?
20              MR. SCHWARZ:  I'm going object
21         to the form.  I'm going object to the
22         form of that question, because you're
23         talking about radiant heat and UV
24         radiation which are different, but
25         you can answer, if you can.



Page 232

1                    J. KARASINSKI

2              THE WITNESS:  I can't.  That

3        was a long winded question.

4        Q.    I understand I'm hoping --

5        A.    From this picture, all I'm

6   trying to show is that when the cell

7   expelled from the laptop and landed in this

8   position, it was still producing flaming

9   combustion coming out of the cell and

10  that's what produced the charring to the

11  carpet.

12              What I was saying is, this cell

13  did not ignite the carpet because of it's

14  configure, steel configuration, right,

15  because the carpet on the floor is

16  horizontal, and the carpet also has fire

17  ambers in it.  So once this cell expelled

18  all of its materials and extinguished, it

19  didn't do anything.

20       Q.    Looking at figures 63 and 64

21  here which show the breaker, The Vaca

22  Circuit breaker and the system breaker

23  along with the X-ray, and my question is,

24  Mr. Karasinski, did you want an X-ray for

25  that one circuit breaker that was tripped?



Page 233

                     J. KARASINSKI

1

2       A.     No, we didn't need it because

3   we found no electrical activity in our room

4   of origin.

5       Q.     Is it the same answer for

6   whether you attached any significance to

7   the fact that this panel had been recalled

8   by the manufacturer?

9       A.     No.

10      Q.     It's not the same answer?

11      A.     No, I mean, just because the

12  panel has got a recall, doesn't mean it

13  started a fire.  And we have no fire in the

14  area in the panel, so it's just, like, any

15  piece of equipment that you have in your

16  house that's got a recall, it doesn't mean

17  it automatically is going to start a fire

18  and catch on fire the next time you use it.

19  It may never catch on fire even though it

20  was recalled.

21      Q.     Yeah, I understand that.  I

22  just asked you about a circuit breaker

23  number four, you said because it was not,

24  you know, it was not consistent with your

25  findings in respect of electrical activity



Page 234

1                    J. KARASINSKI

2   that's why no further under investigation

3   was undertaken.  And my question is, if you

4   learned that the panel itself was recalled,

5   is that, you know, would that warrant any

6   additional investigation in your mind?  And

7   I think you just said, no, is that fair?

8        A.    That's fair because there's no

9   -- if the fire was originating here or we

10  had an issue that something was not working

11  in the panel or the fire originated here,

12  then absolutely, we would address that, and

13  we would be looking at that.  And I

14  understand that Federal Pacific has a

15  recall.

16       Q.    So the circuit breaker number

17  four, the recall, the panel, that's not

18  relevant to your analysis in this case?

19       A.    No, and the occupants didn't

20  provide any issues with any of the breakers

21  tripping or having any issues with any

22  electrical problems in the structure.

23       Q.    Well, we know at least one was

24  tripped, whether it was from an electrical

25  event or a local fire department person,



Page 235

1                    J. KARASINSKI

2    right?

3         A.     Correct.

4         Q.     On page 45, you state that the

5    failure of the Hp Pavilion laptop system to

6    include the battery pack resulted in the

7    injection of hot battery material that

8    ignited combustible located within the room

9    of origin including the closet, so I'm

10   describing a break that -- first of all,

11   did I read that correctly?

12        A.     Yes.

13        Q.     I'm going to break this one

14   down at a time.  So, is it fair to say

15   based on reading this that you don't know

16   what part of the Pavilion system including

17   the battery pack failed?

18        A.     Again, that was for Mr. Martin

19   to handle.

20        Q.     Then you say that a hot battery

21   material was injected.  What material was

22   ejected?

23        A.     So you can inject multiple

24   items out of there, but typically, from the

25   testing that we've done is the foil, is a



Page 236

                    J. KARASINSKI
1
2   very competent ignition source.  So I mean
3   there's multiple things in there.  You've
4   got safety events, you've got gaskets,
5   you've got crimps.  There's other material
6   that's shooting out, but typically, that
7   foil is going to retain enough energy and
8   sufficient heat to ignite combustible
9   material.  Did I lose you?
10       Q.    No, I'm just making a note.
11   I'm just making a note that you send that
12   in a way that was very clear.  So I was
13   just trying to make a note of it.  So you
14   -- is it fair to say that multiple kinds of
15   battery material were ejected here then?
16       A.    Yes.
17       Q.    But you believe it was the foil
18   that ignited the secondary fuels in this
19   case?
20       A.    I believe the foil is the most
21   competent ignition source when the battery
22   injects its materials.
23       Q.    You believe it's the most
24   competent ignition source in this case as
25   well?



Page 237

1                    J. KARASINSKI

2        A.    Yes, and we found that in the

3    closet area which is the secondary fuels.

4        Q.    So it was the foil, it wasn't

5    the jelly roll, the caps or these other

6    components you were talking about?

7        A.    Well, the foil is the jelly

8    roll.  That's what it looks like after it

9    fails.

10       Q.    Right.  But the foil can come

11   out.  It can be like confetti, right, or it

12   could be injected like a slug too, right?

13       A.    Yeah, or sometimes, it doesn't

14   come all the way out, and it looks like --

15   I don't you know how to describe it, a half

16   eaten popsicle on the way out.

17       Q.    Right.  Right.  Rocket top,

18   yes.  So, is it fair to say that this is in

19   the confetti category, the ignition that we

20   are talking about here?

21       A.    No, it was a pretty it was a

22   pretty large piece of jelly roll foil that

23   we found in the closet.

24       Q.    So it was more like a slug.

25       A.    Yes.



Page 238

1                    J. KARASINSKI

2        Q.    Where it's injected in its

3    entirety?

4        A.    Yeah, I've not heard it call

5    slug before, but, yes, if that's what you

6    want to use.

7        Q.    That's what I have been calling

8    it because of the case and the contents,

9    it's just, I don't know, visually, it makes

10   sense to me, but no, it's not scientific at

11   all.

12       A.    As long as we both agree on

13   what we are calling it, that's fine.

14       Q.    Then you said that the hot

15   battery material ignited combustibles, what

16   combustibles.

17       A.    So if you look at the

18   photographs and you go back to the hallway

19   or the photographs of the yarn at the

20   process, you can see that there were towels

21   in there, were clothes in there, there was

22   yarn in there stored on the floor level.

23   There was a plastic stool that you can see

24   in the hallway that was in that closet, it

25   had multiple clothes, towels, so there was



1                    J. KARASINSKI

2    plenty of combustible material in there

3    that could have landed on it and ignited.

4         Q.    So you named a couple of

5    different things, do you have an opinion as

6    to what was the secondary fuel in this

7    case?

8         A.    Just the combustibles that were

9    stored in the closet.

10        Q.    So you can't say whether it was

11   the towels or the clothes or the yarn or

12   the plastic stool?

13        A.    No, it was all -- it was moved

14   prior to my inspection.

15        Q.    Don't you ordinarily ask to

16   identify the combustible that ignited in a

17   fire investigation?

18        A.    I am identifying the

19   combustible.  The combustible materials

20   that were stored in the closet.

21        Q.    But I guess I'm asking, would

22   you ordinarily go for a greater level of

23   detail, meaning identifying whether it was

24   the towels, clothes, yarn, stool or some

25   other thing?



1                    J. KARASINSKI

2        A.    Based on the material that was

3    in that closet, I'm comfortable with the

4    combustible materials in there because of

5    the clothing the towels, the -- like I

6    said, the yarn, the sewing items, and that

7    is -- that -- your slug can ignite those

8    materials.  I don't know how they were

9    stacked in there.  I don't know what was on

10   the bottom of the towels or on the bottom

11   or the sheets were on the bottom or the

12   comforter was on the top.  I don't know the

13   answer to that.

14       Q.    So, is it your opinion that the

15   slug that we will call it, was competent to

16   ignite everything that was in the closet?

17       A.    Of the material I just listed

18   to you, yes.

19       Q.    Yes, everything, meaning the

20   towels, the clothes, the yarn and the

21   plastic stools?

22       A.    Yes.  Yes.

23       Q.    So that's why --

24       A.    Not the plastic stool, but yes,

25   the clothing, the towels, the sheets, the



Page 241

                    J. KARASINSKI
1
2  combustible materials that she had stored
3  in there, yes.  That's what supplied
4  sufficient heat and entity to ignite any of
5  those combustibles in the closet.
6       Q.     Did you know, were they all
7  cotton, were they all synthetics, was there
8  some kind of mix?
9       A.     There appeared to be a mix to
10 me.  There was a couple of bags in there
11 that appeared to be synthetic.  There were
12 towels which appeared to be cotton made,
13 the receipts in there, so...
14      Q.     Now, you said in the room of
15 origin including the closet, so my question
16 is, were the secondary fuels ignited in the
17 closet or somewhere else?
18      A.     The secondary fuels were
19 ignited in the closet and that's fire event
20 is the closet.  The expended batteries
21 besides the damage melting and fire damage
22 you see to the bottom of the laptop and the
23 top the laptop from the failure of the
24 cells, right, to tell you that fuels and
25 then the other areas where we found cells,



```
1                  J. KARASINSKI
2    we did not -- those cells did not produce
3    enough heat and energy to cause a fire
4    somewhere else in that room.
5               (Whereupon, a break was taken.)
6         Q.    Mr. Karasinski, we left the
7    last -- we left after we were discussing
8    the combustibles in the closet, right?
9         A.    I believe so, yes.  Unless you
10   want her to read back the last question and
11   answer.
12        Q.    That no, that's okay.  So you
13   state that --
14        A.    Can we go back with your ear
15   buds?
16        Q.    Is that better?
17        A.    It's much better when you got
18   your earbuds in, thank you.
19        Q.    So I'm looking at let's see,
20   okay, so you see here, the highlighted
21   section under your cause to determination
22   analysis?
23        A.    Can you turn your volume off on
24   your computer because now I'm getting
25   feedback.  Sorry about that, not trying to
```



Page 243

                    J. KARASINSKI
1
2    be difficult, I got a bad echo.
3         Q.    Is that better?
4         A.    Yeah, that's fine.
5         Q.    Do you see the highlighted text
6    and their cause determination analysis, Mr.
7    Karasinski?
8         A.    Yes.
9         Q.    Can you read that to yourself
10   and let me know when you've do so.
11        A.    Your highlighted section is
12   covering a couple members.
13        Q.    Of course, that would be a
14   little bit easier, wouldn't it?  I'm trying
15   to just highlight this beginning with
16   Ms. Marcellin to the word "retreated," do
17   you see that.  So Ms. Marcellin through
18   retreated.
19        A.    Okay.
20        Q.    So Ms. Marcellin stated that it
21   was too big for her to extinguish, so she
22   would be retreated and my question is, how
23   long would it take for the fire that you
24   alleged start in the Hp computer to be too
25   big to be extinguished?



Page 244

1                   J. KARASINSKI

2      A.    Well, I don't agree with that

3  timeline, so what I -- what I'm saying is,

4  you've got the computer igniting and with

5  the battery itself failing and injecting,

6  those injected components, one of foils

7  landed in the closet and ignite in those

8  combustibles.  The closet it ignited, which

9  caused the further damage.

10     Q.    So, how long would it take for

11 the fire to -- that was ignited by way of

12 secondary fuel in the closet to become too

13 big to extinguish.

14     A.    Extinguish with what?

15     Q.    With what Ms. Marcellin

16 testified that she was using which was a

17 handheld extinguisher.

18     A.    So typically, when we do light

19 burns, our burns sells, typically usually

20 10 by 10 or 12 by 12, so and I'm giving you

21 as an example from a large burn fire and

22 testing what we have done, that we can

23 ignite with an open flame a 12 by 12

24 structure burn pot room and contents,

25 whatever you want to call it, we can ignite



Page 245

                         J. KARASINSKI

1

2   that with an open flame and I can typically

3   get that room through a full room

4   involvement and flashover in less than four

5   and a half five minutes.

6              So when that closet finally got

7   to full room involvement, she was not going

8   to be able to extinguish that with a fire

9   extinguisher.

10      Q.    But to get to that full room

11  involvement where no handheld extinguisher

12  is going to put it down, we're talking less

13  than 4.5, 5 minutes?

14      A.    Yes.

15      Q.    Would it be less than four

16  minutes?

17      A.    It could be, it depends on, you

18  know, door opening, ventilation, it depends

19  on, you know, are those windows really

20  airtight.  It's a trailer, right, so, you

21  know, nothing really in a trailer is going

22  to be airtight and settled.

23              So again, I'm giving you all

24  the burnt pots that I've found at The

25  National Fire Academy down at Cedar for ATF



Page 246

                    J. KARASINSKI
1
2   and local law enforcement and the burn top
3   that I have done through training
4   throughout my career.  We can typically get
5   that room, just room and contents to flash
6   over in less than four and a half, five
7   minutes.
8              So we have got -- this is a
9   much smaller room, right, it's -- you've
10  got -- so you were going to have more
11  radians.  You've got corner configuration,
12  you've got your horizontal configuration.
13  So, you know, I'll stick to the four and a
14  half five minutes, but that's probably a
15  good amount of time, because maybe when it
16  got there, it was smoldering for a little
17  bit first, producing smoke before then
18  reached to an open claim.  I just don't
19  know, right.  We weren't there, so I can
20  give you four and a half to five minutes is
21  a typical burn time, that we got full-time
22  room involvement and flash over on the burn
23  cells that I've burned through the
24  trainings I've done over the years.
25         Q.    Understood.  So we talked a



Page 247

                              J. KARASINSKI
1
2    little bit about the secondary combustible
3    fuels in the closet.  And I think your
4    testimony was essentially that the injected
5    jelly roll, the slug that we're calling it,
6    was competent to ignite any of the
7    materials, specifically being the towels,
8    clothes, linens, and yarn.  So, is it fair
9    to say that because of that opinion, you
10   did not conduct any analysis of the
11   flammability ratings of those various
12   materials.
13        A.    They were already burned, so at
14   that point, they're --  they've changed
15   their state.  So to take that, they've
16   already been heated and cooled, so they're
17   not in the same -- they're not the same
18   material that they were prior to the fire,
19   so...
20        Q.    What were the limitations of
21   the ignition source for the secondary
22   fuels, meaning that jelly roll?
23        A.    What do you mean by
24   "limitation"?
25        Q.    Whatever limitations there



Page 248

1                 J. KARASINSKI

2    might be in whatever way you might

3    understand that.

4         A.    I mean, based on my knowledge

5    and the -- and causing the battery packs to

6    fail and burning down from fire to pack in

7    thermal pack, we see the jelly roll on

8    fire, shooting across room.  I've actually

9    seen an 18650 sticking into drywall, so it

10   can go and it can be protected anywhere at

11   a high rate, and then if it's hitting the

12   ceiling, it's not just going to just hit

13   the ceiling and bounce straight down.  It

14   could bounce to the left, could bounce to

15   the right, could come straight down.  It

16   could go anywhere.

17        Q.    So, is it fair to say that the

18   energy potential of the jelly roll eject

19   its variable from thermal runaway to

20   thermal runaway?

21        A.    I don't understand that

22   question.  Thermal runaway to thermal

23   runaway?

24        Q.    Yeah, when you're looking at

25   different cases thermal runaway, like the



Page 249

J. KARASINSKI

1
2  one in this case or one you just mentioned,
3  you know, jelly roll lodged in the
4  driveway?
5      A.    What was the question then
6  again?
7      Q.    My question is, the energy
8  potential of the jelly roll is different in
9  every case?
10     A.    Oh yeah, it's going to depend
11  on the size.  I guess, I'll use your term
12  that you use, that we agreed on, a slug.
13  So if it comes out as like the other word
14  used, confetti, that's going to have less
15  energy, less thermal mass, so with a less
16  energy and less thermal mass, it's going to
17  be less likely to ignite combustible
18  materials.  But now, you've got the slug
19  issue, right, you've got more mass, you've
20  got more energy and it's going to maintain
21  that heat energy longer than something of a
22  much smaller mass, like what you used to
23  use, for example, with the foil as
24  confetti.
25     Q.    I'm looking at 1911 which you



Page 250

                         J. KARASINSKI
1
2    cite at page 46.  Do you see that there?
3         A.    Yes.
4         Q.    That directs that the factors
5    to be considered in determining fire cause
6    include a competent ignition source, the
7    type and form of the first and I'll add
8    here secondary fuel in this case and the
9    circumstances such as failures in human
10   actions that allows the factors to come
11   together and start the fire.
12             So we've talked about ignition
13   sources, we have talked about first and
14   secondary fuel, we talked about failures,
15   my question is, what human actions did you
16   consider, if any, in this case?
17        A.    So in this case the human
18   factors would be because she was sleeping,
19   was that laptop being used improperly, was
20   that -- was the laptop not the correct
21   charger, what was going on with that laptop
22   at the time?  So that would be those other
23   human factors that we would need to
24   investigate.
25        Q.    How did you investigate those?



Page 251

                    J. KARASINSKI

1

2       A.    Which part?

3       Q.    The human factors we just

4   talked about, specifically being misused to

5   the laptop.

6       A.      We determined that the again,

7   this is Mr. Martin's area, but I can talk

8   to it in general terms, right, but the

9   cord, I believe, Mr. Martin determined that

10  the charger that she was using was the

11  proper charger for that computer.  So it

12  wasn't -- a lot of people will use the

13  incorrect charger, right, you find that a

14  lot of you do battery defense cases.  You

15  find that a lot especially with power

16  tools, people will use the wrong charger,

17  but hey, if -- what was the OJ Simpson? If

18  the glove doesn't fit, you must quit,

19  right.  So you if it fits, people are going

20  to use it.  So, through that, the human

21  factors Steve went through and determined

22  if the charger was the proper charger that

23  she was using, so it wasn't overcharging

24  those cells.

25              We went to the extent of



Page 252

1                    J. KARASINSKI

2    identifying the battery pack that it was,

3    again, human factors, there was a

4    replacement battery pack.  So those are

5    things we investigate.  But that

6    investigation, remember, I said earlier, we

7    follow a scientific method.  You're always

8    in that data collection phase, getting this

9    data, and in this case the human factors

10   what you've asked about to finally get to

11   that part where we can develop a

12   hypothesis, test a hypothesis, and then

13   select the final hypothesis.

14        Q.    Then, right below this, you'll

15   see you mentioned Section 19443, do you see

16   that?

17        A.    Yes.

18        Q.    It says 14443 concerns ignition

19   sequences and times when there is no

20   physical evidence of the ignition source.

21   Did I read that correctly?

22        A.    Yes.

23        Q.    So in your expert opinion,

24   there was no evidence of the ignition

25   source found in the room of origin?



Page 253

                    J. KARASINSKI

1

2        A.    What do you mean?  We've been

3    talking about batteries since 8 o'clock

4    this morning.

5        Q.    I apologize, I'm not -- I'm not

6    trying to -- I'm missed it too, that's why

7    I'm asking, this section talks about cases

8    when there's no physical evidence of

9    ignition source.

10        A.    Well, if you read --

11        Q.    So I'm asking, you know, what

12    what's this doing here in terms of your

13    report?

14        A.    So if you read down further,

15    it's saying that, so let's say it was --

16    someone used gasoline and they ignited the

17    gasoline and there's no evidence of the

18    gasoline bag, but you get a positive

19    sample, you can infer what that ignition

20    source would be.

21             So in this case, I didn't need

22    to infer anything because we didn't --

23    there was no computer in a bag in that

24    closet, there was no vacuum, oven, in that

25    closet, there are no outlets.  The only



1                    J. KARASINSKI

2  ignition source that we found was your slug

3  material from the battery that it expelled.

4       Q.    So it's fair to say that this

5  first part of the section, you're saying,

6  you applied 19443 in times when there's no

7  physical evidence of the ignition source

8  from the origin.  That wasn't -- you didn't

9  apply that to your analysis, because in

10  your view there was physical evidence of

11  ignition, right?

12       A.    Right, but I included in this

13  section because of the material that was

14  not found in the closet.

15       Q.    Okay, okay.  That makes sense.

16  And so, that section goes on to say that --

17  where is it --

18       A.    Yeah, I just gave you an

19  example in all.

20       Q.    The testing alternate

21  hypotheses regard involving potential

22  ignition sequences provided that the

23  conclusion regarding the ignition sequence

24  is consistent with all known facts.  So

25  this is what you were just telling us



Page 255

1                     J. KARASINSKI
2   about, right?  You looked, there was no
3   contact in the closet.  There was no
4   receptacle in the closet, etcetera, right?
5        A.    Correct, and that's how we were
6   following the scientific method and
7   developing that hypothesis.  We're going
8   through and we are going that data
9   collection stage out of those seven steps
10  of the scientific method to get down.  So
11  all known facts, there were no ignition
12  sources found in that closet except for
13  your slug jelly roll material.
14       Q.    Now, I'm going to pull up that
15  picture later, so we can actually have a
16  more inform conversation, but I just want
17  to talk more generally about it with you
18  now.
19             On this, 19443, I looked at it
20  up, and it looks like they provide a
21  nonexclusive list of examples of situations
22  that lend themselves to formulating an
23  ignition scenario when the ignition source
24  is not found during the examination.
25             Now, I was going to ask about



Page 256

                    J. KARASINSKI
1
2    these, but it sounds like because you have
3    did find an ignition source and you are
4    offering an opinion in respect of that,
5    this list may not apt here, is that right?
6         A.    The list may not be what, I'm
7    sorry?
8         Q.    Apt or, you know, appropriate
9    to discuss.
10        A.    Well, yeah, but again, I
11   included this section because the
12   information that was provided about these
13   other pieces of potential admission sources
14   that were in the closet were physically not
15   there.  So that's why I included this
16   section.
17        Q.    Then, you see, it lists some
18   potential ignition sources on page 46 and
19   47?
20        A.    Yes, sir.
21        Q.    So I'm just going to -- we
22   talked about a couple.  So you list here,
23   building electrical system, lightning,
24   smoking materials, handled incense and
25   incendiary, did you consider any others?



Page 257

                    J. KARASINSKI
1
2        A.    That was all I could consider
3    based on my room of origin, I didn't find
4    any other potential ignition sources room
5    of origin.
6        Q.    How did you dial in on the room
7    of origin?
8        A.    Well, again, we dialed in on
9    the room based on 19421.  I would say
10   there's three pillars, fire patterns,
11   witness statements and fire dynamics, puts
12   us in that room.  So we talked about that
13   at length earlier.
14       Q.    Of course, yeah.  Now, the
15   reason I'm asking about the room of origin
16   thing is we are, you know, you said it was
17   all -- those were the only things you can
18   consider based on the room of origin.  So,
19   I guess, my follow-up question is, did you
20   do an arch survey of the whole house?
21       A.    Again, that's a question for
22   Andy.  That was his scope, not mine.  But
23   we did expose everything in that office
24   space to look for arcing in an arc event
25   and we didn't find any.  And sometimes,



Page 258

                        J. KARASINSKI

1

2    that happens in fires just because I

3    actually -- and it's funny you mentioned,

4    because I actually -- it's funny you

5    mentioned that because I actually am the

6    taks group chair for the arc survey and arc

7    methane section of 921, right, so

8    sometimes, you can get into a fire event,

9    you can seven or eight trip breakers, but

10   you may only find two or three trip

11   locations.  You're not always going to find

12   them and if you don't find them, it either

13   means somebody manipulated the panel and or

14   shut it off or somebody did something or

15   bumped up against it and shut it off, so

16   there are reasons you don't ever --

17   sometimes you don't find arcing.

18        Q.    You shouldn't eliminate a

19   potential addition source just because

20   there's no obvious evidence for it, right?

21        A.    No.  It's again, it's through

22   that entire data collection stage of the

23   scientific method.

24        Q.    Are devices that are heat

25   producing or capable of heat production



Page 259

                    J. KARASINSKI

1

2    when they sustained a failure, those are

3    should be on your list of hypotheses,

4    right?

5         A.    Well, I have got laptop there,

6    that was the only appliance that was in the

7    room that was plugged in.

8         Q.    Were there any other devices

9    that were heat producing or capable of

10   producing heat?

11        A.    Not that had fire damage or

12   failure to it.

13        Q.    Have you heard of the heat and

14   flame vector technique?

15        A.    Say again, what was the term?

16        Q.    The heat and flame vector

17   technique?

18        A.    I have not heard of that.

19        Q.    Did you do a heat and flame

20   vector diagram in this case?

21        A.    I did not.  I didn't feel it

22   was necessary.

23        Q.    When would it be necessary?

24        A.    Well, I guess, one of the

25   reasons it wasn't necessary is because when



Page 260

1                      J. KARASINSKI

2    we were on site, all the experts agreed

3    that the office was a room of origin.  So

4    at that point, I didn't need to did a

5    vector analysis to show to support that

6    when we all agreed that the room of origin

7    was the office.  Even Greg Gorbit

8    [phonetic] agreed that the room or origin

9    was the office.

10              We asked that every time, Mr.

11   Gorbit didn't ask for any evidence anywhere

12   else in the house.  We asked, is there

13   anything else that someone wants to collect

14   as evidence?  Everyone agreed that no,

15   because everyone agreed the room of origin

16   as the office.  The answer was yes, I

17   didn't need to do a vector analysis because

18   all the experts agreed.

19        Q.    But even if all the experts

20   disagreed with you and they all said, no, I

21   actually think it started in

22   Ms. Marcellin's bedroom, would that change

23   your conclusions in this case?

24        A.    If someone did not agree with

25   my area of origin, then we would have



Page 261

1                    J. KARASINSKI

2    processed the area that they felt was the

3    origin too.  And if I had a discrepancy on

4    origin, then I would -- I could have put

5    together a vector analysis.  But again,

6    19921 is a guide.  I don't have to do

7    everything as to the guide.  This document

8    is an advisory, I don't have to do a vector

9    analysis if I don't believe that it's going

10   to support my file when everybody agreed,

11   even your expert agreed that the room of

12   origin was that office space.

13        Q.    I understand that.  I'm just

14   trying to focus on your efforts, because I

15   understand that what you found there was

16   consistent with what everyone else was

17   finding.  But you were doing your own

18   homework, right, you were doing your own

19   science that day?

20        A.    Of course.

21        Q.    What their saying, it wasn't

22   steering you one way or the other, I

23   assume?

24        A.    Not at all, but again, I'm

25   here.  I'm not a case-maker, right, I'm a


MAGNA
LEGAL SERVICES

Page 262

1                    J. KARASINSKI

2    truth seeker.  So if someone had an

3    objection or believe that the origin could

4    be in a different spot, that's why we asked

5    that question, because I want everybody

6    that had that ability to collect the same

7    data that I have.

8        Q.    That's why you looked at other

9    possible rooms of origin, right?

10       A.    I inspected the entire

11   structure, yes.

12       Q.    You personally ruled out the

13   other rooms?

14       A.    Yes.

15       Q.    I'm looking at page 47, Mr.

16   Karasinski, where you say that you

17   considered candles, and we looked at -- and

18   you said no evidence of candles was found.

19   We've looked at the picture together, the

20   candles, so having seen that picture of

21   those bird candles, does that change your

22   opinion at all that I've highlighted here?

23       A.    No, these are items within the

24   area of origin.  The candle that you show

25   production of is in the living room.



Page 263

1                    J. KARASINSKI

2        Q.     That's why you don't list the

3    electric couch here either, not in the room

4    of origin?

5        A.     Correct.

6        Q.     Did you consider it at all as a

7    potential ignition source during your

8    initial investigation before you arrived on

9    the room of origin?

10       A.     Yeah, I consider everything at

11   the scene as evidence.  So once we do our

12   scope and our systematic approach and get

13   our documentation done, then we start

14   talking as experts to see what the plan is,

15   what everyone thinks, and then I tell them,

16   okay, I believe that's area of origin based

17   on, you know, everything that we have seen

18   and based on the witness statements and

19   based on what the fire department's

20   response was and what they stated in their

21   interviews.  Everyone agreed that the

22   origin was the office and had nothing to do

23   with anything the living room.

24       Q.     You stated that there was a cat

25   at the house and my question is, did you



Page 264

                        J. KARASINSKI
1
2    ever consider that the cat might have been
3    involved in the fire in any way at all?
4         A.    No.  What do you mean?
5         Q.    Until Mr. Litzinger told me he
6    worked on a case where the cat knocked over
7    a candle and started a fire.  That's the
8    only reason I'm asking you, did you
9    consider it at all?
10        A.    Well, I considered that there
11   was a cat in the structure and then that
12   could be a possibility, but there were no
13   candles lit in the office or the origin.
14   So, no, at that point, I did not consider
15   -- yeah, you see it on TV and YouTube,
16   right, you can get on YouTube and watch the
17   dog turn on a stove.
18        Q.    Yeah.  I mean, when I have a --
19   when I lighter romantic candle on the
20   dinner table, the cat is very intrigued
21   every time, I have no idea why.
22        A.    We didn't need to know about
23   the romance part, but that's all right.
24        Q.    You didn't physically
25   investigate the furnish beyond what we



Page 265

1                    J. KARASINSKI

2    talked about with the door, the louver door

3    and the interior door?

4         A.    What do you mean "I didn't

5    investigate it anymore"?

6         Q.    I'm saying beyond what we

7    talked about earlier, how you opened up the

8    door, you didn't see damage and charring,

9    was there anything beyond that you did to

10   rule the furnish out?

11        A.    No, it wasn't the area of

12   origin.  Everyone agreed and we even asked

13   if anyone wanted the furnace and nobody

14   wanted that as evidence.

15        Q.    But if you had wanted it, you

16   would have taken it?

17        A.    Yes, but I had no interest in

18   it.  We had eliminated it based on the

19   witness statements, fire patterns and fire

20   dynamics.  It was not the area of origin.

21        Q.    We talked about -- we have

22   here, incendiary, no evidence that fire

23   patterns support incendiary fire.  What's

24   an incendiary fire?

25        A.    An incendiary fire is a fire



Page 266

```
1                    J. KARASINSKI
2    that someone sets when they know it's not
3    supposed to be -- there shouldn't be a fire
4    there.  So with an incendiary fire, we
5    didn't -- there was -- we didn't see any
6    patterns to support any flammable liquid or
7    ignitable liquids that were on board
8    somewhere and intentionally started.  We
9    didn't see any of that.
10       Q.    So, for incendiary fire, you're
11   looking for accelerants?
12       A.    No.  Well, you can start a fire
13   with an open flame, if you want.  You don't
14   have to use accelerants.
15       Q.    But do you look for accelerants
16   when you're ruling out an incendiary fire?
17       A.    Sometimes, but there weren't
18   any patterns in support on the floor.
19   There were no patterns on the floor to
20   support an accelerant was utilized.  The
21   only damage to the carpet was the carpet in
22   front of the closet which was consistent
23   with thermal attack and melting from the
24   fire that progressed from the closet and
25   outward.
```



Page 267

```
                    J. KARASINSKI
 1
 2       Q.    So we talked about the bed that
 3   was unmade on Mr. Hollowell's side, we
 4   talked about the witness mark where he was
 5   found, we talked about toaster oven that
 6   may or may not have been on, we talked
 7   about the coffee pot that may or may not
 8   have been scheduled, we talked cordless
 9   phone.
10       A.    Well, the coffee pot though
11   too, we also talked about and I do this at
12   my house, if I don't drink it, I leave it
13   there and I don't pour it out.
14       Q.    Could have been from that
15   morning just as easily, absolutely.  I'm
16   not -- I'm just summarizing.  I'm not
17   trying to --
18       A.    Okay.
19       Q.    But we talked about some of
20   these things, and my question to you, sir,
21   is, hearing me summarize them now, are they
22   -- are these facts consistent with everyone
23   in the house being asleep at the time of
24   the fire?
25       A.    To me, they are, yeah.
```



Page 268

```
 1                    J. KARASINSKI
 2      Q.    Does any of this make you
 3  suspicion in any way at all?
 4      A.    No, it does not.
 5      Q.    Did you consider the
 6  possibility of an intentionally set fire in
 7  this case?
 8      A.    Yes, I did.
 9      Q.    What did you do to forensically
10  rule that out?
11      A.    I eliminated that based on the
12  witness statements, fire patterns and fire
13  dynamics.
14      Q.    So you looked at
15  Ms. Marcellin's statements together with
16  the physical evidence that we have
17  discussed?
18      A.    Correct and that brought me to
19  my final hypothesis and then I relied on
20  Mr. Martin for the inspection, and then I
21  relied on Andy lifting her to eliminate the
22  electrical system of the house, if
23  possible.
24      Q.    You've worked on some arson
25  cases, right?
```



Page 269

1                    J. KARASINSKI

2        A.    I have, I have put people in

3   jail.

4        Q.    Is it your experience that

5   female arson offenders typically burn an

6   area of personal significance?

7        A.    Sometimes, they do.  I had a

8   lady a couple of years ago that she lit her

9   husband's clothes on fire.

10        Q.    Would you view the fire as is

11   in this case is that the fact that it was

12   an area of personal significance, does that

13   mean anything to you in ruling out

14   potentially set fire?

15        A.    In the closet was a personal

16   interest, towels, sheets?

17        Q.    Perhaps it was the notebook or

18   the desk area?

19        A.    Based on my investigation and

20   the statements provided by the sole

21   occupants that's still alive, I was able to

22   eliminate incendiary fire based on witness

23   statements, fire patterns and fire

24   dynamics.

25        Q.    So we have talked about how you



Page 270

1                    J. KARASINSKI
2    came to your conclusions in this case and
3    you basically have explained to me that you
4    looked at your possible hypotheses, you
5    looked at the physical evidence and witness
6    statements that was supportive -- or not
7    supportive each hypotheses and you relied
8    on a single hypothesis that you could not
9    rule out, is that a fair summary of our
10   conversation?
11        A.    That sums it up pretty well.
12        Q.    So you're the NFPA expert, so
13   you can explain this to me, because it
14   seems like it's a very fine point that the
15   NFPA has been debating for sometime, what's
16   the differences process that you used here
17   and negative corpus?
18        A.    I'm not sure what you mean.
19        Q.    So 1965, it discusses negative
20   corpus and it says that process of
21   elimination can be used inappropriately.
22   Identifying the ignition source for a fire
23   by believing to have eliminated all
24   ignition sources found known or suspected
25   to have been present in the area of origin



Page 271

1                        J. KARASINSKI

2     and for which no supporting evidence exists

3     is referred to by some investigators as

4     negative corpus.

5                And there's some further

6     discussion, goes on to say that negative

7     corpus is not consistent with a scientific

8     method.  It is inappropriate, it should not

9     be used because it generates untestable

10    hypothesis and may result in incorrect

11    determinations of ignition sources and

12    first or a secondary fuel area ignited.

13    Any hypothesis formulated for causal

14    factors, fuel ignition source ignition

15    sequence must be based on the analysis of

16    facts and logical inferences that flow from

17    those facts.

18                So this is a discussion that

19    they have of negative corpus and the

20    process of elimination, and I'm asking how

21    you distinguish the scientific process you

22    did here from what's described in 1965?

23        A.    Well, I didn't use negative

24    corpus.  I used the process of elimination

25    and the lack of ignition sources or



Page 272

1                    J. KARASINSKI

2  competent ignition sources in the room of

3  origin as well as the closet, and through

4  that, I was able to find a potential

5  ignition source.  The remains of the jelly

6  roll that were in the closet.  And so, that

7  is not process, that is not negative

8  corpus.

9              Negative corpus is when you're

10  trying to say that this is how the fire

11  started and you evidence to support that.

12  I do have evidence, I do have physical

13  evidence to support what the ignition

14  source was.

15      Q.    I appreciate that

16  clarification?

17      A.    It is a very big topic.

18      Q.    It's been revised quite a few

19  times, so I didn't really get it, so thank

20  you for that.

21              I'm going to turn your rebuttal

22  report now, I'm going to try to get through

23  it as quickly as I can.  I have one last

24  question on your initial report though.

25  You said that there's no exposure damage to



Page 273

1                    J. KARASINSKI

2    other residences in the area, what did you

3    mean by that?

4         A.    So a lot of times, this is for

5    more for the insurance related fold, right.

6    So sometimes they're going to want to know

7    -- like let's say you have a house -- you

8    have a house that's on fire and

9    Jacqueline's house is right next door, did

10   that fire cause any damage to that

11   neighboring property because the insurance

12   company is going to want to know if they

13   have to open some sort of liability file,

14   if they're at fault for the neighboring

15   damage, so we include that in there, but

16   that's more for the insurance industry.

17   That's what that's there for.

18        Q.    I'm going to turn to your

19   rebuttal report and it's my hope we can go

20   through it quickly and get you on your way.

21   So thank you for bearing with me, I don't

22   know if you want to take a short break or

23   if you want to just try and knock it out,

24   it's up to you.

25        A.    Knock it out, if you think you



Page 274

                    J. KARASINSKI
1
2    can get through it quickly.
3        Q.    On the first page, this is our
4    rebuttal report we marked as Exhibit 2,
5    right?
6        A.    Yeah, can you just make it
7    bigger or --
8        Q.    Yes.
9        A.    I have mine here, I can --
10       Q.    So this first section that I
11   have here, this paragraph says that the
12   statement is being provided to address data
13   points raised in the reports of defendant,
14   Hp.
15            My question, Mr. Karasinski, is
16   there anything upon which you relied in
17   this rebuttal report that you didn't have
18   at the time of your original report other
19   than Hp's expert disclosures?
20       A.    No, it was due to the expert
21   disclosures provided by Exponent and they
22   addressed things that we were all competent
23   as experts that we have eliminated on the
24   site.  So they weren't on the scene,
25   Exponent, so they didn't have the



Page 275

                         J. KARASINSKI

1

2    opportunities to be privy of those

3    conversations and to get those experts

4    agreements, so I felt that they needed this

5    additional information for them to

6    determine that that still supports their

7    hypothesis that they concluded.

8         Q.    You'll see there's a note on

9    this first page and every subsequent page

10   here that begins with a manufacturer, do

11   you see that?

12        A.    Yes.

13        Q.    So there's some caveats here in

14   this section, including that this is a

15   preliminary draft of laboratory analysis

16   notes, and it should not be considered a

17   formal report, do you see that?

18        A.    Yes, that's a format issue with

19   this form we use for rebuttal reports.

20   That's on every one of our rebuttals.

21        Q.    This is the only rebuttal?

22        A.    The only draft out there.

23        Q.    Okay, great.  Now, you relied

24   on a supplemental declaration from Ms.

25   Marcillin, my question is, was this



1                    J. KARASINSKI

2  information you could have had at the time

3  of your initial report?

4        A.    It could have been but I wasn't

5  -- again, everyone agreed on the area of

6  origin and nobody brought up that Carol was

7  going to be standing in the heat later that

8  was only four feet high.  That would have

9  been of temperatures close to

10  1,000 degrees, so when I saw that that's

11  what their, kind of, opine, then I felt

12  like I needed her driver's license, because

13  I didn't know how tall she was.  So I

14  wanted to show that if she were standing in

15  that room when they they think the -- as

16  far as Exponent believes she was in that

17  room where she would be standing in that

18  heat layer which would be impossible and

19  you would die.

20        Q.    I'm turning to page 4 of report

21  and you stated that Ms. Marcellin traveled

22  past the couch more than once.  Do you see

23  that?

24        A.    Yeah, and that was again

25  because they -- Exponent opined or offered



Page 277

                    J. KARASINSKI
1
2    that the living room could be the origin
3    and the point of origin could be the couch.
4    And again, they weren't there to hear the
5    fire department's statements about what
6    occurred and what statement that she gave
7    them, so I felt it necessary for your
8    experts to know that she passed this couch,
9    and it wasn't on fire, at least four times.
10        Q.    So the one thing I can -- I
11   have seen this statement and we have looked
12   at the depositions together, she certainly
13   doesn't say the couch was on fire, right?
14        A.    Correct.  She doesn't say it
15   was or it wasn't but she had to walk by it
16   and if you're walking by a couch on fire,
17   that's probably what you're going to try to
18   put out and not even go to the office.
19        Q.    I understand exactly what
20   you're saying.  What I was going to ask,
21   which is, she doesn't actually say one way
22   or another whether the couch was or was not
23   on fire, right?
24        A.    If that couch was on fire, that
25   occurred well after full room involvement



Page 278

                    J. KARASINSKI
1
2    of the closet and if she was standing in
3    there and that couch was on fire with the
4    amount of damage on that couch, she
5    wouldn't be alive.
6        Q.    In respect to the furnace, is
7    there any possibility that the furnace
8    overheated or had broken down insulation in
9    it?
10       A.    No, there were no fire patterns
11   on the sides or above or the wall or where
12   the pipes went through the roof of the
13   ventilation.
14       Q.    Did you take the wall that
15   abutted the furnace and the closet that was
16   issue in this case, did you take that wall
17   out or did you remove the furnace to see if
18   there was any damage to that abutting wall?
19       A.    No, you could see the studs
20   from closet and the studs that were between
21   the furnace and the studs that you can
22   visually see on the wall that adjoins the
23   closet and the furnace, that mechanical
24   room, those studs don't have any fire
25   damage to them.



Page 279

1              J. KARASINSKI

2              So using that analogy, if I had

3    a fire that originates at the furnace would

4    that ignite burn -- be burning inside the

5    wall studs in that wall and I do not have

6    that.  That also supports eliminating that

7    based on fire patterns that it did not

8    overheat and it did not have any sort of

9    failure with its high limit switch or

10   terminal couple whatever was going on.

11       Q.    Now, in her Supplemental

12   Declaration, Ms. Marcellin states that she

13   looked in on the furnace and saw that it

14   wasn't on fire, right?

15       A.    Correct.

16       Q.    Isn't that different from her

17   testimony in her deposition where she said

18   he thought the smoke might be from the

19   furnace but then she saw the glow from the

20   office and that's where she went first?

21       A.    I don't -- you have to pull it

22   and put it in front of us, I don't recall

23   the statement being --

24       Q.    Yeah, you cite in your report

25   at 21, you have part of her testimony here,



Page 280

                        J. KARASINSKI

1

2    I think it's on this page.

3         A.    Well, I think -- I don't know

4    if she was exactly asked that question.

5    And we did that original information from

6    the fire department when they were doing

7    their normal this is what happened, this is

8    what she said, so everybody got that

9    information at the initial -- at our

10   initial scene exam.

11             So I don't know.  Maybe she

12   didn't, maybe she wasn't asked, well, did

13   you open the louver door?  I mean, maybe

14   she wasn't asked that, but...

15        Q.    If you take a look at this

16   testimony that I put up on the screen here

17   which you cite in your report at pages 20

18   and 21.

19        A.    Okay.

20        Q.    You can see line -- beginning

21   on line six, Ms. Marcellin stated I could

22   smell smoke.  I knew there was something

23   going on, hoping it was just the furnace,

24   maybe it had smoke.  I knew there was

25   something going on, hoping it was just the



Page 281

                    J. KARASINSKI

1

2    furnace.  Maybe it had malfunctioned and

3    was putting out smoke or something and I

4    could shut that down, but I went back

5    through the kitchen, passed the bathroom

6    through the kitchen and I got to the living

7    room.  When I stepped right to go down that

8    hall, meaning, the hall with the furnace,

9    right?

10        A.    So she would have stepped left

11   and not right, but, okay.

12        Q.    The hall to the furnace was to

13   the left and the hall to the office was to

14   the right?

15        A.    No, you said she stepped to the

16   right to go down the hall, but the hallway,

17   you'd have to make a left to go down the

18   hallway, not a right, a right --

19        Q.    She was mistaken when she said

20   she stepped right tot go down the hall?

21        A.    Yeah.

22        Q.    Okay.

23        A.    Yeah, we you're in the kitchen

24   and you are looking at this photo you had

25   up on the refrigerator, she would have to



Page 282

1                    J. KARASINSKI
2    walk that way and go left to go down the
3    hallway and not to the right.
4         Q.    So reading the testimony that I
5    just read to you, I read that to say that
6    she woke up, she smelled the smoke, she was
7    hoping it was the furnace, and then
8    immediately when she went down the hall,
9    she could see the glow of the fire coming
10   from the room with a laptop, do you read
11   this to say anything different?
12        A.    No, that's what it says.
13        Q.    Okay.
14        A.    But again, it doesn't say it
15   was the second time, because the first time
16   that she went to the room, remember, she
17   said she couldn't see flames.  The only way
18   that she is going to see flames or a glow
19   is because that closet is probably fully
20   evolved at that point.  She is not going it
21   see a glow like that from the batteries
22   accelerant.
23             So I believe that to be the
24   second time that she was going to go back
25   to try to extinguish it and that's when she



Page 283

```
 1                   J. KARASINSKI
 2   sees that glow and that's when you have
 3   full room involvement of the closet.
 4        Q.    So when she says, when I
 5   stepped right to go down that hall, I could
 6   see the glow of the fire coming from that
 7   room with the laptop was and I immediately
 8   backtracked, grabbed the fire extinguisher,
 9   but when I got there, I was already putting
10   out firewalls.  You're saying she is
11   mistaken here?
12        A.    I'm not saying she was
13   mistaken.  I'm saying that glow, I think,
14   is what she sees when that closet is full
15   room involvement, that space.  Otherwise,
16   there's not going to be a glow.  I mean,
17   you might see flashes from the cells going
18   off, but that glow is a fire event.
19        Q.    So that fire would have been
20   fully involved by the time she made it to
21   that doorway?
22        A.    Yeah, and if you remember from
23   her testimony, she went to the room first
24   and then she went back to the kitchen to
25   get the fire extinguisher and when she went
```



Page 284

1                    J. KARASINSKI

2  back for the extinguisher, it was too big

3  to put out and that's when she was -- let's

4  go to Charles.  Let's vacant the property.

5       Q.    Right, but when she went and

6  saw the glow the first time, it's your

7  testimony that the closet would have been

8  fully evolved at that point in order for

9  her to see the glow at all?

10      A.    For her to see the glow like

11  that, the closet that would have to be on

12  fire at that point.

13      Q.    So in her declaration, I'm

14  going to put that up for you.  This is the

15  declaration we have been talking about,

16  right, you're seeing this?

17      A.    I have seen it, yes.  Can you

18  make it bigger, if you're going to...

19      Q.    Yeah, absolutely.  So I'm

20  hoping we can resolve an issue I'm having

21  with this.  There is some testimony here

22  that appears to be confusing, and in the

23  declaration in the section that I put up

24  here, it appears that Ms. Marcellin is

25  stating that she could not -- so she could



```
 1                    J. KARASINSKI
 2   see into the office closet, but that she
 3   didn't enter the office.  And so, my
 4   question is, what we're just talking about,
 5   isn't it true that you can't see the closet
 6   from the hallway?
 7        A.    You can't see the interior of
 8   the closet unless you walk in that two or
 9   three feet to get past that closet wall,
10   that will be on her left side.
11        Q.    You see, I'm confused because
12   she says --
13        A.    Well, it's going be dark out
14   and the light switches are in the
15   opposition, so the see glow she is seeing
16   is fire.
17        Q.    So in her statement here, she
18   says she didn't detect any smoke or heat
19   coming from the closet while she was in the
20   doorway, right, do you see that?
21        A.    Are you referring to is this --
22   the first or second paragraph?
23        Q.    Paragraph 4 she says she did
24   not enter the room, and then she says in
25   Paragraph 5:  I did not enter the room at
```



Page 286

1                    J. KARASINSKI
2    that point because of flying projectiles,
3    do you see that?
4         A.    Yes.
5         Q.    And in paragraph 6, she says I
6    again observe that there was no smoke,
7    flames or heat coming from the closet.  So
8    how could she be unable to enter the
9    office, but still be able to examine the
10   contents of the closet?
11        A.    I don't know that that's what
12   she is saying.  Are you reading from
13   paragraph 5 or 6?
14        Q.    The last sentence that I read
15   was from paragraph 6.  I again observe
16   there was no smoke, flames or heat coming,
17   paragraph 5, she says, I did not enter the
18   room.
19        A.    I think the point here that
20   needs to be made is we don't know whether
21   this was the first or second time she went
22   there.  So at the first time, when she's
23   seen these flying projectiles, that's when
24   we're having an issue with the laptop and
25   the battery pack, and that is still



Page 287

1                    J. KARASINSKI

2    occurring when she thinks she can put it

3    out and goes to get the fire extinguisher,

4    but when she comes back, the closet

5    contents are now on fire.  That's the glow

6    that she is seeing, because again, the

7    hallway light was in the on off position.

8    And so, this time of year, it in the middle

9    of winter in upstate New York, it's dark.

10   So that room is going to be dark.  So the

11   only way she could see is if on the second

12   time, you see that glow is if that -- if

13   the closet is on fire when she's returning

14   with the fire extinguisher.

15        Q.    But she did testify she saw the

16   glow when she first went there, right?

17        A.    I'm not sure anyone asked

18   whether she saw the glow the first time or

19   the second time.

20        Q.    Well, isn't that what we just

21   went over, it's in your report at page 21?

22   She says, "I went to the kitchen.  When I

23   stepped to go down the hall, I could see

24   the glows."  This is when she first

25   approached the office, no?



Page 288

J. KARASINSKI

1

2     A.     Yeah, I mean that's what it

3  says, but if it -- was that with the with

4  full room involvement of the closet, she

5  wouldn't be able to -- she wouldn't be able

6  to get into that room at all.

7     Q.     That's the what she says in her

8  declaration, right, I didn't enter the

9  room?

10     A.     Yeah, because this is why I

11  think she's just confused, because we are

12  really not talking about -- she is

13  physically not being asked is this the

14  first time or second time you went.

15           So what I believe happened and

16  makes sense is that when she goes the first

17  time and smells smoke and we have got the

18  smoke alarm activation, she goes -- that is

19  when she sees the flying projectiles

20  flying, and then she exits to go get the

21  fire extinguisher she comes back, that's --

22  on her way back, that's when the closet

23  material is ignited and that's the glow

24  that she sees.

25     Q.     So she was mistaken the first



Page 289

                         J. KARASINSKI
1
2    time and she just corrected herself here?
3         A.    I don't know that she corrected
4    herself.  I just don't think she was the
5    asked the question, was this the first or
6    second time, I think maybe she's just
7    confused.
8         Q.    Well, let's just be clear.  She
9    says -- you described this here as
10   Ms. Marcellin explained her route of travel
11   after taken -- after being awoken from the
12   smoke on the morning of fire and described
13   what she saw.  That that's how you
14   captioned this, right?
15        A.    Yes.
16        Q.    The question was, can you take
17   me through the route you took upon waking
18   on January 24th, 2020, using this diagram,
19   that was the question, right?
20        A.    Okay.
21        Q.    That's the question?
22        A.    Yes.
23        Q.    So and her answer was, "I
24   opened the door, I silenced the fire alarm,
25   I could smell smoke, I went back through



1                    J. KARASINSKI

2    the kitchen, passed the bathroom, through

3    the kitchen into the living room, I saw the

4    glow.  So this is her first time, right?

5         A.    But again, that glow because

6    it's dark, I guess, it could still be the

7    batteries expelling or you're going to have

8    a small fire where you can see that, right,

9    you've got burnt plastic and material on

10   the laptop.  That could be a small fire on

11   the laptop where she sees the glow.

12             What I'm saying is when she

13   goes back, if that -- if the closet is at

14   full room involvement, there is no way she

15   can get into that room.  That's all I'm

16   trying to opine based on this question.

17        Q.    That's helpful, because I'm

18   trying to figure out.  She's saying in this

19   Supplemental Declaration, "I could see into

20   the closet," she said, "I didn't see smoke,

21   I didn't see heat," she says, "I observed

22   no heat.  No flames coming from the

23   closet," when she comes back with a fire

24   extinguisher, so this is the full

25   involvement time, right, she comes back,



Page 291

                         J. KARASINSKI

1
2  it's full involvement, right?
3      A.    Again, I just I think -- I
4  don't think she was asked the question
5  appropriately.  I think this is the second
6  time she goes back because she would not be
7  able to get down that hallway if the --
8  within two minutes after this full room
9  involvement, there's no way she would be
10  able to walk down that hallway and get
11  access into that room.
12      Q.    So, Mr. Karasinski, just to be
13  clear, what I have up here on the screen
14  now is not her testimony where she was
15  asked questions by Jackie.  This is her
16  Supplemental Declaration that she prepared
17  based on informations you requested from
18  Attorney Schwarz, do you see that?
19      A.    Right, again, I'm saying
20  there's nowhere in this question does Mr.
21  Schwartz say is this the first or second
22  time?  So again, I'm telling you -- if all
23  I'm saying is there's no way if she went
24  down that hallway and that closet was fully
25  involved like it is based on the fire



Page 292

1                          J. KARASINSKI
2    damage that we see, she would not haven
3    been able to enter that bedroom or the
4    office, I'm sorry, the office.
5         Q.    He she certainly wouldn't have
6    been able to see into the closet, right?
7         A.    No, she cannot see in the
8    closet.  So I believe what she is saying is
9    went she went the first time, she could get
10   in there, because that's the initiation and
11   the incipient stage of that failure at the
12   laptop, the battery pack.  She could walk
13   if there at that point and at that point,
14   that's right when the event occurs.  So
15   that produces smoke, you've got the melting
16   plastic, you got the flaming combustion
17   from the cells, and there are expelling
18   when she's in there, she had to be get in
19   there somewhat, because how are you going
20   to see them, you know, blowing up out of
21   the computer if she didn't walk in.
22              So I think that was the first
23   time.  I think when she came back the
24   second time, that's when she could see the
25   glow and realized she couldn't put it out


MAGNA
LEGAL SERVICES

Page 293

                        J. KARASINSKI

1

2    with a fire extinguisher and exited the

3    property and tried to get Charles out.

4         Q.    When you were telling me that

5    she wasn't asked the right questions in

6    respect of this Supplemental Declaration,

7    those are the questions you gave to

8    Attorney Schwarz, right?

9         A.    Yes, but I don't know how

10   Mr. Schwartz gave her these questions.  I

11   don't know, did he -- I don't know if he

12   called her.  I have no idea.

13              I gave him the questions,

14   because that's what was told to us by the

15   fire department during our initial

16   inspection, but again, the folks at

17   Exponent, they weren't privy of all that

18   information, right, so I felt in necessary

19   to do this rebuttal, so they can have the

20   same data that we have.

21        Q.    Could Ms. Marcellin's

22   Supplemental Declaration have been a little

23   clearer too?

24        A.    What to -- what do you mean

25   "clear"?  Clear or what?



Page 294

1                    J. KARASINSKI
2        Q.    We are just talking about how
3    he could have added more detail on when was
4    the first time, when the with second time
5    and what exactly she observed on each of
6    those times.  And that above made this
7    conversation go a little bit quicker,
8    right?
9        A.    Yeah, I don't think you would
10   have had to many questions about it.
11       Q.    So it could have been a little
12   clearer.  Like her affidavit, this last one
13   that we are looking at?
14       A.    It could have been a little
15   clearer, but again, the physical evidence
16   and based on my training education and
17   experience, I know that that's not
18   accurate, because she wouldn't be able to
19   walk down that hallway if that closet had
20   full room involvement.
21       Q.    Would you agree that if there
22   was a faster response to this fire, that
23   Mr. Hollowell's chances of surviving might
24   have increased?
25       A.    Do you have a timeline from



1                    J. KARASINSKI

2    when the 911 call was to when fire

3    department arrived on site?

4         Q.    It was 18 minutes.

5         A.    18 minutes.  Yeah, that's

6    definitely a slow response time, but it's a

7    volunteer fire department, and this is

8    really a remote area.

9         Q.    Certainly, certainly.  So a

10   faster response time probably would have

11   been somewhat increased his chances?

12        A.    Any faster response anything,

13   shooting fire, anything, car accident,

14   anything can improve anybody's chances.

15        Q.    So, this is your opportunity to

16   explain to me what I was so confused about

17   with an actual picture, okay?

18        A.    Okay.

19        Q.    Here is Figure 7 of your

20   rebuttal of which is the location of the HP

21   Pavilion laptop and has various arrows and

22   indicators on it, do you see that?

23        A.    Yes.

24        Q.    So you stated that the HP

25   monitor has less thermal damage in the



Page 296

                    J. KARASINSKI

1

2   laptop in front?

3        A.    Correct.

4        Q.    Isn't the HP monitor vertically

5   oriented?

6        A.    Yeah, so is the laptop.

7        Q.    The laptop is vertically

8   oriented, the screen, the keyboard assembly

9   is horizontal, wouldn't you say?

10       A.    The keyboard is horizontal, but

11  the screen is vertical.

12       Q.    Is the screen 90 degrees like

13  the monitor or is it at some more --

14       A.    Well, I don't know -- first of

15  all, it's at an angle now, but, I mean, for

16  all we know, when NEFCO investigator put

17  that piece of tape on it, he could've

18  pushed it open a little bit further, I

19  don't know the exact division of the

20  monitor or screen for the Hp laptop.

21       Q.    You see the papers that are

22  vertically oriented, right?

23       A.    Yes.

24       Q.    Those weren't burned either,

25  right?



Page 297

1                     J. KARASINSKI
2         A.     They're starting to turn, you
3    can see the discoloration and if you zoom
4    in a little bit, you can see all the
5    Post-It notes on the side wall of the
6    armoire and those are almost to ignition
7    right there, those post it notes
8    underneath, yeah, right there, yes, yes.
9         Q.     So we see some evidence that
10   things are getting close to ignition, but
11   they weren't burned, right?
12        A.     No, they were burnt.  You can
13   see, there is burning on the top where the
14   red box is, the stuff that's higher is up,
15   that's burning.  You've got --
16        Q.     I'm thinking more of as I'm
17   looking at paper and I'm expecting it to be
18   consumed.  So when say burned, I mean --
19        A.     No.  So remember, you've got
20   them all stacked together, right, so I'm
21   assuming you and Jacqueline have had a
22   bonfire at some point in your life and you
23   wanted to get rid of your magazines and you
24   put a stack of your magazines in the bond
25   fire and even after all the wood and you



Page 298

1                    J. KARASINSKI
2    are pushing those magazines and you still
3    have unburned pages that you could
4    physically open up and read.
5              So these are protected areas.
6    So the areas that aren't protected, right,
7    you can see that you had charring and you
8    have flaming ignition starting, especially
9    up in the red box.
10             But if you go back to my
11   explanation about my paper again, again,
12   with no ceiling fan, no ventilation issues,
13   no airflow, if I light the bottom of that
14   piece of paper, right, with the that, you
15   have plenty of heat and fuel to consume
16   entire piece of paper.
17             But now, if I ignite -- if I
18   attempt to ignite the top of that piece of
19   paper, it's going to ignite, and then it's
20   going to burn itself out, because its fuel
21   configuration is not vertical.
22        Q.   So why didn't these -- I guess
23   I'm just restricting ourselves to the
24   obvious cases of these papers that are
25   protruding out in the red boxes.  Why



Page 299

```
 1                    J. KARASINSKI
 2    didn't they get burned up?
 3        A.    Because they were -- again, we
 4    talked about fuel configuration.  All these
 5    are sitting there horizontal, so your top
 6    left box is wide, but you can see that
 7    they're starting to burn, but again, you
 8    can see -- look at the differences between
 9    the Post-It notes on the sidewall and the
10    items that are laying horizontally flat on
11    top of each other.
12                Two different patterns, because
13    one vertical and one's horizontal
14    protecting the other pieces of paper, just
15    like I described with the magazine in your
16    bond fire out back in your backyard at
17    home.
18        Q.    What impacts the amount of
19    radiative heat an object receives?
20        A.    It's fuel configurations.  If
21    it's and there's things stacked on top of
22    it, so again, it goes back to, you can see
23    there's a clear difference between how much
24    charring and that those Post-It notes
25    almost got to ignition compared to the
```



Page 300

                    J. KARASINSKI
1
2    items that are stacked on top of each other
3    and protected on the shelves.  And then if
4    you take the stuff in the big square at the
5    top, and then you go down and you look at
6    the middle square and the bottom, you can
7    see where the paper is exposed, it is
8    starting to burn.
9        Q.    I wanted to go back to
10   Figure 43 of your report which relates
11   to --
12       A.    43?
13       Q.    Figure 43.
14       A.    Yes.
15       Q.    So we have talked about how the
16   top gas layer, it doesn't need to descend
17   to the level of the item it's damaging
18   basically in order to damage it.  So you
19   said that in order to --
20       A.    Well, it depends on the
21   material and the radiant heat and her
22   coming down from the heat layer, yes.
23       Q.    Right.  So my question is, in
24   this picture, you've drawn demarkation line
25   along the wall, right, in 43 here?



Page 301

                    J. KARASINSKI

1

2       A.    Correct, to show the flow and

3    the heat layer, yes.

4       Q.    So, what caused the extensive

5    heat damage to this couch in this photo?

6       A.    As the radiant heat was banking

7    down, you can see the uniform burning on

8    the couch, at the radiant heat was banking

9    down from the heat layer, it ignited the

10   material on the couch, because that's at a

11   lower ignition temperature than wood

12   panelling or the carpet or as you just

13   talked about, why that chair doesn't have

14   as much damage to the couch, because the

15   chair is a different material.

16            So that uniformity on the

17   couch, if you want, if you have a 921

18   there, I think it's Section 6.5.7, you can

19   see what the couch looks like when it's

20   burning.  You've got the melting material

21   dripping down on the ground, if that is

22   your origin location, if this is my origin,

23   then the -- whatever area that the fire may

24   have originated on this house would be

25   completely burned down to the floor level



1                    J. KARASINSKI

2   based on the damage we have on this house.

3              This damage on this house is

4   totally uniform, and that's because that's

5   the radiant heat that ignited the couch

6   from the heat layer in the living room as

7   the fire progressed.

8        Q.    I think we talked a little

9   about it -- a little bit about thermal

10  runaway and I understand that Dr. Martin is

11  going to be the expert on the battery

12  chemistry and things of that nature, but I

13  want to ask you fire investigation, if

14  that's okay.  So what factors from a fire

15  investigation standpoint would increase the

16  likelihood of thermal runaway in a 18650

17  cell?

18       A.    That is going to be a Steve

19  question.  I don't have any opinions on the

20  laptop.

21       Q.    When you did your -- the

22  recycling fires, do they get a lot of

23  batteries that are beat up in one way or

24  another, I mean you talked about physical

25  abuse, it gets dropped and such, but do you



Page 303

1                    J. KARASINSKI

2    get, you know, other kinds of abuse, you

3    know, people it was too cold, it was too

4    hot, they ran over it with their car?

5         A.   Oh, of course, yeah, there's

6    all sort of reasons why lithium ion

7    batteries fail, and they're also going to

8    be a mechanical defects or a design defect.

9    But again, those are questions for Steve, I

10   mean, yeah.

11        Q.   Okay.  How hot does radiative

12   heat get in a compartment fire before flash

13   over?

14        A.   Well, flash over, everything at

15   night at the same time, so you're at the

16   same temperature from ceiling to floor

17   level, so from anywhere from -- I guess I

18   could give you a range, 18 to 2100 degree

19   F.

20        Q.   That can certainly cause

21   thermal runaway, right?

22        A.   I said that earlier when I when

23   you were talking about the batteries, that

24   thermal hear and fire attack is also a

25   cause for thermal runaway within the



Page 304
```
 1                    J. KARASINSKI
 2   battery cells.
 3        Q.    So now, I want to talk about --
 4   give you an opportunity to see something
 5   that we have been just talking about this
 6   whole time which is the slug, what I have
 7   been calling the slug, but the jelly roll
 8   projectile which I believe is shown on?
 9        A.    Next slide.
10        Q.    Figure 18?
11        A.    Correct.
12        Q.    You see that?
13        A.    Yes.
14        Q.    So I guess, I'm going to start
15   with a couple of things.  The first is the
16   slug that we are talking about that you
17   believe ignited the secondary fuels in the
18   closet is depicted in the red circle drawn
19   on Figure 18?
20        A.    Yes.
21        Q.    Was this item vouchered by FRT?
22        A.    What do you mean "vouchered"?
23        Q.    Was it collected for further
24   examination?
25        A.    Yes.
```



Page 305

                         J. KARASINSKI
1
2        Q.    What was the nature of further
3   examination you undertook?
4        A.    That again would be for Mr.
5   Martin at the lab exam, but obviously, we
6   took this as evidence because it was a
7   potential ignition source that we had to
8   evaluate.
9        Q.    Did you X-ray it?
10       A.    I'm not sure -- an X-ray is not
11  going to give you any information.  That's
12  basically just going to show you the
13  outline of that subject, so you if X-ray
14  1650s, it's just going to shoot right
15  through it.
16            So if you were going to do
17  anything with this jelly roll, i don't know
18  that it would give you any evidence or
19  value.  The only thing you could do to
20  that, but because it's been a through a
21  fire and it's been ignited, I don't know
22  that you would be able to determine if
23  there was any mechanical damage or anything
24  to it, but the only way that you be able to
25  do that would not be an X-ray.  You'd have



Page 306

1                  J. KARASINSKI

2    to CT it, but based on the amount of damage

3    to it, I don't feel a CT would tell you

4    anything different at that point, just

5    because of the amount of damage it has

6    already sustained.

7        Q.    So this -- if you are to do any

8    further analysis, you would Ct it, you

9    didn't in this case because of damage it

10   depicted in Figure 18?

11       A.    Yeah, you would have to ask Mr.

12   Martin if he would want it CT, that's with

13   him.

14       Q.    Have you seen and touched the

15   item that is depicted in the red circle and

16   Figure 18 yourself?

17       A.    Have I seen it?  I had to

18   collect it.  I don't know I was actually

19   the one that put it in the bag, but, yeah,

20   I have seen it, yes.

21       Q.    Have you ever touched it?

22       A.    I don't know if I touched it,

23   but the people that the lab we handed, your

24   experts as well as Andy and the battery

25   expert.  Again, this goes back to the



Page 307

1                    J. KARASINSKI
2    batteries with the laptop, so it was not --
3         Q.    Yeah, I understand that this is
4    -- that maybe some of technical aspects of
5    the battery analysis are better directed to
6    others, but I guess, my question is, this
7    image of this --  that's on Figure 1 here
8    is the first time that you've seen the
9    picture of this and you are telling me that
10   this is the material that was competent to
11   ignite the secondary sources in the closet,
12   right?
13        A.    Correct, but Greg was there and
14   Greg saw this as well.  Greg was there for
15   the whole time, so he should have pictures
16   of it.  I believe I have asked for Greg's
17   pictures.  I don't think we have received
18   any of Greg's pictures yet.
19        Q.    When you identified the
20   ignition material that in your opinion was
21   competent of causing a secondary fuel to
22   ignite resulting in the fire that is the
23   subject of this litigation that caused the
24   death, did you think it appropriate to do
25   anymore analysis on this piece?  I mean,



Page 308

1                    J. KARASINSKI
2    the other pieces in the room were all
3    individually had, right?
4         A.    Yes, but so how we process the
5    scene, if you go back to, like, one of
6    original photos, you don't have to, but
7    you'll see where all the tents were out.
8              So instead of having people
9    walking into that room of origin and
10   stepping on potential evidence and things
11   of that nature, we let people get their
12   pictures.  We had, I believe, Andy was
13   standing in there to make sure that nobody
14   stepped on anything, and then as soon as
15   everyone got their overall pictures of that
16   room, we said, okay, we're going to stop,
17   we're going to tent the evidence that we
18   can see and bag that now, so it doesn't get
19   trampled on or damaged during our
20   inspection.  So we bagged that separately
21   before we started to excavate and process
22   the closet.
23        Q.    I guess, what I'm getting at,
24   Mr. Karasinski, is, would you agree with me
25   that what we're looking at in Figure 18



```
 1                    J. KARASINSKI
 2  what's circle there and then the close up
 3  is critical evidence in a case?
 4       A.    Well, it's part of admission
 5  scenario, so any bit of the data is
 6  important to your case.  It's not one over
 7  another, you have to look at it at its
 8  totality.  But again, Greg Gorbit was
 9  there.  He observed the photographs as
10  well, and we didn't hide it from anybody,
11  everybody saw it, so if anybody should --
12       Q.    So to be clear, I'm not
13  suggesting you you did anything, Mr.
14  Karasinski, I wouldn't suggest otherwise.
15  And just focusing on this piece of evidence
16  because -- let me phrase it in a negative.
17  If you had never found what's depicted here
18  in Figure 18 and you had never seen it and
19  you had never collected it, and you have
20  never examined it, would that change any of
21  your opinions in this case?
22       A.    Because the melting temperature
23  of the battery material is higher than what
24  temperature is of the closet is going to
25  get to, I would expect if I'm going to be
```



1                    J. KARASINSKI

2   able to opine that I have gotten cell

3   material or shrapnel material that vented

4   from a cell and I find that in there, I

5   should find that in there, that's my

6   admission source, because the melting

7   temperature of that is higher than the

8   temperature of the closet fire is going to

9   get to, heat-wise and energy-wise.  So if I

10  did not find it in the closet, I would not

11  have opined that the battery failure

12  ignited cause material.

13       Q.    That answers my question.  So

14  we looked at the other cell adjuster not

15  the stuff that landed in the closet.  I

16  think it was your testimony that basically,

17  they didn't have enough energy to ignite a

18  nearby combustible in the open flame, there

19  was damage was on charring and other

20  thermal damages, is that fair to say?

21       A.    Can you repeat the question,

22  I'm sorry?

23       Q.    No, I apologize.  We are almost

24  done and it's a long day.  I said when we

25  looked at the other battery cell materials



```
 1                    J. KARASINSKI
 2    that you covered outside the closet, in the
 3    office room, would you agree that in the
 4    those locations where you found those
 5    materials, the battery cell material didn't
 6    have enough energy to ignite the nearby
 7    combustibles into open flame?
 8         A.    I would agree with that
 9    statement, yes, but we did have charring
10    like we looked at on the carpet, where I
11    believe there was some charring in the
12    garbage can or adjacent to the garbage can
13    which was on the other side of the room.
14         Q.    That's consistent of what you
15    said earlier about they were probably still
16    venting when they landed?
17         A.    Correct.
18         Q.    The material that's shown here
19    in Figure 18, is that the material that's
20    consistent with the copper foil?
21         A.    Yes.
22         Q.    What makes you say that?
23         A.    Just when I observed it, we all
24    knew what it was, we all knew that it was
25    foil from battery remains.
```



Page 312

1                    J. KARASINSKI
2        Q.    Did you measure the mass,
3    surface area or thickness of this piece of
4    foil?
5        A.    You would have to go to Mr.
6    Martin on that or your battery expert who
7    was at the lab exam.
8        Q.    If you had to estimate the
9    sides, would you say it's like two inches,
10   that's what it looks like to me, but
11   without any --
12       A.    I would have to --
13       Q.    -- that's maybe an inch or an
14   inch and a half?
15       A.    Yeah, I would have to put a
16   scale next to it, I don't know how large it
17   was or how thick the material was.  But
18   again, the battery expert was able to
19   observe this and ask for any testing he
20   wanted to do to at the lab exam already,
21   so...
22       Q.    How thick it copper flow in a
23   battery?
24       A.    That's a Mr. Martin question.
25       Q.    They are thin though, right?



Page 313

                    J. KARASINSKI

1

2      A.    Oh, it very thin.  Yes, like,

3   paper-thin, yeah.

4      Q.    Would you agree that a piece of

5   copper foil of this size would cool when

6   it's ejected from the battery?

7      A.    Again, that's a Mr. Martin

8   question, but I can answer that, yes.  That

9   is going to cool as it ejects based on its

10  mass size and the amount of energy that's

11  left in that.

12     Q.    This piece of foil, this item

13  that we are looking at in Figure 18, it

14  would have very little thermal mass to

15  transfer to the transfer heat to

16  surrounding materials, right?

17     A.    Well, again, we have already

18  talked about this, but we'll go through it

19  again, this slug, as you call it, right,

20  it's much more -- there's more mass to

21  that's utilized in your confetti answer,

22  right, but because of this, the mass of it,

23  and the energy that it has, that is going

24  to maintain that heat and energy longer

25  than utilizing your confetti explanation.



Page 314

1                    J. KARASINSKI

2        Q.    So, is it your testimony that

3    the because it is the slug type projectile

4    rather than confetti, that it did have

5    enough energy at the time it contracted the

6    materials in the closet to combust -- to

7    ignite any combustible materials?

8        A.    It is my opinion that based on

9    this material that I found in there, and

10   the other data that was collected during

11   our investigation and the processing of the

12   scene, that was the only available ignition

13   source that we found in the closet.

14       Q.    Is it your opinion that the

15   ejector ignited the materials in the

16   closet?

17       A.    I mean this is readily

18   available on YouTube, you can watch the

19   battery failures, and you can see them

20   shooting across rooms on fire, I mean, it

21   readily knows what happens.

22       Q.    If it ejected the material in

23   the closet across the room --

24       A.    When you say "across the room,"

25   if you mean two or three feet away, then



Page 315

                    J. KARASINSKI
1
2    yes.
3         Q.    So two or three feet away and I
4    appreciate the clarification, because I do
5    want to kind of nail this down.  So it's
6    you opinion that the battery materials that
7    were ejected into the closet ignited the
8    combustibles, right, in the closet?
9         A.    If the combustible materials
10   were ever stored in the closet, yes.
11        Q.    So now, question is why, did
12   those same battery materials that were
13   ejected into the rest of the room, why did
14   they not ignite anything?
15        A.    You didn't have any fuel
16   adjacent to them, right.
17        Q.    What about all the papers and
18   all the stuff we looked at?
19        A.    We didn't find any battery
20   remains up in those shelves in the paper
21   areas.  We documented all the remains that
22   we found and we put tents on those.  So
23   again -- and it also depends on if you --
24   when you -- if that battery, when it expels
25   it's contents, maybe it expels it after it



Page 316

1                    J. KARASINSKI
2    lands on the ground or flies through the
3    air or does it expel it all right as it's
4    sitting in the laptop?
5         Q.    I'm following along.  I'm just
6    trying to find that diagram with the tents.
7    I know you made it.
8         A.    Can you go back, down, down one
9    more though.  Keep going, keep going, keep
10   going, keep going, I'm looking for the --
11   you can see some of the materials I have
12   pictures of, the one NFPA caps and the
13   garbage can.
14        Q.    NFPA caps in the garbage, we
15   looked at this one together, right?
16        A.    Yeah, go down, go down, okay.
17   So you can that caps in the garbage can.
18        Q.    We are looking at in 61?
19        A.    Yeah, there's no combustible
20   material in the garbage can.
21        Q.    It's empty right?
22        A.    There you go.
23        Q.    So again, if you go back up to
24   the cell on the carpet, we talked about
25   that, right, the carpet is on a horizontal



Page 317

```
 1                    J. KARASINSKI
 2   fuel configuration, if the cell landed, it
 3   was still expelling, but it didn't have
 4   energy to ignite the carpet, but you take
 5   that same energy and you put that energy in
 6   that closet with the combustible material
 7   and the contents of that closet, now you
 8   have that combustible material to unlike
 9   where we found the other material or masses
10   from the battery that did expel?
11        Q.    I'm going to take 60 seconds to
12   speak with my co-counsel, and then I'm
13   hoping to have you and Ms. Schweke done by
14   5:30.  So if everybody can just stay on,
15   I'm just going to go to mute, and I'll be
16   back on in 60 seconds.
17        A.    You got it.
18        Q.    All right.  So, Mr. Karasinski,
19   thank you for bearing with us.  I just have
20   a few very brief questions.  The first
21   being, have you understood all of my
22   questions today?
23        A.    I believe so, yes.
24        Q.    Is there anything else you want
25   to tell me about this fire or your
```



Page 318

1                    J. KARASINSKI

2   investigation of Marcellin notebook?

3       A.     Not at this point, I think we

4   pretty much covered it.

5       Q.     Did you conduct any other

6   physical testing of your hypothesis other

7   than what we've talked about today?

8       A.     No.

9       Q.     Well, thank you again so much

10  for bearing with us and for doing this

11  while you're traveling, I really appreciate

12  it.  With that, I'm going to turn you over

13  to Attorney Schwarz, I appreciate it.  Nice

14  meeting you and thanks for making it.

15      A.     Thank you for making it a nice

16  conversation.

17      Q.     I appreciate it.

18             MR. SCHWARZ:  I have no

19         questions, so we can close the

20         deposition.

21             (Whereupon, at 5:26 P.M., the

22         Examination of this witness was

23         concluded.)

24

25             ?         ?         ?          ?



Page 319

```
 1                    J. KARASINSKI
 2               D E C L A R A T I O N
 3
 4        I hereby certify that having been
 5   first duly sworn to testify to the truth, I
 6   gave the above testimony.
 7
 8        I FURTHER CERTIFY that the foregoing
 9   transcript is a true and correct transcript
10   of the testimony given by me at the time
11   and place specified hereinbefore.
12
13
14
                  _____
15                    JASON T. KARASINSKI
16
17
18   Subscribed and sworn to before me
19   this _____ day of _____ 20____.
20
21
     _____
22        NOTARY PUBLIC
23
24
25
```



Page 320

1                   J. KARASINSKI

2                  E X H I B I T S

3

4   ^ PLAINTIFF ^ DEFENDANT EXHIBITS

5

6   EXHIBIT    EXHIBIT                      PAGE

7   NUMBER     DESCRIPTION

8   A          Report                       63

9   B          Rebuttal Report              65

10

11       (Exhibits retained by Counsel.)

12

13                  I N D E X

14

15   EXAMINATION BY                        PAGE

16   MR. LEVITES

17

18   INFORMATION AND/OR DOCUMENTS REQUESTED

19   INFORMATION AND/OR DOCUMENTS         PAGE

20   (None)

21

22

23   QUESTIONS MARKED FOR RULINGS

24   PAGE LINE QUESTION

25   (None)



Page 321

```
 1                 J. KARASINSKI
 2             C E R T I F I C A T E
 3
 4   STATE OF NEW YORK        )
                              :  SS.:
 5   COUNTY OF KINGS          )
 6
 7        I, MIRIAM SCHWEKE, a Notary Public
 8   for and within the State of New York, do
 9   hereby certify:
10        That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14        I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19        IN WITNESS WHEREOF, I have hereunto
20   set my hand this 2nd day of April 2025.
21
22
23        _____
                MIRIAM SCHWEKE
24
25
```



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)





Web: **MagnaLS.com** Phone: **866.624.6221**

## Magna Litigation Screen Grab Preview



*The video of this deposition may be available to order through our Magna VOD program. If this deposition was **not noticed** for video, all parties must approve of the production for it to be released to any party. Admissibility will ultimately be determined by a judge. Please visit magnals.com/vod to order.*

Magna Legal Services
1635 Market St, 8th Floor
Philadelphia, PA 19103

## A

**a.m**
1:15 183:2 205:16
**abilities**
129:14
**ability**
262:6
**able**
12:17 57:9 73:18
80:23 81:5 88:2
93:11 94:4 96:8
100:9 118:3 131:20
143:4,11 151:2
162:10,24 163:5
167:9,14 189:10
245:8 269:21 272:4
286:9 288:5,5 291:7
291:10 292:3,6
294:18 305:22,24
310:2 312:18
**absence**
217:25
**absolutely**
27:17 78:16 94:17
110:2 164:25
186:19 196:22
203:25 205:6 209:9
234:12 267:15
284:19
**abuse**
43:16,25 109:3,4
302:25 303:2
**abutted**
278:15
**abutting**
278:18
**AC**
156:17
**Academy**
245:25
**accelerant**
266:20 282:22
**accelerants**
266:11,14,15
**accepted**

54:2,8,15,16,19,23
55:4 56:10,18 58:13
58:17,20
**access**
31:15 188:5 210:23
211:6 291:11
**accident**
295:13
**accidentally**
203:24 205:23
**accidently**
203:11
**accommodating**
13:4
**accreditation**
35:2
**accumulate**
154:17
**accuracy**
14:4
**accurate**
57:10,11 59:10 86:21
133:4,8 152:3 201:5
294:18
**action**
321:16
**actions**
250:10,15
**activate**
145:15
**activated**
142:19 143:24
144:11,13 153:24
154:3 186:9 197:5
**activates**
145:15 147:20
**activating**
197:8
**activation**
154:8 288:18
**active**
70:6,25 81:4
**activities**
87:12
**activity**
222:17 223:11

224:14,23 233:3,25
**actual**
13:22 49:19 74:16
92:15 100:10 101:9
108:9 126:21
150:21 184:9
295:17
**add**
250:7
**added**
58:4 61:22 294:3
**adding**
60:20
**addition**
258:19
**additional**
18:22 19:2,7,12
22:23 24:14 234:6
275:5
**address**
4:12 19:14 234:12
274:12
**addressed**
20:3 274:22
**adequacy**
14:4
**adequate**
15:15
**adjacent**
15:21 139:11 155:6
227:25 228:2
311:12 315:16
**adjoins**
278:22
**adjuster**
38:19 310:14
**administer**
3:11
**admission**
256:13 309:4 310:6
**advised**
51:15 96:6 186:5,13
187:6,7
**advisory**
55:21 56:7,23 57:21
58:9 261:8

**affect**
45:10 47:5 133:9
**affidavit**
23:16 24:6,20 25:4
294:12
**afoot**
226:3
**aftermarket**
121:16 127:21 128:5
128:15 130:4,9
131:22
**against-**
1:8
**age**
100:6,19,22,25
101:12 132:11
**agency**
110:21
**ago**
269:8
**agree**
5:9 7:20 8:8 14:2,7
14:13,17 15:13,23
16:14 29:23 94:7
95:2 123:13,17
154:15 170:17,19
176:18 177:9
186:10 196:19,23
198:8 238:12 244:2
260:24 294:21
308:24 311:3,8
313:4
**agreed**
3:5,20 12:10,11
88:18 178:3 180:5
249:12 260:2,6,8,14
260:15,18 261:10
261:11 263:21
265:12 276:5
**agreement**
18:23,24 19:15 73:12
**agreements**
275:4
**ahead**
81:16 151:16 155:4
**air**



46:11,16 47:16
207:19 316:3
**airflow**
155:19 156:24
298:13
**airtight**
156:18 245:20,22
**alarm**
135:20 136:2,6,12,20
138:21,23 139:3
140:21,24 142:4,9
144:10,17 145:2,7
145:24 146:10
147:18 149:10,18
150:17 182:18
183:15,16 186:9
187:9 288:18
289:24
**alarm's**
153:23
**alarms**
136:24 137:11
138:20 139:9 141:7
141:9 148:5,8 154:3
154:5,8 183:5
**alerted**
143:24 144:13
**alive**
180:21 269:21 278:5
**alleged**
184:13 243:24
**Allegheny**
160:20 161:4,6,20,21
164:21
**allow**
7:5 208:5
**allowed**
22:10 88:9
**allows**
22:5 250:10
**alterations**
95:8,12,16 122:12
**altering**
122:16
**alternate**
254:20

**Amazon**
128:12
**ambers**
230:10 232:17
**ambient**
45:24 46:7,19 99:4
**amount**
25:21 57:4 152:3
153:9 158:3,7,9,18
246:15 278:4
299:18 306:2,5
313:10
**analogy**
152:25 279:2
**analysis**
35:23 47:17,20 49:25
91:23 133:10 144:4
190:21 221:23
234:18 242:22
243:6 247:10 254:9
260:5,17 261:5,9
271:15 275:15
306:8 307:5,25
**analyze**
52:17,24 56:20 57:9
111:11 220:18
**analyzing**
52:20
**AND/OR**
320:18,19
**Andy**
35:12 225:11 257:22
268:21 306:24
308:12
**angle**
296:15
**annual**
59:2
**answer**
6:21,21 7:4,6,13,14
9:2,9 12:18 16:21
21:8,24,25 27:12
49:24 72:24 103:8
127:5,7,9,11 146:11
147:13 148:7,15,17
149:3 150:23,25

151:3,11 152:9
153:3,16 157:2,17
166:21 167:20
175:16 177:13
178:15,20 192:17
194:5 195:3,4
202:25 203:3
231:25 233:5,10
240:13 242:11
260:16 289:23
313:8,21
**answer's**
10:25
**answered**
18:5,17 22:8 124:16
152:10 195:12
**answering**
124:19
**answers**
8:18 26:20 27:3,6,19
27:22 310:13
**anticipate**
6:25 32:2
**anticipated**
75:16
**anybody**
10:4 56:25 309:10,11
**anybody's**
295:14
**anymore**
31:13,16 265:5
307:25
**apart**
122:11
**apologize**
10:2,13 23:22 52:12
114:12 146:5 161:7
161:15 199:21
210:10 253:5
310:23
**appeared**
241:9,11,12
**appears**
65:18 86:17 182:8
284:22,24
**appliance**

14:8,14 15:4,14,19
15:24 16:9,15,19,24
259:6
**appliances**
17:3
**applied**
254:6
**apply**
99:11 254:9
**appreciate**
6:25 7:2 13:2 62:15
77:12 272:15 315:4
318:11,13,17
**approach**
263:12
**approached**
287:25
**appropriate**
27:2 51:8 256:8
307:24
**appropriately**
291:5
**approve**
61:25,25
**approved**
92:13
**approving**
61:21
**approximately**
39:14 185:5 213:12
226:10
**April**
321:20
**apt**
256:5,8
**arbitrations**
37:22
**arc**
62:10 224:7 257:24
258:6,6
**arch**
257:20
**arcing**
221:24 222:3 257:24
258:17
**area**



19:15 30:23 47:19
117:12,16 118:8
120:14 138:24
164:20 168:5 169:7
170:15 172:22
204:8 233:14 237:3
251:7 260:25 261:2
262:24 263:16
265:11,20 269:6,12
269:18 270:25
271:12 273:2 276:5
295:8 301:23 312:3
**areas**
113:25 168:8 208:17
228:4 241:25 298:5
298:6 315:21
**armoire**
94:14 297:6
**arms**
164:9 166:12
**arrived**
263:8 295:3
**arriving**
89:13
**arrow**
212:10
**arrows**
295:21
**arson**
71:14 72:18 81:10
268:24 269:5
**articles**
41:3,11 53:22
**Articulates**
192:15
**articulating**
231:18
**ascertain**
95:15
**ashtrays**
119:21
**aside**
11:20 182:21 195:20
**asked**
18:13 19:2 22:11
29:15 31:23 51:18

96:4,5 103:14,17,23
105:14 109:15
125:16 145:3
152:10 153:6
157:18 162:13
163:8 178:14
233:22 252:10
260:10,12 262:4
265:12 280:4,12,14
287:17 288:13
289:5 291:4,15
293:5 307:16
**asking**
4:20 7:5,7,9 16:19
17:7 38:10 76:13
121:25 128:6 148:8
148:17 177:12
183:19 191:6 198:7
207:3 220:10
239:21 253:7,11
257:15 264:8
271:20
**asleep**
134:18 135:6 178:7
182:18,20 183:2,3
186:21 187:7 200:8
267:23
**aspect**
44:2,3,4,5
**aspects**
44:14 307:4
**assembly**
296:8
**assessing**
188:23
**assignment**
79:13
**assist**
35:19 79:21
**assistance**
35:22 93:24
**Association**
37:2 53:19
**assume**
45:23 153:6 202:22
261:23

**assumed**
9:3
**assuming**
95:25 203:4 206:25
211:3 297:21
**assumption**
101:15
**ATF**
245:25
**attached**
102:23 233:6
**attack**
16:20 107:16,17,20
107:20 108:4,7,7
109:13,13 196:7
197:17 216:7
225:17,19 266:23
303:24
**attacked**
217:6,8 222:7
**attacking**
194:23
**attacks**
107:25
**attainment**
36:11
**attempt**
298:18
**attended**
77:19 89:6
**attention**
137:12 175:11
188:21
**attorney**
4:20,25 9:13 10:6,15
20:24,25 21:3,18,19
21:23 22:5,7,9
24:19 79:6 291:18
293:8 318:13
**attorney/client**
20:11
**Attorneys**
2:4,11
**audio**
40:2
**authored**

75:19
**authoritative**
54:2,8,13,14,19,23
55:4,6,8,18 56:4,8
58:8,12,18
**authorities**
25:18 26:11 135:3
**authorized**
3:11
**automatically**
233:17
**available**
44:21 131:9 314:12
314:18
**average**
151:4
**awake**
176:4 182:17 203:8
203:20 205:16
**awakened**
135:19
**award**
39:3
**aware**
25:4,7 26:17 27:18
27:21 51:20 55:12
61:12,13 62:12
76:16 77:25 78:6
91:10 93:5 102:13
108:24 109:2
167:13 184:16
199:12,22
**awoken**
289:11

_____
**B**
_____
**B**
320:2,9
**back**
13:19 58:11 61:23
62:4 67:6,7,10,17
67:18 72:7,9,15,21
72:23 76:8 84:9
88:9,13,17 95:24
96:13 99:12 107:8
109:7,14,24 118:9



109:7,14,24 118:9
118:23 119:10
120:12,24 121:7
127:22 162:7
163:13,22 164:6,10
164:18,23 174:4,9
174:18 175:11,17
175:18 176:8
177:15 180:20
188:16 205:18
214:9 218:22 220:6
221:18 222:12
223:12 231:2
238:18 242:10,14
281:4 282:24
283:24 284:2 287:4
288:21,22 289:25
290:13,23,25 291:6
292:23 298:10
299:16,22 300:9
306:25 308:5 316:8
316:23 317:16
**background**
36:10 37:9 40:15,18
50:11 87:15,16,22
102:3 122:2
**backside**
214:17
**backtracked**
283:8
**backup**
77:4 140:20
**backyard**
152:17 299:16
**bad**
101:17 170:8 227:22
243:2
**badly**
143:10
**bag**
129:18 253:18,23
306:19 308:18
**bagged**
308:20
**bags**
241:10

**ball**
152:13
**bank**
159:4,11 192:3,12
213:22
**banked**
154:18 155:15
213:11,15
**banking**
124:25 166:24
172:15,16,19
194:22 213:23
214:15 215:20
216:16,24 301:6,8
**barbecue**
152:18
**barbecuing**
152:16
**base**
198:25
**based**
19:22 20:14 30:11
34:25 42:19 43:22
47:13 49:8 50:24
55:19 93:24 98:8
104:15 117:13,21
117:22 118:6
132:11 133:4,8
143:2 157:5 163:17
167:21 175:15
181:9 182:19
183:12 195:16
199:3 208:8,8
209:25 210:2
217:14 218:10
222:3 226:20
235:15 240:2 248:4
257:3,9,18 263:16
263:18,19 265:18
268:11 269:19,22
271:15 279:7
290:16 291:17,25
294:16 302:2 306:2
313:9 314:8
**basically**
42:22 113:6 165:5

177:7 179:12 270:3
300:18 305:12
310:16
**basics**
156:24
**basis**
53:8 56:13 59:2
76:12,18 122:11
**bathroom**
162:25 281:5 290:2
**batteries**
41:12 42:5,6 45:16
47:5 72:25 73:3,5,7
73:15 74:6,13 80:11
80:13,15,17 91:18
91:20 99:11 100:12
101:17 102:10
158:11 194:18
196:6,11 197:18
215:17,25 227:12
229:14 241:20
253:3 282:21 290:7
302:23 303:7,23
307:2
**battery**
16:10 17:8 40:6,7,9
40:12,23 41:6,18
42:8,9,11 44:15
46:14 51:17,19
52:25 60:25 61:2
73:9,19 80:19 91:22
92:2,7,9,11,12,19
92:22,23 93:9,16
94:2,21,23 95:5,13
95:20,24 96:7,9,24
97:4,10,12,17 98:3
98:5,12 100:6,7,9
100:23 101:5,22
102:14,22 103:18
104:4,6 105:23
106:3,11,19 107:11
108:2,2,25 109:17
112:13,22 113:22
113:25 114:5,20
115:5 121:17,18,21
122:3,6,15,19,24

123:9,14,15 124:4
124:12,17 125:9,15
125:22 126:8
127:21 128:5,15,18
129:4 130:4,9,13,15
130:19 131:22
132:8,10 133:17,18
138:24 139:8,21
140:13,19,19 141:3
141:9,16,22 144:20
214:8,14 215:3,10
217:5 218:20
219:12,14 225:22
227:3 229:12,17
230:2 235:6,7,17,20
236:15,21 238:15
244:5 248:5 251:14
252:2,4 254:3
286:25 292:12
302:11 304:2
306:24 307:5
309:23 310:11,25
311:5,25 312:6,18
312:23 313:6
314:19 315:6,12,19
315:24 317:10
**battery-operated**
60:19 138:23 139:3
139:20,24 140:24
**battery-powered**
107:4
**beach**
230:24
**bearing**
273:21 317:19
318:10
**beat**
302:23
**Beaton**
201:7 203:6
**Beaton's**
204:11
**bed**
134:17,19 135:6
161:2,23 163:13
164:6,11,18 165:5



166:7,11 168:3
169:6 170:12,14,16
170:18,21 171:6,6
171:11,16,21,22
172:2,7,9,23,23
173:3,21,25 174:6
175:14 176:23
177:2,5,7,9,17,18
177:22,25 178:7,10
178:24 179:11,21
179:24,25 180:4,7
180:14,15,21 182:7
182:9 183:2,3,15,23
203:24 267:2
**bedroom**
31:15 119:11 120:23
120:24 121:7 136:2
136:10,14 137:4
138:22 139:11,13
139:25 140:12,22
141:14 142:5 143:4
144:19 145:10,19
146:14,20 147:10
147:24 149:19
150:20 155:2,5,6,9
156:16,22,22 164:7
167:23 169:11
186:21 190:12,20
260:22 292:3
**bedrooms**
121:4
**began**
213:13
**beginning**
67:20,23 115:16
149:17 243:15
280:20
**begins**
68:24 83:13 194:8
275:10
**behalf**
69:6
**Belanger**
79:20
**belief**
30:17

**believe**
11:16,25 17:13,19
24:8 28:6 33:2
36:20 38:16,20 39:5
64:5 68:6 70:20,22
71:2,4 72:17 81:8
87:19 93:7 94:4
99:7 102:23 109:15
122:21 123:11
126:9 130:22
134:16,20 146:11
156:17 159:2
160:10 162:4 173:8
173:15 183:3
188:14 189:3
198:22 220:7,15
221:6,8 228:12,14
236:17,20,23 242:9
251:9 261:9 262:3
263:16 282:23
288:15 292:8 304:8
304:17 307:16
308:12 311:11
317:23
**believed**
30:12 32:12,19 94:21
96:6 140:13 144:19
**believes**
276:16
**believing**
270:23
**Ben**
4:16 189:22
**BENJAMIN**
2:13
**best**
54:9 57:22
**BETKE**
2:10
**better**
63:20,21 83:8 89:3
93:2 94:6 97:24
109:20 202:19
242:16,17 243:3
307:5
**beyond**

40:21 66:15 103:16
203:19 264:25
265:6,9
**bicycle**
113:20
**Biden**
60:22
**big**
35:5 72:13 79:14
227:19 243:21,25
244:13 272:17
284:2 300:4
**bigger**
63:15 274:7 284:18
**billed**
78:8
**billing**
66:10,11 78:13,13
**billow**
150:16
**bills**
78:25
**bird**
262:21
**bit**
30:9 31:10 39:22
64:17 161:12 231:3
243:14 246:17
247:2 294:7 296:18
297:4 302:9 309:5
**black**
117:21
**blamed**
80:17
**blanket**
174:9 179:23,23
180:12,16,19
**blankets**
174:3 180:24
**blew**
229:21
**blood**
321:16
**blow**
83:9 204:14,15
**blowing**

199:6 292:20
**blown**
63:23 218:13
**BMS**
101:6
**board**
102:22 213:8 266:7
**body**
164:20 165:4 166:11
175:21 177:15
178:18
**boiling**
197:10,12
**bond**
297:24 299:16
**bonfire**
297:22
**Boston**
2:12
**bottom**
67:25 70:17 208:2,24
227:17 231:5
240:10,10,11
241:22 298:13
300:6
**bought**
66:18 123:16 184:7
**bounce**
248:13,14,14
**bouncing**
194:21
**box**
88:24 200:19 229:25
297:14 298:9 299:6
**boxes**
298:25
**break**
7:23 9:6 68:12 82:24
83:3,4 126:20
135:11,13 202:21
235:10,13 242:5
273:22
**breaker**
88:24 90:5,17 219:22
219:23 220:19,24
221:3,4 222:2,10,11



223:12,13 224:10
232:21,22,22,25
233:22 234:16
**breakers**
234:20 258:9
**breathe**
168:2 169:5
**breathing**
172:21
**Brent**
12:4
**brewing**
205:5,9
**Brian**
87:19
**brief**
36:9 38:3,12 88:14
317:20
**briefly**
4:15 71:5
**bring**
35:6 51:16 149:11
**broad**
149:2
**broken**
212:6 278:8
**brought**
18:12 19:13 37:19
268:18 276:6
**buds**
242:15
**Buffalo**
72:12,14
**building**
75:22 76:6,21 154:2
188:19 191:5,7
256:23
**bullets**
110:8
**bump**
223:8
**bumped**
223:22 258:15
**buoyancy**
191:18
**burn**

117:24,25 172:2
207:13,14,23 208:6
244:21,24 246:2,21
246:22 269:5 279:4
298:20 299:7 300:8
**burned**
107:22 118:5 159:17
171:22 172:9
231:10 246:23
247:13 296:24
297:11,18 299:2
301:25
**burner**
149:12,13
**burning**
158:17 166:23
216:23 248:6 279:4
297:13,15 301:7,20
**burns**
244:19,19
**burnt**
117:19 172:3 245:24
290:9 297:12
**business**
36:19 88:5
**busy**
77:10
**button**
183:16 202:20
**buy**
202:14

---

**C**

**C**
2:2 319:2 321:2,2
**calculate**
143:5,6
**calculation**
167:13
**calculations**
143:2,16,18,19
147:14,15 157:7,8
167:8 226:20
**California**
107:22
**call**

20:13 31:3 55:18
74:14 85:5 113:13
162:8 164:16
166:22 187:12,19
187:21 189:11
191:2 216:22 238:4
240:15 244:25
295:2 313:19
**called**
4:3 48:14 71:13
189:3 293:12
**calling**
130:6 238:7,13 247:5
304:7
**calls**
71:12 74:16 188:25
**cancel**
116:13
**candle**
116:8,15,24 117:11
117:23 118:4,5,7,13
120:14 121:6
262:24 264:7,19
**candles**
115:23,23 116:6,12
116:14 117:5,7,8,11
118:11,16,22 119:2
119:25 120:6
121:10 132:17
262:17,18,20,21
264:13
**cap**
118:3
**capable**
258:25 259:9
**caps**
196:14,14 237:5
316:12,14,17
**caption**
212:8
**captioned**
289:14
**capture**
8:18
**car**
151:7,8,11,14,17,22

151:24 164:16
187:20 189:7
295:13 303:4
**card**
128:11
**career**
246:4
**Carol**
1:3 2:5 4:21,24 11:19
19:17 20:4 22:12
26:18 27:9,21
153:16 209:19
276:6
**carpet**
228:7,21,23 229:2,23
230:5,9,17 232:11
232:13,15,16
266:21,21 301:12
311:10 316:24,25
317:4
**case**
1:8 4:18 10:5,15
11:23 14:3 17:15
20:21 21:9,14,24
22:10 24:16 26:20
27:19 32:18 33:7,23
34:6 39:21 49:3,11
51:14,25 52:23
61:10,11 62:7 63:8
64:13 66:15,20
70:21,25 71:17,23
72:18 73:9,10,24
75:12,21 76:24 78:4
79:10,19 80:20
81:10,11,24,25 82:3
82:4,5,12,12 83:18
91:23 100:18
101:11 102:6
105:14 114:14,21
118:14 131:23
144:24 148:2
149:17 150:3 160:8
165:24 166:4 172:8
181:13 184:19
185:3 195:22 198:7
204:7 227:25



234:18 236:19,24
238:8 239:7 249:2,9
250:8,16,17 252:9
253:21 259:20
260:23 264:6 268:7
269:11 270:2
278:16 306:9 309:3
309:6,21
**case-maker**
261:25
**cases**
46:9,22 69:5,13,20
70:16,19 71:6,14,15
71:18,20 72:25 73:2
73:6,8 75:7,18,25
76:2,10,13,20,23
79:24 80:7,8,12,22
80:24 81:7,12,14,17
81:19,22 182:24
227:18 248:25
251:14 253:7
268:25 298:24
**cat**
148:21 263:24 264:2
264:6,11,20
**catch**
204:19 233:18,19
**category**
184:24 237:19
**cats**
148:21
**caught**
42:4
**causal**
271:13
**cause**
14:9,16 16:20 43:21
43:21 45:3 52:9,11
52:12,14 53:22 61:5
75:23 76:20 103:24
105:12 109:5
110:14,17,19,19
111:2,7,14 114:6
144:5 195:10
197:17,24 209:8
216:16 220:25

221:22 224:3 225:2
242:3,21 243:6
250:5 273:10
303:20,25 310:12
**caused**
73:25 76:7 82:6
103:10 110:25
145:12 159:18
193:18 194:11
195:25 219:18
244:9 301:4 307:23
**causes**
76:4 109:11 111:17
**causing**
16:4,17 72:2 248:5
307:21
**caveats**
275:13
**Cedar**
245:25
**ceiling**
155:17 156:5,7,11
172:18 191:19
194:20 197:14
226:22 248:12,13
298:12 303:16
**cell**
40:13,16,24 99:5
104:16 106:19
113:6 158:15
159:14 160:2,10
187:18 189:4
228:21 230:16
232:6,9,12,17
302:17 310:2,4,14
310:25 311:5
316:24 317:2
**cellphone**
7:21
**cells**
42:20,25 43:5,14,16
43:18,19 44:7 45:2
47:9 73:17 75:3
91:14 93:5,20
102:21,25 106:12
109:19 113:17

159:17 160:3,7
195:7 196:15
217:25 218:5,12,13
218:21 219:20
228:17 229:3
241:24,25 242:2
246:23 251:24
283:17 292:17
304:2
**cement**
107:6,8
**Central**
36:13
**certain**
30:16 115:15
**certainly**
17:25 26:25 90:24
91:3 176:17,19
178:4 277:12 292:5
295:9,9 303:20
**certificates**
36:22
**certification**
3:8
**certified**
36:23,24 182:16
**certify**
319:4,8 321:9,14
**chair**
62:8 173:6 258:6
301:13,15
**chance**
22:20
**chances**
294:23 295:11,14
**change**
15:21 21:8 26:20
27:19 57:2,16 61:2
101:6 117:4 118:13
124:4,12 134:12
141:25 157:2
175:12 180:8
195:23 260:22
262:21 309:20
**changed**
86:23 108:24 123:2

127:10 247:14
**changes**
58:2 59:19 60:21
61:23 62:24 104:14
109:2
**changing**
27:3,21 122:9,9,16
**chapter**
55:24 60:10,10,11,13
60:15,16 62:9,10,10
**characterize**
32:16
**characterizing**
157:23
**charge**
113:20
**charged**
106:15
**charger**
250:21 251:10,11,13
251:16,22,22
**charges**
37:19
**Charles**
1:4,5 2:5,7 4:25
187:8 284:4 293:3
**charred**
230:8,9
**charring**
229:24 232:10 265:8
298:7 299:24
310:19 311:9,11
**checked**
124:24
**chemical**
113:5
**chemistry**
302:12
**cigarette**
119:19 151:19,20
152:5
**cigarettes**
119:22
**circle**
227:2 304:18 306:15
309:2



**circuit**
220:19 221:11,13
    224:10 232:22,25
    233:22 234:16
**circuits**
88:23 222:4
**circumstances**
24:13 110:20 250:9
**cite**
61:14 62:16 124:19
    135:24 147:3 157:9
    160:25 206:9 250:2
    279:24 280:17
**cited**
161:8,20
**civil**
1:21 37:15 75:15
**claim**
246:18
**claimed**
85:12 153:18
**clarification**
18:14 20:4 272:16
    315:4
**clarify**
77:24 113:2
**clarity**
19:16
**class**
68:22
**classification**
110:17,23 111:2
**clean**
206:2,3
**cleaner**
30:3,25 33:12
**clear**
167:20 177:21 180:3
    236:12 289:8
    291:13 293:25,25
    299:23 309:12
**clearer**
293:23 294:12,15
**client**
21:6 29:15 50:25
    51:16 79:14 103:17

**close**
78:20 227:4 276:9
    297:10 309:2
    318:19
**closed**
70:23 212:5
**closely**
210:15
**closer**
6:12 23:23 161:12
    225:24
**closet**
29:19,21 30:2,4,10
    30:23 31:2,12,17,22
    32:3,9 85:13 129:19
    129:21,25 130:10
    130:16 131:11,19
    133:16,17,20
    134:13 158:11,16
    167:6,24 183:20
    184:4 192:2 198:14
    210:17 212:13,17
    212:17,20,21 218:2
    218:4,15,16,17,18
    218:25 219:10,15
    219:17 226:20,23
    235:9 237:3,23
    238:24 239:9,20
    240:3,16 241:5,15
    241:17,19,20 242:8
    244:7,8,12 245:6
    247:3 253:24,25
    254:14 255:3,4,12
    256:14 266:22,24
    269:15 272:3,6
    278:2,15,20,23
    282:19 283:3,14
    284:7,11 285:2,5,8
    285:9,19 286:7,10
    287:4,13 288:4,22
    290:13,20,23
    291:24 292:6,8
    294:19 304:18
    307:11 308:22
    309:24 310:8,10,15
    311:2 314:6,13,16

    314:23 315:7,8,10
    317:6,7
**closets**
31:14
**clothes**
238:21,25 239:11,24
    240:20 247:8 269:9
**clothing**
133:19 240:5,25
**Co-Administrator**
1:4,5 2:5,6
**co-counsel**
317:12
**coast**
58:2
**coffee**
204:17,21,23 205:9
    205:13,17,25 267:7
    267:10
**cold**
303:3
**colleague**
10:7 39:19 52:16
**collect**
20:16 66:19 224:16
    260:13 262:6
    306:18
**collected**
12:13 18:25 19:3
    25:22 88:22 89:5
    198:20 218:7
    224:13,17,20
    304:23 309:19
    314:10
**collecting**
131:11 132:22 218:9
**collection**
15:9 66:23 88:22
    111:19 252:8 255:9
    258:22
**combust**
314:6
**combustible**
227:24 235:8 236:8
    239:2,16,19,19
    240:4 241:2 247:2

    249:17 310:18
    314:7 315:9 316:19
    317:6,8
**combustibles**
238:15,16 239:8
    241:5 242:8 244:8
    311:7 315:8
**combustion**
208:19 229:22
    230:15 232:9
    292:16
**come**
25:13 44:9,10 47:10
    59:13 74:8 111:19
    213:16 237:10,14
    248:15 250:10
**comes**
191:22 209:16
    249:13 287:4
    288:21 290:23,25
**comfortable**
240:3
**comforter**
240:12
**coming**
47:17,19 167:18
    193:23 232:9 282:9
    283:6 285:19 286:7
    286:16 290:22
    300:22
**comment**
57:2 61:24 62:4,6,22
**comments**
56:25 60:7 61:8
**committee**
61:20
**common**
133:6
**community**
133:2
**compact**
29:18,21,25 30:24
    33:13 129:18 130:5
    130:11,18,24 131:8
    132:16 183:20
    184:24 218:17



**companies**
100:11
**company**
13:9,20 17:19 38:18
  67:12 100:11 102:2
  273:12
**compare**
103:4 104:13 120:18
**compared**
102:25 299:25
**comparison**
100:2,4,13,16,21,25
  101:11 104:10
**comparisons**
102:7
**compartment**
191:12,16 192:24
  193:8,9 208:13
  303:12
**compartments**
143:7
**competency**
111:23
**competent**
112:3,5,18 236:2,21
  236:24 240:15
  247:6 250:6 272:2
  274:22 307:10,21
**complaint**
184:13
**complaints**
132:7
**complete**
208:5
**completed**
57:12 90:3
**completely**
174:13 176:7 231:4
  301:25
**completes**
230:15
**complies**
127:15 138:3,8 175:2
  190:3
**components**
94:19 106:3 237:6

244:6
**comprises**
64:3 90:19 192:13
**computer**
16:11 29:19,25 30:24
  37:9 40:4 41:16
  49:6 51:17,19 52:21
  52:25 67:12 85:3
  92:2 95:9 97:5
  100:8 101:22
  121:12,19,21
  122:17,24 125:11
  125:17 126:7
  129:25 130:15,24
  131:4,8,12 132:5,7
  133:16,20 134:6,10
  158:8 161:13
  183:19,20 184:6,9
  184:21,21 193:22
  193:23,25 194:7,17
  194:23 195:6,8,11
  196:5,16 213:4
  215:20,21 217:7
  218:14,17 223:15
  228:3 242:24
  243:24 244:4
  251:11 253:23
  292:21
**computers**
40:19,22 41:3,7 80:9
  99:12 222:4
**conceit**
218:19
**conceivable**
164:17
**concern**
132:9
**concerning**
4:23 5:4 41:11
  115:22 128:25
**concerns**
252:18
**concluded**
75:22 76:6,19 117:16
  123:8 224:6 275:7
  318:23

**conclusion**
15:6 83:13 116:7
  254:23
**conclusions**
25:14 89:13 143:20
  260:23 270:2
**condition**
95:3 100:20 101:2
  108:15,20 110:20
  178:24 179:18
**conditioning**
46:12
**conditions**
44:13,14
**conduct**
21:14 247:10 318:5
**conducted**
149:15
**conducting**
34:21
**conduction**
193:4
**conference**
60:2 61:9 62:23
**confetti**
237:11,19 249:14,24
  313:21,25 314:4
**confident**
136:12
**confidential**
73:12
**configuration**
94:9,13,17 104:16
  207:14,15 208:4,9
  208:18,25 230:13
  230:18,19 232:14
  246:11,12 298:21
  299:4 317:2
**configurations**
94:13 299:20
**configure**
232:14
**configured**
208:11
**confirm**
93:10 94:5 96:8 98:6

98:12
**confirmed**
129:19 219:23
  223:12
**confused**
285:11 288:11 289:7
  295:16
**confusing**
8:22 40:18 284:22
**connect**
44:7 189:8
**connection**
102:6
**connections**
43:19,20 44:10 47:13
**consider**
53:25 54:5,7,23,25
  55:3,5,7,19 56:17
  78:2 90:4,6,23
  111:23 112:7
  118:25 122:8
  125:14 204:6 209:7
  250:16 256:25
  257:2,18 263:6,10
  264:2,9,14 268:5
**considered**
250:5 262:17 264:10
  275:16
**consist**
116:3
**consistency**
183:13
**consistent**
17:2 28:4,6,7,13,18
  28:22 30:12 45:25
  46:8 119:3 125:5,8
  128:16,19 133:22
  162:3 185:16 186:5
  192:10 213:4
  217:20 218:24
  233:24 254:24
  261:16 266:22
  267:22 271:7
  311:14,20
**construction**
98:9



consulting
69:23
consume
298:15
consumed
297:18
consumer
96:21 122:7 125:12
132:6
contact
44:10 47:10,12 255:3
contacted
17:17 79:7,20
contain
112:14
contemplated
61:8 62:25
contending
186:20
contents
55:22 112:12,15
114:5 149:14 160:4
206:17 210:16
212:20 214:6
219:16 228:25
238:8 244:24 246:5
286:10 287:5
315:25 317:7
context
124:22 126:19 136:8
continuation
189:24
continue
8:17 159:4,9 192:8
192:12
continued
104:2
continues
68:25 191:24
continuing
20:16
contracted
314:5
contractor
72:3
convection

193:4
conversation
6:24 255:16 270:10
294:7 318:16
conversations
9:12 12:7 18:21 19:5
275:3
cook
203:16
cool
313:5,9
cooled
247:16
copper
311:20 312:22 313:5
copy
3:14,17 63:17,19
64:7,8 83:8
cord
201:14 202:11,17
251:9
cordless
188:5,18 189:15,21
190:11 267:8
cords
202:16 222:3
corner
207:20,22 208:3
212:23 246:11
corpus
270:17,20 271:4,7,19
271:24 272:8,9
correct
7:24 8:12 13:25
15:10 17:12 19:11
21:16,17 22:14
25:15 26:8 30:18
42:10 43:17 50:21
56:21 57:14 59:9,20
63:5 84:18 86:3,4
86:16 91:4 98:7
102:13 105:15
108:5,17 110:9
112:24 114:17
115:7,17,20 116:2
117:17 119:7,11,12

121:9 123:11 125:3
129:23,24 130:5,13
136:18,21 137:7
140:16 141:17
144:22 145:20
146:16,24 168:17
169:18 171:19
176:24 179:16
191:19 198:13
199:5,16 216:23
220:12 222:16
227:20 229:23
235:3 250:20 255:5
263:5 268:18
277:14 279:15
296:3 301:2 304:11
307:13 311:17
319:9
corrected
289:2,3
correction
57:3 199:22
correctly
49:21 146:18 160:12
171:4 188:15
235:11 252:21
correlate
197:2 198:12
corresponded
222:25
cost
128:13
cotton
241:7,12
couch
162:8 175:18 263:3
276:22 277:3,8,13
277:16,22,24 278:3
278:4 301:5,8,10,14
301:17,19 302:5
COUGHLIN
2:10
could've
217:6 296:17
counsel
3:6,17 20:21 22:3

24:15 39:20 78:9
205:18 320:11
Counsellor
42:14
Counselor
91:25 119:16 148:16
153:5 177:9 183:10
counter
186:4
counterfeit
92:7,23 105:23
country
37:4 50:16 54:12
countrywide
70:4
County
72:17 160:20 161:4,6
321:5
couple
15:17 200:12 218:12
239:4 241:10
243:12 256:22
269:8 279:10
304:15
course
4:19 13:14 16:7
38:10 52:2,8 75:24
105:5 137:18
177:11 243:13
257:14 261:20
303:5
court
1:2,20 3:13 4:18 48:6
72:10 76:14
cover
201:19
covered
44:20,24 311:2 318:4
covering
200:20 206:18
210:22 211:10
243:12
covers
175:8 176:22 178:8
178:11 179:8,12
182:13



**COVID**
87:2 113:20
**CPR**
175:22
**cracked**
227:9
**cracking**
227:15
**crannies**
151:25
**crawl**
165:8,11,18,22
    167:22 169:10
    170:9,24 191:5,6
**crawled**
170:9
**crazy**
190:23 191:8
**create**
24:20
**creating**
20:7
**creation**
24:13
**credibility**
184:2
**credible**
29:6
**credit**
128:11 178:22
**criminal**
37:18 69:13 71:15
    75:12
**crimps**
236:5
**critical**
77:8 106:2,5,5 309:3
**crosswise**
161:2,23
**crystal**
152:13
**Ct**
34:7,21 35:14,15
    67:9,14 90:9,18,21
    90:21 91:7 229:5
    306:2,3,8,12

**CT'd**
67:12
**CTs**
14:23 34:3
**current**
59:15,16,23 68:4,6
    81:23
**currently**
54:10 61:14 62:20
**customary**
5:20
**cut**
151:15
**CV**
38:6 64:4,8 67:17,20
    67:23 68:3,7,18
    77:13,16,22 78:5

— D —

**D**
3:2 319:2 320:13
**daily**
53:7 122:10
**damage**
15:14 106:12 107:2
    107:11 109:12
    204:9 206:16
    209:12,14,18
    211:18 212:9 214:3
    214:5,21,25 215:7
    215:13,22 216:6,25
    221:2 225:22 226:2
    226:25 227:3
    241:21,21 244:9
    259:11 265:8
    266:21 272:25
    273:10,15 278:4,18
    278:25 292:2
    295:25 300:18
    301:5,14 302:2,3
    305:23 306:2,5,9
    310:19
**damaged**
15:25 16:4,16,20
    143:10 206:21
    207:8 208:12

225:16 227:6
    231:14 308:19
**damages**
310:20
**damaging**
108:10 300:17
**dangerous**
43:15 44:3,15 45:3
**dark**
285:13 287:9,10
    290:6
**data**
15:9 20:16 25:21
    57:9 111:11,18
    132:23 147:12
    149:5 198:15,20
    202:4 218:6,10
    221:21 224:24
    252:8,9 255:8
    258:22 262:7
    274:12 293:20
    309:5 314:10
**date**
1:14 10:18 17:16
    63:12 64:20,21
    65:10 66:12 68:4
    77:16 78:8 86:20
    89:8 93:3,19 128:16
    128:19 132:8,11
    143:5 184:5
**dated**
65:13 126:25
**dates**
182:5
**day**
12:21 93:17 183:25
    205:14,25 206:3,6
    228:14 231:6
    261:19 310:24
    319:19 321:20
**days**
3:16
**deal**
53:7 76:11,17 178:5
    185:6
**death**

21:24 307:24
**debating**
270:15
**debris**
35:17 120:14 139:5,7
    139:21 141:2
**decay**
196:7
**deceased**
1:4,5 2:6,7 120:24
    134:17 174:17
**December**
65:13,16,23 85:21
    99:12
**declaration**
20:8 23:17,24 25:3
    28:3 275:24 279:12
    284:13,15,23 288:8
    290:19 291:16
    293:6,22
**decoration**
118:16
**decreases**
172:19
**defect**
303:8
**defects**
303:8
**defendant**
1:20 4:17 69:9
    274:13 320:4
**Defendant's**
63:10 65:9
**Defendants**
1:11 2:11 39:20
**defense**
69:11,16,17 70:2
    251:14
**deferring**
108:13
**define**
17:6 34:17 92:13
    101:16 106:5
**definitely**
43:12 295:6
**definitive**



72:24
**degree**
15:13 36:12,17,18,19
303:18
**degreed**
53:6
**degrees**
46:4,6,23 47:6,7
197:11,13,14
276:10 296:12
**Dell**
13:20,23,25
**demarkation**
300:24
**department**
11:3,10,12 166:15
167:3 175:20
177:16 180:22
204:3 210:18
234:25 280:6
293:15 295:3,7
**department's**
164:22 263:19 277:5
**depend**
249:10
**depending**
15:19 21:7 60:22
**depends**
121:24 122:13
170:14 191:8
198:19 206:23
245:17,18 300:20
315:23
**depicted**
193:18 194:10
195:24 211:25
214:21 227:4 229:4
230:2 304:18
306:10,15 309:17
**depicts**
116:24
**depo**
66:13
**deposed**
6:6 17:11 29:14
151:24

**deposition**
1:18 3:8,9,14 6:3
7:22 8:11 9:15 10:2
12:18 22:22 23:3,6
23:8,14 25:2 27:25
39:22 97:15 137:9
143:7 157:8,15,24
170:2 178:22
185:15,20 186:7
189:2 279:17
318:20
**depositions**
18:6,13,18 19:8 23:9
26:10 277:12
**derived**
18:10
**descend**
300:16
**descended**
172:6
**describe**
35:24 106:18 112:25
114:25 149:20
237:15
**described**
24:12 135:21 194:20
271:22 289:9,12
299:15
**describing**
158:4 230:21 235:10
**description**
19:23 88:14 320:7
**descriptions**
35:4
**design**
37:9 40:6,8,10,13
52:21,24 61:3 98:8
98:9 105:6 106:10
106:23 303:8
**designated**
50:6,7
**desk**
94:15 188:15 269:18
**despite**
220:20
**destructive**

102:19
**detail**
239:23 294:3
**detailed**
125:14
**detect**
285:18
**detector**
142:18 143:3,24
144:3 149:16
153:10,14 197:4,7
**detectors**
136:9 139:19 143:10
**determination**
94:5 242:21 243:6
**determinations**
271:11
**determine**
48:21 57:10 90:5
103:23 104:5,15
108:14,18 110:14
111:7 112:2 120:13
186:16 221:19
275:6 305:22
**determined**
93:15 196:20 251:6,9
251:21
**determines**
15:16
**determining**
111:22 250:5
**develop**
15:10 252:11
**developing**
191:15 192:24 255:7
**devices**
7:22 104:17 258:24
259:8
**diagram**
191:11 259:20
289:18 316:6
**dial**
149:6 257:6
**dialed**
257:8
**die**

276:19
**difference**
13:3 299:23
**differences**
104:14 270:16 299:8
**different**
15:17 21:9 34:23
35:3,3,3 82:21
111:2,3 112:17
113:24 122:3 148:9
148:20 195:4 198:6
221:13 231:24
239:5 248:25 249:8
262:4 279:16
282:11 299:12
301:15 306:4
**differently**
190:17
**difficult**
101:7 134:3 243:2
**difficulties**
161:18
**dining**
156:3
**dinner**
264:20
**direct**
137:12
**directed**
24:14 97:24 307:5
**direction**
156:20
**directions**
112:17
**directly**
79:8,17 118:2 198:11
202:23
**directs**
250:4
**disagree**
135:5 177:10
**disagreed**
260:20
**disassemble**
102:18
**disbelieve**



135:9 181:9 199:3
**discard**
119:19
**disclosure**
64:2
**disclosures**
274:19,21
**discoloration**
297:3
**discover**
194:25
**discovered**
32:20 158:2 183:4,5
  186:8
**discovers**
193:25 194:24 195:5
  196:9 198:2 215:24
  216:18
**discovery**
196:25 198:11
**discrepancy**
261:3
**discuss**
33:10,15 50:17 209:5
  256:9
**discussed**
181:3 268:17
**discusses**
118:11 174:20
  206:12 270:19
**discussing**
242:7
**discussion**
10:9 60:7 61:15
  271:6,18
**dismantled**
42:21,22
**display**
13:6
**displayed**
128:6 136:17
**disposal**
42:16
**dispose**
42:14,18
**disposes**

195:14
**disposing**
43:10,23
**disproved**
133:13,13,14,14
**dissemble**
102:15,20
**distinction**
92:10,21 217:23
**distinguish**
271:21
**distribution**
170:11
**DISTRICT**
1:2,2
**division**
296:19
**doctor**
140:4,6
**document**
56:23,24 58:7 64:5
  65:19 126:14,15,18
  126:19,21,25 261:7
**documentation**
88:21 131:2 263:13
**documented**
224:12,19 315:21
**documents**
8:2,9 9:19 13:5 99:7
  320:18,19
**dog**
264:17
**doing**
8:16,17 32:25 79:11
  86:18 88:3,8 106:17
  133:3 186:12,17
  187:4,17 189:6
  221:15,16 253:12
  261:17,18 280:6
  318:10
**dominant**
192:22 193:5,14
**door**
131:7 136:9 139:13
  142:12 150:3 151:7
  151:10 152:17

155:6 156:21,22
  167:18 192:4,9
  209:19,23 210:22
  210:23 211:16,20
  212:3 223:7 245:18
  265:2,2,3,8 273:9
  280:13 289:24
**doors**
155:2,5,7,20 192:7
**doorway**
154:18 155:15
  283:21 285:20
**doubt**
87:7
**downward**
197:17 213:3
**Dr**
92:3 97:24 98:25
  102:12 108:13
  109:9 123:5 128:17
  129:8 185:7 193:19
  194:12 195:25
  302:10
**draft**
24:6 275:15,22
**dramatically**
86:23
**draw**
119:6
**drawer**
119:10 131:7
**drawn**
229:25 300:24
  304:18
**drill**
107:4
**drink**
205:13 267:12
**dripping**
213:4 301:21
**drive**
187:22
**driver's**
276:12
**driveway**
249:4

**driving**
216:21
**drop**
107:5,7
**dropped**
107:11 302:25
**drove**
189:10
**dry**
44:24
**drywall**
248:9
**due**
76:15 274:20
**duly**
4:3 319:5 321:11
**dumpster**
43:15 44:20 46:24
  47:6
**dumpsters**
43:5,22 44:2 47:9,15
**duplicate**
100:3
**duplicated**
105:2
**dust**
72:16 81:10
**Dv6**
84:17
**dynamics**
15:22 52:17 257:11
  265:20 268:13
  269:24

**E**

**E**
1:4,5 2:2,2,6,7 3:2,2
  319:2 320:2,13
  321:2,2
**e-mail**
124:16,24
**e-mailed**
68:13
**ear**
242:14
**earbuds**



242:18
**earlier**
31:23 102:3 122:23
  128:3 217:11,12
  252:6 257:13 265:7
  303:22 311:15
**early**
12:25 135:12
**ease**
84:24
**easier**
243:14
**easily**
267:15
**East**
2:8
**Eastbound**
106:4
**eaten**
237:16
**echo**
243:2
**edition**
59:15,18
**EDNY**
70:25
**education**
294:16
**educational**
36:9 38:2 50:11
**effect**
3:12,15 146:13
  184:18
**effort**
7:13 12:20 132:3
**efforts**
130:18 132:2 261:14
**eight**
258:9
**either**
61:21,24 71:24 77:23
  89:25 115:24
  159:23 220:21
  258:12 263:3
  296:24
**eject**

248:18
**ejected**
158:15 235:22
  236:15 313:6
  314:22 315:7,13
**ejector**
314:15
**ejects**
313:9
**elderly**
205:24
**electric**
218:16 263:3
**electrical**
60:18 62:9 72:11
  75:22 76:4,6,11,15
  76:17,21 81:9
  220:22,24 222:17
  222:23 223:3,11,14
  223:23 224:7,7,14
  224:23 225:12
  233:3,25 234:22,24
  256:23 268:22
**electronic**
7:21
**electronics**
96:21
**elements**
44:21 45:21
**eliminate**
118:8 258:18 268:21
  269:22
**eliminated**
265:18 268:11
  270:23 274:23
**eliminating**
209:25 279:6
**elimination**
270:21 271:20,24
**emergency**
188:24
**emotional**
21:2,16
**employees**
39:6,15
**employment**

38:3
**empty**
316:21
**ends**
68:2
**energize**
73:22
**energized**
73:20
**energizing**
74:13
**energy**
112:6 236:7 242:3
  248:18 249:7,15,16
  249:20,21 310:17
  311:6 313:10,23,24
  314:5 317:4,5,5
**energy-wise**
310:9
**enforcement**
12:3 246:2
**engineer**
37:6 53:4,6
**engineering**
53:7
**enlisted**
37:11
**enter**
285:3,24,25 286:8,17
  288:8 292:3
**entire**
65:19 90:3 111:18
  114:11 147:21
  166:25 258:22
  262:10 298:16
**entirety**
208:6 238:3
**entity**
92:20 241:4
**equalized**
167:17
**equalizes**
159:7,10 192:11
**Equally**
7:12
**equipment**

14:25 233:15
**ergo**
145:10
**escape**
150:17
**especially**
251:15 298:8
**ESQ**
2:9,13
**essentially**
74:18 87:7 132:6
  177:5 247:4
**Estate**
1:4,5 2:5,7
**estimate**
78:23,24 312:8
**etcetera**
255:4
**evaluate**
305:8
**event**
48:19,19 120:20
  140:23 196:4
  208:23 209:16
  213:11,24,25
  215:14 220:22,24
  222:5,24 223:3,24
  225:2 234:25
  241:19 257:24
  258:8 283:18
  292:14
**events**
108:8 110:24 111:16
  236:4
**everybody**
261:10 262:5 280:8
  309:11 317:14
**Everybody's**
148:20
**everyone's**
120:19
**everything's**
107:10
**evidence**
12:13 14:22 18:25
  19:2,22 25:12 28:19



28:22,25 29:25 30:7
30:14,22 31:8,19
33:2 34:2 35:16,18
66:19,23 88:16,20
88:21,22,25 89:2,5
119:24 120:12,17
122:25 130:12,14
131:11 132:23
134:12,23 139:18
141:17 146:12
181:18 185:24
194:17,18 195:16
195:20 196:12
198:16 199:3
205:20 211:22
216:11 217:15,22
218:3 224:5 252:20
252:24 253:8,17
254:7,10 258:20
260:11,14 262:18
263:11 265:14,22
268:16 270:5 271:2
272:11,12,13
294:15 297:9 305:6
305:18 308:10,17
309:3,15
**evolve**
61:2
**evolved**
167:4 282:20 284:8
**evolving**
58:24
**exact**
17:16 86:20 100:3,5
100:16 101:8 153:8
219:2,6 231:5,6
296:19
**exactly**
96:23 221:20 277:19
280:4 294:5
**exam**
10:24 11:13 12:5
14:21 19:6 25:21
26:4,5 34:5,8,20,21
35:19 82:9 86:24
87:2,4,22 89:6,24

91:12 93:4,8,15,18
94:24 96:10 102:18
102:19 120:11,13
130:13 132:10
280:10 305:5 312:7
312:20
**examination**
4:7 11:4,5 18:2 29:22
87:10 116:4 255:24
304:24 305:3
318:22 320:15
321:10,12
**examine**
14:22 286:9
**examined**
4:5 86:14,14 309:20
**examines**
109:19
**examining**
40:22
**example**
107:2,19 108:3
113:18 114:2,18
151:15,17 229:20
230:20 231:13
244:21 249:23
254:19
**examples**
109:15,17 224:2
255:21
**exams**
87:14
**excavate**
308:21
**excavated**
103:2
**exceed**
112:19 142:24
**executed**
24:2,4
**exemplar**
99:23 100:2,3,10,12
100:14,15,18 101:2
101:8,11 102:14
104:11
**exemplars**

102:5,11
**exert**
160:19
**exhibit**
38:7 49:6 63:8,11
64:2 65:3,6,9,22
67:18 82:17,18
86:10 135:15 274:4
320:6,6
**Exhibits**
320:4,11
**exhumed**
229:16
**exists**
271:2
**exit**
191:7
**exited**
293:2
**exits**
288:20
**expect**
15:5 101:10 131:3
157:15 158:5
165:23 169:12,16
170:10,25 171:22
172:9 206:20 207:7
207:11,12,16
208:10 214:24
227:9 309:25
**expected**
227:5
**expecting**
297:17
**expel**
316:3 317:10
**expelled**
113:23 114:5,21
228:25 232:7,17
254:3
**expelling**
215:17 228:8 290:7
292:17 317:3
**expels**
112:12 315:24,25
**expended**

158:12 218:5,12
241:20
**expending**
196:11
**expense**
67:9,11,13,15
**expenses**
66:8,14,17,20 67:4
**experience**
38:2,3 40:21,23
51:21 160:16
182:23 269:4
294:17
**expert**
48:6,15 49:14,18
50:6,8,13 51:2,13
51:17,20 52:6,10
64:2 81:18 93:25
94:2 252:23 261:11
270:12 274:19,20
302:11 306:25
312:6,18
**expertise**
97:25 103:16 122:2
**experts**
10:21,23 11:3,20,21
11:22 18:22 54:12
57:15 260:2,18,19
263:14 274:23
275:3 277:8 306:24
**explain**
207:17 270:13
295:16
**explained**
270:3 289:10
**explanation**
164:17 203:19
230:19 298:11
313:25
**explode**
112:16
**explosion**
72:17 81:10,23 82:5
110:22
**Exponent**
18:12 19:13 20:2



24:15 26:13 274:21
274:25 276:16,25
293:17
**expose**
257:23
**exposed**
222:5 231:9 300:7
**exposure**
223:19 272:25
**extended**
227:14
**extensive**
301:4
**extent**
251:25
**exterior**
88:5 107:20
**external**
108:4,6
**extinguish**
207:24 243:21
244:13,14 245:8
282:25
**extinguished**
195:3 232:18 243:25
**extinguisher**
186:2,2 244:17 245:9
245:11 283:8,25
284:2 287:3,14
288:21 290:24
293:2
**extra**
7:19 70:17
**extraordinary**
30:9
**extremely**
101:7
**eye**
177:25 204:19
**Eyewitness**
198:15

———————————
**F**
———————————
**F**
3:2 226:23 303:19
321:2

**fabric**
151:19
**face**
231:8
**facilities**
39:11 42:4,9,12
46:16 47:15
**facility**
10:23 11:5 35:20
39:13 41:16,19,24
41:25 43:13 44:16
45:15 46:7,10 89:7
102:19 108:2
117:24 160:17,17
**fact**
17:3 116:14 146:14
154:10 184:18
190:12,18 220:20
233:7 269:11
**factor**
15:18 46:17,21
**factors**
15:17 48:6,14 49:24
250:4,10,18,23
251:3,21 252:3,9
271:14 302:14
**factory**
72:13 81:11 128:22
**facts**
254:24 255:11
267:22 271:16,17
**faded**
23:21
**fading**
114:10
**fail**
113:7,17 159:18
194:8 197:18 248:6
303:7
**failed**
73:24 74:3 227:13
235:17
**failing**
195:7 244:5
**fails**
237:9

**failure**
49:9 72:4 91:22
103:10,24 105:2,12
112:11 214:8,14
215:18,25 216:13
219:12 235:5
241:23 259:2,12
279:9 292:11
310:11
**failures**
109:18 250:9,14
314:19
**fair**
13:23 31:8 34:12,13
43:2 46:17 47:21,22
52:5,18 56:6,9
58:20,22 59:4 63:3
75:17 76:25 78:22
80:2 82:7 83:16,22
90:19 93:23 101:3,4
115:2,3 119:13
123:3,4 125:11
141:20,21 145:13
153:21 154:13,14
178:12 182:10
194:14 216:3 219:9
234:7,8 235:14
236:14 237:18
247:8 248:17 254:4
270:9 310:20
**fairly**
146:12
**fake**
150:19
**fall**
163:10
**falls**
125:24
**familiar**
13:8,10 91:17,21
98:13
**familiarity**
6:2 99:16 109:17
**fan**
155:25 156:5,7,11
298:12

**fans**
155:20,23 156:9,25
**far**
5:17 8:17 72:21
131:17 276:16
**Faraci**
2:4 22:15 79:12,23
80:24 81:13,15,19
81:22
**fast**
70:8,13 198:15
**faster**
64:18 294:22 295:10
295:12
**fatalities**
82:2
**fatality**
20:23 21:10,15
**faucet**
159:22
**fault**
71:25 273:14
**features**
104:20 105:4,7,10,10
106:9
**February**
86:15 210:7
**federal**
1:21 2:12 72:10
234:14
**feedback**
221:10 242:25
**feeding**
221:18
**feel**
63:18 152:10 259:21
306:3
**fees**
66:24 67:2
**feet**
46:5 165:3 197:21
226:11 276:8 285:9
314:25 315:3
**fell**
162:5
**felt**



19:24 25:18 261:2
275:4 276:11 277:7
293:18
**female**
269:5
**fewer**
36:5
**FFA**
12:2,8
**field**
15:20 16:10 57:6
58:25
**fighters**
179:15
**figure**
103:15 105:22
116:11,12 118:10
119:6 123:21
124:20 129:10,11
129:11,12 130:2
147:4,16 160:21
185:11,21 191:11
191:21 193:18
194:10 195:24
199:6 210:4 211:13
211:20 212:2
214:22 215:8 224:9
225:13 226:15,25
228:9 229:15 230:3
290:18 295:19
300:10,13 304:10
304:19 306:10,16
307:7 308:25
309:18 311:19
313:13
**figures**
115:12,22 118:10
129:15,16 229:4,11
232:20
**file**
78:8 261:10 273:13
**filed**
4:21
**files**
72:9 76:22
**filing**

3:7
**fill**
149:22,25 192:2
**filling**
149:21
**final**
15:11 252:13 268:19
**finally**
245:6 252:10
**find**
27:23 28:3 29:5,24
30:13,19 32:13
100:5,9 101:7,21
126:21 133:5,9
137:10 138:23
219:2,5 222:16
224:22 251:13,15
256:3 257:3,25
258:10,11,12,17
272:4 310:4,5,10
315:19 316:6
**finding**
59:20 133:15 261:17
**findings**
82:20 233:25
**fine**
6:16 58:18 63:22
127:25 151:16
238:13 243:4
270:14
**finish**
7:5,15 12:21 88:7
205:25
**finished**
7:17 82:8 127:16
**finishes**
230:16
**finishing**
7:9
**Firachi**
69:7
**fire**
4:23 5:5 8:6 9:18
10:20 11:3,10,12
12:4 14:10,16 15:18
15:22,25 16:5,16,17

16:20 17:9,25 28:8
29:20 36:23,25 37:2
39:2,4,7,8 40:20,22
42:4 43:22 46:17,20
48:13 50:14 52:6,17
52:17 53:20,22 54:3
54:22,24 55:8,22
56:11,16,25 58:24
59:16,23 60:15 61:5
62:11 72:2,11,14
73:25 74:23 75:5,23
76:7,20 79:21 81:9
81:11,25 87:17
93:21 94:8 95:3,10
105:3,12 107:16,20
108:5,7,8,16,21
109:6,12 110:15,21
110:25 112:8 113:3
113:18 115:8
117:13 119:2,4
120:19 129:20
130:11 132:25
133:2,25 134:2,15
135:7,20 136:4
142:7 143:8 144:5,9
145:23 146:8 147:8
147:21 149:8,17
153:2 154:16 158:2
158:5,10,14,17
160:20 163:10
164:21 166:15,18
167:3,4,10,23
174:17 175:20
176:12 177:16
179:14 180:22
181:15,21,23
182:16,18,23 183:6
183:18 185:11,17
185:22,25 186:2,6,8
186:12 188:11
190:14,24 191:12
191:15,24 192:24
193:8,9,23,25
194:16,20,24,25
195:2 196:20,24
198:10,14,16,23

199:15,20,25 200:8
204:3,9 208:13,23
209:8,12,14,16,18
209:23 210:2,17
211:17 212:9 213:6
213:10,24,25 215:2
215:2,9,10,13,14,22
216:5,18,22 217:6,8
218:15,24,24 219:8
221:2 222:5,8 225:2
225:17,19 226:19
227:7,19,23 228:15
229:13,18 230:10
232:16 233:13,13
233:17,18,19 234:9
234:11,25 239:17
241:19,21 242:3
243:23 244:11,21
245:8,25 247:18
248:6,8 250:5,11
257:10,11 258:8
259:11 263:19
264:3,7 265:19,19
265:22,23,24,25,25
266:3,4,10,12,16,24
267:24 268:6,12,12
269:9,10,14,22,23
269:23 270:22
272:10 273:8,10
277:5,9,13,16,23,24
278:3,10,24 279:3,7
279:14 280:6 282:9
283:6,8,18,19,25
284:12 285:16
287:3,5,13,14
288:21 289:12,24
290:8,10,23 291:25
293:2,15 294:22
295:2,7,13 297:25
299:16 301:23
302:7,13,14 303:12
303:24 305:21
307:22 310:8
314:20 317:25
**fire's**
166:23 167:15



fire-car
113:21
fire-related
45:4 48:9 49:19
firefighters
177:6 178:17
fireman
199:19,22 201:7
223:5
fires
41:23 42:19,24 43:7
45:16 46:14 47:18
47:20 55:11 71:19
76:18 107:19,21
149:14 227:12
258:2 302:22
firewalls
283:10
firm
76:10 79:6,17
first
4:3 5:2 23:5 87:19
110:13 111:6,15,24
112:4,6,8,9,21
113:8,11 115:5
126:18 136:22
145:12 160:24
161:21 206:14
210:6 219:13 220:2
222:6 223:21
235:10 246:17
250:7,13 254:5
271:12 274:3,10
275:9 279:20
282:15 283:23
284:6 285:22
286:21,22 287:16
287:18,24 288:14
288:16,25 289:5
290:4 291:21 292:9
292:22 294:4
296:14 304:15
307:8 317:20 319:5
first-party
69:15
fit

251:18
fits
251:19
five
79:25 80:4,6 81:21
113:24 152:24
205:10 245:5 246:6
246:14,20
flame
207:22 208:23
244:23 245:2
259:14,16,19
266:13 310:18
311:7
flames
159:23 230:6 282:17
282:18 286:7,16
290:22
flaming
208:19 229:22
230:15 232:8
292:16 298:8
flammability
247:11
flammable
266:6
flash
246:5,22 303:12,14
flashes
283:17
flashover
245:4
flat
299:10
fled
225:18
flies
316:2
floor
107:6,8 162:5 163:10
163:19,22 165:4
169:12 170:6,10,22
180:13,20 206:17
210:5,9 228:8
232:15 238:22
266:18,19 301:25

303:16
Florida
39:11 41:25
flow
271:16 301:2 312:22
flux
206:15
flying
286:2,23 288:19,20
focus
217:17 261:14
focusing
309:15
foil
196:13 200:4 218:4
218:20 219:20
235:25 236:7,17,20
237:4,7,10,22
249:23 311:20,25
312:4 313:5,12
foils
244:6
fold
273:5
folks
293:16
follow
20:16 25:23 54:10
57:24 59:13 83:7,16
252:7
follow-up
16:22 20:13 26:12
257:19
followed
26:3 48:12 49:17
following
15:7 20:15 32:21
111:10 132:21
138:6 210:4 218:7
255:6 316:5
follows
4:6
food
204:5
foot
171:5 226:6,8,11,14

force
3:15
forces
193:17 194:10
195:24
forefront
60:4
foregoing
319:8
foreground
116:25
forensic
39:13 57:5
forensically
14:21 209:10 268:9
forever
134:8
forget
120:21
form
3:21 25:22 26:23
31:18 166:19
191:17 192:22
231:21,22 250:7
275:19
formal
75:8 275:17
format
275:18
forming
185:2
formulated
271:13
formulating
255:22
forth
13:19 67:6 82:19
321:11
forward
20:20 67:15
found
28:13,18,21 29:2
30:7,22 113:25
128:17 130:22
139:2,20 140:25,25
141:11 161:2,22



163:18 164:19
171:13 173:12
186:3 194:19
196:13,14 217:15
217:24 218:19
228:13 233:3 237:2
237:23 241:25
245:24 252:25
254:2,14 255:12,24
261:15 262:18
267:5 270:24
309:17 311:4 314:9
314:13 315:22
317:9
**four**
59:17 63:24 79:25
219:23 220:20
221:3,5 222:10,14
222:18,19,20,23,25
224:10,19,21 225:3
233:23 234:17
245:4,15 246:6,13
246:20 276:8 277:9
**four-foot**
201:14 202:16
213:12
**four-year**
36:16
**FPDU**
71:10,13,18 81:11
**free**
63:18 83:7
**Friday**
63:6
**fridge**
199:7 202:11
**front**
25:13 79:2 120:23
228:7 231:3 266:22
279:22 296:2
**FRT**
33:17,23 34:9 304:21
**fuel**
17:3,6,9 110:13
111:6,15,24 112:4,6
112:8,9,21 113:4,8

113:14 114:22,25
115:5 207:24 208:3
208:9,18,25 209:3
219:10,13,14,18
229:18 230:12
239:6 244:12 250:8
250:14 271:12,14
298:15,20 299:4,20
307:21 315:15
317:2
**fuels**
113:16 114:8 229:13
236:18 237:3
241:16,18,24 247:3
247:22 304:17
**full**
119:21 167:5 204:17
204:21,24 226:19
226:22 245:3,7,10
277:25 283:3,14
288:4 290:14,24
291:2,8 294:20
**full-time**
246:21
**fully**
167:24 282:19
283:20 284:8
291:24
**fuming**
154:22
**funny**
258:3,4
**furnace**
204:14 209:4,5,7,11
209:13,16,20
211:17 265:13
278:6,7,15,17,21,23
279:3,13,19 280:23
281:2,8,12 282:7
**furnish**
264:25 265:10
**furniture**
71:13
**further**
3:20 138:13 234:2
244:9 253:14 271:5

296:18 304:23
305:2 306:8 319:8
321:14
**fuses**
106:12
**future**
89:6

---

## G

**game**
38:7
**gap**
221:22
**garage**
89:3 107:5 113:19,21
113:23 114:14
175:22 176:10
**garbage**
180:17 311:12,12
316:13,14,17,20
**gas**
60:23 191:16 192:13
192:23 193:13
206:12,16 209:17
213:16 217:9
225:21 300:16
**gases**
171:24
**gaskets**
236:4
**gasoline**
253:16,17,18
**general**
27:2 34:15 69:8,10
87:12 89:20,21
97:18,25 143:13,14
251:8
**generally**
44:13 54:16 56:10,17
58:13,17,20 79:7
87:9 106:18 186:15
208:11 219:3
255:17
**generated**
60:6
**generates**

271:9
**gentleman**
173:14
**getting**
42:25 78:20 102:14
151:10 161:13
177:15 221:10
231:14 242:24
252:8 297:10
308:23
**give**
30:19 36:8 37:25
38:12 50:25 71:5
72:23 87:15 88:14
111:6 126:18 143:9
150:25 152:11
178:19 221:17
246:20 303:18
304:4 305:11,18
**given**
22:19 50:8 87:16
132:17 158:3,18
195:22 319:10
321:13
**giving**
7:6,12 114:17 142:20
224:2 244:20
245:23
**glove**
251:18
**glow**
279:19 282:9,18,21
283:2,6,13,16,18
284:6,9,10 285:15
287:5,12,16,18
288:23 290:4,5,11
292:25
**glowing**
199:13,24 202:7
203:5
**glows**
287:24
**go**
6:17 13:19 20:24
21:5,19 31:13 38:7
47:12 55:22 60:21



61:23 64:17 67:6,17
72:6,9,15 77:11
81:16 87:14 96:13
99:5 101:17 106:22
107:15 109:14
112:16 115:10
137:2,19 144:17
151:16 155:4 157:9
160:19 162:8,15,24
164:15,16 166:22
174:18 183:17
187:19 188:10,16
191:19 192:9
195:11 196:7
197:18,24 216:16
218:22 220:6 226:2
228:20 238:18
239:22 242:14
248:10,16 273:19
277:18 281:7,16,17
281:20 282:2,2,24
283:5 284:4 287:23
288:20 294:7
298:10 300:5,9
308:5 312:5 313:18
316:8,16,16,22,23
317:15
**goal**
6:19
**goes**
56:24 63:5 67:24
108:3 136:25
149:16 159:8
184:23 193:24
206:5 231:10
254:16 271:6 287:3
288:16,18 290:13
291:6 299:22
306:25
**going**
10:11 22:3 32:23,25
39:25 44:23 45:24
47:3,4 55:22 56:3
60:23,24 62:23 63:7
64:16 65:2,6,21
67:16,18 72:20

76:22 82:24 83:3,5
83:9 84:25 85:4
88:15 94:11 98:20
98:21 100:9 104:4
114:4,7,19,21,24
115:10,11 116:18
118:9 126:17,21
127:8 135:10 137:8
137:11,18 144:10
149:20 152:18,19
152:20,25 153:14
153:15 159:4,9,9,22
160:18 162:15
163:11 167:10
168:4,9,10 174:18
178:19 190:4 191:6
191:10 193:10
194:22 197:5,11,16
197:22 201:24
202:12,15,16
205:18 207:13,14
207:23,24 208:4,18
209:21 212:25
213:20 216:9
218:22 219:5 231:7
231:20,21 233:17
235:13 236:7 245:7
245:12,21 246:10
248:12 249:10,14
249:16,20 250:21
251:19 255:7,8,14
255:25 256:21
258:11 261:9
272:21,22 273:6,12
273:18 276:7
277:17,20 279:10
280:23,25 282:18
282:20,24 283:16
283:17 284:14,18
285:13 287:10
290:7 292:19
298:19,20 302:11
302:18 303:7
304:14 305:11,12
305:14,16 308:16
308:17 309:24,25

310:8 313:9,23
316:9,9,10,10
317:11,15 318:12
**good**
12:25 14:24 39:25
64:23 82:23 83:2
101:15 107:10
114:2 187:18
230:12 246:15
**Gorbit**
87:25 260:7,11 309:8
**Gorbit's**
130:21
**gotten**
62:11 147:23 162:7
164:6 310:2
**govern**
96:20 97:12
**government**
96:17
**governor**
87:8
**grabbed**
283:8
**gradient**
213:8
**graduated**
38:17 134:5
**graduation**
38:4
**grain**
132:19
**Grand**
71:16 75:12
**great**
8:16 120:19 197:23
213:21 275:23
**greater**
214:5 239:22
**Greg**
87:25 88:3,7,7 89:2,4
130:21 260:7
307:13,14,14 309:8
**Greg's**
307:16,18
**ground**

46:5 156:2 228:5
301:21 316:2
**group**
35:5 60:14 62:8
258:6
**groups**
11:9 34:15,23
**grow**
191:25 209:2
**grows**
198:16
**growth**
196:20,24 198:10
**guess**
9:23 10:10,24 11:8
17:5 30:8 31:6,6,9
34:17 40:17 42:2
45:19 49:15,23 59:7
66:4 67:8 89:15
94:5 106:5 113:2
121:24 149:5,20
150:9,10 152:15
156:3,3 159:6
173:22 188:20
189:8 207:17 219:6
229:15 239:21
249:11 257:19
259:24 290:6
298:22 303:17
304:14 307:6
308:23
**guidance**
42:17
**guide**
54:2,6,8,9,17,19,24
55:2,20 56:10 57:21
57:22 261:6,7

---

**H**

**H**
320:2
**half**
142:14,21 197:6
237:15 245:5 246:6
246:14,20 312:14
**hall**



144:17 281:8,8,12
281:13,16,20 282:8
283:5 287:23
**hallway**
139:10 140:20
141:14 142:6,9,13
142:19 145:9,11,18
146:21 150:18,20
154:22 155:9,17
159:8,10 210:5
212:9 238:18,24
281:16,18 282:3
285:6 287:7 291:7
291:10,24 294:19
**Hampshire**
73:10
**hand**
7:7 197:12 321:20
**Handbook**
55:15 57:8 91:18,20
**handed**
306:23
**handheld**
244:17 245:11
**handle**
69:15,16 78:13 79:15
80:16 88:15 105:16
235:19
**handled**
42:5 45:2 80:6,19
81:24 82:2 256:24
**hands**
175:19
**handwritten**
200:2
**happen**
172:7 196:2
**happened**
107:22 114:15 172:8
174:21 176:11
177:10 178:16
181:7 224:9 280:7
288:15
**happens**
168:4 258:2 314:21
**hard**

223:8
**hardwired**
136:25 137:4 138:20
138:22 139:10,18
140:23 141:15,23
142:5 144:17,21
145:10,11,14
146:14
**hat**
230:25
**haven**
292:2
**hazard**
43:6
**head**
68:19 82:15
**header**
191:22
**hear**
84:10 114:11 153:13
160:5 277:4 303:24
**heard**
6:18 136:11 154:10
238:4 259:13,18
**hearing**
75:12 267:21
**heat**
74:16 108:8 113:4
156:19 167:15
191:18 192:8,9,16
192:23,25 193:2,3,8
193:12,16 194:3,5,6
194:7,21 195:2,10
196:4 197:16,23
209:3 213:8,11,14
213:18,19,23
214:15 215:19,20
215:23 216:14,15
216:23 223:4,5,19
225:19,20,23,25
226:9,21 230:23
231:13,23 236:8
241:4 242:3 249:21
258:24,25 259:9,10
259:13,16,19 276:7
276:18 285:18

286:7,16 290:21,22
298:15 299:19
300:21,22 301:3,5,6
301:8,9 302:5,6
303:12 313:15,24
**heat-wise**
310:9
**heated**
209:17 247:16
**heater**
73:14,16,24 74:8,19
81:8,24 82:12 105:7
**heats**
231:2
**heavier**
170:3
**height**
143:2 171:6 197:15
**held**
10:9
**help**
114:3 162:21 163:9
190:6
**helped**
35:6
**helpful**
77:9 89:9 98:16
114:13 142:3 150:9
290:17
**helping**
34:20,22
**helps**
180:7
**hereinbefore**
319:11 321:11
**hereunto**
321:19
**hey**
251:17
**hide**
309:10
**high**
36:10,12 134:5
248:11 276:8 279:9
**higher**
226:11,15 297:14

309:23 310:7
**highest**
36:10
**highlight**
243:15
**highlighted**
110:8 227:2 242:20
243:5,11 262:22
**highly**
196:21
**hissing**
160:5
**historian**
120:19
**hit**
107:9 183:15 248:12
**hitting**
168:3 169:6 248:11
**hold**
7:6 49:13 52:5 70:8
**holder**
116:8,13,15
**holders**
115:24
**Hollowell**
1:4,5 2:6,7 4:25 27:8
134:19 135:6
160:25 161:22
165:7 166:6 169:3
169:11,20,25 173:4
173:13 176:25
179:10,14
**Hollowell's**
171:12 267:3 294:23
**HOLLOWELL-M...**
1:5 2:6 4:22
**home**
154:23 155:18
299:17
**homework**
261:18
**hope**
161:8 273:19
**hoping**
209:20 232:4 280:23
280:25 282:7



284:20 317:13
**horizontal**
206:20 207:7,8,15
208:13,14,17,21
230:14 231:14
232:16 246:12
296:9,10 299:5,13
316:25
**horizontally**
299:10
**hot**
46:10 171:24 191:16
192:13,23 193:13
206:12,16 213:16
216:16 217:9
225:21 235:7,20
238:14 303:4,11
**hours**
78:10,15
**house**
30:11 107:4 117:6
119:21 121:3,10
130:10 133:25
134:2,11 136:6
141:7,23 145:5,8,25
146:10,23 147:11
148:13 152:21
156:25 157:6 159:5
163:9 181:23
189:21 198:22
200:7 216:21
233:16 257:20
260:12 263:25
267:12,23 268:22
273:7,8,9 301:24
302:2,3
**housekeeping**
5:9
**houses**
107:23
**hovering**
157:12,21
**Hp**
1:10 2:11 4:17 10:23
11:21,22 13:8,12,18
13:19,22 42:2 84:17

84:20,22 93:6,22,25
95:10 100:19 104:7
113:13 136:5 142:8
145:24 146:9 147:9
149:9 158:6,8
166:19 168:11
212:10 227:5 235:5
243:24 274:14
295:20,24 296:4,20
**Hp's**
274:19
**Hp424**
175:12 178:25
**Hp450**
116:24
**human**
48:6,14 49:24 250:9
250:15,17,23 251:3
251:20 252:3,9
**humans**
181:13 186:11,17
**hundred**
178:19
**husband's**
269:9
**hypotheses**
14:5 254:21 259:3
270:4,7
**hypothesis**
15:10,11,12 59:14
198:18 217:20
252:12,12,13 255:7
268:19 270:8
271:10,13 275:7
318:6
**hypothesize**
114:15
**hypothesized**
193:20 196:2
**hypothesizes**
194:12
**hypothetical**
203:2

---
**I**
---

**IAAI**

36:24
**idea**
78:9 121:4 264:21
293:12
**identical**
100:16
**identification**
63:11 65:10 110:12
111:5
**identified**
14:9,15 65:22 307:19
**identify**
88:23 104:5 239:16
**identifying**
239:18,23 252:2
270:22
**IEEE**
99:17,18
**ignitable**
266:7
**ignite**
112:4,6 227:13 228:2
230:16 232:13
236:8 240:7,16
241:4 244:7,23,25
247:6 249:17 279:4
298:17,18,19
307:11,22 310:17
311:6 314:7 315:14
317:4
**ignited**
111:24 113:12
158:16 219:11,19
227:24 229:12,17
230:6 235:8 236:18
238:15 239:3,16
241:16,19 244:8,11
253:16 271:12
288:23 301:9 302:5
304:17 305:21
310:12 314:15
315:7
**igniting**
111:15 114:24 244:4
**ignition**
12:11 41:8 55:15

57:8 110:13,24
111:5,14,15,22,23
112:3,10,10,18
113:7,11 114:6
142:17 172:24
197:2 198:12 204:7
207:11 217:25
218:3,14,18 223:14
224:8 236:2,21,24
237:19 247:21
250:6,12 252:18,20
252:24 253:9,19
254:2,7,11,22,23
255:11,23,23 256:3
256:18 257:4 263:7
270:22,24 271:11
271:14,14,25 272:2
272:5,13 297:6,10
298:8 299:25
301:11 305:7
307:20 314:12
**Illinois**
72:16
**illustration**
191:12
**image**
225:14 230:22 307:7
**images**
35:15,15 181:10
199:10
**immediately**
147:5 157:25 183:24
282:8 283:7
**impacts**
299:18
**import**
78:3
**important**
7:19 58:6 125:20
126:8 143:20,21,23
144:9,12 154:9,13
181:14 186:10,16
309:6
**impossible**
101:16 183:8 276:18
**impression**



93:8 94:20
**improper**
106:24 107:13,14
108:9 109:4,11
**improperly**
42:25 48:18 50:20
250:19
**improve**
295:14
**in-house**
67:14 100:13
**inaccurate**
77:23
**inappropriate**
27:4 42:16 271:8
**inappropriately**
270:21
**incendiary**
256:25 265:22,23,24
265:25 266:4,10,16
269:22
**incense**
256:24
**inch**
129:17 312:13,14
**inches**
171:7 312:9
**incident**
33:18,21
**incipient**
194:3 215:18,24
226:18 292:11
**include**
41:6 60:18 235:6
250:6 273:15
**included**
149:15 254:12
256:11,15
**including**
36:7 235:9,16 241:15
275:14
**inclusive**
35:25
**inconsistency**
29:17 30:6,8 31:4,10
31:20 32:10,17

178:6
**inconsistent**
28:25 181:4 214:4
**incorrect**
27:10 57:4,7,7,8 58:5
58:6 77:24 183:21
199:17 251:13
271:10
**increase**
302:15
**increased**
294:24 295:11
**incur**
66:8,14
**indicate**
182:8 203:7
**indicated**
83:7
**indicates**
212:10
**indicating**
124:21 200:17 211:8
**indication**
15:15 29:20 180:10
**indicators**
295:22
**individual**
121:25 122:10 191:8
**individually**
1:3 2:5 308:3
**individuals**
62:2
**indoor**
45:8,9 46:16 47:16
**indoors**
45:16
**industry**
57:23 99:10,25
100:15 112:19
273:16
**infer**
146:18 253:19,22
**inferences**
271:16
**inform**
30:18 255:16

**information**
19:25 60:18 111:7
115:15 131:9 135:2
143:12 256:12
275:5 276:2 280:5,9
293:18 305:11
320:18,19
**informations**
291:17
**inhabitants**
198:22 200:7
**initial**
17:19 18:2,18 19:6
25:14 26:4 87:22
263:8 272:24 276:3
280:9,10 293:15
**initially**
87:13
**initiation**
213:25 292:10
**inject**
235:23
**injected**
235:21 237:12 238:2
244:6 247:4
**injecting**
244:5
**injection**
235:7
**injects**
236:22
**injury**
69:20,22
**input**
58:3 61:16 62:2,3,6
**inputs**
60:12,16 61:21,22
62:13
**inquiries**
20:20
**inquiry**
56:4
**inside**
44:18 45:8,20,22
46:10 209:12
212:16,20 279:4

**inspect**
183:17 215:7 229:7
**inspected**
262:10
**inspecting**
97:9
**inspection**
14:20 17:19,21,22
88:6 93:12 94:3,3
187:17 189:6
225:12 239:14
268:20 293:16
308:20
**inspections**
102:9
**installed**
94:18 121:20 130:4
131:25 132:13
**installing**
122:3 125:15
**instance**
117:11
**instances**
16:6,9,15 20:2 44:25
76:7
**instant**
152:18
**instructions**
77:17
**insulation**
278:8
**insurance**
17:18 38:18 273:5,11
273:16
**insured**
21:6 117:9
**intact**
133:19 228:17
**intended**
124:23 125:18
143:25
**intense**
165:21 169:9
**intensity**
191:25 214:5
**intent**



228:19
**intentionally**
71:19 266:8 268:6
**interest**
265:17 269:16
**interested**
321:17
**interesting**
42:13
**interior**
88:11,12 158:12
    265:3 285:7
**internal**
39:4
**interpretation**
125:19 178:14
**interrogatory**
27:6 126:23 184:15
**interrupt**
7:14
**interview**
19:20,21 20:6,19
    21:21 22:4,11 26:10
    133:7,10
**interviewed**
20:10 24:19 187:3
**interviewing**
20:25
**interviews**
21:14 32:23,25 133:3
    133:4 263:21
**intrigued**
264:20
**investigate**
128:22 250:24,25
    252:5 264:25 265:5
**investigated**
28:20 154:2
**investigating**
55:11
**investigation**
11:18 15:5,6 32:14
    39:2,5,7 48:22
    50:14 52:6,23 54:3
    54:22,24 55:8 56:11
    57:2 79:22 90:12

103:7,13 104:24
105:20 106:17
111:18 129:4 131:5
133:2 143:22 154:5
184:22 220:5 234:2
234:6 239:17 252:6
263:8 269:19
302:13,15 314:11
318:2
**investigations**
53:23
**investigator**
36:24,25 87:17,18
    96:5 182:17,23
    199:12,20 211:3
    220:25 223:22
    296:16
**investigator's**
11:16
**investigators**
12:8 25:2 26:2 27:25
    37:3 53:20 56:16
    116:19,23 220:22
    228:16 271:3
**invoiced**
66:13
**involve**
21:10 71:7,19,20
    72:25 73:2,20 80:8
    80:12
**involved**
37:14 71:8,10,18
    73:11 80:15 81:6
    90:10 167:24 264:3
    283:20 291:25
**involvement**
167:5 226:19,23
    245:4,7,11 246:22
    277:25 283:3,15
    288:4 290:14,25
    291:2,9 294:20
**involves**
20:22 21:15 50:2
**involving**
254:21
**ion**

41:12 42:6 73:4,7,9
    74:6 80:11,12,15,17
    80:19 97:12 103:18
    106:3 218:20 303:6
**ISO**
35:2
**isolated**
214:4
**issue**
43:12 46:20 47:7
    61:6 84:17 106:23
    106:24 131:8,23
    187:22 193:22
    194:2 195:6 221:14
    234:10 249:19
    275:18 278:16
    284:20 286:24
**issues**
19:14 26:15,18 32:5
    32:8 45:4,7 48:9
    52:24 59:24 61:4
    76:11,15,17 181:3
    189:5 234:20,21
    298:12
**item**
14:20 92:15 113:11
    231:14 300:17
    304:21 306:15
    313:12
**items**
14:18 18:12,15 20:5
    43:9 50:17 106:13
    207:6,7 208:12
    235:24 240:6
    262:23 299:10
    300:2

—————————
        **J**
—————————
**J**
4:1,2 5:1 6:1 7:1 8:1
    9:1 10:1 11:1 12:1
    13:1 14:1 15:1 16:1
    17:1 18:1 19:1 20:1
    21:1 22:1 23:1 24:1
    25:1 26:1 27:1 28:1
    29:1 30:1 31:1 32:1

33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1



187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
**Jackie**

39:19 291:15
**Jaclyn**
2:15
**Jacqueline**
297:21
**Jacqueline's**
273:9
**jail**
269:3
**January**
4:23 5:6 46:4 148:11
   182:2,7 289:18
**Jason**
1:19 4:11 27:13
   319:15
**Jeff**
11:17 87:16
**jelly**
237:5,7,22 247:5,22
   248:7,18 249:3,8
   255:13 272:5 304:7
   305:17
**Jersey**
38:18
**Jessica**
1:4 2:6 4:22
**job**
8:16 35:4 38:18,20
**joined**
39:18
**joint**
11:13 34:4,8 35:19
   87:14
**Judge**
3:13
**July**
17:12,12 128:15
**jump**
72:5
**Jury**
71:16 75:12

———————————
K
———————————

**K**
4:2,2
**Karasinski**

1:19 4:1,11,15 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1,5
34:1 35:1 36:1 37:1
38:1 39:1,16 40:1,3
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1,14
64:1 65:1 66:1 67:1
67:21 68:1 69:1,2
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
77:10 78:1 79:1
80:1 81:1 82:1 83:1
83:5 84:1 85:1 86:1
87:1 88:1 89:1,11
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1,2 118:1
119:1,6 120:1 121:1
122:1 123:1,25
124:1 125:1 126:1
127:1,12,17 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1,16 136:1
137:1,14,23 138:1
139:1 140:1,10
141:1,6 142:1 143:1
144:1 145:1 146:1
147:1,7 148:1 149:1
150:1 151:1 152:1

153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1,22
161:1,24 162:1
163:1 164:1 165:1
166:1 167:1 168:1
168:13 169:1,8
170:1 171:1 172:1
173:1,19 174:1
175:1 176:1 177:1
177:21 178:1 179:1
180:1 181:1 182:1
182:14,15 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1,6 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1,8 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1,6
214:1,7 215:1 216:1
217:1 218:1 219:1
220:1,3 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1,24 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1,6
243:1,7 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1,16
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
274:15 275:1 276:1
277:1 278:1 279:1



280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
291:12 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
308:24 309:1,14
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1,18
318:1 319:1,15
320:1 321:1
**keep**
205:18 316:9,9,9,10
**Kentucky**
72:10
**key**
213:8
**keyboard**
225:16 296:8,10
**Keyence**
90:9,14,15
**kicking**
74:19
**kids'**
31:14 121:4
**killed**
107:23
**kind**
70:7 102:23 114:9,14
148:6 156:4
156:24 184:23
214:24 215:7 241:8
276:11 315:5
**kinds**
44:17 236:14 303:2
**KINGS**
321:5
**Kirk's**
54:22 55:7,14 56:9
56:12 57:7,17 58:20
59:2

**kitchen**
155:10 185:25 186:4
199:8 201:22
204:16 281:5,6,23
283:24 287:22
290:2,3
**knew**
31:24 98:19,19 132:9
280:22,24 311:24
311:24
**knock**
273:23,25
**knocked**
264:6
**knockoff**
92:18
**know**
5:19 6:6 7:9,16 8:10
14:19,21 15:18 22:9
24:3,10 26:14,19
30:20 31:5 32:22
34:6 38:14 39:15
43:8,10 44:21 45:3
45:22,25 47:5,6,7
47:11 49:25 50:16
50:24 51:3 55:17,18
55:21 56:20 57:19
58:25,25 59:3,16,16
60:25 62:19,24 66:4
66:15 68:11,18 69:5
71:11 72:2,9,24
77:9,23 78:7,10
80:3 82:6 84:3,20
85:9,16,16 86:22
87:10 89:23 90:9
94:12,18,23 95:23
95:25 96:11 97:3,6
97:11,16 98:11 99:2
99:4,10,18 100:6,7
101:20 104:15,19
106:13 107:2
108:11 111:11
112:16 113:17
119:16,22 120:22
120:25 121:20
122:23 124:18,20

125:21 126:11
127:13 131:17
134:6,22 137:25
139:6 141:22 144:9
146:3 148:16,25
150:24 151:4,12
152:12 153:11,11
153:22 156:5
159:13 173:17
174:7,11,25 175:22
175:23,24 176:6,11
176:13,13 177:10
177:14 179:15
180:7,25 181:6
184:6,12 186:24
187:17 192:6 197:9
200:9,23,24 201:4
201:15 204:15
205:22,24 217:5,18
221:4 222:19,20,22
223:2 225:7 226:14
231:2,9 233:24
234:5,23 235:15
237:15 238:9 240:8
240:9,12 241:6
243:10 245:18,19
245:21 246:13,19
249:3 253:11 256:8
257:16 263:17
264:22 266:2 273:6
273:12,22 276:13
277:8 280:3,11
286:11,20 289:3
292:20 293:9,11,11
294:17 296:14,16
296:19 303:2,3
305:17,21 306:18
306:22 312:16
316:7
**knowing**
153:4 155:19
**knowledge**
95:7,11 248:4
**known**
112:18 254:24
255:11 270:24

**knows**
33:17,20 314:21

---

**L**

**L**
3:2,2 319:2
**lab**
10:24 11:5 14:21
25:20 34:4,25 35:19
66:24,25 67:2 89:6
89:24 91:12 93:12
93:15 94:3,24 96:10
102:18 120:13
132:10 305:5
306:23 312:7,20
**Laboratories**
96:16
**laboratory**
26:5 34:8,20 93:4,18
275:15
**labs**
39:11
**lack**
271:25
**lady**
269:8
**laid**
34:16
**Lambuth**
36:15 38:5
**land**
187:25 188:3 190:8
**landed**
228:8 232:7 239:3
244:7 310:15
311:16 317:2
**landing**
114:23
**lands**
55:23 316:2
**lane**
69:7 103:21
**Lange**
2:4 22:15 79:12,24
80:24 81:13,15,19
**laptop**



12:12 13:22 17:21
49:8,9 90:11 91:12
94:24 95:2,24
102:24 108:25
109:19 126:2 129:2
129:18 136:5 142:8
145:24 146:9 147:9
149:9 166:19
184:11,14 185:7
196:10,12 197:17
197:24 212:10
213:3,17 214:4,9,10
214:22,25 215:8,17
216:2,4,13 217:2
219:25 220:3
225:24 226:2,5,6,13
227:5,12 229:21
232:7 235:5 241:22
241:23 250:19,20
250:21 251:5 259:5
282:10 283:7
286:24 290:10,11
292:12 295:21
296:2,6,7,20 302:20
307:2 316:4
**laptop's**
225:22
**laptops**
13:11,15,16,20
101:18
**large**
38:24 113:19 237:22
244:21 312:16
**larger**
137:17 173:14
**law**
12:3 38:24 246:2
**lawnmower**
82:3,12
**lawsuit**
4:21 5:4 37:15
**lawsuits**
37:21
**lay**
89:2
**layer**

143:4 147:22 149:19
150:6 156:19
167:25 168:2 169:6
169:9 170:23 171:8
171:10,15,20 172:6
172:13,15,25
191:16 192:8,14,23
193:13 194:3,5,22
195:2 196:4 197:21
206:12,16 209:17
213:11,14,16,18,23
215:19,23 216:23
217:9 225:23 226:2
226:9,21,22 276:18
300:16,22 301:3,9
302:6
**layer's**
159:3 166:24 192:10
**laying**
101:20 179:22,23
228:5,21 229:2
299:10
**layman**
122:4
**layman's**
230:23
**layout**
106:10
**learned**
234:4
**learning**
184:17
**leave**
70:18 165:7 190:25
204:4 267:12
**leaves**
166:22
**leaving**
157:23 195:8
**left**
12:13 38:14,22 39:5
46:24 89:5 162:8
163:21 164:11,15
169:3 170:5 173:5
176:7,16,20 178:3
181:7 199:10

203:11,25 205:14
205:22 206:6
211:20 217:9
229:25 242:6,7
248:14 281:10,13
281:17 282:2
285:10 299:6
313:11
**lend**
255:22
**length**
257:13
**let's**
56:7 74:2 100:21
113:11 136:15
150:13 151:3 159:6
171:18 180:3
214:16 242:19
253:15 273:7 284:3
284:4 289:8
**letter**
57:17
**letting**
7:8
**level**
36:11 157:15,24
159:6,11 172:6,17
172:18 197:14
213:12,15,17
238:22 239:22
300:17 301:25
303:17
**Levites**
2:13 4:8,16 5:8,12,21
5:24 39:17 68:15
77:3,6 190:2,3
320:16
**liability**
273:13
**Liberty**
38:20,21,23,25 39:3
76:8
**license**
276:12
**licenses**
36:21 37:4

**life**
152:5 297:22
**lifted**
51:7
**lifting**
268:21
**light**
117:10 151:20
158:20 207:19,22
208:2,24 244:18
285:14 287:7
298:13
**lighter**
225:21 264:19
**lightning**
256:23
**lights**
152:19
**liked**
22:18
**likeliest**
164:14
**likelihood**
302:16
**limit**
279:9
**limitation**
247:24
**limitations**
149:5 247:20,25
**Linden**
91:19
**Linden's**
91:17,20
**line**
119:7,9 160:24
161:21 190:8
226:15 280:20,21
300:24 320:24
**linens**
247:8
**lines**
63:24 136:16 137:22
138:6,10,14 140:9
187:25 188:3
**liquid**



266:6
**liquids**
266:7
**list**
68:24 69:4 70:5
71:20 72:6 80:22
81:4 255:21 256:5,6
256:22 259:3 263:2
**listed**
51:24 55:19 76:23
85:25 96:12 97:2
137:22 240:17
**listing**
96:15
**lists**
256:17
**lit**
119:2 264:13 269:8
**lithium**
41:12 42:6 73:4,7,8
74:6 80:11,12,15,17
80:19 97:12 103:18
106:3 218:20 303:6
**litigation**
307:23
**little**
23:23 30:9 31:10
39:22 40:18 64:17
70:8 135:12 138:13
161:12 191:21
198:5 200:22 231:2
243:14 246:16
247:2 293:22 294:7
294:11,14 296:18
297:4 302:8,9
313:14
**Litzinger**
10:7,16 11:22 29:15
33:22 35:21 36:2
52:16 219:22
220:17 223:18
264:5
**live**
149:12,13
**living**
11:19 121:8 155:10

156:2 262:25
263:23 277:2 281:6
290:3 302:6
**LLP**
2:4
**load**
16:10
**local**
8:6 9:18 10:20 11:3
11:10,12 12:3,3
24:25 25:17,25
26:11 27:25 87:17
96:4 116:19,23
135:3 185:17 186:6
199:12 220:22
223:21 234:25
246:2
**local's**
200:4
**locals**
19:23 185:14,19
**locate**
129:24 130:18,20
218:11
**located**
165:13 183:18
185:24 235:8
**location**
119:20 120:12 167:2
187:15 189:5
217:24 295:20
301:22
**locations**
181:14 196:16
258:11 311:4
**lodged**
249:3
**logical**
271:16
**long**
17:22 22:2 80:3
85:17 136:3 142:6
144:9,25 145:4,22
146:8 147:7 148:12
152:25 155:11
157:14 158:4,13,17

158:21 166:17
167:9,20 232:3
238:12 243:23
244:10 310:24
**longer**
135:10 150:19
196:15 249:21
313:24
**longest**
142:14
**look**
14:18 40:19 45:7,15
48:20 51:10,23
63:16,19 68:12,16
68:17 72:15,19,23
96:14 98:5 102:4
103:18 104:8 105:3
105:9 117:18
120:16 127:13
131:7 169:13,16
173:20,24 174:5
176:2,15 177:8,17
178:9 185:2,4
188:17 189:12
193:24 198:13
201:17 202:18
210:15 214:10,17
230:5 238:17
257:24 266:15
280:15 299:8 300:5
309:7
**looked**
60:17 81:3 131:17
134:24 175:23
176:6,14 182:8
210:6,12 211:23
255:2,19 262:8,17
262:19 268:14
270:4,5 277:11
279:13 310:14,25
311:10 315:18
316:15
**looking**
50:2 51:3,4,5 69:4
71:24 104:25
105:11 110:7 127:4

131:12 147:2
161:19 178:9,25
188:22 192:18
206:8 211:19 212:8
215:8 225:16
226:21,25 229:3,11
232:20 234:13
242:19 248:24
249:25 262:15
266:11 281:24
294:13 297:17
308:25 313:13
316:10,18
**looks**
117:20 174:11,14
175:13,24 176:4
177:25 200:12,17
200:21 201:20
231:12 237:8,14
255:20 301:19
312:10
**loosely**
99:25 100:14
**lose**
236:9
**loss**
10:18 67:10 105:20
132:8
**losses**
80:19
**lost**
160:4
**lot**
6:7 10:11 12:22 34:5
42:18 43:3 55:14
60:11,12,15,18,20
77:11 79:12 80:18
87:11 101:21
117:22 230:20
251:12,14,15 273:4
302:22
**lotion**
230:25
**lots**
63:6
**loud**



159:13,15,16,19,20
160:3,6
**louder**
160:14
**louver**
211:16,20 265:2
280:13
**low**
169:9 170:23 225:23
225:25
**lower**
172:16 196:4 301:11
**lowest**
172:17
**Luckey**
11:17 87:17
**lunch**
135:12
**lying**
161:2,23 230:24

**M**

**magazine**
168:6 208:21,22
299:15
**magazines**
208:16 297:23,24
298:2
**Main**
2:8
**maintain**
249:20 313:24
**maintenance**
108:9 121:13 122:8
**major**
47:18
**making**
43:18,20 47:14 57:19
59:19 61:19 122:12
179:4 236:10,11
318:14,15
**malfunctioned**
281:2
**man**
151:4
**management**

98:6 102:22 104:4
106:11
**manipulated**
258:13
**manipulating**
90:7
**manner**
87:12
**manufacture**
143:12 184:6
**manufactured**
85:10,21 92:14
123:10
**manufacturer**
52:25 92:14 101:9
105:22 147:18,19
233:8 275:10
**manufacturers**
70:3 101:5
**manufacturing**
40:4,16,24 41:16,19
42:8 60:21 61:3
**mapping**
62:10
**Marcellin**
1:3 2:5 4:22,24 17:11
19:7,20 22:13,19
23:25 26:15 27:10
29:18 32:19 85:5,8
85:14 93:5,20 95:19
96:25 100:20
102:15 103:10,24
108:21 115:16
118:11,19 119:14
120:3 121:12 123:3
123:9,16,19 124:3
130:3,8 131:21
132:15 134:15
135:19 139:23
141:15 142:17
144:18 147:4,10
148:10 162:21
164:2 165:6 169:3
170:24 175:7
178:22 181:19
182:17 184:7,12

187:12 198:7 217:7
217:9 225:17
243:16,17,20
244:15 276:21
279:12 280:21
284:24 289:10
318:2
**Marcellin's**
5:4 29:5 94:8 129:17
132:18 137:9,12
162:3 174:19 179:7
185:10 188:23
194:13 195:13
216:7 217:13
260:22 268:15
293:21
**March**
1:14 126:25 127:11
**Marcillin**
20:19 24:19 25:5
85:3 103:2 108:17
131:16 275:25
**Marcillin's**
18:6
**Marine**
60:10
**Marion**
36:13
**mark**
65:6 165:24 166:4,5
166:19 167:11
168:12,15,20
169:13,13,22
170:25 171:12
181:4 267:4
**marked**
63:10,25 65:3,9 66:3
82:17,18 86:9
135:15 226:9 274:4
320:23
**marketing**
36:20
**marking**
229:23
**marks**
168:24

**marriage**
321:16
**marshal**
12:4
**Marshal's**
8:6 9:18
**marshals**
10:21 185:17 186:6
**Martin**
92:4,6 93:2 95:18
97:14,22,24 98:15
99:2,15,22 102:9,12
103:5 105:15,25
108:13,22 109:8,9
109:19 125:25
128:17 129:8 160:9
185:7 193:19
194:12 196:2
228:19 229:9
235:18 251:9
268:20 302:10
305:5 306:12 312:6
312:24 313:7
**Martin's**
123:6 184:10 251:7
**mask**
148:21
**masking**
87:3
**mass**
249:15,16,19,22
312:2 313:10,14,20
313:22
**Massachusetts**
2:12
**masses**
317:9
**master**
140:22 156:22
**match**
100:16 133:21
**material**
114:20 158:12
172:23 206:24
207:3 218:12 235:7
235:21,21 236:5,9



236:15 238:15
239:2 240:2,17
247:18 254:3,13
255:13 288:23
290:9 300:21
301:10,15,20
307:10,20 309:23
310:3,3,12 311:5,18
311:19 312:17
314:9,22 316:20
317:6,8,9
**materials**
66:24 85:24 206:18
206:21,25 207:8
227:24 232:18
236:22 239:19
240:4,8 241:2 247:7
247:12 249:18
256:24 310:25
311:5 313:16 314:6
314:7,15 315:6,9,12
316:11
**Matt**
79:19
**matter**
64:3 79:22 103:3
321:18
**Matterport**
88:3,4,8 130:22
131:2 202:20
**matters**
70:6,23 75:15
**McKay-Hollowell**
27:9
**mean**
22:6 24:3 25:16
28:10 32:7 33:19
34:17 35:11 40:7
43:3 47:3 56:21
66:5,17,18 69:7
71:22 80:4,16 89:15
89:20 90:2 94:12,17
95:22 101:16 106:6
106:7 108:5 116:10
116:15 117:25
118:15 120:22,24

121:2 125:2,24
126:4,4 133:15
134:4,7 142:11
146:7 153:12 163:9
164:7,11 170:15
172:14 173:5,7,22
174:2,10 175:16,23
183:18 190:4
192:15 197:9 206:7
214:7 233:11,12,16
236:2 247:23 248:4
253:2 264:4,18
265:4 269:13
270:18 273:3
280:13 283:16
288:2 293:24
296:15 297:18
302:24 303:10
304:22 307:25
314:17,20,25
**meaning**
27:24 32:18 37:15,16
85:15 94:13 124:23
224:25 239:23
240:19 247:22
281:8
**meaningful**
68:19
**means**
124:15 258:13
**meant**
94:16 161:7
**measure**
312:2
**measurements**
98:4
**mechanical**
53:3,5,6,7 209:13
278:23 303:8
305:23
**mechanism**
193:12
**mediations**
37:22
**medication**
12:15 113:9

**meet**
9:22
**meeting**
57:25 63:5 318:14
**meets**
96:17 98:8,10 115:7
**melt**
82:10 213:13,21
**melted**
213:2 214:11,13
216:25 227:16
**melting**
196:5 213:7 225:15
226:5,7,12 227:16
241:21 266:23
292:15 301:20
309:22 310:6
**member**
53:10,12,14,15,17
60:13
**members**
243:12
**memorialized**
25:6
**memorization**
38:8
**memorized**
38:9
**memory**
26:16,17 31:25 32:6
32:8 72:21
**mentioned**
44:6 46:23 51:22
64:20 71:17 126:16
168:10 173:3
189:15 209:4 249:2
252:15 258:3,5
**mentioning**
228:10
**merely**
177:24
**messy**
174:13
**met**
4:15 10:3
**meter**

90:4,16 91:6
**methane**
258:7
**method**
14:3 15:8 20:15,17
25:23 32:22 59:13
111:10 132:22
218:8 252:7 255:6
255:10 258:23
271:8
**Miami**
113:18
**microscopy**
90:15,18 91:7
**middle**
46:3 87:2 113:20
287:8 300:6
**military**
37:12
**mind**
18:5,17 72:6 92:22
92:24 230:23 234:6
**mine**
182:12 257:22 274:9
**minor**
36:20 220:16
**minus**
46:6
**minute**
137:11 142:13,14,21
152:23 158:23
197:6
**minutes**
82:25 142:16,21,24
144:16 149:8
150:12,14,15
152:24 158:25
197:7 226:22 245:5
245:13,16 246:7,14
246:20 291:8 295:4
295:5
**Miriam**
1:22 321:7,23
**mishandled**
106:15
**misinterpret**



119:24
**misinterpreted**
120:4
**missed**
68:15 253:6
**misspoke**
176:12
**mistaken**
140:15 141:16,25
   202:6,6 281:19
   283:11,13 288:25
**misuse**
107:7,12 108:8
**misused**
48:22 106:15 251:4
**mix**
241:8,9
**model**
84:19 85:2 100:6
**modeling**
147:21
**modification**
121:22 122:2
**modifications**
121:14
**moment**
127:12 174:24
   182:22
**Monday**
68:10 151:7
**monitor**
295:25 296:4,13,20
**month**
38:14
**months**
26:3
**morning**
12:25 39:25 135:20
   181:25,25 182:6
   205:6 253:4 267:15
   289:12
**Morrisville**
36:14
**motive**
193:8,14
**motives**

193:2
**mourning**
206:4
**move**
23:23 47:8,9 169:23
**moved**
32:14 175:20 239:13
**movement**
207:19
**movements**
181:15
**moving**
47:14 59:3 67:15
**multiple**
37:3 41:22 42:9
   43:13 44:7,25 54:12
   55:16 70:3 82:2
   106:21,22 107:14
   196:16 223:9
   235:23 236:3,14
   238:25
**mute**
317:15
**Mutual**
38:20,21,23,25 39:4

**N**

**N**
2:2 3:2 4:2,2 319:2
   320:13
**NAFI**
36:25 53:17,19
**nail**
315:5
**name**
4:9,16 11:17 73:13
   87:20,20
**named**
239:4
**National**
37:2 53:19 245:25
**nature**
66:16,19 91:14 96:19
   148:23 152:9 217:2
   302:12 305:2
   308:11

**near**
15:21
**nearby**
310:18 311:6
**necessarily**
49:25 124:4 146:22
**necessary**
224:8 259:22,23,25
   277:7 293:18
**need**
7:3,4 17:5 38:13 51:2
   55:23 59:14 61:3
   72:6 112:2 139:15
   147:16,17 233:2
   250:23 253:21
   260:4,17 264:22
   300:16
**needed**
26:19 27:18 51:16
   275:4 276:12
**needs**
51:12 58:4 60:11
   163:9 286:20
**NEFCO**
12:2,8 17:20 87:19
   211:3 228:15
   296:16
**negative**
270:17,19 271:4,6,19
   271:23 272:7,9
   309:16
**neighbor's**
152:16
**neighboring**
273:11,14
**neither**
138:20 190:20
**never**
14:19 22:11 25:11
   26:6 29:20 31:13
   46:17 57:12,15
   95:19 97:8 116:8
   118:17 121:12
   122:19 152:4
   233:19 309:17,18
   309:19,20

**new**
1:2,23 2:8 4:5,14
   35:20 38:18 39:14
   41:23 46:2 72:12
   73:10 87:6 89:7
   96:7 100:22 125:7
   125:15 206:5 287:9
   321:4,8
**news**
80:17
**NFPA**
53:10,12,13,14,25
   54:5 55:15,16,19
   57:3 58:19,25 61:22
   62:17 110:9 115:6
   206:9 270:12,15
   316:12,14
**nice**
318:13,15
**night**
203:13,23 204:24,24
   205:4,4,8 303:15
**Non-OEM**
92:9,11,18,19 93:16
**Non-Party**
1:19
**nondestructive**
90:7
**nonexclusive**
255:21
**nooks**
151:25
**normal**
6:24 122:7 153:7
   203:17 280:7
**normally**
7:2 20:24 21:14
**northerly**
5:20
**nose**
151:5 231:8
**notable**
166:9 168:24
**Notary**
1:22 4:4 319:22
   321:7



**note**
5:25 129:17 130:3
  135:18 236:10,11
  236:13 275:8
**notebook**
16:11 17:8 41:3,16
  52:21 72:25 73:3
  80:9 84:17 85:4,5,9
  85:11,14,15 93:20
  94:8 97:2 99:12
  102:16 103:3,11,25
  104:21 108:15,19
  109:5 113:13
  123:10,14,16,20
  124:5,11,13 130:11
  130:12 131:23
  142:18 225:14
  269:17 318:2
**noted**
123:19
**notes**
7:25 8:9 29:8 85:19
  275:16 297:5,7
  299:9,24
**notice**
87:23 204:17,18
**notified**
153:24
**noting**
39:17 161:11
**notwithstanding**
216:5
**number**
219:22,24 220:20
  221:3,4 222:10,12
  222:14,18,19,20,23
  222:25 224:10,17
  224:18,19,20 225:3
  233:23 234:16
  320:7

---
**O**
---
**O**
3:2 4:2 319:2
**o'clock**
205:10 253:3

**oath**
3:12 5:14
**object**
26:22 231:20,21
  299:19
**objected**
145:3,6,8,22 146:3
**objection**
27:20 56:5 146:6
  262:3
**objections**
3:21
**observations**
217:14 218:10
**observe**
220:7 286:6,15
  312:19
**observed**
28:7,23 117:7,14
  183:13 213:2 214:3
  218:4 219:8,22
  224:11 290:21
  294:5 309:9 311:23
**observing**
158:4
**obtain**
102:5
**obtained**
36:16 38:17 47:23
  48:2,3
**obvious**
258:20 298:24
**obviously**
10:22 17:17 35:16
  43:6 44:18 47:8,9
  62:17 71:24 100:24
  170:16 172:3 305:5
**occupant**
11:19 143:25
**occupants**
144:14 153:24
  186:20,22,25 187:5
  234:19 269:21
**occurred**
72:14 93:13 213:24
  214:9,13 215:13

  277:6,25
**occurrence**
133:6
**occurring**
110:22 113:6 172:20
  196:10 287:2
**occurs**
86:22 292:14
**October**
19:9 63:9 64:13 65:3
  68:3,20 77:16 93:4
  93:18
**OEM**
92:12 93:9 104:6
**off-the-record**
10:8
**offenders**
269:5
**offered**
50:4 276:25
**offering**
49:10 256:4
**offhand**
49:4
**office**
76:9 79:8 88:19,20
  112:23 129:18
  130:10 136:11,13
  137:6 138:24 139:3
  141:3 150:13,17
  154:16,17 155:7,16
  157:11,13,22,24,25
  188:6,13 209:24
  212:9 218:25 225:4
  257:23 260:3,7,9,16
  261:12 263:22
  264:13 277:18
  279:20 281:13
  285:2,3 286:9
  287:25 292:4,4
  311:3
**Ogden**
98:22
**Oh**
58:14 63:21 64:19
  72:20 75:24 78:9,16

81:23 123:22
  166:14 186:19
  210:10 249:10
  303:5 313:2
**OJ**
251:17
**okay**
5:13,23 6:2,14,17,22
  7:10,17 8:5 9:4,9
  12:14 13:12 16:8
  21:22 22:25 24:24
  25:10 27:23 28:9
  30:15 32:13 33:16
  34:7 35:5,21 36:8
  42:7 46:21 47:23
  49:2,10,13 50:10
  51:5 52:20 54:18
  55:25 57:13 58:16
  58:23 59:6 61:18
  62:15 63:25 64:11
  64:22 65:4,12,23,24
  67:16,23 68:9,23
  69:12,14 70:24
  73:17 74:25 75:14
  75:21 77:6 78:21
  82:5,11 83:11,24
  84:21 85:6,7,18
  86:2 90:16 91:6
  92:3,16 94:16 98:16
  99:20 106:8 109:22
  111:4,21 112:7
  113:9 114:8,9 115:9
  115:13 116:21
  117:15 118:9 123:5
  123:23 125:7
  128:14 129:3,9,15
  134:14 135:14
  137:20 138:4,5,17
  139:2,15,22 140:17
  141:13 146:17,25
  148:19 151:2 153:6
  153:17 154:6,15
  155:11 156:23
  159:13 160:18
  162:2 163:3,15
  164:13 165:16



166:3 168:9 169:2
169:19,24 171:15
171:20 173:2,9,13
173:19 174:18
175:3,4,10 177:4,23
180:2,18 181:8,12
183:11,21 184:23
189:12,17 190:5,10
190:16,18 193:17
195:12 205:20,21
208:7 210:14
211:15 214:12
225:13 226:17
230:24 242:12,20
243:19 254:15,15
263:16 267:18
275:23 280:19
281:11,22 282:13
289:20 295:17,18
302:14 303:11
308:16 316:16
**old**
100:8,23 185:5
**once**
61:24 88:7,12,17
156:21 167:5 168:4
174:3 200:3 225:23
232:17 263:11
276:22
**one's**
299:13
**ones**
80:22 96:23 160:14
206:22 222:6
**online**
101:23 126:10
**Onondaga**
72:17
**OnStar**
187:13,21 189:8,9,11
**open**
131:6 152:5 155:21
156:12,15 192:7
207:19,22 208:23
212:3 213:5,8
244:23 245:2

246:18 266:13
273:13 280:13
296:18 298:4
310:18 311:7
**opened**
39:8 124:15 151:7,10
156:21 204:4
209:22 265:7
289:24
**opening**
125:17 142:12 150:3
150:4,7 154:18,20
155:15 159:5 192:4
245:18
**operate**
144:20
**operated**
140:14
**operates**
14:25
**operating**
139:8 156:6,8
**operation**
14:14 15:3
**opine**
114:6 276:11 290:16
310:2
**opined**
276:25 310:11
**opinion**
25:22 50:5 73:23
93:14 103:9,12
110:12 111:20
115:4 117:4 118:20
121:17 175:12
177:20 179:25
180:2,4 182:12,16
213:7 219:9 229:12
239:5 240:14 247:9
252:23 256:4
262:22 307:20
314:8,14 315:6
**opinions**
49:8,11 50:8 66:6
78:3 82:20 83:18,24
84:5,13 118:14

125:22 132:12
142:2 184:19 185:3
302:19 309:21
**opportunities**
275:2
**opportunity**
24:5 30:20 62:4
295:15 304:4
**opposed**
16:16
**opposite**
136:6 145:5,7,25
146:10 179:9
**opposition**
285:15
**order**
1:20 84:10 171:11,17
284:8 300:18,19
**ordinarily**
105:3 239:15,22
**ordinary**
5:10 20:18
**oriented**
296:5,8,22
**origin**
12:10 15:15 18:24
19:16 52:9,11,12,13
53:22 88:19 113:24
114:7 117:12,13,16
118:8 120:15
131:14 144:4 204:8
220:24 221:22,25
222:13,17 223:10
223:13 224:6 233:4
235:9 241:15
252:25 254:8 257:3
257:5,7,15,18 260:3
260:6,8,15,25 261:3
261:4,12 262:3,9,24
263:4,9,16,22
264:13 265:12,20
270:25 272:3 276:6
277:2,3 301:22,22
308:9
**original**
3:9,17 93:6,21 96:25

97:4 274:18 280:5
308:6
**originally**
94:10 95:4
**originated**
234:11 301:24
**originates**
15:19 279:3
**originating**
234:9
**outcome**
321:17
**outcomes**
217:5
**outdoor**
47:18
**outlet**
71:12 128:22 200:10
200:24 201:12,15
201:17,22,24
202:13,23
**outlets**
253:25
**outline**
305:13
**outreach**
79:17
**outset**
15:4
**outside**
44:19,22,23 46:2,22
46:24,25 47:6 49:7
51:18 52:22 88:14
90:11 91:15,24
92:25 97:20 99:14
103:6,13,20 104:23
105:19 108:23
109:8,21 125:23
128:24 129:7,13
136:2,20 137:4,6
138:21 139:9,24
140:11 141:14
142:4 144:19 145:9
146:14,19 149:18
150:5 157:25
184:21 198:6 212:9



221:7 225:10 311:2
**outward**
266:25
**oven**
199:11,23 200:6
  201:16,21,23
  202:12,24 203:10
  203:15,17 205:23
  253:24 267:5
**ovens**
201:13 202:15
**overall**
88:10 308:15
**overcharge**
109:12
**overcharging**
106:25 107:13
  251:23
**overflows**
149:22
**overheat**
279:8
**overheated**
278:8
**overlap**
34:14,18
**oversight**
32:11,24 33:6,13
  118:19 119:14,15
  141:19 164:2,5
**oxygen**
113:5

---

**P**

**P**
2:2,2 3:2
**P.M**
318:21
**Pacific**
234:14
**pack**
16:10 17:8 40:6,8,10
  40:16,24 73:19 92:8
  92:9,11,12 93:9,16
  96:25 97:4 104:10
  104:12,13,18

105:23 107:11,15
108:10,10,25
112:11,22 121:18
121:21 122:15,20
122:24 128:18
130:15 215:3,10
219:14 235:6,17
248:6,7 252:2,4
286:25 292:12
**packaged**
88:25
**packages**
15:20
**packs**
41:7 97:12,17 98:3
101:22 102:14
103:18 109:18
112:15 248:5
**page**
67:19,24 68:2,23,25
70:8,12,16,17,18
81:4 83:6 85:25
86:6,13 109:23
115:10,21 121:11
123:18 129:9 130:2
135:14,18 137:14
137:20 138:14
147:4 160:19,21
161:19 162:18
174:19 175:5
189:13,23 191:10
199:6 206:8 209:5
212:25 218:23
219:21 225:13
235:4 250:2 256:18
262:15 274:3 275:9
275:9 276:20 280:2
287:21 320:6,15,19
320:24
**pages**
84:2,6,13 86:11
137:13 280:17
298:3
**Palm**
39:12
**panel**

88:24 221:3 233:7,12
  233:14 234:4,11,17
  258:13
**panelling**
301:12
**paper**
63:16,19 64:7,8 83:8
  207:6,12,18,21,21
  208:2,5 297:17
  298:11,14,16,19
  299:14 300:7
  315:20
**paper-thin**
313:3
**papers**
41:5,9,14 296:21
  298:24 315:17
**paragraph**
115:21 274:11
  285:22,23,25 286:5
  286:13,15,17
**paragraphs**
83:15,17
**part**
14:2,17 15:23 48:16
  132:25 155:13,14
  217:18 235:16
  251:2 252:11 254:5
  264:23 279:25
  309:4
**participated**
34:4
**particular**
116:16 118:4
**particularly**
50:12 153:20 170:13
**parties**
3:7 19:2 87:23 88:9
  88:18 93:16 321:15
**party**
51:12
**passed**
134:3 170:16,18,21
  277:8 281:5 290:2
**patent**
47:24 48:2

**patents**
48:4
**patterns**
52:17 62:11 117:13
  210:3 218:24 219:8
  257:10 265:19,23
  266:6,18,19 268:12
  269:23 278:10
  279:7 299:12
**Pavilion**
84:17,20,22,25 85:15
  96:11,21 100:19
  104:20 131:22
  214:22 216:2 235:5
  235:16 295:21
**pay**
66:24 67:3
**paying**
188:21
**peer**
41:2,11 53:21 54:11
  56:23 57:22 58:7
**people**
12:2 19:5 33:25 34:6
  34:19,21,24 35:3,9
  35:25 36:4,5 59:12
  74:8 87:11 99:25
  107:3,23 118:16
  119:16,18,23
  120:21 122:14
  153:12,19 173:20
  173:25 174:6
  175:14 190:14,23
  251:12,16,19 269:2
  303:3 306:23 308:8
  308:11
**perceived**
122:13
**percent**
69:25 70:2 97:8
**perfectly**
201:3
**perform**
89:12
**period**
30:2



permits
39:23
person
71:25 122:4 151:3
  174:14,16 178:2
  234:25
person's
22:2
personal
37:22 69:20,22 269:6
  269:12,15
personally
19:22 22:12 37:15
  86:14 89:17 262:12
perspective
149:12
pertain
61:9
pertains
62:6 81:18 184:20
  225:2
phase
15:9 252:8
phone
187:19 188:5,8,12
  189:15,21 190:11
  190:19 191:7 267:9
phones
188:19,21
phonetic
69:8 87:25 201:7
  203:6 260:8
photo
88:20 179:21 180:6
  181:2 226:24
  281:24 301:5
photograph
118:12 166:15
  188:17 200:13
  212:15
photographed
117:8
photographs
88:10 89:4 96:14
  120:11 130:21,25
  168:11,22 175:11

220:16 228:20
238:18,19 309:9
photos
88:6 116:20,23
  202:19 220:7 308:6
phrase
309:16
phrased
16:25
physical
28:19,22,25 29:25
  30:7,13,22 31:8,18
  33:2 43:25 109:4
  119:24 120:11,17
  130:14 132:23
  133:5,8,15 134:12
  139:17 141:17
  185:24 194:17,18
  195:16,20 196:12
  211:22 216:11
  217:15,21 252:20
  253:8 254:7,10
  268:16 270:5
  272:12 294:15
  302:24 318:6
physically
95:22 97:9 209:22
  256:14 264:24
  288:13 298:4
PI
37:3
pick
107:8
picture
129:12 168:10 172:4
  175:13 178:9
  200:20 212:5,6,7
  214:10,17 229:14
  232:5 255:15
  262:19,20 295:17
  300:24 307:9
pictures
307:15,17,18 308:12
  308:15 316:12
piece
14:24 207:18,20,21

207:25 208:5,20
210:22 233:15
237:22 296:17
298:14,16,18
307:25 309:15
312:3 313:4,12
pieces
256:13 299:14 308:2
pile
44:8 101:24
pillars
257:10
pillow
169:22
pins
228:10
pipes
278:12
place
87:24 181:20 193:20
  194:12 319:11
places
131:17
plaintiff
23:17 27:8 69:6,8,10
  69:15,17,18,25
  117:10 126:5 320:4
Plaintiff's
126:22,23
Plaintiffs
1:6 2:4
plan
263:14
plant
42:8
plants
42:19,24 43:4
plastic
213:2,22 214:12
  216:25 238:23
  239:12 240:21,24
  290:9 292:16
plate
201:19
play
47:17 193:7

please
4:9 5:24 7:16 155:4
  174:24
plenty
239:2 298:15
plug
73:15,18 201:25
plugged
200:11 203:5 220:2,4
  220:8,10,13 259:7
plywood
211:12
point
4:14 11:7 22:21,23
  25:19 33:14 50:24
  62:14 63:2 87:25
  88:18 89:7 94:22
  125:24 136:14
  149:3 158:10,14
  163:21 177:24
  195:5,5 215:24
  224:23,24 247:14
  260:4 264:14
  270:14 277:3
  282:20 284:8,12
  286:2,19 292:13,13
  297:22 306:4 318:3
points
41:5,13 50:18 113:24
  274:13
popsicle
237:16
portion
105:16
ports
71:13 101:6
position
38:15 170:2 213:5
  222:2 224:12 232:8
  287:7
positive
253:18
positive/negative
196:14
possibilities
216:9 223:21



**possibility**
44:6 132:4 163:25
195:15 217:12
264:12 268:6 278:7
**possible**
104:25 153:7 163:12
163:14 173:23
174:2 175:17,19
176:8 182:15,25
183:9 202:2 203:21
203:23 204:2 205:3
205:12,12,15,24
217:5 223:19 262:9
268:23 270:4
**possibly**
101:21 125:9
**post**
297:7
**post-fire**
17:18
**Post-It**
297:5 299:9,24
**pot**
149:21,22,24,25
150:13,15,16
191:24 197:12
204:17,21 205:9
206:5 244:24 267:7
267:10
**potential**
18:15 41:7 72:3
105:12 109:5 204:7
248:18 249:8
254:21 256:13,18
257:4 258:19 263:7
272:4 305:7 308:10
**potentially**
269:14
**pots**
245:24
**pounds**
173:16
**pour**
267:13
**pours**
206:4

**power**
41:5,13 50:18 73:21
219:24 251:15
**powered**
141:23
**practice**
20:18
**preliminary**
275:15
**Prematurely**
128:3
**premise**
186:11
**premises**
181:13
**prep**
66:12
**preparation**
9:25 19:18 23:7,10
26:5 34:22 36:3
86:9
**prepare**
9:14
**prepared**
29:9 35:22 75:17
291:16
**preparing**
19:9 34:10 89:14
**presence**
225:21
**present**
2:14 4:18 8:13 38:5
74:9 102:17 270:25
**presentation**
60:3
**presentations**
50:15,18 77:17,19
**presented**
41:6 68:22 77:18
**presume**
97:7
**pretty**
14:23 35:5 72:21
76:12 86:23 101:6
142:10 163:10
167:4 237:21,22

270:11 318:4
**previous**
76:7
**previously**
6:6 26:21 27:19 83:7
127:20 129:20
**principal**
53:14,15
**principally**
52:7
**principle**
198:8
**prior**
17:25 18:18 23:2
43:11 48:19 157:8
181:15 239:14
247:18
**privilege**
20:12
**privy**
275:2 293:17
**probable**
163:16,18,25 164:12
**probably**
6:12 36:6 69:16,24
78:19 80:6 92:25
98:7 100:8 103:8
112:20 142:13
155:22 158:20
160:13 226:3,4,11
228:15 246:14
277:17 282:19
295:10 311:15
**problem**
45:13 84:11 231:17
**problems**
234:22
**Procedure**
1:22
**proceed**
9:2
**proceeded**
183:17
**proceeding**
5:14
**proceedings**

37:18
**process**
6:3 26:3 42:16 48:16
88:16 104:3 106:19
132:25 238:20
270:16,20 271:20
271:21,24 272:7
308:4,21
**processed**
12:9 88:19 261:2
**processing**
141:2 314:11
**produce**
6:20 158:7 165:23
167:10 171:11
197:16 206:16
242:2
**produced**
158:9 232:10
**produces**
292:15
**producing**
167:15,25 229:21
232:8 246:17
258:25 259:9,10
**product**
13:18 48:17,21 49:14
49:20,21 50:3,19
51:6 52:3 71:24
72:4 73:13 74:4,5,7
74:10 81:21 93:6,22
101:13 105:2,4,6,11
105:18 185:5
**product's**
51:23
**production**
126:24 258:25
262:25
**products**
13:13 48:10 71:6,7,7
71:21 72:5 80:23
81:6
**professional**
37:5,8 40:23 182:16
**progressed**
158:6 266:24 302:7



**progressing**
167:15
**projectile**
98:22 304:8 314:3
**projectiles**
195:7 286:2,23
  288:19
**proper**
48:12 50:3 251:11,22
**properly**
42:18 44:24 48:11,18
  50:20 106:14,15
  154:4
**property**
38:19 88:10 120:2
  273:11 284:4 293:3
**proposal**
57:16
**protect**
106:12
**protected**
164:19 168:5 169:7
  170:15 172:22
  190:12,20 208:17
  214:13 231:3
  248:10 298:5,6
  300:3
**protecting**
299:14
**protective**
168:8
**protruding**
298:25
**prove**
57:6
**provide**
100:12 234:20
  255:20
**provided**
11:18 24:21 25:17
  26:11,13 28:16
  29:12 135:2 200:3
  219:24 254:22
  256:12 269:20
  274:12,21
**public**

1:23 4:4 56:24 58:3
  60:12,15 61:16,20
  61:21,24 62:2,3,5
  62:13,22 319:22
  321:7
**published**
29:12 53:21 55:13
**pull**
49:5 109:24 126:15
  127:22 139:15
  164:23 165:10
  166:16 255:14
  279:21
**pulled**
179:12
**pulling**
123:12 126:13
  156:19
**purchase**
92:20 127:19 128:5,7
  128:10,14
**purchased**
92:17 94:21 96:7
  104:7,11 126:10,10
  129:5 184:9,13,15
**purchasing**
95:23 122:6
**purpose**
124:23
**purposes**
64:25 202:22
**pursuant**
1:20
**pushed**
175:18 176:8 177:14
  180:23 296:18
**pushing**
213:19 298:2
**put**
35:10 42:21 63:7
  64:9,12 67:16 84:9
  87:23 95:24 100:23
  116:18 118:3 120:6
  122:19,23 125:22
  126:7,11,18,22
  127:2 131:21 137:8

168:9 170:4 183:25
208:22 211:4
228:15 245:12
261:4 269:2 277:18
279:22 280:16
284:3,14,23 287:2
292:25 296:16
297:24 306:19
312:15 315:22
317:5
**puts**
257:11
**putting**
116:22 125:9 281:3
  283:9

---

## Q

**qualifications**
96:18
**qualified**
48:5
**qualifies**
50:12
**quantity**
150:21
**quarter**
211:10
**question**
5:2,22 6:20,21 7:2,4
  7:5,7,10,15 8:21 9:4
  9:8 10:11,14 14:11
  16:13,19,22 21:12
  26:23 27:12,15,16
  27:17 29:16 33:4
  35:24 41:10 42:14
  50:4 51:13 54:21
  56:6 66:22 80:25
  81:7 84:8,11 93:2
  95:17 96:10 97:13
  97:21,24 98:15
  103:5 104:13
  105:24 108:17
  109:15,20 110:11
  116:13 120:4
  122:13 124:14
  125:13,16 127:4,7,9

129:8 132:17 136:3
142:6 144:7,8,25
145:3,22 147:6,13
148:9,12,15,18,24
149:2 150:18
151:12 152:24
153:15 157:14,17
157:19 158:3,16
160:10 162:2,14
163:8 166:22 169:8
169:24 170:7,22
172:11 175:4,16
177:13 179:2,3
182:24 190:22
195:13,23 199:11
202:22 213:6 220:2
220:23 227:4 229:8
229:16 230:12
231:22 232:3,23
234:3 241:15
242:10 243:22
248:22 249:5,7
250:15 257:19,21
262:5 263:25
267:20 272:24
274:15 275:25
280:4 285:4 289:5
289:16,19,21
290:16 291:4,20
300:23 302:19
307:6 310:13,21
312:24 313:8
315:11 320:24
**question's**
198:5
**questions**
4:21 12:18 18:4,9,10
  18:16 19:7,12,17
  20:12,14 21:6 22:8
  22:18,22,24 24:14
  24:21 26:12 77:8
  122:5 127:8 291:15
  293:5,7,10,13
  294:10 303:9
  317:20,22 318:19
  320:23



**quick**
12:23 83:19 151:19
  226:20
**quicker**
294:7
**quickly**
6:18 142:10 272:23
  273:20 274:2
**quit**
251:18
**quite**
30:15 43:6 272:18
**quote**
219:2,6

---

**R**

**R**
2:2 3:2 4:2 319:2
  321:2
**radians**
246:11
**radiant**
193:3,15,16 194:6,7
  195:10 197:15,23
  206:15 213:19
  214:15 215:19,23
  216:14,15 225:19
  225:20 230:23
  231:13,23 300:21
  301:6,8 302:5
**radiation**
171:25 231:24
**radiative**
299:19 303:11
**rain**
44:22
**raised**
274:13
**ran**
303:4
**range**
142:21 143:9 157:3
  303:18
**rapidly**
157:22 167:4
**rapport**

**quick**
21:4
**rate**
143:6 196:19 248:11
**ratings**
247:11
**re-review**
50:21
**reach**
47:4 146:22 171:11
  172:24 197:22
  201:24 202:12
  207:11
**reached**
246:18
**reaches**
150:6
**reaching**
84:5,13
**reaction**
113:5
**reacts**
190:17
**read**
5:18 7:4 83:19 127:6
  137:17,19,23 138:4
  138:6 174:24 189:2
  206:18 235:11
  242:10 243:9
  252:21 253:10,14
  282:5,5,10 286:14
  298:4
**reader**
70:13
**readily**
314:17,21
**reading**
127:16 235:15 282:4
  286:12
**readings**
91:13
**reads**
6:20 212:8
**real**
83:19
**realized**
292:25

**really**
13:11,21 18:20 31:15
  42:17 43:5 57:18
  60:17 101:10 109:9
  125:10 143:23
  188:21 195:14
  197:2 227:22
  245:19,21 272:19
  288:12 295:8
  318:11
**rear**
155:2,4,6
**reason**
9:7 25:11 26:6 56:5
  62:16 75:4,5 135:4
  135:8 145:6,8,21
  146:17 181:8 199:2
  257:15 264:8
**reasons**
223:9 258:16 259:25
  303:6
**rebuttal**
8:4 9:17 18:15 19:18
  29:13 65:7,8,17,20
  82:17 272:21
  273:19 274:4,17
  275:19,21 293:19
  295:20 320:9
**rebuttals**
275:20
**recall**
11:6 24:11 33:8,11
  48:7 74:17 75:4,5
  80:14,18,23 81:5
  84:19 85:17 96:22
  96:24 116:4 119:17
  120:22 168:23
  176:13 184:8
  192:19 228:18
  233:12,16 234:15
  234:17 279:22
**recalled**
51:6,7,24 52:3 74:5
  120:6 233:7,20
  234:4
**receipt**

**quick**
24:15 93:10 94:23
  126:9 128:11,12
**receipts**
104:8,9 241:13
**received**
39:3 63:3 200:4
  307:17
**receives**
299:19
**receiving**
18:11 19:12 24:22
  26:12
**receptacle**
200:14 219:25
  222:24 255:4
**receptacles**
200:13,16
**rechargeable**
99:11
**recollect**
32:2 132:15
**recollecting**
31:21
**recollection**
32:4 85:22 132:18
  138:19 163:4
  165:18 175:6 188:7
  189:20
**recommendation**
50:25 51:12
**recommendations**
96:18
**recommended**
22:10
**recommends**
22:6
**reconvene**
88:13
**record**
4:10,16 39:18 116:18
  321:12
**records**
66:10,11 72:23
**recycle**
43:24
**recycling**



42:3,9,12,19 43:4
43:11 44:16 45:15
46:15 47:18,20
102:2 302:22
**red**
212:10 226:15 227:2
231:5 297:14 298:9
298:25 304:18
306:15
**refer**
8:8 64:25 65:20 77:7
85:3 109:7 113:15
114:7,19
**reference**
84:24
**referenced**
86:10 126:14
**references**
64:4 86:6
**referred**
79:8 271:3
**referring**
20:8 27:5 76:8 85:2
127:20 128:8
210:24 285:21
**refined**
148:7
**reflected**
66:2,9 84:6,14
**refresh**
32:3 85:22 138:18
163:4 165:17 175:6
188:6 189:19
**refrigerator**
200:15 201:23 202:3
202:8,10 281:25
**regard**
254:21
**regarding**
254:23
**regular**
56:13
**regularly**
32:24 40:19 55:10
101:6 207:13
**reimbursed**

66:21
**reject**
61:25
**relate**
48:13
**related**
273:5 321:15
**relates**
300:10
**relevant**
56:3 62:21 144:4
234:18
**reliable**
133:25 153:20
**relied**
217:19,22 268:19,21
270:7 274:16
275:23
**relying**
153:17 182:22
195:21
**remade**
177:5,7
**remain**
46:8
**remainder**
155:18
**remaining**
91:13 102:21 159:5
**remainor**
154:22
**remains**
30:22 113:25 129:25
130:15 133:5,9,15
133:17 227:3
229:12 230:2 272:5
311:25 315:20,21
**remember**
6:7 11:9,14 12:6
13:18,21 17:14
31:12,14,16 49:2
81:12,20 82:13
86:18,20 87:20
120:8 128:10,13
134:4,9,10 156:14
162:9,12,13 165:11

166:3 171:4 187:11
187:15,24 188:2,8,9
188:14 230:13
252:6 282:16
283:22 297:19
**remembered**
102:4
**remembering**
32:9 160:12
**remnants**
131:4
**remote**
167:2 187:14 295:8
**remotely**
5:14,15
**removal**
88:16
**remove**
278:17
**removed**
96:9 165:25 178:18
179:8
**removing**
175:21
**render**
75:8
**rendered**
78:4
**rental**
151:8
**repeat**
8:24 10:10 14:11
21:11 27:16 45:12
80:25 84:8 179:2
310:21
**rephrase**
8:24 16:13 42:3 74:3
94:12
**replace**
101:18 122:6,15
**replaced**
95:12,20
**replacement**
95:5 104:6,11 108:25
132:10 133:18
252:4

**replacing**
95:22 124:17
**report**
8:3,4,7 9:16,18 12:22
18:15,19 19:10,18
19:24 20:3 23:11
24:23 25:14,20 26:6
29:12 34:10,22 35:7
35:11,22 36:3,4
62:21 63:8,10 64:3
64:11,13,24 65:2,4
65:7,8,17,21,23
67:17,19 68:5,24
75:8,11,16,17,20
76:14 82:16 83:6
84:7,14 85:25 86:9
86:11 89:14 109:23
115:11,19 118:10
123:6,12,18 129:10
135:15 136:17
147:3 153:19
160:19,20 161:9,10
161:20,21 164:22
166:15 191:11
224:15 226:10
253:13 272:22,24
273:19 274:4,17,18
275:17 276:3,20
279:24 280:17
287:21 300:10
320:8,9
**reported**
39:8 161:2,4,5,22
219:25 220:9
**reporter**
4:19 8:18 63:12
65:11 77:5
**reporting**
196:24 198:9
**reports**
18:11 19:13 24:16
26:13 36:7 61:10
66:3 77:11 82:19,21
200:4 274:13
275:19
**represent**



4:17 70:3 83:17
127:8 223:18
**represented**
20:23 21:18,20,23
22:3
**representing**
21:7
**reproduction**
42:21
**request**
9:7 57:16 126:24
**requested**
88:2 291:17 320:18
**requests**
200:5
**required**
60:24
**requirement**
115:8
**research**
39:9 55:12 147:19
**reserved**
3:22
**residence**
4:24 5:5 225:18
**residences**
273:2
**residents**
187:2
**resolve**
284:20
**resource**
55:2,4,5,10 56:13
58:10
**resources**
55:14 56:14
**respect**
5:5 19:8 20:7,11
26:15 29:9 32:5
34:9 49:24 50:13
54:21 60:5 69:23
85:8 117:5 127:20
141:16 148:7 164:3
175:7 181:3 184:25
188:24 221:22
233:25 256:4 278:6

293:6
**respective**
3:6
**respond**
46:15
**responded**
42:23 182:24 199:15
199:24
**responder**
223:22
**response**
263:20 294:22 295:6
295:10,12
**responses**
126:23
**rest**
6:25 72:19 133:10
165:4 193:13
315:13
**restricting**
298:23
**result**
16:16 271:10
**resulted**
110:21 235:6
**resulting**
213:3 307:22
**retain**
51:12 236:7
**retained**
17:15,23,24 22:16
49:7 51:19 69:6
79:5,10 90:13
105:16 129:7
225:11 320:11
**retreated**
157:13 243:16,18,22
**retrieving**
177:6
**returning**
287:13
**review**
8:10 18:11 20:14
23:8,13,16,25 35:15
41:3,11 48:9,15,17
49:4,15,18,20 50:18

53:22 55:23 56:24
58:3,4 63:6 97:14
97:19 98:14 99:19
104:22 105:17
185:23
**reviewed**
9:16,17,17 22:25
23:5,11 25:16 26:8
28:5,10,10,12 36:7
54:11,11 57:22 58:7
78:12 85:24 86:8
110:9 123:5 138:17
139:23 175:5
176:21 181:10
189:18 199:4
**reviewing**
19:24 28:15 61:20
65:19 74:4 76:16
185:10,18
**reviews**
13:5
**revise**
59:22
**revised**
59:2 62:20 272:18
**revision**
61:15
**revisions**
60:5 61:7
**revisit**
59:22
**rid**
297:23
**ride**
60:24
**right**
8:2,14,19 9:20 16:17
17:4,9 18:2 20:9
23:3 30:17 38:16
43:16 44:3 45:18
48:17,22 49:24 53:4
53:10,11,18 54:4,10
55:21 56:23 57:14
57:23,25 59:9,21
60:3,21 61:19 64:6
69:19 70:11 77:4,21

85:23 86:25 90:25
95:20 96:3 105:9,18
106:9,17 107:6,10
107:12,20,25 108:6
109:22 110:4
111:16,24 113:4
114:16,19 115:10
115:25 117:16
118:22 119:22
120:8 121:7,23
122:20 123:6 126:3
126:13,17,22 131:5
133:25 135:22
136:20,23 137:6
139:14,25 141:10
144:22 145:19
146:15 147:13
148:2 149:21,23
150:13 151:20,25
152:7 155:24 156:9
160:18 162:15
165:9 167:17,21
168:16,20 170:7
172:5,15,20 173:2,7
173:14 174:15
176:5,17 177:2
178:2,4 179:19
180:12 181:16,21
181:24 182:21
186:15 188:16
190:8 191:20,24
192:20 197:9,12
198:23 200:18
202:18 203:20
206:18,22 207:18
207:20,21 208:2,3
210:11 211:13,17
212:2,4,15,18,22
213:19 215:16
216:10 217:13,17
219:3 222:9,10
224:4,17 225:4,9,18
227:18,19 228:11
228:22 230:8,13,14
231:4,7 232:14
235:2 237:10,11,12



237:17,17 241:24
242:8 245:20 246:9
246:19 248:15
249:19 251:8,13,19
252:14 254:11,12
255:2,4 256:5 258:7
258:20 259:4
261:18,25 262:9
264:16,23 268:25
273:5,9 274:5
277:13,23 279:14
281:7,9,11,14,16,18
281:18,20 282:3
283:5 284:5,16
285:20 287:16
288:8 289:14,19
290:4,8,25 291:2,19
292:6,14 293:5,8,18
294:8 296:22,25
297:7,8,11,20 298:6
298:14 300:23,25
303:21 305:14
307:12 308:3
312:25 313:16,19
313:22 315:8,16
316:3,15,21,25
317:18
**rises**
191:18
**risk**
45:10
**road**
187:23 189:10
216:22
**Rochester**
2:8
**Rocket**
237:17
**roll**
237:5,8,22 247:5,22
248:7,18 249:3,8
255:13 272:6 304:7
305:17
**romance**
264:23
**romantic**

264:19
**roof**
278:12
**room**
8:14 12:10 18:23
31:12 55:22 88:18
113:12 114:6 121:8
131:13 136:20
149:14 150:5
155:10 156:2,4
159:12 165:8,12,19
165:22 167:5 168:7
170:3 172:25
174:10 188:10
192:2,12,24 193:14
193:24 194:19
195:9 196:16 197:6
197:9 207:5 209:13
209:13 210:21
211:5 214:6 216:14
221:25 222:6,13,17
223:10,13 224:6
226:19,23 233:3
235:8 241:14 242:4
244:24 245:3,3,7,10
246:5,5,9,22 248:8
252:25 257:3,4,6,9
257:12,15,18 259:7
260:3,6,8,15 261:11
262:25 263:3,9,23
272:2 276:15,17
277:2,25 278:24
281:7 282:10,16
283:3,7,15,23
285:24,25 286:18
287:10 288:4,6,9
290:3,14,15 291:8
291:11 294:20
302:6 308:2,9,16
311:3,13 314:23,24
315:13
**room/living**
156:3
**rooms**
262:9,13 314:20
**rough**

148:3
**route**
4:13 289:10,17
**rude**
7:8
**rule**
109:4 131:20 132:3
209:10 220:23
265:10 268:10
270:9
**ruled**
217:11 223:19
262:12
**Rules**
1:21
**ruling**
216:4 266:16 269:13
**RULINGS**
320:23
**run**
43:12 73:16,19
106:16 110:18
119:17 120:10
**runaway**
43:21 45:4,11 47:13
75:2 99:6 106:20,23
107:16 108:3
112:11 113:22
159:14 193:19
194:11 195:11,25
196:8 197:19,25
216:17 248:19,20
248:22,23,25
302:10,16 303:21
303:25
**running**
46:11 74:11 225:6
**runs**
106:19 207:23
**ruptured**
160:7,11
**ruptures**
160:2

———————————
S
———————————
S

1:3 2:2,5 3:2,2 4:2,2
4:2 320:2
**safety**
61:6 96:18 98:7
104:16,20 105:3,6
105:10 106:9 236:4
**sale**
101:22,22 108:16
**salt**
132:20
**sample**
253:19
**Sarasota**
39:12
**saw**
24:8 29:3,20 33:6
119:4 121:9 123:8
130:12 135:21
155:24 156:11,13
158:18 188:12,20
195:18 196:18
209:23 216:12
220:13 276:10
279:13,19 284:6
287:15,18 289:13
290:3 307:14
309:11
**saying**
31:25 45:20 56:2,20
58:8 111:8 114:12
141:5,13 142:23
145:22 150:8,11
165:11 167:22
172:5,7 179:13
186:15 188:9 196:8
196:13 201:8 202:5
213:15 215:6 217:3
217:10,11 224:4
227:21 229:16
231:16 232:12
244:3 253:15 254:5
261:21 265:6
277:20 283:10,12
283:13 286:12
290:12,18 291:19
291:23 292:8



says
110:8 116:11,12
118:24 157:11
161:22 162:20
181:24 189:14
200:25 202:25
203:6 206:14,15
222:9 252:18
270:20 274:11
282:12 283:4
285:12,18,23,24
286:5,17 287:22
288:3,7 289:9
290:21
scale
312:16
scan
88:8 90:18
scanning
90:22
scared
190:15 191:9
scenario
111:14 255:23 309:5
scene
11:4,13 12:5 18:2
26:4 28:8 29:22
67:7 82:8 86:15,19
87:14 89:19,21,22
89:23 90:6,17 91:7
93:8 116:4 119:4
129:23 135:3
175:11 210:7
220:16 263:11
274:24 280:10
308:5 314:12
scenes
40:20,22
schedule
39:23
scheduled
267:8
schematics
105:18
school
36:10,12,13 134:5

Schwartz
291:21 293:10
Schwarz
2:9 4:20,25 5:11,16
9:13 10:6,16 22:9
23:21 24:19 26:22
27:20 68:13 79:6
140:3,6 146:2
178:13 189:22
190:4 203:3 231:20
291:18 293:8
318:13,18
Schweke
1:22 4:19 5:25 77:4
317:13 321:7,23
science
36:2 57:5 133:2
261:19
science-related
59:23
scientific
14:3 15:8 20:15,17
25:23 26:2 32:22
59:13 86:5 111:10
132:22 218:7
238:10 252:7 255:6
255:10 258:23
271:7,21
scope
49:7 51:18 52:23
90:12 91:16,25
92:25 97:21 99:14
103:6,13,16,21
104:23 105:19
108:23 109:8,21
125:24 128:25
129:7 184:22 185:7
221:7 225:11
257:22 263:12
scorched
231:4
screen
13:6 63:16 64:10,12
70:15 127:2 213:3,9
213:17 227:10,15
280:16 291:13

296:8,11,12,20
scroll
64:14,17,19 67:24
138:13 210:8
scrolling
70:7 138:10
se
125:11
sealing
3:7
seated
165:7 169:11
second
23:13 113:13 126:19
145:12 151:22
152:22 155:14
163:23 190:12
192:20 217:18
219:14 282:15,24
285:22 286:21
287:11,19 288:14
289:6 291:5,21
292:24 294:4
secondary
15:20 113:16 114:8
114:22,25 219:10
219:18 229:13,17
236:18 237:3 239:6
241:16,18 244:12
247:2,21 250:8,14
271:12 304:17
307:11,21
seconds
149:16 155:22 157:3
317:11,16
section
56:2 60:6 62:23
83:12 115:19
135:11,24 242:21
243:11 252:15
253:7 254:5,13,16
256:11,16 258:7
274:10 275:14
284:23 301:18
sections
61:14 62:12,17

secure
210:23 211:5
secured
35:17
see
23:18 24:6,7 32:17
32:24 42:18 48:10
48:17 49:20 50:2,19
50:22 58:11 63:13
64:15 65:14 67:20
67:25 69:2 70:19
79:21 80:16 83:10
83:12 102:2 104:14
110:5 115:12
116:25 118:6,10
121:14 123:20,24
125:18 127:2
129:10,11,16 131:3
133:7 135:16
136:15,15 137:9,13
137:15,20,21 138:5
138:11,14 156:8
157:10 160:21
161:3,23 162:17
164:7,19 165:15
166:11 168:13
169:21 170:15
174:20,21 180:10
181:2 185:4 187:3
189:13,15 191:13
191:20,21 198:14
199:8 200:2,10,16
200:18,21 201:12
201:25 202:9,19
204:5 206:9,10
208:15 209:15
210:4,8,11,21
211:16 212:11
214:11,16 219:5
220:3,10 224:5
226:4,7,12 228:3,4
228:6,6,21,22
229:22 238:20,23
241:22 242:19,20
243:5,17 248:7
250:2 252:15,15



256:17 263:14
264:15 265:8 266:5
266:9 275:8,11,17
276:22 278:17,19
278:22 280:20
282:9,17,18,21
283:6,17 284:9,10
285:2,5,7,11,15,20
286:3 287:11,12,23
290:8,19,20,21
291:18 292:2,6,7,20
292:24 295:22
296:21 297:3,4,9,13
298:7 299:6,8,22
300:7 301:7,19
304:4,12 308:7,18
314:19 316:11
**seeing**
16:24 128:10 162:12
188:8 284:16
285:15 287:6
**seeker**
262:2
**seen**
97:4,8 99:8,9 118:12
130:24 160:3 163:3
167:19 168:22
227:21,22 248:9
262:20 263:17
277:11 284:17
286:23 306:14,17
306:20 307:8
309:18
**sees**
195:9 215:16 216:15
283:2,14 288:19,24
290:11
**select**
15:11 252:13
**self-extinguish**
230:17
**sells**
244:19
**seminar**
77:20
**send**

20:12 57:17 67:11
147:9 236:11
**sense**
52:15 94:18 113:10
115:9 146:7 148:16
148:25 150:24
151:12 152:11
153:4,23 218:11
230:20 238:10
254:15 288:16
**sent**
10:23 38:25 57:15
68:6
**sentence**
206:15 286:14
**separate**
198:6
**separately**
308:20
**sequence**
110:24 111:16,22
113:11 254:23
271:15
**sequences**
252:19 254:22
**service**
3:16 187:18 189:4
**serviced**
121:13
**set**
71:19 74:6,12 82:19
136:5 142:8 144:3
145:11,24 146:9
149:9 153:9 203:15
204:25 205:4,8
268:6 269:14
321:11,20
**sets**
266:2
**setting**
11:20 182:21 195:20
203:10,15
**settled**
70:22 71:3,4,9 73:12
81:25 245:22
**seven**

80:6,7 255:9 258:9
**sewing**
240:6
**shadow**
201:21
**shape**
200:22
**She'll**
39:21
**sheathing**
211:7
**sheet**
11:25 87:21
**sheeting**
210:22,25 211:2
**sheets**
164:20 240:11,25
269:16
**shelves**
300:3 315:20
**shoot**
305:14
**shooting**
159:23 236:6 248:8
295:13 314:20
**short**
152:2 273:22
**shorting**
44:7
**shortly**
17:24 86:24 144:21
**shoulders**
231:8
**show**
70:14 147:22 165:12
189:23 232:6,21
260:5 262:24
276:14 301:2
305:12
**showed**
121:6 210:6
**showing**
181:18 199:7
**shown**
59:21 169:14 210:10
304:8 311:18

**shows**
31:19 119:25 210:5
**shrapnel**
112:16 193:23 310:3
**shut**
87:7 155:7 209:19
223:7 258:14,15
281:4
**sic**
27:9
**side**
12:5 136:6 145:5,7
145:25 146:10,22
147:11 148:13
173:2,5,7,11,12
176:5,7,16,20 177:2
178:3,4,10,11,23
179:11,13,21,24
180:5,14,15 191:20
199:7,10 212:2
267:3 285:10 297:5
311:13
**sides**
176:23 178:8 179:9
278:11 312:9
**sidewall**
299:9
**sifted**
35:17
**sign**
5:19
**sign-in**
11:25 87:21
**signage**
17:20
**signal**
187:16
**signed**
3:10,12,15 24:7,9,10
**significance**
66:2,5,9 78:3 83:25
84:5,12,15 190:13
233:6 269:6,12
**significant**
66:6,7 77:15 116:7
184:25 198:3



**signs**
59:16 224:7
**silence**
183:16
**silenced**
136:19 289:24
**similar**
49:23 100:5,17
   120:15 144:24
   215:22
**simple**
105:7
**Simpson**
251:17
**singed**
228:6,23 229:23
**single**
270:8
**sir**
5:3 6:4 8:15 9:21
   12:15 37:20 40:5,11
   40:14 46:13 49:12
   98:24 136:3 157:14
   256:20 267:20
**sit**
12:17 22:17 53:13,14
   77:22 94:25 161:12
   164:9 225:7
**site**
10:22 11:4,13,24
   12:9 18:22 19:3,5
   19:16 28:23 29:4
   35:18 93:25 131:10
   183:14 220:4 260:2
   274:24 295:3
**siting**
62:18
**sitting**
33:12 39:21 47:5
   62:14 94:14 168:6
   172:21,22 201:2
   299:5 316:4
**situation**
15:22 156:25 231:6
**situations**
119:18 255:21

**six**
80:5 81:22 113:24
   280:21
**six-foot**
202:17
**size**
157:5 191:25 249:11
   313:5,10
**sleeping**
120:23 139:12
   140:12,22 156:16
   173:4,20,25 175:14
   176:5 178:2 179:9
   179:10 180:11
   186:14 187:10
   198:23 203:22
   205:20 250:18
**sleet**
44:23
**slide**
304:9
**slightly**
148:8
**slow**
295:6
**slower**
64:18
**slug**
237:12,24 238:5
   240:7,15 247:5
   249:12,18 254:2
   255:13 304:6,7,16
   313:19 314:3
**small**
158:10 290:8,10
**smaller**
246:9 249:22
**smell**
147:6,10 148:10,13
   148:17,22,25
   150:22,24 151:9,13
   151:19,23 152:7,8
   152:11,14,18,21
   153:2,4,13,23
   280:22 289:25
**smelled**

153:12,18 154:9,11
   154:12 282:6
**smeller**
151:4
**smells**
288:17
**smoke**
119:20,22 135:20,25
   136:6,8,11,24
   137:10 138:20,23
   139:3,9,18 140:21
   140:24 141:6,8
   142:9,11,18 143:3,3
   143:7,10,24 144:3
   144:10,17 145:4,7
   145:24 146:9,21
   147:6,9,18,22,23
   148:4,7,10,13,22
   149:15,18,19,19,23
   149:25 150:4,6,16
   150:16,19 152:8,20
   153:10,12,13,14,18
   153:23,25 154:3,5,8
   154:11,16 156:21
   157:12,15,20,24
   158:3,7,9,18,20
   159:3,8 165:21
   166:24 167:16,25
   168:2 169:4,6,8
   170:8,11,23 171:8
   171:10,15,20,24,25
   172:5,13,14,14,20
   172:25 183:4,15,16
   186:8 187:9 192:3,3
   192:5,16 197:4,7
   246:17 279:18
   280:22,24 281:3
   282:6 285:18 286:6
   286:16 288:17,18
   289:12,25 290:20
   292:15
**smoked**
152:4,6
**smoker**
151:9
**smoking**

193:22 256:24
**smoldering**
246:16
**snow**
44:22 46:5 82:9
**Sodus**
4:13 89:7
**sold**
94:10 95:4 108:20
**sole**
269:20
**solid**
228:5
**somebody**
174:12 176:8 258:13
   258:14
**somebody's**
223:6
**somewhat**
292:19 295:11
**soon**
151:7,9 152:5 230:14
   308:14
**soot**
118:6 170:3,8,11
   171:11 209:14
**sorry**
14:12 16:24 23:22
   38:22 70:10 72:19
   81:2,16 83:20 84:9
   89:22 90:14 91:2
   110:3 123:22
   127:24 151:15
   155:3 161:16
   164:24 179:4 215:5
   224:18,18 242:25
   256:7 292:4 310:22
**sort**
45:23 128:11 167:7
   273:13 279:8 303:6
**sound**
160:6 179:3 219:3
**sounds**
83:2 85:23 159:22
   256:2
**source**



12:11 110:13,24
111:5,15,24 112:3
112:10,18 113:8
121:18 204:7 218:3
218:19 236:2,21,24
247:21 250:6
252:20,25 253:9,20
254:2,7 255:23
256:3 258:19 263:7
270:22 271:14
272:5,14 305:7
310:6 314:13
**sources**
41:8 55:17 218:2,14
223:14 250:13
255:12 256:13,18
257:4 270:24
271:11,25 272:2
307:11
**space**
81:24 82:11 88:20
105:7 141:4 167:6
167:23,24 209:25
257:24 261:12
283:15
**speak**
317:12
**spec**
221:18
**specialist**
38:24
**specific**
9:24 33:9 50:5 76:13
98:11,17 111:12
**specifically**
41:25 48:14 193:11
247:7 251:4
**specifics**
79:5
**specified**
319:11
**spoke**
11:10
**spoken**
10:5,14 11:23
**spot**

262:4
**spread**
154:21 155:16
158:14 209:2
**spreads**
218:25
**square**
119:7 211:8,9,10
231:17 300:4,6
**squaring**
230:22
**SS**
321:4
**stack**
297:24
**stacked**
240:9 297:20 299:21
300:2
**staff**
35:13,14
**stage**
61:17 194:3 215:18
215:25 226:18
255:9 258:22
292:11
**stamp**
132:11
**stand**
191:4
**standard**
98:10
**standards**
96:20,22 97:11,17
99:11,17,18
**standing**
168:2 169:5 171:5,7
194:4,4 195:8 197:8
197:15 276:7,14,17
278:2 308:13
**standpoint**
126:6 302:15
**Staples**
1:10 2:11 4:17
**start**
175:22 192:5 196:7
215:2,9 226:4,12

227:23 233:17
243:24 250:11
263:13 266:12
304:14
**started**
74:22 80:5 134:15
135:7 136:5 142:8
145:23 146:9 147:8
149:9 154:16 158:6
166:18 185:12,22
198:23 227:7,19
233:13 260:21
264:7 266:8 272:11
308:21
**starting**
39:4 218:11 297:2
298:8 299:7 300:8
**starts**
186:12 192:2 204:25
**state**
1:23 4:4,9,13 21:2,16
72:15 86:13 104:19
121:11 165:3 235:4
242:13 247:15
321:4,8
**stated**
95:19 123:19 124:9
144:18 147:4 161:9
180:4 184:14
212:25 243:20
263:20,24 276:21
280:21 295:24
**statement**
23:2 24:25 25:11,17
26:7 27:3,11 34:13
57:18 76:25 80:3
83:22 93:23 114:11
117:8 125:19
133:21 134:7,16,20
134:23,25 135:5
154:14 179:4
183:12,25 184:2
185:2,13,19,19
194:13 196:17
199:16,18 200:3
201:5 203:22

204:11,14 205:19
217:16 274:12
277:6,11 279:23
285:17 311:9
**statement's**
59:21
**statements**
11:18 25:5,8,25 26:9
27:24,24 28:11,12
28:16,18,21 29:6,10
30:6,11 31:18
120:17 124:7 125:4
133:12,23 163:17
186:4 194:16
196:21 210:2 216:8
217:19 257:11
263:18 265:19
268:12,15 269:20
269:23 270:6 277:5
**states**
1:2 39:7 96:17
146:12 160:25
186:6 190:9 209:19
219:21 279:12
**stating**
284:25
**stay**
61:4 317:14
**stayed**
103:21
**staying**
44:24
**steel**
72:13 81:10 232:14
**steering**
261:22
**STEPHEN**
2:9
**stepped**
281:7,10,15,20 283:5
287:23 308:14
**stepping**
308:10
**steps**
88:15 255:9
**Steve**



5:9 68:16 92:5
103:5 202:25 203:2
251:21 302:18
303:9
**stick**
197:11 246:13
**stickers**
96:14
**sticking**
248:9
**stinks**
151:22
**STIPULATED**
3:5,20
**stipulations**
5:10,13,18,20
**stock**
100:23
**stool**
238:23 239:12,24
240:24
**stools**
240:21
**stop**
308:16
**storage**
44:13,14 45:8,10,17
85:13 107:14
**store**
42:20 126:7 128:23
**stored**
42:25 44:19 45:2,8
45:16,20 106:13,14
118:22 119:10
238:22 239:9,20
241:2 315:10
**storing**
44:18 46:6
**stove**
264:17
**straight**
248:13,15
**Street**
2:8,12
**strength**
163:11

**strong**
31:10
**structural**
76:3
**structure**
30:21 73:22 88:8,11
88:13,25 147:22
153:25 166:25
167:16,21 186:23
187:2,5 192:6
234:22 244:24
262:11 264:11
**studs**
278:19,20,21,24
279:5
**stuff**
60:20 80:18 112:14
148:3 208:16
297:14 300:4
310:15 315:18
**subcontractor**
72:3
**subject**
54:3,24 60:4 305:13
307:23
**subject's**
128:17
**subjective**
196:21
**subrogation**
69:19,22,25 71:23
126:5
**Subscribed**
319:18
**subsequent**
92:19 275:9
**subsequently**
127:10
**substance**
9:12
**substantially**
108:19
**suck**
209:17
**sued**
37:16,16

**suffer**
216:6
**sufficient**
25:13,19 110:14
112:14 150:21
236:8 241:4
**sufficiently**
170:23
**suggest**
309:14
**suggested**
30:2 62:25 223:23
**suggesting**
309:13
**Suite**
2:8,12
**summarize**
115:15 267:21
**summarized**
83:25
**summarizing**
219:7 267:16
**summary**
36:9 38:3,12 71:6
83:17,23 89:10
145:13 270:9
**summer**
46:3
**sums**
270:11
**sun**
231:10,13
**suntan**
230:25
**supplemental**
20:7 23:17,23 25:3
28:2 82:20 275:24
279:11 290:19
291:16 293:6,22
**supplied**
62:3 241:3
**support**
30:14,23 34:9,15
35:12,14 117:13
132:24 141:18
198:17 208:19

260:5 261:10
265:23 266:6,18,20
272:11,13
**supported**
194:16 195:17
217:16
**supporting**
271:2
**supportive**
270:6,7
**supports**
134:13 196:12,17
205:20 216:12
275:6 279:6
**suppose**
114:23
**supposed**
266:3
**suppression**
43:9
**sure**
13:21 16:12,14 17:6
17:16,22 57:18
59:14 61:4 64:16
93:13 116:9 128:9
144:6 162:6 163:11
164:4 165:14
166:21 172:10
190:2 270:18
287:17 305:10
308:13
**surface**
312:3
**surfaces**
206:17
**surmise**
157:5
**surrounding**
313:16
**surveillance**
43:8
**survey**
257:20 258:6
**surviving**
294:23
**susceptible**



222:7
**suspected**
270:24
**suspicion**
268:3
**sustained**
259:2 306:6
**switch**
105:9 279:9
**switches**
285:14
**sworn**
3:10 4:4 5:15 319:5
   319:18 321:11
**synthetic**
241:11
**synthetics**
241:7
**system**
75:23 76:6,21 98:6
   102:22 104:4
   187:13 225:12
   232:22 235:5,16
   256:23 268:22
**systematic**
263:12
**systems**
43:9 106:11

---
                    T
---

**T**
1:19 3:2,2 4:2,11
   319:2,15 320:2
   321:2,2
**table**
168:6 264:20
**take**
9:6 12:14 35:13,14
   68:12,16 82:24 89:3
   98:4 120:11 127:12
   132:2,18 133:11
   136:4 142:7 145:4
   145:23 146:8 147:8
   148:12 149:24
   150:14 152:19,25
   153:9 155:12

157:16 166:18
174:24 179:7
195:19 200:19
202:18 207:18,25
208:20 243:23
244:10 247:15
273:22 278:14,16
280:15 289:16
300:4 317:4,11
**taken**
1:19 25:25 83:4
   91:13 135:13 144:3
   144:16 150:12
   155:8 242:5 265:16
   289:11
**takes**
87:24 151:18,23
   152:22,23,23
**taks**
258:6
**talk**
56:22 84:25 110:23
   114:4,21 251:7
   255:17 304:3
**talked**
10:20,21,22 44:12
   80:21 102:3 107:18
   109:3,11 121:16
   132:14,16,16
   137:10 167:8 184:5
   197:3 216:19 229:6
   246:25 250:12,13
   250:14 251:4
   256:22 257:12
   265:2,7,21 267:2,4
   267:5,6,8,11,19
   269:25 299:4
   300:15 301:13
   302:8,24 313:18
   316:24 318:7
**talking**
23:18,24 26:24 48:8
   66:23 110:17,19
   111:13 113:3,10
   114:14 126:5
   162:17 164:22

168:16 191:23,23
193:11 208:15
212:14 214:18,20
215:15 219:7
222:11,14 230:11
231:23 237:6,20
245:12 253:3
263:14 284:15
285:4 288:12 294:2
303:23 304:5,16
**talks**
189:14 253:7
**tall**
276:13
**tape**
296:17
**target**
59:4,8,9
**task**
60:13 62:8
**tasked**
103:20
**team**
9:14 33:25 34:16
   35:6
**technical**
53:13,15 146:7
   161:17 307:4
**technician**
35:14
**technicians**
34:8,9
**technique**
259:14,17
**technology**
39:9 129:14
**techs**
34:2 35:16,18
**tell**
8:22,25 26:24 30:10
   64:17 79:7 152:14
   167:9 241:24
   263:15 306:3
   317:25
**telling**
9:11 79:4 183:22

254:25 291:22
293:4 307:9
**temperature**
45:9,10,17,24 46:8
   46:16,19 47:16,19
   99:5 172:16,18,24
   196:6 197:10
   301:11 303:16
   309:22,24 310:7,8
**temperatures**
44:19 47:4 112:20
   148:4 197:23 198:3
   213:21 276:9
**ten**
35:9 36:5,6 100:8
**tent**
308:17
**tents**
88:21 308:7 315:22
   316:6
**term**
30:8 249:11 259:15
**terminal**
279:10
**terminologywise**
114:3
**terms**
99:24 110:18 111:3
   158:14 251:8
   253:12
**Tesla**
108:2
**test**
14:4 15:11 57:12,13
   89:17 90:4 98:22,22
   229:5,6 252:12
**tested**
57:20 90:5
**testified**
4:5 25:10 29:16,18
   48:11 52:16 71:14
   71:15,15 72:12,18
   73:6 76:14 129:21
   135:19 144:15,25
   162:10 163:5 165:6
   181:9 187:25 188:3



188:4 198:21
220:17 223:20,24
244:16
**testify**
49:16 50:12 98:21
287:15 319:5
**testifying**
75:11 194:9
**testimony**
23:6,11 28:2 29:23
31:7 32:4 58:24
62:22 68:25 70:5
81:4,18 114:13
115:23 122:22
124:20 135:22
137:3,9,13,21,21
138:18 139:16,22
141:20 142:15
145:13,17 146:19
147:2 154:7 157:10
162:3,16 164:3
171:9 174:19 175:5
176:21 178:21
179:6,7 180:8 181:5
182:19,22 183:7
185:10,20 188:23
189:13,19,25
195:14,17,21,22
199:2 201:6 205:7
217:13 225:15
247:4 279:17,25
280:16 282:4
283:23 284:7,21
291:14 310:16
314:2 319:6,10
321:13
**testing**
57:5 59:20 90:8,10
90:23,25 91:4,11
92:2 117:23 160:16
235:25 244:22
254:20 312:19
318:6
**tests**
89:12,16 90:2,19
91:8 97:16 98:2,11

98:17
**Texas**
41:24
**text**
243:5
**thank**
13:3 39:16,24 72:20
89:10 182:4 190:5
225:20 242:18
272:19 273:21
317:19 318:9,15
**thanks**
318:14
**thermal**
43:21 45:4,11 47:12
74:25 99:6 106:20
106:23 107:15,19
108:7 109:13
112:11 113:22
159:14 193:19
194:11 195:11,25
196:7,8 197:19,21
197:24 216:7,17
223:5 225:21 248:7
248:19,20,22,22,25
249:15,16 266:23
295:25 302:9,16
303:21,24,25
310:20 313:14
**thermo**
107:16
**thermostat**
74:7,11,14,16
**thick**
312:17,22
**thickness**
312:3
**thin**
312:25 313:2
**thing**
90:3 108:23 122:11
136:22 144:12
149:23 164:14
196:9 202:9 207:2
239:25 257:16
277:10 305:19

**things**
45:14 59:19 66:16,18
91:14 96:19 111:2
114:24 119:23
132:14 148:23
152:8 190:23 191:9
192:18 217:2
221:17 236:3 239:5
252:5 257:17
267:20 274:22
297:10 299:21
302:12 304:15
308:10
**think**
11:24 24:12 25:10
26:25 27:4 29:17
31:9 32:10,11 41:23
41:24 53:18 70:22
72:16 73:11 74:10
76:3 77:13,14 80:10
82:3 87:6 93:11,13
93:15,24 99:9
108:12 111:7 114:3
120:3,5,21 122:14
125:20 130:23
134:14 136:4,7
139:16 142:7
143:21 145:2
146:11 147:7 148:6
150:13 152:15
153:8 154:6 158:8,9
158:13 160:11
163:7,15,24 164:5
164:13 166:13,14
166:17 167:12,19
179:6 186:16
187:19,21 188:16
189:24 195:12
217:4 220:13
221:12,21 224:8
225:5,6,25 228:4
234:7 247:3 260:21
273:25 276:15
280:2,3 283:13
286:19 288:11
289:4,6 291:3,4,5

292:22,23 294:9
301:18 302:8
307:17,24 310:16
318:3
**thinking**
58:15 87:4 135:10
297:16
**thinks**
263:15 287:2
**thought**
128:10 130:22 179:3
279:18
**three**
9:19 34:15,23 83:15
83:17 118:6 141:6
141:10,12 158:25
178:15 193:2,10
201:14 202:15
219:24 221:13
222:12 223:13
224:17,18 226:10
257:10 258:10
285:9 314:25 315:3
**threw**
174:3
**throw**
43:4 101:19 151:21
180:12,16,20
**thrown**
174:8 182:12 210:17
**till**
132:7 154:17,19
**time**
1:15 3:22 9:6 13:3,17
13:22 17:21 19:25
29:19 38:4 48:19
63:19,24 66:12,13
66:15 67:10 68:5
82:23 93:21 94:8
95:2,9,10 104:17,18
108:16,16,21
116:17 119:2,18
120:10 121:2
129:20 130:11
133:23 135:7 137:5
140:23 142:17,18



143:22 144:2
145:16 151:18,23
152:2,3,19 153:9
157:2,25 158:15
163:23 165:25
166:25 167:3,19
170:9 174:17
180:21 181:15,20
181:23 186:12
187:7 194:2,7,23
196:9,25 197:2,25
198:10,12 199:14
199:24 209:2 213:5
216:17 220:8
224:24 233:18
235:14 246:15,21
250:22 260:10
264:21 267:23
274:18 276:2
282:15,15,24
283:20 284:6
286:21,22 287:8,12
287:18,19 288:14
288:14,17 289:2,6
290:4,25 291:6,22
292:9,23,24 294:4,4
295:6,10 303:15
304:6 307:8,15
314:5 319:10
**timeline**
143:13,15 244:3
294:25
**timer**
204:25 205:5,8
**times**
6:5,8,19 43:13
159:25 178:15,19
196:24 198:9
252:19 254:6
272:19 273:4 277:9
294:6
**timing**
149:6 215:15 216:20
**tip**
105:8 149:24 208:21
**tip-over**

105:8
**toaster**
199:11,13,23 200:6,9
201:13,15,21,23
202:12,14,24 203:4
204:6 205:23 267:5
**today**
5:3,4 6:19 12:15
22:17 39:10 59:17
62:22 66:13 77:22
84:24 94:25 225:8
317:22 318:7
**today's**
9:15
**told**
11:14,15 45:14 49:17
77:14 85:20 144:20
149:7 169:2 185:17
190:10 204:20
264:5 293:14
**tools**
251:16
**top**
68:18 82:14 118:2,4
168:3 179:22
207:20,21 229:25
231:4 237:17
240:12 241:23
246:2 297:13
298:18 299:5,11,21
300:2,5,16
**topic**
272:17
**torpedo**
73:14,16,24 74:8,18
81:8
**tossing**
43:14
**tot**
281:20
**total**
35:24 80:7 141:11,12
**totality**
111:17 218:6 309:8
**totally**
10:17 111:3 176:16

302:4
**totes**
66:18
**touch**
189:11
**touched**
306:14,21,22
**touching**
223:6
**tough**
133:24
**towels**
238:20,25 239:11,24
240:5,10,20,25
241:12 247:7
269:16
**trace**
220:19 221:6,9,9,19
**traced**
88:23 222:12 223:11
**tracers**
221:11,13
**trailer**
245:20,21
**training**
39:2 68:21 246:3
294:16
**trainings**
149:13 246:24
**trampled**
308:19
**transcript**
6:20 7:3 23:6,14
319:9,9
**transcripts**
25:2
**transfer**
192:23 193:2,3,9
313:15,15
**transferred**
36:15 193:12
**travel**
67:4,8 150:20 151:23
192:5 289:10
**traveled**
276:21

**traveling**
318:11
**treatise**
56:3,10
**trial**
3:22
**triangle**
113:3 115:8
**tried**
130:20 167:20 189:7
221:6,9,12 293:3
**trigger**
107:9 150:17
**trim**
201:18
**trip**
220:19 222:2 223:4,5
223:7,7,9,20 224:3
258:9,10
**tripped**
88:24 145:12 219:23
220:21 222:10,15
223:4,17 232:25
234:24
**tripping**
234:21
**trouble**
230:22
**troubles**
31:24
**true**
124:5,8 179:8 208:11
285:5 319:9 321:12
**Trump**
60:23
**truth**
262:2 319:5
**try**
20:11 43:7 83:9
103:14,15 104:9
105:21 126:20
162:23 163:12,23
272:22 273:23
277:17 282:25
**trying**
7:8 58:11,12 84:9



126:15 146:5 149:6
150:10 152:15
162:5 176:9 177:24
178:5 179:5 180:22
182:5 191:3 216:20
219:2 221:12 232:6
236:13 242:25
243:14 253:6
261:14 267:17
272:10 290:16,18
316:6
**turn**
11:9 40:2 74:15 83:6
201:9 242:23
264:17 272:21
273:18 297:2
318:12
**turned**
214:11
**turning**
67:18 135:14 175:10
276:20
**TV**
264:15
**two**
26:9 39:11 66:3
79:14,24 99:24
110:18,25 111:3
115:14 131:13
136:8 139:8,18
141:8 142:16,21,24
144:16 149:8
150:12,14,15 155:7
165:3 168:11
173:20,24 174:5
175:14 186:20
187:5 197:7 200:16
216:8 221:13
223:20 226:22
229:10 231:17
258:10 285:8 291:8
299:12 312:9
314:25 315:3
**type**
250:7 314:3
**typical**

32:24 48:23 101:14
133:22 151:4,5
201:12 209:15
246:21
**typically**
15:8 20:22 21:3
42:15 79:16 101:17
156:18 235:24
236:6 244:18,19
245:2 246:4 269:5

--- U ---

**U**
3:2
**UL**
96:12,15,20 97:2,11
97:17 98:3,10
**ultimately**
171:13
**unable**
132:15 188:5 221:19
286:8
**unartfully**
16:25
**unattended**
74:19
**unauthorized**
92:22
**unburned**
298:3
**und3erstand**
231:15
**undercharge**
109:12
**undercharging**
106:25 107:13
**underneath**
297:8
**underside**
214:21
**understand**
5:3 8:23,25 9:3 16:12
21:12 24:18 27:13
27:14 55:25 58:23
84:16,21 93:19
116:9 119:5 144:6

149:4 150:10,11
152:12 154:6
161:10 172:10
179:5 181:14
186:11 217:3,4
223:25 232:4
233:21 234:14
248:3,21 261:13,15
277:19 302:10
307:3
**understanding**
14:24 15:3 16:18
32:15 68:2 72:22
78:25 97:18,23 98:2
142:4 147:2 170:20
**understood**
14:8,15 25:24 26:14
29:14 45:6 53:9
59:11 69:21 75:13
125:2 128:4 246:25
317:21
**undertake**
130:17 132:3
**undertaken**
234:3
**undertook**
305:3
**underwrite**
36:3
**Underwriters**
96:16
**uniform**
301:7 302:4
**uniformity**
301:16
**unit**
73:19 74:13,14 96:10
156:17 214:14,15
227:16
**United**
1:2 39:6 96:17
**University**
36:14,16
**unmade**
267:3
**unplug**

201:9 221:17
**unplugged**
199:14,25 201:2
202:2,8,10
**unsigned**
3:14
**untestable**
271:9
**updated**
68:7,18
**updates**
68:19
**upper**
166:10 206:17
**upside**
149:24
**upstairs**
121:3
**upstate**
35:20 39:13 46:2
287:9
**urine**
148:22
**USB**
71:12
**use**
7:21 14:7,14 15:3
31:5 48:12 55:9,10
55:14,14,15,15,16
55:17 56:13 58:9,16
99:25 104:17,18
106:24 107:14
108:9,11 109:4,11
115:24 116:6,12,13
116:14 118:17,21
118:25 124:10,15
124:16 125:16,18
146:6 159:6 163:11
164:9 187:20 189:7
190:19 193:10
198:17 221:12,12
233:18 238:6
249:11,12,23
251:12,16,20
266:14 271:23
275:19



**uses**
164:8
**usually**
117:24 201:13
  244:19
**utilize**
35:12,13 57:24
**utilized**
50:20 266:20 313:21
**utilizing**
59:12 73:21 313:25
**UV**
231:23

**V**

**Vaca**
232:21
**vacant**
284:4
**vacuum**
30:3,25 33:12 218:18
  253:24
**value**
305:19
**variable**
248:19
**various**
29:9 62:17 109:10
  247:11 295:21
**vector**
259:14,16,20 260:5
  260:17 261:5,8
**vehicle**
60:14,16,23,25 72:11
  81:9 189:9
**vehicles**
60:19,19 61:2
**vent**
142:12 150:7 154:19
**vented**
160:4,14 310:3
**ventilation**
150:2 155:8 245:18
  278:13 298:12
**venting**
112:13 311:16

**verbal**
8:17
**verified**
27:7
**verify**
64:20
**verses**
16:20
**version**
62:18 68:7
**versus**
20:25 69:9,11,17
**vertical**
206:21 207:6,9,13,16
  208:22 231:15
  296:11 298:21
  299:13
**vertically**
208:11 296:4,7,22
**victim**
214:25 215:9,12,21
  216:5
**video**
43:8 77:4
**view**
143:19 168:18
  184:25 254:10
  269:10
**VIRTUAL**
1:18
**visible**
212:14,19,21
**visited**
129:23
**visual**
178:5
**visually**
195:9 238:9 278:22
**voltage**
91:13 98:5
**volume**
242:23
**volunteer**
295:7
**vouchered**
304:21,22

**W**

**waft**
152:20,21
**waited**
88:6
**waiting**
82:9
**waived**
3:9
**wake**
204:25 205:10
**waking**
136:23 147:5 289:17
**walk**
74:9 119:21 139:12
  164:8 277:15 282:2
  285:8 291:10
  292:12,21 294:19
**walked**
174:9
**walker**
164:7,8
**walking**
231:7 277:16 308:9
**wall**
136:9,10,13 138:22
  139:13 143:3
  183:17 201:3
  212:17 278:11,14
  278:16,18,22 279:5
  279:5 285:9 297:5
  300:25
**Wanemaker**
2:15 39:19,24
**want**
5:18 26:23 33:9,15
  49:5 55:11 59:8,10
  59:25 118:3 166:16
  190:25 203:16
  232:24 238:6
  242:10 244:25
  255:16 262:5
  266:13 273:6,12,22
  273:23 301:17
  302:13 304:3

306:12 315:5
  317:24
**wanted**
18:6,14 19:8,16 20:3
  64:20 265:13,14,15
  276:14 297:23
  300:9 312:20
**wants**
260:13
**warned**
50:23 51:11
**warning**
50:8 51:7,25
**warnings**
48:8,16,21 49:3,11
  49:14,15,16,18,19
  50:2,5,6,9,13,19,21
  51:2,4,13,21 74:4
**warrant**
234:5
**wasn't**
21:23 30:16 31:19
  32:3 33:3 51:11
  74:25 116:15
  117:15 121:7
  125:16 130:23
  131:12,18 133:18
  146:4 188:21
  216:13 221:8 237:4
  251:12,23 254:8
  259:25 261:21
  265:11 276:4 277:9
  277:15 279:14
  280:12,14 293:5
**watch**
264:16 314:18
**water**
47:8 149:21 197:10
  197:12
**way**
32:19,20 50:3 56:15
  79:9 86:17 118:2
  129:13 152:16
  153:7 156:20
  157:18 171:16
  191:2 198:17



204:11 225:6 229:7
231:18 236:12
237:14,16 244:11
248:2 261:22 264:3
268:3 273:20
277:21 282:2,17
287:11 288:22
290:14 291:9,23
302:23 305:24
321:17
**ways**
106:22 107:15
227:21
**we'll**
67:17 68:12 87:14
313:18
**we're**
5:3,13 7:20,22 8:10
15:8 32:25,25 47:3
47:3 55:11,12 58:2
58:3,3 59:18,19,19
60:20 61:16,19
66:23 69:16,24
71:22,23 90:7
105:11 110:16,19
111:13 113:3
126:20 161:19
178:25 191:9 197:5
208:15 218:9
226:21 245:12
247:5 255:7 285:4
286:24 308:16,17
308:25
**we've**
23:18,24 65:3 66:3
82:24 97:3 117:23
149:15 160:16
167:19 168:15
181:10 185:13
235:25 250:12
253:2 262:19 318:7
**wear**
230:25,25
**weather**
44:22 45:22
**website**

124:25 128:22
**week**
68:10 77:10
**weekly**
76:12,18 103:19
**weighed**
173:16,18
**went**
11:17 21:3 36:14
80:21 88:4,17
112:15 113:22
124:24 137:5
144:21 145:18
146:20,21 154:2
163:22 182:18
183:5 185:25
187:20 203:24
204:16 209:24
221:5,20 222:12,20
222:21,23 251:21
251:25 278:12
279:20 281:4 282:8
282:16 283:23,24
283:25 284:5
286:21 287:16,21
287:22 288:14
289:25 291:23
292:9,9
**weren't**
7:16 18:5,17 42:7
46:11 93:11 96:8
105:14 120:6
143:11,23 153:17
155:23 156:15
188:22 196:15
227:18 246:19
266:17 274:24
277:4 293:17
296:24 297:11
**west**
39:12 58:2
**WESTERN**
1:2
**whatever's**
44:23
**whatsoever**

92:2 122:25
**wheelchair**
173:3 177:2
**when's**
120:25
**WHEREOF**
321:19
**white**
41:4,8,13 170:25
171:18
**wicks**
117:21 118:6
**wide**
299:6
**wife**
141:22
**wild**
55:23 107:18,21
**wind**
107:18,21
**winded**
232:3
**window**
151:21 156:16
180:14
**windows**
156:12,15 207:19
245:19
**winter**
287:9
**witness**
3:10,16,18 4:3 5:17
5:23 23:2 24:25
25:8 31:18 115:15
127:15 133:23,25
138:3,8 165:23
166:4,5,19 167:11
168:12,15,20,24
169:13,13,22
170:25 171:12
175:2 181:4 184:2
196:20,24 210:2
232:2 257:11
263:18 265:19
267:4 268:12
269:22 270:5

318:22 321:10,13
321:19
**witness'**
120:16
**witnessed**
194:15
**witnesses**
193:21 198:9
**woke**
135:25 148:11
150:22 174:21
181:25 182:6
183:14,23 187:8,9
205:6 282:6
**wonderful**
87:8
**wood**
201:18 211:2 297:25
301:11
**word**
31:4 56:4 58:12 94:6
124:15 146:6 159:7
161:14 243:16
249:13
**wording**
58:5
**words**
16:2
**work**
22:13,15 60:11 61:9
65:25 69:17,17,18
69:25 70:2 76:8
79:11,13,15 84:4,12
102:6 186:3
**worked**
33:22,24 36:2 38:21
40:4,9,12 60:9
78:11 79:18,23
81:22 264:6 268:24
**working**
59:18 141:8 234:10
**works**
107:9
**world**
86:23
**worries**



12:24
**worse**
157:13,22
**would've**
220:21
**wouldn't**
31:3,16 32:2,16 55:7
59:7,8 67:14 75:10
122:8 134:10
141:22 142:16,23
149:7 158:22
169:19,25 170:10
171:21,25 172:8
186:3 188:10
214:24 215:6
222:22 227:9
243:14 278:5 288:5
288:5 292:5 294:18
296:9 309:14
**wow**
13:2 87:9
**write**
25:20
**written**
41:2,5,8,11 75:8,11
76:14
**wrong**
201:7,8 209:21
251:16
**wrote**
61:10 68:5

—————————————
**X**
—————————————
**X**
1:3,12 320:2,13
**X-ray**
102:20 229:5 232:23
232:24 305:9,10,13
305:25
**X-rays**
14:23 34:4 35:13
90:22,24 91:3,8
104:3

—————————————
**Y**
—————————————
**yarn**

238:19,22 239:11,24
240:6,20 247:8
**yeah**
6:13,14,16 13:2 28:5
29:24 33:11 34:5
43:3,17 45:13 48:20
58:17 62:15 63:18
63:21 64:7,16,23
66:18,22 70:20,21
71:14,22 72:8 75:14
80:2 86:19 87:2,6
90:2 95:23 107:24
109:14,16 110:2
115:7 116:11
117:21,21 120:9
121:9 127:24 128:9
128:12 137:18
139:5 140:8 142:20
143:5 149:4 157:4
157:20 159:16,17
161:5 164:25 165:3
165:14 174:4
179:20 192:21
200:23 208:14
211:2,12,12 233:21
237:13 238:4 243:4
248:24 249:10
254:18 256:10
257:14 263:10
264:15,18 267:25
274:6 276:24
279:24 281:21,23
283:22 284:19
288:2,10 294:9
295:5 296:6 297:8
303:5,10 306:11,19
307:3 312:15 313:3
316:16,19
**year**
36:15 38:14 60:4
76:11 79:13,24
121:4 128:13 287:8
**years**
38:11 59:17 79:12,25
80:4,6 100:8 134:9
182:5 184:4 246:24

269:8
**yes/**
92:6
**yesterday**
60:9,14 68:8,14
**York**
1:2,23 2:8 4:5,14
35:20 39:14 41:23
46:2 72:12 87:6
89:7 287:9 321:4,8
**YouTube**
264:15,16 314:18
**Yup**
190:7 206:11

—————————————
**Z**
—————————————
**zoom**
5:12 7:20 115:11
297:3

—————————————
**0**
—————————————
**02110**
2:12

—————————————
**1**
—————————————
**1**
3:17 63:8,11 64:2
65:3 66:3 67:18
82:17 86:10 135:15
307:7
**1,000**
276:10
**1,200**
76:10
**1:21-cv-00704-JLS**
1:9
**10**
138:6 244:20,20
**10:08**
1:15
**100**
47:7 97:8
**1000F**
112:20
**1033**
55:16 110:9

**11**
123:18 138:14
**1100**
2:8
**115**
189:13
**12**
35:9 138:6 140:9
244:20,20,23,23
**124**
136:15
**13**
127:5 129:9 140:10
**1321**
53:15
**14**
19:10 63:9 64:13
65:3 68:3 138:11
**14443**
252:18
**1450**
2:12
**14555**
4:14
**14614**
2:8
**14th**
68:20
**15**
123:21 124:20 130:2
155:21 157:3
**16**
119:7 138:11
**160**
137:13,14,20
**161**
137:13,15
**1650s**
305:14
**17**
119:9
**175**
2:12
**18**
129:10,11,12,15
138:15 295:4,5



303:18 304:10,19
306:10,16 308:25
309:18 311:19
313:13
**18650**
73:17 99:5 159:14
248:9 302:16
**18650s**
73:21
**187**
174:19 175:5
**19**
119:7,9 129:11,12,16
**191**
162:18
**1911**
249:25
**19421**
257:9
**19443**
252:15 254:6 255:19
**1965**
270:19 271:22
**1990**
134:6 183:21
**1991**
134:5
**19921**
261:6
**1995**
38:17
**1998**
38:20,21

_____

**2**

**2**
65:6,9,22 66:3 82:18
85:25 86:11,13
109:23 136:16
171:5 274:4
**2/27/20**
86:21
**20**
6:13,15,19 46:6
78:15 130:2 135:14
147:4 184:4 280:17

319:19
**200**
173:16 197:14
**2008**
38:22
**2010**
85:21 99:13 123:14
184:14
**2014**
38:23 39:9
**2015**
123:10,15 128:15,16
184:15
**2020**
4:23 5:6 67:10 78:16
80:4 86:15 93:4,18
148:11 210:7
289:18
**2024**
63:9
**2025**
1:14 321:20
**20th**
182:3,4
**21**
130:3 157:10 279:25
280:18 287:21
**2100**
303:18
**212**
197:11,13
**22**
126:25 127:11
128:15
**23**
17:12 160:19,21
161:19
**24**
4:23 5:6 17:12 19:10
64:13 65:4,13,17,23
68:4 77:16 148:11
**24th**
182:3,4,7 289:18
**27**
1:14 86:15 93:18
191:10

**28**
2:8 199:6
**29**
60:10 147:4
**2nd**
321:20

_____

**3**

**3**
46:5
**30**
3:16 39:6 206:8
**300F**
99:8
**31**
65:13,16,23 160:21
**33**
209:5
**35**
212:25 218:23,23
**350**
203:15
**36**
171:7 218:23 219:21
**37**
191:11 193:18
194:10 195:24
**38**
199:6
**3D**
90:15,17 91:7

_____

**4**

**4**
4:13 197:21 205:10
276:20 285:23
**4.5**
245:13
**4:00**
183:2 205:16
**40**
70:2
**400**
203:15
**41**
225:13

**423**
168:11,12 169:14
**424**
168:11 169:14
**43**
300:10,12,13,25
**45**
39:15 155:22 157:3
212:2 235:4
**450**
203:16
**46**
211:20 250:2 256:18
**47**
83:6 84:2,6,13 212:8
256:19 262:15
**48**
84:2,6,14
**49**
226:15

_____

**5**

**5**
115:22 116:11
118:10 119:6
137:22 138:4 171:4
245:13 285:25
286:13,17
**5/21**
71:2
**5:26**
318:21
**5:30**
317:14
**50**
6:9,10,15 39:15
78:18,21 86:6,11
**500F**
99:8
**51**
67:19,24
**53**
68:23 70:17 81:4
**54**
68:25 70:14,16,18
81:4



**56**
 225:13
**57**
 226:25
**58**
 214:22 215:8
**59**
 228:9 229:4,11

——————— 6 ———————

**6**
 62:10 115:10,21,22
  116:12 136:16
  286:5,13,15
**6.5.7**
 301:18
**60**
 69:25 229:4,11,15
  230:3 317:11,16
**60/40**
 69:16
**61**
 316:18
**63**
 232:20 320:8
**64**
 68:2 232:20
**65**
 320:9

——————— 7 ———————

**7**
 17:12 295:19
**700**
 226:23
**7317**
 4:13

——————— 8 ———————

**8**
 253:3

——————— 9 ———————

**9**
 17:12 121:11 126:25
  127:11 129:17

 137:22 138:4
**90**
 46:3,23 82:25 296:12
**900**
 76:10
**911**
 162:8 164:16 166:23
  187:12,21 189:11
  191:2 216:22 295:2
**921**
 53:13,25 54:5 55:16
  55:19 56:22 57:3,7
  57:21 58:19 60:6
  61:22 110:9 115:6
  258:7 301:17
**921643**
 206:9
**95**
 47:6

