UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
CAROL S. MARCELLIN, individually, and
as Co-Administrator of the Estate of
Charles E. Hollowell, deceased, and
JESSICA HOLLOWELL-McKAY, as
Co-Administrator of the Estate of
Charles E. Hollowell, deceased,

          Plaintiffs,

   -against-      Civil Action No.
                 1:21-cv-00704-JLS
HP, INC., and STAPLES, INC.,
         Defendants.
- - - - - - - - - - - - - - - - - - - -x

         REMOTE VIDEOCONFERENCE
         New York, New York
         March 20, 2025
         10:00 a.m.

    EXAMINATION BEFORE TRIAL of ANDREW
LITZINGER, the Expert Witness herein,
held remotely via Zoom at the
above-mentioned time, pursuant to
Court Order, before Ilysa A. Linzer, a
Court Reporter and Notary Public in
and for the State of New York.
        MAGNA LEGAL SERVICES
        (866) MAGNA-21
        www.MagnaLS.com



Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   FARACI LANGE, LLP
          Attorneys for Plaintiffs
 5        28 East Main Street, Suite 1100
          Rochester, New York 14614
 6   BY: STEPHEN SCHWARZ, ESQ.
 7
 8   COUGHLIN BETKE LLP
          Attorneys for Defendants
 9        175 Federal Street, Suite 1450
          Boston, Massachusetts 02110
10   BY: BENJAMIN LEVITES, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



MAGNA
LEGAL SERVICES

Page 3

```
 1

 2    FEDERAL STIPULATIONS

 3

 4        IT IS HEREBY STIPULATED AND AGREED

 5    by and between the attorneys for the

 6    respective parties herein, that filing

 7    and sealing be and the same are hereby

 8    waived.

 9

10        IT IS FURTHER STIPULATED AND

11    AGREED that all objections, except as

12    to form of the question, shall be

13    reserved to the time of the trial.

14

15        IT IS FURTHER STIPULATED AND

16    AGREED that the within deposition may

17    be sworn to and signed before any

18    officer authorized to administer an

19    oath, with the same force and effect

20    as if signed and sworn to before this

21    Court.

22

23

24                    -oOo-

25
```



```
 1
 2  A N D R E W   L I T Z I N G E R,
 3       the Expert Witness herein, after
 4       having presented a
 5       government-issued identification
 6       for verification, has been duly
 7       sworn by the Notary Public, was
 8       examined and testified as follows:
 9            THE COURT REPORTER:
10            Can you please state your
11            name for the record?
12            THE WITNESS:  Andrew
13            Litzinger.
14            THE COURT REPORTER:
15            Can you please state your
16            home address?
17            THE WITNESS:  747
18            Saffron Lane, Webster, New
19            York 14580.
20            THE COURT REPORTER:
21            Before we get started,
22            does everyone agree to the
23            usual Federal Stips?
24            MR. LEVITES:  Yes.
25            MR. SCHWARZ:  Yes.
```



1                    A. LITZINGER

2    EXAMINATION BY

3    MR. LEVITES:

4        Q.    It is nice to meet you,

5    Mr. Litzinger.  My name is Benjamin

6    Levites.  I represent the Defendants

7    in this case, HP and Staples.

8              So we have with us the court

9    reporter, Ms. Linzer.  We have your

10   attorney, Mr. Schwarz, and I will be

11   asking you questions about a lawsuit

12   filed by Carol Marcellin and Jessica

13   Hollowell-McKay concerning a fire on

14   January 24, 2020, at the residence of

15   Carol Marcellin and Charles Hollowell.

16   Attorney Schwarz may do so as well.

17             My first question is, do you

18   understand we are here today

19   concerning Ms. Marcellin's lawsuit

20   with respect to the fire at her

21   residence on January 24, 2020?

22       A.    Yes.

23       Q.    Have you been deposed

24   previously, Mr. Litzinger?

25       A.    Yes, I have.



                    A. LITZINGER

1

2      Q.    When were you previously

3    deposed?

4      A.    It has been -- it should be

5    in my CV, but I have been deposed I

6    think five or six times now.

7      Q.    Okay.

8      A.    Most recent was October.

9      Q.    Okay.  So you have some

10   familiarity with the process.  I am

11   going to get through these preliminary

12   rules as quickly as possible because

13   you have familiarity.

14          The goal of today is to

15   produce a written transcript of our

16   conversation that reads question and

17   answer, question and answer and so on.

18   Is that okay?

19     A.    Yes.

20     Q.    So in a normal conversation

21   I appreciate when you anticipate the

22   rest of my question, but so that we

23   can get that same transcript you will

24   have to allow me to finish my

25   question.  So if I hold my hand up I



```
 1                A. LITZINGER
 2   am not trying to be rude, I am just
 3   trying to indicate that I am still
 4   asking a question.  Is that all right?
 5        A.    Yes.
 6        Q.    Okay.  Equally if you are
 7   giving an answer I will make every
 8   effort not to start another question
 9   before you are finishing.  If I do so,
10   please let me know that you haven't
11   finished an answer.  Is that okay?
12        A.    Yes.
13        Q.    This part is extra important
14   because we are on Zoom.  Do you agree
15   not to use your cell phone or other
16   electronic devices during the
17   deposition when we are not on a break?
18        A.    Yes.
19        Q.    You can take a break at any
20   time for any reason that you would
21   like.  My only request is that you --
22   if there is a question pending that
23   you answer it before we take the
24   break.  Is that all right?
25        A.    Yes.
```



```
 1                    A. LITZINGER
 2       Q.    I will try to put them in
 3   every hour, hour and a half, something
 4   like that.
 5             Do you have any notes or
 6   documents with you today?
 7       A.    I just have a copy of my
 8   final report.
 9       Q.    Okay.  Do you agree not to
10   refer to any notes or documents other
11   than those we review together in the
12   deposition?
13       A.    Yes.
14       Q.    Okay.  Is there anyone else
15   present in the room with you today?
16       A.    No.
17       Q.    Sir, you are doing an
18   amazing job so far, but if you can
19   keep giving verbal answers, so saying
20   yes or no instead of shaking your
21   head.  Similarly the transcript won't
22   capture tones, so try to avoid answers
23   like "uh-huh" and "uh-uh" if that's
24   all right.  Okay?
25       A.    Yes.
```



1            A. LITZINGER

2      Q.    What did you do to prepare

3  for this deposition without telling me

4  the substance of any conversations

5  that you might have had with Attorney

6  Schwarz or anyone in his firm?

7      A.    Outside of preparation with

8  my attorney, I reviewed all notes,

9  photos, and documentation as it

10  pertains to this loss.

11      Q.    Okay.  The notes were notes

12  that you took, or notes from others,

13  or both?

14      A.    It would be Jason

15  Karasinski, the O and C for this file.

16  I reviewed his report, his photographs

17  and notes as well as my own

18  documentation, and as well Mr. -- I

19  apologize, I forget -- I am very bad

20  with names.

21      Q.    Dr. Martin?

22      A.    Thank you.

23      Q.    So you looked at

24  Mr. Karasinski's photos and notes,

25  Dr. Martin's report.  Did you have any



Page 10

1                    A. LITZINGER

2    photos or notes that you took?

3        A.    Yes.

4        Q.    Okay.  And you reviewed

5    those as well?

6        A.    I did.

7        Q.    Have you spoken about this

8    case with anyone other than Attorney

9    Schwarz and Mr. Karasinski?

10        A.    No, I have not.

11        Q.    What did Mr. Karasinski tell

12    you in preparation of your report?

13    You can talk generally if you had a

14    lot of conversations or anything like

15    that.

16        A.    Just the details and the

17    facts of the case.  I was at the joint

18    scene exam with Mr. Karasinski, so we

19    both have a lot of the same

20    information.

21        Q.    Did you review any other

22    documents in preparation for the

23    deposition today other than the ones

24    we just mentioned?

25        A.    Nothing outside of what was



```
 1                    A. LITZINGER
 2   in my -- stipulated in my report.
 3   There was a scan of the computer that
 4   was done very early on, the subject
 5   computer.  I did briefly look at that.
 6   That would be the most substantial
 7   other than our typical 921 and
 8   anything related to that.
 9        Q.    Without getting into too
10   exhaustive of a list, what is related
11   to a typical 921?
12        A.    So for 921 it would be
13   looking at things such as arc survey,
14   arc mapping.  Primarily the arc
15   survey, arc mapping section of Chapter
16   6 and Chapter 9, which is the
17   electrical section.
18        Q.    Did you perform an arc
19   survey in this case?
20        A.    Yes, I did.
21        Q.    Did you do arc mapping in
22   this case?
23        A.    So an arc survey is used to
24   create an arc map, so yes, I did.
25        Q.    So you created an arc map in
```



Page 12

```
 1                A. LITZINGER
 2   this case?
 3       A.    If there was any electrical
 4   activity or arcing identified at the
 5   scene, yes.
 6       Q.    Was there any arcing
 7   activity at the scene?
 8       A.    Not identified at the scene,
 9   no.
10       Q.    So you didn't create an arc
11   map because there was no arcing; is
12   that fair to say?
13       A.    Yes.  So we would have
14   created -- we created a diagram of the
15   scene, but there is no information as
16   it pertains to any arcing that was
17   found at the scene because none was
18   found.
19       Q.    Did you take any medication
20   today, sir?
21       A.    I did not.
22       Q.    Are you able to sit through
23   this deposition and answer questions
24   comfortably?
25       A.    Yes.
```



Page 13

1                    A. LITZINGER

2       Q.    Okay.  Can you review

3   documents if I displayed them on your

4   screen here?

5       A.    Yes, I can.

6       Q.    If you need me to magnify

7   them or move them around, please let

8   me know and I will do that for you.

9   Okay?

10      A.    Yes.

11      Q.    Are you familiar with HP as

12  a company?

13      A.    Yes, I am.

14      Q.    What is HP?

15      A.    They primarily produce

16  computers.

17      Q.    Okay.  You understand that

18  the allegations in this case are that

19  HP produced a defective product that

20  caused the fire in this case?

21      A.    Yes.

22      Q.    Okay.  So you understand

23  that that's the ground of the claim

24  here?

25      A.    That's my understanding,



Page 14

1                    A. LITZINGER

2  yes.

3      Q.    And it is a serious claim;

4  right?

5      A.    Yes.

6      Q.    Okay.  And you applied the

7  scientific method to your analysis of

8  the serious claim?

9      A.    Yes, I did.

10     Q.    And you agree that part of

11 the scientific method is to be able to

12 test the adequacy and accuracy of your

13 hypotheses?

14     A.    Yes.

15     Q.    What do you know about the

16 history of this HP computer,

17 Ms. Marcellin's notebook?

18     A.    It was -- I am going off

19 memory, so it was an older computer of

20 hers.  She had purchased a newer

21 computer, which we did collect that as

22 evidence.  She was running, I believe,

23 it was some updates that the last time

24 she used it she was running some

25 updates.



1                    A. LITZINGER

2      Q.    Is product history something

3   you would consider in the assessment

4   of a particular product that is

5   alleged to have caused the fire?

6      A.    I am sorry, can you repeat

7   that, please?

8      Q.    Yes.  So my question is, is

9   product history something that you

10  should consider in assessing a product

11  that's alleged to have caused the

12  fire?

13              MR. SCHWARZ:  Objection

14          to the form.  He wasn't

15          hired to assess the

16          product, but you can

17          answer the question if you

18          can.

19      A.    Yes, but that would be

20  outside of the scope of my

21  investigation.

22      Q.    Okay.  So you didn't look at

23  the history of this product?

24      A.    We collected information

25  from Ms. Marcellin about the product,



Page 16

                    A. LITZINGER

1
2   about the history of the product, but
3   that was not part of my scope of the
4   investigation.
5       Q.    Okay.  So some information
6   was collected from Ms. Marcellin about
7   the history of the product.  Was there
8   any information about the model in
9   particular that you collected or that
10  your team collected?
11      A.    I am not sure I understand
12  your question.  I am sorry.
13      Q.    That's okay.  So you said
14  that you collected information with
15  Ms. Marcellin about her personal
16  history with the product with that
17  particular notebook.  My question is,
18  do you know anything about the history
19  of this model generally?
20      A.    Do you mean this particular
21  model in terms of HP, or this model as
22  in terms of Ms. Marcellin?
23      Q.    In terms of HP.  Thank you.
24      A.    I did not look -- I don't
25  have that information.



Page 17

1                    A. LITZINGER

2      Q.     Would you agree with me that

3  the use and operation of an appliance

4  should be well understood before it is

5  identified as the cause of a fire?

6      A.     I think every effort should

7  be made to do that, but the -- yeah.

8      Q.     Would you agree that the

9  degree of damage to an appliance is

10 not an adequate indication of a fire's

11 origin?

12     A.     Yes.

13     Q.     That's because an appliance

14 can be damaged in a fire as opposed to

15 causing a fire; right?

16     A.     That's correct.

17     Q.     And this is more so in a

18 circumstance where an appliance might

19 have a fuel in it like a battery pack

20 and a notebook computer; right?

21     A.     That would be taken into

22 consideration.

23     Q.     Do you know if there are any

24 other lawsuits alleging that this

25 model of notebook caused the fire?



Page 18

1                    A. LITZINGER

2      A.    I am not aware of that, no.

3      Q.    Ms. Marcellin was deposed on

4  July 23rd and July 24th; right?

5      A.    I don't know what the -- I

6  don't know the dates off the top of my

7  head.

8      Q.    Have you seen both

9  transcripts for her deposition?

10     A.    I have seen the first

11 transcript.  I did not look at the

12 second one.

13     Q.    So the first transcript was

14 of the July 23rd deposition; does that

15 sound right?

16     A.    Again, on the dates, I don't

17 have the dates committed to memory, so

18 I will have to defer to you on that

19 one.

20     Q.    The reason I am asking about

21 the dates is because I am curious if

22 you were retained before she was

23 deposed or after, if you know?

24     A.    Before.

25     Q.    So prior to 23?



```
 1                  A. LITZINGER
 2      A.     That's correct.
 3      Q.     Because you were at the
 4  scene exam?
 5      A.     That's correct.
 6      Q.     Okay.  Do you remember when
 7  you were engaged in this matter?
 8      A.     I will have to look at the
 9  date.  I don't know when FRT as a
10  company was retained.  I know that --
11  but I was present for the joint scene
12  examination on 2/27/2020.
13      Q.     You were certainly retained
14  by 2/27/2020; is that fair to say?
15      A.     Yes.
16      Q.     All right.  Did you -- when
17  you reviewed Ms. Marcellin's first
18  transcript there, did you have any
19  questions that came to mind that
20  weren't answered in her deposition
21  that you wanted to ask her?
22      A.     No.
23      Q.     Did you, yourself, ever
24  interview Ms. Marcellin?
25      A.     I did not.
```



Page 20

1                    A. LITZINGER

2        Q.    Did Mr. Karasinski interview

3    Ms. Marcellin?

4        A.    I believe he did.

5        Q.    Do you know if it was

6    recorded?

7        A.    I do not know the answer to

8    that question.

9        Q.    Okay.  As you sit here

10   today, are there any questions you

11   would have liked to ask Ms. Marcellin

12   if you were given the chance?

13       A.    No.

14       Q.    Did you ever ask to speak

15   with her?

16       A.    I did not.

17       Q.    Was there any reason you

18   didn't ask to speak with her?

19       A.    Jason Karasinski, he did the

20   interviews.  He asked what I felt was

21   all relevant questions at the time, so

22   I had no reason to ask her questions.

23       Q.    So you said you reviewed her

24   deposition transcript.  Did you review

25   her witness statement from the fire?



Page 21

```
 1                  A. LITZINGER
 2      A.    I did.  If you have
 3  something specific I would have to
 4  look at that.
 5      Q.    Understood.  Did you review
 6  her affidavit?
 7      A.    I believe that was taken
 8  semi recently.
 9      Q.    Correct.
10      A.    I did review it.  Again, if
11  you have a specific question I would
12  have to see it again.
13      Q.    And that was created after
14  your report was written; correct?
15      A.    Yes.
16      Q.    Do you know what the
17  circumstances of its creation were?
18      A.    I believe it was in regard
19  to additional information that was
20  brought up by your experts.
21      Q.    Who do you understand
22  interviewed her to create that
23  affidavit?
24      A.    I believe my attorney did
25  that.
```



Page 22

                    A. LITZINGER

1

2     Q.     Okay.  Other than the

3  witness statement, the depositions,

4  and affidavit, are you aware of any

5  other statements from her,

6  Ms. Marcellin, that were memorialized

7  in writing?

8     A.     Not that I am aware of.

9     Q.     Did anyone from FRT take a

10  written statement of Ms. Marcellin?

11     A.     Outside of initial witness

12  statements, not that I am aware of.

13     Q.     Do you know if there is any

14  reason why FRT didn't take a witness

15  statement?

16     A.     I believe Jason Karasinski

17  did speak with Ms. Marcellin around

18  the time of the joint scene

19  examination, but after that I don't

20  know if he had any further follow-up

21  with her.

22     Q.     Do you know if Ms. Marcellin

23  had any issues with respect to her

24  memory?

25     A.     Not that I am aware of.



Page 23

                    A. LITZINGER
1
2       Q.     How would you know one way
3   or the other if you didn't speak with
4   her?
5               MR. SCHWARZ:  Objection
6               to the form of the
7               question.  You can answer.
8       A.     That would have come from my
9   O and C, Jason Karasinski.
10      Q.     Are you aware that she
11  needed to change her answers in this
12  case previously?
13              MR. SCHWARZ:  Objection
14              to the form of the
15              question.  Irrelevant.
16      Q.     You can answer,
17  Mr. Litzinger.
18      A.     Can you ask the question
19  again?  I am sorry.
20      Q.     Yeah.  Are you aware whether
21  she needed to change her answers in
22  this case previously?
23              MR. SCHWARZ:  Same
24              objection.
25      A.     I believe that may have


MAGNA
LEGAL SERVICES

Page 24

```
 1              A. LITZINGER
 2  occurred.  I don't recall off the top
 3  of my head.
 4      Q.    Do you find her statements,
 5  meaning, her witness statement that
 6  you looked at, the deposition that you
 7  reviewed, and her affidavit to be
 8  consistent with each other?
 9      A.    I believe there are
10  consistencies, yes.
11      Q.    Well, I understand there are
12  some consistencies, but would you
13  describe them as consistent with one
14  another, or inconsistent with one
15  another, or would you use some other
16  term?
17      A.    Well, I guess I would need
18  more specifics in order to say one way
19  or the other on that.  I don't want to
20  throw blanket yes to that question.
21      Q.    So you don't know if they
22  are consistent or inconsistent without
23  looking at them more specifically?
24      A.    I would need more specifics
25  to be able to answer that question.
```



Page 25

1                    A. LITZINGER

2      Q.    Okay.  So when you were

3   formulating your report, and you were

4   looking at these three different

5   statements, did you rely on one

6   particularly?

7                    MR. SCHWARZ:  Objection

8                to the form of the

9                question.  You asked him

10               three different statements

11               and his report.  Are you

12               referring in some sense to

13               her affidavit which was

14               done after his report, or

15               are you referring to some

16               other statement when you

17               are talking about three

18               statements?

19                    MR. LEVITES:  The three

20               statements are her witness

21               statement, the deposition

22               that -- the three

23               statements he reviewed;

24               the witness statement, the

25               deposition that he



Page 26

```
 1              A. LITZINGER
 2         reviewed, and the
 3         Affidavit.
 4           MR. SCHWARZ:  Right,
 5         but the Affidavit came
 6         after his report.  Your
 7         question was premised on
 8         what he looked at when he
 9         wrote his report.  That's
10         why I brought it up.  He
11         didn't have her affidavit
12         at the time he wrote his
13         report.
14     Q.    Okay.  Why don't we focus on
15   the things you had at the time of your
16   report that you reviewed, which was
17   the fire department statement, and the
18   deposition; is that right?
19     A.    The fire department -- any
20   statements made around the initial
21   scene examination and the first
22   deposition?
23     Q.    That's right.
24     A.    So can you just -- and you
25   are asking me what?  I am sorry.
```



Page 27

```
 1                    A. LITZINGER
 2        Q.    With respect to those two
 3   documents, did you notice any
 4   inconsistencies between them?
 5        A.    I don't recall off the top
 6   of my head, no.
 7        Q.    Okay.  Did you find her
 8   statements in those two documents to
 9   be consistent with the physical
10   evidence that you discovered during
11   your examination?
12        A.    I don't recall that off the
13   top of my head.
14        Q.    Okay.  Did you find her
15   statements, meaning, the two we are
16   talking about; the deposition
17   statement and the statement she gave
18   at the time of the fire, did you find
19   them to be credible?
20        A.    At the time, yes, but my
21   investigation is focused on the
22   evidence, what the evidence tells me
23   also.
24        Q.    Okay.  Do you find them to
25   be credible today?
```



Page 28

1                    A. LITZINGER

2        A.    Yes.

3        Q.    Do you have any notes that

4    Mr. Karasinski gave you from his

5    interviews?

6        A.    We have those in our

7    repository, but I don't have those in

8    front of me today, no.

9        Q.    Have you reviewed them

10   previously?

11       A.    I have.

12       Q.    Okay.  When you reviewed

13   those notes, did you find that her

14   statements were consistent with the

15   other things that we just talked

16   about, meaning, her statements at the

17   time of the fire and in the deposition

18   that you reviewed?

19       A.    I apologize, I am thinking.

20       Q.    Please, take your time.

21       A.    I believe there were some

22   inconsistencies as far as where things

23   may have been located in regards to

24   the closet, but other than that, most

25   things were consistent.



Page 29

```
 1                    A. LITZINGER
 2        Q.    Which inconsistencies with
 3    respect to the closet do you remember?
 4        A.    The presence of an old
 5    laptop.
 6        Q.    Is there anything else that
 7    you remember?
 8        A.    Not that I recall off the
 9    top of my head, but if you ask me a
10    specific question it may spark
11    something later on.
12        Q.    Okay.  What is your full
13    name, Mr. Litzinger?
14        A.    My full name is Andrew David
15    Litzinger.
16        Q.    And have you ever gone by
17    any other name?
18        A.    Just Andy.
19        Q.    What is the address of your
20    primary residence?
21        A.    747 Saffron Lane, Webster,
22    New York 14580.
23        Q.    When did you move to Saffron
24    Lane?
25        A.    I bought my house five years
```



Page 30

1                    A. LITZINGER

2   ago.  So I believe -- what are we in,

3   March?   About March 2020 is when I

4   bought my house.

5      Q.    Okay.  Do you know of anyone

6   other than the people mentioned in

7   your report, and the individuals we

8   discussed already, meaning,

9   Attorney Schwarz, Ms. Marcellin,

10  Mr. Karasinski, Dr. Martin, is there

11  anyone else that knows anything about

12  this incident?

13                MR. SCHWARZ:  Object to

14           the form of the question.

15     A.    Not that I am aware of, no.

16     Q.    If you can give me a brief

17  summary of your educational background

18  from high school to your highest level

19  of educational attainment?

20     A.    Sure.  Brief summary would

21  be I graduated high school in 2003.  I

22  joined the United States Marine Corps.

23  I did five years active duty where I

24  got out with an E5 sergeant.  And in

25  that time period I became FAA



Page 31

1                    A. LITZINGER

2    certified to -- certified unmanned

3    aircraft safer flight, which is a

4    pretty big certification.

5             From there I graduated -- I

6    left there and went to college to be

7    an electrician where I graduated with

8    honors.  That's more of a trade

9    school.

10            Then after that I went back

11   to school to -- for electrical

12   engineering.  I graduated from Monroe

13   Community College in approximately

14   2013 with an associate's degree in

15   engineering.  Then from there I went

16   to Rochester Institute of Technology

17   where I graduated in spring of 2016

18   with a bachelor's degree in electrical

19   engineering.

20       Q.    Okay.  That's very helpful.

21   Do you have any licenses or

22   certificates?

23       A.    I don't have any licenses.

24   I have certificates in different

25   areas.



Page 32

1                    A. LITZINGER

2      Q.     Okay.  Could you talk about

3   the ones that were pertinent to your

4   report here first?

5      A.     Certificates?

6      Q.     Correct.

7      A.     So pertinent to this case my

8   degree as an electrician coupled with

9   my degree in electrical engineering

10  allows me to evaluate the building's

11  electrical system as a whole as well

12  as my degree in electrical engineering

13  helps me look, you know, at potential

14  failures in appliances and anything

15  electrically connected, it helps me in

16  that evaluation.

17     Q.     Okay.  But you mentioned you

18  had a number of certificates too, so I

19  am just wondering if there are any

20  certificates that you particularly

21  relied on in formulating this report?

22     A.     No.  My certificate, no.

23     Q.     Okay.  I guess what is the

24  most recent certificate you have

25  received in respect of this work?



Page 33

```
 1                    A. LITZINGER
 2       A.     As it pertains to this case
 3   or --
 4       Q.     Just generally.
 5       A.     Generally my most -- I have
 6   an ABYC Marine Electrical Technician
 7   Certification, but that applies to
 8   boats.
 9       Q.     Okay.  Are you a
10   professional engineer?
11       A.     I do not have my
12   professional engineer license.
13       Q.     Are you -- do you have any
14   professional background in computer
15   design?
16       A.     I do not.
17       Q.     You were with the Military,
18   and so that deals with those
19   questions.  I apologize, should I be
20   addressing you as Sergeant Litzinger?
21       A.     No, no, no.  I am no longer
22   active duty, but thank you.
23       Q.     Understood.
24              Have you ever personally
25   been involved in a civil lawsuit,
```



Page 34

1                    A. LITZINGER

2    meaning, you sued someone, or they

3    sued you?

4        A.    Personally, no.

5        Q.    What about criminal

6    proceedings, have any charges been

7    brought against you?

8        A.    No.

9        Q.    Any other kind of lawsuits,

10   arbitrations, anything like that,

11   again, personal to you?

12       A.    No.

13       Q.    Okay.  So we already talked

14   a little bit about this.  I think you

15   have kind of brought me up to 2016

16   with respect to your employment

17   history, but if you can give me a

18   brief summary of the positions you

19   have held, and the responsibilities

20   you have held since retiring from

21   active duty with the Military?

22       A.    Sure.  What I -- while I was

23   in college, my first time in college,

24   my electrician's degree to make it

25   easy, I worked for a company called



Page 35

```
 1                    A. LITZINGER
 2   Blackmon-Farrell Electric where I did
 3   project management and project
 4   estimation.  Basically what I did
 5   there is I would take engineering
 6   drawings and determine a cost estimate
 7   for our company to be able to complete
 8   that work based on either the new
 9   conditions that are there, or the
10   existing conditions.  Once those -- if
11   we did win those bids I would then
12   manage that project from beginning to
13   end.
14             From there while I was in
15   school, and part time while -- in
16   school for my engineering degree I did
17   work for Picard Engineering.  While I
18   was there I did what is called MEP
19   work, it is mechanical, electrical,
20   plumbing.  I didn't do any mechanical
21   or plumbing in that regards, but I did
22   the electrical.  That pertained to
23   doing anywhere from residential to
24   industrial or commercial design work.
25   So in that instance I would do -- I
```



Page 36

```
 1                  A. LITZINGER
 2   would evaluate generator systems to
 3   upgrade those or bring those up to
 4   current code and compliance.
 5           I did work for the hospitals
 6   in their infectious disease ward to
 7   design the electrical systems for part
 8   distribution all the way to the
 9   electrical system in terms of
10   receptacles, things of that nature.
11           I did solar panel design and
12   layout as well as other types of
13   renewal energy such as wind.  I did
14   game and casinos.
15           I did work for a Lockheed
16   Martin designing some of their
17   infrastructure.  Whenever they get a
18   new project they would basically gut
19   an entire facility to set up a new
20   area electrically for whatever new
21   project they had.
22           Then from there when I
23   graduated from RIT with my bachelor's
24   in electrical engineering I came to
25   work for FRT.
```



Page 37

1               A. LITZINGER

2      Q.     So basically your entire

3   career since getting your degree in

4   2016 from RIT has been with FRT?

5      A.     My full-time career, that's

6   correct.

7      Q.     Okay.  So you talked about

8   gutting and setting up these areas for

9   Lockheed Martin, and also just

10  generally electrical design for

11  residential and commercial spaces;

12  right?

13     A.     That's correct.

14     Q.     So would you know a lot

15  about how a properly wired house is

16  supposed to look?

17     A.     That's correct.

18     Q.     You know, pull the walls off

19  and you can see if it was a hasty job,

20  or if everything is nice and neat kind

21  of thing?

22     A.     Yes.

23     Q.     Okay.  How would you

24  characterize the electrical system of

25  the Marcellin residence based on your



Page 38

1                    A. LITZINGER

2    experience in designing new builds and

3    things like that?

4         A.    I would say it was typical

5    of that type of structure.  This was

6    what I would call more of a modular

7    home, so that would be pretty

8    consistent with those types of wiring.

9         Q.    So did it look to you like

10   old?  New?  Recently redone?  Can you

11   comment on, I guess, the

12   characteristics of the wiring as it

13   were?

14        A.    In terms of age I can tell

15   you it wasn't anything recent, but

16   outside of that I don't have much

17   information.

18        Q.    Was it messy, or was

19   everything cabled nicely?

20        A.    I didn't see anything wrong

21   with the installation.

22        Q.    I live in a 1941 house, and

23   I had to redo the electric and it was

24   full of old stuff that wasn't

25   connected to anything, right.  So



Page 39

```
 1                A. LITZINGER
 2   there is an old doorbell chime that
 3   doesn't go anywhere, and there's a
 4   cloth-wrapped wire in the wall that
 5   isn't connected to any outlet.  Did
 6   you see anything like that in the
 7   Marcellin home, any old or essentially
 8   extent-type wiring?
 9        A.    No, I did not.
10        Q.    So everything looked like it
11   was going somewhere?
12        A.    Yes.
13        Q.    It all had a purpose?
14        A.    That's correct.
15        Q.    And it was pretty neat and
16   orderly behind the walls?
17        A.    Yes.
18        Q.    Was everything in channels,
19   or was it just out when you took the
20   wall off?
21        A.    I am sorry, I don't know
22   what you mean by channels.
23        Q.    I mean, were the electrical
24   supply cables, again, this is a total
25   laymen speaking.  When we did our
```



Page 40

```
 1                    A. LITZINGER
 2    house the building inspector said,
 3    here, here, and here you need to have
 4    a guard, or a plastic tubing, or
 5    basically an insulator for the cables
 6    at various points in the house because
 7    it was semi-accessible to a crawl
 8    space for instance, so they said you
 9    can't have the bare cable.  Am I
10    making any sense, Mr. Litzinger?
11        A.    Yes, I understand.
12        Q.    So do you know what I mean
13    by saying were the cables in channels
14    at all behind the wall?
15        A.    I believe I understand.  To
16    answer your question, the -- so it was
17    a two-by-four framing, so in this type
18    of residence -- this type of structure
19    the wires would have been considered
20    concealed behind the wallboard.
21            So in that typical -- so it
22    would be typical and allowable by
23    code.  What they would do is they
24    would drill holes through the studs,
25    and they would run their wires through
```



Page 41

1                    A. LITZINGER
2    the wall studs, which is acceptable.
3    Since it is concealed there is no
4    protection wire required.
5            There were nailer plates on
6    the studs where those wires did go
7    through the holes in the studs, and
8    those nailer plates are used to
9    protect from any potential, you know,
10   of drywall, or nails or if they shoot
11   a nail through there it is not going
12   to damage the wire.
13       Q.    Okay.  Thank you for reading
14   between the lines of my question, I
15   appreciate that.
16           You mentioned that this was
17   allowable by code, and I understand it
18   is exactly what we were talking about
19   with the building inspector, right,
20   when it is fully concealed you don't
21   need those channels, those protection.
22           When you mention the code
23   thing it got me thinking, was there --
24   was the house generally, did it appear
25   to be consistent with the code as you



Page 42

1                    A. LITZINGER

2    understood it at the time?

3        A.    Yes.

4        Q.    So it generally looked up to

5    code?

6        A.    I wasn't looking at it from

7    that perspective.  I wasn't looking

8    for code violations, but what I did

9    observe appeared to be correct.

10        Q.    Okay.  So fair to say you

11    weren't looking for code violations,

12    but you certainly didn't see any in

13    your examination of the residence?

14        A.    That's correct.

15        Q.    Okay.  Have you ever worked

16    in computer manufacturing?

17        A.    I have not.

18        Q.    Do you have any professional

19    background in battery pack design?

20        A.    Design, no.

21        Q.    How about battery cell

22    design?

23        A.    I have learned about battery

24    cell design to a limited degree in

25    doing what we are doing, what I do in



Page 43

1                    A. LITZINGER

2    the fire investigation field trying to

3    learn and understand about those, but

4    I haven't taken any formal training as

5    far as a degree program.

6         Q.    Do you have any professional

7    background in battery pack and cell

8    manufacturing?

9         A.    I do not.

10        Q.    Have you ever written any

11   peer-reviewed articles about notebook

12   computers?

13        A.    I have not.

14        Q.    How about lithium-ion

15   batteries?

16        A.    I have not.

17        Q.    Have you ever been in a

18   notebook computer manufacturing

19   facility?

20        A.    I have not.

21        Q.    Have you ever been in a

22   battery manufacturing facility?

23        A.    I have not.

24        Q.    Have you ever obtained a

25   PET?



Page 44

```
 1                   A. LITZINGER
 2       A.    No.
 3       Q.    Have you ever been qualified
 4  as an expert in human factors?
 5       A.     I am not familiar with what
 6  you mean by that.
 7       Q.    Fair to say you don't hold
 8  yourself out as an expert in human
 9  factors?
10       A.    I don't know how to answer
11  that because I don't understand what
12  you are asking me.
13       Q.    Okay.  How about an expert
14  on product warnings, do you hold
15  yourself as an expert in product
16  warnings?
17       A.    I do evaluate them.  For
18  this case that's outside of the scope
19  of my investigation.
20       Q.    So you didn't look at any
21  warnings here?
22       A.    Once again, if you have a
23  specific warning, I did review all of
24  the evidence so if there is a warning
25  to review, I did review it, but I
```



Page 45

1                    A. LITZINGER
2    would have to have a more specific
3    example of that.
4         Q.    Okay.  But assessing the
5    warnings in this case wasn't part of
6    the purview of your engagement; is
7    that fair to say?
8         A.    Correct.  That's outside of
9    the scope of my investigation.
10        Q.    Okay.  Have you ever been
11   qualified as an expert in fire
12   investigation by any court?
13        A.    Yes, I have.
14        Q.    Do you hold yourself out as
15   an expert in fire investigation?
16        A.    In the electrical aspects of
17   fire investigation, that's correct.
18        Q.    I would like to dial in a
19   little bit on that.  So what is the
20   distinction between being an expert in
21   fire investigation generally, and
22   being an expert in the electrical
23   aspect of fire investigation?
24        A.    So typically if there is a
25   line of delineation it would be



Page 46

```
 1                    A. LITZINGER
 2   that -- well, Jason Karasinski, our
 3   origin and cause expert, he looks at
 4   fire patterns.  That's where he would
 5   be looking at the fire dynamics and
 6   fire patterns of that particular
 7   aspect of a fire in general.
 8            When there is a perceived,
 9   or thought to be an electrical cause,
10   whether it is the building or some
11   sort of a product, that's when I would
12   be engaged to take a look at the
13   evidence and/or the scene to do my
14   portion of the evaluation.
15       Q.    And your portion of the
16   evaluation is to look at whether there
17   is an electrical cause, meaning, the
18   building or a product?
19       A.    Simply put, yes.
20       Q.    And that's what you were
21   engaged to do in this case?
22       A.    That's correct.
23       Q.    So is it fair to say you are
24   not a cause and origin expert?
25       A.    That was not part of my
```



Page 47

1                    A. LITZINGER

2    scope for this investigation.

3         Q.     That's Mr. Karasinski;

4    right?

5         A.     That's correct.

6         Q.     Are you a notebook battery

7    design expert?

8         A.     I have not designed a

9    battery -- notebook battery before.

10        Q.     Are you a mechanical

11   engineer?

12        A.     No, I am not.

13        Q.     Have you ever been the

14   subject of a Daubert challenge, if you

15   know what that means?

16        A.     Yes, I have.

17        Q.     Do you know what the outcome

18   of that was?

19        A.     I was not precluded, if

20   that's the correct -- I passed.

21        Q.     That's the correct way to

22   say it.

23               Are you a member of NFPA?

24        A.     I do serve on a special task

25   force.  I will call it a task group, I



Page 48

1                    A. LITZINGER

2    guess, not task force, for Chapter 6

3    and Chapter 9 review.  I was part of

4    the Chapter 9 review most recently due

5    to -- I was part of that task group

6    for the current edition that's out

7    now.  I helped write the Chapter 9

8    section.

9        Q.    And that's the 2024 edition?

10       A.    That's correct.

11       Q.    Are you a member of the

12   NAFI?

13       A.    I am a member of NAFI,

14   correct.

15       Q.    Have you published any

16   articles on cause and origin or fire

17   investigation?

18       A.    I have not.

19       Q.    I think I know the answer to

20   this one seeing as you wrote it, but

21   would you consider NFPA 921 to be an

22   authoritative and accepted guide on

23   the subject of fire and explosion

24   investigation?

25       A.    Yes.



Page 49

```
 1                    A. LITZINGER
 2      Q.    Would you consider Kirk's a
 3  generally accepted guide or treatise
 4  on fire and explosion investigation?
 5      A.    Yes, I would.
 6      Q.    I am going to turn to the
 7  document marked as Exhibit 1, if I may
 8  share, Madam Reporter.  It looks like
 9  I can.
10              (Whereupon, 26-page Andy
11              Litzinger report dated
12              October 14, 2024, was
13              marked Litzinger Exhibit 1
14              for identification, as of
15              this date.)
16              MR. SCHWARZ:  Is that
17              his report?
18              MR. LEVITES:  It is.
19              MR. SCHWARZ:  He's got
20              a paper copy of that too
21              so you may not have to
22              share unless you want to.
23      Q.    If you prefer to look at the
24  paper copy, Mr. Litzinger, that's
25  fine, and then we can all see each
```



Page 50

                    A. LITZINGER

1
2    other a little bit better.  If you
3    would like me to put up the specific
4    pages I can do that as well.  Up to
5    you.
6        A.    We can work from my paper
7    copy, that's fine.  If we have to do a
8    screen share --
9        Q.    Yeah, if you want me to pull
10   up a particular page if you can't find
11   it or something we can do that.
12       A.    Sure.
13       Q.    I have in front of me a
14   26-page document that begins with the
15   FRT logo, your origin and cause
16   solution, by Andy Litzinger.  Do you
17   have that document in front of you?
18       A.    I do.
19       Q.    Okay.  So the document is
20   dated on the first page October 14,
21   2024.  Is that the one you have in
22   front of you?
23       A.    It is.
24       Q.    Okay.  So for our purposes,
25   Mr. Litzinger, if we refer to your



Page 51

                   A. LITZINGER

1                   A. LITZINGER

2   report it is going to be the report we

3   just identified as this October 2024

4   report, and we are marking as

5   Exhibit 1.  Is that okay?

6        A.    Yes.

7        Q.    I am going to also mark as

8   Exhibit 2 the rebuttal report of

9   Mr. Karasinski dated December 31,

10  2024.

11              (Whereupon, rebuttal

12              report of Mr. Karasinski

13              dated December 31, 2024,

14              was marked as Litzinger

15              Exhibit 2 for

16              identification, as of this

17              date.)

18       Q.    Do you have that,

19  Mr. Litzinger?

20       A.    I do not have that.

21       Q.    Okay.  So I am just going to

22  put this up so we can ID it for the

23  reporter.  Can you see that,

24  Mr. Litzinger?

25       A.    Yes, I can.



Page 52

1                    A. LITZINGER

2        Q.    So it states on page one of

3    this rebuttal report, "opinions

4    concerning the electrical system are

5    provided by senior forensic electric

6    consultant Andy Litzinger."  That's

7    you; right?

8        A.    Yes.

9        Q.    My question is, did you

10    provide opinions in this December 31,

11    2024, report?

12        A.    I did not.

13        Q.    Okay.  I am going to have

14    this marked as Exhibit 2, this

15    rebuttal report.  We may not need to

16    go into it at all because it appears

17    that Mr. Karasinski's statement here

18    that opinions concerning the

19    electrical system were provided by

20    Mr. Litzinger that that's merely

21    referring the reader to your report of

22    October 14th that we just marked as

23    Exhibit 1; does that sound right?

24        A.    That sounds correct.

25        Q.    Okay.  If we do get to this



Page 53

1                    A. LITZINGER

2    second exhibit, this rebuttal report

3    by Mr. Karasinski I will refer to it

4    as the rebuttal report.  Okay?

5        A.    Understood.

6        Q.    Thank you.

7              So we mentioned

8    Mr. Karasinski a few times.  Who is

9    Mr. Karasinski?

10       A.    Mr. Karasinski is the owner

11   of Fire Research Technology as well as

12   the senior origin and cause expert.

13       Q.    Okay.  How do you work

14   together?  Are you -- you described it

15   a little bit earlier, but maybe if you

16   can expand on that process?

17       A.    So I guess I will use it in

18   general terms.  Mr. Karasinski is --

19   would typically be what I would say,

20   he would go out to a fire scene

21   investigation and do his initial

22   evaluation.  If there is, as I said

23   before, if there is electrical --

24   thought to be an electrical causation

25   or potential for that Mr. Karasinski



Page 54

1                    A. LITZINGER

2    would engage me, and have me come out

3    to the scene and evaluate the

4    electrical portion of our

5    investigation.

6              Typically he goes out first.

7    In this instance Mr. Karasinski and I,

8    our first time at the fire scene was

9    together.  To my understanding he had

10   no previous interactions with -- or he

11   had not been on to the fire scene

12   prior to his and my first time.

13        Q.    Okay.  I think you kind of

14   answered my next question, which is,

15   what is the nature of your working at

16   the company?  He is the owner, and he

17   engages you when his initial

18   evaluation discloses some potential

19   electrical issue.

20              When you say he engages you,

21   are you -- do you bill FRT hourly?

22   Are you a salaried employee?  Is he

23   assigning you this work, or is he

24   retaining you as a consultant?

25        A.    No, I am an employee of FRT.



Page 55

                    A. LITZINGER

1

2      Q.     Okay.  So when he is

3    engaging you he is basically sending

4    you a message saying, are you

5    available, I have this investigation.

6    There might be an electrical issue.  I

7    would like you to come out and perform

8    your analysis?

9      A.     He is not engaging me

10   directly.  It would go to our office

11   staff, which I call project

12   coordinators.  Back then we didn't

13   have project coordinators.  It would

14   have been, I will call it just our

15   lone secretary.  Once it hits my

16   schedule then I would go out with him.

17   That's how we would operate.  He is

18   not necessarily sending me any

19   particular information in that regard.

20     Q.     Okay.  Makes sense.

21            So who maintains the file

22   for a particular case?

23     A.     I don't understand.  What do

24   you mean by that?

25     Q.     So to take this one as an



Page 56

1              A. LITZINGER

2    example, Ms. Marcellin.  Does

3    Mr. Karasinski maintain all of the

4    documents and records?  Do you do it?

5    Do you both do it?

6         A.    I understand.  So we have a

7    file management system used by

8    attorneys, it is called Clio.  We use

9    that as a repository for all of our

10   documentation, that's photographs,

11   notes, timekeeping.  So we have a

12   repository where we would put all of

13   that information.

14        Q.    So you're uploading

15   documents and notes to Clio, and so is

16   Mr. Karasinski?

17        A.    That is correct.

18        Q.    And you can both see each

19   other's documents, and work, and so

20   forth?

21        A.    That is correct.

22        Q.    Okay.  Did you do any work

23   of significance to your opinions

24   that's not reflected in the two

25   reports we have marked here as



Page 57

                        A. LITZINGER

1                       A. LITZINGER

2    Exhibits 1 and 2?

3        A.    No.

4        Q.    Did you incur any expenses

5    of significance that are not reflected

6    in your billing records?

7        A.    Not that I am aware of.

8        Q.    I am going to turn to page

9    20 of your report, which is your CV.

10       A.    I have pages one through 19

11   here.  I did not print out my CV.

12       Q.    Not a problem.  I will put

13   it up.

14             So we have your CV here.  It

15   begins on page 20.  It looks like it

16   is three pages total through page 23.

17   Is that your CV?

18       A.    It is kind of small, but it

19   appears that way, correct.

20       Q.    Let me see if I can blow it

21   up.

22       A.    That's better.

23       Q.    So starting on page 20.  I

24   am going to scroll down.  Let me know

25   if I need to slow down a little bit.



Page 58

                    A. LITZINGER

1    I am just going to scroll so you can

2    see the three pages.  It looks like it

3    goes through page 23 there.

4            Having reviewed this CV more

5    closely, can you answer whether that's

6    your CV?

7       A.    That looks to be my CV,

8    that's correct.

9       Q.    Okay.  Do you know if it is

10   current, at least current as of the

11   date of this disclosure, which was

12   October of 2024?

13      A.    It looks to be that way.  I

14   have had some updates to it since

15   October because I believe my last

16   deposition was a week after this was

17   issued.

18      Q.    Understood.  Then on page 21

19   you will see there is a list of your

20   testimony, and it continues on to page

21   22.  So these were the cases in which

22   you were previously deposed and we

23   talked about earlier; right?

24      A.    Yes, it is.



Page 59

1                    A. LITZINGER

2        Q.    Do you know how many cases

3    in which you were engaged to represent

4    the plaintiff, or to support the

5    plaintiff?

6        A.    All of these were plaintiff.

7        Q.    Okay.  And are any of these

8    active matters?

9        A.    Not that I am aware of, no.

10       Q.    Have you been qualified as

11   an expert and testified at trial in

12   any of these cases?

13       A.    I have not.

14       Q.    What were the products

15   involved in these cases?

16       A.    I will do my best from

17   memory here.

18       Q.    Of course.  I understand

19   some of these are five years old.

20       A.    Bear with me, please.

21             The State of Massachusetts

22   loss involved a steam generator.  That

23   one was a steam generator that had a

24   failure of the unit itself.  The State

25   of New York involved a window fan,


MAGNA
LEGAL SERVICES

Page 60

1              A. LITZINGER

2    more specifically a shaded pole motor

3    failure.  The -- can you scroll down a

4    little bit for me?

5        Q.    Absolutely.

6        A.    That's good.  The State of

7    Pennsylvania deposition, that

8    involved -- there was no electrical

9    cause.  It was an unattended candle

10   and a puppy unfortunately.  I was

11   brought in to evaluate the electrical

12   system, and was -- I determined that

13   it was not a factor in the loss.

14            I do not recall the last one

15   that is on there, but I have had -- I

16   can say that I have had two more

17   depositions since then, I believe, now

18   that I am thinking about it.  I

19   misspoke earlier.

20       Q.    That's okay.  For those two

21   cases, what were the products in

22   those?

23       A.    One involved a RYOBI battery

24   pack, lithium-ion battery failure in

25   that case.  And the other one involved



Page 61

                    A. LITZINGER
1
2   a furniture power distribution unit,
3   or FPU, that was in a night stand.
4       Q.    Okay.  So none of these
5   involved notebook computers; fair to
6   say?
7       A.    That is correct.
8       Q.    It looks like the RYOBI case
9   was the one that -- the only one that
10  involved a lithium-ion battery?
11      A.    That's correct.
12      Q.    In the RYOBI case, do you
13  remember the law firms that were
14  involved?
15      A.    I do not off the top of my
16  head.
17      Q.    Do you remember the
18  circumstances of that case?  Was there
19  a fire?
20      A.    Yes, there was a fire.  The
21  circumstances of that case, I remember
22  them, I can't say I remember all of
23  them.
24      Q.    But generally, was it your
25  opinion that the RYOBI lithium-ion



Page 62

1                    A. LITZINGER

2    battery was implicated in the fire, or

3    ruled out, or something else?

4         A.    Yes, they were implicated in

5    the fire.

6         Q.    And was it your opinion that

7    the other sources could be ruled out,

8    but the RYOBI could not?

9         A.    That's correct.

10        Q.    Do you know what kind of

11   lithium-ion battery was in that RYOBI?

12        A.    What do you mean by what

13   kind?

14        Q.    I mean like what kind of

15   cell?  Was it an 18650 cell like in

16   this notebook?  Was it a little button

17   cell like in your watch?

18        A.    Understood.  It was an 18650

19   cell.

20        Q.    Was it one?  Two?  Four?  If

21   you remember.

22        A.    I don't recall what the

23   capacity was of the battery pack off

24   the top of my head.

25        Q.    Did all of these -- in each



Page 63

```
 1                    A. LITZINGER
 2    of the cases that we just talked
 3    about, did you end up giving a formal
 4    opinion in the form of a report?
 5        A.    Yes.
 6        Q.    Okay.  Is it fair to say
 7    that in each of the cases we talked
 8    about except for the unattended candle
 9    matter, that you concluded the --
10    actually, withdrawn.
11              Is it fair to say in each of
12    the cases we talked about you
13    concluded the building electrical
14    system was not the cause of the fire?
15        A.    That's correct.
16        Q.    Now, going back to your CV
17    here, and I can zoom out a little bit
18    so you can see more of it, is there
19    anything in here that as you sit here
20    today is either inaccurate or
21    incorrect that you would like to alert
22    us to?  You told us about the
23    additional depositions you have since
24    given, but is there anything else, you
25    know, certificates, licenses,
```



Page 64

```
 1              A. LITZINGER
 2   publications, any of this other stuff
 3   here?
 4        A.    No.
 5        Q.    Okay.  Is there anything
 6   that you consider of importance or
 7   significance to your opinions that you
 8   gave in this case that's not in your
 9   CV, meaning, you have some other kind
10   of experience that you brought to
11   bear, but it is not listed here on
12   these three pages?
13        A.    Not that I am aware of, no.
14        Q.    Okay.  Do you know how much
15   you billed to date on this file?
16        A.    I don't.
17        Q.    Okay.  Do you have any idea
18   of it?  1,000?  5,000?  10,000?
19        A.    I do not.
20        Q.    Okay.  Do you know how many
21   hours you have worked on this case?
22        A.    I do not.
23        Q.    Would you say it is more
24   than one hour?
25        A.    Yes.
```



Page 65

                    A. LITZINGER

1

2        Q.      Would you say it is more

3    than five hours?

4        A.      Yes.

5        Q.      Would you say it is more

6    than 20 hours?

7        A.      Yes.

8        Q.      Okay.  Would you say it is

9    more than 50 hours?

10       A.      I am going to say yes.

11       Q.      Okay.  Would you say it is

12   more than 100 hours?

13       A.      I don't know at this point.

14       Q.      Okay.  So more than 50, but

15   you can't say if it is greater than

16   100; is that fair to say?

17       A.      Yes.

18       Q.      Okay.  So you can say with

19   some confidence you worked at least

20   50 hours on this case?

21       A.      Yes.

22       Q.      Okay.  Now, without telling

23   me the specifics of any communications

24   you have had with Attorney Schwarz or

25   with anyone from his law firm, how was



Page 66

```
 1                A. LITZINGER
 2    it that you came to be retained in
 3    this matter?  I think you talked about
 4    how you came to be involved with
 5    Mr. Karasinski.  Is there anything
 6    beyond that that you can add?  Was it
 7    a consulting, you know, a referral
 8    that you got?  Did you get a call from
 9    Attorney Schwarz's office?  Was it
10    something else?
11        A.    I don't know how typically
12    FRT is engaged.  We are retained by --
13    in this instance it would be
14    Mr. Schwarz's office, but Jason
15    Karasinski was the one initially
16    engaged in it.
17            Typically FRT is engaged as
18    a company, and then we have an
19    investigator assigned such as
20    Mr. Karasinski, then I will be brought
21    in if the client deems it necessary.
22    Outside of that, I don't have a lot of
23    involvement in that.
24        Q.    Understood.  Have you worked
25    with Mr. Schwarz before this case?
```



Page 67

1                    A. LITZINGER

2        A.      I have not.

3        Q.      Have you worked with his

4   firm, Faraci and Lange, prior to this

5   case?

6        A.      I don't believe so, no.

7        Q.      Okay.  So we went over your

8   report, which was October 14th that we

9   marked as Exhibit 1.  We talked about

10  Mr. Karasinski's rebuttal that was

11  marked as Exhibit 2.  Are there any

12  other reports out there that set forth

13  opinions or findings, your opinions or

14  findings that are different or

15  supplemental to these two reports that

16  we just marked?

17       A.      Not that I am aware of, no.

18       Q.      If we can turn to page 17 of

19  your report, which I --

20              MR. SCHWARZ:  We have

21              been going an hour five

22              minutes.  Do you mind

23              taking a five-minute break

24              about now?

25              MR. LEVITES:



Page 68

```
 1              A. LITZINGER
 2          Absolutely.  Let's make it
 3          six minutes and I will see
 4          you guys at 11:10.
 5            THE WITNESS:  Sounds
 6          good.  Thank you.
 7            (Whereupon, a short
 8          break was taken at this
 9          time.)
10      Q.    Mr. Litzinger, I asked you
11  before our break to turn to page 17 of
12  your report.  Do you have that?
13      A.    Yes, sir.
14      Q.    Okay.  So under the section
15  entitled, Conclusions, there are three
16  paragraphs that appear to be setting
17  forth your findings in this cause.  Is
18  it fair to say that these paragraphs
19  represent a summary of your opinions
20  in the case?
21      A.    Yes.
22      Q.    Do you have any opinions of
23  significance that is not set forth on
24  this page?
25      A.    No.
```



Page 69

                    A. LITZINGER
1

2      Q.    Did you do any work of

3   significance in reaching your opinions

4   on page 17 that is not reflected in

5   your report?

6      A.    No.

7      Q.    I asked you about

8   significant expenses, but did you

9   incur any expenses in doing your work

10  in this case?

11     A.    Expenses, what do you mean

12  by expenses?

13     Q.    Incidental expenses; travel,

14  copying, mailing, anything like that?

15     A.    Not that I am aware of, but

16  there may be expenses that the office

17  has in there, as you said, copying,

18  but I don't know what those are.

19     Q.    Okay.  But nothing for you

20  for buying parts, or travel, or

21  anything like that?

22     A.    Not that I recall.  There

23  may have been something in there, but

24  I just don't recall.

25     Q.    Okay.  But anything of



Page 70

1                    A. LITZINGER

2    significance would have been in your

3    billing records?

4         A.    Yes.

5         Q.    Now, as an initial matter,

6    do you understand that the notebook

7    that is at issue in this case was an

8    HP Pavilion DV6?

9         A.    Yes.

10        Q.    For ease of reference today,

11   when I talk about the Pavilion, I am

12   talking about the Pavilion DV6 model,

13   and then when I talk about the

14   specific notebook, the one that

15   Ms. Marcellin had, I will call it the

16   Marcellin notebook.  Is that okay?

17        A.    So the -- sorry, can you say

18   that last part again?

19        Q.    Yes.  So when I am talking

20   about the model generally I am going

21   to say Pavilion.  When I'm talking

22   about Ms. Marcellin's physical

23   notebook, the one that was in her

24   house, I will call it the Marcellin

25   notebook.  Does that make sense?



Page 71

                          A. LITZINGER

1

2     A.     Understood.

3     Q.     Okay.  With respect to the

4  Marcellin notebook, the one that she

5  had, do you know when it was

6  manufactured?

7     A.     I would have to look at the

8  markings on the computer to give you a

9  definitive answer on that.

10     Q.     Has anyone else conveyed to

11  you when it was manufactured?

12     A.     No.

13     Q.     Okay.  If I told you it was

14  manufactured in December 2010, does

15  that sound right to you?

16     A.     The year 2010 does sound

17  familiar with regards to this case.

18  Like I said, I would have to look at a

19  photograph to refresh my memory.

20     Q.     Okay.  And then if you look

21  at pages two to three of your report

22  there is a list of materials you

23  reviewed beginning in the header,

24  services conducted in preparation of

25  this summary.  Do you see that?



Page 72

                        A. LITZINGER

1

2        A.    Yes, I am there.

3        Q.    Okay.  And then I am going

4    to flip one more time to page 19.  It

5    is the last page of the report that

6    you have.  You will see there is a

7    header that says references, and there

8    are five documents listed there.  Do

9    you see that?

10        A.    Give me one second.  I am

11    just going to get these so they are

12    easily -- okay.

13        Q.    So you see the list of

14    references on 19?

15        A.    Yes, I do.

16        Q.    So my question,

17    Mr. Litzinger, is there anything you

18    reviewed in preparation of your report

19    that's not listed on pages two and

20    three or page 19?

21        A.    No.

22        Q.    Okay.  So going back to

23    three.

24        A.    Okay.

25        Q.    You state that you



1                    A. LITZINGER

2    personally examined the Marcellin

3    notebook, and that you attended two

4    examinations.  Do you see that?

5        A.    Are we looking in the

6    services conducted, or the synopsis

7    portion?

8        Q.    Synopsis.  Thank you.

9        A.    Yes.

10       Q.    Okay.  So when did you

11   examine the Marcellin notebook?  Was

12   it on February 27th, October 27th, or

13   on both days?

14       A.    It would have been both

15   days.

16       Q.    Okay.  So I guess let's take

17   them one at a time then.  We will try

18   to do the same questions for each.

19           So for the February 27th

20   exam, what did you do during that

21   examination of the Marcellin notebook?

22       A.    That would have just been

23   general documentation of the Marcellin

24   notebook; how we first observed it,

25   its condition, its location, as well



Page 74

 1                   A. LITZINGER

 2   as its collection.

 3        Q.    So fair to say your

 4   examination was physical, like a

 5   visual examination; you picked it up,

 6   you looked at it, then you vouchered

 7   it for collection?

 8        A.    That's correct.

 9        Q.    Then what did you do during

10   the October 27th examination of the

11   Marcellin notebook?

12        A.    The October 27th examination

13   would have been an examination not

14   just of the notebook, but all evidence

15   that was collected.  As far as the

16   Marcellin notebook -- am I saying that

17   correct?

18        Q.    Yes, absolutely.

19        A.    I just want to make sure I

20   am using the same verbiage.  That one

21   we inspected it, we looked for any

22   identifiers in terms of the laptop as

23   well as the battery pack and/or any

24   components.  There were a few labels

25   that we documented; one was thermal



1                  A. LITZINGER

2  paper, so that one was heavily fire

3  damaged so we weren't able to glean

4  any good information from it, but we

5  did not fully disassemble the

6  Marcellin notebook at that time.

7      Q.    When you say you didn't

8  fully disassemble it, did you partly

9  disassemble it?

10      A.    I believe we excavated some

11  of the battery cell remains that were

12  in there, but we didn't go past that.

13  We were attempting to identify any

14  potential stickers or markings on the

15  battery pack enclosure of what

16  remained.

17      Q.    Okay.  At the February 27th

18  and October 27th exams, was it just

19  you and Mr. Karasinski for both

20  exams?

21      A.    No.

22      Q.    Okay.  So who else was

23  present at the October 27th exam?

24      A.    I couldn't give you -- I

25  believe there is a -- I have to look



Page 76

1                    A. LITZINGER
2   at the sign-in sheet for that day to
3   be able to give you a firm answer on
4   who was there, but I believe there
5   were representatives from HP there as
6   well as I think a representative of
7   the home, the insurance company for
8   the home, but I don't recall names and
9   who else may have been there.
10      Q.    Okay.  On February 27th, who
11  else was at that examination?
12      A.    It would have -- I believe
13  it would have been similar individuals
14  or noticed parties, but I don't -- no,
15  I believe HP did have representation
16  there as well.  I would have to look
17  at the sign-in sheet as well.  I
18  apologize.
19      Q.    No apologies necessary.  I
20  am quizzing you from memory five years
21  ago.  I appreciate you doing the best
22  you can.
23              Now, you explained that you
24  excavated some cells from the
25  Marcellin battery.  Did you perform



1                A. LITZINGER

2    any tests on February 27th with

3    respect to the Marcellin notebook?

4        A.    Testing, no.

5        Q.    I think you said you

6    reviewed an early CT scan.  Was that

7    the only CT scan you reviewed in this

8    case?

9        A.    That is correct.

10       Q.    Did you review any X-rays in

11   this case?

12       A.    Yes.

13       Q.    When did you review those

14   X-rays?

15       A.    Those X-rays were taken

16   during the October 27th exam.

17       Q.    So they were taken during

18   the initial scene investigation?

19       A.    No.  The joint laboratory

20   examination.

21       Q.    So February 27th then?

22       A.    No.  February 27th was --

23       Q.    I apologize.  I am reversing

24   them.  I apologize.  February 27th was

25   the scene exam.  October was the lab



Page 78

                    A. LITZINGER

1

2    exam, and that's when you took the

3    X-rays?

4         A.    That is correct.

5         Q.    Thank you for straightening

6    me out there.

7               Are you familiar with

8    Linden's Handbook of Batteries?

9         A.    I am not.

10        Q.    Have you ever performed

11   battery failure analysis?

12        A.    In regards to?  I guess I

13   would need to know what your

14   definition of that would be.

15        Q.    I am wondering if you have

16   ever performed a failure analysis with

17   respect to a notebook computer battery

18   pack?

19        A.    Not a notebook battery pack,

20   no.

21        Q.    Did you do one for the RYOBI

22   battery pack?

23        A.    I did an exemplar

24   documentation and tear down.

25        Q.    For the RYOBI case?



Page 79

```
 1              A. LITZINGER

 2      A.    That's correct.

 3      Q.    What is a counterfeit

 4  battery pack?

 5      A.    I don't have -- I don't know

 6  if there is a true definition.  Would

 7  you like me to give you an answer as I

 8  understand what one would be?

 9      Q.    Yes, please.  Also, just

10  going forward, we are just looking to

11  test your knowledge, your

12  understanding just because this is my

13  one chance to talk to you.  If we come

14  across another question like that,

15  please understand that I am looking

16  for your understanding.  It doesn't

17  have to be a legal or scientific

18  definition.  We are just having a

19  conversation.

20            With that said, what is a

21  counterfeit battery pack to you?

22      A.    Understood.  A counterfeit

23  battery pack would be a battery pack

24  that was not manufactured, I will say

25  by in this case HP, but it would be
```



Page 80

```
 1                   A. LITZINGER
 2    able to be utilized with an HP
 3    product.
 4        Q.    Okay.
 5        A.    That's just being very
 6    specific to this particular case.
 7        Q.    That's fine.  That's
 8    perfectly fine.
 9              Is there any distinction in
10    your mind between a counterfeit
11    battery pack and a non-authorized
12    replacement battery pack?
13        A.    I don't understand what you
14    are asking in regards to that
15    question.
16        Q.    Maybe you have seen it in
17    Dr. Martin's report.  He talks about
18    this, but I guess the distinction
19    would be between a battery pack that's
20    counterfeit versus one that's simply
21    unauthorized.  Neither is manufactured
22    by HP, but there may be other
23    difference between them.  Does that
24    make any sense to you?
25        A.    Yes.  To answer the question
```


MAGNA
LEGAL SERVICES

Page 81

                    A. LITZINGER

1
2   to the best of my ability, obviously
3   the inspection of the HP laptop and
4   the battery pack as a whole is -- was
5   outside of my scope, and would be
6   better talked about by Dr. Martin, but
7   to answer your question, a -- works
8   with, I believe that's the word you
9   used, works with?
10      Q.    I believe you might have
11  used it.  I think I used authorized.
12      A.    Yes, I apologize, an
13  authorized versus non-authorized there
14  could be differences in the types of
15  cells as well as the construction of
16  the battery management system for that
17  particular battery pack.
18      Q.    So as of the date of your
19  examination on October 27th, was it
20  your understanding that the cells in
21  the Marcellin notebook were not
22  original to her notebook?
23      A.    We -- initially we weren't
24  sure about that.  Then when we did the
25  joint laboratory examination we did



Page 82

```
 1                   A. LITZINGER
 2   have questions based on the evidence
 3   that we observed.
 4        Q.    And what were those
 5   questions?
 6        A.    The questions were more
 7   specific to the evidence.  We did note
 8   that there were difference in the
 9   battery cells.  We had a combination
10   of what we call three vent hole cells
11   and five vent hole cells, which would
12   indicate that we had different cell
13   manufactures in the battery pack
14   itself.
15        Q.    What is the significance of
16   that fact to you?
17        A.    That either -- that was the
18   question we had at the time, you know,
19   that brings the questions of if the
20   battery pack was a true HP, or was
21   there something involved during the
22   manufacturing of these cells if this
23   was a true HP product.  We just didn't
24   have enough information to go one way
25   or the other at that time.
```



Page 83

                    A. LITZINGER

1

2    Q.    Okay.  So you had some

3    questions as of October 27, 2020, as

4    to whether the cells were original to

5    the HP product, but you didn't have an

6    answer one way or another, is that

7    fair to say?

8    A.    That's correct.

9    Q.    Okay.  Did you later get an

10   answer one way or the other?

11   A.    Yes.

12   Q.    And when did you get that

13   answer?

14   A.    I believe it was

15   Ms. Marcellin -- it might have been

16   before Ms. Marcellin's deposition.  I

17   don't recall, but we did eventually

18   learn that it wasn't aftermarket

19   battery pack.

20   Q.    Again, without getting into

21   the substance of anything,

22   conversations with Attorney Schwarz or

23   any of his team, was that conveyed to

24   you by counsel, Mr. Martin, someone

25   else, or was it a result of your



Page 84

                    A. LITZINGER
1
2   investigation?
3        A.    I guess I would say it was a
4   result of our investigation.
5        Q.    So in October of 2020 you
6   had some questions about whether the
7   battery pack was original, and then at
8   some point between then and
9   Ms. Marcellin's testimony in 23 your
10  investigation, your further
11  investigation disclosed that it was
12  not original; is that right?
13       A.    That would be correct.
14       Q.    Was that further
15  investigation looking at the documents
16  that were generated during the initial
17  scene exam on February 27, 2020, and
18  the laboratory exam on October 27,
19  2020?
20       A.    It would have been during
21  the initial joint scene examination,
22  my only time at the scene, we didn't
23  know that so that would have been
24  after the October 27th examination.
25       Q.    So at some point after the



Page 85

                    A. LITZINGER
1
2    October 27th examination you were
3    reviewing the documents that you --
4    your notes to that examination, and
5    you came to the conclusion that this
6    was not an original battery pack; is
7    that accurate?
8        A.    I guess I would say that
9    Ms. Marcellin's deposition I guess is
10   what I would have -- I will say firmed
11   that up for us.
12       Q.    What about her deposition
13   firmed it up for you?
14       A.    I believe she -- if I recall
15   correctly, she agreed that it was an
16   aftermarket battery that she had
17   purchased.
18       Q.    But you would agree that at
19   the time of the fire the HP was not in
20   the configuration that was sold to
21   Ms. Marcellin; right?
22       A.    I don't understand your
23   question.
24       Q.    So what I am trying to say
25   is if the Marcellin notebook had an



Page 86

1                    A. LITZINGER

2    aftermarket battery in it at the time

3    of the fire, then it was not in the

4    configuration that HP sold it to

5    Ms. Marcellin; right?

6        A.    I understand.  Yes, I agree

7    with what you are saying.

8        Q.    Do you have any knowledge of

9    about what other alterations might

10   have been made to the computer, or the

11   operating system, or anything like

12   that?

13       A.    Not that I am aware of, no.

14       Q.    Okay.  Did you do any tests

15   with respect to your work in the

16   October 14, 2024, report?

17       A.    Outside of the CT scans, no.

18       Q.    Do you know if the Pavilion

19   was UL listed?

20       A.    I don't recall off the top

21   of my head.

22       Q.    What is UL?

23       A.    Underwriters laboratory.

24       Q.    Do you know what UL

25   standards govern consumer electronic



Page 87

                    A. LITZINGER

1
2    products like the Pavilion?

3        A.    I do not off the top of my
4    head know the specific standards.

5        Q.    Have you read them in the
6    past?

7        A.    For the Pavilion, I don't
8    recall that I have reviewed that one
9    specifically, but I have worked with
10   UL standards in the past.

11       Q.    Do you know if the battery
12   pack or cells that shipped with the
13   Pavilion were UL listed?

14       A.    I don't know that
15   information.  We were never able to
16   inspect the original battery pack.

17       Q.    Okay.  Do you know if the
18   materials that you got in this case
19   would have indicated one way or
20   another if that was the case?

21       A.    I haven't seen anything that
22   indicated that.

23       Q.    Do you know what UL
24   standards govern lithium-ion battery
25   packs?



Page 88

1                    A. LITZINGER

2      A.    I don't know the specific

3    standard off the top of my head.

4      Q.    Okay.  Are you familiar with

5    the UL testing for battery packs, the

6    various tests that they perform?

7      A.    I have reviewed a few of

8    them, but I have not done a

9    comprehensive review of that.

10      Q.    Okay.  Do you know generally

11    what tests they perform on battery

12    packs?

13      A.    Generally, to name a few off

14    the top of my head they will do charge

15    and discharge, what I will call a

16    characterization test to look at

17    the -- how the batteries perform while

18    charging and discharging to make sure

19    they are not over or under discharging

20    per the tests.  Other than that, I

21    know they do a lot more, but I am just

22    not familiar with that.

23      Q.    Have you heard of the oven

24    test?

25      A.    In regards to batteries I



Page 89

                    A. LITZINGER
1
2    may have in the past, but I don't -- I
3    can't say specifically as it pertains
4    to lithium-ion battery.
5        Q.    Have you ever heard of the
6    IEEE?
7        A.    Yes, it is referred to as I
8    Triple E.
9        Q.    Right.  So what is the IEEE?
10   You don't have to give me the acronym.
11   Just describe the organization.
12       A.    It is the study of
13   electrical engineers, electrical and
14   electronic engineers.  They do
15   publications.  I don't have a -- I
16   don't work with IEEE, so I don't have
17   a ton of familiarity with them.  I
18   know of them, but I don't work with
19   them.
20       Q.    Do you know what IEEE
21   standards would have applied to
22   rechargeable batteries for notebook
23   computers back in December 2010?
24       A.    I do not.
25       Q.    Do you know what an exemplar



Page 90

                    A. LITZINGER

 1
 2   is?
 3        A.    Yes.
 4        Q.    What is an exemplar?
 5        A.    An exemplar would be a true
 6   representation of a particular
 7   product.  In this case it would be
 8   something that we could -- we would
 9   say if we had a -- the Marcellin
10   notebook, if we were able to locate an
11   original notebook that was exactly the
12   same to include layout, hardware, as
13   well as the original cells, original
14   charger.  That's what would be
15   considered an exemplar.
16        Q.    Okay.  So in this case it
17   would be another Pavilion DV6 similar
18   in condition to Ms. Marcellin's
19   notebook; right?
20        A.    That is correct.
21        Q.    Did you obtain any exemplars
22   in connection with your work in this
23   case?
24        A.    No.
25        Q.    Did you attempt to?



Page 91

                    A. LITZINGER

1
2      A.    I would say yes, in terms of
3    the other laptop computer that was
4    collected from the scene.
5      Q.    So you would consider the
6    newer HP to be an exemplar in this
7    case?
8      A.    No, that's not correct.  We
9    collected it to evaluate what type of
10   battery system it had, and maybe it
11   was a similar one.  We did not know
12   during the scene exam if that would be
13   the case.
14          So all parties agreed to
15   collect it, and preserve it because
16   once we left we wouldn't -- we may not
17   have the opportunity to get that back.
18   We collected it in an attempt to see
19   if there was anything that we can
20   glean from it.
21     Q.    So you are saying you did
22   attempt to obtain an exemplar what you
23   took what you later discovered to be a
24   newer notebook, but based on its
25   condition at the time could well have



Page 92

```
 1                 A. LITZINGER
 2  been an exemplar for the Pavilion DV6;
 3  is that a fair summary of your answer?
 4      A.    Correct, it had potential,
 5  but at the time we didn't know that.
 6      Q.    Okay.  So other than
 7  vouchering the 2019 HP notebook from
 8  the fire scene, did you make any other
 9  efforts to obtain an exemplar in
10  connection with your work in this
11  case?
12      A.    We did not.
13      Q.    Okay.  When you made an
14  examination of the cells that you
15  excavated from the Marcellin notebook,
16  what did you compare those cells to?
17      A.    Typically 18650 -- what we
18  knew at the time of 18650 cells.
19      Q.    You were saying primarily?
20      A.    Primarily size
21  characteristics to confirm if it was
22  an 18650 as well as what remained in
23  those cells, and attempting to
24  identify a potential cell
25  manufacturer.
```



Page 93

                    A. LITZINGER

1

2    Q.    So when you examined the

3   cells you excavated you compared them

4   to typical 18650s that you had on hand

5   in the laboratory?

6    A.    Not on hand.  It would be

7   obviously 18650s, you know, in the

8   past we will say five to ten years

9   have become a very big part of fire

10  investigations.  So with the knowledge

11  that we have that's continually

12  growing over the years we use that

13  information to primarily -- and at

14  that stage in the investigation would

15  have been to just confirm are these

16  18650s, and is there any identifying

17  information that we can get off of it

18  to confirm is it an HP product, we

19  will say, or is it consistent with

20  known HP products and/or is it not

21  consistent.

22   Q.    Listening to your answer it

23  sounds like you guys have dealt with a

24  lot of 18650s, and so you are looking

25  at the cells that you excavated and



Page 94

1                    A. LITZINGER

2  you are comparing it to, in your minds

3  to what you know what an 18650s, the

4  characteristics are based on your

5  experience examining them many times

6  in the past; is that accurate?

7       A.    That's correct.

8       Q.    Okay.  I am just trying to

9  figure out if you were literally

10  looking at excavated cells in one hand

11  and some other cell on the right, or

12  if you are just looking at the

13  excavated cell and saying, I have seen

14  a million 18650s, this has the

15  characteristics of an 18650s?

16      A.    I guess you can say there

17  was one of -- I believe the

18  representative from HP did have what

19  we will call a comparison 18650 just

20  for size and shape.  There are a few

21  photographs where we have one that's

22  just being compared for reference

23  sake.

24      Q.    So that would have been

25  during the February exam, or would it



Page 95

1                     A. LITZINGER

2  have also been during the October,

3  too?

4       A.    Not the February exam.  That

5  would be not somewhere where we would

6  do that type of work, but the cell

7  review would be.

8       Q.    Okay.  So at the October

9  exam you did have a physical, at least

10 in comparison cell that HP brought

11 just so you could see size and shape

12 characteristics versus the excavated

13 cells?

14      A.    Correct, but it was not --

15 it wasn't like a -- it was like out of

16 a flashlight that he currently had

17 with him.  I believe it was the HP

18 representative.  I don't recall that

19 part, but it wasn't a cell that HP

20 gave him that would have been

21 representative.

22      Q.    Okay.  So it was a typical

23 18650 cell, and you were really using

24 it just to make sure that the debris

25 and the things that you were looking



Page 96

1                    A. LITZINGER

2    at corresponded with the right size

3    and diameter characteristics of a

4    new-ish 18650 cell; fair to say?

5         A.    Correct.

6         Q.    Okay.  Do you offer any

7    opinion in your report as to what

8    caused the failure of the Marcellin

9    notebook?

10        A.    No, that was outside of the

11   scope of my investigation.

12        Q.    Okay.  So you don't identify

13   the causes of the failure of the

14   notebook; is that right?

15        A.    That is correct.

16        Q.    Okay.  So you can't say for

17   certain if it was the battery pack or

18   something else?

19        A.    When you say, something

20   else, what do you mean by something

21   else?

22        Q.    Something else within the

23   notebook.

24        A.    That's correct.  That would

25   be under -- I would refer to


MAGNA
LEGAL SERVICES

                            A. LITZINGER

 1
 2   Dr. Martin on that one.
 3       Q.    Okay.  So you couldn't say
 4   if it was a battery pack or some other
 5   component of the notebook that failed
 6   because that was beyond the scope of
 7   your engagement?
 8       A.    That's correct.
 9       Q.    Okay.  If you were trying to
10   figure out what caused the failure of
11   the notebook, what would you do?
12       A.    I would defer to someone
13   such as Dr. Martin.
14       Q.    So that would not be
15   something you would ordinarily do in
16   connection with your investigations in
17   a case like this?
18       A.    Correct.
19       Q.    Turning to page five of your
20   report.
21       A.    Okay.
22       Q.    If you hold that page there,
23   I actually have one or two other
24   questions before we go back to the
25   report.



Page 98

```
 1                    A. LITZINGER
 2            Do you know, and can you
 3    state for the record the safety
 4    features of the Pavilion?
 5                MR. SCHWARZ:  Of the
 6                Pavilion, or of the
 7                battery pack?
 8                MR. LEVITES:  The
 9                Pavilion, which we are
10                discussing as the model.
11                Not the Marcellin
12                notebook.
13                MR. SCHWARZ:  I just
14                wanted to specify, you are
15                talking about the entire
16                computer --
17                MR. LEVITES:  The
18                Pavilion DV6, the whole
19                assembly, yes.
20        A.    Safety features, I do not --
21    I will defer to Dr. Martin on that
22    one.
23        Q.    In an investigation like
24    this, the -- you wouldn't ordinarily
25    look for the safety features of a
```



Page 99

```
 1                  A. LITZINGER
 2   product like this, right, that
 3   wouldn't be part of your analysis?
 4                  MR. SCHWARZ:  Object to
 5              the form of the question.
 6              He said he wouldn't do
 7              this analysis.  He would
 8              defer to another expert to
 9              do it, so I think it is an
10              unfair question to ask him
11              what he would do if he
12              says he wouldn't do that
13              type of analysis, but you
14              can answer.
15                  MR. LEVITES:  I am just
16              trying to understand
17              generally.
18       Q.    I understand that here
19   Dr. Martin is the one who has reviewed
20   the safety features of the Pavilion,
21   and you are deferring to him to
22   address that.
23              My question to you is, in a
24   typical case, would someone like
25   Dr. Martin do that, or in another case
```



Page 100

```
 1                 A. LITZINGER
 2   might you do that?
 3        A.    If it were a computer it
 4   would be Dr. Martin.
 5        Q.    Okay.  So if you had another
 6   notebook computer case you wouldn't
 7   review the safety features of the
 8   notebook.  You would defer to someone
 9   who is an expert in that area?
10        A.    I would defer to him, yes,
11   because he has more experience in this
12   area than I do, correct.
13        Q.    Did you review the notebook
14   schematics for the Pavilion DV6 in
15   this case?
16        A.    I was not able to locate
17   one.
18        Q.    Did you review any other
19   manufacturing documents?
20        A.    No.
21        Q.    I think we talked about this
22   briefly, but this is a slightly
23   different question.  Did you do
24   anything to try and determine who
25   manufactured the battery pack that was
```



Page 101

1                    A. LITZINGER

2    in Ms. Marcellin's notebook?  You said

3    you looked at some labels, and you

4    looked at some attributes.  Did you do

5    anything else to try to figure out who

6    made that?

7         A.    Outside of trying to do some

8    Internet research without a receipt or

9    where it was purchased from, it was

10   not -- we were not able to find

11   something to confirm it would be a

12   match.

13        Q.    Do you know what the

14   critical components of lithium-ion

15   battery are?

16        A.    Off the top of my head, I am

17   not familiar with that, no.

18        Q.    Okay.  How does a cell

19   typically -- what is the process of a

20   cell going into thermal runaway, if

21   you can describe that for me?

22        A.    I would defer to Dr. Martin

23   on that one.

24        Q.    Because he is the lithium

25   expert; fair to say?



```
 1                    A. LITZINGER
 2       A.    Yes, he has more experience
 3  with lithium-ion batteries, that's
 4  correct.
 5       Q.    Now, I think you kind of
 6  answered this question before when you
 7  said that failure analysis with
 8  respect to the notebook computer, the
 9  Marcellin notebook was beyond the
10  scope of your analysis in this case,
11  but I guess this is somewhat related.
12  How did you rule out abuse of the
13  notebook as a cause of the fire?
14       A.    That would be something that
15  Dr. Martin would have to discuss
16  further.
17       Q.    Okay.  Is it fair to say the
18  failure analysis -- you are going to
19  defer to Dr. Martin with respect to
20  the failure analysis of the notebook,
21  and your domain is really the building
22  and electrical system?
23       A.    That's correct.
24       Q.    Do you ever talk to the fire
25  department in this case?
```



```
 1              A. LITZINGER
 2              MR. SCHWARZ:  You are
 3         talking about the fire
 4         investigator?
 5              MR. LEVITES:  Or anyone
 6         from the fire department.
 7              MR. SCHWARZ:  Okay.
 8    A.    I believe the local -- we
 9    refer to the fire department or
10    anybody that's in the public sector as
11    the local investigator.  In this case
12    the local investigator was at the
13    joint scene exam to provide us kind of
14    his -- the information that he had
15    that he can provide to us in regards
16    to fire suppression, and overhaul, and
17    his part of the investigation prior to
18    us being involved.
19    Q.    Okay.  And generally do you
20    remember what the local investigator
21    told you during that joint scene exam?
22    A.    My recollection is that he
23    put the area of origin as the, I
24    believe it is referred to as the
25    sewing room as the area of origin.  He
```



Page 104

1                    A. LITZINGER

2    did not say -- he was undetermined

3    from my understanding, but he could

4    not eliminate -- I think he was

5    just -- he could not eliminate the

6    subject laptop, Ms. Marcellin's

7    notebook.

8        Q.    Thank you for that.  I know

9    I am throwing around a lot of defined

10   terms for you so I appreciate it.

11             I am going to go back to

12   page two of your report.  You wrote

13   that you were requested to write a

14   report regarding the electrical

15   system, and items collected as it

16   relates to the electrical failure

17   analysis as it pertains to the above

18   caption fire loss.  Did I read that

19   right?

20       A.    That is correct.

21       Q.    What is electrical failure

22   analysis?

23       A.    In this instance it would

24   have been the buildings's electrical

25   system as a whole.  Up to the --



```
 1                    A. LITZINGER
 2   essentially up to the laptop, the
 3   subject -- I apologize, we call the
 4   subject notebook.  It is the Marcellin
 5   notebook.
 6       Q.    That's okay.  I think
 7   subject laptop is fine as well.
 8   Incident laptop, incident notebook.  I
 9   am going to call it the Marcellin
10   notebook, but I understand your
11   meaning.
12           So I think you answered my
13   next question, which is, what do you
14   mean when you refer to the electrical
15   system?  You are talking about the
16   building electrical system up to the
17   subject notebook; right?
18       A.    That is correct.
19       Q.    Okay.  We briefly went over
20   this on the next page, page three,
21   second to last bullet references your
22   review of the report by Dr. Martin.
23   Just generally speaking, what is your
24   understanding of Dr. Martin's
25   conclusions?
```



                    A. LITZINGER

1

2      A.    That the -- my

3  understanding -- I will do my best not

4  to speak out of turn is that there was

5  fail safes in the -- that would have

6  prevented the -- at the time there

7  were fail safes being used in industry

8  that should have prevented the use of

9  an aftermarket battery pack or could

10  have been used.

11     Q.    Okay.  You say here that you

12  reviewed NFPA 921.  Well, we know you

13  were writing the '24 edition; right?

14     A.    That is correct.

15     Q.    You reference here

16  Mr. Karasinski's origin and cause

17  report.  Same thing with Dr. Martin,

18  could you just give me your general

19  understanding of what Mr. Karasinski's

20  conclusions were in that report?

21     A.    Again, paraphrasing,

22  Mr. Karasinski puts the room of origin

23  as what is referred to as the sewing

24  room.  The area of origin is at the HP

25  Pavilion, the subject notebook.  I



Page 107

1                    A. LITZINGER

2    can't eliminate failure of that -- of

3    the subject notebook to include its

4    battery pack.

5        Q.    So based on everything you

6    are telling me you restricted yourself

7    to the electrical aspects of this

8    case?

9        A.    That is correct.

10       Q.    And to be clear, the

11   electrical aspects don't include the

12   failure of the notebook, even though

13   electricity may have been involved

14   with that; is that fair to say?

15       A.    That is correct.

16       Q.    So you reference NFPA 921.

17   I am going to read you one of the

18   sections from 921 with which you may

19   already be familiar, it is Section

20   19.6.5.2.  It states, "the

21   investigator should remember that the

22   fire cause is defined as the

23   circumstances, conditions, or agencies

24   that bring together a fuel ignition

25   source, and oxidizers (such as air or



Page 108

1                    A. LITZINGER

2    oxygen) resulting in a fire or

3    combustion explosion.  The

4    identification of an ignition source

5    and a first fuel is not sufficient to

6    determine a cause.  Determining a fire

7    cause and ignition sequence requires

8    that any proposed hypothesis include

9    consideration of the relationship

10   between the competency of the ignition

11   source and the first fuel ignited.

12   The investigator should determine if

13   the proposed ignition source is a

14   competent ignition source for the

15   proposed first fuel ignited."

16            I realize that was a longer

17   statement, but having heard this

18   statement from 19652, would you agree

19   with that?

20       A.    Can you share that on the

21   screen for me, please?

22       Q.    Absolutely.  I am going to

23   put this up in a blank document

24   because I have pasted this into my

25   notes, so if that's all right with you



Page 109

```
 1                    A. LITZINGER
 2    I will do that.  If you have the NFPA
 3    you can probably turn to the section
 4    if that's easier for you.
 5        A.    I do not have that with me
 6    at the moment.
 7        Q.    Can you see that?
 8        A.    Yes.
 9            MR. SCHWARZ:  This is
10            your summary of that, or
11            did someone type it?
12            MR. LEVITES:  I copied
13            and pasted it beginning
14            with this quotation as a
15            direct quote.
16            MR. SCHWARZ:  That's
17            from the causation
18            chapter, Chapter 19;
19            correct?
20            MR. LEVITES:  Correct.
21            This is the Subsection
22            19.6.5.2.
23            MR. SCHWARZ:  Right.
24            And he has testified that
25            was Mr. Karasinski's area
```



Page 110

```
 1              A. LITZINGER
 2        of expertise in his
 3        report; correct?
 4           MR. LEVITES:  Was that
 5        his testimony?
 6           MR. SCHWARZ:  Yes, I
 7        believe so.  The cause and
 8        origin investigation
 9        report was
10        Mr. Karasinski's, and
11        Mr. Litzinger handled the
12        electrical system, which
13        is a different chapter, I
14        believe Chapter 6.  Is
15        that correct,
16        Mr. Litzinger?
17           THE WITNESS:  That
18        would be correct.
19           MR. SCHWARZ:  I am just
20        going to preserve my -- I
21        don't have a chance to
22        review word for word this
23        that you are saying is --
24        I don't doubt that you did
25        that, but I just want to
```



Page 111

```
 1              A. LITZINGER
 2              put an objection without
 3              looking at the actual --
 4                MR. LEVITES:
 5              Understood.
 6                MR. SCHWARZ:  -- 921
 7              document, and we are going
 8              to take this as your cut
 9              and paste from that
10              document, and you are
11              asking a question that is
12              in Mr. Karasinski's
13              expertise and report in
14              this case and not
15              Mr. Litzinger's, but with
16              that objection, go ahead.
17      Q.    Okay.  So Mr. Litzinger, I
18  have up here NFPA 921 Section
19  19.6.5.2; do you see that?
20      A.    Yes.
21      Q.    Have you had an opportunity
22  to review it?
23      A.    I was -- give me one second.
24  "According to NFPA 921 Section
25  19.6.5.2, the investigator should
```



```
 1                A. LITZINGER
 2   remember that the fire cause is
 3   defined as the circumstances,
 4   conditions, or agencies that bring
 5   together a fuel, ignition source, and
 6   oxidizer (such as air or oxygen)
 7   resulting in a fire or a combustion
 8   explosion (see 3.3.74).  The
 9   identification of an ignition source
10   and a first fuel is not sufficient to
11   determine a cause.  Determining a fire
12   cause and ignition sequence requires
13   that any proposed hypothesis include
14   consideration of the relationship
15   between the competency of the ignition
16   source and the first fuel ignited.
17   The investigator should determine if
18   the proposed ignition source is a
19   competent ignition source for the
20   proposed first fuel ignited (see
21   19.4.2)."  Okay.
22        Q.    So my question is, do you
23   agree with the statements that I put
24   up on the screen there?
25        A.    Yes.
```



Page 113

```
 1                    A. LITZINGER
 2      Q.     What do you consider to be
 3   the first fuel for this fire?
 4      A.     That would be
 5   Mr. Karasinski's purview.
 6      Q.     So you didn't address the
 7   issue of the first fuel in your
 8   report; fair to say?
 9      A.     Correct.
10      Q.     I am going to turn to page
11   17.
12              MR. SCHWARZ:  Of this
13           report again?
14              MR. LEVITES:  Correct.
15              MR. SCHWARZ:  Thank
16           you.
17      Q.     Are you there,
18   Mr. Litzinger?
19      A.     I am, yes.
20      Q.     You state in your conclusion
21   in the -- I am trying to figure out
22   where I took this from.  I apologize.
23   It is the first full paragraph there.
24   It is in the middle of the paragraph,
25   the line that begins with the word,
```



Page 114

```
 1                 A. LITZINGER

 2  consultant; do you see that?

 3      A.    "It is the forensic-based

 4  opinion of this forensic electrical

 5  consultant"?

 6      Q.    Correct.

 7      A.    Okay.

 8      Q.    So you go on to opine there

 9  that the only item that cannot be

10  eliminated at this time is a failure

11  within the HP Pavilion laptop;

12  therefore, the fire was caused by a

13  failure of the HP Pavilion laptop to

14  include the battery system.

15           We will go through the other

16  aspects of your report, but I was

17  hoping you can give me a general

18  discussion of how you determined that

19  the laptop was the cause of the fire?

20      A.    From an electrical

21  standpoint that was based off of my

22  evaluation of the building's

23  electrical system as well as the --

24  the building's electrical system as

25  well as the evidence that was
```



Page 115

1                    A. LITZINGER

2    inspected post joint collection.  The

3    only available -- electrically the

4    only other device would have been the

5    subject notebook.

6        Q.    I think we talked about the

7    first fuel issue, but having no

8    opinion on what the first fuel is, is

9    it fair to say you have no opinion on

10   how the laptop caused the ignition of

11   the first fuel?

12       A.    That's correct.

13       Q.    So you said that you

14   determined the laptop was the cause of

15   fire by looking at the building

16   electrical system from an electrical

17   standpoint, the evidence that was

18   inspected after the joint collection,

19   is there any other evidence that you

20   looked at to arrive at that

21   conclusion?

22       A.    Yeah, that is correct.

23       Q.    The cause of the fire you

24   did determine was the failure of

25   Ms. Marcellin's notebook; right?



Page 116

1                    A. LITZINGER

2      A.    That's the only thing I

3   cannot eliminate electrically,

4   correct.

5      Q.    But you couldn't determine

6   which of several possible causes could

7   have caused her computer to fail?  I

8   apologize for using the word cause,

9   like, three times but hopefully you

10  understood my question.

11     A.    Not a problem.  That would

12  have been outside of my scope.  I

13  would refer to Dr. Martin in that

14  regard.

15     Q.    Okay.  I would like to go to

16  page six of your report.

17     A.    Okay.

18     Q.    Now, you have a discussion

19  here of circuit breaker number four;

20  do you see that?

21     A.    Yes.

22     Q.    So it says, "the main

23  circuit breaker as well as circuit

24  breaker number four were documented in

25  the off position."  My question is, do



Page 117

1                    A. LITZINGER
2    you know why the main circuit breaker
3    was in the off position?
4         A.    Typically the main circuit
5    breaker, the local fire department --
6    it varies from fire department to fire
7    department.  Some fire departments are
8    trained to only turn off the main.
9    Other fire departments will go in and
10   will turn off every circuit breaker in
11   the panel.
12             Based on our observations it
13   would be that the fire department
14   turned it off.  As this part of the
15   building was not directly impacted by
16   fire, there would have been no reason
17   for that circuit breaker to have
18   activated.
19        Q.    Okay.  That's why the main
20   circuit breaker was off.  Do you know
21   why circuit breaker four was in the
22   off position?
23        A.    Circuit breaker number four,
24   we do not know.  It was not -- we were
25   not able to determine what that



Page 118

```
 1                    A. LITZINGER
 2   circuit breaker was for.
 3           This was an older style
 4   panel.  Typically circuit breakers --
 5   not typically, different manufacturers
 6   of circuit breakers trip different
 7   positions.  Some trip to center, some
 8   trip to off.  Some have indicator
 9   windows.  In this particular
10   circumstance, I do not know if these
11   style breakers do trip to off or not.
12   The only condition --
13        Q.    I may be able to --
14             MR. SCHWARZ:  I'm
15             sorry, I didn't catch the
16             end of his testimony, and
17             I don't think the court
18             reporter did either, the
19             last sentence, because I
20             think you over spoke him.
21        Q.    I apologize, Mr. Litzinger.
22   Can you repeat the last sentence for
23   Ms. Linzer?
24        A.    Absolutely.  I do not know
25   if this -- these breakers trip to off
```



```
 1                    A. LITZINGER
 2   or to trip to center.  I don't have
 3   that information.
 4       Q.    Mr. Litzinger, I may be able
 5   to assist with some technology here.
 6   I am just pulling up your report.  Can
 7   you see that?
 8       A.    Yes, I can.
 9       Q.    I am going to try and blow
10   up this picture here.  Do you see
11   this?  I have blown up the panel here;
12   do you see that?
13       A.    Mm-hmm, that's correct.
14       Q.    Do you see the text on the
15   left side of the panel?
16       A.    Yes, I do.
17       Q.    Is it says, "when breaker
18   trips, handle moves to off position."
19       A.    Yes.
20       Q.    Okay.  So with that
21   information, does that give you any
22   additional information with respect to
23   why circuit breaker number four would
24   have been in the off position?
25       A.    Without examining the
```



Page 120

```
 1                  A. LITZINGER
 2  circuit breaker itself I would not be
 3  able to give you that answer.  We
 4  would have to do X-rays in order to
 5  look at the positions of the internal
 6  context to give a definitive answer.
 7          Because the circuit breaker
 8  trips to the off position, whether it
 9  was bumped off by a firefighter or was
10  off due to an electrical event, there
11  would be further analysis of that
12  circuit breaker that would be needed.
13      Q.    Do you do any further
14  analysis of that circuit breaker?
15      A.    Not on that circuit breaker,
16  no.
17      Q.    In this picture it is the
18  only individual breaker handle that's
19  moved to the off position; right?
20      A.    That's correct.
21      Q.    You mentioned that it could
22  have been bumped off by a local
23  investigator, and it could have been
24  tripped by an electrical event.  Is
25  there any other way that it could have
```



Page 121

```
 1                    A. LITZINGER
 2    been in the off position?
 3        A.    Circuit breakers can
 4    effectively trip due to heat, thermal
 5    impacts as well.  In this particular
 6    case, the evidence did not support
 7    that that was the case.
 8        Q.    Okay.  So it probably would
 9    have been in either the local
10    firefighters, or local investigators
11    rather, or an electrical event?
12        A.    That is correct.
13        Q.    Okay.  I am going to direct
14    your attention to the figure five,
15    which is directly below the one we
16    have been talking about.
17        A.    Yes.
18        Q.    You will see there that you
19    state, "figure five depicts the
20    receptacle on the C wall of the room
21    of origin that the laptop was reported
22    to be plugged into at the time of the
23    incident."  Did I read that right?
24        A.    Yes, that's correct.
25        Q.    Okay.  So when you observed
```



Page 122

```
 1                A. LITZINGER
 2   it, it was unplugged?
 3        A.     That's correct.
 4        Q.     Do you know who unplugged
 5   it?
 6        A.     I do not know who unplugged
 7   it.
 8        Q.     So do you know if it was
 9   plugged in at the time of the fire?
10        A.      It was reported to have been
11   plugged in at the time of the fire,
12   that's correct.
13        Q.     Who reported that it was
14   plugged in at the time of the fire?
15        A.     I would have to review my
16   notes for that information.
17                MR. SCHWARZ:  We have
18                been going another hour.
19                If you want to take a
20                break?
21                MR. LEVITES:  Yes, this
22                is a good time to take a
23                break.  Maybe we come back
24                at 12:20, unless you want
25                to do a longer one now for
```



MAGNA
LEGAL SERVICES

Page 123

```
 1                    A. LITZINGER
 2           lunch or whatever?
 3              THE WITNESS:  That
 4           would be good for me if
 5           that works for you guys.
 6              MR. SCHWARZ:  What time
 7           do you need to eat, Andy?
 8              THE WITNESS:  Can we do
 9           20 minutes instead of 10?
10              MR. LEVITES:  Sure.
11           Why don't we do 25, and we
12           will come back on at
13           12:40.
14              MR. SCHWARZ:  Sounds
15           good.
16              THE WITNESS:  Thank you
17           very much.
18              (Whereupon, a short
19           break was taken at this
20           time.)
21      Q.    I think we were at page
22   seven of your report, Mr. Litzinger,
23   before we broke.  You have that in
24   front of you?
25      A.    Yes.
```



Page 124

```
 1                    A. LITZINGER
 2        Q.     Okay.  So you state here, it
 3   is the third full sentence below
 4   figure six, it says, "the laptop was
 5   connected to the wall receptacle
 6   through a charger"; do you see that?
 7        A.     That's correct.
 8        Q.     But you did state earlier it
 9   was not connected to the wall
10   receptacle during your survey of the
11   room; right?
12        A.     That's correct.
13        Q.     Okay.  You say, moving to
14   the next page, which is page eight --
15        A.     Okay.
16        Q.     You say here concerning your
17   joint laboratory analysis that the
18   batteries, you noted the three vent
19   holes to the five vent holes.
20               We talked about that before,
21   but you note it here in your report as
22   well.  I'm asking what is the
23   significance of this -- in this
24   section of your report, the different
25   end caps?
```



Page 125

1                   A. LITZINGER

2      A.     That would indicate that

3   there are different cells being used

4   in the battery pack.

5      Q.     Okay.  So looking -- if they

6   were authentic you would expect them

7   to all have the same end caps; is that

8   right?

9      A.     That is correct.

10     Q.     Looking at figure F here,

11  these were the end cap cells that were

12  recovered from the scene; right?

13     A.     That is correct.

14     Q.     These ones did not go in the

15  thermal runaway?

16     A.     I don't have that answer.  I

17  would refer to Dr. Martin's review of

18  those battery cells.

19     Q.     So you didn't do anything in

20  particular to review the cells in F?

21     A.     Not in regards to an

22  internal failure or thermal runaway

23  event.

24     Q.     Okay.  Did you do anything

25  else to test the cells in F?



Page 126

                    A. LITZINGER

1

2       A.      I did not, no.

3       Q.      Did you collect any other

4    battery cells?

5       A.      What we refer to as the can,

6    we did find a couple of cans in the

7    room as well.

8       Q.      Did you -- you inspected

9    those cells that you collected

10   relative to the cans?

11      A.      Yes, I documented those.

12      Q.      Is it your opinion that the

13   cells in F caused the fire?

14      A.      That was outside of the

15   scope of my investigation.  I don't

16   have an opinion on that.

17      Q.      Do you have an opinion as to

18   whether the cells that were recovered

19   from site F was where the fire

20   started?

21      A.      I'm sorry, can you repeat

22   that?

23      Q.      Do you have any opinion as

24   to whether the cells recovered from

25   site F was the location -- or if site



Page 127

                    A. LITZINGER

 1
 2   F was the site at which the fire
 3   started?
 4       A.    I have to refer to my
 5   diagram to see where F is located.  I
 6   believe these were -- item number one
 7   is a collection of, I would call it
 8   cell debris from within the room.
 9   That's where those -- that got that
10   nomenclature.
11       Q.    Okay.
12       A.    We got that early on to
13   prevent any damage, to limit damage,
14   so these were the first items
15   collected and documented.  Let me look
16   at my diagram real quick to see where
17   F is.
18       Q.    I can put it up for you and
19   blow it up for you here.  It is page
20   five of the report for the record.
21   This is Exhibit 1 again.  I am going
22   to blow up figure three on page five,
23   which is the diagram and evidence
24   locations that we have been talking
25   about.



Page 128

```
 1                    A. LITZINGER
 2           So can you see that a little
 3    better on the screen here?
 4      A.    Yes, I can.
 5      Q.    Okay.  So my question for
 6    you is, you can see F now on this
 7    picture on the right?
 8      A.    Yes, I can.
 9      Q.    And you can see F on the
10    diagram that's to the left?
11      A.    Yes.
12      Q.    Okay.  So we just looked at
13    on the page below, we just looked at
14    the cells that were recovered from F
15    on this diagram; right?
16      A.    Yes.
17      Q.    So having looked at the
18    cells and this photograph, my question
19    is, is it your opinion that the fire
20    started in F where those cells were
21    recovered?
22      A.    As far as fire origin I
23    would defer to Jason Karasinski.
24      Q.    Okay.  So you don't know if
25    the cells that landed at F, if the
```



Page 129

```
 1                A. LITZINGER
 2  fire started there?
 3      A.    Again, I don't have an
 4  opinion on that.
 5      Q.    Okay.  If you can go back
 6  to -- I am going to leave this up
 7  because I am going to ask another
 8  question about the diagram.  If you
 9  can go back to page seven of your
10  report.
11      A.    Okay.
12      Q.    You will see there is an
13  item that's H.  It is not really
14  clear.  I can tell what the other
15  debris items are, but I can't really
16  make heads or tails of what item H is.
17  Can you tell from this picture?
18      A.    So I am looking back at page
19  eight, figure seven.
20      Q.    Thank you.  I apologize.
21      A.    That's fine.  H is -- based
22  on the photograph appears to be
23  internal battery components that were
24  fused to carpet.
25      Q.    Do you have any opinion as
```



Page 130

1                    A. LITZINGER

2    to whether this, the fire would have

3    started in H on this diagram?

4        A.    I don't have an opinion on

5    that.  I would defer to Jason

6    Karasinski.

7        Q.    Does it look like the fire

8    started in H just as a laymen?  I am

9    looking at F and H, and they look less

10   charred than the sites around them.

11       A.    Once again, I cannot offer

12   an opinion on that.  I would defer to

13   Jason Karasinski.

14       Q.    Setting aside technical

15   opinion as to where the fire started,

16   would you agree with me that the area

17   around F and H in figure three in your

18   report appear to be burned in some

19   other areas of this carpet?

20       A.    I think that the purpose of

21   this diagram was not to show burn

22   patterns.  Just to show locations

23   where things were collected.  There

24   are varying degrees of burning of the

25   carpet within the room, but I can't



Page 131

1                    A. LITZINGER

2    offer a good opinion as far as origin

3    is concerned and burn patterns.

4         Q.    Okay.  And then if we look

5    at page eight of your report you

6    stated that -- excuse me.  Figure

7    eight on page nine, so moving to the

8    next page now.

9         A.    Okay.

10        Q.    So figure eight page nine

11   you stated that the debris you

12   collected from the hallway had been

13   moved from the closet during fire

14   suppression and overhaul.  What did

15   you mean by that?

16        A.    So it was reported to us by

17   the local investigator that the

18   fire -- the responding fire department

19   removed debris from the closet area

20   into the hallway during their, what I

21   would call their suppression efforts.

22             So fire suppression is

23   obviously the act of putting out the

24   fire, and then overhaul is a term we

25   use to describe -- the fire department



Page 132

```
 1                    A. LITZINGER
 2    will look for extension, or any type
 3    of -- they want to make sure that the
 4    fire is out.  If there is a fire in
 5    the closet they are going to pull
 6    everything out of the closet, and
 7    essentially soak it down to make sure
 8    we don't have either -- that the fire
 9    is out or they don't have what is
10    called a recon built, which means a
11    fire is started -- we will call it a
12    secondary fire, they just didn't maybe
13    get it all at their initial attack.
14         Q.    Okay.  So based on the
15    reports of the local investigators --
16    it is based on the report of the local
17    investigators that you concluded that
18    this was what was in the closet at the
19    time of the fire; fair to say?
20         A.    Correct.
21         Q.    Okay.  So the first item
22    from the hall closet was the heated
23    blanket and LED lamp remains; do you
24    see that?
25         A.    Yes.  You are referring to
```



Page 133

1                A. LITZINGER

2   figure nine; correct?

3        Q.    Correct.  And the -- excuse

4   me, I believe it is figure eight, the

5   LED lamp.

6        A.    Yes, so there were -- so the

7   hall debris was collected in two

8   portions.  Essentially what we did is

9   we split the -- I will call it a pile

10  because it was kind of strewn about, I

11  will say about a four- to six-foot

12  area.  We split that in half, and what

13  we did is actually cut the carpet and

14  roll the debris in the carpet, and

15  then secured that so nothing was lost.

16       Q.    Okay.  So what we are

17  looking at in figure eight, is that

18  believed to be the remains of the LED

19  lamp, or is it the heated blanket, or

20  both?

21       A.    Figure eight would be LED

22  lamp.  So one part of the hallway

23  debris roll up was item number two,

24  and then item number three was

25  collected as a separate piece of



Page 134

```
 1                   A. LITZINGER
 2   evidence, which also was the other
 3   part of that hallway debris.
 4           So in item two we -- the
 5   electrical items that were collected
 6   out of that were these two lamp
 7   remains.
 8           Then item three, which is in
 9   figure nine, had another lamp as well
10   as a heated blanket.
11       Q.   Okay.  So looking first at
12   the LED lamp in figure number eight,
13   would you say the lamp has thermal
14   damage?
15       A.   Yes, it does appear that
16   there is thermal damage to it.
17       Q.   Okay.  But you forensically
18   eliminated it; right?
19       A.   That's correct.
20       Q.   How were you able to do
21   that?
22       A.   First there was no light in
23   the closet, so nowhere for that to be
24   plugged into.  If there is nothing for
25   it to be plugged into that means there
```



Page 135

1                    A. LITZINGER

2    is no electrical energy for it to

3    fail.

4              This particular lamp did not

5    have any kind of battery in it, so

6    without a power source it wouldn't

7    have had any energy to have a failure.

8              Also, that was stored in

9    the -- so that right there gives us

10   that information how we can eliminate

11   it, but there were no other signs of

12   failure of those lamps either.

13        Q.   So what are the signs of

14   failure that you would look for?

15        A.   In this particular lamp, one

16   of the things we would look for is you

17   can see in there there is some -- the

18   brown, they look like brown packets,

19   those are capacitors.  So we would

20   look for signs that the capacitors had

21   any kind of failure, and that is a

22   variety of things.  We would be

23   looking for if it looks swelled,

24   cracking, if one of them shows signs

25   of higher damage than the others.



```
 1                    A. LITZINGER
 2              I believe looking at that
 3    photo there are two to three, I have
 4    in other photos I have to look at, but
 5    that's from a component standpoint,
 6    but then also what you would be
 7    looking at is there are two other ways
 8    to look for failures.  One of those is
 9    on the side in an intact lamp remains
10    you wouldn't notice this, but there is
11    a small, I will call it a weak spot.
12    That is a vent -- it is actually
13    designed as a vent.
14              So lamps have thermal
15    protection in them, and different LEDs
16    have -- some lamps are not designed to
17    be inverted or base up, so that can
18    cause -- you can see issues manifest
19    there in their thermal protection.
20    That could have a failure which could
21    cause a thermal event.
22              If that vent opens due to a
23    thermal event, so basically if you
24    have a failure it will shoot hot
25    gasses and things like that out,
```



Page 137

```
 1                 A. LITZINGER
 2  depending what the components are
 3  inside, and those can indicate that
 4  that lamp went into thermal runaway of
 5  some kind.
 6            Another area that I would be
 7  looking at would be what is called the
 8  COB or chip on board.  It is typical
 9  with these types of lamps to have your
10  LED, the driver, and the biasing
11  resistor.  There has to be, I believe
12  it is a four -- I might be off on the
13  number, but there is a certain
14  resistance value that you are supposed
15  to have in conjunction with your LED
16  for appropriate what is called
17  biasing, basically so the light turns
18  on.
19            So we would look at those to
20  see if there is any localized heating
21  and/or damaged surrounding that chip
22  on board.  In this one I don't recall
23  how many chips on boards, but
24  typically there is more than one on a
25  lamp such as this.
```



Page 138

1                    A. LITZINGER

2      Q.    So you didn't see any damage

3    to the chip on board?

4      A.    Correct.

5      Q.    And then, I guess, the chip

6    on board, is it fair to say that this

7    is the -- that this is the green chip

8    that's in the foreground of the photo

9    on the right of the two lamps just

10   below, I guess -- I will put it up on

11   my screen so you can see what I am

12   talking about.

13             What I am circling here on

14   my mouse, is that the chip on board,

15   this green thing here?

16     A.    Can you zoom in more?  I

17   don't believe -- that does not appear

18   from right here.

19     Q.    This photo might not show

20   it.  It might be on the reverse?

21     A.    No, that appears -- that may

22   be --

23     Q.    This little thing right here

24   (indicating)?

25     A.    That could be another



Page 139

```
 1                 A. LITZINGER
 2   smaller capacitor used for filtering.
 3   I am not sure.  I would have to look
 4   at that a little closer, but the
 5   chip -- that would be what is in the
 6   base of the lamp so the other side
 7   would produce the light.
 8      Q.    So the other side would have
 9   the chip?
10      A.    Yes.  And you can see it a
11   little better in figure nine on that
12   other lamp that was collected.
13      Q.    That's this one?  This is
14   the chip on board?
15      A.    So the chip on board --
16   there are various shapes and sizes.  I
17   apologize, it looks like when this was
18   made into a PDF it degraded the photo
19   a little bit, but chip on board would
20   be typically square in nature with a
21   circle on it.  Often times that circle
22   would be yellow in appearance, which
23   is the phosphor coding of the light
24   which gives it its color temperature.
25   That's what you would be looking for.
```



Page 140

1                    A. LITZINGER

2              So that would be -- this one

3    does have thermal damage to it, but it

4    doesn't exhibit any signs either of a

5    potential failure.

6        Q.    That's helpful.  So what

7    would you see if there were signs of

8    thermal -- in this photo that we are

9    looking at of the blow up of figure

10   nine here, what should we be looking

11   for if this was -- if there were signs

12   of failure?

13       A.    So you would be looking for

14   very localized failure.  If we are

15   talking about a chip on board failure

16   we would be looking for a lot more

17   localized damage that you wouldn't see

18   on other chip on boards.

19             Like I said, typically there

20   are multiple COBs in -- on these lamps

21   because one light is -- if you have

22   one chip on board it is typically for

23   a flashlight or something like that.

24   You don't want that in your house

25   because that would shine a giant



Page 141

1                    A. LITZINGER

2    spotlight on the floor, and that

3    doesn't help anybody.

4              These will typically have

5    multiple COBs that will have a wider

6    angle of light transmission, so you

7    would be looking for those to see if

8    one of them has more localized damage

9    to help indicate a failure of a COB.

10             Now, conversely there are

11   obviously electronics on the other

12   side, as we previously talked about in

13   figure eight, we would be looking for

14   other evidence such as that vent hole

15   to indicate that we have a thermal

16   runaway event, or we would be looking

17   for a failed component on the other

18   side.

19        Q.    So I'm looking at this more

20   closely.  So this that we are looking

21   at on the left side of figure nine, is

22   this a single chip on board, and then

23   you can see the yellow patina of the

24   phosphor?

25        A.    No, you are looking at the



Page 142

```
 1                 A. LITZINGER
 2   entire circuit board, so they are
 3   actually small --
 4       Q.    Is it like this little dot
 5   right here (indicating)?
 6       A.    That could be one example
 7   that I unfortunately -- the photo is
 8   not high enough resolution, I
 9   apologize.
10       Q.    So there are multiple chips
11   on board on what we are looking at in
12   figure nine?
13       A.    Correct.
14       Q.    And if this had failed,
15   would you expect the whole thing to be
16   blackened?  I am just trying to
17   visualize if we were to look at a
18   failed version right here, what would
19   it look like?
20       A.    It is a lot more -- we would
21   be looking -- sometimes they look a
22   little different than others.  Like I
23   said, it is a very each case dependent
24   because you can see signs of arc
25   tracking on the circuit board, but you
```



Page 143

1                    A. LITZINGER

2    will see a localized area of damage.

3    Where here in this case we see the

4    area of damage is consistent across

5    the entire circuit board.

6    Furthermore, there is actually the

7    dome, the plastic dome, that is

8    also -- you are seeing melted remains

9    of that as well.

10        Q.    That's the blackened rim

11    around here that I am circling with my

12    mouse?

13        A.    I believe that's correct.

14    You are seeing the charred plastic.

15    You are in some of what I am trying to

16    explain to you.

17        Q.    That's helpful.

18            Now, is this next image, is

19    this what is believed to be the heated

20    blanket?

21        A.    Yes.

22        Q.    I think your answer is

23    probably going to be similar in

24    respect to the lamp, but this has

25    thermal damage, too; right?



1                    A. LITZINGER

2        A.    Correct.

3        Q.    But you were also able to

4    forensically eliminate this as a

5    potential cause?

6        A.    That's correct.

7        Q.    Am I to take it that you

8    eliminated this on a similar basis as

9    to the lamps in that there was no

10   obvious sign of -- there was no

11   obvious place for it to be plugged in?

12       A.    Well, in addition to there

13   is no place for it to be plugged in,

14   when we inspect -- so one, it is

15   folded up so it is in a stored

16   condition.

17            Secondly, in the bottom

18   right of that photo you can see the

19   plug end of it, so that's where it

20   would plug into an extension cord, or

21   even the wall receptacle.  So that did

22   not show what we would call protected

23   area.

24            A lot of times what happens

25   is when something is plugged in you



Page 145

```
 1                    A. LITZINGER
 2   will see a protected area, not only on
 3   the receptacle or the -- whatever it
 4   is plugged into you will see a
 5   protected end.  This also -- this plug
 6   end does not show protected area as
 7   well.  It shows heat and smoke damage.
 8       Q.    Okay.  That makes sense.
 9             I am going to turn to page
10   ten, which is the next page.  I am
11   looking at figure ten.  You stated the
12   item in figure ten couldn't be
13   identified.  My question is, how were
14   you able to rule it out then if you
15   didn't know what it was?
16       A.    So based on our -- my
17   inspection of the device, it was not
18   battery operated.  It was a
19   plug-operated device.  Having nowhere
20   for that to get plugged into, there
21   were no receptacles in the room that
22   showed other than the C wall, which
23   didn't have a lot of smoke deposition,
24   but the receptacle closest to the
25   closet did not show any protected
```



Page 146

```
 1                    A. LITZINGER
 2   areas indicating anything was plugged
 3   in.  So having nothing plugged in
 4   there, or having nowhere -- no way to
 5   plug it inside the closet we can make
 6   that determination.
 7       Q.    Okay.  Yeah, that's helpful
 8   because your report mentions that
 9   there were no receptacles in the
10   closet that could have provided power,
11   but my next question is, what about
12   battery?  You stated that this was
13   not -- you ruled out that it was a
14   battery-powered device.  It was a
15   corded device; right?
16       A.    Correct.
17       Q.    But that's not in your
18   report?
19       A.    It is not in that -- you are
20   right.  That's correct.
21       Q.    So maybe you can -- I mean,
22   is it even possible to tell -- I can
23   see some kind of frayed cabling it
24   looks like.  Is that what you looked
25   at and determined it was corded?  It
```



Page 147

1                    A. LITZINGER

2    is kind of frayed wires sticking out

3    of the foreground, they are green,

4    twisted wires.

5        A.    Unfortunately you are

6    looking at one photo of many photos.

7    I wasn't just using this photo to help

8    make that determination.  It was all

9    of my documentation.

10       Q.    Okay.  But I guess does this

11   photo depict what you think is the

12   plug end, I guess?

13       A.    I can't tell from this

14   photo, no.

15       Q.    Now, figure 11 depicts two

16   smoke detectors that you recovered

17   from the scene; right?

18       A.    That is correct.

19       Q.    What about the smoke

20   detectors in figure 11 makes you think

21   that they were both activated?

22       A.    Based on Ms. Marcellin's

23   interview and testimony as well as the

24   soot conglomeration on the smoke

25   detectors.



Page 148

                              A. LITZINGER

1

2      Q.     If you can tell me more

3   about the soot conglomeration on the

4   smoke detectors, if you can explain to

5   me what to look for in these pictures?

6      A.     Once again it is not just

7   the -- these are just the

8   representative --

9      Q.     I understand you have other

10  photographs, but you examined in

11  person, too?

12     A.     Correct.  What you would be

13  looking for to see if it activated, it

14  will almost look like sort of

15  concentric rings.  And what that is is

16  as the alarm is going off, or the

17  sound device is operating it will

18  actually in certain areas will -- you

19  won't get soot deposition as a result

20  of a smoke condition or something of

21  that nature.  You will actually see

22  those rings, which will help you

23  determine whether or not they

24  activated or not.

25     Q.     Okay.  So I kind of see the



Page 149

1                    A. LITZINGER

2    rings on the one on the right, but I

3    don't really see the rings on the one

4    on the left.  Is that because of the

5    nature of the photograph?  Would I see

6    it on the flip side of this one on the

7    left?

8         A.    I think it is the nature of

9    the photograph.

10        Q.    Okay.  I see there is

11   Duracell battery next to each of these

12   two smoke detectors.  Were they both

13   battery powered?  Both hard wired with

14   a battery back up?  Some combination

15   of the two?

16        A.    I believe they were battery

17   operated.

18        Q.    Okay.  If you know, what did

19   the building codes require back in

20   2020 for smoke detectors like this?

21        A.    So it wouldn't be based on

22   the 2020 building code.  It would have

23   gone back to when it was manufactured.

24   I don't recall when it was built, and

25   what the code requirements would have



Page 150

1                    A. LITZINGER

2    been at that time.

3        Q.    I am going on to the next

4    page, figure 14, page 11.  We have

5    photographs of the charger.

6        A.    Yes.

7        Q.    You stated that the charger

8    was forensically eliminated.  So my

9    question is, we looked at your opinion

10   where you stated that the HP Pavilion,

11   including the battery, failed.  My

12   question is, reading this I read this

13   to exclude the charger from that

14   opinion; is that fair?

15       A.    Yes, that's correct.

16       Q.    Okay.

17            MR. SCHWARZ:  I'm sorry

18            can you clarify, you mean

19            that the charger failed;

20            is what you meant by that?

21            Eliminated that the

22            charger failed?

23            MR. LEVITES:  Yes,

24            absolutely.  His opinion

25            was that the HP Pavilion,



Page 151

```
 1                  A. LITZINGER
 2            including the battery,
 3            failed.  I am asking based
 4            on this, is the charger
 5            excluded from that
 6            opinion, and his answer is
 7            yes, I believe.
 8      Q.    Right, Mr. Litzinger?
 9      A.    That's correct.
10      Q.    Okay.  Is there any evidence
11   in these photographs, and again, I
12   understand the limitations of these is
13   for the -- it was illustrative
14   photographs, but is there any evidence
15   in these photographs, or that you can
16   describe to me from your examination
17   that this charger was in fact plugged
18   in?  Like, is there anything we can
19   look for in these photographs?
20      A.    So looking at, if you want
21   to bring up figure 14, the plug
22   itself, or the plug end.  I realize
23   these photos could have been lightened
24   up a little bit, but --
25      Q.    Not a problem.
```



Page 152

                    A. LITZINGER

1

2      A.    It actually looks better on

3   your screen than it does on the

4   printed copy.

5      Q.    How is that?

6      A.    Can you zoom in a little bit

7   more, please?  Perfect.

8            So to show that this was

9   plugged in, what you can see here is

10  that the plug blades are a lot shinier

11  so there is not a lot of soot

12  conglomeration on there, if you will.

13  You can also see that there does

14  appear to be a bit of a protected area

15  on the face where the plugs go into

16  the, what we call the plug face on

17  this end.  So this area does appear to

18  show a protected area that if this

19  wasn't plugged in you may see -- we

20  expect to see more sooting.

21     Q.    I am going to try, if I can

22  manage it, let's see if I can draw a

23  square.  Bear with me.  I believe I

24  know what you are talking about, but I

25  want to make sure that we have it for



Page 153

```
 1                    A. LITZINGER
 2   later in the case.
 3            Is this the protected area
 4   you were just talking about that I
 5   draw in the red rectangle?
 6        A.    If you make it the whole
 7   face as you will.
 8        Q.    Like that (indicating)?
 9        A.    So you have the plug blades
10   highlighted, so those plug blades
11   go -- see where they meet the plastic
12   housing?
13        Q.    Over here where they --
14        A.    Yes, but the plug face as a
15   whole.  It is going to be hard to do
16   with a box.
17        Q.    That's fine.  Maybe an
18   arrow?
19        A.    Sure.  Whatever works for
20   you.
21        Q.    Is that clear where the
22   arrow is pointing?
23        A.    Like I said, it is that
24   whole plug face where the ground lug
25   as well as the neutral blades go into,
```



Page 154

```
 1                A. LITZINGER
 2   that flat surface.
 3        Q.    It is really we are looking
 4   at the protected areas shown in both
 5   of these areas, by both of these
 6   arrows, indicated by these two arrows
 7   drawn in red?
 8        A.    Yes, but if you are
 9   indicating what I will call a plug
10   face, yes.  The areas that those meet,
11   which is a lot more expansive than
12   what you are talking about there
13   showed signs of protection.
14        Q.    Okay.  I understand you mean
15   the reverse of the -- for the circular
16   blade is going to go all the way
17   around, and for these two flat plug
18   blades the reverse is going to show
19   the same.  I am just trying to
20   indicate with these arrows so we know
21   we are talking about the same.
22        A.    It is not limited just where
23   they meet the flat portion of the
24   plug.
25        Q.    Okay.
```



Page 155

1                    A. LITZINGER

2        A.    The whole plug area.   That's

3    all I am trying to make sure.

4        Q.    So the whole plug to you

5    shows signs of protection; is that

6    fair?

7        A.    The plug face.

8        Q.    So I could also fairly draw

9    this circle and say that everything

10   within this square shows signs of

11   protection to you?

12       A.    Yes, yes.

13       Q.    Okay.

14       A.    Using the other -- the

15   heated blanket plug that we talked

16   about in figure nine, you can see that

17   as an example, that one would show

18   that that does not have a protected

19   area.

20       Q.    I am now drawing a circle

21   over the plug blade in nine.

22       A.    That's correct.

23       Q.    So you are saying the blades

24   are more tarnished looking; is that

25   it?



```
 1                    A. LITZINGER

 2        A.     Yes.

 3        Q.     Okay.  The face of both is

 4   the same, so that's not -- I can see

 5   the difference in the blades that you

 6   are describing.

 7        A.     The face of the heated

 8   blanket plug would appear to be white,

 9   not black as in the case of the

10   charger.

11        Q.     Okay.  That makes sense.

12             So we have drawn squares and

13   the arrows to indicate the areas of

14   protection.  Was there -- would you

15   expect the charger itself to be more

16   damaged if it was plugged in during an

17   overcharge or overvoltage event?  When

18   I say the charger I mean the entire

19   assembly from the plug ends that go

20   into the receptacle, the converter all

21   the way to the plug end into the

22   notebook.

23             So my question is, would you

24   expect that assembly to be more

25   damaged if it was plugged in during an
```



Page 157

```
 1                  A. LITZINGER
 2   overcharge, overvoltage scenario?
 3        A.    An over -- when you say
 4   overvoltage, what do you mean by that?
 5        Q.    Maybe I am being an exact
 6   because I have read too many of these
 7   reports.  I will be -- I will take it
 8   back to a bigger level generality.
 9              If this was plugged in
10   during an electrical event with the
11   notebook, would you expect the
12   charger, the whole charger assembly to
13   show more damage than is depicted in
14   this photograph or no?
15              MR. SCHWARZ:  Objection
16              to the form of the
17              question.  You can answer.
18        A.    So I guess overvoltage can
19   mean a lot of things, and that's where
20   answering the question isn't a simple
21   yes or no.
22        Q.    How about just electrical
23   event --
24              MR. SCHWARZ:  I don't
25              mean to interrupt you, but
```


MAGNA
LEGAL SERVICES

```
 1              A. LITZINGER
 2         I need to.  I think what
 3         you are trying to ask is
 4         if there was an electrical
 5         event within the battery
 6         pack, would you expect
 7         something?
 8           Because I think what is
 9         tripping him up is there
10         could be an electrical
11         event any place in the
12         computer or in the charger
13         itself.  I think what you
14         are asking is if there was
15         an electrical event like
16         an overvoltage in the
17         battery pack, would you
18         expect damage to the cord.
19         I think that's what you
20         are asking.  I think
21         that's what is tripping
22         him up.
23           MR. LEVITES:  Yeah, it
24         is not quite that, but
25         that's close.
```



Page 159

```
 1                  A. LITZINGER
 2      Q.    What I am getting at,
 3  Mr. Litzinger, is your opinion in this
 4  case, and you testified is that the HP
 5  Pavilion including the battery failed;
 6  right?
 7      A.    Correct.
 8      Q.    And you couldn't identify
 9  the specific mechanism of failure, but
10  it is your opinion that it was the
11  notebook including the battery
12  exclusive of the charger that failed;
13  right?
14      A.    Correct.
15      Q.    With that understanding, I
16  am asking, we don't know exactly what
17  failed within the notebook based upon
18  your opinion here, but with your
19  opinion that it was the notebook that
20  failed, my question is, with such a
21  failure, which is electrical in nature
22  as we understand it, would you expect
23  this charger to be more damaged?
24  Should it be burned, blown up, you
25  know, anything like that, or is this
```



Page 160

```
 1                  A. LITZINGER
 2   consistent with the kind of failure
 3   that you observed in this case?
 4        A.    So a failure of the laptop
 5   and/or its battery, to include its
 6   battery, I would not expect to see
 7   damage to the charger itself.
 8        Q.    And why is that?
 9        A.    This charger is just
10   outputting what it is designed to
11   output, or what it is intended to.  I
12   don't recall off the top of my head
13   what the output voltage of this is,
14   but this charger doesn't know what is
15   going on at the laptop any more than
16   the laptop knows what is going on at
17   the charger other than what is coming
18   in from that charger.
19             So this charger in and of
20   itself I wouldn't expect to see --
21   unless it was -- this was on the
22   floor, so it was on the floor further
23   away so the level of damage is
24   consistent from where it was located
25   in the room, which didn't show a lot
```



Page 161

1                    A. LITZINGER

2    of heat damage.  I believe we did

3    X-ray it, and it didn't show any signs

4    of internal failure, and that's how we

5    were able to eliminate it.

6        Q.    Okay.  That makes sense to

7    me.  I am just thinking of what you

8    are saying is that the charger is just

9    pushing voltage out to the computer

10    and battery, and that when the

11    computer and battery fail it is going

12    to have no -- the charger itself is

13    not going to melt, burn, explode, or

14    anything like that, you wouldn't

15    expect that to happen?

16        A.    That is correct.

17        Q.    Okay.  In that RYOBI case

18    you talked about, was the charger

19    okay, was it intact afterwards?

20        A.    No, it was not.

21        Q.    Was it damaged by the fire,

22    or was it damaged by the electrical

23    event within the drill?

24        A.    Without getting into too

25    many aspects of it, the battery was on



Page 162

```
 1              A. LITZINGER
 2  charge at the time.  A RYOBI battery
 3  sits on top of the charger itself, or
 4  this particular model did.  Due to
 5  level fire damage it was not able to
 6  be determined was it the charger that
 7  failed, or was it an issue of the
 8  battery.  Both were connected.  Both
 9  were on at the time.  Unfortunately
10  one of the issues in that case was
11  that at the time it got to deposition
12  the insured was deceased.
13      Q.    I see.  So you are talking
14  about, like, a weed whacker battery.
15  It slots directly into the charger.
16  Both were consumed by fire so you
17  can't tell which was the victim and
18  which was the cause?
19      A.    That's correct.
20      Q.    And because this charger is
21  not mated directly to the battery we
22  don't have that factual situation;
23  right?
24      A.    That's correct.
25      Q.    Okay.  I am going to turn to
```



Page 163

1                    A. LITZINGER

2    page 12 of the report, which shows

3    figure 15.  Do you see that,

4    Mr. Litzinger?

5         A.    I do.

6         Q.    So page 12 you state, "the

7    laptop remains depict damage to the

8    laptop's battery compartment that is

9    inconsistent with fire exposure and

10   fire attack"; do you see that?

11        A.    Correct.

12        Q.    My question is, this

13   photograph in the top left that shows

14   the whole notebook assembly, doesn't

15   that depict melting and deforming of

16   the plastic casing of the computer?

17        A.    Which part of the computer?

18   I'm sorry.

19        Q.    The keyboard and the facing.

20        A.    There is thermal damage,

21   yes.

22        Q.    And there is dripping on the

23   screen?

24        A.    Yes, there is.

25        Q.    Is that damage consistent



Page 164

1                    A. LITZINGER

2    with a fire exposure?

3        A.    That would be consistent,

4    yes, with thermal attack.

5        Q.    Can the presence of a hot

6    gas thermal layer damage the laptop?

7        A.    It could, but that would

8    be -- we will get a little more into

9    Jason Karasinski's side.  I will defer

10   to him on that one.

11       Q.    Okay.  But if it could

12   damage the laptop it could damage the

13   battery; right?

14       A.    It would be a much broader

15   area rather than just the small area

16   that in this photo showing that's the

17   battery compartment that was the most

18   affected.

19       Q.    But the battery compartment

20   was filled with fuel; right?

21       A.    I guess I would defer to

22   Jason Karasinski on the fuel aspect of

23   that.

24       Q.    But a battery pack is fuel

25   for a fire?



Page 165

1                 A. LITZINGER

2        A.    It has electrical potential,

3    that is correct.

4        Q.    Okay.  So we looked at the

5    items from the hallway.  My question

6    is, for the other items that were

7    recovered from the armoire, including

8    the items depicted here in figure 15,

9    isn't it true that the damage to each

10   of the items was consistent with some

11   kind of fire exposure?

12       A.    I am sorry, can you say that

13   again?

14       Q.    Sure.  My question is, isn't

15   it true that the items recovered from

16   the armoire, including the laptop and

17   battery debris that we just talked

18   about, isn't it true that the damage

19   patterns that you saw were also

20   consistent with some kind of fire

21   exposure?

22       A.    The laptop shows fire

23   exposure, that's correct.  I would say

24   electrically it is not consistent, or

25   from the electrical components that



Page 166

1                    A. LITZINGER

2    are there it is not consistent with

3    fire exposure.

4        Q.    And why is that?

5        A.    So looking at figure 15,

6    while the laptop does show thermal

7    damage, the area of the battery

8    compartment shows the heaviest damage.

9    That would be what I would

10   characterize as localized damage, more

11   importantly, localized damage of an

12   area that has what I will say

13   electrical potential as those

14   batteries are -- even when they are

15   being uncharged they have some sort of

16   electrical energy that's there.

17            We don't know what the state

18   of charge of those batteries at the

19   time of the event, but we do know

20   through testimony of being plugged in

21   they would have been at more than zero

22   state of charge.  So they would have

23   had a high -- a much more electrical

24   potential for something to occur.

25       Q.    So the lithium battery pack



MAGNA
LEGAL SERVICES

Page 167

```
 1                  A. LITZINGER
 2   has stored energy that gives it
 3   electrical potential?
 4        A.    Correct.
 5        Q.    So whether it is the victim
 6   of the fire or the cause of the fire
 7   it is going to show a lot of localized
 8   damage; right?
 9        A.    That's dependent on each
10   case.  It is not -- this case isn't
11   going to look like the next case, if
12   you will.
13        Q.    Okay.  I guess my question
14   is, whether it is the victim or a
15   cause, when a battery pack goes into
16   thermal runaway we typically see this
17   kind of localized damage; right?
18        A.    I would defer to Dr. Martin
19   in that regard of what a battery that
20   goes into thermal runaway looks like.
21        Q.    Okay.  So you can't tell
22   from looking at this if it is victim
23   or cause.  You are pointing to the
24   highly localized damage; right?
25        A.    That's correct.
```



Page 168

                    A. LITZINGER

1

2     Q.    Would you expect it to look

3  any different if it were a victim

4  versus cause in these photos?

5     A.    The laptop?

6     Q.    Yes.

7     A.    Once again -- or the subject

8  laptop, once again I would say the

9  localized damage is something that

10  would be a data point that we would

11  look at and consider when evaluating

12  the fire scene and all potential

13  electrical ignition sources, but to

14  say what I would expect, I don't have

15  an expectation when looking at the

16  evidence until I have considered all

17  aspects.

18     Q.    Understood.  So it is your

19  opinion that the battery pack was the

20  cause?

21     A.    That's not what I am saying.

22     Q.    I apologize.  Please go

23  ahead.

24     A.    No, I wasn't saying that

25  that was the case.  I was just saying



Page 169

1                    A. LITZINGER

2    that every fire is different, so what

3    I would expect to see is not -- I

4    don't have an expectation of what I

5    should see.  I just look at the

6    evidence, the data points that the

7    evidence gives me to get down to a

8    potential area.

9        Q.    I appreciate that.  I am

10   trying to kind of drill down on this

11   distinction.  You testified that it

12   was the HP -- it was Ms. Marcellin's

13   notebook, including the battery, that

14   failed, but we can't say one way or

15   another what was the mechanism of

16   failure within that notebook; right?

17       A.    That's correct.

18       Q.    Okay.  So with that

19   understanding, the statement that the

20   damage to the battery compartment is

21   inconsistent with a fire exposure

22   appears to be at odds with my previous

23   statement; does that make any sense?

24       A.    What I am saying is I can't

25   eliminate the laptop and its battery



Page 170

```
 1                   A. LITZINGER
 2  as to a root cause one way or the
 3  other or how it started, I would defer
 4  to Dr. Martin in that regard, but as
 5  far as potential electric ignition
 6  sources, this is the only one that I
 7  can't eliminate, and that's based off
 8  my physical observations of the
 9  electrical system as well as the
10  laptop, so all potential ignition
11  sources within the room.
12      Q.    All right.  I understand.  I
13  am just looking at these yellow boxes
14  on the battery, and that is suggestive
15  that the battery as opposed to some
16  other aspect failed to me.  Am I
17  drawing the wrong conclusion from
18  this?
19              MR. SCHWARZ:  Just so
20              that we are clear, you are
21              talking about the yellow
22              boxes that are in the
23              left-hand side of figure
24              15 of this report?
25              MR. LEVITES:
```



Page 171

1          A. LITZINGER

2          Absolutely.

3          MR. SCHWARZ:  Okay.

4          Thank you.

5      A.    What I am trying to show in

6   that photograph is that the cell in

7   the bottom left-hand corner that's

8   there, that's where that was excavated

9   from.  You can actually see it in that

10  photograph with it in place and you

11  can see it out of place.

12          I am merely drawing a

13  distinction that there is damage on

14  both sides.  I am not saying one way

15  or the other that it was the battery

16  or the laptop.  That's just showing

17  where that item came from in helping

18  to draw attention to the damage.

19     Q.    Okay.  Thank you.  That's

20  helpful.

21          I am going to move to page

22  14 now.  Page 14 is the discussion

23  of -- the first half of page 14

24  discusses evidence of item number

25  nine, which was circuit breaker number



Page 172

```
 1                    A. LITZINGER
 2    three; do you see that?
 3         A.    I do.
 4         Q.    It states that you
 5    documented and collected the number
 6    three breaker; right?
 7         A.    That is correct.
 8         Q.    And you traced it to the
 9    receptacle that's depicted in figure
10    19?
11         A.    Correct.  We actually traced
12    it from the receptacle to the circuit
13    breaker.
14         Q.    Okay.  But you didn't look
15    at the number four breaker that was
16    tripped at the time of the fire;
17    right?
18         A.    That is correct.
19         Q.    And you didn't trace that
20    one either?
21         A.    That is correct.
22         Q.    Looking at photograph 19, or
23    figure 19, pardon me, kind of the same
24    exercise that we went through with the
25    plug blades.  What in this photograph
```



Page 173

```
 1              A. LITZINGER
 2   suggests to you that the notebook was
 3   plugged into this receptacle?
 4       A.    Do you want to bring that up
 5   again, please?
 6       Q.    Sure.  I have the image
 7   there, I will blow it up.  Is that
 8   enough there?
 9       A.    Yes.
10       Q.    Okay.  What are we looking
11   for here?
12       A.    So once again the photo is
13   pixilated, but it would appear that
14   the -- that where this was most likely
15   plugged in is the top receptacle, or
16   the one on the left in this
17   photograph.
18       Q.    This one here that I've
19   drawn the square around?
20       A.    Correct.
21       Q.    Please go on.  Sorry.
22       A.    No problem.  So that
23   receptacle does show what looks like
24   almost what I will say almost no soot
25   conglomeration.  When you look at the
```



Page 174

```
 1                  A. LITZINGER
 2  receptacle below it, you can see that
 3  there is, especially in that middle
 4  section that there is a -- looks like
 5  there is a -- yes, right there, that
 6  there is some sooting that has started
 7  in there.
 8      Q.   So this to you suggests that
 9  the notebook charger was plugged into
10  this larger square on the left, and
11  that this receptacle on the right
12  was -- had nothing plugged into it,
13  and that's why it was sooted?
14      A.   Yes.  You are starting to
15  see a little bit.  Now, this was lower
16  on the ground so you wouldn't expect a
17  high level of that based on its
18  location, but yes, this one shows that
19  there is a little bit more -- it is
20  starting to get sooted up a little bit
21  more than what you would see on the
22  large square.
23      Q.   Okay.  But there is some
24  sooting over here it looks like;
25  right?
```



Page 175

                        A. LITZINGER
1

2       A.     It is hard to say to that

3    level.  I don't -- I couldn't really

4    say.  To me it doesn't look like there

5    is much, if any, sooting there, but

6    the other receptacle appears to have

7    more soot deposits.

8       Q.     Okay.  Now, I am going to

9    turn to page 15.

10      A.     Okay.

11      Q.     I expect that we can

12   probably go through this pretty

13   quickly because you have explained the

14   signs and your analysis with respect

15   to the LED lamps, but I have kind of

16   the same questions here.  How were you

17   able to forensically eliminate this

18   bulb remains notwithstanding the

19   obviously thermal damage?

20      A.     So based on the lights were

21   reported to be off, to our knowledge,

22   reported to be off at the time of the

23   fire event, and if they were -- I

24   don't recall if Ms. Marcellin turned

25   them on or not at the time of the fire



Page 176

1                    A. LITZINGER

2   discovery, I don't recall that, but

3   the -- for this one it still actually

4   had -- was in relatively I will say

5   intact shape.  It is heavily fire

6   damaged, but if you look at that

7   photograph, I would have to blow it

8   up, but I believe that you can see

9   just the sort of the outline of that

10  vent location, but I want to make sure

11  I am being accurate.  No, that just

12  might be a soot mark.  Actually, this

13  photo, you see those little squares on

14  the face there?

15      Q.    These little squares that

16  are depicted within the rectangle?

17      A.    Yes, that would be the chip

18  on board.  That's what we would be

19  looking for.

20      Q.    And the vents for the gas is

21  not depicted in this photo?

22      A.    I don't see the vent hole on

23  there, no.

24      Q.    Okay.  But if you had -- if

25  it had failed you would expect that



Page 177

```
 1                A. LITZINGER
 2  hole to been blown out; right?
 3      A.    You would see that hole.  It
 4  would have been readily available,
 5  that is correct.
 6      Q.    We see in the next figure,
 7  figure 21, we have battery remains
 8  from the C/D corner of the room; do
 9  you see that?
10      A.    Yes.
11      Q.    We talked about this with
12  the other cells so I expect your
13  answer is the same, but do you have an
14  opinion as to whether this cell
15  started the fire?
16      A.    I do not.  I would have to
17  defer to Dr. Martin.
18      Q.    Does the carpet around the
19  cell look particularly burned to you?
20      A.    There are some areas of
21  char, I believe, on the photograph in
22  the top left of figure 21 coming
23  right -- if you look at the top of the
24  cell, which would be the top of the
25  photo, you see some what looks like
```



Page 178

```
 1                    A. LITZINGER

 2    charring of the carpeting.

 3        Q.    So I believe that's -- you

 4    are talking about the charring that's

 5    depicted in the red square here?

 6        A.    That's correct.

 7        Q.    Okay.  So is that charring

 8    consistent with, like, ignition?

 9        A.    It would be the cell

10    venting.

11        Q.    Okay.  But does it look like

12    the fire started right there to you?

13        A.    I would defer to Jason

14    Karasinski as far as where the fire

15    started.

16        Q.    But you don't have an

17    opinion one way or another whether

18    this is where the fire started?

19        A.    That's correct.

20        Q.    Okay.  So you don't know if

21    the cell in that 21 ignited the first

22    fuels?

23        A.    I don't have an opinion on

24    that, no.

25        Q.    And you don't have an
```



Page 179

                    A. LITZINGER

1

2    opinion on what the first fuels were?

3        A.    That would be correct.

4        Q.    Okay.  So you wouldn't be

5    opining as to any flammability

6    ratings, or limitations of the

7    ignition source, or anything of that

8    nature?

9        A.    That is correct.

10       Q.    Okay.  But generally

11   speaking, the fuel for a fire has to

12   be capable of being ignited by your

13   hypothesized ignition source; right?

14       A.    You would have to have the

15   competent ignition source.

16       Q.    Page 16 of your report you

17   refer to -- in the third full

18   paragraph there you refer to NFPA 921

19   and all other authoritative treatise

20   known to the writer.

21           We talked about NFPA 921.

22   We talked about Kirk's.  Are there any

23   other authoritative treatises upon

24   which you relied upon your conclusions

25   in this case?


MAGNA
LEGAL SERVICES

Page 180

```
 1                 A. LITZINGER
 2        A.    No.
 3        Q.    Okay.  Then you also state
 4   in that same paragraph that your
 5   analysis is in light of all
 6   information provided to date; do you
 7   see that?
 8        A.    That's correct.
 9        Q.    And so all of the
10   information provided to date as of the
11   date of your report, that's the
12   information we talked about before
13   that's listed on pages two to three
14   and 19 of your report?
15        A.    Nineteen of my references,
16   correct.
17        Q.    Right.  19 was the
18   references, and two to three was the
19   materials reviewed and the services
20   conducted?
21        A.    That's correct.
22        Q.    So all of the information
23   provided to date, is that assumed
24   within those references on pages two
25   to three and 19, or is there other
```



Page 181

1                    A. LITZINGER

2    information?

3         A.    That's correct.

4         Q.    That's all?

5         A.    That's all of it, yes, sir.

6         Q.    Okay.  And then you

7    reference at that page 19443 ignition

8    sequences.

9         A.    That's correct.

10        Q.    It says, "this section

11   concerns times when there is no

12   physical evidence of an ignition

13   source."  Did I read that right?

14        A.    There is more to that

15   sentence, but yes.

16        Q.    You are referring to "there

17   are times when there is no physical

18   evidence of the ignition source found

19   at the origin, but wherein an ignition

20   source can be logically inferred by

21   using other data," is that what you

22   mean?

23        A.    Yes, just to finish the

24   sentence off.  There is much more to

25   144.4.3, but that's just the first



Page 182

```
 1                A. LITZINGER
 2   sentence, yes.
 3       Q.    Of course.  I am not trying
 4   to excerpt any relevant context from
 5   my question.  I am just looking at
 6   this first sentence because it appears
 7   to impose a condition that this
 8   section be referred to at times when
 9   there is no physical evidence of the
10   ignition source; is that accurate?
11       A.    I am sorry, can you restate
12   that?
13       Q.    So I am saying we looked to
14   19443 at times when there is no
15   physical evidence to the ignition
16   source, but the sequence can be
17   logically inferred with other data;
18   correct?
19       A.    Correct.
20       Q.    So am I correctly reading
21   your reference here in your report as
22   conveying that you found no evidence,
23   physical evidence of ignition source,
24   but you have logically inferred it
25   using other data; is that accurate?
```



Page 183

                    A. LITZINGER

1

2       A.      That's correct.

3       Q.      Okay.   So in your expert

4   opinion there was no physical evidence

5   of the ignition source, but you can

6   infer it logically based on the other

7   evidence you reviewed?

8       A.      That would be correct.

9       Q.      So the section continues.

10  You will see, I think it is the last

11  sentence of that section.   It says,

12  "inferences may be arrived at by the

13  testing of alternative hypotheses

14  involving potential ignition sequences

15  provided that the conclusion regarding

16  the remaining ignition sequence is

17  consistent with all known facts."   Did

18  I read that right?

19      A.      That's correct.

20      Q.      How did you do that in this

21  case?

22      A.      So I evaluated -- so if you

23  go down to just below that in the

24  sentence section, that would be my

25  potential ignition sources considered,



Page 184

1                    A. LITZINGER

2    and I have those listed out there if

3    you want to go through that.

4        Q.    Yes.  So you list the

5    potential ignition sources in that

6    next section, which comprises the

7    Pavilion laptop, the building

8    electrical system, and lightening.  My

9    question is, did you consider any

10   other potential ignition sources?

11       A.    I only considered the

12   electrical ignition sources as that

13   was the scope of my investigation.  At

14   the time there was no other potential

15   ignition sources I identified.

16       Q.    Page 18 of the report you

17   stated under fire investigation

18   disposition you stated this case is

19   open.  What does that mean?

20       A.    This case is still ongoing.

21   So it would be -- we would consider

22   this case open, and that goes to if

23   there is any potential new data that

24   comes forward then it is open, but

25   until the case is -- whatever



Page 185

1                    A. LITZINGER

2   determination is made by the

3   attorneys, we will -- it will remain

4   open on our end until we get told to

5   close our file.

6        Q.    Okay.  Then under evidence

7   you state 15 items were secured by

8   FRT.  My question is, are all of them

9   discussed in your report?

10       A.    No.

11       Q.    Do you know which ones are

12  not discussed in your report?

13       A.    I don't recall which

14  evidence items they are.  I only

15  discussed the electrical items as part

16  of the investigation.

17       Q.    Okay.  Are there any other

18  evidence items other than the ones in

19  your report, and the non-nonelectrical

20  ones vouchered by FRT that you are

21  aware?

22       A.    I would have to review the

23  evidence log.

24       Q.    But as far as you know, it

25  is these 15?



Page 186

```
 1                    A. LITZINGER
 2      A.    That's correct.  These 15
 3  items is what was agreed to by all
 4  parties present.  The building, or the
 5  insurance representative for
 6  Mr. Hollowell, ourselves, as well as
 7  HP's representative that was at the
 8  fire scene as well.
 9      Q.    Then on the next page there
10  is a technical reviewer listed and a
11  manager reviewer.  Who are those
12  people?
13      A.    Kaitlyn Marcellus is the
14  engineering manager.  She reviews --
15  she does the technical reviews for all
16  employees following the engineering
17  discipline.  Klana (phonetic)
18  Karasinski is our end manager, and she
19  does the final review before going out
20  to the client.
21      Q.    What was the nature of
22  Ms. Marcellus' review in this case?
23      A.    It would be to look at the
24  technical aspects to make sure that
25  they are being explained clearly and
```



Page 187

1                  A. LITZINGER

2    concisely as well as to ask any

3    questions in regards to, I will call

4    it clarity in the technical sense.

5        Q.    Okay.  Do you recall if she

6    had any comments, edits, or anything

7    like that clarity wise or any other

8    way?

9        A.    Any good technical reviewer

10   has questions, but I don't recall what

11   specific questions.  I know she had

12   questions, that's where I would expand

13   a little bit more on what I am trying

14   to explain or the point I am trying to

15   get across in my report, but I don't

16   remember specifics.

17       Q.    All right.  I am going to --

18   I am looking at your references here.

19   I see the references that are listed,

20   but the only one of these five that's

21   actually cited in the body of your

22   report is NFPA 921.  My question is,

23   can you tell me where in your report

24   you looked to these other references

25   listed on page 19?



Page 188

1                    A. LITZINGER

2      A.    Yes, absolutely.  So the

3  first reference there is development

4  analysis electrical receptacle fires.

5  One of the big things that I do in

6  most fires is I am looking at the

7  receptacles.  So using that one I am

8  looking for evidence of a high

9  resistance connection, or often

10  referred to as an HRC, looking for

11  that.  Looking for any of those

12  instances which is part of the

13  building evaluation as well as looking

14  at the electrical connections because

15  there are certain instances that will

16  increase the likelihood of such as an

17  HRC, and there are things that would

18  help that are more likely to mitigate

19  that circumstances.  That's where I

20  would use that one.

21          The arc mapping and

22  explanation and example is another one

23  that I use on a regular basis for arc

24  mapping -- well, I apologize.  So in

25  2009 arc mapping was the term to


MAGNA
LEGAL SERVICES

Page 189

```
 1                    A. LITZINGER
 2    describe that.  Now it has been broken
 3    out to arc survey, which is the
 4    process of finding arcs, and the arc
 5    map is the end result where we would
 6    add that to a diagram.
 7            So that was just a little --
 8    as far as the terminology, but the
 9    actual substance of it is still
10    relevant today.  I use that in my
11    everyday course of my job on most fire
12    scenes, which I did do in this
13    instance, but there were no arc sites
14    located so that's why our arc map does
15    not show it.
16            NFPA 921, we went over that.
17            Forensic investigation
18    techniques for electrical conductors
19    involved in fire, that one as well --
20    that kind of ties into the ATF
21    bulletin.  One is used to further
22    expand on distinguishes between arc
23    mapping and melting, but the technical
24    bulletin also references, further
25    references distinguishes between arc
```



Page 190

```
 1                    A. LITZINGER
 2   melting versus fire melting.
 3           Those are ones that I used
 4   in the course of my regular duties
 5   when inspecting electrical systems
 6   that are in a fire scene.
 7      Q.    Okay.  So looking at these
 8   it is like the -- it appears to me
 9   that the numbers two, four, and five,
10   meaning, Mr. Karasinski's article on
11   arc mapping, the Roby article on
12   forensic investigation techniques, and
13   the ATF bulletin all concern arc
14   survey and/or mapping which was not
15   something -- which you didn't produce
16   an arc map because no arcs were found
17   during your survey; is that fair?
18      A.    That's correct.
19      Q.    Thank you for bearing with
20   me.  I was trying to construct that,
21   but that's helpful.
22           These one, two, four, and
23   five, you are relying on them, but
24   because you didn't produce an actual
25   arc survey in this, that's why they
```



Page 191

```
 1                    A. LITZINGER
 2    are not cited; is that fair to say?
 3         A.    The arc survey did not show
 4    anything, so the arc map -- we
 5    couldn't produce an arc map.
 6              MR. LEVITES:  Maybe now
 7              is a good time to take
 8              another break.  Let's come
 9              back at 2:05.
10              (Whereupon, a short
11              break was taken at this
12              time.)
13         Q.    So before our break we were
14    talking about arc surveying and arc
15    mapping, and you explained that you
16    had done an arc survey, and given that
17    there was no evidence of arcing that
18    you saw, no arc map was repaired; is
19    that an accurate summary of our
20    conversation?
21         A.    That's correct.
22         Q.    Okay.  So my question is,
23    did you do an arc survey of the sewing
24    room/office, the whole house, or
25    something in between?
```



Page 192

                        A. LITZINGER

1

2       A.      The sewing room/office.

3       Q.      Was there a reason you

4   restricted yourself to that room

5   rather than the rest of the residence?

6       A.      All parties present agreed

7   that that was the room of origin, and

8   all other damage was fire progression.

9       Q.      So based on what you saw

10  that day you concluded there was no

11  reason to do a survey of the living

12  room or any of the other rooms of the

13  house?

14      A.      That's correct.

15      Q.      Would you agree you

16  shouldn't eliminate a potential

17  ignition source just because there is

18  no obvious evidence for it?

19      A.      Can you say that again?

20      Q.      Would you agree that during

21  a fire investigation you shouldn't

22  eliminate a potential ignition source

23  just because there is no obvious

24  evidence for it; right?

25      A.      When you say that, do you



Page 193

```
 1                  A. LITZINGER
 2   mean -- I guess that is pretty broad.
 3   Could you elaborate on that more,
 4   please?
 5      Q.    I am a total laymen, so I am
 6   just looking to the NFPA, and that's
 7   just one of the things it says, it is
 8   194.
 9      A.    Yeah, to answer your
10   question, it would be based on the
11   area of origin as defined not just by
12   Jason Karasinski, but the other
13   experts; HP's expert, and the building
14   insurer's expert, we -- everyone
15   agrees that was the area of origin,
16   and that the fire progressed from that
17   room to the rest of the house.
18              If there was no clearly
19   defined area of origin we would have
20   done a more extensive arc survey, and
21   by default would have created a more
22   extensive arc map, but based on the
23   agreement by all parties that being
24   the room of origin, we limited it to
25   that room of origin.
```



Page 194

1                    A. LITZINGER

2             Now, if there was an

3    electrical ignition source in that

4    room that we -- we looked at all

5    potential ignition sources in this

6    specific case within the defined room

7    of origin, and we did collect those

8    for evaluation.  Everyone agreed on

9    what was collected.  Had somebody

10   wanted something else, or something

11   different we would have collected that

12   for future evaluation, but at the end

13   of the day no one -- everyone agreed

14   that what we collected was all

15   relevant evidence.

16        Q.    Okay.  So I understand how

17   you drilled down from the more general

18   to the more specific in respect to

19   your investigation in this case, but

20   generally speaking in your work, would

21   you agree that you start -- that at

22   the outset you don't eliminate a

23   source just because there is no

24   obvious evidence for it?

25        A.    I don't know if I -- I don't



Page 195

```
 1                    A. LITZINGER
 2   know if I am completely understanding
 3   what you are saying in that regard.
 4            I did evaluate -- as I
 5   walked from the area of least damage
 6   to the area of most damage I was
 7   evaluating all potential electrical
 8   ignition courses within those areas,
 9   but as I was going through, that was
10   the process by which I went by, but I
11   don't -- I guess, I am trying to
12   answer your question, but I think
13   that's what you are asking.  I would
14   need a little bit more specifics, I
15   guess, to be able to answer it more
16   robustly.
17       Q.    I appreciate that.  I am
18   really asking just in the most general
19   sense in terms of your investigative
20   process as it were separate and
21   outside of this case.  I think your
22   answer was responsive to that.
23            This is another general
24   question about how you approach your
25   investigations.  Devices that are heat
```



Page 196

                    A. LITZINGER
1
2    producing or capable of producing heat
3    when they sustain a failure, those
4    devices should be on your list of
5    hypotheses; right?
6        A.    If they are capable -- if
7    they produce heat, or capable of
8    producing heat?
9        Q.    In a failure.
10       A.    In a failure, electrically,
11   yes.
12       Q.    Do you know what a heat and
13   flame vector technique is?
14       A.    That would be something that
15   Jason Karasinski would be more
16   familiar with than I am.
17       Q.    Okay.  Do you know what a
18   heat and flame vector technique is?
19   Because I don't.
20       A.    I have -- it has been
21   discussed in the past, but I couldn't
22   be super specific on it.
23       Q.    Okay.  But you didn't do one
24   in this case; right?
25       A.    I did not.



Page 197

                    A. LITZINGER

1

2      Q.    What do you think the

3  inhabitants of the house were doing

4  when the fire started?

5      A.    My understanding is they

6  were sleeping.

7      Q.    What do you base that

8  understanding on?

9      A.    The testimony Ms. Marcellin,

10  I believe it was the -- I don't recall

11  the exact time, but I believe it was

12  sometime in the early morning or

13  middle of the nighttime frame.  And I

14  believe Mr. Hollowell was found in the

15  bedroom.

16      Q.    Okay.  Are you aware that in

17  the local investigation records the

18  toaster oven was on at the time they

19  responded to the fire?

20      A.    I may have observed that,

21  but I don't recall that specifically,

22  no.

23      Q.    And if Mr. Beeten (phonetic)

24  said it was glowing, and that he

25  unplugged it on arrival, does that



                    A. LITZINGER
 1
 2  refresh your recollection at all?
 3      A.    No, it does not.  I'm sorry.
 4      Q.    Why would the toaster oven
 5  be on if the inhabitants of the house
 6  were asleep?
 7      A.    I don't have an answer for
 8  you.
 9      Q.    Is this evidence that
10  someone might have been awake in the
11  house and was using a toaster oven,
12  would you consider that as a potential
13  ignition source?
14      A.    It would be considered.  Any
15  electrical item within a building or a
16  house has the potential to have a
17  failure to cause a fire, but just
18  because something has potential
19  doesn't mean that it did.
20      Q.    Did you consider the toaster
21  oven?
22      A.    In this particular instance,
23  I would say no, I did not.
24      Q.    Are you aware of toaster
25  ovens starting fires ever?



Page 199

1                    A. LITZINGER

2      A.    It is possible.  It is a

3  heat-producing device, as you said,

4  but the kitchen was one of the first

5  areas that I encountered upon entering

6  the house from the B side, so that

7  would have been in the relatively

8  least damaged portion of the house as

9  you progressed inward towards the area

10  of most damaged.

11     Q.    Did you look at the electric

12  couch as an ignition source?

13     A.    The electric couch, I did

14  not based on the damage that was

15  present to it.

16     Q.    So it was pretty damaged;

17  right?

18     A.    When talking about damage to

19  a couch, I am going to say no.  When

20  you look at couches that are involved,

21  I have investigated fires that have

22  involved furniture fires, we will call

23  it for lack of a better word, that

24  couch was relatively intact compared

25  to ones that had been directly



Page 200

```
 1                    A. LITZINGER
 2   involved in fires.
 3        Q.    Okay.  That's helpful.
 4   Maybe I can see if I can pull up one
 5   for you so that we can take a look.
 6   Just bear with me.  I think there are
 7   some photos of the couch.  I will put
 8   these up.  Do you see that,
 9   Mr. Litzinger, those two photos of the
10   couch?
11        A.    Yes, I do.
12        Q.    You said that it was
13   relatively intact.  To me it looks
14   pretty burned, but you are saying it
15   should be more burned; is that right?
16        A.    Yes.  And I am coming from
17   the point of view of electrically
18   operated whether they have -- as we
19   have discussed, furniture power
20   distribution units, or FPU for short,
21   so those or any type of a motor
22   involved.  All of those electronics or
23   electrical items are typically located
24   in the lower portion of the couch, so
25   the seating area down.
```



Page 201

1                    A. LITZINGER

2       Q.    Okay.  So is it your

3    testimony today that because the

4    seating area was not burned that

5    that's why the couch is as relatively

6    less damage as you testified earlier?

7       A.    No, I am talking in regards

8    to a potential electrical issue the

9    damage isn't consistent for what I

10   would be looking for for a couch that

11   is electrically operated.  But talking

12   about areas considered, the origin and

13   cause experts, Jason Karasinski, the

14   representative for the insured, as

15   well as the representative for HP all

16   agree the area -- the room of origin

17   was the sewing/office.

18      Q.    Did you agree?

19      A.    Based on fire patterns you

20   would have to ask Jason Karasinski.  I

21   was there to look at the electrical

22   systems.

23            Once all parties agreed of

24   the room of origin is when I started

25   with electrical in that room.  I was



Page 202

```
 1                A. LITZINGER
 2   able to limit my scope based off of
 3   their observations and expert opinion.
 4       Q.    So you don't disagree or
 5   disagree with their determination,
 6   with Mr. Karasinski's determination,
 7   you just relied upon it; is that fair?
 8       A.    I relied upon not only
 9   Mr. Karasinski, but all other parties
10   present.
11       Q.    Right.  So all of the other
12   parties were looking at the office and
13   sewing room.  You didn't form an
14   opinion one way or the other, and you
15   relied on that determination that all
16   of the parties made?
17       A.    That's correct.
18       Q.    Okay.  In looking at this
19   couch, if this couch had started the
20   fire you are saying the whole bottom
21   should be burned up; did I understand
22   that right?
23       A.    I would expect more damage
24   to the bottom portion as well, that's
25   correct.
```



Page 203

```
 1                    A. LITZINGER
 2       Q.    Okay.  How about the gas
 3   furnace, did you discuss that in your
 4   report?
 5       A.    I did not.
 6       Q.    Is it fair to say you didn't
 7   address that as a potential ignition
 8   source either?
 9       A.    That's correct.
10       Q.    You didn't physically
11   investigate the furnace; right?
12       A.    No, that would have been
13   Jason Karasinski.
14       Q.    Do you know where the
15   furnace is in the house?
16       A.    It is -- yes, it is in the
17   hallway adjacent to the closet, the
18   sewing room/office closet.
19       Q.    Okay.  So it abutted the
20   area of origin as determined by
21   Karasinski?
22       A.    Correct.
23       Q.    Did you know that the local
24   investigator said that the furnace was
25   blown out when they came to the site
```



Page 204

1                    A. LITZINGER
2    of the fire?
3        A.    I had heard that.  I don't
4    know when I heard that.
5        Q.    Does that have any
6    significance to your conclusions?
7        A.    That was a gas fire furnace,
8    so I would not have been looking at
9    it.
10       Q.    Okay.  Was it possible that
11   the ignition source was not electric
12   in this case?
13       A.    For anything nonelectric you
14   would have to talk to Jason
15   Karasinski.
16       Q.    Okay.  But with the
17   understanding that you are engaged to
18   look at electrical ignition sources,
19   and that's your expertise, and that's
20   what your report is, and that's what
21   the subject of your testimony is, is
22   it also possible that the fire was
23   started by a nonelectrical source?
24       A.    Based off FRT's review, that
25   was not the case.



Page 205

1                    A. LITZINGER

2       Q.     Okay.  Based upon your

3    review of Mr. Karasinski's work you

4    agree with him that it is not possible

5    that the source of the ignition was

6    nonelectric?

7       A.     That's correct.

8       Q.     Did you know there were

9    burnt candles in the house?

10      A.     I believe I heard about that

11   after the fact, but I did not observe

12   any of that within the agreed upon

13   room of origin.

14      Q.     Okay.  So we talked about

15   the rebuttal report of Mr. Karasinski,

16   and I am thinking that it is probably

17   not the best use of our time to put it

18   up and ask you questions about it

19   because you neither assisted in the

20   drafting or the preparation of the

21   opinions inside of it; is that fair to

22   say?

23      A.     That's correct.

24      Q.     Okay.  So I won't put it up

25   here and go through it with you.



Page 206

1                    A. LITZINGER

2              We talked about the couch.

3    We talked about the furnace.

4              Did you ever see

5    Ms. Marcellin's supplemental

6    declaration?  I know you testified you

7    were aware of it, and it was prepared

8    recently, but did you ever read it?

9         A.    No, I did not.

10        Q.    In a developing fire in a

11   compartment, or a closed room like the

12   room of origin that Mr. Karasinski

13   concluded, how does a hot gas layer

14   form?

15        A.    You would have to talk to

16   Jason Karasinski about that.

17        Q.    What does the NFPA say about

18   that though; do you know?

19        A.    I would have to review that

20   section.

21        Q.    Do you know what the form of

22   heat transfer is between the gas layer

23   and a room in a compartment fire?

24        A.    Not off the top of my head I

25   do not.



Page 207

1                  A. LITZINGER

2      Q.    But this was a compartment,

3   right, this room, it had a ceiling?

4      A.    That question would be more

5   appropriate for Jason Karasinski to

6   talk about.

7      Q.    Does the fact that it is a

8   room with a ceiling have any affect on

9   your electrical analysis, the fact

10  that it is a compartment, or is it

11  irrelevant?

12     A.    It does not.

13     Q.    When you went to the scene,

14  is it fair to say in that diagram we

15  looked at earlier of the vouchered,

16  the recovered battery cell components

17  that the majority of the cans and the

18  electrodes were in the center of the

19  room or the opposite corner?

20     A.    No.  So the items on that

21  diagram only show what was part of

22  item number one.  Item number one was

23  labeled with letters.  I forget the

24  number, I think 12 or something items

25  as part of that.  That's what that



Page 208

1                    A. LITZINGER

2    diagram shows.

3             During the excavation we

4    did -- the other items that were

5    collected to include I believe that

6    one can we saw later on in my report,

7    that was found in the C/D corner.

8    That's not shown on the diagram.  The

9    diagram started getting cluttered with

10   the initial information, so we did not

11   include that.  It could be included,

12   but we didn't include that for clarity

13   of item number one, but no, it didn't

14   just come from the center of the room.

15       Q.    No, I may have swallowed the

16   end of my question there, and I

17   apologize.  What I was asking is,

18   would you agree that the majority of

19   the cans and electrode materials were

20   in the center or the opposite side of

21   the room, meaning that C/D corner

22   where you got the other cell; would

23   you agree with that?

24       A.    The majority was, but there

25   was battery remains that were



Page 209

```
 1                 A. LITZINGER
 2   recovered while we were excavating the
 3   closet space.
 4       Q.    We looked at some of the
 5   pictures, but from your recollection
 6   from that day, did you see any thermal
 7   damage or ignition of other
 8   combustible materials at the floor
 9   level where you found and recovered
10   this debris?
11               MR. SCHWARZ:  This
12               debris, meaning, the
13               battery cell components in
14               the closet?
15               MR. LEVITES:  That were
16               found in the center,
17               opposite, and in the
18               closet, yes.
19       A.    Sorry, can you ask that
20   again?
21       Q.    So you just testified that
22   you recovered cell can and electrode
23   materials from the center of the room.
24   You said you also recovered some
25   materials from the C/D corner of the
```



Page 210

```
 1                 A. LITZINGER
 2   room.  You also recovered some
 3   materials from the floor of the
 4   closet.
 5             My question is, did you
 6   observe any floor level thermal damage
 7   at any of those places?
 8       A.    There was charring to the
 9   floor at various areas, yes.  Even the
10   C/D corner did show some charring, as
11   we discussed earlier, while limited,
12   but yes, there were definitely charred
13   areas around the battery cans and cell
14   remains.
15       Q.    So there was some thermal
16   damage in the form of charring, but
17   you didn't see any evidence of
18   combustion; is that fair to say?
19       A.    Well, the closet -- I would
20   say the charring is showing that it is
21   starting to off gas.  Are you talking
22   about open flame?
23       Q.    Open flame.
24       A.    In terms of -- I couldn't
25   offer an opinion as to what was all on
```



Page 211

```
 1                    A. LITZINGER
 2   fire, but there is definitely evidence
 3   around the room in various areas
 4   around these cans as well as the
 5   debris itself to include the closet
 6   debris that are either charred or, you
 7   know, you can't say one way or the
 8   other because the fire was out when I
 9   got there.  There is definitely more
10   areas where it appears there was open
11   flame, and areas where there may not
12   have been necessarily open flame.
13        Q.   That's what I am trying to
14   get at.  These areas where all of the
15   cell ejecta was found, when we went
16   over it, it looked like there was more
17   evidence of charring than an open
18   flame-type combustion.  I am asking if
19   you observed anything inconsistent
20   with that?
21        A.   No, there were varying
22   degrees of charring/suggestive of open
23   combustion, yes.
24        Q.   Which of the recovered cell
25   ejecta showed signs of open flame
```



Page 212

```
 1                A. LITZINGER
 2    combustion?
 3         A.    That one I would defer to
 4    Jason Karasinski to make that opinion.
 5         Q.    So you don't know which of
 6    them would have been open flame
 7    combustion versus just charring?
 8         A.    That's correct.  I wouldn't
 9    be able to offer an opinion on that.
10         Q.    Okay.  Would it help if we
11    went back to the pictures?
12         A.    No, I just wouldn't offer an
13    opinion which ones were involved in
14    open combustion and which ones were
15    not.
16         Q.    When you went into the room,
17    the sewing room, the office, did you
18    notice that -- what observations did
19    you make of the combustible materials
20    that were in the armoire around the
21    subject notebook?
22         A.    There were -- I believe that
23    there were papers underneath it as
24    well as there was some I would call
25    them light combustibles in and around,
```



Page 213

```
 1                  A. LITZINGER
 2   I believe on top there might have been
 3   some papers or light combustibles on
 4   top as well.
 5        Q.    And those weren't burned up
 6   in the fire; right?
 7        A.    I would say there were
 8   various degrees of thermal decay.
 9        Q.    So some were fully burned
10   up, and some weren't burned at all?
11        A.    I will say just various
12   degrees of thermal decay.  Whether
13   that's burned up or not, I don't
14   recall exactly where that would be.
15        Q.    If you take a look at page
16   seven of your report, which is figure
17   six.
18        A.    Okay.
19        Q.    I appreciate your report has
20   captions for all of the -- has the
21   accessibility captions.
22        A.    I didn't create that.
23        Q.    No, of course.  It is a
24   software, mine does the same.
25              So this is what I am asking
```



Page 214

1                    A. LITZINGER

2    about here.  Does that help answer the

3    question at all?

4       A.    Yes.  This is a little low.

5    I guess I would include on top of the

6    armoire as well that this picture just

7    doesn't show that.  Yes, there were

8    definitely papers and things of that

9    nature in that area before, in and

10   around as I said earlier.

11      Q.    Do you have an opinion as to

12   why there appears to be limited

13   combustion of these papers and other

14   objections in the armoire, and yet the

15   materials in the closet were ignited?

16      A.    I don't have an opinion on

17   that.  You would have to talk to Jason

18   Karasinski in that regard.

19      Q.    So you don't know why all of

20   these papers weren't incinerated

21   basically?

22      A.    That portion -- that would

23   have been outside of my scope.  That

24   would be more within Jason

25   Karasinski's scope.



Page 215

```
1                    A. LITZINGER
2        Q.    Okay.
3             MR. LEVITES:  I am just
4             going to take -- maybe we
5             can take a longer break
6             because I don't think I
7             have too much more.  If we
8             can go until 2:40, I think
9             I should be done within an
10            hour of that or less.
11            Let's come back at 2:40.
12             MR. SCHWARZ:  Okay.
13             (Whereupon, a short
14            break was taken at this
15            time.)
16        Q.    So my first question was,
17   you mentioned in one of your cases
18   there was no electrical cause for the
19   fire because there was an unattended
20   candle and a dog.  So did I correctly
21   infer from that that the cause of the
22   fire was the candle being knocked over
23   by a pet?
24        A.    That would be correct.  That
25   was one of our other O and Cs that I
```



Page 216

```
 1                    A. LITZINGER
 2   was working with.  Originally it was
 3   reported or suspected that there was a
 4   ceiling fan that was overhead.  That
 5   would be -- that was the -- that and a
 6   potential RPC as well were the two
 7   electrical items, which is why I was
 8   brought in on that investigation.
 9                Those two items were -- as
10   well as the building electrical system
11   itself were subsequently eliminated,
12   and the opposing expert agreed with
13   that, and then my origin of cause
14   investigator for that file, that was
15   his determination.
16       Q.    What -- I am sorry, you said
17   RPC?
18       A.    It stands for relocatable
19   power cap.  Most people would refer to
20   those as, like, power strips or surge
21   suppressors, but the actual look at
22   the back it says relocatable power
23   cap.
24       Q.    As a result of all of these
25   cases you might understand why I don't
```



Page 217

```
 1                    A. LITZINGER
 2  have any of those in my house.  I was
 3  just helping my brother-in-law move,
 4  and he had an old one covered in dust.
 5  I said, how old is this thing?  Is it
 6  more than two years old?  He said, oh
 7  yes, it has got to be, whatever, I
 8  said you know they only warranty these
 9  things for a year because they are not
10  supposed to last ten years.
11       A.    Right.
12       Q.    Okay.  So you looked at the
13  ceiling fan, you looked at the RPC,
14  and you were able to rule those out in
15  this case; right?
16       A.    That is correct.
17       Q.    Then the determination with
18  respect to the candle and the pet was
19  all beyond your analysis?
20       A.    That was beyond my scope,
21  yes.  That was my origin and cause
22  investigator, that was part of his
23  scope.
24       Q.    Okay.  And I think you said
25  you weren't sure if you had seen a
```



Page 218

```
 1                    A. LITZINGER
 2    picture of the candle in this case?
 3        A.    I don't recall making that
 4    observation while I was at the fire
 5    scene.
 6        Q.    I am going to put it up for
 7    you.  Do you see the candle there?
 8        A.    I do.
 9        Q.    Does that refresh your
10    recollection as to whether you saw the
11    candle at the time of the fire?
12        A.    I mean, I see it in this
13    photograph, so yes, that's -- there
14    was a candle present.  It looks like
15    the couch we are looking at earlier.
16        Q.    Yes.
17        A.    There was a candle present,
18    yes, I agree with that.
19        Q.    But does that refresh your
20    recollection as to whether you saw the
21    candle at the time, or just looking at
22    this picture you now know there must
23    have been one?
24        A.    Yeah, the latter.
25        Q.    Did you know that there was
```



Page 219

                     A. LITZINGER
1
2   a cat in this house?
3        A.    I don't recall that
4   information, no.
5        Q.    Does it change any of your
6   opinions or anything?
7        A.    It does not.
8        Q.    Okay.  And then the one
9   other thing, I asked you earlier about
10  your review of Ms. Marcellin's
11  statements, deposition, and her
12  affidavit, and if you found them to be
13  consistent; do you remember that?
14       A.    Correct, yes.
15       Q.    When we were talking about
16  it you said the only thing that you
17  can think of with respect to an
18  inconsistency was about an old
19  notebook; do you remember that?
20       A.    Yes, I do.
21       Q.    What was the inconsistency
22  about the old notebook?
23       A.    Per her, I believe it was
24  her deposition she said it was in the
25  closet.  There was nothing in the



Page 220

```
 1                A. LITZINGER
 2   closet.   There is no older laptop in
 3   the closet, or in the hallway debris
 4   that was collected for inspection.
 5      Q.    Okay.  So we don't know
 6   where this notebook is, or you
 7   certainly don't know?
 8      A.    I don't know.  It was not
 9   collected as part of the evidence that
10   we -- from the scene.
11      Q.    And you would expect to find
12   debris of this notebook in the -- when
13   you were performing your
14   investigation; right?
15      A.    Yes.
16      Q.    A house fire wouldn't
17   disintegrate it?
18      A.    I mean, it can barely fire
19   damage it, but I would expect to find
20   remains that we could identify as
21   being for a computer.
22      Q.    Okay.  So we talked about
23   the way that you went about your
24   investigation, the analysis that you
25   performed, the CT scan that you
```



Page 221

```
 1                   A. LITZINGER
 2    examined, the X-rays.  Was there any
 3    other physical testing of your
 4    hypotheses in this case that we
 5    haven't talked about yet?
 6         A.    No.
 7         Q.    Is there anything else that
 8    you want to tell me about the fire, or
 9    your investigation of the fire and the
10    electrical system of the house that
11    you haven't had the chance to tell me
12    today that you would like to tell me?
13         A.    No.
14         Q.    Is there any question that I
15    should have asked you, but I didn't
16    that would help you clarify or expand
17    on your opinions?
18         A.    No.
19         Q.    And did you understand all
20    of my questions today?
21         A.    Yes.
22         Q.    Okay.  With the exception of
23    those for which you requested
24    clarification and it was provided?
25         A.    Yes.
```



Page 222

1              A. LITZINGER

2         MR. LEVITES:  I believe

3    with that my questions are

4    done.  I will turn you

5    back over to Attorney

6    Schwarz, and thank you for

7    your time today.

8         THE WITNESS:  Thank you

9    very much.

10        MR. SCHWARZ:  I have no

11   questions, so thank you,

12   Andy.

13      (TIME NOTED: 2:50 p.m.)

14

15

                   ANDREW LITZINGER

16

17

18

19

20

21

22

23

24

25



Page 223

```
 1
 2    A C K N O W L E D G E M E N T
 3    STATE OF NEW YORK    )
                                :
 4    COUNTY OF _____)
 5
 6            I, ANDREW LITZINGER, hereby
 7    certify, I have read the transcript of
 8    my testimony taken under oath in my
 9    deposition of March 20, 2025; that the
10    transcript is a true, complete and
11    correct record of what was asked,
12    answered and said during this
13    deposition, and that the answers on
14    the record as given by me are true and
15    accurate.
16
17            _____
                    ANDREW LITZINGER
18
19
      Signed and subscribed to
20    before me, this_____day
      of _____ 2025.
21
      _____
22    Notary Public
23
24
25
```



Page 224

1

2          ERRATA SHEET CORRECTIONS:

3    Pg. Ln.  Now Reads          Should Read

4    ___ ___  _____ _____

5    ___ ___  _____ _____

6    ___ ___  _____ _____

7    ___ ___  _____ _____

8    ___ ___  _____ _____

9    ___ ___  _____ _____

10   ___ ___  _____ _____

11   ___ ___  _____ _____

12   ___ ___  _____ _____

13   ___ ___  _____ _____

14

15

16

17   _____

18   Signature of Deponent

19   SUBSCRIBED AND SWORN BEFORE ME

20   THIS____DAY OF_____, 2025.

21

22   _____

23   (Notary Public)  MY COMMISSION

24   EXPIRES:_____

25



Page 225

```
 1
 2                  INDEX TO TESTIMONY
 3
 4   WITNESS        EXAMINATION BY        PAGE
 5   Andrew Litzinger  Mr. Levites        5
 6
 7
 8                  INDEX TO EXHIBITS
 9   LITZINGER
     EXHIBITS      DESCRIPTION            PAGE
10
11   1    26-page Andy Litzinger report  49
          datedOctober 14, 2024
12
     2    Rebuttal report of             51
13        Mr. Karasinski dated
          December 31, 2024
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 226

```
 1
 2              C E R T I F I C A T E
 3
 4      I, ILYSA A. LINZER, a Shorthand
 5  Reporter and Notary Public of the
 6  State of New York, do hereby certify:
 7
 8      That, ANDREW LITZINGER, the
 9  Witness whose examination is
10  hereinbefore set forth, was duly
11  sworn, and that such examination is a
12  true record of the testimony given by
13  such Witness.
14
15      I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage; and that
18  I am in no way interested in the
19  outcome of this matter.
20
21  ILYSA A. LINZER    _____
    ILYSA A. LINZER         MARCH 28, 2025
22
23
24
25
```



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES



Web: MagnaLS.com Phone: 866.624.6221

# Magna Litigation Screen Grab Preview



*The video of this deposition may be available to order through our Magna VOD program. If this deposition was **not noticed** for video, all parties must approve of the production for it to be released to any party. Admissibility will ultimately be determined by a judge. Please visit magnals.com/vod to order.*

Magna Legal Services
1635 Market St, 8th Floor
Philadelphia, PA 19103

**A**

**a.m**
1:15
**ability**
81:2
**able**
12:22 14:11 24:25
35:7 75:3 76:3 80:2
87:15 90:10 100:16
101:10 117:25
118:13 119:4 120:3
134:20 144:3
145:14 161:5 162:5
175:17 195:15
202:2 212:9 217:14
**above-mentioned**
1:20
**absolutely**
60:5 68:2 74:18
108:22 118:24
150:24 171:2 188:2
**abuse**
102:12
**abutted**
203:19
**ABYC**
33:6
**acceptable**
41:2
**accepted**
48:22 49:3
**accessibility**
213:21
**accuracy**
14:12
**accurate**
85:7 94:6 176:11
182:10,25 191:19
223:15
**acronym**
89:10
**act**
131:23
**action**
1:8 226:17

**activated**
117:18 147:21
148:13,24
**active**
30:23 33:22 34:21
59:8
**activity**
12:4,7
**actual**
111:3 189:9 190:24
216:21
**add**
66:6 189:6
**addition**
144:12
**additional**
21:19 63:23 119:22
**address**
4:16 29:19 99:22
113:6 203:7
**addressing**
33:20
**adequacy**
14:12
**adequate**
17:10
**adjacent**
203:17
**administer**
3:18
**affect**
207:8
**affidavit**
21:6,23 22:4 24:7
25:13 26:3,5,11
219:12
**aftermarket**
83:18 85:16 86:2
106:9
**against-**
1:8
**age**
38:14
**agencies**
107:23 112:4

**ago**
30:2 76:21
**agree**
4:22 7:14 8:9 14:10
17:2,8 85:18 86:6
108:18 112:23
130:16 192:15,20
194:21 201:16,18
205:4 208:18,23
218:18
**agreed**
3:4,11,16 85:15
91:14 186:3 192:6
194:8,13 201:23
205:12 216:12
**agreement**
193:23
**agrees**
193:15
**ahead**
111:16 168:23
**air**
107:25 112:6
**aircraft**
31:3
**alarm**
148:16
**alert**
63:21
**allegations**
13:18
**alleged**
15:5,11
**alleging**
17:24
**allow**
6:24
**allowable**
40:22 41:17
**allows**
32:10
**alterations**
86:9
**alternative**
183:13

**amazing**
8:18
**analysis**
14:7 55:8 78:11,16
99:3,7,13 102:7,10
102:18,20 104:17
104:22 120:11,14
124:17 175:14
180:5 188:4 207:9
217:19 220:24
**and/or**
46:13 74:23 93:20
137:21 160:5
190:14
**Andrew**
1:17 4:12 29:14
222:15 223:6,17
225:5 226:8
**Andy**
29:18 49:10 50:16
52:6 123:7 222:12
225:11
**angle**
141:6
**answer**
6:17,17 7:7,11,23
12:23 15:17 20:7
23:7,16 24:25 40:16
44:10 48:19 58:6
71:9 76:3 79:7
80:25 81:7 83:6,10
83:13 92:3 93:22
99:14 120:3,6
125:16 143:22
151:6 157:17
177:13 193:9
195:12,15,22 198:7
214:2
**answered**
19:20 54:14 102:6
105:12 223:12
**answering**
157:20
**answers**
8:19,22 23:11,21



223:13
**anticipate**
6:21
**anybody**
103:10 141:3
**apologies**
76:19
**apologize**
9:19 28:19 33:19
76:18 77:23,24
81:12 105:3 113:22
116:8 118:21
129:20 139:17
142:9 168:22
188:24 208:17
**appear**
41:24 68:16 130:18
134:15 138:17
152:14,17 156:8
173:13
**appearance**
139:22
**appeared**
42:9
**appears**
52:16 57:19 129:22
138:21 169:22
175:6 182:6 190:8
211:10 214:12
**appliance**
17:3,9,13,18
**appliances**
32:14
**applied**
14:6 89:21
**applies**
33:7
**appreciate**
6:21 41:15 76:21
104:10 169:9
195:17 213:19
**approach**
195:24
**appropriate**
137:16 207:5

**approximately**
31:13
**arbitrations**
34:10
**arc**
11:13,14,14,15,18,21
11:23,24,25 12:10
142:24 188:21,23
188:25 189:3,4,13
189:14,22,25
190:11,13,16,25
191:3,4,5,14,14,16
191:18,23 193:20
193:22
**arcing**
12:4,6,11,16 191:17
**arcs**
189:4 190:16
**area**
36:20 100:9,12
103:23,25 106:24
109:25 130:16
131:19 133:12
137:6 143:2,4
144:23 145:2,6
152:14,17,18 153:3
155:2,19 164:15,15
166:7,12 169:8
193:11,15,19 195:5
195:6 199:9 200:25
201:4,16 203:20
214:9
**areas**
31:25 37:8 130:19
146:2 148:18 154:4
154:5,10 156:13
177:20 195:8 199:5
201:12 210:9,13
211:3,10,11,14
**armoire**
165:7,16 212:20
214:6,14
**arrival**
197:25
**arrive**

115:20
**arrived**
183:12
**arrow**
153:18,22
**arrows**
154:6,6,20 156:13
**article**
190:10,11
**articles**
43:11 48:16
**aside**
130:14
**asked**
20:20 25:9 68:10
69:7 219:9 221:15
223:11
**asking**
5:11 7:4 18:20 26:25
44:12 80:14 111:11
124:22 151:3
158:14,20 159:16
195:13,18 208:17
211:18 213:25
**asleep**
198:6
**aspect**
45:23 46:7 164:22
170:16
**aspects**
45:16 107:7,11
114:16 161:25
168:17 186:24
**assembly**
98:19 156:19,24
157:12 163:14
**assess**
15:15
**assessing**
15:10 45:4
**assessment**
15:3
**assigned**
66:19
**assigning**

54:23
**assist**
119:5
**assisted**
205:19
**associate's**
31:14
**assumed**
180:23
**ATF**
189:20 190:13
**attack**
132:13 163:10 164:4
**attainment**
30:19
**attempt**
90:25 91:18,22
**attempting**
75:13 92:23
**attended**
73:3
**attention**
121:14 171:18
**attorney**
5:10,16 9:5,8 10:8
21:24 30:9 65:24
66:9 83:22 222:5
**attorneys**
2:4,8 3:5 56:8 185:3
**attributes**
101:4
**authentic**
125:6
**authoritative**
48:22 179:19,23
**authorized**
3:18 81:11,13
**available**
55:5 115:3 177:4
**avoid**
8:22
**awake**
198:10
**aware**
18:2 22:4,8,12,25



23:10,20 30:15 57:7
59:9 64:13 67:17
69:15 86:13 185:21
197:16 198:24
206:7

**B**

**B**
199:6
**bachelor's**
31:18 36:23
**back**
31:10 55:12 63:16
72:22 89:23 91:17
97:24 104:11
122:23 123:12
129:5,9,18 149:14
149:19,23 157:8
191:9 212:11
215:11 216:22
222:5
**background**
30:17 33:14 42:19
43:7
**bad**
9:19
**bare**
40:9
**barely**
220:18
**base**
136:17 139:6 197:7
**based**
35:8 37:25 82:2
91:24 94:4 107:5
114:21 117:12
129:21 132:14,16
145:16 147:22
149:21 151:3
159:17 170:7
174:17 175:20
183:6 192:9 193:10
193:22 199:14
201:19 202:2
204:24 205:2

**basically**
35:4 36:18 37:2 40:5
55:3 136:23 137:17
214:21
**basis**
144:8 188:23
**batteries**
43:15 78:8 88:17,25
89:22 102:3 124:18
166:14,18
**battery**
17:19 42:19,21,23
43:7,22 47:6,9,9
60:23,24 61:10 62:2
62:11,23 74:23
75:11,15 76:25
78:11,17,19,22 79:4
79:21,23,23 80:11
80:12,19 81:4,16,17
82:9,13,20 83:19
84:7 85:6,16 86:2
87:11,16,24 88:5,11
89:4 91:10 96:17
97:4 98:7 100:25
101:15 106:9 107:4
114:14 125:4,18
126:4 129:23 135:5
145:18 146:12
149:11,13,14,16
150:11 151:2 158:5
158:17 159:5,11
160:5,6 161:10,11
161:25 162:2,8,14
162:21 163:8
164:13,17,19,24
165:17 166:7,25
167:15,19 168:19
169:13,20,25
170:14,15 171:15
177:7 207:16
208:25 209:13
210:13
**battery-powered**
146:14
**bear**

59:20 64:11 152:23
200:6
**bearing**
190:19
**bedroom**
197:15
**Beeten**
197:23
**beginning**
35:12 71:23 109:13
**begins**
50:14 57:15 113:25
**believe**
14:22 20:4 21:7,18
21:24 22:16 23:25
24:9 28:21 30:2
40:15 58:16 60:17
67:6 75:10,25 76:4
76:12,15 81:8,10
83:14 85:14 94:17
95:17 103:8,24
110:7,14 127:6
133:4 136:2 137:11
138:17 143:13
149:16 151:7
152:23 161:2 176:8
177:21 178:3
197:10,11,14
205:10 208:5
212:22 213:2
219:23 222:2
**believed**
133:18 143:19
**Benjamin**
2:10 5:5
**best**
59:16 76:21 81:2
106:3 205:17
**BETKE**
2:8
**better**
50:2 57:22 81:6
128:3 139:11 152:2
199:23
**beyond**

66:6 97:6 102:9
217:19,20
**biasing**
137:10,17
**bids**
35:11
**big**
31:4 93:9 188:5
**bigger**
157:8
**bill**
54:21
**billed**
64:15
**billing**
57:6 70:3
**bit**
34:14 45:19 50:2
53:15 57:25 60:4
63:17 139:19
151:24 152:6,14
174:15,19,20
187:13 195:14
**black**
156:9
**blackened**
142:16 143:10
**Blackmon-Farrell**
35:2
**blade**
154:16 155:21
**blades**
152:10 153:9,10,25
154:18 155:23
156:5 172:25
**blank**
108:23
**blanket**
24:20 132:23 133:19
134:10 143:20
155:15 156:8
**blood**
226:17
**blow**
57:20 119:9 127:19



127:22 140:9 173:7
176:7
**blown**
119:11 159:24 177:2
203:25
**board**
137:8,22 138:3,6,14
139:14,15,19
140:15,22 141:22
142:2,11,25 143:5
176:18
**boards**
137:23 140:18
**boats**
33:8
**body**
187:21
**Boston**
2:9
**bottom**
144:17 171:7 202:20
202:24
**bought**
29:25 30:4
**box**
153:16
**boxes**
170:13,22
**break**
7:17,19,24 67:23
68:8,11 122:20,23
123:19 191:8,11,13
215:5,14
**breaker**
116:19,23,24 117:2,5
117:10,17,20,21,23
118:2 119:17,23
120:2,7,12,14,15,18
171:25 172:6,13,15
**breakers**
118:4,6,11,25 121:3
**brief**
30:16,20 34:18
**briefly**
11:5 100:22 105:19

**bring**
36:3 107:24 112:4
151:21 173:4
**brings**
82:19
**broad**
193:2
**broader**
164:14
**broke**
123:23
**broken**
189:2
**brother-in-law**
217:3
**brought**
21:20 26:10 34:7,15
60:11 64:10 66:20
95:10 216:8
**brown**
135:18,18
**building**
40:2 41:19 46:10,18
63:13 102:21
105:16 115:15
117:15 149:19,22
184:7 186:4 188:13
193:13 198:15
216:10
**building's**
32:10 114:22,24
**buildings's**
104:24
**builds**
38:2
**built**
132:10 149:24
**bulb**
175:18
**bullet**
105:21
**bulletin**
189:21,24 190:13
**bumped**
120:9,22

**burn**
130:21 131:3 161:13
**burned**
130:18 159:24
177:19 200:14,15
201:4 202:21 213:5
213:9,10,13
**burning**
130:24
**burnt**
205:9
**button**
62:16
**buying**
69:20

_____

C

**C**
2:2 9:15 23:9 121:20
145:22 223:2 226:2
226:2
**C/D**
177:8 208:7,21
209:25 210:10
**cable**
40:9
**cabled**
38:19
**cables**
39:24 40:5,13
**cabling**
146:23
**call**
38:6 47:25 55:11,14
66:8 70:15,24 82:10
88:15 94:19 105:3,9
127:7 131:21
132:11 133:9
136:11 144:22
152:16 154:9 187:3
199:22 212:24
**called**
34:25 35:18 56:8
132:10 137:7,16
**candle**

**candles**
205:9
**cans**
126:6,10 207:17
208:19 210:13
211:4
**cap**
125:11 216:19,23
**capable**
179:12 196:2,6,7
**capacitor**
139:2
**capacitors**
135:19,20
**capacity**
62:23
**caps**
124:25 125:7
**caption**
104:18
**captions**
213:20,21
**capture**
8:22
**career**
37:3,5
**Carol**
1:4 5:12,15
**carpet**
129:24 130:19,25
133:13,14 177:18
**carpeting**
178:2
**case**
5:7 10:8,17 11:19,22
12:2 13:18,20 23:12
23:22 32:7 33:2
44:18 45:5 46:21
55:22 60:25 61:8,12
61:18,21 64:8,21
65:20 66:25 67:5
68:20 69:10 70:7

60:9 63:8 215:20,22
217:18 218:2,7,11
218:14,17,21



71:17 77:8,11 78:25
79:25 80:6 87:18,20
90:7,16,23 91:7,13
92:11 97:17 99:24
99:25 100:6,15
102:10,25 103:11
107:8 111:14 121:6
121:7 142:23 143:3
153:2 156:9 159:4
160:3 161:17
162:10 167:10,10
167:11 168:25
179:25 183:21
184:18,20,22,25
186:22 194:6,19
195:21 196:24
204:12,25 217:15
218:2 221:4
**cases**
58:22 59:2,12,15
60:21 63:2,7,12
215:17 216:25
**casing**
163:16
**casinos**
36:14
**cat**
219:2
**catch**
118:15
**causation**
53:24 109:17
**cause**
17:5 46:3,9,17,24
48:16 50:15 53:12
60:9 63:14 68:17
102:13 106:16
107:22 108:6,7
110:7 112:2,11,12
114:19 115:14,23
116:8 136:18,21
144:5 162:18 167:6
167:15,23 168:4,20
170:2 198:17
201:13 215:18,21

216:13 217:21
**caused**
13:20 15:5,11 17:25
96:8 97:10 114:12
115:10 116:7
126:13
**causes**
96:13 116:6
**causing**
17:15
**ceiling**
207:3,8 216:4 217:13
**cell**
7:15 42:21,24 43:7
62:15,15,17,19
75:11 82:12 92:24
94:11,13 95:6,10,19
95:23 96:4 101:18
101:20 127:8 171:6
177:14,19,24 178:9
178:21 207:16
208:22 209:13,22
210:13 211:15,24
**cells**
76:24 81:15,20 82:9
82:10,11,22 83:4
87:12 90:13 92:14
92:16,18,23 93:3,25
94:10 95:13 125:3
125:11,18,20,25
126:4,9,13,18,24
128:14,18,20,25
177:12
**center**
118:7 119:2 207:18
208:14,20 209:16
209:23
**certain**
96:17 137:13 148:18
188:15
**certainly**
19:13 42:12 220:7
**certificate**
32:22,24
**certificates**

31:22,24 32:5,18,20
63:25
**certification**
31:4 33:7
**certified**
31:2,2
**certify**
223:7 226:6,15
**challenge**
47:14
**chance**
20:12 79:13 110:21
221:11
**change**
23:11,21 219:5
**channels**
39:18,22 40:13 41:21
**chapter**
11:15,16 48:2,3,4,7
109:18,18 110:13
110:14
**char**
177:21
**characteristics**
38:12 92:21 94:4,15
95:12 96:3
**characterization**
88:16
**characterize**
37:24 166:10
**charge**
88:14 162:2 166:18
166:22
**charger**
90:14 124:6 150:5,7
150:13,19,22 151:4
151:17 156:10,15
156:18 157:12,12
158:12 159:12,23
160:7,9,14,17,18,19
161:8,12,18 162:3,6
162:15,20 174:9
**charges**
34:6
**charging**

88:18
**Charles**
1:5,6 5:15
**charred**
130:10 143:14
210:12 211:6
**charring**
178:2,4,7 210:8,10
210:16,20 211:17
212:7
**charring/suggestive**
211:22
**chime**
39:2
**chip**
137:8,21 138:3,5,7
138:14 139:5,9,14
139:15,19 140:15
140:18,22 141:22
176:17
**chips**
137:23 142:10
**circle**
139:21,21 155:9,20
**circling**
138:13 143:11
**circuit**
116:19,23,23 117:2,4
117:10,17,20,21,23
118:2,4,6 119:23
120:2,7,12,14,15
121:3 142:2,25
143:5 171:25
172:12
**circular**
154:15
**circumstance**
17:18 118:10
**circumstances**
21:17 61:18,21
107:23 112:3
188:19
**cited**
187:21 191:2
**civil**



1:8 33:25
**claim**
13:23 14:3,8
**clarification**
221:24
**clarify**
150:18 221:16
**clarity**
187:4,7 208:12
**clear**
107:10 129:14
153:21 170:20
**clearly**
186:25 193:18
**client**
66:21 186:20
**Clio**
56:8,15
**close**
158:25 185:5
**closed**
206:11
**closely**
58:6 141:20
**closer**
139:4
**closest**
145:24
**closet**
28:24 29:3 131:13,19
132:5,6,18,22
134:23 145:25
146:5,10 203:17,18
209:3,14,18 210:4
210:19 211:5
214:15 219:25
220:2,3
**cloth-wrapped**
39:4
**cluttered**
208:9
**Co-Administrator**
1:4,6
**COB**
137:8 141:9

**COBs**
140:20 141:5
**code**
36:4 40:23 41:17,22
41:25 42:5,8,11
149:22,25
**codes**
149:19
**coding**
139:23
**collect**
14:21 91:15 126:3
194:7
**collected**
15:24 16:6,9,10,14
74:15 91:4,9,18
104:15 126:9
127:15 130:23
131:12 133:7,25
134:5 139:12 172:5
194:9,11,14 208:5
220:4,9
**collection**
74:2,7 115:2,18
127:7
**college**
31:6,13 34:23,23
**color**
139:24
**combination**
82:9 149:14
**combustible**
209:8 212:19
**combustibles**
212:25 213:3
**combustion**
108:3 112:7 210:18
211:18,23 212:2,7
212:14 214:13
**come**
23:8 54:2 55:7 79:13
122:23 123:12
191:8 208:14
215:11
**comes**

184:24
**comfortably**
12:24
**coming**
160:17 177:22
200:16
**comment**
38:11
**comments**
187:6
**commercial**
35:24 37:11
**COMMISSION**
224:23
**committed**
18:17
**communications**
65:23
**Community**
31:13
**company**
13:12 19:10 34:25
35:7 54:16 66:18
76:7
**compare**
92:16
**compared**
93:3 94:22 199:24
**comparing**
94:2
**comparison**
94:19 95:10
**compartment**
163:8 164:17,19
166:8 169:20
206:11,23 207:2,10
**competency**
108:10 112:15
**competent**
108:14 112:19
179:15
**complete**
35:7 223:10
**completely**
195:2

**compliance**
36:4
**component**
97:5 136:5 141:17
**components**
74:24 101:14 129:23
137:2 165:25
207:16 209:13
**comprehensive**
88:9
**comprises**
184:6
**computer**
11:3,5 14:16,19,21
17:20 33:14 42:16
43:18 71:8 78:17
86:10 91:3 98:16
100:3,6 102:8 116:7
158:12 161:9,11
163:16,17 220:21
**computers**
13:16 43:12 61:5
89:23
**concealed**
40:20 41:3,20
**concentric**
148:15
**concern**
190:13
**concerned**
131:3
**concerning**
5:13,19 52:4,18
124:16
**concerns**
181:11
**concisely**
187:2
**concluded**
63:9,13 132:17
192:10 206:13
**conclusion**
85:5 113:20 115:21
170:17 183:15
**conclusions**



68:15 105:25
106:20 179:24
204:6
**condition**
73:25 90:18 91:25
118:12 144:16
148:20 182:7
**conditions**
35:9,10 107:23 112:4
**conducted**
71:24 73:6 180:20
**conductors**
189:18
**confidence**
65:19
**configuration**
85:20 86:4
**confirm**
92:21 93:15,18
101:11
**conglomeration**
147:24 148:3 152:12
173:25
**conjunction**
137:15
**connected**
32:15 38:25 39:5
124:5,9 162:8
**connection**
90:22 92:10 97:16
188:9
**connections**
188:14
**consider**
15:3,10 48:21 49:2
64:6 91:5 113:2
168:11 184:9,21
198:12,20
**consideration**
17:22 108:9 112:14
**considered**
40:19 90:15 168:16
183:25 184:11
198:14 201:12
**consistencies**

24:10,12
**consistent**
24:8,13,22 27:9
28:14,25 38:8 41:25
93:19,21 143:4
160:2,24 163:25
164:3 165:10,20,24
166:2 178:8 183:17
201:9 219:13
**construct**
190:20
**construction**
81:15
**consultant**
52:6 54:24 114:2,5
**consulting**
66:7
**consumed**
162:16
**consumer**
86:25
**context**
120:6 182:4
**continually**
93:11
**continues**
58:21 183:9
**conversation**
6:16,20 79:19 191:20
**conversations**
9:4 10:14 83:22
**conversely**
141:10
**converter**
156:20
**conveyed**
71:10 83:23
**conveying**
182:22
**coordinators**
55:12,13
**copied**
109:12
**copy**
8:7 49:20,24 50:7

152:4
**copying**
69:14,17
**cord**
144:20 158:18
**corded**
146:15,25
**corner**
171:7 177:8 207:19
208:7,21 209:25
210:10
**Corps**
30:22
**correct**
17:16 19:2,5 21:9,14
32:6 37:6,13,17
39:14 42:9,14 45:8
45:17 46:22 47:5,20
47:21 48:10,14
52:24 56:17,21
57:19 58:9 61:7,11
62:9 63:15 74:8,17
77:9 78:4 79:2 83:8
84:13 90:20 91:8
92:4 94:7 95:14
96:5,15,24 97:8,18
100:12 102:4,23
104:20 105:18
106:14 107:9,15
109:19,20 110:3,15
110:18 113:9,14
114:6 115:12,22
116:4 119:13
120:20 121:12,24
122:3,12 124:7,12
125:9,13 132:20
133:2,3 134:19
138:4 142:13
143:13 144:2,6
146:16,20 147:18
148:12 150:15
151:9 155:22 159:7
159:14 161:16
162:19,24 163:11
165:3,23 167:4,25

169:17 172:7,11,18
172:21 173:20
177:5 178:6,19
179:3,9 180:8,16,21
181:3,9 182:18,19
183:2,8,19 186:2
190:18 191:21
192:14 202:17,25
203:9,22 205:7,23
212:8 215:24
217:16 219:14
223:11
**CORRECTIONS**
224:2
**correctly**
85:15 182:20 215:20
**corresponded**
96:2
**cost**
35:6
**couch**
199:12,13,19,24
200:7,10,24 201:5
201:10 202:19,19
206:2 218:15
**couches**
199:20
**COUGHLIN**
2:8
**counsel**
83:24
**counterfeit**
79:3,21,22 80:10,20
**COUNTY**
223:4
**couple**
126:6
**coupled**
32:8
**course**
59:18 182:3 189:11
190:4 213:23
**courses**
195:8
**court**



4:20 5:8 45:12
118:17
**covered**
217:4
**cracking**
135:24
**crawl**
40:7
**create**
11:24 12:10 21:22
213:22
**created**
11:25 12:14,14 21:13
193:21
**creation**
21:17
**credible**
27:19,25
**criminal**
34:5
**critical**
101:14
**Cs**
215:25
**CT**
77:6,7 86:17 220:25
**curious**
18:21
**current**
36:4 48:6 58:11,11
**currently**
95:16
**cut**
111:8 133:13
**CV**
6:5 57:9,11,14,17
58:5,7,8 63:16 64:9

**D**

**D**
4:2 223:2
**damage**
17:9 41:12 127:13,13
134:14,16 135:25
138:2 140:3,17

141:8 143:2,4,25
145:7 157:13
158:18 160:7,23
161:2 162:5 163:7
163:20,25 164:6,12
164:12 165:9,18
166:7,8,10,11 167:8
167:17,24 168:9
169:20 171:13,18
175:19 192:8 195:5
195:6 199:14,18
201:6,9 202:23
209:7 210:6,16
220:19
**damaged**
17:14 75:3 137:21
156:16,25 159:23
161:21,22 176:6
199:8,10,16
**data**
168:10 169:6 181:21
182:17,25 184:23
**date**
19:9 49:15 51:17
58:12 64:15 81:18
180:6,10,11,23
**dated**
49:11 50:20 51:9,13
225:13
**datedOctober**
225:11
**dates**
18:6,16,17,21
**Daubert**
47:14
**David**
29:14
**day**
76:2 192:10 194:13
209:6 223:20
224:20
**days**
73:13,15
**deals**
33:18

**dealt**
93:23
**debris**
95:24 127:8 129:15
131:11,19 133:7,14
133:23 134:3
165:17 209:10,12
211:5,6 220:3,12
**decay**
213:8,12
**deceased**
1:5,6 162:12
**December**
51:9,13 52:10 71:14
89:23 225:13
**declaration**
206:6
**deems**
66:21
**default**
193:21
**defective**
13:19
**Defendants**
1:11 2:8 5:6
**defer**
18:18 97:12 98:21
99:8 100:8,10
101:22 102:19
128:23 130:5,12
164:9,21 167:18
170:3 177:17
178:13 212:3
**deferring**
99:21
**defined**
104:9 107:22 112:3
193:11,19 194:6
**definitely**
210:12 211:2,9 214:8
**definition**
78:14 79:6,18
**definitive**
71:9 120:6
**deforming**

163:15
**degraded**
139:18
**degree**
17:9 31:14,18 32:8,9
32:12 34:24 35:16
37:3 42:24 43:5
**degrees**
130:24 211:22 213:8
213:12
**delineation**
45:25
**department**
26:17,19 102:25
103:6,9 117:5,6,7
117:13 131:18,25
**departments**
117:7,9
**dependent**
142:23 167:9
**depending**
137:2
**depict**
147:11 163:7,15
**depicted**
157:13 165:8 172:9
176:16,21 178:5
**depicts**
121:19 147:15
**Deponent**
224:18
**deposed**
5:23 6:3,5 18:3,23
58:23
**deposition**
3:16 7:17 8:12 9:3
10:23 12:23 18:9,14
19:20 20:24 24:6
25:21,25 26:18,22
27:16 28:17 58:17
60:7 83:16 85:9,12
145:23 148:19
162:11 219:11,24
223:9,13
**depositions**



22:3 60:17 63:23
**deposits**
175:7
**describe**
24:13 89:11 101:21
131:25 151:16
189:2
**described**
53:14
**describing**
156:6
**DESCRIPTION**
225:9
**design**
33:15 35:24 36:7,11
37:10 42:19,20,22
42:24 47:7
**designed**
47:8 136:13,16
160:10
**designing**
36:16 38:2
**details**
10:16
**detectors**
147:16,20,25 148:4
149:12,20
**determination**
146:6 147:8 185:2
202:5,6,15 216:15
217:17
**determine**
35:6 100:24 108:6,12
112:11,17 115:24
116:5 117:25
148:23
**determined**
60:12 114:18 115:14
146:25 162:6
203:20
**Determining**
108:6 112:11
**developing**
206:10
**development**

188:3
**device**
115:4 145:17,19
146:14,15 148:17
199:3
**devices**
7:16 195:25 196:4
**diagram**
12:14 127:5,16,23
128:10,15 129:8
130:3,21 189:6
207:14,21 208:2,8,9
**dial**
45:18
**diameter**
96:3
**difference**
80:23 82:8 156:5
**differences**
81:14
**different**
25:4,10 31:24 67:14
82:12 100:23
110:13 118:5,6
124:24 125:3
136:15 142:22
168:3 169:2 194:11
**direct**
109:15 121:13
**directly**
55:10 117:15 121:15
162:15,21 199:25
**disagree**
202:4,5
**disassemble**
75:5,8,9
**discharge**
88:15
**discharging**
88:18,19
**discipline**
186:17
**disclosed**
84:11
**discloses**

54:18
**disclosure**
58:12
**discovered**
27:10 91:23
**discovery**
176:2
**discuss**
102:15 203:3
**discussed**
30:8 185:9,12,15
196:21 200:19
210:11
**discusses**
171:24
**discussing**
98:10
**discussion**
114:18 116:18
171:22
**disease**
36:6
**disintegrate**
220:17
**displayed**
13:3
**disposition**
184:18
**distinction**
45:20 80:9,18 169:11
171:13
**distinguishes**
189:22,25
**distribution**
36:8 61:2 200:20
**DISTRICT**
1:2,2
**document**
49:7 50:14,17,19
108:23 111:7,10
**documentation**
9:9,18 56:10 73:23
78:24 147:9
**documented**
74:25 116:24 126:11

127:15 172:5
**documents**
8:6,10 10:22 13:3
27:3,8 56:4,15,19
72:8 84:15 85:3
100:19
**dog**
215:20
**doing**
8:17 35:23 42:25,25
69:9 76:21 197:3
**domain**
102:21
**dome**
143:7,7
**doorbell**
39:2
**dot**
142:4
**doubt**
110:24
**Dr**
9:21,25 30:10 80:17
81:6 97:2,13 98:21
99:19,25 100:4
101:22 102:15,19
105:22,24 106:17
116:13 125:17
167:18 170:4
177:17
**drafting**
205:20
**draw**
152:22 153:5 155:8
171:18
**drawing**
155:20 170:17
171:12
**drawings**
35:6
**drawn**
154:7 156:12 173:19
**drill**
40:24 161:23 169:10
**drilled**



194:17
**dripping**
163:22
**driver**
137:10
**drywall**
41:10
**due**
48:4 120:10 121:4
136:22 162:4
**duly**
4:6 226:10
**Duracell**
149:11
**dust**
217:4
**duties**
190:4
**duty**
30:23 33:22 34:21
**DV6**
70:8,12 90:17 92:2
98:18 100:14
**dynamics**
46:5

**E**

**E**
1:5,6 2:2,2 4:2,2 89:8
223:2,2,2 226:2,2
**E5**
30:24
**earlier**
53:15 58:24 60:19
124:8 201:6 207:15
210:11 214:10
218:15 219:9
**early**
11:4 77:6 127:12
197:12
**ease**
70:10
**easier**
109:4
**easily**

72:12
**East**
2:5
**easy**
34:25
**eat**
123:7
**edition**
48:6,9 106:13
**edits**
187:6
**educational**
30:17,19
**effect**
3:19
**effectively**
121:4
**effort**
7:8 17:6
**efforts**
92:9 131:21
**eight**
124:14 129:19 131:5
131:7,10 133:4,17
133:21 134:12
141:13
**either**
35:8 63:20 82:17
118:18 121:9 132:8
135:12 140:4
172:20 203:8 211:6
**ejecta**
211:15,25
**elaborate**
193:3
**electric**
35:2 38:23 52:5
170:5 199:11,13
204:11
**electrical**
11:17 12:3 31:11,18
32:9,11,12 33:6
35:19,22 36:7,9,24
37:10,24 39:23
45:16,22 46:9,17

52:4,19 53:23,24
54:4,19 55:6 60:8
60:11 63:13 89:13
89:13 102:22
104:14,16,21,24
105:14,16 107:7,11
110:12 114:4,20,23
114:24 115:16,16
120:10,24 121:11
134:5 135:2 157:10
157:22 158:4,10,15
159:21 161:22
165:2,25 166:13,16
166:23 167:3
168:13 170:9 184:8
184:12 185:15
188:4,14 189:18
190:5 194:3 195:7
198:15 200:23
201:8,21,25 204:18
207:9 215:18 216:7
216:10 221:10
**electrically**
32:15 36:20 115:3
116:3 165:24
196:10 200:17
201:11
**electrician**
31:7 32:8
**electrician's**
34:24
**electricity**
107:13
**electrode**
208:19 209:22
**electrodes**
207:18
**electronic**
7:16 86:25 89:14
**electronics**
141:11 200:22
**eliminate**
104:4,5 107:2 116:3
135:10 144:4 161:5
169:25 170:7

175:17 192:16,22
194:22
**eliminated**
114:10 134:18 144:8
150:8,21 216:11
**employee**
54:22,25
**employees**
186:16
**employment**
34:16
**enclosure**
75:15
**encountered**
199:5
**ends**
156:19
**energy**
36:13 135:2,7 166:16
167:2
**engage**
54:2
**engaged**
19:7 46:12,21 59:3
66:12,16,17 204:17
**engagement**
45:6 97:7
**engages**
54:17,20
**engaging**
55:3,9
**engineer**
33:10,12 47:11
**engineering**
31:12,15,19 32:9,12
35:5,16,17 36:24
186:14,16
**engineers**
89:13,14
**entering**
199:5
**entire**
36:19 37:2 98:15
142:2 143:5 156:18
**entitled**



68:15
**Equally**
7:6
**ERRATA**
224:2
**especially**
174:3
**ESQ**
2:6,10
**essentially**
39:7 105:2 132:7
133:8
**Estate**
1:4,6
**estimate**
35:6
**estimation**
35:4
**evaluate**
32:10 36:2 44:17
54:3 60:11 91:9
195:4
**evaluated**
183:22
**evaluating**
168:11 195:7
**evaluation**
32:16 46:14,16 53:22
54:18 114:22
188:13 194:8,12
**event**
120:10,24 121:11
125:23 136:21,23
141:16 156:17
157:10,23 158:5,11
158:15 161:23
166:19 175:23
**eventually**
83:17
**everyday**
189:11
**evidence**
14:22 27:10,22,22
44:24 46:13 74:14
82:2,7 114:25

115:17,19 121:6
127:23 134:2
141:14 151:10,14
168:16 169:6,7
171:24 181:12,18
182:9,15,22,23
183:4,7 185:6,14,18
185:23 188:8
191:17 192:18,24
194:15,24 198:9
210:17 211:2,17
220:9
**exact**
157:5 197:11
**exactly**
41:18 90:11 159:16
213:14
**exam**
10:18 19:4 73:20
75:23 77:16,25 78:2
84:17,18 91:12
94:25 95:4,9 103:13
103:21
**examination**
1:17 5:2 19:12 22:19
26:21 27:11 42:13
73:21 74:4,5,10,12
74:13 76:11 77:20
81:19,25 84:21,24
85:2,4 92:14 151:16
225:4 226:9,11
**examinations**
73:4
**examine**
73:11
**examined**
4:8 73:2 93:2 148:10
221:2
**examining**
94:5 119:25
**example**
45:3 56:2 142:6
155:17 188:22
**exams**
75:18,20

**excavated**
75:10 76:24 92:15
93:3,25 94:10,13
95:12 171:8
**excavating**
209:2
**excavation**
208:3
**exception**
221:22
**excerpt**
182:4
**exclude**
150:13
**excluded**
151:5
**exclusive**
159:12
**excuse**
131:6 133:3
**exemplar**
78:23 89:25 90:4,5
90:15 91:6,22 92:2
92:9
**exemplars**
90:21
**exercise**
172:24
**exhaustive**
11:10
**exhibit**
49:7,13 51:5,8,15
52:14,23 53:2 67:9
67:11 127:21 140:4
**Exhibits**
57:2 225:8,9
**existing**
35:10
**expand**
53:16 187:12 189:22
221:16
**expansive**
154:11
**expect**
125:6 142:15 152:20

156:15,24 157:11
158:6,18 159:22
160:6,20 161:15
168:2,14 169:3
174:16 175:11
176:25 177:12
202:23 220:11,19
**expectation**
168:15 169:4
**expenses**
57:4 69:8,9,11,12,13
69:16
**experience**
38:2 64:10 94:5
100:11 102:2
**expert**
1:18 4:3 44:4,8,13,15
45:11,15,20,22 46:3
46:24 47:7 53:12
59:11 99:8 100:9
101:25 183:3
193:13,14 202:3
216:12
**expertise**
110:2 111:13 204:19
**experts**
21:20 193:13 201:13
**EXPIRES**
224:24
**explain**
143:16 148:4 187:14
**explained**
76:23 175:13 186:25
191:15
**explanation**
188:22
**explode**
161:13
**explosion**
48:23 49:4 108:3
112:8
**exposure**
163:9 164:2 165:11
165:21,23 166:3
169:21



**extension**
132:2 144:20
**extensive**
193:20,22
**extent-type**
39:8
**extra**
7:13

**F**

**F**
125:10,20,25 126:13
126:19,25 127:2,5
127:17 128:6,9,14
128:20,25 130:9,17
226:2
**FAA**
30:25
**face**
152:15,16 153:7,14
153:24 154:10
155:7 156:3,7
176:14
**facility**
36:19 43:19,22
**facing**
163:19
**fact**
82:16 151:17 205:11
207:7,9
**factor**
60:13
**factors**
44:4,9
**facts**
10:17 183:17
**factual**
162:22
**fail**
106:5,7 116:7 135:3
161:11
**failed**
97:5 141:17 142:14
142:18 150:11,19
150:22 151:3 159:5

159:12,17,20 162:7
169:14 170:16
176:25
**failure**
59:24 60:3,24 78:11
78:16 96:8,13 97:10
102:7,18,20 104:16
104:21 107:2,12
114:10,13 115:24
125:22 135:7,12,14
135:21 136:20,24
140:5,12,14,15
141:9 159:9,21
160:2,4 161:4
169:16 196:3,9,10
198:17
**failures**
32:14 136:8
**fair**
12:12 19:14 42:10
44:7 45:7 46:23
61:5 63:6,11 65:16
68:18 74:3 83:7
92:3 96:4 101:25
102:17 107:14
113:8 115:9 132:19
138:6 150:14 155:6
190:17 191:2 202:7
203:6 205:21
207:14 210:18
**fairly**
155:8
**familiar**
13:11 44:5 71:17
78:7 88:4,22 101:17
107:19 196:16
**familiarity**
6:10,13 89:17
**fan**
59:25 216:4 217:13
**far**
8:18 28:22 43:5
74:15 128:22 131:2
170:5 178:14
185:24 189:8

**Faraci**
2:4 67:4
**features**
98:4,20,25 99:20
100:7
**February**
73:12,19 75:17 76:10
77:2,21,22,24 84:17
94:25 95:4
**Federal**
2:9 3:2 4:23
**felt**
20:20
**field**
43:2
**figure**
94:9 97:10 101:5
113:21 121:14,19
124:4 125:10
127:22 129:19
130:17 131:6,10
133:2,4,17,21 134:9
134:12 139:11
140:9 141:13,21
142:12 145:11,12
147:15,20 150:4
151:21 155:16
163:3 165:8 166:5
170:23 172:9,23
177:6,7,22 213:16
**file**
9:15 55:21 56:7
64:15 185:5 216:14
**filed**
5:12
**filing**
3:6
**filled**
164:20
**filtering**
139:2
**final**
8:8 186:19
**find**
24:4 27:7,14,18,24

28:13 50:10 101:10
126:6 220:11,19
**finding**
189:4
**findings**
67:13,14 68:17
**fine**
49:25 50:7 80:7,8
105:7 129:21
153:17
**finish**
6:24 181:23
**finished**
7:11
**finishing**
7:9
**fire**
5:13,20 13:20 15:5
15:12 17:5,14,15,25
20:25 26:17,19
27:18 28:17 43:2
45:11,15,17,21,23
46:4,5,6,7 48:16,23
49:4 53:11,20 54:8
54:11 61:19,20 62:2
62:5 63:14 75:2
85:19 86:3 92:8
93:9 102:13,24
103:3,6,9,16 104:18
107:22 108:2,6
112:2,7,11 113:3
114:12,19 115:15
115:23 117:5,6,6,7
117:9,13,16 122:9
122:11,14 126:13
126:19 127:2
128:19,22 129:2
130:2,7,15 131:13
131:18,18,22,24,25
132:4,4,8,11,12,19
161:21 162:5,16
163:9,10 164:2,25
165:11,20,22 166:3
167:6,6 168:12
169:2,21 172:16



175:23,25 176:5
177:15 178:12,14
178:18 179:11
184:17 186:8
189:11,19 190:2,6
192:8,21 193:16
197:4,19 198:17
201:19 202:20
204:2,7,22 206:10
206:23 211:2,8
213:6 215:19,22
218:4,11 220:16,18
221:8,9
**fire's**
17:10
**firefighter**
120:9
**firefighters**
121:10
**fires**
188:4,6 198:25
199:21,22 200:2
**firm**
9:6 65:25 67:4 76:3
**firmed**
85:10,13
**firms**
61:13
**first**
5:17 18:10,13 19:17
26:21 32:4 34:23
50:20 54:6,8,12
73:24 108:5,11,15
112:10,16,20 113:3
113:7,23 115:7,8,11
127:14 132:21
134:11,22 171:23
178:21 179:2
181:25 182:6 188:3
199:4 215:16
**five**
6:6 29:25 30:23
59:19 65:3 67:21
72:8 76:20 82:11
93:8 97:19 121:14

121:19 124:19
127:20,22 187:20
190:9,23
**five-minute**
67:23
**flame**
196:13,18 210:22,23
211:11,12,25 212:6
**flame-type**
211:18
**flammability**
179:5
**flashlight**
95:16 140:23
**flat**
154:2,17,23
**flight**
31:3
**flip**
72:4 149:6
**floor**
141:2 160:22,22
209:8 210:3,6,9
**focus**
26:14
**focused**
27:21
**folded**
144:15
**follow-up**
22:20
**following**
186:16
**follows**
4:8
**force**
3:19 47:25 48:2
**foreground**
138:8 147:3
**forensic**
52:5 114:4 189:17
190:12
**forensic-based**
114:3
**forensically**

134:17 144:4 150:8
175:17
**forget**
9:19 207:23
**form**
3:12 15:14 23:6,14
25:8 30:14 63:4
99:5 157:16 202:13
206:14,21 210:16
**formal**
43:4 63:3
**formulating**
25:3 32:21
**forth**
56:20 67:12 68:17,23
226:10
**forward**
79:10 184:24
**found**
12:17,18 181:18
182:22 190:16
197:14 208:7 209:9
209:16 211:15
219:12
**four**
62:20 116:19,24
117:21,23 119:23
137:12 172:15
190:9,22
**four-**
133:11
**FPU**
61:3 200:20
**frame**
197:13
**framing**
40:17
**frayed**
146:23 147:2
**front**
28:8 50:13,17,22
123:24
**FRT**
19:9 22:9,14 36:25
37:4 50:15 54:21,25

66:12,17 185:8,20
**FRT's**
204:24
**fuel**
17:19 107:24 108:5
108:11,15 112:5,10
112:16,20 113:3,7
115:7,8,11 164:20
164:22,24 179:11
**fuels**
178:22 179:2
**full**
29:12,14 38:24
113:23 124:3
179:17
**full-time**
37:5
**fully**
41:20 75:5,8 213:9
**furnace**
203:3,11,15,24 204:7
206:3
**furniture**
61:2 199:22 200:19
**further**
3:10,15 22:20 84:10
84:14 102:16
120:11,13 160:22
189:21,24 226:15
**Furthermore**
143:6
**fused**
129:24
**future**
194:12

--- G ---

**G**
4:2 223:2
**game**
36:14
**gas**
164:6 176:20 203:2
204:7 206:13,22
210:21



**gasses**
136:25
**general**
46:7 53:18 73:23
106:18 114:17
194:17 195:18,23
**generality**
157:8
**generally**
10:13 16:19 33:4,5
37:10 41:24 42:4
45:21 49:3 61:24
70:20 88:10,13
99:17 103:19
105:23 179:10
194:20
**generated**
84:16
**generator**
36:2 59:22,23
**getting**
11:9 37:3 83:20
159:2 161:24 208:9
**giant**
140:25
**give**
30:16 34:17 71:8
72:10 75:24 76:3
79:7 89:10 106:18
111:23 114:17
119:21 120:3,6
**given**
20:12 63:24 191:16
223:14 226:12
**gives**
135:9 139:24 167:2
169:7
**giving**
7:7 8:19 63:3
**glean**
75:3 91:20
**glowing**
197:24
**go**
39:3 41:6 52:16

53:20 55:10,16
75:12 82:24 97:24
104:11 111:16
114:8,15 116:15
117:9 125:14 129:5
129:9 152:15
153:11,25 154:16
156:19 168:22
173:21 175:12
183:23 184:3
205:25 215:8
**goal**
6:14
**goes**
54:6 58:4 167:15,20
184:22
**going**
6:11 14:18 39:11
41:11 49:6 51:2,7
51:21 52:13 57:8,24
58:2 63:16 65:10
67:21 70:20 72:3,11
72:22 79:10 101:20
102:18 104:11
105:9 107:17
108:22 110:20
111:7 113:10 119:9
121:13 122:18
127:21 129:6,7
132:5 143:23 145:9
148:16 150:3
152:21 153:15
154:16,18 160:15
160:16 161:11,13
162:25 167:7,11
171:21 175:8
186:19 187:17
195:9 199:19 215:4
218:6
**good**
60:6 68:6 75:4
122:22 123:4,15
131:2 187:9 191:7
**govern**
86:25 87:24

**government-issued**
4:5
**graduated**
30:21 31:5,7,12,17
36:23
**greater**
65:15
**green**
138:7,15 147:3
**ground**
13:23 153:24 174:16
**group**
47:25 48:5
**growing**
93:12
**guard**
40:4
**guess**
24:17 32:23 38:11
48:2 53:17 73:16
78:12 80:18 84:3
85:8,9 94:16 102:11
138:5,10 147:10,12
157:18 164:21
167:13 193:2
195:11,15 214:5
**guide**
48:22 49:3
**gut**
36:18
**gutting**
37:8
**guys**
68:4 93:23 123:5

———————————

**H**

**H**
129:13,16,21 130:3,8
130:9,17
**half**
8:3 133:12 171:23
**hall**
132:22 133:7
**hallway**
131:12,20 133:22

134:3 165:5 203:17
220:3
**hand**
6:25 93:4,6 94:10
**Handbook**
78:8
**handle**
119:18 120:18
**handled**
110:11
**happen**
161:15
**happens**
144:24
**hard**
149:13 153:15 175:2
**hardware**
90:12
**hasty**
37:19
**head**
8:21 18:7 24:3 27:6
27:13 29:9 61:16
62:24 86:21 87:4
88:3,14 101:16
160:12 206:24
**header**
71:23 72:7
**heads**
129:16
**heard**
88:23 89:5 108:17
204:3,4 205:10
**heat**
121:4 145:7 161:2
195:25 196:2,7,8,12
196:18 206:22
**heat-producing**
199:3
**heated**
132:22 133:19
134:10 143:19
155:15 156:7
**heating**
137:20



**heaviest**
166:8
**heavily**
75:2 176:5
**held**
1:19 34:19,20
**help**
141:3,9 147:7 148:22
  188:18 212:10
  214:2 221:16
**helped**
48:7
**helpful**
31:20 140:6 143:17
  146:7 171:20
  190:21 200:3
**helping**
171:17 217:3
**helps**
32:13,15
**hereinbefore**
226:10
**high**
30:18,21 142:8
  166:23 174:17
  188:8
**higher**
135:25
**highest**
30:18
**highlighted**
153:10
**highly**
167:24
**hired**
15:15
**history**
14:16 15:2,9,23 16:2
  16:7,16,18 34:17
**hits**
55:15
**hold**
6:25 44:7,14 45:14
  97:22
**hole**

**82:10,11 141:14
  176:22 177:2,3
holes**
40:24 41:7 124:19,19
**Hollowell**
1:5,6 5:15 186:6
  197:14
**HOLLOWELL-M...**
1:5 5:13
**home**
4:16 38:7 39:7 76:7,8
**honors**
31:8
**hopefully**
116:9
**hoping**
114:17
**hospitals**
36:5
**hot**
136:24 164:5 206:13
**hour**
8:3,3 64:24 67:21
  122:18 215:10
**hourly**
54:21
**hours**
64:21 65:3,6,9,12,20
**house**
29:25 30:4 37:15
  38:22 40:2,6 41:24
  70:24 140:24
  191:24 192:13
  193:17 197:3 198:5
  198:11,16 199:6,8
  203:15 205:9 217:2
  219:2 220:16
  221:10
**housing**
153:12
**HP**
1:10 5:7 13:11,14,19
  14:16 16:21,23 70:8
  76:5,15 79:25 80:2
  80:22 81:3 82:20,23

83:5 85:19 86:4
  91:6 92:7 93:18,20
  94:18 95:10,17,19
  106:24 114:11,13
  150:10,25 159:4
  169:12 201:15
HP's**
186:7 193:13
**HRC**
188:10,17
**human**
44:4,8
**hypotheses**
14:13 183:13 196:5
  221:4
**hypothesis**
108:8 112:13
**hypothesized**
179:13

_____

                I

**ID**
51:22
**idea**
64:17
**identification**
4:5 49:14 51:16
  108:4 112:9
**identified**
12:4,8 17:5 51:3
  145:13 184:15
**identifiers**
74:22
**identify**
75:13 92:24 96:12
  159:8 220:20
**identifying**
93:16
**IEEE**
89:6,9,16,20
**ignited**
108:11,15 112:16,20
  178:21 179:12
  214:15
**ignition**

**107:24 108:4,7,10,13
  108:14 112:5,9,12
  112:15,18,19
  115:10 168:13
  170:5,10 178:8
  179:7,13,15 181:7
  181:12,18,19
  182:10,15,23 183:5
  183:14,16,25 184:5
  184:10,12,15
  192:17,22 194:3,5
  195:8 198:13
  199:12 203:7
  204:11,18 205:5
  209:7
illustrative**
151:13
**Ilysa**
1:21 226:4,21
**image**
143:18 173:6
**impacted**
117:15
**impacts**
121:5
**implicated**
62:2,4
**importance**
64:6
**important**
7:13
**importantly**
166:11
**impose**
182:7
**inaccurate**
63:20
**incident**
30:12 105:8,8 121:23
**Incidental**
69:13
**incinerated**
214:20
**include**
90:12 107:3,11 108:8



112:13 114:14
160:5 208:5,11,12
211:5 214:5
**included**
208:11
**including**
150:11 151:2 159:5
159:11 165:7,16
169:13
**inconsistencies**
27:4 28:22 29:2
**inconsistency**
219:18,21
**inconsistent**
24:14,22 163:9
169:21 211:19
**incorrect**
63:21
**increase**
188:16
**incur**
57:4 69:9
**INDEX**
225:2,8
**indicate**
7:3 82:12 125:2
137:3 141:9,15
154:20 156:13
**indicated**
87:19,22 154:6
**indicating**
138:24 142:5 146:2
153:8 154:9
**indication**
17:10
**indicator**
118:8
**individual**
120:18
**individually**
1:4
**individuals**
30:7 76:13
**industrial**
35:24

**industry**
106:7
**infectious**
36:6
**infer**
183:6 215:21
**inferences**
183:12
**inferred**
181:20 182:17,24
**information**
10:20 12:15 15:24
16:5,8,14,25 21:19
38:17 55:19 56:13
75:4 82:24 87:15
93:13,17 103:14
119:3,21,22 122:16
135:10 180:6,10,12
180:22 181:2
208:10 219:4
**infrastructure**
36:17
**inhabitants**
197:3 198:5
**initial**
22:11 26:20 53:21
54:17 70:5 77:18
84:16,21 132:13
208:10
**initially**
66:15 81:23
**inside**
137:3 146:5 205:21
**inspect**
87:16 144:14
**inspected**
74:21 115:2,18 126:8
**inspecting**
190:5
**inspection**
81:3 145:17 220:4
**inspector**
40:2 41:19
**installation**
38:21

**instance**
35:25 40:8 54:7
66:13 104:23
189:13 198:22
**instances**
188:12,15
**Institute**
31:16
**insulator**
40:5
**insurance**
76:7 186:5
**insured**
162:12 201:14
**insurer's**
193:14
**intact**
136:9 161:19 176:5
199:24 200:13
**intended**
160:11
**interactions**
54:10
**interested**
226:18
**internal**
120:5 125:22 129:23
161:4
**Internet**
101:8
**interrupt**
157:25
**interview**
19:24 20:2 147:23
**interviewed**
21:22
**interviews**
20:20 28:5
**inverted**
136:17
**investigate**
203:11
**investigated**
199:21
**investigation**

15:21 16:4 27:21
43:2 44:19 45:9,12
45:15,17,21,23 47:2
48:17,24 49:4 53:21
54:5 55:5 77:18
84:2,4,10,11,15
93:14 96:11 98:23
103:17 110:8
126:15 184:13,17
185:16 189:17
190:12 192:21
194:19 197:17
216:8 220:14,24
221:9
**investigations**
93:10 97:16 195:25
**investigative**
195:19
**investigator**
66:19 103:4,11,12,20
107:21 108:12
111:25 112:17
120:23 131:17
203:24 216:14
217:22
**investigators**
121:10 132:15,17
**involved**
33:25 59:15,22,25
60:8,23,25 61:5,10
61:14 66:4 82:21
103:18 107:13
189:19 199:20,22
200:2,22 212:13
**involvement**
66:23
**involving**
183:14
**inward**
199:9
**irrelevant**
23:15 207:11
**issue**
54:19 55:6 70:7
113:7 115:7 162:7



201:8
**issued**
58:18
**issues**
22:23 136:18 162:10
**item**
114:9 127:6 129:13
129:16 132:21
133:23,24 134:4,8
145:12 171:17,24
198:15 207:22,22
208:13
**items**
104:15 127:14
129:15 134:5 165:5
165:6,8,10,15 185:7
185:14,15,18 186:3
200:23 207:20,24
208:4 216:7,9

**J**

**January**
5:14,21
**Jason**
9:14 20:19 22:16
23:9 46:2 66:14
128:23 130:5,13
164:9,22 178:13
193:12 196:15
201:13,20 203:13
204:14 206:16
207:5 212:4 214:17
214:24
**Jessica**
1:5 5:12
**job**
8:18 37:19 189:11
**joined**
30:22
**joint**
10:17 19:11 22:18
77:19 81:25 84:21
103:13,21 115:2,18
124:17
**July**

18:4,4,14

**K**

**K**
223:2
**Kaitlyn**
186:13
**Karasinski**
9:15 10:9,11,18 20:2
20:19 22:16 23:9
28:4 30:10 46:2
47:3 51:9,12 53:3,8
53:9,10,18,25 54:7
56:3,16 66:5,15,20
75:19 106:22
128:23 130:6,13
164:22 178:14
186:18 193:12
196:15 201:13,20
202:9 203:13,21
204:15 205:15
206:12,16 207:5
212:4 214:18
225:13
**Karasinski's**
9:24 52:17 67:10
106:16,19 109:25
110:10 111:12
113:5 164:9 190:10
202:6 205:3 214:25
**keep**
8:19
**keyboard**
163:19
**kind**
34:9,15 37:20 54:13
57:18 62:10,13,14
64:9 102:5 103:13
133:10 135:5,21
137:5 146:23 147:2
148:25 160:2
165:11,20 167:17
169:10 172:23
175:15 189:20
**Kirk's**

49:2 179:22
**kitchen**
199:4
**Klana**
186:17
**knew**
92:18
**knocked**
215:22
**know**
7:10 13:8 14:15
16:18 17:23 18:5,6
18:23 19:9,10 20:5
20:7 21:16 22:13,20
22:22 23:2 24:21
30:5 32:13 37:14,18
39:21 40:12 41:9
44:10 47:15,17
48:19 57:24 58:10
59:2 62:10 63:25
64:14,20 65:13 66:7
66:11 69:18 71:5
78:13 79:5 82:18
84:23 86:18,24 87:4
87:11,14,17,23 88:2
88:10,21 89:18,20
89:25 91:11 92:5
93:7 94:3 98:2
101:13 104:8
106:12 117:2,20,24
118:10,24 122:4,6,8
128:24 145:15
149:18 152:24
154:20 159:16,25
160:14 166:17,19
178:20 185:11,24
187:11 194:25
195:2 196:12,17
203:14,23 204:4
205:8 206:6,18,21
211:7 212:5 214:19
217:8 218:22,25
220:5,7,8
**knowledge**
79:11 86:8 93:10

175:21
**known**
93:20 179:20 183:17
**knows**
30:11 160:16

**L**

**L**
4:2 223:2
**lab**
77:25
**labeled**
207:23
**labels**
74:24 101:3
**laboratory**
77:19 81:25 84:18
86:23 93:5 124:17
**lack**
199:23
**lamp**
132:23 133:5,19,22
134:6,9,12,13 135:4
135:15 136:9 137:4
137:25 139:6,12
143:24
**lamps**
135:12 136:14,16
137:9 138:9 140:20
144:9 175:15
**landed**
128:25
**Lane**
4:18 29:21,24
**Lange**
2:4 67:4
**laptop**
29:5 74:22 81:3 91:3
104:6 105:2,7,8
114:11,13,19
115:10,14 121:21
124:4 160:4,15,16
163:7 164:6,12
165:16,22 166:6
168:5,8 169:25



170:10 171:16
184:7 220:2
**laptop's**
163:8
**large**
174:22
**larger**
174:10
**law**
61:13 65:25
**lawsuit**
5:11,19 33:25
**lawsuits**
17:24 34:9
**layer**
164:6 206:13,22
**laymen**
39:25 130:8 193:5
**layout**
36:12 90:12
**learn**
43:3 83:18
**learned**
42:23
**leave**
129:6
**LED**
132:23 133:5,18,21
134:12 137:10,15
175:15
**LEDs**
136:15
**left**
31:6 91:16 119:15
128:10 141:21
149:4,7 163:13
173:16 174:10
177:22
**left-hand**
170:23 171:7
**legal**
1:24 79:17
**let's**
68:2 73:16 152:22
191:8 215:11

**letters**
207:23
**level**
30:18 157:8 160:23
162:5 174:17 175:3
209:9 210:6
**Levites**
2:10 4:24 5:3,6 25:19
49:18 67:25 98:8,17
99:15 103:5 109:12
109:20 110:4 111:4
113:14 122:21
123:10 150:23
158:23 170:25
191:6 209:15 215:3
222:2 225:5
**license**
33:12
**licenses**
31:21,23 63:25
**light**
134:22 137:17 139:7
139:23 140:21
141:6 180:5 212:25
213:3
**lightened**
151:23
**lightening**
184:8
**lights**
175:20
**liked**
20:11
**likelihood**
188:16
**limit**
127:13 202:2
**limitations**
151:12 179:6
**limited**
42:24 154:22 193:24
210:11 214:12
**Linden's**
78:8
**line**

45:25 113:25
**lines**
41:14
**Linzer**
1:21 5:9 118:23
226:4,21
**list**
11:10 58:20 71:22
72:13 184:4 196:4
**listed**
64:11 72:8,19 86:19
87:13 180:13 184:2
186:10 187:19,25
**Listening**
93:22
**literally**
94:9
**lithium**
101:24 166:25
**lithium-ion**
43:14 60:24 61:10,25
62:11 87:24 89:4
101:14 102:3
**little**
34:14 45:19 50:2
53:15 57:25 60:4
62:16 63:17 128:2
138:23 139:4,11,19
142:4,22 151:24
152:6 164:8 174:15
174:19,20 176:13
176:15 187:13
189:7 195:14 214:4
**Litzinger**
1:18 4:13 5:1,5,24
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1,17 24:1 25:1
26:1 27:1 28:1 29:1
29:13,15 30:1 31:1
32:1 33:1,20 34:1
35:1 36:1 37:1 38:1
39:1 40:1,10 41:1

42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
49:11,13,24 50:1,16
50:25 51:1,14,19,24
52:1,6,20 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1,10 69:1
70:1 71:1 72:1,17
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1,11,16
111:1,17 112:1
113:1,18 114:1
115:1 116:1 117:1
118:1,21 119:1,4
120:1 121:1 122:1
123:1,22 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1,8
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1,3 160:1
161:1 162:1 163:1,4
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1



179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1,9 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1,15
223:6,17 225:5,9,11
226:8
**Litzinger's**
111:15
**live**
38:22
**living**
192:11
**LLP**
2:4,8
**Ln**
224:3
**local**
103:8,11,12,20 117:5
120:22 121:9,10
131:17 132:15,16
197:17 203:23
**localized**
137:20 140:14,17
141:8 143:2 166:10
166:11 167:7,17,24
168:9
**locate**
90:10 100:16
**located**
28:23 127:5 160:24
189:14 200:23
**location**
73:25 126:25 174:18
176:10

**locations**
127:24 130:22
**Lockheed**
36:15 37:9
**log**
185:23
**logically**
181:20 182:17,24
183:6
**logo**
50:15
**lone**
55:15
**longer**
33:21 108:16 122:25
215:5
**look**
11:5 15:22 16:24
18:11 19:8 21:4
32:13 37:16 38:9
44:20 46:12,16
49:23 71:7,18,20
75:25 76:16 88:16
98:25 120:5 127:15
130:7,9 131:4 132:2
135:14,16,18,20
136:4,8 137:19
139:3 142:17,19,21
148:5,14 151:19
167:11 168:2,11
169:5 172:14
173:25 175:4 176:6
177:19,23 178:11
186:23 199:11,20
200:5 201:21
204:18 213:15
216:21
**looked**
9:23 24:6 26:8 39:10
42:4 74:6,21 101:3
101:4 115:20
128:12,13,17
146:24 150:9 165:4
182:13 187:24
194:4 207:15 209:4

211:16 217:12,13
**looking**
11:13 24:23 25:4
42:6,7,11 46:5 73:5
79:10,15 84:15
93:24 94:10,12
95:25 111:3 115:15
125:5,10 129:18
130:9 133:17
134:11 135:23
136:2,7 137:7
139:25 140:9,10,13
140:16 141:7,13,16
141:19,20,25
142:11,21 145:11
147:6 148:13
151:20 154:3
155:24 166:5
167:22 168:15
170:13 172:22
173:10 176:19
182:5 187:18 188:6
188:8,10,11,13
190:7 193:6 201:10
202:12,18 204:8
218:15,21
**looks**
46:3 49:8 57:15 58:3
58:8,14 61:8 135:23
139:17 146:24
152:2 167:20
173:23 174:4,24
177:25 200:13
218:14
**loss**
9:10 59:22 60:13
104:18
**lost**
133:15
**lot**
10:14,19 37:14 66:22
88:21 93:24 104:9
140:16 142:20
144:24 145:23
152:10,11 154:11

157:19 160:25
167:7
**low**
214:4
**lower**
174:15 200:24
**lug**
153:24
**lunch**
123:2

---

**M**

**M**
223:2
**Madam**
49:8
**MAGNA**
1:24
**MAGNA-21**
1:24
**magnify**
13:6
**mailing**
69:14
**main**
2:5 116:22 117:2,4,8
117:19
**maintain**
56:3
**maintains**
55:21
**majority**
207:17 208:18,24
**making**
40:10 218:3
**manage**
35:12 152:22
**management**
35:3 56:7 81:16
**manager**
186:11,14,18
**manifest**
136:18
**manufactured**
71:6,11,14 79:24



80:21 100:25
149:23
**manufacturer**
92:25
**manufacturers**
118:5
**manufactures**
82:13
**manufacturing**
42:16 43:8,18,22
82:22 100:19
**map**
11:24,25 12:11 189:5
189:14 190:16
191:4,5,18 193:22
**mapping**
11:14,15,21 188:21
188:24,25 189:23
190:11,14 191:15
**Marcellin**
1:4 5:12,15 15:25
16:6,15,22 18:3
19:24 20:3,11 22:6
22:10,17,22 30:9
37:25 39:7 56:2
70:15,16,24 71:4
73:2,11,21,23 74:11
74:16 75:6 76:25
77:3 81:21 83:15
85:21,25 86:5 90:9
92:15 96:8 98:11
102:9 105:4,9
175:24 197:9
**Marcellin's**
5:19 14:17 19:17
70:22 83:16 84:9
85:9 90:18 101:2
104:6 115:25
147:22 169:12
206:5 219:10
**Marcellus**
186:13
**Marcellus'**
186:22
**March**

1:14 30:3,3 223:9
226:21
**Marine**
30:22 33:6
**mark**
51:7 176:12
**marked**
49:7,13 51:14 52:14
52:22 56:25 67:9,11
67:16
**marking**
51:4
**markings**
71:8 75:14
**marriage**
226:17
**Martin**
9:21 30:10 36:16
37:9 81:6 83:24
97:2,13 98:21 99:19
99:25 100:4 101:22
102:15,19 105:22
106:17 116:13
167:18 170:4
177:17
**Martin's**
9:25 80:17 105:24
125:17
**Massachusetts**
2:9 59:21
**match**
101:12
**mated**
162:21
**materials**
71:22 87:18 180:19
208:19 209:8,23,25
210:3 212:19
214:15
**matter**
19:7 63:9 66:3 70:5
226:19
**matters**
59:8
**mean**

16:20 39:22,23 40:12
44:6 55:24 62:12,14
69:11 96:20 105:14
131:15 146:21
150:18 154:14
156:18 157:4,19,25
181:22 184:19
193:2 198:19
218:12 220:18
**meaning**
24:5 27:15 28:16
30:8 34:2 46:17
64:9 105:11 190:10
208:21 209:12
**means**
47:15 132:10 134:25
**meant**
150:20
**mechanical**
35:19,20 47:10
**mechanism**
159:9 169:15
**medication**
12:19
**meet**
5:4 153:11 154:10,23
**melt**
161:13
**melted**
143:8
**melting**
163:15 189:23 190:2
190:2
**member**
47:23 48:11,13
**memorialized**
22:6
**memory**
14:19 18:17 22:24
59:17 71:19 76:20
**mention**
41:22
**mentioned**
10:24 30:6 32:17
41:16 53:7 120:21

215:17
**mentions**
146:8
**MEP**
35:18
**merely**
52:20 171:12
**message**
55:4
**messy**
38:18
**method**
14:7,11
**middle**
113:24 174:3 197:13
**Military**
33:17 34:21
**million**
94:14
**mind**
19:19 67:22 80:10
**minds**
94:2
**mine**
213:24
**minutes**
67:22 68:3 123:9
**misspoke**
60:19
**mitigate**
188:18
**Mm-hmm**
119:13
**model**
16:8,19,21,21 17:25
70:12,20 98:10
162:4
**modular**
38:6
**moment**
109:6
**Monroe**
31:12
**morning**
197:12



**motor**
60:2 200:21
**mouse**
138:14 143:12
**move**
13:7 29:23 171:21
 217:3
**moved**
120:19 131:13
**moves**
119:18
**moving**
124:13 131:7
**multiple**
140:20 141:5 142:10

### N

**N**
2:2 4:2,2 223:2,2
**NAFI**
48:12,13
**nail**
41:11
**nailer**
41:5,8
**nails**
41:10
**name**
4:11 5:5 29:13,14,17
 88:13
**names**
9:20 76:8
**nature**
36:10 54:15 139:20
 148:21 149:5,8
 159:21 179:8
 186:21 214:9
**neat**
37:20 39:15
**necessarily**
55:18 211:12
**necessary**
66:21 76:19
**need**
13:6 24:17,24 40:3

41:21 52:15 57:25
 78:13 123:7 158:2
 195:14
**needed**
23:11,21 120:12
**neither**
80:21 205:19
**neutral**
153:25
**never**
87:15
**new**
1:2,14,14,23 2:5 4:18
 29:22 35:8 36:18,19
 36:20 38:2,10 59:25
 184:23 223:3 226:6
**new-ish**
96:4
**newer**
14:20 91:6,24
**NFPA**
47:23 48:21 106:12
 107:16 109:2
 111:18,24 179:18
 179:21 187:22
 189:16 193:6
 206:17
**nice**
5:4 37:20
**nicely**
38:19
**night**
61:3
**nighttime**
197:13
**nine**
131:7,10 133:2 134:9
 139:11 140:10
 141:21 142:12
 155:16,21 171:25
**Nineteen**
180:15
**nomenclature**
127:10
**non-authorized**

80:11 81:13
**non-nonelectrical**
185:19
**nonelectric**
204:13 205:6
**nonelectrical**
204:23
**normal**
6:20
**Notary**
1:22 4:7 223:22
 224:23 226:5
**note**
82:7 124:21
**notebook**
14:17 16:17 17:20,25
 43:11,18 47:6,9
 61:5 62:16 70:6,14
 70:16,23,25 71:4
 73:3,11,21,24 74:11
 74:14,16 75:6 77:3
 78:17,19 81:21,22
 85:25 89:22 90:10
 90:11,19 91:24 92:7
 92:15 96:9,14,23
 97:5,11 98:12 100:6
 100:8,13 101:2
 102:8,9,13,20 104:7
 105:4,5,8,10,17
 106:25 107:3,12
 115:5,25 156:22
 157:11 159:11,17
 159:19 163:14
 169:13,16 173:2
 174:9 212:21
 219:19,22 220:6,12
**noted**
124:18 222:13
**notes**
8:5,10 9:8,11,11,12
 9:17,24 10:2 28:3
 28:13 56:11,15 85:4
 108:25 122:16
**notice**
27:3 136:10 212:18

**noticed**
76:14
**notwithstanding**
175:18
**number**
32:18 116:19,24
 117:23 119:23
 127:6 133:23,24
 134:12 137:13
 171:24,25 172:5,15
 207:22,22,24
 208:13
**numbers**
190:9

### O

**O**
9:15 23:9 215:25
 223:2
**oath**
3:19 223:8
**Object**
30:13 99:4
**objection**
15:13 23:5,13,24
 25:7 111:2,16
 157:15
**objections**
3:11 214:14
**observation**
218:4
**observations**
117:12 170:8 202:3
 212:18
**observe**
42:9 205:11 210:6
**observed**
73:24 82:3 121:25
 160:3 197:20
 211:19
**obtain**
90:21 91:22 92:9
**obtained**
43:24
**obvious**



144:10,11 192:18
192:23 194:24
**obviously**
81:2 93:7 131:23
141:11 175:19
**occur**
166:24
**occurred**
24:2
**October**
6:8 49:12 50:20 51:3
52:22 58:13,16 67:8
73:12 74:10,12
75:18,23 77:16,25
81:19 83:3 84:5,18
84:24 85:2 86:16
95:2,8
**odds**
169:22
**offer**
96:6 130:11 131:2
210:25 212:9,12
**office**
55:10 66:9,14 69:16
202:12 212:17
**officer**
3:18
**oh**
217:6
**okay**
6:7,9,18 7:6,11 8:9
8:14,24 9:11 10:4
13:2,9,17,22 14:6
15:22 16:5,13 19:6
20:9 22:2 25:2
26:14 27:7,14,24
28:12 29:12 30:5
31:20 32:2,17,23
33:9 34:13 37:7,23
41:13 42:10,15
44:13 45:4,10 50:19
50:24 51:5,21 52:13
52:25 53:4,13 54:13
55:2,20 56:22 58:10
59:7 60:20 61:4

63:6 64:5,14,17,20
65:8,11,14,18,22
67:7 68:14 69:19,25
70:16 71:3,13,20
72:3,12,22,24 73:10
73:16 75:17,22
76:10 80:4 83:2,9
86:14 87:17 88:4,10
90:16 92:6,13 94:8
95:8,22 96:6,12,16
97:3,9,21 100:5
101:18 102:17
103:7,19 105:6,19
106:11 111:17
112:21 114:7
116:15,17 117:19
119:20 121:8,13,25
124:2,13,15 125:5
125:24 127:11
128:5,12,24 129:5
129:11 131:4,9
132:14,21 133:16
134:11,17 145:8
146:7 147:10
148:25 149:10,18
150:16 151:10
154:14,25 155:13
156:3,11 161:6,17
161:19 162:25
164:11 165:4
167:13,21 169:18
171:3,19 172:14
173:10 174:23
175:8,10 176:24
178:7,11,20 179:4
179:10 180:3 181:6
183:3 185:6,17
187:5 190:7 191:22
194:16 196:17,23
197:16 200:3 201:2
202:18 203:2,19
204:10,16 205:2,14
205:24 212:10
213:18 215:2,12
217:12,24 219:8

220:5,22 221:22
**old**
29:4 38:10,24 39:2,7
59:19 217:4,5,6
219:18,22
**older**
14:19 118:3 220:2
**once**
35:10 44:22 55:15
91:16 130:11 148:6
168:7,8 173:12
201:23
**ones**
10:23 32:3 125:14
185:11,18,20 190:3
199:25 212:13,14
**ongoing**
184:20
**oOo-**
3:24
**open**
184:19,22,24 185:4
210:22,23 211:10
211:12,17,22,25
212:6,14
**opens**
136:22
**operate**
55:17
**operated**
145:18 149:17
200:18 201:11
**operating**
86:11 148:17
**operation**
17:3
**opine**
114:8
**opining**
179:5
**opinion**
61:25 62:6 63:4 96:7
114:4 115:8,9
126:12,16,17,23
128:19 129:4,25

130:4,12,15 131:2
150:9,14,24 151:6
159:3,10,18,19
168:19 177:14
178:17,23 179:2
183:4 202:3,14
210:25 212:4,9,13
214:11,16
**opinions**
52:3,10,18 56:23
64:7 67:13,13 68:19
68:22 69:3 205:21
219:6 221:17
**opportunity**
91:17 111:21
**opposed**
17:14 170:15
**opposing**
216:12
**opposite**
207:19 208:20
209:17
**order**
1:21 24:18 120:4
**orderly**
39:16
**ordinarily**
97:15 98:24
**organization**
89:11
**origin**
17:11 46:3,24 48:16
50:15 53:12 103:23
103:25 106:16,22
106:24 110:8
121:21 128:22
131:2 181:19 192:7
193:11,15,19,24,25
194:7 201:12,16,24
203:20 205:13
206:12 216:13
217:21
**original**
81:22 83:4 84:7,12
85:6 87:16 90:11,13



90:13
**Originally**
216:2
**other's**
56:19
**outcome**
47:17 226:19
**outlet**
39:5
**outline**
176:9
**output**
160:11,13
**outputting**
160:10
**outset**
194:22
**outside**
9:7 10:25 15:20
22:11 38:16 44:18
45:8 66:22 81:5
86:17 96:10 101:7
116:12 126:14
195:21 214:23
**oven**
88:23 197:18 198:4
198:11,21
**ovens**
198:25
**overcharge**
156:17 157:2
**overhaul**
103:16 131:14,24
**overhead**
216:4
**overvoltage**
156:17 157:2,4,18
158:16
**owner**
53:10 54:16
**oxidizer**
112:6
**oxidizers**
107:25
**oxygen**

108:2 112:6

---
**P**
---

**P**
2:2,2
**p.m**
222:13
**pack**
17:19 42:19 43:7
60:24 62:23 74:23
75:15 78:18,19,22
79:4,21,23,23 80:11
80:12,19 81:4,17
82:13,20 83:19 84:7
85:6 87:12,16 96:17
97:4 98:7 100:25
106:9 107:4 125:4
158:6,17 164:24
166:25 167:15
168:19
**packets**
135:18
**packs**
87:25 88:5,12
**page**
50:10,20 52:2 57:8
57:15,16,23 58:4,19
58:21 67:18 68:11
68:24 69:4 72:4,5
72:20 97:19,22
104:12 105:20,20
113:10 116:16
123:21 124:14,14
127:19,22 128:13
129:9,18 131:5,7,8
131:10 145:9,10
150:4,4 163:2,6
171:21,22,23 175:9
179:16 181:7
184:16 186:9
187:25 213:15
225:4,9
**pages**
50:4 57:10,16 58:3
64:12 71:21 72:19

180:13,24
**panel**
36:11 117:11 118:4
119:11,15
**paper**
49:20,24 50:6 75:2
**papers**
212:23 213:3 214:8
214:13,20
**paragraph**
113:23,24 179:18
180:4
**paragraphs**
68:16,18
**paraphrasing**
106:21
**pardon**
172:23
**part**
7:13 14:10 16:3
35:15 36:7 45:5
46:25 48:3,5 70:18
93:9 95:19 99:3
103:17 117:14
133:22 134:3
163:17 185:15
188:12 207:21,25
217:22 220:9
**particular**
15:4 16:9,17,20 46:6
50:10 55:19,22 80:6
81:17 90:6 118:9
121:5 125:20 135:4
135:15 162:4
198:22
**particularly**
25:6 32:20 177:19
**parties**
3:6 76:14 91:14
186:4 192:6 193:23
201:23 202:9,12,16
226:16
**partly**
75:8
**parts**

69:20
**passed**
47:20
**paste**
111:9
**pasted**
108:24 109:13
**patina**
141:23
**patterns**
46:4,6 130:22 131:3
165:19 201:19
**Pavilion**
70:8,11,12,21 86:18
87:2,7,13 90:17
92:2 98:4,6,9,18
99:20 100:14
106:25 114:11,13
150:10,25 159:5
184:7
**PDF**
139:18
**peer-reviewed**
43:11
**pending**
7:22
**Pennsylvania**
60:7
**people**
30:6 186:12 216:19
**perceived**
46:8
**Perfect**
152:7
**perfectly**
80:8
**perform**
11:18 55:7 76:25
88:6,11,17
**performed**
78:10,16 220:25
**performing**
220:13
**period**
30:25



**person**
148:11
**personal**
16:15 34:11
**personally**
33:24 34:4 73:2
**perspective**
42:7
**pertained**
35:22
**pertains**
9:10 12:16 33:2 89:3
    104:17
**pertinent**
32:3,7
**pet**
43:25 215:23 217:18
**Pg**
224:3
**phone**
7:15
**phonetic**
186:17 197:23
**phosphor**
139:23 141:24
**photo**
136:3 138:8,19
    139:18 140:8 142:7
    144:18 147:6,7,11
    147:14 164:16
    173:12 176:13,21
    177:25
**photograph**
71:19 128:18 129:22
    149:5,9 157:14
    163:13 171:6,10
    172:22,25 173:17
    176:7 177:21
    218:13
**photographs**
9:16 56:10 94:21
    148:10 150:5
    151:11,14,15,19
**photos**
9:9,24 10:2 136:4

147:6 151:23 168:4
    200:7,9
**physical**
27:9 70:22 74:4 95:9
    170:8 181:12,17
    182:9,15,23 183:4
    221:3
**physically**
203:10
**Picard**
35:17
**picked**
74:5
**picture**
119:10 120:17 128:7
    129:17 214:6 218:2
    218:22
**pictures**
148:5 209:5 212:11
**piece**
133:25
**pile**
133:9
**pixilated**
173:13
**place**
144:11,13 158:11
    171:10,11
**places**
210:7
**plaintiff**
59:4,5,6
**Plaintiffs**
1:7 2:4
**plastic**
40:4 143:7,14 153:11
    163:16
**plates**
41:5,8
**please**
4:10,15 7:10 13:7
    15:7 28:20 59:20
    79:9,15 108:21
    152:7 168:22 173:5
    173:21 193:4

**plug**
144:19,20 145:5
    146:5 147:12
    151:21,22 152:10
    152:16 153:9,10,14
    153:24 154:9,17,24
    155:2,4,7,15,21
    156:8,19,21 172:25
**plug-operated**
145:19
**plugged**
121:22 122:9,11,14
    134:24,25 144:11
    144:13,25 145:4,20
    146:2,3 151:17
    152:9,19 156:16,25
    157:9 166:20 173:3
    173:15 174:9,12
**plugs**
152:15
**plumbing**
35:20,21
**point**
65:13 84:8,25 168:10
    187:14 200:17
**pointing**
153:22 167:23
**points**
40:6 169:6
**pole**
60:2
**portion**
46:14,15 54:4 73:7
    154:23 199:8
    200:24 202:24
    214:22
**portions**
133:8
**position**
116:25 117:3,22
    119:18,24 120:8,19
    121:2
**positions**
34:18 118:7 120:5
**possible**

6:12 116:6 146:22
    199:2 204:10,22
    205:4
**post**
115:2
**potential**
32:13 41:9 53:25
    54:18 75:14 92:4,24
    140:5 144:5 165:2
    166:13,24 167:3
    168:12 169:8 170:5
    170:10 183:14,25
    184:5,10,14,23
    192:16,22 194:5
    195:7 198:12,16,18
    201:8 203:7 216:6
**power**
61:2 135:6 146:10
    200:19 216:19,20
    216:22
**powered**
149:13
**precluded**
47:19
**prefer**
49:23
**preliminary**
6:11
**premised**
26:7
**preparation**
9:7 10:12,22 71:24
    72:18 205:20
**prepare**
9:2
**prepared**
206:7
**presence**
29:4 164:5
**present**
8:15 19:11 75:23
    186:4 192:6 199:15
    202:10 218:14,17
**presented**
4:4



preserve
91:15 110:20
pretty
31:4 38:7 39:15
  175:12 193:2
  199:16 200:14
prevent
127:13
prevented
106:6,8
previous
54:10 169:22
previously
5:24 6:2 23:12,22
  28:10 58:23 141:12
primarily
11:14 13:15 92:19,20
  93:13
primary
29:20
print
57:11
printed
152:4
prior
18:25 54:12 67:4
  103:17
probably
109:3 121:8 143:23
  175:12 205:16
problem
57:12 116:11 151:25
  173:22
proceedings
34:6
process
6:10 53:16 101:19
  189:4 195:10,20
produce
6:15 13:15 139:7
  190:15,24 191:5
  196:7
produced
13:19
producing

196:2,2,8
product
13:19 15:2,4,9,10,16
  15:23,25 16:2,7,16
  44:14,15 46:11,18
  80:3 82:23 83:5
  90:7 93:18 99:2
products
59:14 60:21 87:2
  93:20
professional
33:10,12,14 42:18
  43:6
program
43:5
progressed
193:16 199:9
progression
192:8
project
35:3,3,12 36:18,21
  55:11,13
properly
37:15
proposed
108:8,13,15 112:13
  112:18,20
protect
41:9
protected
144:22 145:2,5,6,25
  152:14,18 153:3
  154:4 155:18
protection
41:4,21 136:15,19
  154:13 155:5,11
  156:14
provide
52:10 103:13,15
provided
52:5,19 146:10 180:6
  180:10,23 183:15
  221:24
public
1:22 4:7 103:10

223:22 224:23
  226:5
publications
64:2 89:15
published
48:15
pull
37:18 50:9 132:5
  200:4
pulling
119:6
puppy
60:10
purchased
14:20 85:17 101:9
purpose
39:13 130:20
purposes
50:24
pursuant
1:20
purview
45:6 113:5
pushing
161:9
put
8:2 46:19 50:3 51:22
  56:12 57:12 103:23
  108:23 111:2
  112:23 127:18
  138:10 200:7
  205:17,24 218:6
puts
106:22
putting
131:23

_____
Q
_____

qualified
44:3 45:11 59:10
question
3:12 5:17 6:16,17,22
  6:25 7:4,8,22 15:8
  15:17 16:12,17 20:8
  21:11 23:7,15,18

24:20,25 25:9 26:7
  29:10 30:14 40:16
  41:14 52:9 54:14
  72:16 79:14 80:15
  80:25 81:7 82:18
  85:23 99:5,10,23
  100:23 102:6
  105:13 111:11
  112:22 116:10,25
  128:5,18 129:8
  145:13 146:11
  150:9,12 156:23
  157:17,20 159:20
  163:12 165:5,14
  167:13 182:5 184:9
  185:8 187:22
  191:22 193:10
  195:12,24 207:4
  208:16 210:5 214:3
  215:16 221:14
questions
5:11 12:23 19:19
  20:10,21,22 33:19
  73:18 82:2,5,6,19
  83:3 84:6 97:24
  175:16 187:3,10,11
  187:12 205:18
  221:20 222:3,11
quick
127:16
quickly
6:12 175:13
quite
158:24
quizzing
76:20
quotation
109:14
quote
109:15

_____
R
_____

R
2:2 4:2,2 226:2
ratings



179:6
**reaching**
69:3
**read**
87:5 104:18 107:17
121:23 150:12
157:6 181:13
183:18 206:8 223:7
224:3
**reader**
52:21
**readily**
177:4
**reading**
41:13 150:12 182:20
**reads**
6:16 224:3
**real**
127:16
**realize**
108:16 151:22
**really**
95:23 102:21 129:13
129:15 149:3 154:3
175:3 195:18
**reason**
7:20 18:20 20:17,22
22:14 117:16 192:3
192:11
**rebuttal**
51:8,11 52:3,15 53:2
53:4 67:10 205:15
225:12
**recall**
24:2 27:5,12 29:8
60:14 62:22 69:22
69:24 76:8 83:17
85:14 86:20 87:8
95:18 137:22
149:24 160:12
175:24 176:2
185:13 187:5,10
197:10,21 213:14
218:3 219:3
**receipt**

101:8
**received**
32:25
**receptacle**
121:20 124:5,10
144:21 145:3,24
156:20 172:9,12
173:3,15,23 174:2
174:11 175:6 188:4
**receptacles**
36:10 145:21 146:9
188:7
**rechargeable**
89:22
**recollection**
103:22 198:2 209:5
218:10,20
**recon**
132:10
**record**
4:11 98:3 127:20
223:11,14 226:12
**recorded**
20:6
**records**
56:4 57:6 70:3
197:17
**recovered**
125:12 126:18,24
128:14,21 147:16
165:7,15 207:16
209:2,9,22,24 210:2
211:24
**rectangle**
153:5 176:16
**red**
153:5 154:7 178:5
**redo**
38:23
**redone**
38:10
**refer**
8:10 50:25 53:3
96:25 103:9 105:14
116:13 125:17

126:5 127:4 179:17
179:18 216:19
**reference**
70:10 94:22 106:15
107:16 181:7
182:21 188:3
**references**
72:7,14 105:21
180:15,18,24
187:18,19,24
189:24,25
**referral**
66:7
**referred**
89:7 103:24 106:23
182:8 188:10
**referring**
25:12,15 52:21
132:25 181:16
**reflected**
56:24 57:5 69:4
**refresh**
71:19 198:2 218:9,19
**regard**
21:18 55:19 116:14
167:19 170:4 195:3
214:18
**regarding**
104:14 183:15
**regards**
28:23 35:21 71:17
78:12 80:14 88:25
103:15 125:21
187:3 201:7
**regular**
188:23 190:4
**related**
11:8,10 102:11
226:16
**relates**
104:16
**relationship**
108:9 112:14
**relative**
126:10

**relatively**
176:4 199:7,24
200:13 201:5
**relevant**
20:21 182:4 189:10
194:15
**relied**
32:21 179:24 202:7,8
202:15
**relocatable**
216:18,22
**rely**
25:5
**relying**
190:23
**remain**
185:3
**remained**
75:16 92:22
**remaining**
183:16
**remains**
75:11 132:23 133:18
134:7 136:9 143:8
163:7 175:18 177:7
208:25 210:14
220:20
**remember**
19:6 29:3,7 61:13,17
61:21,22 62:21
103:20 107:21
112:2 187:16
219:13,19
**REMOTE**
1:13
**remotely**
1:19
**removed**
131:19
**renewal**
36:13
**repaired**
191:18
**repeat**
15:6 118:22 126:21



**replacement**
80:12
**report**
8:8 9:16,25 10:12
　11:2 21:14 25:3,11
　25:14 26:6,9,13,16
　30:7 32:4,21 49:11
　49:17 51:2,2,4,8,12
　52:3,11,15,21 53:2
　53:4 57:9 63:4 67:8
　67:19 68:12 69:5
　71:21 72:5,18 80:17
　86:16 96:7 97:20,25
　104:12,14 105:22
　106:17,20 110:3,9
　111:13 113:8,13
　114:16 116:16
　119:6 123:22
　124:21,24 127:20
　129:10 130:18
　131:5 132:16 146:8
　146:18 163:2
　170:24 179:16
　180:11,14 182:21
　184:16 185:9,12,19
　187:15,22,23 203:4
　204:20 205:15
　208:6 213:16,19
　225:11,12
**reported**
121:21 122:10,13
　131:16 175:21,22
　216:3
**reporter**
1:22 4:9,14,20 5:9
　49:8 51:23 118:18
　226:5
**reports**
56:25 67:12,15
　132:15 157:7
**repository**
28:7 56:9,12
**represent**
5:6 59:3 68:19
**representation**

76:15 90:6
**representative**
76:6 94:18 95:18,21
　148:18 186:5,7
　201:14,15
**representatives**
76:5
**request**
7:21
**requested**
104:13 221:23
**require**
149:19
**required**
41:4
**requirements**
149:25
**requires**
108:7 112:12
**research**
53:11 101:8
**reserved**
3:13
**residence**
5:14,21 29:20 37:25
　40:18 42:13 192:5
**residential**
35:23 37:11
**resistance**
137:14 188:9
**resistor**
137:11
**resolution**
142:8
**respect**
5:20 22:23 27:2 29:3
　32:25 34:16 71:3
　77:3 78:17 86:15
　102:8,19 119:22
　143:24 175:14
　194:18 217:18
　219:17
**respective**
3:6
**responded**

197:19
**responding**
131:18
**responsibilities**
34:19
**responsive**
195:22
**rest**
6:22 192:5 193:17
**restate**
182:11
**restricted**
107:6 192:4
**result**
83:25 84:4 148:19
　189:5 216:24
**resulting**
108:2 112:7
**retained**
18:22 19:10,13 66:2
　66:12
**retaining**
54:24
**retiring**
34:20
**reverse**
138:20 154:15,18
**reversing**
77:23
**review**
8:11 10:21 13:2
　20:24 21:5,10 44:23
　44:25,25 48:3,4
　77:10,13 88:9 95:7
　100:7,13,18 105:22
　110:22 111:22
　122:15 125:17,20
　185:22 186:19,22
　204:24 205:3
　206:19 219:10
**reviewed**
9:8,16 10:4 19:17
　20:23 24:7 25:23
　26:2,16 28:9,12,18
　58:5 71:23 72:18

77:6,7 87:8 88:7
　99:19 106:12
　180:19 183:7
**reviewer**
186:10,11 187:9
**reviewing**
85:3
**reviews**
186:14,15
**right**
7:4,24 8:24 14:4
　17:15,20 18:4,15
　19:16 26:4,18,23
　37:12 38:25 41:19
　47:4 52:7,23 58:24
　71:15 84:12 85:21
　86:5 89:9 90:19
　94:11 96:2,14 99:2
　104:19 105:17
　106:13 108:25
　109:23 115:25
　120:19 121:23
　124:11 125:8,12
　128:7,15 134:18
　135:9 138:9,18,23
　142:5,18 143:25
　144:18 146:15,20
　147:17 149:2 151:8
　159:6,13 162:23
　164:13,20 167:8,17
　167:24 169:16
　170:12 172:6,17
　174:5,11,25 177:2
　177:23 178:12
　179:13 180:17
　181:13 183:18
　187:17 192:24
　196:5,24 199:17
　200:15 202:11,22
　203:11 207:3 213:6
　217:11,15 220:14
**rim**
143:10
**rings**
148:15,22 149:2,3



**RIT**
36:23 37:4
**robustly**
195:16
**Roby**
190:11
**Rochester**
2:5 31:16
**roll**
133:14,23
**room**
8:15 103:25 106:22
　106:24 121:20
　124:11 126:7 127:8
　130:25 145:21
　160:25 170:11
　177:8 192:4,7,12
　193:17,24,25 194:4
　194:6 201:16,24,25
　202:13 205:13
　206:11,12,23 207:3
　207:8,19 208:14,21
　209:23 210:2 211:3
　212:16,17
**room/office**
191:24 192:2 203:18
**rooms**
192:12
**root**
170:2
**RPC**
216:6,17 217:13
**rude**
7:2
**rule**
102:12 145:14
　217:14
**ruled**
62:3,7 146:13
**rules**
6:12
**run**
40:25
**runaway**
101:20 125:15,22

137:4 141:16
167:16,20
**running**
14:22,24
**RYOBI**
60:23 61:8,12,25
　62:8,11 78:21,25
　161:17 162:2

———— S ————

**S**
1:4 2:2
**safer**
31:3
**safes**
106:5,7
**safety**
98:3,20,25 99:20
　100:7
**Saffron**
4:18 29:21,23
**sake**
94:23
**salaried**
54:22
**saw**
165:19 191:18 192:9
　208:6 218:10,20
**saying**
8:19 40:13 55:4
　74:16 86:7 91:21
　92:19 94:13 110:23
　155:23 161:8
　168:21,24,25
　169:24 171:14
　182:13 195:3
　200:14 202:20
**says**
72:7 99:12 116:22
　119:17 124:4
　181:10 183:11
　193:7 216:22
**scan**
11:3 77:6,7 220:25
**scans**

86:17
**scenario**
157:2
**scene**
10:18 12:5,7,8,15,17
　19:4,11 22:18 26:21
　46:13 53:20 54:3,8
　54:11 77:18,25
　84:17,21,22 91:4,12
　92:8 103:13,21
　125:12 147:17
　168:12 186:8 190:6
　207:13 218:5
　220:10
**scenes**
189:12
**schedule**
55:16
**schematics**
100:14
**school**
30:18,21 31:9,11
　35:15,16
**Schwarz**
2:6 4:25 5:10,16 9:6
　10:9 15:13 23:5,13
　23:23 25:7 26:4
　30:9,13 49:16,19
　65:24 66:25 67:20
　83:22 98:5,13 99:4
　103:2,7 109:9,16,23
　110:6,19 111:6
　113:12,15 118:14
　122:17 123:6,14
　150:17 157:15,24
　170:19 171:3
　209:11 215:12
　222:6,10
**Schwarz's**
66:9,14
**scientific**
14:7,11 79:17
**scope**
15:20 16:3 44:18
　45:9 47:2 81:5

96:11 97:6 102:10
116:12 126:15
184:13 202:2
214:23,25 217:20
217:23
**screen**
13:4 50:8 108:21
　112:24 128:3
　138:11 152:3
　163:23
**scroll**
57:24 58:2 60:3
**sealing**
3:7
**seating**
200:25 201:4
**second**
18:12 53:2 72:10
　105:21 111:23
**secondary**
132:12
**Secondly**
144:17
**secretary**
55:15
**section**
11:15,17 48:8 68:14
　107:19 109:3
　111:18,24 124:24
　174:4 181:10 182:8
　183:9,11,24 184:6
　206:20
**sections**
107:18
**sector**
103:10
**secured**
133:15 185:7
**see**
21:12 37:19 38:20
　39:6 42:12 49:25
　51:23 56:18 57:20
　58:3,20 63:18 68:3
　71:25 72:6,9,13
　73:4 91:18 95:11



109:7 111:19 112:8
112:20 114:2
116:20 119:7,10,12
119:14 121:18
124:6 127:5,16
128:2,6,9 129:12
132:24 135:17
136:18 137:20
138:2,11 139:10
140:7,17 141:7,23
142:24 143:2,3
144:18 145:2,4
146:23 148:13,21
148:25 149:3,5,10
152:9,13,19,20,22
153:11 155:16
156:4 160:6,20
162:13 163:3,10
167:16 169:3,5
171:9,11 172:2
174:2,15,21 176:8
176:13,22 177:3,6,9
177:25 180:7
183:10 187:19
200:4,8 206:4 209:6
210:17 218:7,12
**seeing**
48:20 143:8,14
**seen**
18:8,10 80:16 87:21
94:13 217:25
**semi**
21:8
**semi-accessible**
40:7
**sending**
55:3,18
**senior**
52:5 53:12
**sense**
25:12 40:10 55:20
70:25 80:24 145:8
156:11 161:6
169:23 187:4
195:19

**sentence**
118:19,22 124:3
181:15,24 182:2,6
183:11,24
**separate**
133:25 195:20
**sequence**
108:7 112:12 182:16
183:16
**sequences**
181:8 183:14
**sergeant**
30:24 33:20
**serious**
14:3,8
**serve**
47:24
**services**
1:24 71:24 73:6
180:19
**set**
36:19 67:12 68:23
226:10
**setting**
37:8 68:16 130:14
**seven**
123:22 129:9,19
213:16
**sewing**
103:25 106:23
191:23 192:2
202:13 203:18
212:17
**sewing/office**
201:17
**shaded**
60:2
**shaking**
8:20
**shape**
94:20 95:11 176:5
**shapes**
139:16
**share**
49:8,22 50:8 108:20

**sheet**
76:2,17 224:2
**shine**
140:25
**shinier**
152:10
**shipped**
87:12
**shoot**
41:10 136:24
**short**
68:7 123:18 191:10
200:20 215:13
**Shorthand**
226:4
**show**
130:21,22 138:19
144:22 145:6,25
152:8,18 154:18
155:17 157:13
160:25 161:3 166:6
167:7 171:5 173:23
189:15 191:3
207:21 210:10
214:7
**showed**
145:22 154:13
211:25
**showing**
164:16 171:16
210:20
**shown**
154:4 208:8
**shows**
135:24 145:7 155:5
155:10 163:2,13
165:22 166:8
174:18 208:2
**side**
119:15 136:9 139:6,8
141:12,18,21 149:6
164:9 170:23 199:6
208:20
**sides**
171:14

**sign**
144:10
**sign-in**
76:2,17
**Signature**
224:18
**signed**
3:17,20 223:19
**significance**
56:23 57:5 64:7
68:23 69:3 70:2
82:15 124:23 204:6
**significant**
69:8
**signs**
135:11,13,20,24
140:4,7,11 142:24
154:13 155:5,10
161:3 175:14
211:25
**similar**
76:13 90:17 91:11
143:23 144:8
**Similarly**
8:21
**simple**
157:20
**simply**
46:19 80:20
**single**
141:22
**sir**
8:17 12:20 68:13
181:5
**sit**
12:22 20:9 63:19
**site**
126:19,25,25 127:2
203:25
**sites**
130:10 189:13
**sits**
162:3
**situation**
162:22



**six**
6:6 68:3 116:16
  124:4 213:17
**six-foot**
133:11
**size**
92:20 94:20 95:11
  96:2
**sizes**
139:16
**sleeping**
197:6
**slightly**
100:22
**slots**
162:15
**slow**
57:25
**small**
57:18 136:11 142:3
  164:15
**smaller**
139:2
**smoke**
145:7,23 147:16,19
  147:24 148:4,20
  149:12,20
**soak**
132:7
**software**
213:24
**solar**
36:11
**sold**
85:20 86:4
**solution**
50:16
**somebody**
194:9
**somewhat**
102:11
**soot**
147:24 148:3,19
  152:11 173:24
  175:7 176:12

**sooted**
174:13,20
**sooting**
152:20 174:6,24
  175:5
**sorry**
15:6 16:12 23:19
  26:25 39:21 70:17
  118:15 126:21
  150:17 163:18
  165:12 173:21
  182:11 198:3
  209:19 216:16
**sort**
46:11 148:14 166:15
  176:9
**sound**
18:15 52:23 71:15,16
  148:17
**sounds**
52:24 68:5 93:23
  123:14
**source**
107:25 108:4,11,13
  108:14 112:5,9,16
  112:18,19 135:6
  179:7,13,15 181:13
  181:18,20 182:10
  182:16,23 183:5
  192:17,22 194:3,23
  198:13 199:12
  203:8 204:11,23
  205:5
**sources**
62:7 168:13 170:6,11
  183:25 184:5,10,12
  184:15 194:5
  204:18
**space**
40:8 209:3
**spaces**
37:11
**spark**
29:10
**speak**

20:14,18 22:17 23:3
  106:4
**speaking**
39:25 105:23 179:11
  194:20
**special**
47:24
**specific**
21:3,11 29:10 44:23
  45:2 50:3 70:14
  80:6 82:7 87:4 88:2
  159:9 187:11 194:6
  194:18 196:22
**specifically**
24:23 60:2 87:9 89:3
  197:21
**specifics**
24:18,24 65:23
  187:16 195:14
**specify**
98:14
**split**
133:9,12
**spoke**
118:20
**spoken**
10:7
**spot**
136:11
**spotlight**
141:2
**spring**
31:17
**square**
139:20 152:23
  155:10 173:19
  174:10,22 178:5
**squares**
156:12 176:13,15
**staff**
55:11
**stage**
93:14
**stand**
61:3

**standard**
88:3
**standards**
86:25 87:4,10,24
  89:21
**standpoint**
114:21 115:17 136:5
**stands**
216:18
**Staples**
1:10 5:7
**start**
7:8 194:21
**started**
4:21 126:20 127:3
  128:20 129:2 130:3
  130:8,15 132:11
  170:3 174:6 177:15
  178:12,15,18 197:4
  201:24 202:19
  204:23 208:9
**starting**
57:23 174:14,20
  198:25 210:21
**state**
1:23 4:10,15 59:21
  59:24 60:6 72:25
  98:3 113:20 121:19
  124:2,8 163:6
  166:17,22 180:3
  185:7 223:3 226:6
**stated**
131:6,11 145:11
  146:12 150:7,10
  184:17,18
**statement**
20:25 22:3,10,15
  24:5 25:16,21,24
  26:17 27:17,17
  52:17 108:17,18
  169:19,23
**statements**
22:5,12 24:4 25:5,10
  25:18,20,23 26:20
  27:8,15 28:14,16



112:23 219:11
**states**
1:2 30:22 52:2
107:20 172:4
**steam**
59:22,23
**STEPHEN**
2:6
**stickers**
75:14
**sticking**
147:2
**Stips**
4:23
**stipulated**
3:4,10,15 11:2
**STIPULATIONS**
3:2
**stored**
135:8 144:15 167:2
**straightening**
78:5
**Street**
2:5,9
**strewn**
133:10
**strips**
216:20
**structure**
38:5 40:18
**studs**
40:24 41:2,6,7
**study**
89:12
**stuff**
38:24 64:2
**style**
118:3,11
**subject**
11:4 47:14 48:23
104:6 105:3,4,7,17
106:25 107:3 115:5
168:7 204:21
212:21
**subscribed**

223:19 224:19
**Subsection**
109:21
**subsequently**
216:11
**substance**
9:4 83:21 189:9
**substantial**
11:6
**sued**
34:2,3
**sufficient**
108:5 112:10
**suggestive**
170:14
**suggests**
173:2 174:8
**Suite**
2:5,9
**summary**
30:17,20 34:18 68:19
71:25 92:3 109:10
191:19
**super**
196:22
**supplemental**
67:15 206:5
**supply**
39:24
**support**
59:4 121:6
**supposed**
37:16 137:14 217:10
**suppression**
103:16 131:14,21,22
**suppressors**
216:21
**sure**
16:11 30:20 34:22
50:12 74:19 81:24
88:18 95:24 123:10
132:3,7 139:3
152:25 153:19
155:3 165:14 173:6
176:10 186:24

217:25
**surface**
154:2
**surge**
216:20
**surrounding**
137:21
**survey**
11:13,15,19,23
124:10 189:3
190:14,17,25 191:3
191:16,23 192:11
193:20
**surveying**
191:14
**suspected**
216:3
**sustain**
196:3
**swallowed**
208:15
**swelled**
135:23
**sworn**
3:17,20 4:7 224:19
226:11
**synopsis**
73:6,8
**system**
32:11 36:9 37:24
52:4,19 56:7 60:12
63:14 81:16 86:11
91:10 102:22
104:15,25 105:15
105:16 110:12
114:14,23,24
115:16 170:9 184:8
216:10 221:10
**systems**
36:2,7 190:5 201:22

————————
T
————————
**T**
4:2 223:2 226:2,2
**tails**

129:16
**take**
7:19,23 12:19 22:9
22:14 28:20 35:5
46:12 55:25 73:16
111:8 122:19,22
144:7 157:7 191:7
200:5 213:15 215:4
215:5
**taken**
17:21 21:7 43:4 68:8
77:15,17 123:19
191:11 215:14
223:8
**talk**
10:13 32:2 70:11,13
79:13 102:24
204:14 206:15
207:6 214:17
**talked**
28:15 34:13 37:7
58:24 63:2,7,12
66:3 67:9 81:6
100:21 115:6
124:20 141:12
155:15 161:18
165:17 177:11
179:21,22 180:12
205:14 206:2,3
220:22 221:5
**talking**
25:17 27:16 41:18
70:12,19,21 98:15
103:3 105:15
121:16 127:24
138:12 140:15
152:24 153:4
154:12,21 162:13
170:21 178:4
191:14 199:18
201:7,11 210:21
219:15
**talks**
80:17
**tarnished**



155:24
**task**
47:24,25 48:2,5
**team**
16:10 83:23
**tear**
78:24
**technical**
130:14 186:10,15,24
187:4,9 189:23
**Technician**
33:6
**technique**
196:13,18
**techniques**
189:18 190:12
**technology**
31:16 53:11 119:5
**tell**
10:11 38:14 129:14
129:17 146:22
147:13 148:2
162:17 167:21
187:23 221:8,11,12
**telling**
9:3 65:22 107:6
**tells**
27:22
**temperature**
139:24
**ten**
93:8 145:10,11,12
217:10
**term**
24:16 131:24 188:25
**terminology**
189:8
**terms**
16:21,22,23 36:9
38:14 53:18 74:22
91:2 104:10 195:19
210:24
**test**
14:12 79:11 88:16,24
125:25

**testified**
4:8 59:11 109:24
159:4 169:11 201:6
206:6 209:21
**testimony**
58:21 84:9 110:5
118:16 147:23
166:20 197:9 201:3
204:21 223:8 225:2
226:12
**testing**
77:4 88:5 183:13
221:3
**tests**
77:2 86:14 88:6,11
88:20
**text**
119:14
**thank**
9:22 16:23 33:22
41:13 53:6 68:6
73:8 78:5 104:8
113:15 123:16
129:20 171:4,19
190:19 222:6,8,11
**thermal**
74:25 101:20 121:4
125:15,22 134:13
134:16 136:14,19
136:21,23 137:4
140:3,8 141:15
143:25 163:20
164:4,6 166:6
167:16,20 175:19
209:6 210:6,15
213:8,12
**thing**
37:21 41:23 106:17
116:2 138:15,23
142:15 217:5 219:9
219:16
**things**
11:13 26:15 28:15,22
28:25 36:10 38:3
95:25 130:23

135:16,22 136:25
157:19 188:5,17
193:7 214:8 217:9
**think**
6:6 17:6 34:14 48:19
54:13 66:3 76:6
77:5 81:11 99:9
100:21 102:5 104:4
105:6,12 115:6
118:17,20 123:21
130:20 143:22
147:11,20 149:8
158:2,8,13,19,20
183:10 195:12,21
197:2 200:6 207:24
215:6,8 217:24
219:17
**thinking**
28:19 41:23 60:18
161:7 205:16
**third**
124:3 179:17
**thought**
46:9 53:24
**three**
25:4,10,17,19,22
57:16 58:3 64:12
68:15 71:21 72:20
72:23 82:10 105:20
116:9 124:18
127:22 130:17
133:24 134:8 136:3
172:2,6 180:13,18
180:25
**throw**
24:20
**throwing**
104:9
**ties**
189:20
**time**
1:20 3:13 7:20 14:23
20:21 22:18 26:12
26:15 27:18,20
28:17,20 30:25

34:23 35:15 42:2
54:8,12 68:9 72:4
73:17 75:6 82:18,25
84:22 85:19 86:2
91:25 92:5,18 106:6
114:10 121:22
122:9,11,14,22
123:6,20 132:19
150:2 162:2,9,11
166:19 172:16
175:22,25 184:14
191:7,12 197:11,18
205:17 215:15
218:11,21 222:7,13
**timekeeping**
56:11
**times**
6:6 53:8 94:5 116:9
139:21 144:24
181:11,17 182:8,14
**toaster**
197:18 198:4,11,20
198:24
**today**
5:18 6:14 8:6,15
10:23 12:20 20:10
27:25 28:8 63:20
70:10 189:10 201:3
221:12,20 222:7
**told**
63:22 71:13 103:21
185:4
**ton**
89:17
**tones**
8:22
**top**
18:6 24:2 27:5,13
29:9 61:15 62:24
86:20 87:3 88:3,14
101:16 160:12
162:3 163:13
173:15 177:22,23
177:24 206:24
213:2,4 214:5



total
39:24 57:16 193:5
trace
172:19
traced
172:8,11
tracking
142:25
trade
31:8
trained
117:8
training
43:4
transcript
6:15,23 8:21 18:11
    18:13 19:18 20:24
    223:7,10
transcripts
18:9
transfer
206:22
transmission
141:6
travel
69:13,20
treatise
49:3 179:19
treatises
179:23
trial
1:17 3:13 59:11
trip
118:6,7,8,11,25
    119:2 121:4
Triple
89:8
tripped
120:24 172:16
tripping
158:9,21
trips
119:18 120:8
true
79:6 82:20,23 90:5

165:9,15,18 223:10
223:14 226:12
try
8:2,22 73:17 100:24
    101:5 119:9 152:21
trying
7:2,3 43:2 85:24 94:8
    97:9 99:16 101:7
    113:21 142:16
    143:15 154:19
    155:3 158:3 169:10
    171:5 182:3 187:13
    187:14 190:20
    195:11 211:13
tubing
40:4
turn
49:6 57:8 67:18
    68:11 106:4 109:3
    113:10 117:8,10
    145:9 162:25 175:9
    222:4
turned
117:14 175:24
Turning
97:19
turns
137:17
twisted
147:4
two
27:2,8,15 56:24
    60:16,20 62:20
    67:15 71:21 72:19
    73:3 97:23 104:12
    133:7,23 134:4,6
    136:3,7 138:9
    147:15 149:12,15
    154:6,17 180:13,18
    180:24 190:9,22
    200:9 216:6,9 217:6
two-by-four
40:17
type
38:5 40:17,18 91:9

95:6 99:13 109:11
132:2 200:21
types
36:12 38:8 81:14
    137:9
typical
11:7,11 38:4 40:21
    40:22 93:4 95:22
    99:24 137:8
typically
45:24 53:19 54:6
    66:11,17 92:17
    101:19 117:4 118:4
    118:5 137:24
    139:20 140:19,22
    141:4 167:16
    200:23

──────── U ────────

uh-huh
8:23
uh-uh
8:23
UL
86:19,22,24 87:10,13
    87:23 88:5
unattended
60:9 63:8 215:19
unauthorized
80:21
uncharged
166:15
underneath
212:23
understand
5:18 13:17,22 16:11
    21:21 24:11 40:11
    40:15 41:17 43:3
    44:11 55:23 56:6
    59:18 70:6 79:8,15
    80:13 85:22 86:6
    99:16,18 105:10
    148:9 151:12
    154:14 159:22
    170:12 194:16

202:21 216:25
221:19
understanding
13:25 54:9 79:12,16
    81:20 104:3 105:24
    106:3,19 159:15
    169:19 195:2 197:5
    197:8 204:17
understood
17:4 21:5 33:23 42:2
    53:5 58:19 62:18
    66:24 71:2 79:22
    111:5 116:10
    168:18
Underwriters
86:23
undetermined
104:2
unfair
99:10
unfortunately
60:10 142:7 147:5
    162:9
unit
59:24 61:2
United
1:2 30:22
units
200:20
unmanned
31:2
unplugged
122:2,4,6 197:25
updates
14:23,25 58:15
upgrade
36:3
uploading
56:14
use
7:15 17:3 24:15
    53:17 56:8 93:12
    106:8 131:25
    188:20,23 189:10
    205:17



MAGNA ▶
LEGAL SERVICES

**usual**
4:23
**utilized**
80:2

_____ V _____

**value**
137:14
**varies**
117:6
**variety**
135:22
**various**
40:6 88:6 139:16
  210:9 211:3 213:8
  213:11
**varying**
130:24 211:21
**vector**
196:13,18
**vent**
82:10,11 124:18,19
  136:12,13,22
  141:14 176:10,22
**venting**
178:10
**vents**
176:20
**verbal**
8:19
**verbiage**
74:20
**verification**
4:6
**version**
142:18
**versus**
80:20 81:13 95:12
  168:4 190:2 212:7
**victim**
162:17 167:5,14,22
  168:3
**VIDEOCONFERE...**
1:13
**view**

200:17
**violations**
42:8,11
**visual**
74:5
**visualize**
142:17
**voltage**
160:13 161:9
**vouchered**
74:6 185:20 207:15
**vouchering**
92:7

_____ W _____

**W**
4:2 223:2
**waived**
3:8
**walked**
195:5
**wall**
39:4,20 40:14 41:2
  121:20 124:5,9
  144:21 145:22
**wallboard**
40:20
**walls**
37:18 39:16
**want**
24:19 49:22 50:9
  74:19 110:25
  122:19,24 132:3
  140:24 151:20
  152:25 173:4
  176:10 184:3 221:8
**wanted**
19:21 98:14 194:10
**ward**
36:6
**warning**
44:23,24
**warnings**
44:14,16,21 45:5
**warranty**

217:8
**wasn't**
15:14 38:15,24 42:6
  42:7 45:5 83:18
  95:15,19 147:7
  152:19 168:24
**watch**
62:17
**way**
23:2 24:18 36:8
  47:21 57:19 58:14
  82:24 83:6,10 87:19
  120:25 146:4
  154:16 156:21
  169:14 170:2
  171:14 178:17
  187:8 202:14 211:7
  220:23 226:18
**ways**
136:7
**weak**
136:11
**Webster**
4:18 29:21
**weed**
162:14
**week**
58:17
**went**
31:6,10,15 67:7
  105:19 137:4
  172:24 189:16
  195:10 207:13
  211:15 212:11,16
  220:23
**weren't**
19:20 42:11 75:3
  81:23 213:5,10
  214:20 217:25
**WESTERN**
1:2
**whacker**
162:14
**white**
156:8

**wider**
141:5
**win**
35:11
**wind**
36:13
**window**
59:25
**windows**
118:9
**wire**
39:4 41:4,12
**wired**
37:15 149:13
**wires**
40:19,25 41:6 147:2
  147:4
**wiring**
38:8,12 39:8
**wise**
187:7
**withdrawn**
63:10
**witness**
1:18 4:3,12,17 20:25
  22:3,11,14 24:5
  25:20,24 68:5
  110:17 123:3,8,16
  222:8 225:4 226:9
  226:13
**wondering**
32:19 78:15
**word**
81:8 110:22,22
  113:25 116:8
  199:23
**work**
32:25 35:8,17,19,24
  36:5,15,25 50:6
  53:13 54:23 56:19
  56:22 69:2,9 86:15
  89:16,18 90:22
  92:10 95:6 194:20
  205:3
**worked**



34:25 42:15 64:21
65:19 66:24 67:3
87:9
**working**
54:15 216:2
**works**
81:7,9 123:5 153:19
**wouldn't**
91:16 98:24 99:3,6
99:12 100:6 135:6
136:10 140:17
149:21 160:20
161:14 174:16
179:4 212:8,12
220:16
**write**
48:7 104:13
**writer**
179:20
**writing**
22:7 106:13
**written**
6:15 21:14 22:10
43:10
**wrong**
38:20 170:17
**wrote**
26:9,12 48:20 104:12
**www.MagnaLS.com**
1:25

——————————
**X**

**x**
1:3,12
**X-ray**
161:3
**X-rays**
77:10,14,15 78:3
120:4 221:2

——————————
**Y**

**yeah**
17:7 23:20 50:9
115:22 146:7
158:23 193:9

218:24
**year**
71:16 217:9
**years**
29:25 30:23 59:19
76:20 93:8,12 217:6
217:10
**yellow**
139:22 141:23
170:13,21
**York**
1:2,14,14,23 2:5 4:19
29:22 59:25 223:3
226:6

——————————
**Z**

**Z**
4:2
**zero**
166:21
**zoom**
1:19 7:14 63:17
138:16 152:6

——————————
**0**

**02110**
2:9

——————————
**1**

**1**
49:7,13 51:5 52:23
57:2 67:9 127:21
225:11
**1,000**
64:18
**1:21-cv-00704-JLS**
1:9
**10**
123:9
**10,000**
64:18
**10:00**
1:15
**100**
65:12,16
**11**

147:15,20 150:4
**11:10**
68:4
**1100**
2:5
**12**
163:2,6 207:24
**12:20**
122:24
**12:40**
123:13
**14**
49:12 50:20 86:16
150:4 151:21
171:22,22,23
225:11
**144.4.3**
181:25
**1450**
2:9
**14580**
4:19 29:22
**14614**
2:5
**14th**
52:22 67:8
**15**
163:3 165:8 166:5
170:24 175:9 185:7
185:25 186:2
**16**
179:16
**17**
67:18 68:11 69:4
113:11
**175**
2:9
**18**
184:16
**18650**
62:15,18 92:17,18,22
94:19 95:23 96:4
**18650s**
93:4,7,16,24 94:3,14
94:15

**19**
57:10 72:4,14,20
109:18 172:10,22
172:23 180:14,17
180:25 187:25
**19.4.2**
112:21
**19.6.5.2**
107:20 109:22
111:19,25
**194**
193:8
**1941**
38:22
**19443**
181:7 182:14
**19652**
108:18

——————————
**2**

**2**
51:8,15 52:14 57:2
67:11 225:12
**2/27/2020**
19:12,14
**2:05**
191:9
**2:40**
215:8,11
**2:50**
222:13
**20**
1:14 57:9,15,23 65:6
123:9 223:9
**2003**
30:21
**2009**
188:25
**2010**
71:14,16 89:23
**2013**
31:14
**2016**
31:17 34:15 37:4
**2019**



92:7
**2020**
5:14,21 30:3 83:3
84:5,17,19 149:20
149:22
**2024**
48:9 49:12 50:21
51:3,10,13 52:11
58:13 86:16 225:11
225:13
**2025**
1:14 223:9,20 224:20
226:21
**21**
58:19 177:7,22
178:21
**22**
58:22
**23**
18:25 57:16 58:4
84:9
**23rd**
18:4,14
**24**
5:14,21 106:13
**24th**
18:4
**25**
123:11
**26-page**
49:10 50:14 225:11
**27**
83:3 84:17,18
**27th**
73:12,12,19 74:10,12
75:17,18,23 76:10
77:2,16,21,22,24
81:19 84:24 85:2
**28**
2:5 226:21

---
**3**
---
**3.3.74**
112:8
**31**

51:9,13 52:10 225:13

---
**4**
---
**49**
225:11

---
**5**
---
**5**
225:5
**5,000**
64:18
**50**
65:9,14,20
**51**
225:12

---
**6**
---
**6**
11:16 48:2 110:14

---
**7**
---
**747**
4:17 29:21

---
**8**
---
**866**
1:24

---
**9**
---
**9**
11:16 48:3,4,7
**921**
11:7,11,12 48:21
106:12 107:16,18
111:6,18,24 179:18
179:21 187:22
189:16

