# Rebuttal Statement
## Prepared by Jason Karasinski, IAAI-CFI, NAFI- CFEI

Author: Jason Karasinski, IAAI-CFI, NAFI-CFEI
Rebuttal Statement
Title: Sr. Fire Analyst
Company: Fire Research & Technology, LLC
Email: jason@frtinvestigation.com
Forensic Lab Address: 7317 State Route 14, Sodus Point, NY 14555

| FRT File # | 20-047 |
|---|---|
| Client | Faraci Lange |
| Date of Rebuttal | 12/31/2024 |

This Rebuttal Statement is being provided to address the data points raised within the reports submitted on behalf of the Defendant, HP. The scope of my investigation was to provide a report as it pertains to the origin and cause of the fire (Case Identification - Marcellin and Estate of Hollowell v. HP Inc., and Staples, Inc. United States District Court, Western District of New York.)

Opinions concerning the electrical system were provided by Sr. Forensic Electrical Consultant, Andy Litzinger. Please see the opinions of Mr. Steve Martin for the failure of the HP Pavillion Laptop.

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.

> ### 3.4.1 Living Room Electronics
>
> #### 3.4.1.1 Electric Couch
>
> As highlighted in Figure 28 the living room couch experienced significant damage and is the lowest area of burn in the living room. The couch reportedly had electric power, including heating coils. The Allegany County fire investigation team indicated that they verified that the
>
> ---
>
> 70 Greg Gorbett inspection photos.
> 71 Allegany County Fire Service Fire Investigation Form.
> 72 Expert Report of Jason Karasinski.
> 73 Expert Report of Andy Litzinger.
>
> 2110054.EX0 – 9810                    28
>                              **CONFIDENTIAL**
>
> couch was not plugged in at the time of the incident, and Ms. Marcellin confirmed this when interviewed.[74] In her deposition, Ms. Marcellin mentions that "towards the end," Mr. Hollowell did not use the couch since it was too low for him to get back up off from easily; she also did not experience any problems with the couch, nor had she done any previous repairs.[75] I have not seen photographic documentation that confirms whether the power cord for the couch was connected to a wall outlet or other electrical source at the time of the fire.
>
> Other potential ignition sources could have started a fire in the couch. For instance, Allegany fire investigators documented a candle on the table next to the couch as shown in Figure 27. This indicates that candles and open flames are sometimes used near the couch.

*Figure 1: Excerpt from Mr. Myers report, suggesting the couch and/or candle as an ignition source (pg. 28).*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.




*Figure 2: Path traveled by the occupant that discovered the fire.*


*Figure 3: Livingroom couch remains.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



In Figure 1 above Mr. Myers states that he cannot eliminate the electric couch as a potential ignition source. Mr. Myers fails to mention or consider that the occupant of the structure who is also the eyewitness, Ms. Marcellin, passed through this room to get to the office. Ms. Marcellin, traveled past this couch prior to discovering the fire in the office (see deposition of Ms. Marcellin.) After entering the office and discovering the fire she went back to the kitchen to retrieve a fire extinguisher, traveling past the couch again. After obtaining the fire extinguisher and going back to the room of origin, passing the couch again. No fire was ever observed at the couch and is consistent with her statements and traveling past this couch no less than four times. All damage to the couch is consistent with the heat layer extending to the couch as it progressed through the structure. Based on witness statements and observations the potential of a candle as the ignition source can also be eliminated.

### 3.4.2 Natural Gas Furnace

The natural gas furnace used to heat the home shared walls with the office and office closet, as illustrated in Figure 4. The furnace had been replaced less than two years prior to the incident, in the late fall of 2018, by Owl Homes.[79] The reported serial number of the furnace indicates that it is an M7RL Series Single Stage Condensing Downflow Gas Furnace that was manufactured July 24, 2018, and shipped August 31, 2018.[80]

Ms. Marcellin notes that she did not have any gas leaks from the furnace.[81] However, Ms. Marcellin also notes the night of the incident that she hoped it was her furnace putting out smoke, and that she could shut it down.[82] This is consistent with the assumption that the furnace was running the night of the incident, as the outside temperature was 28° F, and Ms. Marcellin reported that they had seldomly used the electric fireplace.[83,84] It is not known if there were prior issues with the furnace generating smoke.

The Allegany County Fire Investigation ruled out the furnace as the source of the fire because the wooden louvers on the furnace door did not exhibit charring on the inside. However, Anthony Greenwald, a member of the second interior firefighting team responsible for advancing the hose line into the living room and cooling hot spots in the interior walls and ceilings, noted that as he moved down the hall to the first room (i.e., the office), he discovered the furnace had been "blown out."[85] There is no further evidence that the furnace was thoroughly inspected or tested. Given the proximity of the furnace to the closet area and the fact that it was operating during the incident time, a potential malfunction of the furnace causing the fire cannot be ruled out.

*Figure 4: Mr. Myers suggests the furnace was also a potential ignition source.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.





Figure 5: Left photo depicts heat and smoke damage no fire. The right photo depicts ventilation damage.

> 2. After being awakened by the smoke detector, I got out of bed in search of the source of the smoke. On my way toward the office, I passed the door behind which the furnace was located and decided to look there first as a possible source. When I opened the door there was no smoke around the furnace.

Figure 6: Statements of Ms. Marcellin inspecting the furnace when attempting to identify the origin location

Based joint scene exam observations, witness statements, fire patterns, and fire dynamics, a fire originating at the furnace has been eliminated. No fire was ever observed at the time the witness inspected it. This is consistent with her statements of physically opening the closet door and visually inspecting the furnace. It should be noted that she would have passed the furnace as well no less than four times.

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Fire Research & Technology, LLC  //  7317 State Route 14  //  Sodus Point, NY 14555  //  Office 315.553.2420  //  frtinvestigation.com



Figure 7: Location of subject HP Pavilion Laptop

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Figure 7, depicted above are yellow lines showing that the hinges allow the armoire doors to fully open to be parallel with the front of the unit. The blue arrow depicts the HP monitor on the desk behind the HP Pavillion Laptop. The HP monitor has less thermal damage than the laptop positioned directly in front. The red squares depict lighter weight combustibles that show different stages of thermal, smoke, and fire damage.



*Figure 8: Measurements recovered by the Matterport of the HP expert on site.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



> 5. I did not enter the room at that point because of the flying projectiles. From the doorway, I did not feel excessive heat. There was a noxious odor and smoke that was similar in smell to that of burning plastic. There was a layer of visible smoke in the office that started approximately a couple of feet over my head and extended to the ceiling.
>
> 6. I went to get a fire extinguisher and returned to the office several seconds later. When I viewed the office through the hall entrance for the second time, there was much more smoke in the room and this time I noticed a feeling heat. I again observed that there was no spoke, flames or heat coming from the closet. The smoke had a foul acrid smell that burned my nose and throat, and I did not advance any farther into the room than the hallway entrance.

*Figure 9: The statements above support the fact that Ms. Marcellin discovered the incident failure during the incipient stage.*



*Figure 10: Measurements recovered by the Matterport of the HP expert (Greg Gorbett) on site.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



> 3. I then continued on down the hallway to the office. When I reached the doorway of the office, I witnessed projectiles shooting upward out of the laptop computer on the desk in the armoire. I had left the armoire doors open the night before when I left the computer running to complete
>
> 
>
> a process I had initiated before going to bed. The wall behind the armoire was blackened and it appeared that the veneer on the wood paneling was melting in the area above the armoire.

*Figure 11: Ms. Marcellin witnesses "Projectiles shooting upward out of the laptop computer."*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Figure 12: Matterport of the room of origin showing heights on wall.



Figure 13: Carol Marcellin (NYS Valid driver's license height in red)

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Figure 12 and Figure 13 contradict statements made by Mr. Horn and Mr. Myers. In Figure 12, you can see the line of demarcation noted in blue which is higher than the HP Pavilion on the armoire. The red line denotes the height of the witness based on Figure 13. It is obvious that the occupant discovered the incident prior to the thermal heat layer reaching the laptop in question. This clearly demonstrates that any heat layer impacting the laptop occurred after the discovery of the event. This eliminates the possibility that the heat layer had reached the level of the laptop prior to Ms. Marcellin observing the projectiles coming from the laptop.

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



## 6 Comments Regarding the Opinions of Plaintiff Expert Jason Karasinski

Mr. Karasinski submitted an Expert Report for the Plaintiff in this matter. Responses to statements and opinions made in his report are listed below. Note, this list may not contain all of my contentions with statements in Mr. Karasinski's report, and I reserve the right to further respond as needed.

### 6.1 On page 45 of Mr. Karasinski's report, he concludes: "Based on the totality of the investigation, the cause of the fire was a failure of the HP Pavilion notebook system, to include the battery pack. This failure resulted in the ejection of hot battery material that ignited combustibles located within the room of origin, to include the closet.

Please refer to the report of Dr. Timothy Meyers for a full analysis of the fire origin and cause in this matter; however, as I discussed in Section 4 of this report, it is highly unlikely that a single fragment of battery remains ignited combustibles in the closet without any set of battery material found in the closet during examination. Copper windings, which melt above 1000 °C, if they were present in enough bulk, and with enough energy remaining after traveling across the room from the notebook to ignite combustibles, would likely still remain in the ignition area after investigation. No such remains were found in the closet.

Further, Mr. Karasinski fails to explain how multiple cell cans and the rest of the battery related evidence observed during scene inspection were located in areas of the alleged room of origin that experienced minimal fire damage and showed no evidence of combustible ignition at the floor level. It appears that, in the absence of an observed ignition source that would be consistent with the fire damage patterns observed in the room, Mr. Karasinski has attributed the initiation of the fire to the notebook without sufficient evidentiary proof to support that claim.

*Figure 14: Mr. Horn's report that no evidence of battery remains were identified within the closet debris (pg38).*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



> ### 4.3.2 Evidence Items Remaining
>
> Earlier in the deposition testimony, Ms. Marcellin also testified that there was another notebook computer inside the closet, as summarized in the following exchange:
>
> > Q. And you said that the Compaq from the '90s was in the closet in the office at the time of the incident; is that correct?
> >
> > A. Yes. It's in a notebook bag inside the closet that's in the room.
> >
> > Q. Was it on a shelf in the closet, on the floor, something else?
> >
> > A. It sat on the floor.
>
> If there was a notebook computer in the closet at the time of the fire, remains of the notebook would have been found during the scene inspection, when investigators cleared the closet of debris. Remains of clothing, plastic bin, and other flammable items were found in the closet during the scene investigation. If a notebook was in the closet, there would have been materials that were not melted or disintegrated during the fire and would have been present for inspection.
>
> Similarly, no windings remnants from the cells that experienced thermal runaway in the Subject Notebook were found in the closet during the scene inspection. The copper foil, from the negative electrode windings, would melt at temperatures over 1000 °C, and it is unlikely that the fire reached those temperatures during the incident. Based on my review of the scene and lab inspection data, it does not appear that any cell or notebook remnants were found in the closet. As such, it appears that most, if not all of the cell ejecta was found in locations in the area of origin that experienced more limited thermal damage, and there was no obvious ignition pathway between the notebook, cell cans or cell ejecta, and the closet where a concentration of fuel burning

*Figure 15: Mr. Horn again states that no battery remains were located in the closet debris.*

Both Mr. Horn and Mr Myers opine that there was no evidence of battery remains within the closet debris. This statement is not accurate, please see photos below.

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Fire Research & Technology, LLC    //    7317 State Route 14    //    Sodus Point, NY 14555    //    Office 315.553.2420    //    frtinvestigation.com

> 7. The closet in the office was used as a linen closet and to store a plug in vacuum and some other odds and ends including an old Compaq laptop I had purchased in the early 1990s and hadn't used for many years. There was no power source in the closet so there were no electronic devices in the closet connected to any power source. We did not store any hanging clothing in that closet and there was no hanging clothing there on the night of the fire.
>
> All of the above is true and accurate and declared under penalty of perjury.
>
> Dated: 12/28/2024
>
> _Carol Marcellin_
> CAROL MARCELLIN

*Figure 16: Carol Marcellin observations of the closet and contents. Please note no remains of a Compaq computer were identified in the closet.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.





*Figure 17: Prior to closet scene processing; excavation and debris collection.*

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.





*Figure 18: During the systematic processing of the closet. The carpet was removed to provide a clean area to process closet debris. The left photo and red circle outline the battery remains. The foil identified in the photo above came out of the closet with the debris from the green basket.*

It should be noted that HP had Gregg Gorbett on site at the time of the joint scene exam. All interested parties were able to observe and identify any evidence collected. All interested parties on site did not require or ask for any additional evidence to be secured. All parties were in agreement that based on witness statements, fire patterns and fire dynamics the fire originates in the office. No parties required the recovery of any additional evidence at the scene as it pertained to fire cause.

A joint lab exam was conducted again with HP present at our forensic facility. The debris within the closet was inspected on site as well as sifted at the joint lab examination. The opportunity was available again for the battery remains to be observed as well as the location it was secured at the structure.

**Conclusion:** This rebuttal statement was completed at the request of our client Faraci Lange. The intent of this rebuttal was to confirm all known facts and details obtained during the data collection to ensure all interested parties have the same relative data points.

**Administrative Review: Claudia Karasinski**

**Review Date: 1/3/25**

The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



The manufacturer and/or distributor information provided herein is correct to the best of FRT's knowledge concerning the product ID inspected. It is the responsibility of FRT's clients and/or their representatives to ascertain ownership/acquisition status as FRT cannot file legal hearings or motions. This document is not intended to waive any rights and may be considered privileged and confidential. This is a preliminary draft of laboratory analysis notes and should not be considered a formal report. The individual collection of data and facts of the investigation may result in the revision of any opinions or conclusion herein.



Fire Research & Technology, LLC   //   7317 State Route 14   //   Sodus Point, NY 14555   //   Office 315.553.2420   //   frtinvestigation.com