UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

CAROL S. MARCELLIN, individually, and as
Co-Administrator of the Estate of Charles E.
Hollowell, deceased, and JESSICA
HOLLOWELL-McKAY, as Co-Administrator
of the Estate of Charles E. Hollowell, deceased,

Plaintiffs,

v.

HP, INC., and STAPLES, INC.,

Defendants.

**Civ. No. 1:21-cv-00704-JLS**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO PRECLUDE REPORTS AND TESTIMONY OF STEVE MARTIN**

Defendant HP Inc. hereby submits this memorandum of law in support of its motion to

preclude the reports and testimony of plaintiff's expert Steve Martin, PhD under Rule 702 of the

Federal Rules of Evidence.

**TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ...................................................................................... 4

BACKGROUND ........................................................................................................ 5

    I.   Martin's Reports .............................................................................................. 5

       A. Martin is unqualified to offer his opinions in this case ........................................ 6

       B. Martin 'opinions are wholly speculative and are not based on reliable facts, data, principles or methodology .................................................................................... 6

LEGAL STANDARDS ................................................................................................ 8

ARGUMENT ........................................................................................................... 10

    I.   The testimony of Martin should be precluded ..................................................... 10

      A. Martin is unqualified to make offer opinions concerning computer design and programming ........................................................................................ 10

      B. Martin did not employ any reliable methodology, test the effectiveness of his alternate design, or identify any contemporaneous industry practice ................................ 11

          1.    Martin's opinions concerning the thermal runaway temperatures of lithium-ion batteries are based solely on his misinterpretation of the oven test ..................... 11

          2.    Martin's opinions concerning notebook computer authentication are based solely on his *ipse dixit* ......................................................................................... 14

CONCLUSION ........................................................................................................ 18

## TABLE OF AUTHORITIES

**Cases**

*Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 739 (W.D.N.Y. Aug. 31, 2015) (Wolford, J.)........................................................................................................... 9

*Amatulli v Delhi Constr. Corp.*, 77 NY2d 525, 532 (1991)............................................................. 7

*Amica Mut. Ins. Co. v. Electrolux Home Prods.*, 440 F. Supp. 3d 211, 215 (W.D.N.Y. Feb. 18, 2020) (Larimer, J.). ................................................................................................. 9, 10, 16

*Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) ............................................. 5, 9, 10, 16

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)........................................... 10

*Bustamante v. Kind, LLC*, 100 F.4th 419, 427 (2d Cir. May 2, 2024) ...................................... 9, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)................................. 5, 9, 10

*GE v. Joiner*, 522 U.S. 136, 146 (1997) .................................................................................. 4, 14

*Group14 Techs., Inc. v. Nexeon Ltd.*, 2024 U.S. Dist. LEXIS 54284, at *26, n.13 (W.D. Wash. Mar. 26, 2024) (Zilly, J.).................................................................................................. 4, 14

*Hoover v. New Holland, Inc.*, 23 N.Y.3d 41, 54 (2014) ................................................................ 7

*Liriano v Hobart Corp.*, 92 NY2d 232, 238 (1998) ...................................................................... 7

*Mia. Prods. & Chem. Co. v. Olin Corp.*, 2024 U.S. Dist. LEXIS 227194, *24 (W.D.N.Y. Dec. 16, 2024) (Wolford, J.) ....................................................................................................... 9

*Nisanov v. Black & Decker (U.S.) Inc.*, 2008 U.S. Dist. LEXIS 27044, at *23-24 (E.D.N.Y. Apr. 2, 2008) (Cogan, J.)............................................................................................................ 17

*Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471 (1980).............................. 7

*United States v. Ho Wan Kwok*, 2024 U.S. Dist. LEXIS 74281, at *3 (S.D.N.Y. Apr. 24, 2024) (Torres, J.)...................................................................................................................... 17

*United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) ...................................................... 9

**Rules**

Fed. R. Evid. 403 ........................................................................................................................ 10

Fed. R. Evid. 702 .......................................................................................................................... 5

**SUMMARY OF ARGUMENT**

The opinions of the plaintiff's proffered expert, Steve Martin, PhD, are unqualified, unreliable and irrelevant, and they must be excluded. The plaintiff purchased an HP notebook computer from Staples in 2011 and in 2015 an aftermarket replacement battery was purchased and installed in her HP notebook. Plaintiff insists she did not purchase or install the replacement battery and has no idea who did. Thereafter, plaintiff alleges the HP notebook caught fire. With her disclosure of the report of Martin, plaintiff now pursues the theory that the HP notebook computer "was defectively designed in that it lacked any battery authentication system or other design that would have prevented the user from unknowingly [1] operating the subject laptop with an unauthorized battery pack." *See* Ex. A to Levites Decl. at 24.

Unsurprisingly given plaintiff's tortured prosecution of this case, her expert is not qualified concerning computer design and programming science, **and he admits it**. Martin's work concerning his design defect opinion is unreliable because it was limited to reviewing a single application report published by Texas Instruments, together with his "experience" ordering replacement batteries from the University of Iowa. This is a willfully unreliable methodology that produced obviously irrelevant opinions–and, consistent with a recent decision similarly declining to accept his opinions for "lack of rigor in Dr. Martin's analysis" and "obvious citation error"– should be rejected by the Court as unsubstantiated *ipse dixit. See Group14 Techs., Inc. v. Nexeon Ltd.*, 2024 U.S. Dist. LEXIS 54284, at \*26, n.13 (W.D. Wash. Mar. 26, 2024) (Zilly, J.); *see also GE v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of

---

[1] As set for in HP's memorandum of law in support of its motion for sanctions and to strike, there is sufficient evidence to conclude that plaintiff did not *unknowingly* use the notebook computer with a replacement battery but, instead, had purchased the replacement battery herself in 2015 for $16 from an entity called factoryoutletstore.com. However, plaintiff changed this story (as she did with many other facts of the case) once the negative implications that this would have on her case became apparent.

Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) ("when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."). However, Martin is not qualified to offer such an opinion, and did not employ a reliable methodology. HP accordingly moves to preclude the opinion and testimony of Martin under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). HP requests a *Daubert* hearing.

## BACKGROUND

### I.  Martin's Reports

Martin stated the following opinions in his report:

A. At the time the subject HP Pavilion laptop was designed and manufactured, it was foreseeable and likely, that a replacement battery pack would be utilized during the anticipated lifespan of the device.

B. At the time the subject HP Pavilion laptop was designed and manufactured, it was known within the industry that replacement battery packs for laptop computers and other devices utilizing lithium-ion batteries were counterfeited and sold at prices below prices charged for authorized replacement battery packs.

C. The fire at issue in this case was caused by cell overcharge or overvoltage causing one or more cells in the battery pack to reach excessive temperatures and prompting a thermal runaway reaction.

D. The unauthorized battery pack that caused the fire lacked overcharge, overvoltage, and overtemperature safety features intended to reduce or eliminate the risk of thermal runaway.

E. Had the overcharge, overvoltage and overtemperature safety features specified by HP for this battery pack been functioning, thermal runaway and the resultant fire would not have occurred.

F. The subject laptop was defectively designed in that it lacked any battery authentication system or other design that would have prevented the user from unknowingly operating the subject laptop with an

unauthorized battery pack.

*See* Ex. A to Levites Decl. at 21-25. On March 7, 2025, Martin was deposed. *See* Ex. B to Levites Decl. His deposition testimony revealed that (1) he is unqualified to offer an opinion in this case and (2) his opinions, such as they are, are entirely speculative and inadmissible. *See id.*

As set forth more fully in the motion to strike Martin's second report filed herewith, Martin also filed a second report that was purportedly a rebuttal. In it, Martin opined that if "a thermal layer from a preexisting fire of unknown origin externally heated the battery pack cells," it "would require a thermal layer temperature in excess of 300°C (572°F) for a period of over an hour for this external fire source to have provoked the thermal runaway reaction." Ex. C to Levites Decl. at 3.

**A. Martin is unqualified to offer his opinions in this case**

Martin is educated as a materials science and engineering professor. He has no education, training, or professional experience in notebook computer design or manufacture, or an expert in human factors or warnings. Ex. B to Levites Decl. at 17, 22. He has not published any peer-reviewed articles about notebook computers. Ex. B to Levites Decl. at 29.

**B. Martin 'opinions are wholly speculative and are not based on reliable facts, data, principles or methodology**

Martin opines that the HP notebook was defectively designed in that it lacked a design "that would have prevented the user from unknowingly operating the subject laptop with an unauthorized battery pack."[2] Ex. A to Levites Decl. at 24. However, as stated, he has no education, training, or professional experience in notebook computer design or manufacture and his ***only***

---

[2] Importantly, as set forth in HP's motion for sanctions, the only reasonable interpretation of the evidence is that plaintiff Carol Marcellin did **not** *unknowingly* operate the HP Notebook with a replacement battery since the replacement battery in the HP notebook was manufactured in 2015 and she admitted she bought a replacement battery in 2015. However, she now incredibly contends that, unlike all other physical evidence in the case, the replacement batter she bought was vaporized in the fire and does not exist.

source for this opinion is a document produced by Texas Instruments entitled, "Battery Authentication and Security Schemes." Ex. B to Levites Decl. at 138-141. This document does not have any apparent relevance to the HP notebook at issue in this case, and references at the outset batteries for "portable devices, such as cellular phones, PDAs, and DVD players." *Id.* at 1.

Further, Martin did *nothing* to ascertain whether there was a market for non-approved batteries in 2010, and, if so, the extent of that market, beyond reviewing the application report document, the gas gauge specifications for the HP notebook, and his experiences ordering replacement batteries at the University of Iowa. *Id.* at 125-7. This is the only relevant time period because to prevail on a product liability claim, plaintiff must show that the product was defective as of the time it left HP's hands. This is because "[i]t is well settled, however, that a manufacturer, who has designed and produced a safe product, will not be liable for injuries resulting from substantial alterations or modifications of the product by a third party which render the product defective or otherwise unsafe." *Hoover v. New Holland, Inc.*, 23 N.Y.3d 41, 54 (2014), *citing Amatulli v Delhi Constr. Corp.*, 77 NY2d 525, 532 (1991); *Robinson v Reed-Prentice Div. of Package Mach. Co.,* 49 NY2d 471 (1980); *Liriano v Hobart Corp.*, 92 NY2d 232, 238 (1998). As the Court of Appeals has explained, "while the manufacturer is under a nondelegable duty to design and produce a product that is not defective, that duty is not an open-ended one. Rather, it is measured as of the time the product leaves the manufacturer's hands and extends only to the design and manufacture of a finished product which is safe at the time of sale. Thus, manufacturers and others in the distribution chain are not required to insure that subsequent owners and users will not adapt the product to their own unique uses. That kind of obligation is much too broad and would effectively impose liability for all product-related injuries." *Hoover, supra* at 54, *citing Amatulli, supra* at 532, *Robinson, supra* at 480-81, *Liriano, supra* at 238.

Here, Martin admitted that he could not identify *any* manufacturer that deployed, let alone *successfully*, the elaborate security schemes in the application report he referenced. Ex. B to Levites Decl. at 141. He also admitted he never tested these same security schemes he opines should have been used, in an exemplar of the HP notebook or in any other computer. *Id.* at 254.

Even though he has no computer design experience or education, Martin opined that HP defectively designed the computer in that it failed to incorporate a warning system for the user that an unauthorized battery pack was installed–but he admitted that he did not know whether the notebook contained any warnings when it left HP's hands. *Id.* at 191. Indeed, Martin conceded that he would not, and could not, even know if such a warning would be heeded, or if it would have prevented the fire. *Id*. at 194. Further demonstrating the speculative and unsupported nature of his opinions, Martin testified that: (a) he had no knowledge about what Marcellin or anyone else may have done to the notebook computer, *id*. at 78-9; (b) he never spoke to Marcellin and did not make any assessment about whether Marcellin needed or would have heeded a warning, *id*. at 79-80, 191-2; (c) he was not aware of any standards or guides concerning warnings to be placed on notebook computers or battery packs for sale to consumers, *id*. at 181-2; and (d) he was not aware of UL standards for notebook computers, he did not review them, and they did not impact his opinion. *Id.* at 81-3. In a case where plaintiffs have played fast and loose with the facts, it should come as no surprise that they have put forth the opinion on computer design of someone who knows nothing about computer design, did next to nothing to learn about, could cite no similar products nor industry standards.

## LEGAL STANDARDS

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
© the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The District Court acts as a gatekeeper and is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Bustamante v. Kind, LLC*, 100 F.4th 419, 427 (2d Cir. May 2, 2024) (quotation marks omitted), *quoting Amorgianos, supra* at 265 , *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Ultimately, however, the proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see also Mia. Prods. & Chem. Co. v. Olin Corp.*, 2024 U.S. Dist. LEXIS 227194, *24 (W.D.N.Y. Dec. 16, 2024) (Wolford, J.) ("Ultimately, the party proffering the expert has the burden to demonstrate by a preponderance of the evidence that its expert witness satisfies these criteria.").

"Determining whether to admit a proffered expert's testimony is a two-step process." *Amica Mut. Ins. Co. v. Electrolux Home Prods.*, 440 F. Supp. 3d 211, 215 (W.D.N.Y. Feb. 18, 2020) (Larimer, J.). "First, the Court must ensure that the witness is, by knowledge, skill, experience, training or education, sufficiently qualified as an expert to testify about matters that are scientific, technical, or specialized in nature." *Id., citing Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729, 739 (W.D.N.Y. Aug. 31, 2015) (Wolford, J.). Second, the Court must determine whether the expert's testimony is reliable and will assist the trier of fact to understand the evidence or determine an issue of fact. *Amica, supra* at 215 (citations omitted).

"Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [of evidence]." *Bustamante, supra* at 427. "If the evidence is relevant, a district court 'must next determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Id., quoting Amorgianos, supra* at 265. "The reviewing court must also consider Rule 403: Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice exercises more control over experts than over lay witnesses." *Bustamante, supra* at 427, *quoting Daubert, supra* at 595, *citing* Fed. R. Evid. 403.

Finally, in assessing the reliability of expert testimony, "Daubert sets forth a non-exclusive list of facts that may be considered. These include: (1) whether a theory or technique could be, and has been, tested; (2) whether it has been subjected to peer review; (3) its error rate; and (4) its degree of acceptance within the relevant scientific community. *See Amica, supra* at 216, *citing Daubert, supra* at 593-94. "In keeping with these principles, the Court should exclude expert testimony that is "speculative and conjectural." *Id*., *quoting Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir. 1996).

**ARGUMENT**

**I.   The testimony of Martin should be precluded**

**A.  Martin is unqualified to make offer opinions concerning computer design and programming**

Martin purports to opine that the HP notebook is defective, but admitted that he has no education, training, or professional experience in notebook design or manufacture. Ex. A to Levites Decl. at 17-18. He has not published any peer-reviewed articles about notebook computers. Ex. A to Levites Decl. at 23. He was not aware of any standards or guides concerning warnings to be

placed on notebook computers or battery packs for sale to consumers. Ex. A to Levites Decl. at 103. Therefore, Martin is unqualified to opine as to whether the HP notebook was a defective consumer product, and his testimony should accordingly be precluded under Federal Rule of Evidence 702.

Martin has no familiarity with Underwriters Laboratory standards for notebook computers, did not review them, and they did not impact his opinion. Ex. A to Levites Decl. at 81-82. He has never done any testing under the UL standards. *Id.* at 83. This is of significance because the UL standards, as Martin concedes, qualify products for safety, including notebook computers and battery cells. *Id.* at 80. This is of further significance here because Martin also shockingly opines that the battery cells at issue would have to be exposed to a temperature much higher than the *actual* UL 1642 heating -of 130º C, to be susceptible to experience thermal runaway.[3] Ex. A to Levites Decl. at 243. Because he is unqualified to offer opinions concerning notebook computer design, the motion to preclude should be granted.

**B. Martin did not employ any reliable methodology, test the effectiveness of his alternate design, or identify any contemporaneous industry practice**

**1. Martin's opinions concerning the thermal runaway temperatures of lithium-ion batteries are based solely on his misinterpretation of the oven test**

Martin's opinions concerning a design defect in the HP notebook are not based on any reliable methodology. While he concedes that external overheating by fire can cause thermal runaway, he opines that it is not a possible cause of thermal runaway here because "[t]he fire could not have been raging for over an hour before Carol Marcellin responded to the smoke alarm, the time it has been documented in the Larsson study for such lithium ion battery cells to reach thermal

---

[3] Martin's willful ignorance regarding the temperature that provokes thermal runaway in lithium-ion batteries is a key issue in the case because it is his misunderstanding of this point that permits him to opine that the battery pack at issue was the cause of the fire rather than the victim. As HP's expert demonstrated, without reliance on the incorrect temperature, Martin could not rule out the batteries going into thermal runway because of being in a hot room. Ex. E to Levites Decl. ¶¶ 6-10.

runaway from an external heating source." Ex. C to Levites Decl. at 14. However, Martin's incorrect opinion regarding the thermal runaway temperatures of lithium-ion batteries is based solely on his misinterpretation of the article by Fredrik Larsson he cites concerning experiments involving an oven test. In reliance on that article, "Gas explosions and thermal runaways during external heating abuse of commercial lithium-ion graphite-LiCoO2 cells at different levels of aging," Martin offers the opinion that there would need to be "a thermal layer temperature in excess of 300°C (572°F) for a period of over an hour for [an] external fire source to have provoked the thermal runaway reaction" in the HP notebook. Ex. C to Levites Decl. at 3. Indeed, Martin testified that this article comprised the sum of his knowledge concerning the oven test. Ex. B. to Levites Decl. at 83.

However, that is not what the article states. The article concerned a study of thermal runaway wherein battery cells were inserted into **cold, not preheated**, oven, which was then turned on. **None of the live cells were ever heated over 191 ° C:**

| Test No. | Cycle ageing and cell status | Thermal runaway temperature (°C) |
|---|---|---|
| 1 | 0 | 195 |
| 2 | 0 | 195 |
| 3 | 0 | 192 |
| 4 | 0 | 192 |
| 5 | 100 | 190 |
| 6 | 100 | 191 |
| 7 | 100 | 187 |
| 8 | 200 | 189 |
| 9 | 200 | 188 |
| 10 | 300 | 191 |
| 11 | 300 | > 188[a] |
| 12 | Dead cell. sudden death after 229 cycles | 205 |
| 13 | Dead cell. 0 cycles. stored in 60 °C during 10 months | 201[b] |
| 14 | Dead cell. 0 cycles. stored in 60 °C during 10 months | 203 |

Ex. D to Levites Decl. at 7. **In fact, it took the oven itself over an hour to heat up to 200 ° C, and the oven temperature never reached 300 ° C:**



*Id.* That is, in the experiment described in the article, there **was no thermal layer temperature in excess of 300°C**–not for one minute, let alone one hour. As is set forth in Figure 4 above, "all tested live cells underwent thermal runaway when externally heated to approximately 190°C (374°F)," **not C 300°C.** Ex. E to Levites Decl. ¶ 8. "Thus, Mr. Martin's opinion regarding the temperature at which external heat induces thermal runaway in lithium-ion batteries is off by approximately 110°C (230°F)." *Id.* "Mr. Martin's error is significant to this case because he used his erroneous Thermal Runaway Temperature of 300 °C (572 °F) to opine that the replacement batteries in the HP Notebook caused the fire as opposed to being a victim of the fire since the temperature in the room never got to that extremely high temperature at the HP Notebook." *Id.* ¶ 10. "However, since this opinion misapplies the data in the Larsson Study, Mr. Martin's opinion that the batteries caused the fire is not reliable and is not scientifically valid." *Id.*

Conversely, the evidence demonstrates that the **external** temperature at the HP Notebook **did** reach "the actual Thermal Runaway Temperature in the Larsson Study [i.e., approximately 190 °C (374 °F)] because portions of the HP Notebook that were made of ABS (acrylonitrile butadiene styrene) plastic melted.  The ABS so-called "process temperature" (where it can flow into molds as if melted) is in the range of 230 °C to 270 °C. Thus, exposure of the battery pack to this temperature would exceed the real Thermal Runaway Temperatures demonstrated by the Larsson article." *Id.* ¶ 11.

Martin's opinion in reliance on this article that the HP notebook would have to be exposed to 300 º C for over one hour for the cells to be provoked into thermal runaway is simply erroneous. Because Martin clearly misrepresents the meaning and significance of the science, his opinion in this regard must be precluded. See, e.g. *Group14 Techs., Inc., supra*  at *26, n.13 (W.D. Wash. Mar. 26, 2024) (Zilly, J.) (rejecting Martin's testimony for "obvious citation error"); *see also* n. 12 (Martin did not reference underlying patent), *12 (Martin's opinion stated in "conclusory fashion"); *17 (Martin's summary of presentation "goes beyond the actual wording of the presentation material without citing to any evidence concerning the content of conversations accompanying the slide"); *21 (Martin described technique as a trade secret when related documentation stated it "does not contain any proprietary, confidential, or otherwise restricted information"); *26 ("Given the lack of rigor in Dr. Martin's analysis … the Court declines to accept Dr. Martin's opinion").

## 2. Martin's opinions concerning notebook computer authentication are based solely on his *ipse dixit*

Further, Martin's opinion regarding the application of or use of elaborate security protocols to prevent use of aftermarket batteries for notebook computers designed in or around 2009 and 2010 is impermissible *ipse dixit* and should be stricken. *See Joiner, supra* at 146. *First*, Martin can

identify <u>no</u> generally accepted industry standard that required or favored the use of such elaborate

protocols. Indeed, HP has proffered the opinion of an expert who has opined the opposite: that:

"In fact, at the time of the computer's manufacture, there were no requirements, guidance, or

recommendations with respect to the presentation of an on-screen warning related to safety

information regarding a counterfeit and/or unauthorized third-party battery." Levites Decl. ¶ 7.

Thus, Martin's opinion is in direct contradiction to the internationally accepted industry-standard

on the topic.

*Second*, Martin does not identify any notebook computers that were using the sort of

elaborate algorithmic security protocols he contends HP should have been using in 2009 and 2010.

Ex. B to Levites Decl. at 139. Thus, his opinion not only goes against the express accepted industry

standard as of that time but, also, is not supported by any reference by him to known manufacturers

of notebook computers at that that time. Indeed, Martin does not know one way or another if any

notebook computers ever used such protocols, let alone whether they ever did or did not prevent

the use of unauthorized battery packs. *Id.* at 253-4. He could not state for the record the make and

model of **any** notebook that he contended had the authentication the Marcellin notebook should

have. *Id.* at 155.

*Third*, the only "support" Martin refers to regarding the use of elaborate algorithmic

security protocols for batteries is a Texas Instrument marketing paper that suggests such should be

done with respect to DVD players and portable phones, and Texas Instruments gas gauges

specifications showing that they marketed that functionality. Martin makes no reference to any

peer-reviewed article–none–in which this is proposed for notebook computers. He could not even

identify any manufacturer of any portable device like a DVD player or a portable phone that used

these protocols. Ex. B to Levites Decl. at 142. Instead, he points to his alleged, unverifiable

personal experience ordering batteries from the University of Iowa, which required him to purchase notebook computer batteries from the manufacturer.[4] Ex. B to Levites Decl. at 112-4, 141-142.

That is, there is **no** methodology in Martin's report beyond Martin's subjective beliefs and unsupported assertions–and "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos supra* at 266. There are no indicia of reliability in Martin' report: there is no testable hypothesis. See *Amica, supra* at 216. There were no industry standards consulted, much less expressly referenced.

Martin never spoke to Marcellin or made any assessment about whether Marcellin actually needed an on-screen warning. Ex. B to Levites Decl. at 79-80, 191-2. Martin had no knowledge about what Marcellin or anyone else may have done to the notebook. *Id*. at 181-2. Martin made no reference in his report to the physical warning provided on the product when it left HP's control. *Id.* at 191. He obtained no exemplar of the HP notebook and **did nothing to test his hypothesis concerning alternate design of the notebook**. *Id*. at 86, 253. Indeed, he did no research to determine if there was a market in 2008 or 2009 in non-approved batteries or a problem with non-approved batteries being used in notebook computers in and around 2008 and 2009. *Id.* at 112-14. On the other hand, HP's expert has queried lithium-ion battery fire data from Underwriters Laboratory that show "there were relatively few incidents involving lithium-ion batteries across the range of applications by the 2011 time period the subject laptop was sold to Staples by HP and purchased/registered by Ms. Marcellin." Levites Decl. ¶ 7.

After all, the **sole** source of Martin' subjective belief that the HP was defectively designed

---

[4] Notably, this was consistent with HP's express recommendation to owners of the notebook.

for failing to incorporate an alert concerning an aftermarket battery in 2009 and 2010 is a document produced by Texas Instruments. Ex. B to Levites Decl. at 160. Martin admitted that he did not know if battery authentication was in fact available in any computer manufactured at that time. *Id.* at 155. Thus, Martin has no basis whatsoever to support his claims concerning design defect.

Equally, insofar as Martin opines that the HP notebook was defectively designed for failing to display an on-screen warning, it "should be excluded because he offers no scientific analysis of the benefits of alternate warnings." *Nisanov v. Black & Decker (U.S.) Inc.*, 2008 U.S. Dist. LEXIS 27044, at *23-24 (E.D.N.Y. Apr. 2, 2008) (Cogan, J.). "It is not enough here to point out the importance of warnings because the [notebook computer] in question had a warning. The question is whether an alternate warning would have prevented this accident." *Id.* Here, there is no competent record evidence that would show either the effectiveness of the authentication system that is the subject of Martin's opinion or that such authentication was a contemporaneous industry practice that would have prevented this accident. In fact, Martin refused to opine whether any alternate design concerning an on-screen warning would even change the Marcellin's behavior. Ex. B to Levites Decl. at 191-2. Martin even refused to opine as to whether this fire would have been prevented by using an authentic battery. *Id.* at 193-4.

"A statement of an opinion's bases and reasons cannot merely be the ipse dixit of the expert' from experience. An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion. The district court has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Ho Wan Kwok*, 2024 U.S. Dist. LEXIS 74281, at *3 (S.D.N.Y. Apr. 24, 2024) (Torres, J.) (alterations, quotations, and citations omitted). His testimony on this score should accordingly be precluded under Federal Rule of Evidence 702.

17

**CONCLUSION**

Martin is not qualified to offer an opinion in this case. He did not employ a reliable methodology, improperly basing his opinion that the HP notebook was defective on a single document and his own personal experiences.  In view of Martin' errors, he has no good grounds for his opinions, and his testimony will not assist the trier of fact. F.R.E. 702. The motion to preclude Martin' testimony should accordingly be granted.

Respectfully Submitted,
HP INC.,
STAPLES, INC.,
By their attorneys,

_____

Respectfully submitted,
Benjamin H. Levites, 5557046
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
blevites@coughlinbetke.com

Jaclyn S. Wanemaker
Smith Sovik Kendrick & Sugnet P.C.
6245 Sheridan Drive
Suite 218
Williamsville, NY 14221
315-474-2911
Fax: 315-474-6015
Email: jwanemaker@smithsovik.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to all counsel of record on Monday, May 12, 2025.

_____
Benjamin Levites