UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL S. MARCELLIN, individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>HP, INC., and STAPLES, INC.,<br><br>Defendants. | **Civ. No. 1:21-cv-00704-JLS** |

JASON KARASINSKI, pursuant to 28 U.S.C. § 1746, makes the following declaration under penalty of perjury that the following statements are true and correct:

1. I am a NFPA 1033 Nationally Pro Board-Certified Fire Investigator, IAAI- CFI, NAFI-CFEI. I currently sit on the NFPA 921 Technical Committee and am a Principal for the NFPA 1321 Fire Investigation Units (FIUs) (FIC-AAA). I have held the position of President for the NY State IAAI Chapter 23 for four years. I continue to hold a seat on the Training Committee, Peer Review Committee, as well as the 921 Committee for the NY State Chapter. Presently I sit on the IAAI Training & Education Committee. I serve as a Subject Matter Expert and instructor at the National Fire Academy (NFA), National Fire Protection Association (NFPA), and Alcohol Tobacco and Firearms (ATF). I have provided advanced electrical instruction for ATF and the National Center for Explosives and Research Center. Throughout my time as a fire investigator and firefighter I have organized and conducted live burns, demonstrations, testing and training for both the public and

1

  private sectors. In 2012-2013, I was a key contributor that led the effort to successfully secure a $267,000 grant from the Department of Homeland Security, awarded to the NYS IAAI Chapter 23. In the course of my career I have investigated multiple fires suspected to have originated from the failures of lithium-ion batteries and have lectured on this subject on multiple occasions in multiple states throughout the United States.

2. I was retained in this case to investigate the origin and cause of the fire that occurred in the early morning hours of January 24, 2020 at 192 Bells Brook Road, Ceres, NY. At approximately 5 am on January 24, 2020, four investigators from the Allegheny County Fire Investigation Team (ACFIT), including Jeff Luckey, arrived at the scene and conducted its initial investigation. A report was issued by the ACFIT on February 21, 2021 which reached the final hypothesis that "[t]he HP laptop battery or components near the battery caused the battery to overheat and explode, sending sparks and flammable material that ignited lightweight fuels in the office area of the computer cabinet or closet." (See Schwarz Dec., Ex. A).

3. On February 27, 2020 with all interested parties placed on notice, a scene investigation of the subject property was conducted following standard NFPA 921 protocols. Attending that scene investigation was ACFIT investigator Jeff Luckey, Bryan Davis, a fire investigator for NEFCO and Scott Phillips, of Forensic & Failure Analysis, both retained by Farmers Insurance Company, the company that insured the home, Joseph Tomizzi and Paul Simonian of Peter Vallas Associates, representing Staples, Andy Litzinger and myself, from Fire Research Technology and Gregory Gorbett, of Fire Dynamics Analysis, representing HP. Initially background information was provided by Jeff Luckey, the local fire investigator who was at the scene on the day of the fire, and Brian Davis of NEFCO,

who had conducted an initial examination of the scene before all parties were put on notice. At that point, Greg Gorbett, a highly experienced fire investigator I have encountered in many other investigations and representing HP at this inspection, requested that he be able to perform a Matterport 3D video scan of the interior of the home. While Gorbett was doing his Matterport scan, everyone else inspected and took photos of the home exterior. Once Gorbett completed his Matterport scan of the structure, all parties were allowed back into the property to get their photographs of the interior of the structure. Once everyone was done inspecting and photographing the interior of the structure, all investigators reconvened back outside and discussed the next steps on how we were going to handle the removal process of any evidence. All investigators present agreed that the room of origin was the office, so we jointly processed the evidence in the office space with photo documentation, as well as evidence tents for collection and we collected that evidence. The office electrical circuits were traced to identify the breaker that was in the tripped position in the load center, and we packaged the evidence. Gorbett requested and we agreed to allow him to lay out the evidence in the garage for him to take better photographs. All investigators were asked if there was any other evidence anyone requested to bring back for a future laboratory examination and all parties were satisfied with the evidence collected, including specifically Mr. Gorbett.

4. During our examination based on the scene exam, documentation of witness statements, fire patterns and fire dynamics, all interested parties agreed that the office was the room of origin, as had Jeff Luckey in his Allegheny Fire Investigation Report, that the likely ignition source was the HP laptop and battery pack, which showed significant heat and fire damage in the area the battery compartment and ejecta from battery cells coming into

3

contact with combustible materials stored inside the closet was likely the ignition sequence and cause for this fire. All but two of the six cells in the battery pack had been ejected from the laptop. The two remaining cells had exploded releasing their contents with the shattered cans remaining in the laptop battery compartment. The two cells that retained their internal contents were found closer to the laptop. Two other cells found more distant from the laptop had completely ejected their internal cell contents and pieces of battery cell internal copper foil windings were found in multiple locations throughout the office after being ejected from the HP laptop.

5. Once the positions where all cell casings and battery copper foil windings were identified within the room of origin had been documented. These items were then secured for a later joint lab inspection with all interested parties. The investigators then focused on the likely location of the origin of the fire, the office closet. Materials were meticulously removed from the floor of the closet, which included burned fabrics and a sewing basket and its contents. After processing the larger debris on the carpet, we then cut the carpeting on the floor of the closet, so we identify all items removed from the closet. Once the carpeting was carefully removed from the closet to the area of the subfloor immediately in front of the closet, we were able to examine all materials removed from the closet and located a piece of copper foil battery windings that all present concluded was likely ejected from one of the cells from the subject laptop battery pack. This piece was photographed by both FRT (Schwarz Dec. Ex. B) and Mr. Gorbett on behalf of HP (*Id.,* Ex. C) and was included in my rebuttal report as Figure 18.

6. It was the consensus of the investigators at the scene inspection that four of the cells in the subject laptop had experienced thermal runaway reactions that caused the ejection of the

      internal cell contents including the fragment of internal cell windings found in the closet. This fragment produced enough thermal energy to cause ignition of the closet combustible materials.

7. On October 30, 2020, a laboratory investigation occurred at the FRT laboratory in Sodus Point, New York, at which time all evidence removed from the home at 192 Bells Brook Road, Ceres, NY was examined using equipment available at the FRT laboratory including x-ray and CT scans. In addition to FRT personnel, including myself, HP expert Donald Galler was present and given he opportunity to examine all evidence collected.

8. My initial report, dated October 14, 2024, contains a more detailed description of the scientific method and methodology followed for the expert opinions I have reached in this case. This report has already been submitted to the Court and the facts and opinions contained in that report are true and accurate. (Dkt. 66-13).

9. After submitting my initial report, I received copies of the reports of Drs. Horn and Myers on behalf of HP. (Schwarz Dec. Ex. D and E). Surprisingly, Greg Gorbett, the qualified and experienced fire investigator present at the scene investigation on February 27, 2020 and who personally viewed, evaluated and photographed all physical evidence at the scene, did not submit a report on behalf of HP. Instead, Drs. Horn and Myers reviewed Mr. Gorbett's photographs and notes and have offered opinions that differ from those arrived at by myself, Mr. Gorbett, Mr. Luckey and all the other fire investigators present at the scene and the ACFIT report. Dr. Myers claims that the origin of the fire is unknown and postulates that the ignition source could have been the living room couch, a candle in a jar on an end table next to the couch, the furnace or some other unknown ignition source. However, Dr. Myers also claims that the likely origin of the fire was the office closet.

(Schwarz Dec., Ex. D, pp. 43, 44). Dr. Horn and Dr. Myers then propose that the fire from the undetermined ignition source and undetermined origin, created a thermal heat layer inside the office that caused the laptop and battery pack to heat up to a temperature that provoked a thermal runaway reaction in four of the six cells of the HP laptop battery pack.

10. For my initial report, I relied upon the deposition testimony of Carol Marcellin for the only eyewitness account of the events of January 4, 2020. After reviewing the reports of Drs. Horn and Myers espousing this new external fire attack theory, there were several questions I wanted to pose to Ms. Marcellin that were not asked at her depositions. Those questions where posed in an email to Plaintiff's Counsel. (Dkt. 66-17). Most of these questions dealt with Ms. Marcellin's observations as she proceeded from her bedroom to the office on the night of the fire and how far into the office she went when she first observed the laptop ejecting flaming objects and after she returned the second time in hopes of extinguishing the fire with a fire extinguisher. Since I had previously not met Ms. Marcellin in person and I was also interested in her height, which was provided by a copy of her driver's license. These questions became relevant because if a fire of unknown origin had heated the office to a sufficient temperature to provoke thermal runaway in the battery pack, it would be a temperature that would exceed the limits of what could be tolerated by a human being, making it impossible that Ms. Marcellin could have withstood such temperatures without suffering burns or thermal injuries. I also asked about her recollection of the old Compaq computer she believed was in the closet. During the scene exam and evidence collection, no remains of a Compaq computer were observed inside the closet.

11. Ms. Marcellin provided a sworn Declaration answering the questions I had posed to the extent of her ability, and I used this information in my rebuttal report along with multiple

findings from the physical evidence to refute the opinions posed by Drs. Horn and Myers differing from the opinions of all interested parties who attended the scene inspection and agreed that the office was the room of origin.

12. As stated in my initial report as well as my rebuttal report, it is my opinion based upon the physical evidence examined at the scene and during the subsequent lab exam, and my training and experience, to a reasonable degree of fire science certainty, that a heated piece of internal battery components ejected from one of the four cells that released its contents, ignited combustible materials in the office closet where the fire originated and then progressed to secondary fuels which then extended to the rest of the structure. The fragment of an internal cell component found in the closet (See Schwarz Dec. Exhibits B & C) together with the fire pattern inside and outside the office, and the eyewitness account of Ms. Marcellin all support this opinion.

13. The opinion of Dr. Meyers that the origin of the fire could have been the living room couch ignited by some unknown ignition source is improbable based on the evidence documented at the scene and eyewitness testimony. First, it would have required Ms. Marcellin to have ignored a flaming couch she had to pass within a few feet of on four separate trips on her way to and from the office. This is both implausible and inconsistent with her statement to the fire investigators on the night of the fire as well as her deposition testimony. Second, the ACFIT verified that the couch was not plugged in or energized at the time of the fire, illuminating any electrical event in the couch as an ignition source. (Schwarz Dec., Ex. A, p. HP00409). Third, the portion of the couch that suffered the most mass loss was the back cushion of the couch, which mass loss would be consistent with ignition from the thermal heat layer and flaming embers from a fire that originated in the closet. This mass loss is

        also consistent with the vent opening located behind the couch on the A wall. Dr. Myers' speculation that a candle next to the couch could ignited the fire suffers from the same data collection inconsistencies with the physical and forensic evidence from the scene and eyewitness testimony. Finally, his theory that the furnace could have been the ignition source was ruled out by all investigators because no evidence was identified of a fire within the small utility closet where the furnace was located and Ms. Marcellin testified she initially suspected the smoke might be from the furnace but as she approached furnace utility closet she saw a glow coming from the office. (Dkt. 66-6, p. 124). Dr. Myer's speculation about the couch and the furnace is even inconsistent with his own statement in his report that the origin of the fire was likely the office closet. (Schwarz Dec., Ex. D, pp. 43, 44)

14. The theory that a thermal heat layer from a fire of unknown origin that spread to the office is inconsistent with Ms. Marcellin's testimony that she was able to enter the office twice to observe the laptop expelling flaming projectiles. A thermal heat layer of sufficient heat to provoke the battery cells into thermal runaway would have prevented her from entering the without suffering burn and thermal injuries. This is also inconsistent with the Matterport 3D scan done by HP's expert who did not submit a report, Mr. Gorbett. These images show that the fire damage to the office walls at the fire's peak created a line of demarcation on the walls at 3' 2" above the floor. The subject laptop was below that level. (See Dkt. 66-15, Figures 8 and 10). Moreover, there were multiple flammable objects including papers that were above the level of the laptop that did not ignite. (See Dkt. 66-15, Figure 7).

15. HP's experts also speculate that the 20 year-old Compaq laptop Ms. Marcellin believed was stored n the closet could have been the ignition source but was somehow removed

before the scene inspection. This suggestion based on witness interviews that not. A careful and meticulous investigation of the contents of the closet failed to uncover any forensic evidence a twenty-year old Compaq laptop. No electrical ignition sources were identified within the closet of origin area.

All of the above is true and accurate and declared under penalty of perjury.

Dated: May 6, 2025

_____
JASON KARASINSKI