UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CAROL S. MARCELLIN, individually, and as Co-
Administrator of the Estate of Charles E. Hollowell,
deceased, and JESSICA HOLLOWELL-McKAY, as
Co-Administrator of the Estate of Charles E.
Hollowell, deceased,

                Plaintiffs,

    v.

HP, INC., and STAPLES, INC.,

                Defendants.

**Civ. No. 1:21-cv-00704-JLS-HKS**

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
TESTIMONY OF DONALD GALLER, QUINN HORN, AND TIMOTHY MYERS
PURSUANT TO F.R.E. 702**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF RELEVANT FACTS ........................................................................ 3

ARGUMENT .............................................................................................................. 6

    I.    CERTAIN OPINIONS OF HP EXPERT DONALD GALLER
        ARE UNRELIABLE AND SHOULD BE EXCLUDED ............................................... 8

    II.    THE OPINION OF DR. HORN THAT THE SUBJECT LAPTOP
        BATTERY CELLS WERE PROVOKED INTO THERMAL RUNAWAY
        BY AN EXTERNAL FIRE ATTACK SHOULD BE EXCLUDED ............................. 15

    III.    THE OPINION OF DR. MYERS THAT THE ORIGIN AND CAUSE
        OF THE FIRE ARE UNKNOWN SHOULD BE EXCLUDED ................................. 24

CONCLUSION ........................................................................................................ 30

## TABLE OF AUTHORITIES

Pages(s)

**CASES**

*Ambrosini v. Labarraque*,
  303 F.3d 256 (2d Cir. 2002) 101 F.3d 129 (D.C. Cir. 1996) ...............................7

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................... *passim*

*Anne de Lacour, v. Colgate-Palmolive, Co.*,
  2024 WL 36820 (S.D.N.Y. Jan. 3, 2024) ...........................................................6

*Baker v. Saint-Gobain Performance Plastics Corp.*,
  2021 WL 2548825 (N.D.N.Y. May 7, 2021) ........................................................7

*Clerveaux v. East Ramapo Central School District*,
  984 F.3d 213 (2d Cir. 2021)................................................................................7

*Daubert v. Merrill Dow Pharmaceuticals*,
  509 U.S. 579 (1993)............................................................................... *passim*

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)....................................................................................7, 21

*Heller v. Shaw Indus., Inc.*,
  167 F.3d 146, 153 (3d Cir.1999) ....................................................................8, 24

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005).........................................................................6, 11

*Sheehan v. Daily Racing Form, Inc.*,
  104 F.3d 940, 942 (7th Cir. 1997) .....................................................................7

*United States v. Downing*,
  753 F.3d 1224 (3d Cir. 1985) ...........................................................................7

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)..............................................................................6

**OTHER SOURCES**

Federal Rule of Evidence 702..................................................................... *passim*

Federal Rule of Evidence 702 Advisory Committee Note (2023)................................6

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum of law in support of their cross-motion to exclude certain opinions of the Donald Galler, and all opinions of Quinn Horn and Timothy Myers as speculative, unsupported by the evidence, and unreliable under Federal Rule of Evidence 702.

Mr. Galler is an electrical engineer retained by Defendant HP to opine on the issue of laptop battery authentication systems and battery management systems. He opined in his report and purports to provide opinions at trial that:

1. Battery authentication systems were not the "industry standard" at the time the subject laptop was manufactured;

2. Had HP included a battery authentication system in the subject laptop it would have been defeated by counterfeiters and, therefore, would not have prevented the fire that caused the death of decedent and injuries to Plaintiff Carol Marcellin ("Plaintiff");

3. There is no explanation why an old Compaq laptop Plaintiff believed was in the closet where the fire originated wasn't found after the fire.

(Schwarz Dec., Ex. F, p. 20).

Galler's first opinion should be excluded because it was not arrived at by any reliable methodology and is speculative. The second opinion should be excluded because at his deposition Mr. Galler admitted he couldn't even say it was *possibl*e that such a system would have been defeated, he could only say it *may have been possible*. He failed to present any reliable evidence to even support that conclusion. The third opinion should be excluded because it is irrelevant and entirely speculative. There is no evidence an old Compaq laptop Plaintiff believed was still in her office closet at the time actually was in that closet at the time of the fire played or played any role in causing the fire.

1

Quinn Horn, a metallurgist, submitted a report opining that the thermal runaway reaction experienced by four of the six cells in the battery pack of the subject laptop was not the cause of the fire but was itself caused by heat from an existing fire. (*Id.,* Exhibit E, p. 31)*.* Dr. Horn's opinions are unsupported by the factual record, speculative, and were arrived at without using any reliable scientific methodology. Instead, Dr. Horn improperly formed the opinion desired by HP and attempted to work backwards to find facts to support it. Ultimately, these facts didn't exist, but Dr. Horn opted to provide the opinion anyway.

Timothy Myers is a fire investigator that works with Dr. Horn. HP hired a fire investigator, named Gregg Gorbett, who actually investigated the fire scene. (Karasinski Dec., ¶ 3). Gorbett photographed all the relevant evidence, and concluded, like all the other investigators who inspected the fire scene, that the fire was caused by a thermal runaway reaction in one of the cells of the subject laptop that exploded and released super-heated internal copper windings that landed on combustible materials on the floor of the office closet where the fire started. (*Id.*, ¶¶ 4-6). Because Gorbett's opinion did not fit Dr. Horn's predetermined conclusion that the thermal runaway was caused by a preexisting fire, Dr. Myers was brought in to try to concoct the pre-existing fire Dr. Horn needed to support his theory. The best Dr. Myers could do was opine that the fire started in the office closet, but the ignition source was "undetermined." (Id. Ex. D, pp, 43, 44). In doing so he ignored the fact that battery windings ejected from the battery cell when it exploded were found in the office closet, where he conceded the fire started, and speculates on other "possible" ignition sources that he says were not properly investigated by all the investigators, including HP's absent investigator, Mr. Gorbett. In essence, Dr. Myers simply took Dr. Horn's speculative theory as fact and unsuccessfully attempted to concoct a story to fit it. His opinion that the ignition source was "undetermined" should also be excluded.

## STATEMENT OF RELEVANT FACTS[1]

On the evening of January 23, 2020 Plaintiff was updating her anti-virus software on her HP Pavillion laptop computer ("subject laptop") via the internet.  Because the download and updating were proceeding slowly, she decided to leave the computer on and running so the download would complete and went to bed.  This was the first time she had ever left the computer plugged in and running overnight since she had owned it, as her usual practice was to unplug the laptop and wrap the cord around it so her cat did not chew the wire.  (See Plaintiffs Counter Statement of Undisputed Material Facts (PCSUMF) submitted in opposition to Defendant's Motion for Summary Judgment, ¶ 4).

Plaintiff was awakened in the early morning hours of January 24, 2020 by a smoke alarm. Leaving her living companion Charles Hollowell ("Decedent") asleep in their bed, she got up to investigate what had set off the smoke alarm. (PCSUMF, ¶¶ 1,2).  The home was a one-story structure with the master bedroom at the far end. (See Schwarz Dec., Ex. D, Figure 4)[2].  Plaintiff proceeded down the hallway outside her bedroom into her kitchen which opened to her living room. When she entered the living room she noticed a glow coming from the office where she had left the laptop running the night before.  She proceeded down the hallway leading to the office and entered the office where she saw flaming projectiles shooting out of the subject laptop in all directions.  She retraced her steps to the kitchen where she kept a fire extinguisher, returning with

---

[1]    A more complete recitation of the relevant facts can be found in Plaintiffs' Memorandum of Law in Opposition to Defendant's motion for Summary Judgment and in support of Plaintiffs' Cross-motion for Partial Summary Judgment, which is incorporated herein by reference.

[2]    All references to capital letters preceded by "Ex." are to Exhibits to the Declaration of Stephen G. Schwarz, in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Cross- Motion for Partial Summary Judgment, dated June 9, 2024, unless otherwise described.

it to try to extinguish the laptop. When she returned, the computer was still ejecting flaming objects and she decided the fire extinguisher would not be effective. (PCSUMF, ¶¶, 2-4).

Plaintiff returned to her bedroom to rouse Decedent and help him get out of the house. Decedent was disabled and used a wheelchair to ambulate. When she tried to get him out of bed he seemed dazed and fell to the floor. She tried to pick him up to get him into the wheelchair and out of the home, but was unable to do so, as the smoke from the fire was increasing. She was unable to locate her cell phone and her landline receiver was located in the office on the other side of the exploding laptop. At that point she decided to go to her car and use OnStar to contact the fire department. She was able to crawl out of the home to the garage and get into her car but could not get a signal. She then drove down the road until she got a signal and contacted the OnStar operator who contacted emergency services. (PCSUMF, ¶¶ 5 -8).

By the time Plaintiff returned, the fire had increased in intensity and she was unable to reenter the home. First responders arrived and were able to enter the bedroom where Plaintiff told them Decedent had fallen to the floor. When the first responders entered the bedroom the found Decedent face down on the bed, where he had apparently crawled on his own. They were unable to revive him and he was pronounced dead of smoke inhalation. (PCSUMF, ¶ 9; Ex. A).

At approximately 5:00 AM four investigators from the Allegheny County Fire Investigation Team (ACFIT) arrived on the scene. (Ex. A). By that time the fire had been extinguished. The ACFIT team investigated the scene working from the areas of least damage to the area of greatest damage, which was the office. They photographed relevant evidence and inspected the subject laptop discovering that the battery compartment was almost completely destroyed. Plaintiff was also interviewed at the hospital and provided them with her account of the events leading up to her escape from the home. The ACFIT investigators determined that the

subject laptop had exploded causing flaming pieces of battery winding to be ejected into combustible materials igniting a fire in the office area and likely the office closet. (*Id.*).

A scene investigation was scheduled for February 27, 2020 in coordination with all interested parties, which included Defendant HP, the manufacturer of the subject laptop, Defendant Staples, the retailer that sold the laptop, the homeowner's insurer, and Plaintiffs Carol Marcellin and Jessica Hollowell McKay, Decedent's daughter. Each party sent one or more investigators to the scene inspection. Plaintiffs sent Jason Karasinski and Andy Litzinger from Fire Research Technologies. HP sent Gregg Gorbett of Fire Dynamics Analysis. Farmers Insurance and Staples each sent two fire investigators to the scene inspection. ACFIT investigator Jeff Luckey was also present and participated in the scene inspection. (Karasinski Dec., ¶¶ 3-5). All areas inside and outside of the home were thoroughly examined and photographed. It was the unanimous determination of the group that the office was the area of origin of the fire and a further detailed inspection was carried out there. (*Id.*) Empty battery cell cans and internal copper windings from battery cells were found throughout the room. These were photographed, their locations documented and then they were bagged for further laboratory analysis as was the subject laptop. The area of greatest damage was the office closet and debris from the closet was carefully removed and photographed. In addition to the remnants of charred clothing and linens and the remains of a sewing basket, a piece of copper battery windings ejected from one of the battery cells that had exploded was found among the debris on the floor of the closet. This was photographed by FRT and by Mr. Gorbett for HP. (*Id.*, ¶ 5).

The investigators for all the parties collaborated on what evidence would be removed from the structure for future laboratory analysis and such evidence was bagged and removed. (Id., ¶ 6). A lab inspection was scheduled with all interested parties at FRT labs in Sodus Point, NY on

October 30, 2020. (*Id.* ¶ 7). In addition to Karasinski and Litzinger from FRT, Donald Galler representing HP, attended and participated in this examination. (*Id.*; Ex. F). The items removed from the fire scene, including the subject laptop and the remains of the battery cells, were carefully inspected and photographed, with some items examined by x-ray and CT scan. (*Id.*) Examination of the remains of the battery pack revealed that although the labeling suggested it was either manufactured or sold by HP, it was not an original equipment battery pack and that it lacked safety features required to prevent potential thermal runaway. (Ex. D; Dkt. 66-5).

## ARGUMENT

Rule 702 governs the admission of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3] The party offering the expert's testimony bears the burden of establishing its admissibility. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The district court serves as a gatekeeper under Rule 702. *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). In that role, the court must "ensure that the expert is qualified; the expert's testimony is relevant; and the expert's testimony is reliable." *Anne de Lacour, v. Colgate-Palmolive, Co.*, 2024 WL 36820 *3 (S.D.N.Y. Jan. 3, 2024) (citing *Nimely v. City of New* York, 414 U.S. 381, 396-97 (2d Cir. 2005); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-68 (2d Cir. 2002)).

---

[3]    Rule 702 was amended effective December 1, 2023. "Nothing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. However, one purpose of the amendment was to emphasize the importance of judicial gatekeeping since jurors may not have the acumen to evaluate scientific evidence. *Id.*

Trial courts applying Rule 702 have broad discretion to act as gatekeepers to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (quoting *United States v. Downing*, 753 F.3d 1224, 1242 (3d Cir. 1985)).

To determine whether testimony has a sufficiently reliable foundation to be admissible at trial, a court must consider the "indicia of reliability identified in [Rule] 702." *Clerveaux v. East Ramapo Central School District*, 984 F.3d 213, 233 (2d Cir. 2021). If the proponent of expert testimony fails to demonstrate that all the indicia of reliability (subsections (a)-(d) of Rule 702 above) have been met, the testimony must be excluded. *Baker v. Saint-Gobain Performance Plastics Corp.*, 2021 WL 2548825 *2 (N.D.N.Y. May 7, 2021) (quoting *Amorgianos*, 303 F.3d at 266) ("'Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable testimony'").

The list of factors provided in *Daubert* by which a district court was to evaluate the reliability of expert opinion evidence was not intended to be exhaustive, and since *Daubert*, additional factors have been articulated, including:

- Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion – "too great an analytical gap between the data and the opinion proffered" *General Electric Co. v. Joiner*, 522 U.S.136, 146 (1997)

- Whether the expert has adequately accounted for obvious alternative explanations; *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996)

- Whether the expert has approached the problem as he or she would have approached it outside of the litigation context; *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940, 942 (7th Cir. 1997)

The Supreme Court recognized in *Joiner,*

> conclusions and methodology are not entirely distinct from one another....
> [N]othing in either Daubert or the Federal Rules of Evidence requires a district
> court to admit opinion evidence that is connected to existing data only by the ipse
> dixit of the expert. A court may conclude that there is simply too great an analytical
> gap between the data and the opinion proffered.

(522 U.S. at 146).

"Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos*, 303 F.3d 256, 266(2d Cir. 2002); *citing Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.").

## POINT I

## CERTAIN OPINIONS OF HP EXPERT DONALD GALLER ARE UNRELIABLE AND SHOUD BE EXCLUDED

Defendant HP produced a report from Donald Galler, an electrical engineer.  (Ex. F). Mr. Galler offered opinions to counter the opinions of Plaintiffs' expert Dr. Steve Martin's opinions that the subject laptop was defectively designed because it lacked a battery authentication system.

Galler attended the laboratory investigation of the evidence removed from the fire scene held on October 24, 2020. During Mr. Galler's deposition, he provided the following admissions:

- He found no discrepancies between the physical evidence he observed and the testimony of Carol Marcellin about the laptop and the events of January 24, 2020 (Ex. G 55:9-57:1);

- He was unaware of any cause of the fire other than the laptop (*Id.*, 62:10-13);

- He did not consider that thermal runaway could have been caused by external heating source as opposed to an internal cell failure due to the lack of safety features on the battery pack in the subject laptop when he issued his report and only began to consider that in the weeks before the deposition (*Id.*, 73:2-79:4);

8

- Thermal damage to the exterior of the subject laptop was not uniform but was concentrated in the area above and below the battery compartment (*Id.*, 80:17-81:4; 82:19-84:6);

- In another HP laptop fire he had investigated where it was determined that thermal runaway had occurred because the battery pack lacked safety functions to prevent it, the damage to that laptop was similar to the damage to the subject laptop (*Id.*, 95:12-97:34);

- He agreed that the major cause of the 25,000 catastrophic thermal runaway failures of lithium-ion batteries reported by the Consumer Product Safety Commission over a five-year period prior to 2020 was energetic failures of the internal cell components that create a self-sustaining exothermic reaction (Ex. G., 109:5-112:12; 113:20-114:20; Ex. H, p. 1);

- The safety functions required by the HP battery specification including cell balance, overcharge, overvoltage and overtemperature protections, which were missing on the battery pack in the subject laptop at the time of the fire, were all intended to prevent thermal runaway reactions in the battery cells. (*Id.*, 135:21-137:4; 140:1-141:21);

- Some of the battery packs he encountered that caused thermal runaway in HP laptops and that lacked required safety devices had counterfeit labeling like the one in the subject laptop, suggesting that they were HP approved battery packs, making it difficult for purchases to distinguish it from an authorized HP battery pack. (*Id.*, 158:11-159:16);

Mr. Galler listed eight opinions he intended to provide at trial regarding this case.

Plaintiff moves to exclude the following three as unreliable and unsupported by the facts:

    **A. Opinion 4 – "Authentication of the type hypothesized by Dr. Martin was not industry standard in 2010 and was not generally used by other manufacturers of notebook computers in 2010."**

Mr. Galler was questioned about his factual basis for this opinion at his deposition. When asked directly whether it was his opinion that no manufactures were implementing battery authentication systems in laptops in 2010, he answered "I never said nobody in the world [was implementing battery authentication systems in 2010]." (Ex. G, 173:22-174:17). Mr. Galler admitted he had not conducted a literature search to look for support for this broad statement of the industry standard for notebook computer manufacturers in 2010. (*Id.*, 174:7-19). Under

further questioning it was revealed that Mr. Galler based his opinion entirely on work he had done in a previous case.  (*Id.*, 175:7-14; 176:11-18).

In that previous case, Mr. Galler's report indicated he purchased three of what he referred to as "vintage" computers manufactured by Dell, Apple, and Lenovo.  (Ex. F, p. 18).  Mr. Galler's report did not indicate the date of manufacture any of the three "vintage" computers.  At his deposition he stated "Now, as I am sitting here now, I can't tell you they were all exactly 2010, but that was my intent when I did that [in the previous case]."  (Ex. G, 181:1-4).  He testified he then purchased replacement battery packs for these three devices from Amazon and determined that the replacement battery packs worked in the three "vintage" devices.  (*Id.*, 177:16-178:3).  He didn't analyze the battery packs he purchased from Amazon to determine if they had authentication capability.  (*Id.*, 183:24-184:13).  He also didn't do any examination or research to determine whether the "vintage" computers were programed with battery authentication systems.  (*Id.*, 184:14-19).  He performed no analysis to determine whether the vintage laptops had authentication systems and the replacement packs also had systems that matched the vintage laptop, which would have allowed the battery packs to function.  (*Id.*, 185:8-186:6).

Mr. Galler simply *assumed* that the battery packs he bought from Amazon were not authorized by the manufacturers because they were the cheapest ones available, and they did not have the laptop manufacturer's name on the label.  He never verified that that the battery packs he purchased from Amazon were not authorized by the manufacturers of the three "vintage" laptops.  (*Id.*, 178:8-20; 186:3-6).  Because he *assumed* the purchased replacement battery packs were not authorized by the laptop manufacturer, and because they worked in the laptop, he *assumed* these laptops lacked battery authentication systems.

Mr. Galler's opinion as to what "industry standard" was in 2010 would have been unreliable even if he knew the dates of manufacture of the three "vintage" laptops and he had verified that they lacked authentication systems since even that would not have established a standard for the entire industry. But he did not know the manufacture date of the three devices and he did nothing to reliably verify that the three devices lacked authentication systems, so this opinion is absolutely unsupported by any reliable methodology or evidence.

Mr. Galler's opinion that battery authentication systems were not industry standard is unreliable and should be excluded under *Daubert*. (See *Nimely v. City of New* York, 414 F.3d 381, 396-97 (2d Cir. 2005) [expert testimony must be both relevant and reliable]).

**B. Opinion 5 – "Even if authentication had been used it is more likely than not that it would have been defeated by the manufacturer of the subject battery pack by the time the subject battery pack was installed. Therefore, the fact that authentication was not used is not the cause of the Marcellin fire." (Galler Rpt. P. 20).**

Mr. Galler opined in Opinion 5 (quoted above) that available authentication systems at the time the subject laptop was manufactured would likely have been defeated by counterfeiters. (Ex. F, p. 20). At his deposition he was questioned about a Texas Instruments Application Report from 2005 entitled "Battery Authentication and Security Schemes." (Ex. I). This report, issued five years prior to the subject laptop's manufacture date, describes the most secure type of authentication system TI offered as the SHA-1 type authentication. (*Id.*). Mr. Galler was then asked what he relied upon to support his opinion that an SHA-1 system "more likely than not could have been defeated." His testimony was as follows:

197:18   Q    What is the basis of your understanding
197:19   that an SHA-1 algorithm authentication system and a
197:20   peripheral can be defeated in the way that you just
197:21   described it?
197:22        In other words, did you read an article
197:23   about that?

11

197:24          Have you done it yourself?
197:25          Have you done research to understand
198:1   how that would be done and duplicated it?
198:2          Tell me how you know that.
198:3      A    Oh, okay.  I haven't done much research
198:4   and I haven't done any experiments.  I read an
198:5   article on hacking, and there were many of them.  And
198:6   they do things, like, looking at the fuel gauge chip,
198:7   looking at something else in the computer, and
198:8   actually getting to the point where you change the
198:9   programming in both of those things.  The hackers
198:10  that do this go to computer conferences and they make
198:11  presentations.  So, I have a bunch of presentations
198:12  from a couple of people that were doing stuff like
198:13  that and it looked very sophisticated to me, and
198:14  enough to figure out how to bypass this
198:15  authentication.
198:16          I can't tell you as I am sitting here
198:17  right now.  I guarantee it will work.  All I am
198:18  saying is that the level of sophistication of the
198:19  hackers was very high.  And so, it seemed to me that
198:20  if they wanted to, they would be able to bypass the
198:21  authentication.

(Schwarz Dec., Ex. G, 197:18-198:21).

When specifically questioned about the SHA-1 authentication system discussed by Texas

Instruments in the 2005 Application Report and whether to his knowledge a counterfeit battery

manufacturer has ever succeeded in defeating such a system, he provided the following testimony:

201:23      Now, what evidence do you have that any
201:24   counterfeit battery manufacturer has ever
201:25   accomplished that?
202:1          A    I don't have any evidence that they
202:2   accomplished that.  What I am saying is there is a
202:3   level of technology that's required and it may be
202:4   possible to do it that way.
202:5      Q    So, it may be possible.  You are not
202:6   saying it is possible?
202:7      A    That's correct.

(*Id.*,  201:23-202:7)

The Texas Instruments Fuel Gauges authorized by HP for use in the Pavillion series HP laptops, like the subject laptop, all offered SHA-1 battery pack authentication capability if the manufacturer of the laptop chose to implement it.  (Dkt. 66-5, p. 24).  When asked if his opinion was that the SHA-1 systems offered on these Fuel Gauges and recommended by Texas Instruments could more likely than not have been defeated by counterfeiters if HP had enabled this authentication technology on its Pavillion laptops, he provided the following testimony:

```
283:1    Q    If it was an SHA-1 authentication
283:2   system that was installed on the computer, are you
283:3   saying that, in your opinion, it's more likely than
283:4   not that that system would have been defeated by the
283:5   counterfeiter?
283:6        A    I think that would have been much
283:7   harder.
283:8        Q    It was more likely than not?
283:9        A    I don't think so.
283:10       Q    And we established through all of the
283:11  testimony today looking at the other -- looking at
283:12  the Texas Instruments 2005 report as well as the
283:13  actual specs for those gas gauges, that SHA-1 was
283:14  clearly available to HP at the time they manufactured
283:15  this computer for authentication system, correct?
283:16            MR. LEVITES:  Objection.
283:17       A    That appears to be.
283:18       Q    That appears to be correct?
283:19       A    I said yes.
```

(Schwarz Dec., Ex. G,  283:1-283:19, 3/24/2025).

When HP's attorney tried to rehabilitate Mr. Galler's opinion 5, it only got worse:

```
290:12  Q    Mr. Galler, thank you for bearing with
290:13  us.  I just have a few brief questions for you with
290:14  respect to your testimony today.
290:15           So, when you were asked about your
290:16  conclusions at paragraph 20 by Attorney -- or page 20
290:17  rather -- by Attorney Schwarz, you were asked about
290:18  paragraph 5 which discusses authentication generally.
290:19  And Attorney Schwarz asked you about SHA-1 on
290:20  authentication specifically.
290:21           So, I want to be clear in respect to
```

13

290:22  this paragraph.
290:23          Are you saying that with respect to
290:24  SHA-1, you don't know if it would be defeated or that
290:25  it wouldn't be defeated?
291:1        A    I think I just don't know.  I think
291:2  it's harder.  But I just don't know if it would be
291:3  defeated.
291:4        Q    Harder as in SHA-1 is harder to defeat?
291:5        A    Correct.

(*Id.,* 290:12-291:5, 3/24/2025)

Mr. Galler should be precluded from offering Opinion 5 in his report at trial.

   **C.  Opinion 8 – "There is no scientific process that explains the missing Compaq computer and battery pack testified to by Ms. Marcellin.  It would not have burned up to the point of complete disappearance in the fire."  (Galler Rept. p. 20).**

   Plaintiff testified that she believed her twenty-year old Compaq computer that she hadn't used since she purchased the subject laptop in approximately 2011 was still in the office closet when the fire occurred. (Dkt. 66-6. Pp. 93-94).   No trace of such a computer was found in the closet or anywhere else in the office.  (Karasinski Dec., ¶15).  There was no electrical power outlet in the closet. (*Id.*)

   Mr. Galler testified that it was highly unlikely that battery cells not connected to a charger that had been unused in ten years would spontaneously go into thermal runaway.  (Schwarz, Ex. G, 102:11-16).   Galler also admitted he had no basis to claim the old Compaq computer Ms. Marcellin believed was still in the office closet had anything to do with the fire.  (*Id.,* 283:20-285:24).

   Because no evidence was found in the closet or in the office of any trace of a Compaq computer or any battery components unrelated to the subject laptop, the most likely explanation

is that Ms. Marcellin or Mr. Hollowell had disposed of that computer before the fire and she had forgotten that fact.

Accordingly, Mr. Galler's eighth opinion should also be excluded as irrelevant and unreliable and would only confuse the jury without providing any probative value. (FRE 702).

## POINT II

## THE OPINION OF DR. HORN THAT THE SUBJECT LAPTOP BATTERY CELLS WERE PROVOKED INTO THERMAL RUNAWAY BY AN EXTERNAL FIRE ATTACK SHOULD BE EXCLUDED

Defendant HP submitted a report from Quinn Horn, Ph.D. a metallurgist, who is employed by Exponent. Dr. Horn agrees with Dr. Martin, Plaintiffs' battery expert, and Mr. Galler, HP's electrical engineer, that four of the six cells in the subject laptop battery pack experienced thermal runaway reactions. (Ex. L, 191:7-21). Horn also agrees with all other experts that the battery pack in the subject laptop at the time of the event was not an authorized battery pack and lacked essential features to prevent overcharge, overvoltage and overtemperature conditions. (Ex. E). Where Dr. Horn differs with Dr. Martin is that Horn claims that thermal runaway in these four cells was provoked by an external fire attack causing the cells to reach thermal runaway temperatures. (*Id.*) Although Dr. Horn provided many rambling and unresponsive answers at his deposition, he was eventually pinned down to the following three bases in support of his opinion on how the laptop battery cells were provoked into thermal runaway:

- His belief that there were no internal battery cell fragments found inside the office closet, which was the area of origin of the fire (Ex. L, 179:1-5; 180:1-181:15);

- His opinion that lithium-ion battery cells *only* eject their contents, as the four cells in the subject laptop undisputedly did, when the thermal runaway is caused by external heating

and not by the internal causes of thermal runaway such as overcharge, overvoltage and overtemperature. (*Id.*, 79:12-87:4; 105:6-106:10); and

- Plaintiff's testimony that she was awakened by the smoke alarm, proceeded to the office and witnessed flaming projectiles coming from the laptop. Horn claims that because thermal runaway reactions like Plaintiff described are over quickly, a fire from some unknown source must have caused the smoke alarm to activate and also caused the battery cells to go into thermal runaway. (Ex. E, p.34-35).

Like Dr. Myers, Dr. Horn did not attend either the site inspection or the laboratory inspection of the evidence removed from the fire scene, including the subject laptop and the remains of the battery cells. (Ex. L, 98:1-100:19). In fact, neither Dr. Myers or Dr. Horn ever bothered to physically examine this evidence which has been preserved and reviewed by Plaintiffs' experts. Like Dr. Myers, Dr. Horn based his opinion exclusively on the photos taken by HP's absent fire investigation expert Gregg Gorbett, and his review of the testimony of Plaintiff. Like Dr. Myers, Dr. Horn also never sought to speak to Mr. Gorbett to obtain Mr. Gorbett's direct observations of the scene, why he took the photographs he did, or what those photographs were intended to depict. (*Id.*, 159:13-161:21).

Dr. Horn agreed with statements in an article he cited in his report that the major cause of catastrophic failure of lithium-ion batteries is thermal runaway that occurs when heat generated from exothermic reactions inside a battery outpace heat dissipated from the battery. (Ex. L, 105:6-112:15; Ex. H). This leads to a rapid increase in temperature and pressure that further increases the reaction rate. If unmitigated, this self-accelerating process will lead to cell rupture and venting of toxic and highly flammable gases and the release of heat and can result in an explosion or fire. (Ex. L, 108:22-111:9; Ex. H). Dr. Horn also agreed with all other experts that the battery pack and

16

cells that went into thermal runaway lacked the essential safety features required to prevent thermal runaway that were included in the HP specification for its battery packs and discussed in the 2005 Texas Instruments Application Report that warned of the dangers of counterfeit battery packs.  (Ex. L, 113:12-114:8; 132:24-133:7; 136:15-24).  Dr. Horn contended that these features were really for *performance* not *safety,* but eventually conceded that HP referred to these features in its specification as "Safety Functions."  (Ex. L, 142:12-143:6).

### A. <u>Internal Battery Cell Fragment Found in Office Closet</u>

Dr. Horn partially based his opinion that heating from an external fire caused the cells in the subject battery pack to go into thermal runaway on is belief that no internal cell remnants were found in the closet where his compatriot from Exponent, Dr. Myers, conceded the fire originated. (Ex. L, 179:1-5).  At his deposition, Dr. Horn contended he hadn't seen any evidence that copper windings ejected from one of the battery cells was discovered in the debris on the floor of the closet where the fire originated.  (Ex. L 169:12-172:16).  Obviously, basing an opinion on a review of photographs without an explanation from the photographer has its limitations, and as established by Mr. Karasinski, Mr. Gorbett was present and photographed the same internal cell fragment found in the debris that Mr. Karasinski displayed in his rebuttal report.  (See Karasinski Dec, ¶ 5; Exs. B & C; Dkt. 66-15, Figure 18).

Although Dr. Horn claimed he hadn't found any documentation that an internal cell fragment was found in the closet where the fire originated, his Exponent Colleague featured a photograph in his report which is labeled "debris from the office closet" which is one of the photos taken by Mr. Gorbett of the internal cell winding found in the closet.  (See Ex. D, Figure 26, p. 28 and Ex. C, HP01849 and HP01850 depicted in Figures 1 and 2 below which are Gorbett's photos of the fragment).

Even after learning of the existence of this what he referred to as "critical evidence", Dr. Horn never looked for Mr. Gorbett's identical photo or asked Gorbett to assist him in finding the photographs taken of this fragment. (Ex. L., 174:19-175:1). Choosing to ignore all evidence that did not fit his contrived opinion that the laptop did not start the fire, Dr. Horn persisted in his assumption that no such fragment was found in the closet and based his opinion on that assumption. (Ex. L, 180:1-181:15). When after his depositions the Gorbett photos were finally produced by HP, the photos in Figures 1 and 2 below clearly show the fragment of internal copper battery windings ejected from one of the laptop battery cells found in the debris removed from the closet.



*Figure 1 - Gorbett Photo of Cell Winding Found in Closet*



*Figure 2 - Gorbett closeup photo of cell winding from closet*

This ignoring the evidence of the fragment found in the closet was necessary because Dr.

Horn's colleague from Exponent, Dr. Myers, admitted in numerous places that the fire started in

the office closet.  (Ex. D, pp. 43, 44).

**B.  Theory that only external fire attack causes ejection of internal cell windings**

Dr. Horn also opines that he is sure the thermal runaway reaction was caused by an external

fire attack because the cell windings were ejected from four of the cells.  When asked to provide

the support for his opinion that cell contents are *only* ejected when thermal runaway is provoked

in this manner – Dr. Horn first claimed that the UL standards required testing of battery cells and

that this testing supported his opinion:

    207:1    Q.   And just so I know, can you give
    207:2    me any references that support your
    207:3    contention that internal causes of thermal
    207:4    runaway never result in expulsion of the
    207:5    internal cell material?
    207:6        A.   Again, I'll -- I'll point you to

207:7      the standards that I referenced, right,
207:8      which is -- which is --
207:9          Q.   In the standard, it says that?
207:10         A.   In the standards, the -- the
207:11     important point of the standards is that all
207:12     of the tests that are conducted in the
207:13     standards require that the cells do not
207:14     expel their internal contents, except when
207:15     exposed to an external heat source, such as
207:16     flame impingement.
207:17             In which case, the cells can
207:18     expel their internal contents and still pass
207:19     the standards, right?  What that tells you
207:20     is that -- and the standards subject cells
207:21     to overcharge, overdischarge, over-current,
207:22     all kinds of testing, right?  They can't --
207:23     and under those conditions, expel their
207:24     contents, unless they're exposed to a fire,
207:25     and now when they're exposed to a fire, they
208:1      can pass the standards and -- and still
208:2      expel their contents.
208:3             So that right there tells you
208:4      that the industry-accepted behavior of 18650
208:5      lithium ion cells is that if they have an
208:6      internal fault, they don't expel their
208:7      contents.  If they're exposed to a fire,
208:8      they can expel their internal contents.

(Ex. L, 207:1-208:8)

This alleged supporting evidence quickly evaporated under further questioning.  Dr. Horn

admitted that the testing he was referring to involved only exposing the cells "briefly" to a

temperature of 130 degrees C, well below the temperature required to provoke the catastrophic

thermal runaway reaction that would expel contents, which he had previously testified was 190-

200 degrees C.  (*Id.*, 208:9-209:1).  He also conceded that he did not know the extent of overcharge

the UL tests required and "unless you are charging them at a very high rate, higher than what is

specified, the cells are not going to go into thermal runaway."  (*Id.*, 215:5-215:20).

The only other support Dr. Horn could come up with to support his *ipsi dixit* opinion was one of his publications, which is entitled "Methodologies for Battery Failure Analysis." (Ex. M). Dr. Horn testified, "I believe that there is a paragraph -- that -- that mentions that when a battery expels its contents, that it is likely from external heat source." (Ex. L, 260:5-261:5). However, Dr. Horn was unable to specify where in this lengthy document this supporting paragraph could be found. (261:6-25). A review of this article after the deposition revealed not only does it not support Dr. Horn's opinion that only external heating provokes ejection of internal cell contents during thermal runaway reactions, it contradicts his opinion:

> In cases where a catastrophic failure induces rapid thermal runaway (e.g., from a puncture to a cell in a pack from an external source, external heating of the battery pack, or **overcharge of the cell**), the initiating cell may be the most heavily damaged cell. Maximum damage occurs to the initiating cell here because the shorting and subsequent thermal runaway are so rapid they often result **in ejection or partial ejection of the cell windings**.

(Ex. M, p. 8 [emphasis added]).

Thus, Dr. Horn's opinion that the ejection of battery windings proves that an external fire source caused the thermal runaway in the cells is an inadmissible *ipse dixit* opinion with no support other than Dr. Horn's assertion. *See Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"] *quoting General Electric Co. v. Joiner,* 522, U.S. 136, 146 (1997).

**C. Timing of Plaintiff's Observations**

Dr. Horn's final justification for his opinion that the four battery cells went into thermal runaway from an external fire attack was based on Plaintiff's testimony that she was awakened by the smoke alarm, proceeded to the office and witnessed flaming projectiles shooting out of the computer. From her description, he concluded she was witnessing a thermal runaway reaction.

(Ex. E, pp. 24-35). Although it took many questions and rambling answers to deconstruct, Dr. Horn's interpretation of Plaintiff's testimony is that there must have been a fire that caused the smoke alarm to activate. According to Dr. Horn, it would have taken longer for the smoke to reach the smoke detector to activate and for Plaintiff to get to the office than the typical length of a cell going through thermal runaway. (Ex. L, 307:1-309:6). From these two assumptions, he concludes an external fire must have activated the smoke alarm and caused the thermal runaway reaction Plaintiff described. (Ex. E, pp. 24-35).

On further questioning, it became clear that in order for this conclusion to be accurate, all four cells would have had to go into thermal runaway at close to the same time. Dr. Horn admitted that what Plaintiff described was *one* of the cells expelling its contents, but was unable to say which one that was. (Ex. L, 293:12-294:4). Plaintiff's expert Dr. Martin and HP's expert Mr. Galler, had testified that one cell can be provoked into thermal runaway by an internal failure such as overcharge or overtemperature and the heat generated by that cell can spread to the next cell by convection until it reaches the temperature to begin its own self-propagating exothermic reaction and goes into catastrophic thermal runaway heating up the next cell in sequence. (Dkt. 66-9, p. 11; 66-16, p. 8; Ex. G., 229:18 - 230:16). Dr. Horn was asked how he had been able to establish that what Plaintiff witnessed was the first cell to go into thermal runaway, as opposed to the last cell to go into thermal runaway in a sequence that could have taken multiple minutes for each cell to eject its internal contents in the fireballs Plaintiff witnessed. Dr. Horn testified he could not say which cell's thermal runaway reaction Plaintiff witnessed. However, because he *assumed* an external fire attack caused the thermal runaway, he concluded the four cells would have gone into thermal runaway at approximately the same time:

        295:14  Q.   And what is the basis of your
        295:15       opinion that -- that some of the cells had

22

295:16 already gone into thermal runaway and
295:17 ejected their -- their contents before she
295:18 saw the cell that was ejecting its contents
295:19 when she walked into the room?
295:20   How did you exclude that other
295:21 cells had already ejected their contents
295:22 before she watched the contents being
295:23 ejected from whatever cell was ejecting when
295:24 she walked into the room?
295:25  A.   I -- I never offer that opinion.
296:1  Q.   So it's possible then that other
296:2 cells went into thermal runaway before the
296:3 cell that she observed?
296:4  A.   From -- from the external heat,
296:5 that's possible.  Yes.

296:10   So just to pin it down, in what
296:11 sequence did the four cells that went into
296:12 thermal runaway go into thermal runaway in
296:13 your opinion?
296:14  A.   I -- I don't have an opinion on
296:15 -- on the sequence of events.
296:16  Q.   Do you have an opinion as to
296:17 whether all four went into thermal runaway
296:18 simultaneously?
296:19  A.   It would likely have been very,
296:20 very close, because the external heat would
296:21 have been heating all of the cells, you
296:22 know, at a reasonably similar, you know,
296:23 rate.  So most likely, they -- they would
296:24 have gone -- they would have gone into
296:25 thermal runaway relatively quickly following
297:1 each other.  The -- the four cells --

(Horn, Quinn (04.03.2025).txt, 295:14-297:1, 4/3/2025)

Thus, Dr. Horn interpreted the sequence of events described by Plaintiff as supporting his opinion that an external fire caused the thermal runaway by *assuming* the thermal runaway was caused by an external source, using one unsupported fact to support another.  This demonstrates conclusively that Dr. Horn started with the conclusion he wanted to reach – the thermal runaway

23

was caused by a fire ignited by something other than the laptop battery cells – and conformed all the facts to fit his desired conclusion rejecting those that didn't.

As such, Dr. Horn's opinion that the thermal runaway reaction was caused by an external fire source must be excluded.  *See Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir.1999) ("[A] district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used.").

## POINT III

### THE OPINION OF DR. MYERS THAT THE ORIGIN AND CAUSE OF THE FIRE ARE UNKNOWN SHOULD BE EXCLUDED

As stated previously, a scene inspection of Plaintiff's home at 192 Bells Brook Road was scheduled with all interested parties and held on February 27, 2020, approximately a month after the fire.  In addition to Plaintiffs' experts, Karasinski and Litsinger from Fire Research Technology (FRT), HP sent Gregg Gorbett, a respected fire investigation expert from Fire Dynamics Analysis to this scene inspection.  Joining them were two fire investigation experts representing Staples, two experts representing Plaintiff's Farmers Insurance, which had issued the homeowner's policy for the home, and Jeff Luckey, who was with the Alleghany County Fire Investigation Team (ACFTI) that had investigated the scene on the day of the fire and had issued its report on February 21, 2020.  (Karasinski Dec., ¶ 3; Ex. A).

The ACFTI investigators had concluded that the fire originated in the office closet and the ignition source was flaming projectiles from the laptop and battery pack.  (Ex. A)[4].  The conclusions of all fire investigators at the scene inspection was the same.  (Karasinski Dec. ¶ 6). The investigators located a piece the inner battery cell windings ejected from one of the laptop

---

[4] Under 921 the conclusion of the investigator is referred to as the "final hypothesis".  (Ex. K 119:15-122:17; Ex. J § 18.7).

battery cells in the debris of the floor of the closet where the fire started and photos were taken of this item by both Plaintiff's experts and Mr. Gorbett on behalf of HP.  (*Id.*, ¶5;. Exs B & C) (See also Figures 1 & 2 above).

A lab inspection was conducted on October 30, 2020 at FRTs facility in Sodus Point, New York.  HP's electrical engineering expert, Donald Galler attended that inspection and was given full access to all evidence collected at the scene in February that had been selected for review by HP's expert Gorbett and the other investigators.  (Schwarz Dec., Ex. G, 40:12-42:16; Karasinski Dec., ¶¶ 3, 7).

Mr. Gorbett was obviously not willing to provide the opinion HP desired that would support Dr. Horn's ipse dixit that an external fire provoked the thermal runaway reaction in the four battery cells, since like all the qualified fire investigators that actually investigated the scene of the fire, he concluded that the fire began in the office closet ignited by the cell winding ejected by one of the battery cells that was found in the debris in the closet.  (Karasinski Dec., ¶ 6).  Thus, HP brought in Dr. Myers, Dr. Horn's colleague from Exponent, who was tasked with inventing other possible ignition sources and origins of the pre-existing fire Dr. Horn needed to support his opinion that it was an external fire that caused the cells to go into thermal runaway.

Thus, Dr. Myers began with Dr. Horn's conclusion that the thermal runaway reaction that occurred in four of the six battery cells from the subject laptop was caused by an external fire attack, and relying on this premise, used his imagination to come up with anything he could to support Dr. Horn's ipse dixit opinion.  (Ex. K, 46:25-50:18; 65:19-66:22).  In the end, all Dr. Myers could come up with was that the ignition source of the fire was "undetermined", but the probable origin of the fire was the office closet.  (Ex. D, pp. 23, 26, 34, 44 ; Ex. K 171:9-14); 197:3-16; 198:4-12; 199:2-8; 201:1-203:2).

Dr. Myers first speculated that the living room couch could have been the origin of the fire. (Ex. D, p. 28). The ACFIT report indicated that the couch, which had an electrically powered recliner feature, wasn't plugged in when they arrived at the scene at approximately 5:00 am on the morning of the fire and that was verified by Plaintiff later. (Ex. A, p. HP00409). Ignoring evidence that didn't fit his predetermined conclusion, Dr. Myers testified he had no way to verify whether the couch was plugged in or not. (Ex. K, 79:1-15). He also testified that Mr. Gorbett's photographs, which were all he looked at to come to his opinion, did not provide any evidence that the fire originated in the couch. (*Id.*, 85:12-86:1). He claimed that the couch wasn't properly investigated, presumably by HP's expert Gorbett. (*Id.*) Dr. Myers also admitted that only the upper portion of the couch above the seat was burned while the electrical mechanism he speculated could have caused the fire was located in the lower part of the couch that did not show any fire damage. (*Id.,* 108:11-109:1). Myers also conceded that Gorbett took few photographs of the couch or the candle next to the couch, which showed no signs of fire damage either. (*Id.,* 116:20-24). He finally conceded that he could not say the fire started from either the candle or the couch. (*Id.,* 172:16-18; 204:13-213:25).

Not only was there no evidence that the couch was the origin of the fire, but as Plaintiffs' expert Jason Karasinski points out, if the fire started in the couch, Plaintiff would have to pass within a few feet of this flaming couch four times on her way to and from the office and back with the fire extinguisher and have failed to notice it. (Karasinski declaration, ¶ 13). (See Figure 3). Dr. Meyers admitted that if Plaintiff's statement to the ACFIT investigator on the day of the incident and her of what she did after being awakened by the smoke alarm is accepted, then the couch could not have been the source of the fire. (Ex. K ,157:19-162:9).

26



*Figure 3 - Diagram from Myers Report*

Dr. Myers next speculates that the furnace could have been the origin of the fire. (Ex. D, p. 31). The furnace was located in a separate utility closet off the hallway leading to the office. (See Figure C). The ACFIT investigators found no evidence of fire damage in that furnace compartment, but only smoke and heat damage. (Ex. A, p. HP00409). Dr. Myers again contended that the scene investigators, including HP's expert Mr. Gorbett, did not do enough to rule out the furnace, but could show nothing in the photographs taken by Mr. Gorbett[5] that supported the furnace causing the fire. (Ex. K, 98:18-107:12; 164:8-166:22). In fact, the photos show the fire could not have started in that room as there is not even significant smoke damage shown in Gorbett's photos. (See Figure 4, below).

---

[5] After the depositions of HP's experts were completed, HP finally produced 586 photos taken by Mr. Gorbett at the scene inspection on February 27, 2020, which Plaintiffs had requested three months earlier before those depositions occurred. Of the 586 photos produced, Mr. Gorbett took only two of the furnace room, signifying how important he deemed that room to determining the cause of the fire.



*Figure 4 - Gorbett photo showing little damage around furnace*

At his deposition, Dr. Myers finally conceded that the furnace couldn't have caused the fire because there was no char observed on the wooden louvered door inches from the vent on the furnace he had claimed was deformed in one of the photographs. (Ex. K 214:14-21:11) (See Figure 4 above).

Dr. Myers stated in his report that "[t]here is no evidence of battery debris in the closet" and "it is probable that the fire initiated in the closet. However, an ignition source was not identified." (Ex. D, pp. 41, 44, 45). Remarkably, Dr. Myers makes this statement, while including Mr. Gorbett's photograph of the copper internal battery windings found in the closet in his report as Figure 26, which he labeled "Photographs of debris from the office closet." (Ex. D, p. 28 compare to Ex. C) (See Figure 5 below). Dr. Myers had to ignore this obvious ignition source because otherwise he would be undermining Dr. Horn's *ipse dixit* opinion that the thermal runaway occurred as a result of a preexisting fire.

28



Figure 26.    Photograph of the debris from the office closet.[76]

*Figure 5 - Figure 26 from Dr. Myers' report*

Dr. Myers also restated Dr. Horn's interpretation of Plaintiff's testimony using this to support his opinion that a fire from some unknown ignition source caused the thermal runaway. (Ex, D pp. 35, 45). At his deposition, however, Dr. Myers claimed he was not offering this opinion but only adopting Dr. Horn's opinion. (Ex. K, 184:8-185:18). As discussed above, Dr. Horn's interpretation of Plaintiff's testimony to support his conclusion that the fire preexisted the thermal runaway was not factually based.

Dr. Myers also opined that the thermal damage to the laptop itself would look physically different if there was an internal cause of the thermal runaway reaction instead of an external fire source. (Ex. D, p. 32 and figure 30). When pressed on the methodology he employed to reach this conclusion, he was unable to do so and could only state his subjective opinion without any factual basis. (Ex. K, 225:15-240:5).

Dr. Myers' opinion that the cause of the fire is "undetermined" is inadmissible because it is unreliable, his methodology is inconsistent or nonexistent, he relied upon facts that are unsupported by the evidence and ignored relevant evidence that didn't fit his theory. His opinion that the thermal runaway in the battery cells was caused by an external fire attack is inadmissible because it relies entirely on Dr. Horn's similar opinion, which for the reasons set forth above, is also inadmissible.

HP sent a qualified fire investigator to the scene examination but chose not to have him submit a report, obviously because his opinion was that the HP laptop battery pack was the ignition source of the fire. HP then hired Dr. Myers to concoct another opinion that he crafted out of thin air with speculation based upon speculation. Dr. Meyer's unsupported and contradictory opinions should be excluded in their entirety. *See Amorgianos*, 303 F.3d 256, 266 (2d Cir. 2002) ("Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony.")

## CONCLUSION

For the reasons set for the herein, Plaintiffs' cross-motion to exclude the opinions of Myers and Horn and portions of the opinions of Galler should be granted and this Court should also grant such other and further relief as it deems just and proper.

DATED: June 9, 2025
          Rochester, New York

                    FARACI LANGE, LLP

                    /s/ Stephen G. Schwarz
                    Stephen G. Schwarz, Esq.
                    Joshua M. Mankoff, Esq.
                    1882 South Winton Road, Suite 1
                    Rochester, New York 14618
                    Telephone: (585) 325-5150
                    Facsimile: (585) 325-3285
                    Email: sschwarz@faraci.com
                    Email: jmankoff@faraci.com

                    *Attorneys for Plaintiffs*