# EXHIBIT K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------X
CAROL S. MARCELLIN, Individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, Deceased,

Plaintiffs,

-against-

HP, INC. and STAPLES, INC.,

Defendants.
-------------------------------------------X
Civ. No: 1:21-cv-00704-JLS
Job No: P1-7232374
-------------------------------------------X

Virtual Deposition
April 1, 2025
10:05 a.m.

DEPOSITION of TIMOTHY JAMES MYERS, Ph.D., CFEI, an Expert Witness, taken by the Plaintiff, pursuant to Notice, held at the above-mentioned time and place, before a Court Reporter and Notary Public of the State of New York and New Jersey.

A P P E A R A N C E S:

FARACI LANGE, LLP
Attorneys for Plaintiffs
1882 South Winton Road - Suite 1
Rochester, New York 14618
BY: STEPHEN G. SCHWARZ, ESQ.
MATTHEW F. BELANGER, ESQ.
JOSH MANKOFF, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET
Attorneys for Defendants
6245 Sheridan - Suite 218
Williamsville, New York 14221
BY: JACLYN WANEMAKER, ESQ.

ALSO PRESENT:
Marcelo Rivera - Videographer

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Timothy James Myers | Mr. Schwarz | 7 |

EXHIBITS

| PLAINTIFF'S EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Professional Profile of Timothy J. Myers (13 pages) | 7 |
| 2 | NFPA 921 Guide for Fire and Explosion Investigations - Guide 2024 (77 pages) | 7 |
| 3 | Evidence Collection Form (2 pages) | 7 |
| 4 | Expert Report of Timothy J. Myers (26 pages) | 7 |
| 5 | 6-CELL Battery Specification For MU06062 Revision 1.3 (12 pages) | 7 |
| 6 | Fire Department Reports (83 pages) | 7 |

I N D E X (CONTINUED)

EXHIBITS

PLAINTIFF'S

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| 7 | A Study of Thermal Runaway Mechanisms in Lithium-Ion Batteries and Predictive Numerical Modeling Techniques (16 pages) | 7 |
| 8 | Gas Explosions and Thermal Runaways During External Heating Abuse of Commercial Lithium-Ion Graphite-LiCoO2 Cells at Different Levels of Ageing (12 pages) | 7 |
| 9 | Rebuttal Statement Prepared by Jason Karasinski, IAAI-CFI, NAFI-CFEI (17 pages) | 7 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
| --- | --- |

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein:

THAT the sealing, filing and certification of the within deposition be waived;

THAT such deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the officer before whom said deposition is taken.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

VIDEOGRAPHER: Good morning.

We are going on the record at 10:05 a.m. on April 1st, 2025.

Please note that this deposition is being conducted virtually. The quality of recording depends on the quality of camera and internet connections of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Dr. Timothy Meyers in the matter of Marcellin versus HP, Inc. and Staples filed in the United States District Court for the District of New York.

This deposition is being conducted remotely using virtual technology. My name is Marcelo Rivera representing Veritext Legal Solutions, and I am the videographer. The court reporter is Eva Kaflinski in association with Veritext Legal Solutions.

I am not related to any party in this

action nor am I interested in the outcome.

All present counsel will be on the stenographic record.

Will the court reporter please swear in the witness.

-oOo-

TIMOTHY JAMES MYERS,

after having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

BY THE COURT REPORTER:

Q State your name for the record.

A Timothy James Myers.

Q State your address for the record.

A 175 Worcester Street, Natick, Massachusetts 01760.

(Documents and photographs were pre-marked as Plaintiff's Exhibit 1 through Plaintiff's Exhibit 9 for identification, as of this date)

EXAMINATION BY

MR. SCHWARZ:

Q Good morning, Dr. Meyers.

My name is Steve Schwarz. I am the attorney for the Plaintiffs in this case. I am going to be the one asking you questions today.

I know from the materials you presented and your list of testimony that you've testified -- I think 17 times in the last four years, according to that sheet -- so I am sure you are familiar with the process and I won't waste a lot of time with that.

How long have you been with Exponent?

A Twenty-six years.

Q And in that time period I assume that you've testified many more times than 17?

A That's correct.

Q Okay.

And prior to working at Exponent, what type of work did you do?

A Immediately prior to that I was a graduate student researcher at Lawrence Berkeley National Laboratory and the University of California Berkeley.

Q So, after graduation with your PhD, then you've been with Exponent ever since?

A That's correct.

Q Can you tell us what does Exponent do?

What is the nature of the business?
A Sure. It's an engineering and scientific consulting company with about a thousand people in roughly twenty offices in the US and some offices overseas that work in a number of different technical and scientific and engineering disciplines that perform consulting for a variety of different types of clients.
Q And is it true that most of your work is for industry?
A There is a variety of clients. A lot of my clients are industrial clients, yes.
Q Okay.
And your testimony that you've given in the last four years has been fairly consistently for different industrial concerns?
A I would have to go back and look at the list, but I wouldn't be surprised if most of the clients were industrial companies.
Q Okay.
Now, we've marked, if you turn to exhibit -- tab 16 in your notebook -- I marked as Meyers Exhibit 1. That's your CV or your resume.
On the first page, the second to last paragraph, it says:

"He --"

You.

"-- has investigated incidents involving self-heating or thermal runaway of chemicals and the unintentional reactions of incompatible chemicals."

Do you see where I am reading?

A I do.

Q Can you tell us have any of those investigations involved lithium-ion batteries?

A They have.

Q Okay.

Approximately how many times have you investigated thermal runaway reactions in lithium-ion batteries?

A So, the cases where there has been allegations of that occurring, I would estimate maybe five to ten times.

Q When you investigated the potential for lithium-ion battery runaway causing fires, did you do any empirical research with regard to lithium-ion batteries?

Did you do any lab studies of temperatures necessary to create thermal runaway or any of that sort of evaluation?

A In some cases, yeah, I've reviewed testing that either Exponent or others have done on that. Oftentimes when I am working on a case like that, there is also an additional person that has better expertise that looks at that in more detail.

Q Tell me about the Exponent information that you've reviewed with regard to testing of lithium-ion battery thermal runaway.

What type of testing was it?

A Sure. So, we've historically done studies where cells were, you know, cycled or operated at different times and they were tested in different types of equipment whether it was an accelerating rate calorimeter or what we call a 60-liter chamber to collect bank gases. And the batteries were CT scanned before and after testing. Tested at various rates of state of charge. So, those are some of the studies that I am talking about.

Q In those studies that you are talking about or any of the studies, did you actually try to provoke thermal runaway using external heat sources?

A Yes.

Q And do you have the data on that?

Have you reviewed that for the purposes

of this case?
A I have not, no.
Q Are you familiar with the temperatures and resident times that are necessary to put thermal --
Let me withdraw that question.
Are you familiar with --
I know you are, but I will just ask you this.
Are you familiar with 18650 type lithium-ion batteries?
A I am.
Q And were the studies that you are referring to where thermal runaway reactions were provoked by external heat sources, were they involving 18650 cells?
A Some of them have been.
Q Okay.
And with regard to those, then, are you familiar with the temperatures and the resident times that are required for external heat to cause thermal runaway in one of those cells?
A That's not something I reviewed specifically for this case. I don't have those numbers at the top of my head. I know that's

something that Dr. Horn has looked at in more detail for this case.

Q Okay.

So, you are relying on Dr. Horn's knowledge of the temperatures necessary for and resident times for 18650 cells to go into thermal runaway from fire --

A That's correct.

Q And you assume that he had done some sort of research or based upon the facts of this case came to the conclusion of what that heat source would be required to do to put them into thermal runaway?

A Correct.

I've reviewed his report where he's had discussion about --

He had discussions about that.

Q Okay.

And is it true, then, that you really don't have any knowledge of the temperatures or resident times necessary to put these types of battery cells into thermal runaway from an external heat source?

A I mean, I have knowledge of some of those temperatures. It's not something that I've looked at in detail for this case. You know, roughly

batteries or lithium-ion cells may start going into runaway at temperatures ranging from 90 degrees Celsius to 200 degrees Celsius or more. But it's dependent on the -- of conditions. That's something that Dr. Horn has looked at in more detail for this case. I don't have those numbers and the details of those at my fingertips.

Q So, the numbers that you just recited to me though, those are the internal battery temperatures, is that correct, that you are talking about?

A In some cases, yes.

Q Well, under what circumstances would a 18650 cell that is exposed to external heat of 70 degrees or 90 degrees go into thermal runaway?

Do you have any idea about that?

A I don't have those specific details with me or, you know, I haven't reviewed that recently.

Q Isn't it true that the numbers that you provided are, whether in the literature, with regard to the internal temperatures that the battery components have to reach before thermal runaway reactions would begin?

A Again, this is an area that I haven't

looked at in detail for this case. And Dr. Horn will be addressing.

Q But you did come to the opinion though that an external heat source was what caused these battery cells to go into thermal runaway?

Do you recall that?

A Yes.

Q But you are not aware of what temperature would be required of that external heat source or the duration of time it would have to be applied before that can occur?

A Again, I am relying on Dr. Horn for those opinions. As I said, I have general knowledge that, you know, the temperature required to do some of the thermal damage to the laptop that was observed are above the temperatures required to cause a battery to go into thermal runaway. But Dr. Horn has looked at that in more detail for this case.

Q What is the basis of your knowledge of what you just told me though?

That the temperature necessary to melt plastic is sufficient to put a battery cell that's covered in a battery casing and covered with plastic coating is sufficient to cause thermal runaway in those cells?

MS. WANEMAKER: Objection to the form.
You can answer.
A So, again, the temperatures required to melt some of the plastic that was involved in the computer or part of the computer to soften it, to cause it to deform, are well above the temperatures that lithium-ion batteries are tested for their stability and where they will go into thermal runaway. But again, you know, some of that depends on the various properties of the cell and that's something that Dr. Horn is covering in this case.
Q Now, if you can turn to the next page, or the next two pages of your CV, which I've marked as Exhibit 1, you have a heading on the third page, I think, that says, "National Fire Protection Association," correct?
A Correct.
Q And you are a member of that, right?
A I am.
Q And you've served as a principal member on a few different committees. One on foam, one on liquified petroleum gases, as the first two. And there may have been others. Actually, another on combustible metals and metal dusts responsible.
Right?

A That's correct. I am involved in a number of technical committees.

Q And what is a principal member of a technical committee?

What does that mean?

A So, an NFPA technical committee, there is both -- typically there is both principal members and then alternate members. The principal members is the primary member for an organization and has the right to vote and do other things related to, you know, deciding whether edits should be made to a standard or if there is requests for a technical interpretation or a variety of other things where members vote on various actions for the committee.

Q Okay.

Could you turn to tab 2, then, which I've marked as Exhibit 2 in your binder?

I will represent that this is only a portion of NFPA 921.

Are you familiar with this document though?

A I am.

Q And you actually cited some sections of this document in your report, correct?

A That's correct.

Q And if you could turn to the page after the cover page. As I said, this is something on the order of five hundred pages so I didn't duplicate all the pages.

But on the first page that I've got after the cover page is what is called a "Technical Committee on Fire Investigations," right?

A That's correct.

Q And what is the role of the Technical Committee on Fire Investigations in developing 921?

A So, with 921 or other NFPA documents, people can propose edits to the standards, or in this case, a guideline. And the technical committee holds meetings and votes on whether they approve or do not approve of those changes to the standard.

Q How does one get appointed as a principal member of the technical committee?

A You apply to the committee. Then the staff weighs on. And the chair of the committee makes a recommendation to the standards council as to whether that person should be added to the committee or not. There are other requirements. They have to maintain a balance on the committee. So, there is limits to what percentage of the committee can be made up of different types of groups. You know, the

chair and others would also review an application that might include the person's resume or other information.

Q Now, 921 is entitled a "Guide for Fire and Explosion Investigations," correct?

A That's correct.

Q And what is the purpose of 921?

A To --

I think it's really two-fold. To provide information --

I am sure in pages that aren't in here there is actually a list of what the scope or purpose of the standard is. But generally, I would say it's two-fold. It provides information to investigators about some of the phenomena of fires and explosions, but it also provides a guide that can be used and relied upon as a methodology to be followed in fire and explosion investigation.

Q So, is it generally recognized as the leading guideline or methodology for doing fire investigations then in the field?

A Yeah. In the United States, yes, I would say that's the case.

Q And have you ever served on the technical committee for fire investigations that put

together 921?

A I have not, no.

Q And if you notice on the first page there is a listing of who are the principal investigators and one of them is Mr. Karasinski who has presented a report in this case, correct?

A That's correct.

Q And Mr. Karasinski's report you read, correct?

A I did.

Q And would it be true, then, to be on the technical committee would require someone to have expertise in fire investigation?

MS. WANEMAKER: Objection to the form.

Q Or you can put anybody on?

A It's a good question. Yeah, there is really a mixture of members on the committee. There is attorneys. There is representatives from an insurance company. So, there is really a diversity of members on the committee. You know, I think most people on the committee have some knowledge of fire investigation or portions of issues involved in fire investigation.

Q Do you think there is some people that really just got on because their attorneys are

insurance company people; they don't have any expertise to be on the committee?

A I didn't say that, no.

Q Okay.

So, you would agree that people --

It requires expertise to be on the technical committee, right?

A It would typically require some knowledge of issues related to fire investigation.

Q So, on the technical committees you have been appointed to, were you appointed because you had technical knowledge in the fields that those committees addressed?

A Typically, yes.

Q Typically or are there some committees you applied to that you have no knowledge about what the topic was?

A So, I believe on all of the committees, I serve as a special expert. That means that I have specialized knowledge in that area.

Q And Mr. Karasinski has special expertise in fire investigation, correct?

A He is listed as a special expert, yes, on the committee.

Q Okay.

And that special expert is in fire investigation?
A I believe so.
Q Now, are you a special expert in fire investigation?
A I do have expertise in fire investigation. Courts have, you know, ruled that I was an expert in fire investigation. So, I would consider so.
Q Okay.
And in doing in your fire investigations, you apply the methodology that is set forth in 921, correct?
A That's correct.
Q Dr. Myers, when did you first have any involvement at all in evaluating the fire in this case?
A Since February 2020.
Q In February of 2020, you were retained?
A I was contacted about being retained on a case, yes.
Q And when did you actually start doing any work on the case?
A In 2023.
Q What did you do between 2020 and 2023?

A I was contacted in 2020 and was originally scheduled to attend an inspection in early February. But then the inspection got postponed to a later date when I wasn't available. And so, at that point, another investigator attended the inspection. And I didn't really do anything specific to the case after that.

Q So, the other investigator was another investigator that was retained by HP, correct?

A That's correct.

Q And his name is Greg Gorbett, right?

A That's correct.

Q Are you familiar with Mr. Gorbett's expertise?

A I have some familiarity with him.

Q Well, he is a professional fire investigator, correct?

A I believe he is a professor at the university and then also does fire investigation, yeah.

Q And he is recognized as someone who has expertise in determining both the cause of fires and also the origin of fires, correct?

A I believe that's correct.

Q And is it your understanding that

Mr. Gorbett also follows the NFPA 921 methodology in doing his fire investigations?

A I don't know that I reviewed his fire investigations to make that determination one way or the other.

Q So, it was Mr. Gorbett -- and not you -- that went to the scene of this fire and conducted the investigation for HP, correct?

A That conducted the scene inspection, that's correct.

Q All right.

Well, the scene inspection is an important part of fire investigation, correct?

A That's correct.

Q And then, in October of 2020, the items that were removed from the site for laboratory inspection were inspected at FRT in Ceres, New York.

Are you familiar with that scenario?

A I am, yes.

Q And you didn't attend that one either?

A I did not.

Q And the materials that were retained from the fire for laboratory inspection, those materials have been in existence and available since 2020.

Have you reviewed any of that physical material?

A I reviewed, you know, documentation from the inspection, photographs, x-rays; things like that.

Q Have you reviewed the actual physical materials that were removed from the fire scene that were examined in the laboratory?

A Not in person, no.

Q Well, have you asked to review them in person so that you could look at them instead of just looking at photographs?

A I have not.

Q Now, if you would --

I am sorry.

Look at tab --

Oh, I'm sorry.

In your report, which I don't think I've marked yet --

Oh, I'm sorry.

Let me go to a different exhibit. There is an exhibit that I have that I want to show you, I am going to put it on share screen, that I don't have in your notebook and I apologize, but that I am going to do that now.

Can you see that document?
A I can.
Q I've marked this as Exhibit 3 for your deposition.
This is the evidence collection form. It is actually two pages. I will scroll down.
There are 15 physical items that were removed from the home for laboratory inspection.
Is that your understanding?
A Yes.
Q And as a fire investigator, would you agree that Mr. Gorbett was involved in the decision making as to which items to remove for laboratory investigation?
A I don't know whether he was or not.
Q So, you are not aware of how Mr. Gorbett did his examination of the fire scene for HP?
MS. WANEMAKER: Object to the form.
You can answer.
A I reviewed his photographs. I reviewed his 3D scan of the facility. But I don't know what conversations he had with people on the scene.
Q Well, have you done inspections of scenes?
A I have.

Q When you do an inspection with scenes, is it common that there are other fire investigation inspectors that are there from various entities like insurance companies?

A Yes.

Q And when you do those inspections, do those investigators typically collaborate to decide which items need to be removed from the scene to be studied under laboratory equipment?

A It really depends on the inspection.

Q So, you are saying sometimes those decisions are made unilaterally and some of the fire investigators don't get a role in picking what items get removed for laboratory inspection?

A That's correct.

Q And is that something that you would do as a fire investigator, is not have some role in choosing what items be examined for laboratory inspection?

A I don't understand your question.

Q In other words, when you do fire inspections, do you defer and just say "I am not going to play any role in what gets looked at here. I don't have any interest in what you take out to look at under laboratory equipment"?

A It really depends on the situation.

Q Okay.

So, there is some times that you just -- you don't look at any of the materials that are removed from the fire scene and you don't play any role in that?

A That's not what I said.

Q Okay.

Well, I don't understand your answer then.

Isn't it standard procedure for a fire investigator to decide what information or what materials need to be looked at in laboratories and removed from the fire scene?

Isn't that part of 921?

A I am not sure I understand your question.

Q Okay.

Under 921 there is a fire investigator under the methodology.

Isn't a fire investigator supposed to identify what items need to be examined under laboratory equipment to make further determinations on origin and cause?

A It really depends on the situation and

who the -- who the investigator is working for. You know, it's not a general answer.

Q So, 921 does not deal with taking materials away from a fire scene for laboratory investigation?

There is nothing in 921 about that?

A Is that a question?

Q Yeah.

Is that what your testimony is?

A No.

Q Does 921 say that the investigator is -- should identify items from the fire scene to do further investigation in a laboratory?

A If necessary, yes.

Q Okay.

I've marked as Exhibit 4, your report, and that's under tab 17, the report in this case?

A Yes.

Q And if you turn to Appendix C?

Appendix C is what's entitled, "Materials Reviewed."

You with me?

A I am trying to get there.

Okay. I am there.

Q Now, item 7 of the materials that you

reviewed were:

"Scene inspection notes and photographs of Greg Gorbett."

Did I read that correctly?

A That's what it says there, yes.

Q So, tell me about, first of all, how many photographs did Mr. Gorbett provide to you of his fire investigation for HP at the scene of the fire in February of 2020?

A I don't know the exact number off the top of my head. I would estimate it was, you know, in the hundreds.

Q Okay.

A Then it was both individual photos as well as images taken around the building with a Matterport System that takes a lot of photos.

Q So, the Matterport was a separate item that basically is a 3D photograph that you can actually walk through the home and review, correct?

A That's correct.

Q And you reviewed the Matterport, correct?

A I did.

Q It also says that you reviewed scene inspection notes from Mr. Gorbett.

Do you see that?
A I do see that.
Q Tell me about those.
How many pages of notes did Mr. Gorbett provide to you for his fire inspection of the home that he undertook for HP in February of 2020?
A I think that's actually a typo. I don't recall reviewing notes of his.
Q Wait.
You are saying that scene inspection notes is a typo?
Like, somebody hit the wrong key?
A I don't believe I reviewed his notes.
Q Well, it's common for fire investigators to take notes, correct?
A Typically, yes.
Q If you do a fire investigation, you don't rely on your memory. You would take notes for what you are looking at and what you are finding.
Correct?
A It's usually a combination of taking notes and taking photographs to document my observations.
Q Right.
A combination of taking notes and

taking photographs, correct?
A Correct.
Q In fact, the notes typically reflect what the photographs are so that you can have a precise description of what you are trying to take a photograph of, right?
A Not usually, no.
Q And you are saying that even though you wrote in the report that your reviewed Mr. Gorbett's notes, you are now saying under oath that you've never reviewed any notes from Mr. Gorbett?
A I don't believe I did. My recollection could be wrong, but I don't believe I did.
Q Well, were you provided with notes by Mr. Gorbett that you think you just didn't look at?
A I don't believe I was provided his notes, no.
Q So, Mr. Gorbett was hired by HP. He is a professional fire investigator. He went to the scene and did the investigation that you intended to do but for your schedule.
And you are saying the only thing that you looked at were his photographs?
MS. WANEMAKER: Objection to form.
A I looked at his photographs and the

Matterport that he recorded.

Q And the Matterport. Okay.

Did you talk to Mr. Gorbett and obtain what his insights were from actually visiting the fire scene?

A I did not, no.

Q Any reason why you didn't do that?

A No.

Q You didn't want to know what his conclusions were based upon his observations?

A I didn't. I wouldn't want an expectation by a --

I was doing my own independent analysis based on the information that was available.

Q And the only information you looked at were photographs and the Matterport?

A No.

I looked at a number of different things. Witness statements. Deposition testimony. Reports from other investigators. Reports from the Allegany Fire Investigation Department. So, I looked at a number of different things.

Q Now, the next item on your list is the:

"Lab inspection notes and photographs of Don Galler."

One of the other experts for HP in this case, correct?

A That's correct.

Q So, he attended the laboratory examination of the materials that were taken from the residents where the fire occurred that were examined in October of 2020?

A That's correct.

Q Is that another typo there that you looked at his notes or do you remember looking at his notes?

A No. I have looked at his notes.

Q What did you glean from his notes that you used for your analysis in this case?

A The primary thing that I recall is some documentation he had comparing components of the battery to an HP battery. That's the primary thing I recall from his notes. Primarily, I was looking at his photographs of the different items.

Q And just so I am clear, are you stating under oath definitively that you've never received Greg Gorbett's notes; just so that we have that on the record?

A I don't believe I did. I can double check that on a break, but I don't believe I did.

Q Okay.

I would appreciate if you would double check it on a break so you can tell us definitely that you never received Greg Gorbett's notes.

Okay?

A (No verbal response)

Q Now, at the inspection on February 27, 2020, in addition to Mr. Gorbett, do you know who else was on the premises investigating?

A I'm sorry.

Can you repeat that?

Q Yeah.

On February 27, 2020 when you were supposed to go but didn't go and Mr. Gorbett went in your place to do the investigation for HP, do you know who else was present during that investigation?

MS. WANEMAKER: Objection to form.

You can answer.

A Just to be clear, I was never scheduled to go there on the 27th. I was not available those dates. I was scheduled to go on an earlier date.

I have -- I have seen a sign-in sheet, and there were a number of parties. There were investigators, I think, for the insurance company. There were investigators for the Hollowell family. I

don't know if there were separate investigators for the Marcellin family. I think there was someone from Staples there. So, there were a number of different investigators for a number of different parties. I think also from the Allegany Fire Investigation.

Q And that would be Mr. Luckey, correct?

A Correct.

Q So, all --

So, there was Mr. Luckey. There was Mr. Karasinski and Mr. Litzinger from FRT.

Correct?

A I believe that's correct.

Q You've read their reports and they said they were there, correct?

A Correct.

Q And then, there was Mr. Gorbett for HP?

A Correct.

Q And then, there was someone from a company called NEFCO Fire Investigations that was there from the insurance company?

A I don't recall it specifically. I think there was someone from an insurance company there. I don't remember what company they were with.

Q Do you remember that the -- some of the pictures you looked at from Mr. Gorbett had signs on

them that referenced NEFCO Fire Investigations having investigated the scene?

A I remember seeing some signs saying not to move things and things like that. I just don't remember what company name was on those.

Q Okay.

So, all of those people were on the scene to investigate the fire, including Mr. Gorbett, but you were not there?

A That's correct.

Q And you are saying that you have no idea what went on at that investigation other than by looking at the pictures?

MS. WANEMAKER: Form.

You can answer.

A I reviewed pictures taken by Mr. Gorbett. The Matterport. I reviewed the reports of other experts, Mr. Karasinski and Mr. Litzinger, that were there. I've seen their photos and seen their discussion of the inspection, but I wasn't there personally, no.

Q Okay.

Now, with regard to this exhibit that I got up --

And you said you had seen this before,

correct?

A Correct.

Q And on this list, is it true, that everything on this list, all 15 items, were removed from either the office area of the home or the hallway where materials from the office were placed by the firefighters except for the circuit breaker?

MS. WANEMAKER: Steve, are you able to make that any larger?

MR. SCHWARZ: Sure.

MS. WANEMAKER: I am having --

Thank you. That's better.

Q And take a moment to review it.

Tell me when you want to go to the next page.

A You can go to the next page.

That's correct.

Q Do you have any knowledge of any other items that were removed from the home for laboratory inspection other than these 15?

A I am not aware of other items, no.

Q Do you believe that Mr. Gorbett was somehow restricted in anything that he could wish to look at for laboratory inspection?

A I don't know one way or --

MS. WANEMAKER: Form.

You can answer.

A I don't know one way or the other.

Obviously, he would have different interests than, say, your experts as well, so.

Q Well, do you understand that it was decided by the group, including Mr. Luckey, and including the NEFCO Fire investigator, Mr. Gorbett, that certain items would be taken out of the home and inspected at the FRT Laboratory in Ceres at a later date?

A The only representation I've seen from that is from reports by your experts.

Q Do you have any --

A I mean, I don't know whether Mr. Luckey was involved. I couldn't tell you.

Q Well, you weren't there so you don't know, right?

A That's correct.

Q And they were there and they had the discussions with the other experts?

A I don't know.

MS. WANEMAKER: Form.

Q Well, that's what they swore under oath that they did, correct?

A I haven't seen Mr. Karasinski's deposition so I don't know what he said or didn't say under oath.
Q Is Mr. Gorbett still alive?
A As far as I know he is.
Q So, you could actually call him and find out exactly what happened at that inspection if you chose to, correct?
A I don't know.
Q You don't know if you can call him?
A I don't know whether he would talk to me about that or not. I don't know.
Q Well, you were both hired by the same client, right, HP?
A That's my understanding.
Q But you think that if you asked HP for permission to call him, it would be denied for some reason?
A I have no idea. I haven't asked him.
Q Why do you think HP wouldn't want you to talk to Mr. Gorbett?
A I don't know whether they would or whether they wouldn't.
Q So, you weren't interested in Mr. Gorbett's observations at the scene or whether he

played a role in choosing these physical evidence items?

That wasn't anything that interested you?

A No.

MS. WANEMAKER: Asked and answered.

Q The answer was "no," right?

A Correct.

Q Now, in addition to the items that are listed --

First of all, in Exhibit 4, Appendix C, your list of items, are there other typos where you said you reviewed something where you didn't really review it?

A I am not aware of any. I wasn't aware of that until we just looked at that.

Q Now, in addition to the 15 items minus Mr. Gorbett's notes that you now say is a typo, have you reviewed anything since you wrote this report about this case?

A I have.

Q What else did you review?

A I reviewed a declaration from Ms. Marcellin. I reviewed deposition testimony from Mr. Martin and Mr. Litzinger. I reviewed a

rebuttable report by Mr. Karasinski and Mr. Martin. I think I reviewed some materials that were referenced by Mr. Martin.

Q Did those include literature articles?

A Yes.

Q Okay.

Let's turn to tab 7, which I have marked as Exhibit 5. Myers Exhibit 5.

I will represent for the record that this is the HP 6-cell battery specification that was produced in discovery in this case for the Pavilion Series Laptop Computers.

Is that your understanding?

A Yes.

Q In your list of materials, you just generally listed HP production documents.

And I assume that means all of the documents that HP produced to the Plaintiffs in this case?

A I don't know if that's the case or not. We had a group of documents that were called HP production documents. I don't know if that was everything that was produced to the Plaintiffs or a subset of that. I don't know.

Q Well, how many pages of that

production, whatever was in the file that you are saying, was called HP production documents?

Approximately how many pages was it?

A I don't know. I would have to look on a break.

Q That's another thing you can look at on a break.

Would you agree that this particular document, which is -- we've marked as Exhibit 5 and begins with the Bates numbers HP 01378 and continues through HP 01389, would be one of the documents that were in that HP production documents file?

A I don't recall whether it was or not.

Q Well, have you looked at this battery specification that was the specification for the subject laptop battery from HP?

A I don't believe I have, no.

Q Are you familiar with what a battery specification is?

A I do have some familiarity with that, yes.

Q So, would it be an accurate statement to say that this is a document that HP produced to provide to battery manufacturers for the specifications they wanted the battery pack and

battery management system to meet in order to be authorized to be used by the HP Pavilion?

MS. WANEMAKER: Objection to form.

You can answer.

I'm sorry to interrupt you.

A I don't know specifically. That would be a better question for Dr. Horn.

(Whereupon, a discussion was held off the record)

Q So, based upon your level of expertise, then, you are not familiar with what a battery specification for a laptop computer is generically?

A I am generically, but I am not --

I haven't looked at this document before. Dr. Horn was looking into more details of the battery. So, this would be a better question for him.

Q Okay.

Well, I am going to ask you some questions about it anyway and then you can tell me that either you are familiar with it or not.

You said that you've done investigations of lithium-ion battery thermal runaway, correct?

A That's correct.

Q So, you, then, are familiar that there are certain safety devices that are intended to prevent or at least limit the potential for thermal runaway in lithium-ion batteries?

A That's correct.

Q And, in fact, we are going to get to it, but in NFPA 921, there is a whole section that talks about lithium-ion batteries, correct?

A That's correct.

Q And you cited to that section?

A That's correct.

Q And in that section it talks about lithium-ion battery thermal runaway, but there are certain safety devices that are standard in battery management systems to try to prevent thermal runaway, correct?

A That's correct.

Q So, you are familiar, then, that there are industry standards for safety devices to try to limit the potential for thermal runaway in lithium-ion batteries in battery packs for peripherals like laptops?

A Correct.

Q So, if we look at this document that we've marked as Exhibit 5, you will see that there is

a section for approved fuel gauges, right?
A That's correct.
Q And there is a whole series of fuel gauges that are listed that are the --
There are microprocessors on the battery management system, correct?
A Correct.
Q And there is also a requirement here in this specification that there is a temperature sense capability. That's 2.5.
A That's correct.
Q And you are familiar with what that means, correct?
A Yes.
Q It means that there is a requirement that when the battery cell gets to a certain temperature that the battery management system has a way of turning off any additional charge to prevent overheating of the battery?
MS. WANEMAKER: Is that the question?
Q You are familiar with that, correct?
A Well, I think Section 2.5 just says here that it has a temperature sensing capability. It doesn't say what it does with that.
Q Well, are you familiar with what a

battery management system temperature sense capability would be used for?

A Yes.

Q And what is that used for?

A It was used to monitor the temperature of the battery and so then it takes certain actions. Like, whether or not to allow charge or discharge of the cells. But again, this is an area that I think Mr. Galler and Mr. Horn are covering in this case.

Q Well, thermal runaway occurs when temperature of the battery cell exceeds a certain temperature, correct?

A Correct.

Q And once thermal runaway begins, it becomes an irreversible reaction and heat producing system that eventually results in the thermal runaway reaction, correct?

A Yeah.

Once you reach a certain point in thermal runaway, unless you can drastically change something, like, provide a lot of cooling, it's just going to continue.

Q So, the temperature sense capability that was required by HP for this battery management system was intended to prevent the laptop battery

cells from exceeding those temperatures that would start that reaction, right?

MS. WANEMAKER: Objection to form.

You can answer.

A So, again, this is an area that Dr. Horn is covering. But more generally, it's to keep the battery operating within a certain range of temperatures that are typically much lower than the temperature in which you will have thermal runaway.

Q Right.

When there is an --

Actually, we can look if you want just to help you. Take a look in this exhibit, page HP 01383, there is a chart that starts on the page before but what I want to ask you about is number 9 on that chart on that page where it says, "Over-Temp Protection for Charge."

A Uh-huh.

Q And in that section, the specification says if the temperature exceeds 46 degrees Celsius for greater than two seconds, that there is an action that is taken to turn off what is called a C-FET.

Do you know what a C-FET is?

A I couldn't tell you what the acronym is, but it is a switch that would allow or not allow

electricity to flow.

Q So, the way this specification reads is that a vendor that's making battery packs for this Pavilion laptop has to have a safety feature that once the temperature exceeds 46 degrees for two seconds then the charge is turned off, correct?

A That's not what it says, no.

Q Explain to me then what that says.

A It says if the temperature is greater than or equal to 46 degrees Celsius for greater than two seconds, then turn off the C-FET, and it must trip within less than five seconds.

Q So, by turning off the C-FET, you stop the charge to the battery?

A That's correct.

Q Okay.

So, was it the "equal to" that you were quibbling about my statement?

A That was one point.

I think there was something you read that was incorrect.

Q Okay.

But the way you read it is the way HP wanted the system to function?

A Again, I haven't looked at this

document before. I am just reading what the document says. I think if you want details about this, it would be more appropriate to be asking Mr. Galler or Dr. Horn.

Q Well, I think you gave an opinion that the thermal runaway in this case did not occur because of something that happened inside the cell. It occurred because of heat that was applied outside the cell.

Correct?

A That's correct.

Q So, is it your testimony, then, that the safety devices that are intended to prevent thermal runaway were not relevant to your opinion?

A I didn't say that. As I've said a number of times, Dr. Horn is covering the more specific battery issues. I related this and I am relying on his work as well.

Q So, your opinion as to the cause of thermal runaway in this battery pack is entirely reliant on Dr. Horn's opinions?

A You make a lot of statements.

Is that a question or just a statement?

Q That's a question. Put a question mark after my statement and you can answer it or you can

say that you can't answer it.

A No, what you said is not correct.

Q So, what is your state of knowledge, then, of the importance of safety devices in preventing thermal runaway in a battery cell that is being charged?

A So, the controls are designed to keep the batteries operating in a safe state, in a safe range of perimeter space whether it is temperature, voltage, a variety of conditions. So, those help maintain the quality of the battery. It helps prevent deterioration of the battery. Factors that can, you know, eventually contribute to thermal runaway. But the temperatures we are talking about here, 45 degrees Celsius are well below the temperatures where thermal runaway would occur.

If you look back at the earlier table in here, it talks about the temperatures the batteries can be stored. They can be stored up to 60 degrees Celsius for one month. But they only want to be charged if they are less than 45 degrees Celsius. So, there is a range of different perimeter space that the systems work to keep the battery within to prevent degradation and for a number of properties.

Q Well, is thermal runaway equally likely when a cell is being charged versus when a cell is being stored?

A One of the factors -- and this is described in the 921 as well -- is it's the state of charge of the cell. The higher state of charge, the more likely it's to go into thermal runaway. The more severe thermal runaway would be. So, there is a variety of factors that are important in determining whether a cell goes into thermal runaway.

Q So, is it your opinion, then, that two battery cells, ones that have the same state of charge, one is under charge and one is just being stored, they would have equal potential for thermal runaway?

A No.

Q So, the one under charge is more likely to go into thermal runaway, correct?

A Typically, or equal.

Q And what is --

What other circumstances that you can envision where that would not be true?

A It depends on environmental factors. What the ambient temperature is. What conditions it is being exposed to. Whether it's been damaged in

some other means prior to that.

Q So, assume that they are identical cells and they are not damaged.

Under what circumstances is it more likely that a cell being stored would go into thermal runaway than one that was under charge, same state of charge?

A I mean, all else being equal, I am not aware of a specific issue; but, again this would be a better question for Dr. Horn.

Q Now, you said that you reviewed the notes of Mr. Galler who physically examined and was there at the laboratory examination of the materials that were removed from the fire scene including the battery management system and the battery board, correct?

A Correct.

Q Do you recall that anything about whether the safety devices that were designed to prevent thermal runaway in this specification from HP were actually present and enabled on the battery pack that was in the computer at the time of the fire?

A So, you are characterizing it as specific safety systems that are designed to prevent thermal runaway. I don't know that I agree with that

characterization. Generally, there were safety systems that were in the HP battery that weren't in the incident battery. It was Mr. Galler's observation.

Q So, for instance, over temperature protection was not enabled in the battery that was in the laptop at the time of the fire, correct?

A I think more specifically there weren't temperature sensors in the battery.

Q And as a result, then, the over temperature safety device was not enabled?

A Correct.

Q So, when the battery cells got to greater than 46 degrees Celsius, there was nothing in the battery management system that would turn off the charge under those circumstances?

A That's my understanding. But again, this is something that Mr. Galler and Mr. -- or Dr. Horn looked at in more detail than I.

Q Well, you came to an opinion as to the most likely cause of the thermal runaway in this battery pack, correct?

A Correct.

Q And in order to weigh the options there is only two options, right, either external fire or

it was an internal event within the battery cells, right?

Those are the two options?

A I mean, by internal, you also mean that the damage could have been battery -- the battery could have been damaged or impacted, yes.

Q So, you are saying that you don't have any direct knowledge of the safety systems intended to prevent the internal components from going into thermal runaway under charge, right?

That's Dr. Horn?

A No. What I said is Dr. Horn has looked into more of the details of the specifics of the systems for these batteries than I have.

Q Well, he might have, but you came to an opinion what was more likely the cause of the thermal runaway, correct?

A That's correct.

Q So, tell me how you evaluated the lack of safety systems to prevent thermal runaway in these cells when you made your judgment as to what was more likely?

A So, again, you keep on characterizing these safety systems as systems that would prevent the thermal runaway of cells. I mean, they don't --

You know, batteries externally heated, these safety systems don't prevent a thermal runaway of a cell. So, I don't agree with the characterization you keep on using.

Q Well, in other words, you have come to the conclusion without any consideration of safety systems that it could only have been external heat that caused these cells to go into thermal runaway?

A I don't agree with that either.

Q Okay.

So, tell me what evaluation you did of the other alternative that it was not external heat but it was an internal event within one of the battery cells that started the thermal runaway reaction?

A So, you know, I described this in more detail in my report, but I reviewed a variety of different factors. Fire damage. Thermal damage to the computer. To the room. Descriptions of observations by Ms. Marcellin. The report of Dr. Horn. A variety of factors to look at this. And, you know, I think the difference between the expert opinions is whether, you know, the cells went into thermal runaway that started the fire or whether the cells went into thermal runaway as a result of a

pre-existing fire. And in reviewing all of that information, my opinion is that the cells went into thermal runaway due to an existing fire.

Q Okay.

A And heat exposure from an existing fire.

Q So, you made the determination that it was more likely an existing fire than something that happened internally in the battery cells?

A Correct.

Q And in order to fairly make that judgment, you would have to consider all of the evidence that related to whether it could have been an internal failure of the battery cells versus all the evidence that would support your theory that it was an external fire source?

A Could you repeat that?

Q Yes.

In order to --

You've determined it is more likely than not that your theory is correct that it was an external fire, you would have to weigh all of the evidence supporting that versus all of the evidence supporting that it was an internal event that caused the thermal runaway, correct?

A Correct.

Q And some of the evidence supporting the internal runaway theory would be the lack of safety systems that would prevent the internal components of the cells from going into thermal runaway?

That would have to be considered, right?

MS. WANEMAKER: Objection to form.

You can answer, if you can.

A Correct. So, I am referring more generally to safety systems that are in the batteries that are made to keep them in a safe operating range where they won't damage the cells. The cells won't deteriorate as much as if they were operating in other extremes. So, those aren't necessarily systems that are specifically put in place to prevent thermal runaway. But yes, you do need to evaluate those factors as well.

Q So, it's your testimony, then, that the safety systems preventing overcharge, overvoltage over temperature and cell imbalance are intended by HP not to prevent thermal runaway explosions but are only intended to maintain the quality of the battery cells?

Is that your testimony?

A No.

Q So, the safety systems may have multiple functions but one of those functions is to turn off the charge when the temperature or the voltage or the charge becomes at a level that could cause thermal runaway, correct?

A No. It's to turn off at temperatures well below the temperatures you would get thermal runaway.

Q Right.

But that's my point.

In other words, you agree that that function of preventing the cells from getting to levels of charge or temperature or voltage that could result in thermal runaway, the purpose of these safety devices is to shut down the power before that happens?

A Correct.

Q And the lack of these safety devices to shut down the power before that happens would have to be a factor that you considered in making your judgment as to what caused thermal runaway, correct?

A Yeah, that's one factor.

Q Just one factor.

Okay.

And are you saying that you relied entirely on Mr. Galler and Dr. Horn in ruling out the potential that these battery cells went into thermal runaway without an external source but because of overcharge, over temperature, overvoltage?

A No.

Q So, tell me, then, what was the basis of your determination that these cells did not go into thermal runaway because of over temperature, overcharge, overvoltage or cell imbalance?

A Right. So, it's a number of factors. One is the witness observations of Ms. Marcellin about the size of the fire, the amount of smoke, the growth of the fire and when -- at what time she actually observed various factors of the fire.

Q So, that's one factor.

You are saying that -- you are saying Ms. Marcellin's description of the events and the timing of when those events occurred led you to be able to rule out that the cells went into thermal runaway on their own based upon overcharge overvoltage, over temperature, cell imbalance?

A That's one factor.

The fire patterns in the room are another factor. A lot of the damage to the laptop

and other objects in the room was clearly caused by radiant heating; whereas if the cells had just initiated in the thermal runaway, I would expect much more severe damage adjacent to the -- to the laptop where as we see really more widespread damage to the laptop and to other objects more based on what their view factor would have been to a hot layer of the ceiling and radiant heat transfer from the ceiling.

Q So, it's your testimony that the damage to the laptop was uniform?

MS. WANEMAKER: Objection to the form.

You can answer.

A I don't believe that's what I stated, no.

Q So, there was a pattern --

I believe you stated that there was a pattern of damage to the laptop that indicated it was damaged by radiant heat from a thermal layer?

A That's correct.

Q And that radiant heat from a thermal layer would be a relatively symmetrical application of radiant heat depending on the configuration of the laptop?

A No.

Q So, you are saying the radiant heat

toward the screen on the keyboard side is likely to be very different than the radiant heat on the touch pad side of the laptop?

A No, I didn't say that.

Q Okay.

So, the flat surface, then, of the laptop where the keyboard is and the touch pad is, that should receive a relatively symmetrical dose of radiant heat, right?

A The top surface would, yes. If there is not other objects in between blocking the radiant heat.

Q Were there any, in your view, any other objects that were blocking the radiant heat from some part of the surface of the keyboard or the laptop versus other parts?

A If you are looking more globally at the laptop, you know, the top of the screen had more thermal damage which would have been more impacted by radiant heat. The top of the surface of the keyboard has more heat damage from the radiant heat. The sides have less damage. The bottom of the screen is in the area with less damage. You know, there is variations in the level of damage based on what the view factor would be. You have the impact of the

armoire behind the laptop, which blocks some objects. So, there is objects around the laptop that have very little fire damage because they are shielded somewhat by the armoire.

Q And actually, what I was trying to ask and I probably didn't say it appropriately, I am asking about the surface of the laptop where the keyboard is.

A Uh-huh.

Q That was a flat surface, correct?

A Other than the fact that the keys aren't flat, but, yes, it is a relatively flat surface.

Q It was in a horizontal position on the shelf or the armoire?

A Correct.

Q And that entire horizontal surface that's on the shelf of the armoire, not the screen but the surface where the keyboard is, would be expected to receive a uniform or relatively uniform dose of radiant energy from a thermal heat layer, correct?

A Correct.

Q And is it your testimony that the damage to that surface of the laptop is uniform?

A Around the keyboard area and the touch pad, yes.

Q So, the hole in the surface over the battery management system over the battery pack, is that something you are defining as some different part of that horizontal surface?

A Yes. I thought you were referring to the touch pad and the keyboard.

Q Okay.

So, I am talking about the inch and a half to two inches beyond the keyboard.

That is more severely damaged, correct?

A That's correct.

Q And your opinion of that is that was caused by thermal runaway?

A It was caused by a combination of the radiant heating from the hot layer and the thermal runaway that eventually occurred in the cells.

Q Now, tell me about your understanding of the battery pack itself.

In other words, what was that comprised of?

A It was comprised of six 18650 cells and a battery management system or a BMU.

Q That was enclosed in a plastic casing,

correct?

A Correct.

Q And the battery cells, themselves, were wrapped in plastic?

A That's correct.

Q And those were all in a compartment in the laptop, right?

A That's correct.

Q And you reviewed the cells --

You didn't look at them because you didn't look at anything other than pictures, but you saw pictures of the cells, correct?

A That's correct.

Q And you relied on Mr. Galler and Dr. Horn with regard to the remnants of those cells and what they represented?

A No, I reviewed those, but in part relied on their observations as well.

Q You came to the conclusion -- that I think you wrote in your report -- that four of the cells went into thermal runaway and two of the cells didn't?

A That's correct.

Q All right.

And was that a determination you made

or did you rely on those other two experts to come to that conclusion?

A I relied on to Dr. Horn to come to that conclusion.

Q Okay.

So, you assumed his opinion was correct and you based your opinion on his opinion?

A I reviewed his report, what he described, and that's consistent with what I expected based on his descriptions as well.

Q So, you are saying you came to the opinion that they went to thermal runaway from reading his report?

A I am relying on his opinion, but I've also reviewed his opinion and agree with it.

Q Okay.

So, you agree with it based upon some independent knowledge of what cells look like from thermal runaway?

A Yes. I've seen cells that have gone through thermal runaway in the past.

Q Okay.

A Can we take a break when it's a convenient time?

MR. SCHWARZ: Sure.

MS. WANEMAKER: I was going to say if this was a good time.

MR. SCHWARZ: Sure.

MS. WANEMAKER: Would 15 minutes be okay?

MR. SCHWARZ: Sure, Jackie.

MS. WANEMAKER: So, we will come back at 11:40?

MR. SCHWARZ: Sure.

VIDEOGRAPHER: The time is 11:24 a.m. and we are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 11:41 a.m.

We are back on the record.

MS. WANEMAKER: Steven and I had a brief discussion off the record during the break with respect to having usual stipulations in this case, agreeing to the ordinary stipulations; objections reserved for time of trail except as to form; with Dr. Myers to read and sign.

MR. SCHWARZ: And that would apply from the beginning of the deposition.

MS. WANEMAKER: Thank you.

Yes.

Q Dr. Myers, would you turn to tab five in your notebook, which I am going to mark as Exhibit 6 and is the Allegany County Fire Investigation Team Report. And this document has HP Bates Stamped numbers on it.

And I would ask you to turn to HP 00409, which is the beginning of the narrative section of the report?

A Okay.

Q This is one of the documents that you did review in preparing your report, correct?

A That's correct.

Q And it appears that from this narrative that on January 24th, 2020 the Fire Investigation Team was contacted at about 4:52 in the morning.

Do you interpret it that way?

A I don't see that specific line, but that sounds correct. That's about the time I recall.

Q At the top it says:

"Chief Brian Hemphill requested the Allegany County Fire Investigation Team at 4:52"?

A Yes.

Q Then it says four different investigators -- Edwards, Aderhold, Valeri and

Luckey -- responded.

So, there were actually four investigators that went?

A Correct.

Q And then, if we go down a little bit further, there is a reference --

There is a statement that says:

"The Fire Investigation Team began working from least to most damage."

Do you see that?

A I do.

Q And that's what 921 --

The methodology of 921 guidelines recommend, correct?

A I think historically it did. I don't think it specifically recommends that now.

Q So, the first place they went to was the master bedroom where Mr. Hollowell was found, correct?

A That's the first room they note, yes.

Q By this point, Mr. Hollowell had been removed -- his body had been removed after his death, correct?

A Correct.

Q And they took pictures of the room

after Mr. Hollowell's body had been removed?
A Correct.
Q And you looked at those pictures?
A I did.
Q And they say here that the pictures revealed or the room by their personal investigation had only smoke and certain damage?
A Correct.
Q And is that --
Based upon your review of photographs, do you agree with that?
A I do.
Q Then they proceed to describe what they saw in the kitchen/dining room area which they say showed heat and smoke damage, correct?
A That's correct.
Q And in your review of the photographs, do you agree that that's the only damage that was shown in the kitchen and dining room area?
A That's the type of damage I observed, yes.
Q Okay.
The next thing they remark on is the area closer to the living room was where heat damage was observed in the kitchen, right?

A Correct.

Q And is that also something you agree with by looking at the photographs?

A Yes.

Q Did you look at what they were describing also in the Matterport as well?

A Yeah. I did review their photographs, Mr. Gorbett's photographs or Dr. Gorbett's photographs and the Matterport images.

Q And so, if there was anything that wasn't explicitly captured in the photographs of Mr. Gorbett or the fire investigators from Allegany County, the Matterport allowed you to also look at other angles that weren't captured in still photographs, correct?

A Correct. But the Matterport was at a later time than the Allegany County photographs. So, there had been changes to the scene by the time the Matterport was taken.

Q Right.

But the Matterport would have revealed the smoke, soot, fire and char damage, correct?

That wasn't changed?

A Right. I mean, objects have been moved. But generally you can see most of the home

from the Matterport. Some portions of the home you can't see, but most of it you can.

Q So, then, the living room --

It says the living room, site C, had less fire heat damage than the A side, correct?

A Correct.

Q So, if you are looking from the kitchen, that would be the left side of the living room had less damage than the right side of the living room?

A Correct.

The area near the couch had more significant damage.

Q And the area near the couch --

The couch was located on the wall that was the common wall between the office and the living room, correct?

A No.

Q What was in between --

In your recollection of the way the house is set up, what was in between the living room and the office?

Was there another room, you believe?

A There was a furnace, but on that wall was an electric fireplace, a TV; objects like that.

Q Why don't we take a look at the photograph. Maybe that will help refresh your recollection.

These photographs are mostly marked with HP numbers, but some of them may have been cut off by the hole punching. But let me find the number and then I will see if I can direct you there.

So, if you take a look at HP 00433, there's a picture of the couch.

A Correct.

Q And the wall above the couch is significantly fire damaged, correct?

A Yes. The wall. On the ceiling. That's correct.

Q What did --

In your understanding of the geometry of the house, what is behind that wall?

A The front of the house. Outdoors. I am not sure if there is actually a screened in porch there or if it's just the outside.

Q What is behind the wall that is the 90 degree angle wall to the right of that couch?

A The kitchen.

Q Okay.

So, going back to the narrative

description then, it says:

"The hallway that led to the office, bathroom and second bedroom had fire damage on both A and C sides about 4 feet off the floor."

Do you see that?

A I do.

Q And is that consistent with your observations based upon your review of the photographs?

A Yes.

That's the approximate height.

Q So, the hallway really just has the left and the right side as you are walking toward the office and both of those walls were damaged by -- showed fire damage about 4 feet off the floor?

A Approximately.

Q And below that area, there was no fire damage, correct?

A That's not true, no.

Q Well, you indicated something in your report called the line of demarcation.

What is that?

A So, that is a line between the most significant damage from a hot layer and less damage.

Q So, if we take a look at --
Let's take a look at a picture of the hallway. Let's take a look at HP 0446. It's a photograph of a door.
A I'm sorry. Let me get there.
You said 446?
Q Yeah.
VIDEOGRAPHER: Dr. Myers, is there any way we can try to center you on the camera because you are --
THE WITNESS: Sorry. I am trying to look at the binder.
Q Were you able to find that?
A Yes.
Q Oh, I am sorry. I didn't know if you had found it.
So, do you know what this picture depicts?
A Yes.
So, the 446 shows a door to the spare bedroom. There is a window on the right. On the left is the entrance to the office or sewing room.
Q Okay.
That's where the HP Pavilion laptop was, correct?

A That's correct.

Q So, and just talking about the line of demarcation, it looks like sort of a diagonal line across this door where everything, you know, below that diagonal line looks to be, I believe, from the level of the doorknob down looks to be undamaged, correct?

A Or less damage, yes.

Q Do you see any damage to the door from the doorknob down that you believe is caused by fire?

A Like, directly below the doorknob there looks to be some discoloration. We can't see the floor in this picture.

Q Well, in your recollection, in the entire building how many areas was there damage to the floor area or just above the floor area?

A There is a few areas. For instance, the couch is in the living room. It's damaged at levels below the line of demarcation. The furnace is as a lower line of demarcation than the general hallway. If you look at the window across from the office. You know, there is material that is dripped down from that. So, you see some melted material and damaged material at lower levels. But generally, you know, things are more heavily damaged above the line

of demarcation than below the line of demarcation.

Q Except for the closet area, correct?

A Correct. The closet area is another area with low burn.

Q And low burn means a burning area lower down closer to the floor?

A Correct.

Q Okay.

A If you go back and look at page or image HP 00434, you know, you can see lower damage below the window there in the hallway.

Q Okay.

Going back to the narrative then, the door we were just looking at, it says:

"During the time of the fire the door to the second bedroom of the trailer was closed and the second bedroom showed only heat and smoke damage."

Do you agree with that from your photographs review?

A Correct.

Q Now, the four fire investigators for Allegany County then say:

"The living room on the A side did have significant damage to the area of the

couch. The couch was an electric couch with heating coils built in. We were able to verify that it was not plugged in and later when interviewed Ms. Marcellin confirmed this."

Do you see that?

A You preference that statement by saying the four investigators said this. I believe this is a report from Mr. Luckey. I don't know if that -- it's by all four investigators or just him, but it says it's signed by him. But I do see that description in the report.

Q Okay.

And you never talked to Mr. Luckey, correct?

A I did not, no.

Q So, from the photographs --

So, you weren't able to investigate the scene, correct?

A I did investigate the scene. I wasn't able to go there in person.

Q But you weren't able to investigate the scene in person; you can only look at photographs?

A The photographs. Descriptions. The Matterport. So, a number of things.

Q In any event, did you find anything in the information that you just listed that you looked at to do your investigation in this case that contradicts the statement of the Allegany fire investigators that they verified that the couch wasn't plugged in?
A I haven't seen any photographs that document that.
Q That document that it wasn't plugged in?
A Whether it was or wasn't plugged in.
Q So, did you discount their statement that they verified that it wasn't plugged in, in some way?
A I mean, it's something that I couldn't independently verify.
Q Well, you couldn't independently verify a lot because all you did was look at somebody's pictures, right?
A That is not correct. The NFPA 921 talks about the fact that investigators should document things so that other parties can review their documentation. So, that's not correct.
Q And that would be, for instance, Mr. Gorbett's documentation that you said in your

report you looked at but you didn't look at?

A No. I did look at his photographs. Typically, it's documenting with photographs. So, I did document his photographs. I mean, I did review his photographs and his Matterport.

Q Right.

But Mr. Gorbett's notes may have indicated why the Allegany fire investigators determined the couch wasn't plugged in, correct?

You just didn't look at those notes.

MS. WANEMAKER: Objection to the form.

If you can answer, you can.

A I don't know if he has notes or what those notes do or do not say.

Q What is your evidentiary basis of contending that the couch was plugged in?

A Well, clearly it's an area of low fire burn so it's something that would be considered as a possible origin. So, you know, how you --

You then have to look at how that could having ignited. There was a candle adjacent to it. So, it could have been an open flame that ignited it. But obviously, one cause that you would look at is whether, you know, electrical wiring that was part of it such as the heating elements could have ignited

it. But that was something that I wasn't able to independently verify. They say it wasn't plugged in. I wasn't able to independently verify that.

Q But if you had been at the scene you would have been able to independently verify that, correct?

A No. The couch had already been moved by the time of the investigation.

Q But you could have investigated whether there was any electrical arcing in the couch or in the mechanisms that were part of the mechanism that either heated the couch or made the couch -- turned into a recliner?

You could have investigated that, correct?

A Typically, that's something you would have looked at in a lab exam, but the couch wasn't retained.

Q If the investigators believed that the couch was the source of the fire, would 921 have recommended that they take portions of the couch for investigation in a laboratory?

A 921 actually speaks more broadly than that saying you should document and retain items that, you know, support your theory of what happened

as well as possible alternative causes. So, it's really more broad than that.

Q So, if the investigators hadn't ruled out the couch at the scene, they should have retained parts of the couch and brought it in for laboratory inspection?

A I think NFPA 921 specifies that even alternative causes that you don't believe necessarily started the fire should be documented and retained.

Q So, you are saying that the investigators, which would include the Allegany County investigators, Mr. Karasinski who is on the committee that devises 921 and revises 921, and Mr. Gorbett, all failed to follow -- and the insurance investigator for NEFCO, all failed to retain important evidence from the couch and send it out for laboratory examination?

A I think you have to look at the different roles of all those parties. We are looking at a report by Mr. Luckey that was written on February 21st. So, that was prior to the inspection you are talking about. I don't know. He may have been complete with his investigation and wasn't interested in it.

Obviously, people representing the

house or the Plaintiffs have broader interests in what caused the fire than a party that is just representing a single object where they may be looking more at whether or not the device they made started or didn't start the fire and may be less interested in alternative causes.

Q Well, certainly Mr. Gorbett, who was retained by HP, theoretically to prove that the HP device didn't cause the fire, would have had interest in other alternative theories, correct?

A I mean, you made a few statements. I assumed he was retained to determine whether or not the HP device was the cause of the fire. Not to determine just one impact, you know. The party that designed the couch would have had more interest in evaluating the couch.

Q The party that designed the couch, did they have an investigator at the scene?

A I don't believe so. I don't believe whoever was running it put that party on notice.

Q Well, your theory is that the fire started somewhere other than the HP laptop, correct?

A That's correct.

Q And you are saying that Mr. Gorbett wouldn't have considered your theory as a possibility

when he arrived at the scene?

A I would think he would consider that theory. I don't know what he did or didn't consider. I would hope most fire investigators would have considered alternative causes of the fire.

You know, here the Allegany Fire Department is obviously commenting on the couch and commenting on whether or not it was energized, considering it is a possible cause. I think most fire investigators would consider that.

Q And when they determined that it wasn't energized, then, they decided to move on and look for other causes, right?

MS. WANEMAKER: Objection to form.

A I don't know what they did or didn't do.

As NFPA 921 describes, oftentimes the actual cause of the fire isn't determined 'til near the end of the investigation. So, you know, it's typically too preliminary to make a determination about something like this before you have the full information before you have full witness statements before people are deposed before you have other information. You know, so you err on the side of collecting additional information and a lot of

objects besides just what you believe started the fire. NFPA 921 describes that you should document both what you think started the fire and possible alternative causes.

Q So, you are saying 921 recommends that you retain for laboratory examination any other possible cause of the fire?

A I mean, it says what it says. I don't think that's the specific language, but it describes that you should document and retain other possible hypothesized causes.

Q And for all you know, Mr. Gorbett did document and ruled out of the couch, right, because you didn't look at his notes?

MS. WANEMAKER: Object to the form.

You can answer.

A I reviewed hundreds of his photographs. If he had disassembled the couch, I would think he would have photographed it.

Q So, the fact that he didn't photograph it, means that he didn't disassemble the couch, right?

A I don't think it definitively means that one way or the other. But my assumption would be that if he did disassemble the couch, he would

have photographed that.

Q And if he seriously considered the couch as the origin of the fire, then, don't you believe as a diligent fire investigator he would have disassembled the couch?

A No. Typically, that's something that would have been done in a laboratory investigation; not in the field. Again, you have to look at the roles of the individual fire investigators. He may have not seen that as his role to investigate the couch.

Q So, if it wouldn't be Mr. Gorbett's role to look for the ignition source and the origin of the fire, then what would his role be?

A To investigate the fire and determine whether or not the HP product caused the fire.

Q And you have no idea what his conclusion was on that issue, right?

A I do not.

Q Because you didn't talk to him and you didn't review his notes, correct?

A I don't know if he reached a conclusion. I haven't talked to him or reviewed his notes.

Q But he was there to help determine if

it wasn't HP what it was, correct?
A I don't know. He was there to document the scene and investigate the role of the HP laptop.
Q And all you saw of that investigation was his photographs?
That was it?
A I saw a few hundred photographs he took and the Matterport that he recorded.
Q Okay.
Now, the next sentence of the Allegany fire investigators, or Mr. Luckey, in particular, was:
"We were --"
He says "we." So, I assume he is talking for the group, but if you want to assume it was just him.
It says:
"We were able to rule out the gas furnace. The wooden louvered door for the furnace did not show signs of charring on the inside."
And has two pictures of that.
Correct?
A I actually don't see where you are. Okay. Actually, I still don't see where you are.

Did you move to a different page or?
Q I am on page HP 00409, which is --
The next sentence is after he said that he verified the couch wasn't plugged in --
A Okay. I see where you are right now.
Q So, he states that the wooden louvered door for the furnace did not show signs of charring on the inside.
Do you see that?
A I see where he says that, yes.
Q And you looked at pictures of the wooden louvered door that was the door to the compartment where the furnace was located?
A Correct.
Q And did you find charring on the inside of the door where he did not?
A No. I saw burned damage on the louvers of the furnace. You can see there is some discoloration on the lower areas of the louver door in photograph HP 00456.
Q So, your evaluation of photographs came to a different conclusion than Mr. Luckey's evaluation in person of the furnace and the louver door for the furnace?
A He is saying he did not see charring.

I am saying that you do see discoloration on the lower louvers on the doors.

Q Right.

So, you are saying that he is wrong and by your review of his photograph there is charring on the lower louvers of the door?

A No. I am saying that there is discoloration.

Q Well, he didn't say discoloration. He said charring.

So, the question is:

Do you see that as charring or discoloration of a different type?

A In 456, you see discoloration. You do see blistering of paint on the doorjamb for the furnace.

Q So, you are saying that your evaluation of his photograph, you came to a different conclusion as to what is shown on the door than he did, and his investigators did, when they investigated the scene in person?

A I do --

I am saying I see thermal damage to those areas, whether he --

What he is saying is somewhat

different. He is saying he doesn't see charring.

Q Okay.

Do you see charring?

A No. Like I said, I see blistering of paint. I see discoloration. But I don't specifically see charring.

Q Okay.

A I do see thermal damage there.

Q You don't disagree with that, on the charring?

A Correct.

Q Okay.

So, in looking at the furnace and the door, the louvered door to the furnace, did you reach an opinion that the furnace ignited a fire that then spread to the rest of the house?

A No. But it's an ignition source that I can't rule out.

Q And did you come to some --

So, an ignition source then has to ignite something that the fire spreads.

What was your theory that the furnace was the ignition source that spread through the rest of the house?

How did it do that?

A Sure. So, the furnace is adjacent to the closet that has heavy damage and so, you know, there is a number of ways that the furnace could have heated material on the adjacent wall to the closet and spread to the closet.

Q And what evidence did you find of heated material in the closet that spread through the wall?

A Well, the wall of the closet is charred and consumed. There is damage to that. And my understanding was that the furnace was never removed or examined or the wall between the origin --

You have the wall near the furnace and the closet.

Q Would Mr. Gorbett have been able to do that investigation if he had wanted to?

A I don't know. He could have requested that of the other parties. I don't know. I don't know what the protocol was for that inspection.

Q Did you find any photographs that showed charring on the furnace side of that wall?

A No. You can't -- you can't see that. The furnace was never removed.

Q So, you are saying that the four Allegany fire investigators and Mr. Gorbett and

Mr. Karasinski and Mr. Litzinger and the NEFCO fire investigator all missed that because they didn't remove the furnace?

Is that your assumption?

A I don't know why they did or didn't remove the furnace, but they didn't remove the furnace.

Q Right.

And you are saying that they should have removed the furnace because you believe the furnace caused the fire?

A It's a potential source that should have been considered.

Q Well, a meteor could have hit the house and caused the fire, so. I mean, there are a lot potential sources.

Are you saying that this was the likely source that caused the fire?

A I don't think there is any reports of a meteor hitting the house. I haven't seen any damage to the roof of the house consistent with that. You can actually research whether or not a meteor hit an area. So, people examine whether lightning struck the house. So, you do consider a number of different causes.

Q So, they considered lightning, but they didn't consider the furnace even though they did the inspection?
A That's correct.
There was -- there was a note from one of the first responders that he observed that the furnace was blown out.
Q And what does that mean to you?
A I have to go back to the specific language. But that subcomponent of the furnace was pushed out. And I know in the earliest pictures I've seen the louvered door on the furnace does appear to be blown out.
Q And blown out, meaning, so that there was some force that bent the louvers?
A No. That it was pushed out.
Q And this was a gas furnace, correct?
A That's correct.
Q Is it your, then, theory that when that blowout occurred, that that caused the fire?
A That's something that hadn't been examined. There could be a number of ways that a furnace can start a fire. With a gas appliance, you could have a hard start where gas accumulates and then ignites that ends of pushing out components or

could ignite something. You can have damaged insulation in a furnace that then causes it to heat adjacent walls and starts fires. So, there is a number of potential ways that a furnace can cause a fire that it doesn't appear were investigated.

Q What physical evidence that you observed supports any of those theories?

A Well, there is a description from one of the first people, the firefighters in the house that it was blown out and we do see fire damage, you know, in the adjacent closet. That's one of the more heavily burned areas. There is damage to the walls of the closet. So, again, that's something that can't be ruled out. But I can't say that it caused the fire either. It hasn't been investigated.

Q The next statement says:

"Electrical wires and the hard wired smoke detector located in the hallway between the furnace and office door was inspected."

Do you see that?

A I do.

Q And what was your assumption with regard to the smoke detectors in the house?

In other words, how many were there and

how were they wired?

A My understanding is that there were two or three smoke detectors in the house. I think the house was built in 1980. So, I would assume smoke detectors or they may have been replaced over time because typically you are supposed to replace them every ten years.

Ms. Marcellin testified that the one near the office door was hard wired and that the one near her door was battery operated. So, that was my understanding based on her testimony.

I've reviewed the pictures of the smoke detectors and the areas where they were mounted and where the wiring was. It's not possible to confirm one way or the other how they were installed.

Q Now, Mr. Karasinski testified that they were both hard wired and they were wired together so that when one went off, the other went off.

Is that something that you found evidence to suggest was not true?

A Looking at the wiring near her bedroom, I don't see any connections for a smoke detector near there. I didn't see --

In the back of the smoke detector -- one of the smoke detectors -- I don't see any of the

places where you would attach a connection. So, I haven't seen any documentation of that. The wiring near the outlet in the bedroom has wires in it and I don't see any loose wires that you would connect.

Q So, you are saying that based upon your review of the photographs of the smoke detectors, you are able to determine that the smoke detector near the office was not hard wired; even though the investigators found that it was?

A That's not correct. That's not what I said.

Q You don't see any evidence based upon the photographs, but you are limited by the photographs, correct?

A I think you may have misunderstood me.

Both the investigators and Ms. Marcellin said that the smoke detector near the office was hard wired. Ms. Marcellin said the smoke detector near the bedroom she was sleeping in was battery operated and wasn't hard wired.

I've looked at the photographs of the smoke detector near there and the wiring near there and I don't see evidence that it was hard wired.

Q But if you had been on the scene, you would have been able to determine that one way or the

other, correct?

A Not necessarily, no.

Q So, you wouldn't have been able to determine if it was a smoke detector that had a battery in it as a backup or when power was lost versus a smoke detector that was completely battery operated?

You wouldn't be able to determine that by looking at it?

A If you knew the smoke detector that was mounted there and depending on its condition you may be able to verify that.

Q And there was no fire damage down at that end of that hallway, correct?

We already went through that?

A Yes, there was less damage on that end of the hallway.

Q So, had you been able to attend the investigation and the inspection as Mr. Gorbett did, you would have been able to definitively determine whether or not that smoke detector was a wired smoke detector with a battery backup versus an independent battery operated smoke detector?

A You may or may not have the --

The earliest pictures I've seen of the

smoke detectors, they are grouped together. So, it is not clear where each one came from.

Q And then, it goes on a few lines down to say that the office was observed for fire damage?

Right?

Do you see that?

A Are you referring to where it says:

"Next we observed the office area for fire damage"?

Q Exactly.

And it says:

"The storage closet in the office had some of the lowest burn."

And I think you described that meaning, that means that the burn area closest to the floor would be the lowest burn?

A Correct.

Q And then it says:

"We pulled out the clothing and found that the floor was protected. We did not find any wires or source of ignition in the closet."

Correct?

A That's what it says. That's correct.

Q Now, did you find any wires or source

of ignition in the closet by looking at photographs?
A I did not see anything in the closet that was plugged in, no.
As I mentioned, you do have the furnace on the adjacent wall that was a potential source of ignition.
Q But that would be on the wall on the other side of the closet?
In other words, not the closet wall itself?
A Correct. It would be on the other side of the wall.
Q And what were the walls made of?
Were they studs with drywall and paneling or were they some kind of solid wall substance; do you know?
A My understanding was it was wood two by fours and then it had the paneling for the wall surface.
Q Did the fire investigators or the pictures determine that the damaged walls in the closet if you look through the damaged paneling you could see fire damage on the other side of that wall by the furnace?
A I would have to go back and look at

some of the pictures.

Q Well, your theory was that the furnace could have caused the fire, that -- you would have looked for that evidence, right?

A I did review that, but, you know, there is hundreds of photos so I don't recall --

Q But your alternative theory was the furnace caused the fire.

So, you would have been looking for any evidence that would support that theory, I would think?

A I would be looking for any evidence that would support or refute the theory.

Q Did you find something?

A I am looking right now.

Q Are you able to look at Mr. Gorbett's photographs while you are looking at photographs?

A Right now I am looking at the binder that you supplied. If you would like me to, I can look at the photographs of Mr. Gorbett.

Q I would like to look at Mr. Gorbett's photographs because they haven't been produced; and we requested them. I will just put on the record that we requested everything that you looked at from Mr. Gorbett and haven't received it. And we can take

that up later.

But if you have photographs that Mr. Gorbett took that support your theory that the furnace caused the fire, then why don't we have you look for them on the break and then you can mark them as exhibits --

MS. WANEMAKER: We --

A I'm sorry. I didn't hear that.

Q I'm sorry.

Is there anything in your report that shows photographs that support your theory that the furnace caused the fire?

A I am still looking at the photos of the binder. And so, you know, there is photographs HP -- actually, I think there is a hole through it -- HP 00463 that shows, you know, the wall in between the furnace and the closet burned through. Let me look at my --

Q Okay.

Let me find that.

A I think I have that same photograph as figure 22 in my report.

Q So, I am looking at the wrong photograph. So, 63.

So, photograph 63 shows the door with

the ironing board hanging on it?
A Correct.
Q And the lower part of the closet has burn damage, correct?
A I think most of the closet has burn damage in the lower portion you could see that the wall is burned through.
Q Right.
And it looks like a light brown color on the other side where the wall is burned through.
Am I looking at the right thing?
A That's correct.
Q So, you are saying that that light brown color, which doesn't look burned, is evidence that the fire came through that wall that doesn't look burned?
A I don't know what that is on the other side. And we can't see the whole wall because there is objects and the furnace is never removed to look at it from the other side.
What I am saying is there is heavy burn damage on the wall in that area. It was burned through.
Q It's burned through, but the other side of that wall would be the side that faces the

furnace, right?

A The other side of that could be the furnace. It could be a wall --

We can't tell from the photograph.

Q I'm sorry.

Your theory was that this was a fire in the furnace that spread through the wall of the compartment of the furnace into the closet, right?

A That's one potential scenario.

Q Okay.

And this photograph does not show that anything burned through the wall of the closet, does it -- I'm sorry -- burned through the wall of the furnace.

A The wall of the furnace is metal. So, fire wouldn't burn through metal.

Q So, the interior wall that the furnace compartment was in, in that little closet, was lined with metal?

A No. You just said that it burned through the wall of the furnace. The furnace the furnace wall would be made out of steel.

Q Okay.

But the compartment that the furnace was in was made out of the same material that the

rest of the walls were made out of, correct?
A That wasn't documented.
Q Well, did you assume that they were made of something else?
A No.
Q When you look at this photograph that you've identified, the one that, I believe, is HP 00463, there clearly is another wall behind the burnt part of the closet, right?
A There is something behind that. What that is, I don't know.
Q And whatever it is, it is not burnt?
A At least the limited portion that you can see in this picture is intact. We can only see a limited portion of it where the inner wall of the closet is burned through.
Q So, is this picture to you evidence supporting your theory that the furnace caused the fire?
A That it's a potential cause. But as I describe in my report, there isn't enough evidence to determine one way or the other. That the cause of the fire is undetermined.
Q But if that were the cause of the fire, are you saying that this photograph supports that

cause?

A So, yes. You have severe damage in this area of the closet that's adjacent to the furnace. So, that's something that should be considered.

Q Right.

But behind the point that is burned is a part that is unburned, which is the part closest to the furnace.

Isn't the wall behind the charred wall of the closet closer to the furnace?

A So, I said this a few times, we can only see a limited portion of what is behind that burned wall where it's burned through. I am not sure if that's the furnace or if that's an individual wall. We can't see the whole wall. It could be the whole wall. We can't see that whole wall. It wasn't examined.

But clearly, if the walls of the closet were completely intact and not fire damaged, there would be less of a possibility or less evidence that the furnace caused the fire in the closet. When you have significant damage to the wall adjacent to the furnace, that's something you need to consider.

Q And if you had been able to investigate

the scene, you would have been able to look behind that wall that's charred to see what was behind it?

A If I was allowed to do that. As I told you earlier, I wasn't available for the inspection that day. I had another inspection.

Q But certainly, Mr. Gorbett was able to do that, right?

A I don't know if he was able to do that or if he asked to do that.

Q Well, did he take any pictures any close-up pictures of the wall behind the burnt wall in the closet?

A I was going to look at that on our next break.

Q So, you don't remember him ever taking any pictures?

You are saying you have to look for them now?

A Correct.

Q We will certainly do that.

MS. WANEMAKER: We will take it under advisement.

Q Well, is there any reason why if you have evidence that the furnace caused the fire based upon pictures that Mr. Gorbett took that you wouldn't

put those in your report?

A I didn't put every photograph. There is hundreds of photographs. I didn't put every photograph in my report.

Q But if there was a photograph that supported an alternative cause of the fire different than the Allegany fire investigators and Mr. Karasinski and the other investigators that were at the scene found, wouldn't you put that in your report?

A I may have. As I've said the cause of the fire is undetermined, is my opinion.

Q So, would you agree that the greatest extent of fire damage shown in any photographs that Mr. Gorbett took or any of the other photographs that you looked at for the fire investigators was the inside of the closet?

A I would say there is really two areas. Above and near the couch and near and in the closet.

Like, the firefighters reported that when they responded, I think they had to fight fire. There is glowing in the ceiling above the couch and had to extinguish that.

Q So, you are saying that the area of the couch showed as much fire damage as the area of the

closet?

A Correct. It showed a similar amount of damage.

Q And that would be floor to ceiling?

A Well, part of the wall was protected by the couch. But the couch and then the ceiling above it.

Q So, you believe the couch was on fire, but it protected the wall?

A A portion of the wall.

Q What about the lower part of the couch?

Did that go on fire?

A No. It only burned down to approximately the bottom of the seat.

Q Where are the electrical mechanisms located in a couch like that?

In the back or in the lower part of the couch that didn't burn?

A Well, there would be multiple locations. Some for doing things like reclining would typically be located in the lower portions. Heating elements, or heating as described had heating elements, would be in the back and in the seat area. It was also mentioned in the report there is a candle adjacent to the couch. So, an open flame could have

been another ignition source.

Q Is it your opinion that somehow the candle --

Which is upright in the picture that you saw, correct?

A That's correct.

Q That somehow jumped to the couch and started the fire and that's what the cause of the fire was?

A No. It's not my opinion that the candle jumped, no.

Q Well, did you come to the opinion that somebody knocked the candle over and a firefighter straightened it back up and put it back in its normal position?

A There is a few issues related to the candle. Ms. Marcellin testified that she didn't use candles; all the candles were in -- put away in a drawer or something like that. And I think the other fire investigators said there weren't candles where clearly there are candles there that were present. I don't know if there were other candles near the couch. There were humans there at the time of the fire. Someone could have knocked something. There was a cat in the house and could have knocked

something or knocked another burning object into the couch.

Q So, your theory, then, is that Ms. Marcellin lit a candle in the living room and it somehow got knocked onto the couch while she was sleeping?

A I didn't say that, no.

Q Well, how would the candle get lit if Ms. Marcellin didn't light it?

A Ms. Marcellin could have lit it. Someone else could have lit it. But she testified she doesn't have candles and there is a candle there. So, there is inconsistencies.

Q It might be inconsistent, but what evidence is there that the candle started the fire?

A We have a candle adjacent to one of the most heavily burn-damaged areas in the house.

Q But the candle is a candle in a jar that is sitting upright on the table and shows no signs of ever tipping over or causing any fires on the table, does it?

A I don't know that I agree with that.

Q Okay.

Tell me what evidence that you are referring to by looking at photographs that you can

say that there is evidence that the candle caused the fire?

A So, as I described in my report, at the end of the day the cause of the fire is undetermined. These are potential causes that I am discussing.

Q So, they are possible?

A Correct.

Q You are not saying that --

A They are causes that can't be ruled out.

Q Okay.

So, you are saying they're possible, but they are not probable.

You come to no conclusion as to the probable cause of the fire; only possible causes?

A The cause of the fire is undetermined, is my opinion.

Q Which means that you can't find anything that you believe is a probable cause of the fire?

A Correct.

Q Okay.

What about arson?

Is that a possible cause of the fire?

A It is.

Q And is that another possible cause, then, that Ms. Marcellin or someone else purposefully set the fire?
A That's a potential cause that you should consider in any investigation.
Q Is it more or less likely than a candle?
A A candle would be one method of intentionally starting a fire.
Q Okay.
So, you believe the candle theory, then, is an arson theory?
A It could be arson. It could be accidental.
Q So, you think Ms. Marcellin knocked over the candle and just didn't mention it to anybody?
A I don't believe that's something I stated, no.
Q Now, Ms. Marcellin testified that she smelled smoke and walked through the living room and saw a glow in the office, correct?
A I believe that's --
I mean, she gave a number of different statements that are inconsistent. I believe that's

what she described in her deposition, yes.

Q Okay.

Let's take a look at what she described to the fire investigators the night of the fire, and that's still in the same document we started. Okay? I will tell you what page.

If you turn to look at 410?

Do you see the recitation of the interview Mr. Luckey did of Ms. Marcellin in the hospital on the night of the fire, morning of the fire?

It's on page --

A On 411 are his handwritten notes of the interview.

Q Okay.

Look at either one.

So, he provided a fuller description of what she said in his typewritten note than he did in his handwritten note, correct?

A That's correct.

Q Is it your assumption, then, that the typewritten note is not accurate and only the handwritten note is accurate?

A All I know is that they are slightly different.

Q Okay.

Are you saying that -- that the difference in his handwritten notes from his typewritten notes is somehow attributable to Ms. Marcellin being inconsistent?

A I don't know if he interviewed her more than once. I am just saying that there is --

As you mentioned, his typewritten notes, which is a report dated February 21st, are different than his handwritten notes that I think were taken on the day of the fire.

Q Well, you reviewed the Matterport photographs, right?

A I did.

Q And that allows you to actually see the whole layout of the house and see the route that one would have to take from the master bedroom to the office?

A Correct.

Q And that leads you right through the living room into that hallway to the office, correct?

A Correct.

Q So, is it your assumption, then, that Ms. Marcellin walked through that living room and the couch was on fire as the ignition source of the fire

and she just didn't see that?

A No. I think in my report when I am describing the couch I described that she didn't say that that's where the fire started, so. I think I acknowledge that. I mean, there is inconsistences in her statements so you don't know what portions you can believe and what portions you can't.

But I do note in my report that, you know, based on her testimony she says she walked by the couch and she didn't note the fire there. She noted a fire in the office. So, I do note that in my report.

Q Right.

So, you would have to assume that she either lied or she just completely missed the fire if your theory that the couch caused the fire was true?

A No, I don't have any opinions about whether she is lying or not lying. Just whether or not the information is correct or incorrect. There is inconsistences in her testimony. I have no opinions about whether she is lying or not lying.

Q So, is it your experience as a fire investigator that witnesses are always completely consistent in every aspect of their recollections?

A No. That's why you compare their

testimony to other physical evidence.

Q (Overlapping audio)

A (Overlapping audio)

Q Go ahead.

I'm sorry.

A And other evidence that you have.

Q So, the testimony of Carol Marcellin is certainly not consistent with the candle causing the fire. The only physical evidence you find is the fact that the couch, which was near the candle, eventually caught on fire, right?

That's your evidence?

A No. It's much more than that.

The couch is very significantly burned. Has a lower level burn than other objects around it. It is more very severely burned than a few different chairs in the room. It is unique that it's one of the two areas in the home with the most significant burn damage and low burn damage.

Q Did Mr. Gorbett take a bunch of pictures of the candle and the couch and the mechanisms in the couch that could have initiated the fire?

A I don't believe he did, no.

Q If you look back to 410 of Exhibit 6,

which is the fire investigation, they describe the HP laptop computer on the pull-out shelf of the computer cabinet which we referred to as the armoire as well, correct?

A Correct.

Q And it says that:

"The FI team saw unusual looking damage to the area between the keyboard and the screen."

And that would be the area that was exposed from the battery compartment, correct?

A I am not sure what you --

The last comment was?

Q Well, the battery compartment was underneath the surface and there was an opening into the battery compartment that was located above the keyboard and before the screen on the right side of the laptop.

Do you recall that?

A Yes.

Q And that is the unusual looking damage that they are referring to?

Do you agree?

A I would assume that that's what they are referring to.

Q Then they say:

"We picked up the HP laptop and observed additional damage to the paper under the battery cover area. We also observed damage to the battery cover and battery located in the laptop. This area of the battery cover showed an inconsistency with damage from fire spread."

Do you agree with that conclusion or disagree with that conclusion?

A I disagree with it.

Q And they say that:

"The bottom of the laptop should have been a protected area."

What does that mean?

A I think they are referring to a fire where the radiant heat level or, you know, the hot heat level at the top of the ceiling, a hot layer, that it would be causing radiant heat transfer to the top of the laptop but not to the bottom of the laptop. So, they would not expect to see fire damage on the -- of the laptop. But you have to consider the fuel sources involved. You know, a charged lithium-ion battery is a significant fuel source, as

it's heated and goes into thermal runaway it's going to cause more significant fire damage than the other materials around it.

Q So, just to make sure I understand.

In your opinion, the damage, the unusual damage to the top of the laptop and to the bottom of the laptop that should have been in a protected area, was not caused by radiant heat but was caused by the heat generated by the thermal runaway?

A Correct. You have a combination of heating that is occurring there. You have the heat from the radiant energy as well as from the thermal runaway of the batteries.

Q And we'll get to the hypothesis that was reached by the fire investigators and by Mr. Karasinski that is different than yours.

But there's two.

Yours is that the thermal runaway was caused by a fire that started somewhere in an unknown origin that caused the cells to go into thermal runaway. And all the other fire investigators determined that it was the laptop batteries, cells, or one of them, that went into thermal runaway that caused the fire, correct?

Those are the two competing theories that we are talking about?

A That's correct. I don't agree with the characterization that all the other fire investigators.

Q Well, Mr. Karasinski came to that conclusion, correct?

A That's correct.

Q And you are not aware of what Mr. Gorbett concluded because you never talked to him and you only looked at his photographs?

A That's correct.

Q And you also haven't talked to the NEFCO insurance fire investigator who was there, correct?

A That's correct.

Q But what you do know is that the Allegany fire investigators -- the four of them as summarized by Mr. Luckey -- says:

"Based upon our observation and ruling out other probable causes, it is our hypothesis that the cause of fire is the HP laptop."

That's what they stated in their report?

A Right. They said that that's their hypothesis.

Q Right.

Now, the word "hypothesis" under the 921 terminology has a specific meaning, correct?

A Well, I think it's a general word that's used in scientific methods. You form a hypothesis and then you test the hypothesis.

Q And then, you come to a final hypothesis?

A Or a final conclusion, if you can.

You can't always come to a final conclusion.

Q No. I am just talking about 921 talks about reaching a final hypothesis. We can look up the section, if you want to.

Do you agree with that or you are not familiar with 921 when it comes to cause and origin?

A I am familiar with NFPA 921.

Q Are you familiar with the section that says "arriving at final hypothesis"?

A Yes.

Q Okay.

And that is the end of the investigation process under that methodology is

reaching a final hypothesis, correct?

A No. I mean, sometimes you can't reach a final hypothesis.

Q So, either you reach a final hypothesis or you don't reach any conclusions, right?

Those are the two options under 921?

A Your conclusion may be that the cause of the fire is undetermined.

Q Right.

But if you have a determination of what you think caused the fire, then it's called a final hypothesis under 921?

Am I correct on that or are you going to tell me I am wrong?

A If it reaches certain criteria of the confidence of the opinion.

Q Right.

In other words, that is the highest level of confidence that's expressed is called the final hypothesis under 921?

A I mean, it could be a range of contents. It could be more likely than not. It could be --

You know, there's a higher standard in criminal investigations. So, there is a variety of

different levels of confidence.

Q You are saying that there is a variety of different levels of confidence that are noted in 921 under the causation chapter?

A It's noted in NFPA 921, yes.

Q You are saying that the criminal standard is included in that?

A I believe so.

Q Okay.

We will look at that after the break.

MS. WANEMAKER: Speaking of which, I don't want to interrupt you, but when are you thinking of in terms of a break for lunch? We were going about an hour and 12 minutes since last break.

MR. SCHWARZ: Let's break at 1.

MS. WANEMAKER: Okay.

MR. SCHWARZ: Once we go off the record, we can talk about how long.

MS. WANEMAKER: Sounds good.

Q The Allegany fire investigators then said:

"The HP laptop battery or components near the battery caused the battery to overheat and explode, sending sparks and

flammable material that ignited light weight fuels in the office area of the computer cabinet or closet."

That is what they concluded that you disagree with, correct?

A They say two possibilities here. The HP laptop battery or components near the battery caused the battery to overheat and explode. So, I don't know what they mean by components near the battery. I mean, certainly I agree that components near the battery got heated by an external fire and ultimately caused the batteries to go into thermal runaway. They didn't reach the conclusion that the laptop batteries on their own necessarily went into thermal runaway.

Q And so, you interpret that statement to say that the fire started somewhere else and from the heat from that fire that started somewhere else caused thermal runaway in the battery component?

A I am saying it could mean a variety of things. It could mean that the batteries went into thermal runaway on their own due to some internal defect. If could mean that a component in the computer malfunctioned and overheated and caused the battery to go into thermal runaway. That seems to be

their hypothesis. It could also mean that a component was heated by something else that then caused the battery to come into thermal runaway.

Q Which part of their statement supports your last conclusion that an external fire could have caused the thermal runaway?

Which part of that paragraph that they sum up their final hypothesis supports your conclusion that this could have been a fire of unknown origin that actually set the laptop on fire?

A They say:

"Or components near the battery caused the battery to overheat and explode."

The radiant heat that heated up the --

In my opinion, the radiant heat that heated up the plastic then led to the battery going into thermal runaway. I don't know that that's what they were envisioning, but it is consistent.

Q So, when they say the cause of the fire is the HP laptop, you interpret that to mean that the fire started elsewhere and set the HP laptop on fire?

That's how you interpret their conclusion there?

A No.

In that sentence, it says:

"The HP laptop battery or components near the battery caused the battery to overheat and explode."

That's what I am referring to.

Q Right.

But the sentence before that says:

"Based upon our observation and ruling out other probable causes, it is our hypothesis that the cause of the fire is the HP laptop."

Is that ambiguous to you?

A No. I mean, that's a separate sentence. I see that sentence as well.

Q And then the next sentence is a follow on sentence that describes why they came to that conclusion.

A I think it's providing more detail of how they believe the HP laptop started the fire.

Q Right.

So, my question is what about that -- the combination of those two sentences -- allows you to conclude that they were also saying that an external fire from unknown -- from some unknown source from some unknown location spread to the office and then caused the laptop to go into thermal

runaway?

A Now, you are asking me a different question about those two statements. I agree those two statements are not consistent with that.

Q Okay.

Thank you.

MR. SCHWARZ: Why don't we take a break.

VIDEOGRAPHER: The time is 12:57 p.m. We are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 1:22 p.m. We are back on the record.

Q Mr. Myers, if you can now turn to your report, which we marked as Exhibit 4, I think. And it's at tab 17.

A Yes.

Q And if you could turn to page 6 of your report?

A All right.

Q Now, you got a section entitled, "2.2 Incident Timeline."

And in that section you indicate that Ms. Marcellin started the Norton Antivirus Software on the notebook at about 9:30 p.m. leaving it plugged

in and running when she went to sleep.

Correct?

A Correct.

Q Did you do any research on whether running Norton Antivirus software can cause the computer to heat up?

A Not specifically, no.

Q Did you review Ms. Marcellin's testimony in preparing for writing your report?

A I did.

Q And did you find in there what Ms. Marcellin said was her practice typically when she finished using her computer?

A Yes.

Q And what was that?

A That she would close it up and wrap the cord around it, I guess, partially out of the concern that the cat would chew on the cord.

Q So, based upon Ms. Marcellin's testimony anyway, this was the first or one of the first times she ever left the computer running and plugged in and left it, correct?

A Yeah. I think she testified this was the first time she had done that.

Q All right.

And did you consider that in light of the subsequent information you learned that this battery pack had no overvoltage, over temperature, overcharge protection?

Did you consider that as a fact when you were evaluating whether this battery pack went into thermal runaway because of the internal issues with the battery pack or because of external fire source?

A Yeah. I considered that to mean typically, as we discussed earlier, a battery is going to be more susceptible to thermal runaway, the higher state of charge and when it's being -- or when it's being charged. So, if it's on all night, you would expect it to be fully charged by the time of the fire.

Q And also, without the protection if it were to overheat, there would be nothing to stop the charge, correct?

A There wouldn't be the same protections that would be in an HP battery, that's correct.

Q Are there any other protections against overheating batteries other than the safety devices that were intended and were not implemented on this battery pack?

A Well, within the laptop itself would have some protection. I think you just asked me if I looked at the impact of running Norton Antivirus. You know, there is protection on most notebooks that, you know, if the processer is above a certain temperature, it will shut down. So, there is protections on a laptop, a notebook computer.

Q What is your understanding of what temperatures that would require for this particular model?

A I don't know those. For this specific case, those are issues that Mr. Galler or Dr. Horn would be more familiar with.

Q Okay.

Now, on page 7 of your report, and you refer to figure 5. You have a box around a portable phone that was in the spare bedroom that had the door closed that was on the other side of the office where the fire was located, correct?

A That's correct.

Q And on page 7 --

A I mean, I guess I should correct that. A portion of the --

Yeah. That's correct.

Q So, you mention that this cordless

phone that you thought was available for Ms. Marcellin --

And my question is what was your basis that the cordless phone was plugged into anything and actually worked?

A There is a picture there of a cordless phone in a charging station.

Q Right.

But does the picture show that it was hooked up to a landline?

A Typically, a cordless phone would be connected to a wireless base station that is connected to the landline.

Q Okay.

Were you able to tell that this was one of those cordless phones that had a Bluetooth connection to some station?

A They don't typically use Bluetooth. They are typically wireless.

Q Okay.

So, in other words, what information do you have that this was this type of phone and what was your information that it actually was hooked up to anything at the time of the fire?

A That photograph showing the phone

there.

Q All right.

So, what would the difference in that photograph be if that was a phone that was not in use at the time, it was not hooked up to any landline?

What would it look like that it would be different than it looks like in that photograph?

A It wouldn't appear different.

Q So, what testimony are you relying on to come to the opinion that that phone was in working order on the night of the fire?

A So, I mean --

What I say in my report is spelled out on the bottom of the second paragraph on page 7. That's what I state in my report.

Q Well, you say that the photograph is inconsistent with Ms. Marcellin's testimony that the only landline phone was in the office.

That's what you said, correct?

A Correct.

Q And that means you came to a conclusion that this phone was working at the time because she said that the only landline that was working was in the office.

So, you came to a conclusion that she

was being inconsistent.

And my question is what is the basis of your conclusion that this was a working landline?

A So, what I state in there is that there is a cordless phone in a charging station in the spare bedroom.

Q But then, the next sentence --

A And that it would have been accessible.

Q Right.

Well, it could have been accessible, but if it wasn't connected to anything it wouldn't have done her much good, right?

A That's correct.

Q So, when she said the only landline phone was in the office, did you interpret that to mean the only landline phone that would actually allow her to make a phone call or just the only landline phone that was in the house entirely?

A I interpreted that to mean a phone that would allow her to make a phone call other than her cell phone. Historically, homes had both landlines and people also have cell phones.

Q So, in other words, what led you to the conclusion, other than this photograph, that this phone was capable of making a phone call on that

night connected to a landline?
A This photograph showing the cordless phone in a charging base station.
Q Right.
And is it shown whether it's plugged in?
A I can't see from this specific photo in this -- in the binder.
Q Are you saying that these cordless phones did not frequently actually have direct connection to the phone connection at the base?
MS. WANEMAKER: Can you rephrase that? That was a little confusing to me.
MR. SCHWARZ: Sure.
Q So, the charging station that you are referring to also in some of these cordless phones, at least the ones I've ever been involved with, are directly connected to the receptacle on the wall that provides you with the landline connection?
A That's not --
Q Do you recall that?
A That's not what I am familiar with. I also owned cordless phones over the years. Typically, there is a base station that's a larger unit where you can also put a phone, but then there

is these smaller charging stations that you would have additional phones that would also communicate with that base station. To me this appears to be one of those smaller charging stations.

Q And so, where was the base station that you assumed located?

Did you find a picture of that?

A She referred to it as being in the office.

Q She referred to a base station being in the office?

A She referred to a landline being in the office.

Q Right.

So, are you assuming that what she was referring to is the base station for multiple cordless phones that you are assuming?

Is that what your assumption was?

A That's correct.

Q And what was that assumption based on?

Your experience with cordless phones?

A Her testimony. The photograph of the cordless phone. And the familiarity with cordless phones.

Q What model is this?

A I can't see from the photograph in the binder.

Q And what in the photograph provides you with information that this is the type of cordless phone that you are familiar with versus the type that I described that I am familiar with?

How do you distinguish the two?

A I am not sure what type you are familiar with, but I've seen cordless phones for probably 30 or 40 years. There is a variety of different types. That is what I am familiar with.

Q The answer is that you can't tell by the photograph what the model is, what the type of cordless phone it is or whether it requires a base station, as you refer to it?

A As I said, based on viewing the photograph, to me it appears that it's a cordless phone that's in a charging station that would require another base station attached to the -- to a landline.

Q The office contents were well described in multiple reports and there are hundreds of pictures of the office.

Did you see a picture of the base station that you are referring to that you assumed

existed?

A I don't recall that, but I also didn't see a picture of the compact computer that was allegedly in the office.

Q Well, you didn't see a picture of a lot of things, but I am asking you did you see a picture of this base station that you assume existed that gave you the conclusion that Ms. Marcellin's testimony is inconsistent?

A Well, if there is not a landline in that office, landline phone in that office, that that would be inconsistent with her testimony.

Q Oh, the base station is what we are talking about.

In other words, your assumption is that the phone in the bedroom that you've depicted here was not connected directly to a landline but was connected wirelessly to a base station.

That's your assumption, correct?

A Right. I don't recall seeing a picture of any phone in the office, so.

Q And what was the purpose of your pointing this out in your report; this what you believe to be an inconsistency based upon these assumptions that you made?

Was it to discredit Ms. Marcellin's credibility?

A No. NFPA 921 directs you that you should compare all evidence to other evidence and to examine witness statements and compare those to other evidence. And so, that's what I attempted to do in my analysis; review her testimony and review what is consistent with other facts. Obviously, the more inconsistencies there are, you know, then the less reliable the testimony becomes.

Q So, based upon your multiple assumptions as to the -- whether this phone was actually working, you've made this a factor in considering the credibility of Ms. Marcellin's testimony about when she woke up from the fire and what she observed?

A This is one of several areas where there were inconsistencies in her testimony.

Q Okay.

And so --

A I didn't make a determination based on a, you know, a single inconsistency.

Q But this was one of the alleged inconsistencies that you used to basically disregard some of her testimony?

A No, I didn't disregard her testimony. I considered her testimony.
Q What --
A I referred in my report about referring to her testimony.
Q Which parts of her testimony, then, did you determine were not credible that were related to your theory that either the furnace or the candle or the couch caused the fire?
A There were a number of things in her testimony that were inconsistent. For instance, her testimony in her deposition is not consistent with a later declaration that was filed at the same time as rebuttal reports. There is significant inconsistencies in that declaration with her previous deposition testimony. There were things that were --
Q Let me stop you there.
Tell me what those inconsistencies were, please.
A So, for instance, the order in which she said she did things. In her deposition she said that she first started walking to the office, saw a -- saw a glowing fire, heavy smoke coming out of the office. Then went back to the kitchen to get a fire extinguisher. Then went back to the office and

saw eruptions coming from the laptop. In her declaration, the order of those things are reversed. Her declaration also describes things that aren't consistent with the physical evidence. On the one hand, she can't go into the office because of the fire and says that she can't -- you know, she can't go into the office, but yet she can see into the closet and see that there is no fire or smoke into the closet even though the closet wouldn't be visible unless you entered a significant distance into the room. Actually that statement is inconsistent with the Plaintiff experts saying that the fire started in the closet.

There were inconsistencies in her testimony about candles that we discussed earlier that she said she didn't use candles. And all the candles were in the drawer or something like that. I am trying to think what else. I mean, there were several inconsistencies.

Oh, there was an inconsistency that she said that Mr. Hollowell was on the floor and that he wouldn't be able to get up from the floor. The photographs show patterns, a protected region of where he would have been on the bed with his feet on the ground, consistent with where first responders

found him. So, there were a number of different issues that -- and her testimony that were inconsistent with other fac -- with itself and other factors.

Q Let's take them sort of in reverse order.

What was your understanding of Mr. Hollowell's ability to get himself out of bed and into a wheelchair by himself without help before the fire?

A That he would typically require assistance.

Q That's your testimony?

That's your recollection of --

A That was my recollection.

Q Okay.

And that's what your assumption is based on, that he couldn't have gotten himself up off the floor and onto the bed?

A No. Ms. Marcellin's testimony was that he wouldn't be able to get himself off of the floor and onto the bed. I am not assuming anything.

Q So, that's basically her opinion of what he could do, and not necessarily a fact, right?

A That was her testimony. If she is

incorrect about that, that's another example of her testimony being non reliable.

Q Okay.

So, you view that as a major inconsistency, then, the fact that Mr. Hollowell was able to get himself up on the bed contrary to her opinion as to whether he could pull that off?

A So, there were several inconsistencies. I named a few. There is others that I am just not recalling here but --

Q Okay.

A But that statement, you know, either it was inconsistent about whether or not he could get himself off the floor, if that was what really happened. Or he actually wasn't on the floor and he was really in the bed where he was found. There was, you know, other issues of that that were inconsistent. She talked about throwing the covers off the bed and her cell phone flying. But if you look at the bed afterwards, the covers aren't thrown off the bed. The one side of the bed, the covers are actually neatly on the bed and they are just pulled back on the side where Mr. Hollowell was found.

Q And that photograph was taken after the body was removed, correct?

A That's correct.

Q And what is your understanding of what happened between the time she threw the covers off and when his body was removed from the bed and they took the pictures?

A So, she --

It depends on whether you are referring to her declaration or if you refer to her deposition.

Q I am talking about what happened --

Ms. Marcellin never went back into the bedroom after she finally crawled out of the house, correct?

A After she crawled out of the house, no. She drove away and placed a call to OnStar and testified that she drove back to the end of the driveway and sat at the end of the driveway.

Q So, after she did that, and the firemen came in. They helped put the fire out. They found Mr. Hollowell on the bed. They removed his body.

Right?

A My understanding is one of the first things they did was find his body on the bed, removed him into the garage, so first responders could perform CPR on him.

Q Right.

So, the condition of the bedroom, then, since Ms. Marcellin left it could conceivably have been changed before the photograph was taken, correct?

A I am not sure what you are asking.

Q So, in other words, when the firefighters went in to remove the body, do you think that they were particularly --

A Made the bed or?

Q Is your view of the picture that the bed is made?

Is that what you are saying?

A I don't think they made the other side of the bed. I mean, you could see obviously they removed the body. You can still see the visible witness marks from where the body was. So, it appears that that's consistent with -- relatively consistent to how it was when they removed the body.

Q So, from all of this, you've determined that you think Mr. Hollowell was always in the bed and she never was in the bed?

A I am sorry.

I didn't --

Q You --

A -- hear what you said.

Q You didn't believe that he was ever on the floor?
A You just asked me two different questions.
Q Okay.
Well, I am asking the second one.
Is it your conclusion as a fire investigator that Mr. Hollowell was never on -- more probably than not was never on the floor?
A My opinion is that her statements are inconsistent with the facts. You know, either --
Q You --
A Either he was never on the floor or either he was able to get off the floor, what she was incorrect about.
But looking at the witness patterns on the bed, you know, it looks like for most of the time that there was soot deposition that he was on the bed because there is a protected region that doesn't have soot.
Q Then if you look at your Figure 6, then, you are saying that your Figure 6 shows that the bed is made at least on one side?
Is that how you interpret that?
A I think Figure 7 shows a better view of

that.

Q And that shows that --

You believe that's where the bed is made there?

A It's relatively neat. It doesn't appear that the covers were thrown off.

Q Okay.

If you turn to page 14?

A Okay.

Q And on page 14, and I think referring to Figure 11, you refer to a lines of demarcation, correct?

A Correct.

Q And if you look at the picture, it appears that relatively -- around the room there is a line between where the paneling looks brown and the paneling looks charred or at least has soot damage, correct?

A Correct.

Q And that's the line of demarcation you are referring to?

A Correct.

Q Now, when in the course of the fire do you believe that line of demarcation got to its lowest point?

When it first started?

A No.

Typically, it would --

You know, the testimony was that the fire had extinguished itself by the time the firefighters arrived. So, there would have been, you know, various phases of the fire. But typically, you have a first phase of fire growth where smoke is accumulating or a hot layer is forming and lowering down. And then, at some point it reaches its lower level before the intensity of the fire decreased.

Q So, it would be at the maximum intensity of the fire in the house, correct, or at least in that compartment?

A I mean, near that time. Not necessarily at that absolute time.

Q When in the sequence of events do you think that the thermal layer got to that point where it reached the line of demarcation?

A I am not sure I understand your question.

Q So, do you think that that had already occurred at the time that Ms. Marcellin first observed the laptop ejecting parts of batteries?

A So, you know, it's going to depend on

where the fire started and what sequence of events that actually occurred.

Q Right.

In other words, you reached the opinion that the thermal layer ignited the battery pack and put it into thermal runaway.

So, my question is when in the course of events did the thermal layer get to the level of line of demarcation?

Was it at the time that Ms. Marcellin discovered the fire, sometime before that or sometime after that?

A So, as I said, it's going to depend on what actually happened in the fire, what the sequence of events was.

Q Well, what was the sequence of events based on your opinion that the thermal layer and radiation caused the battery pack to overheat?

In other words, you must have an opinion that's based upon evidence as to how that happened and when it happened.

And in your opinion, it happened before Ms. Marcellin came into the office, correct?

A So, it really depends on what the scenario was. There is multiple hypotheses that I

considered. I considered a fire starting in the couch. I considered a fire starting in the closet due to the furnace or some other cause. We talked about that some of Ms. Marcellin's testimony isn't credible. So, you know, are we supposed to trust her testimony? Which version of her testimony are we supposed to be trusting? What she said in her deposition? What she said in her more recent declaration?

Q Okay.

A Are you asking me to accept the sequence of events that she described in one of those pieces of testimony or one or the other?

Q No.

I am asking you whatever you decided was credible evidence that allowed you to reach your conclusion that an external fire heated up the battery pack and caused thermal runaway. Whatever facts you used as evidence for that conclusion under your scenario that you said was more probable than not.

When did the thermal layer in the office reach the level of the line of demarcation in the office?

When in the sequence of events?

How long after the smoke alarm went off?

A So, considering a sequence where the fire started in the closet, you would have had a fire, fire growth, a hot level of smoke would have had to bank down from the ceiling. You wouldn't have gotten significant smoke traveling out of the room until the smoke layer went down below the opening for the door.

And so, once you have --

By the time you have that hot layer coming down, you are providing significant radiation to objects in the room. And so, it's likely that it would have been near that time or before the hot layer reaches its full extent down in the room that you heat up the laptop sufficiently to cause the batteries to go into thermal runaway. If you accept, for instance, the deposition testimony from Ms. Marcellin, you know, you had to have a few things happen. You had to have smoke bank down and migrate all the way to the end of the other end of the building where her smoke detector was activated. She said by that time she can smell smoke in that region. She can smell smoke in the living room, in the hallway. She could see a glowing coming from the

office. So, by that time you have a substantial fire in the office.

She then walks back to the -- to get a fire extinguisher. Walked into the office and that's when she sees the batteries going into thermal runaway. So, that's consistent with the scenario of the hot layer forming and banking down and heating objects and then the battery is going into thermal runaway.

Q I want to take that apart.

So, first of all, what were the height of the ceilings in this building?

A They were somewhere around 8 feet or a little less than 8 feet.

Q What is the basis of that opinion?

A Two things. That's a typical ceiling height, but the Matterport drawings --

Mr. --

And then, some of the rebuttal reports there is dimensions that were taken with the Matterport.

Q Okay.

And then, what is the height of the doorjamb in the office that you are saying that the thermal layer would have to come down to that level

before it would escape and go out into the rest of the house, right?

A Correct. I am not sure if there is --

If you are assuming that the fire starts in that room, yes.

Q But that was the assumption you just gave me. So, I am working with that. So, let's just start with that one.

So, the height of the doorjamb or the height of the entranceway to the office is significantly above the line of demarcation in the office, correct?

A Correct.

Q So, once the smoke and the thermal layer get to that level of the height of the doorway, that's when the heat starts to equalize and go into other parts of the house if the door is open, right?

A I mean, that's when that hot layer will start traveling to other portions of the building, yes.

Q And as it travels to other portions of the building with that door opening, it's going to slow its progression in the office, itself, right, because now you have bigger volume for that heat to go into?

A To some extent. I mean, the hot layer is going to start coming down at a lower level. On the other hand, you have the fire growing in size so you are producing more combustion products.

Q So, your theory, then, again, starting with the theory that the fire started in the closet, your theory is that the hot layer was already low enough in the office and exiting out into the hallway but low enough to provide enough radiant heat to heat up the laptop to put the batteries into thermal runaway?

That's your theory, correct?

A That's correct.

Q And so, that thermal layer would have had to be how far from the surface of the desktop or the armoire shelf top where the laptop was to produce enough heat to cause thermal runaway in the laptop?

A There is no requirement for it to be a certain distance. Radiant heat transfer doesn't rely on distances between the objects. It's really the view factor between the objects. So, there is no significant change --

Q So, the radiant -- the radiant heat that hit the floor would be the same amount of energy as the radiant heat that --

COURT REPORTER: We lost Mr. Schwarz.

(Whereupon, a discussion was held off the record)

VIDEOGRAPHER: The time is 1:57 p.m. We are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: It's 2 p.m. We are back on the record.

Q So, what I was trying to question you about, and somewhat inartfully, what is the first scenario about the fire starting in the closet and when the thermal layer would reach a level sufficiently low to cause enough heat to cause thermal runaway. That was the premise we were talking about.

Do you recall that?

A Yes.

Q So, I think what you were saying is that regardless of where the thermal layer was the amount of heat that would be radiated to the laptop and to everything else in the office would be the same?

Is that what you said?

A Correct.

I mean, once it's grown a significant

distance, it is going to be -- what the temperature of the hot layer is. And what the temperature of other objects are. What their emissivity is. What their absorbance is. And the view factor of what they are seeing. So, it's really not the distance that they are separated.

Q So, the --

You are saying that once the thermal layer forms, let's say, a foot, it goes down a foot from the ceiling, it's going to generate enough heat from radiant energy to heat the laptop sufficiently to cause -- to get through the plastic to get there through the wrapper to get to the battery cells and cause the battery cells to increase in heat sufficiently to cause thermal runaway?

A Correct.

By the time --

You know, based on Ms. Marcellin's testimony, by the time she was to the office, there was a hot layer of smoke that was somewhere between the top of her head and the ceiling.

Q Now, did she --

That layer of -- heat layer, then, would have had to be transferring radiant heat to her, too, right?

A If she went into the room. I think she said she didn't go into the room.

Q Even in the doorway, though, she would have been close enough to experience radiant heat, correct?

A Correct.

Q If the radiant heat was enough to heat up the laptop batteries to over 100 degrees Centigrade, which you would agree that it has to be somewhere in that range, which is the boiling point of water, right?

A Yeah, 100 degrees Celsius is the point of bowling water. Yes.

Q So, if it was in excess of that temperature, then there would have been some effect on Ms. Marcellin as she -- even in the doorway, correct?

A Correct.

I mean, she would be getting less being in the doorway than being inside the room or closer to the closet. And obviously part of it is the duration that you are near that.

Q So, you are saying she would have to be in there for a significant amount of time to feel the heat?

A No. The amount that she would feel heat or the amount that her skin would heat up would be a function of how long she was near that or in the room.

Q So, it wouldn't be like opening the oven door and the blast of heat from that you feel from that?

It would be some gradual process for her?

A Well, you know, opening the door, part of that is confection of hot air coming out of the oven in addition to radiation --

Q -- temperature --

A In addition to radiation. The part that is, you know, the hot air. If you open the oven door with your head right in front of it, you will feel a lot more heat than if you open the door away from it and then get in front of the oven.

Q So, let's take your other theories that the couch turned on fire from the candle or from some mechanism that you postulate it could have gone on fire from.

When does the thermal heat layer in the office develop if the couch started the fire?

A So, then, you would be building up

smoke in the family room or living room. Smoke would have to go, you know, down the hallway and bank down below the height of that entry and then start going into the -- into the office and building up in the office and igniting materials. It's sort of the reverse of scenario if you are assuming the fire starts in the closet and the couch later ignites due to build-up of hot layer from the office building up in the family room.

Q So, if that scenario --

That's one of your possible theories, right, that the couch started the whole thing?

A Correct.

Q And that would require --

If the living room was the compartment where the fire began, then a thermal heat layer would have developed in the living room, correct?

A Correct.

Q Now, when we looked at the photographs of the living room and we looked at the description that was provided, the damage in the living room was significantly greater on one side of the living room than the other beside the couch, correct?

A Correct.

Q And what was that damage caused by, in

your view?

Was it the thermal layer or was it flames from the couch?

A I am trying to look for a picture of that.

Q I think it's Figure 11 in your report.

A So, I think it's really a combination of two things that are happening there. You do have a thermal layer throughout the room. But clearly, you know, the couch has the most consumption of mass, the most thermal damage and there is localized fire damage caused from the couch. The burning above the ceiling directly above the couch. Some of the worst burning on the wall is near the couch.

Q So, if the fire started in the couch, then all of that would have to occur and the thermal layer would have to then spread to the office down the hall and around the corner before enough heat was generated in the office to put the laptop into thermal runaway, correct?

A Correct.

Q So, under that theoretical scenario that you came up with, Ms. Marcellin would have had to walk through all of that to get to the office, right?

A Correct.

If you accept her testimony in the sequence of events in her testimony by the time --

Q Well, are you saying --

A By the time there was significant fire in the office, there would have been significant fire in the -- you know, in the family room. She should have seen the fire of the couch. There would have been a significant hot layer in the couch. So, that was something I discussed in my report that, you know, her testimony is inconsistent with that sequence of events.

Q Right.

And she would not only have to have not seen it, but she also would have not felt it because she would have had to walk through all that, right?

She would have to walk through that thermal layer in order to get to that office?

A Correct. If that sequence of events was correct.

Q All right.

So, do you put a high likelihood that she walked through a thermal layer and didn't mention it, didn't notice a fire raging on the couch and instead focused her attention on the office?

Is that what you conclude is the most likely scenario?

A No. I think I describe in my report that that's not consistent with her testimony. So, if you accept her testimony, that's not likely to happen. If her testimony is incorrect and that wasn't really what she did, then that is a scenario that could have occurred.

Q Okay.

And then, the other scenario that you came up with is that the furnace caused the fire but your assumption there is the furnace caused the fire through the wall into the closet?

So, the first fuel was in the closet?

A It could have either been in the closet or more likely you would have burned material in the wall. That would have been the first fuel. And then the closet quickly after that. Unless what was in the closet was much more susceptible to ignition than the wall.

Q And so, is there a scenario that you are saying that the wall could have heated up from the furnace but not burned and that heat from the wall could have started the first fuel?

A I think that's unlikely. But if there

was material on the other side of the wall that was much more susceptible to ignition, then that's a scenario that could have occurred.

Q So, the wall --

There is a studded wall that has paneling, then airspace, then paneling, right?

A That is my understanding.

Q So, your theory, then, would be that the heat from the furnace, would that be fire heat or just the heat created by the furnace in the furnace itself?

A It could be either.

Q Is there any evidence of direct fire damage in the room where the furnace was that you observed in any of the photographs you looked at?

A There is fire damage near that area and, you know, we talked about there is not really a photograph showing the back of the furnace.

Q Right.

But you were going to look on the break. I know you probably had to eat.

But had you looked for any pictures by Mr. Gorbett that would have shown the area that you are theorizing could have been on fire in the furnace compartment that then spread to the closet?

Did you find any?

A I didn't have time to look for that. I don't know if he has that or not.

I think we discussed Figure 22 in my report that shows the wall burned through at least on one side.

Q On the closet side, but not on the furnace side?

A It's clearly burned through on the closet side.

Q Right.

A You can't tell what the other side is.

Q Well, let me put it a different way.

There is no evidence in that photograph that the furnace side of the wall is burned at all?

A You can't see the full side of the wall there.

Q Which would mean there's no evidence there is any burning on the furnace side of the wall, correct?

A Other than the fact that the closet side is completely burned through.

Q The closet side and the furnace side are two different sides.

Do you agree with me there?

A Correct.

Q The closet side shows significant burning, correct?

A Correct. It's burned through.

Q There is nothing in the photograph that shows the furnace side of the wall burned at all?

A Correct.

Q There is no other evidence that you have that the furnace side of the wall burned at all?

A It wasn't examined.

Q Right.

So, there is no evidence to support that?

A Well, the fact that you have a wall right next to it that has significant burn damage suggests that there would be heating of that wall. But we can't examine that. We don't have that.

Q And HP's fire investigator, you don't believe took any pictures that depicted any burns on the furnace side of that wall?

A I haven't looked back to that. I don't recall seeing that. But my understanding is that the furnace was never removed to examine that.

Q But you could have gone into the closet and taken a picture through that opening of the

burned out closet side of the wall to see what the furnace side of the wall looked like?
That's possible?
A Potentially if you could fit a camera through that opening.
Q Well, you don't think you could do that with a camera and a lens to get a picture inside the closet looking through that burned out wall at the wall behind it in the furnace room?
A You may be able to. I am saying if you could.
Q And if Mr. Gorbett suspected that the furnace caused the fire, don't you think he would have taken a photograph of that?
MS. WANEMAKER: Objection to form.
You can answer.
A I don't know whether he would or wouldn't. I can't speculate about his mind.
Q Would a reasonable fire investigator who -- a reasonably trained fire investigator who believed that the furnace was a potential source of the fire, would they have taken a picture of that wall?
A I think it depends on what they -- what their role was in the investigation.

Q So, what did you believe Mr. Gorbett's role was in the investigation?
A To document the fire scene and determine whether or not the HP laptop started the fire. I think at the time HP was put on notice. There was an allegation that the laptop may have started the fire. He may not have been concerned about whether the furnace started the fire.
Q Well, in order for anything other than the laptop to start the fire, something else would have to start the fire under your theory, correct?
A Correct.
Q So, you don't think it would have been within Mr. Gorbett's purview to try to figure out the other source of the fire that would have taken the laptop out of the picture with regard to ignition source?
A I can't speculate on what he thought he should or shouldn't do.
Q Well, if you were there, would you have done that?
A Most likely.
Q Could you turn to page 20 of your report?
Now, in the second --

In the first full paragraph on page 20 you say:

"There are several areas of interest in the office that warrant further inspection. The closet, a high-burn area; the armoire, where the incident notebook was located; and the desk, where a second notebook (2019 HP) was located."

Are you with me?

A Yes.

Q All right.

Then you say:

"Figure 18 provides photographs of the desk in the office space, which can be seen from the office doorway; this is where the second notebook was located."

And there is a picture showing the top of the desk on the right and a picture sort of diagonal from looking down on it on the left, right?

A Correct.

Q So, Ms. Marcellin had purchased a newer HP laptop and that was sitting on that desktop theoretically closed up at the time of the fire, correct?

A Correct.

Q And what was the height of that desktop compared to the height of the pull-out drawer in the armoire?

A I don't have the exact dimensions. They appear similar.

Q So, what is your opinion as to the radiant heat level at the surface where the 2019 laptop was on that desk compared to the radiant heat level from the thermal heat layer of the subject HP laptop?

A Sure. So, you know, radiant heat you will be getting from the ceiling would be similar. With the scenario of a fire starting in the closet and exhausting from the closet, you would have more of a hot layer near the closet. You know, exiting the closet and going up towards the ceiling.

So, the armoire and things in the armoire would be getting more radiant energy from the smoke exiting the closet and then eventually exiting through the hallway door. But you know, to some extent it would be similar.

Q So, let's go back to your candle theory.

If the office was set on fire by the candle on the couch, would you expect that there

would be different levels of radiant heat in different parts of the office?

A Not initially, but, you know, eventually we do see more significant fire damage in the closet. So, at some point, you know, the closet would have contributed more locally to the armoire than to other parts of the office.

Q But not initially?

A Not initially.

Q And how far into the fire is eventually?

A Well, in that scenario, the closet would have been ignited later in the fire. I can't give you an exact timeframe.

Q So, the difference in heat then if the couch was the source --

The difference in heat in parts of the room would in the office --

Withdraw that question.

Let me phrase it a different way.

If the fire started in the couch and spread by thermal layer into the office, initially then the radiant energy in different parts of the office would be similar. But once the combustibles in the closet were set on fire, then the heat would

be more concentrated in that side of the office.

Is that what you are saying?

A Correct.

Q And that would be sequentially after the living room was on fire and the thermal layer started to move down the hallway into the office, it would also move the other way, too, right?

Toward the -- it would move in all directions, right?

Into the kitchen. Into the -- down the hallway towards the master bedroom, but also into the office.

A Correct.

Q And then, once it got into the office, then there would be uniform thermal heat throughout the office until the heat caused the combustibles in the closet to catch on fire and then at that point there would be an uneven distribution of heat in the office?

A Correct.

Q And is that what you believe happened?

A So, as I said, the cause of the fire in my opinion is undetermined. I don't have an opinion where the fire started one way or the other.

Q Is that theory that we just discussed

something that's consistent with the evidence that you found in the photographs and the testimony of Ms. Marcellin?

A As we discussed earlier, it's not consistent with the testimony of Ms. Marcellin.

Q And is it consistent with the physical evidence in your view?

A It is.

Q So, in the closet, then, is it your belief that the physical evidence in the closet demonstrates that the fire started at a higher level and spread to the lower level?

A No. I think it's more likely that the fire started in the closet.

Q Okay.

Well, if it started in the closet, did it start at the lower level of the closet or the higher level of the closet?

A In the lower level of the closet.

Q All right.

So, if a thermal layer set the combustibles in the closet on fire and it came from the couch in the living room, how is it that the lowest level combustibles set on fire first?

A You would have to look at the various

fuels and what was more susceptible to ignition.

Q Well, did you do that?

A No. The materials had been removed from the closet prior to the inspection.

Q Well, there are plenty of pictures of the materials that were on fire in the closet.

A There are.

Q Right.

Did you determine that there was something combustible in the lower part of the closet to the extent that it would be set on fire before the items on the higher end of the closet?

A I didn't analyze that.

Q Well, wouldn't that be necessary for your candle couch theory to be liable?

A As I said, my opinion is that the cause of the fire is undetermined. I can't say that the fire was started by the candle and the couch.

Q Well, you can't say the candle was on fire in the first place, right?

It never was lit on that night. You can't say that. There is no evidence of that.

A I mean, the candle wick had been burned. It was burned at some point.

Q Right.

But there is no evidence that it happened the night of the fire?

A Correct.

Q And there is no evidence that the candle tipped over or was knocked over by anyone else?

A I think --

Q Or anything else?

A There is that wax on the one side of the opening; but, like I said, I can't reach an opinion that that was a cause of the fire.

Q We are still on page 20 of your report.

You say that it is unlikely that the fire started on that sewing desk that was across the room in the office where the 2019 HP laptop was located, right?

A Correct.

Q And you base that conclusion on the fact that there is less damage on that side of the room than there is on the other side of the room?

A Correct.

And, you know, there is less damage to objects on there. There is no evidence that the fire started there.

Q Then you say Figures 19 and 20 display

photographs of the armoire in the office.
And those are on the next page, right?
A Correct.
Q And you say:
"The armoire doors have smoke and soot deposition extending almost halfway through its height, consistent with the smoke and soot damage on the walls in the office."
A Correct.
Q So, the armoire has a similar line of demarcation to the walls in the office?
A Correct.
Q Then you say:
"The incident notebook --"
Which is the HP Pavilion.
"-- on the armoire also shows heat damage to the keyboard and softening and dripping of plastic surrounding the notebook screen."
And that's depicted in Exhibits 19 and 20.
Correct?
A Correct.
Q And you believe that --
Withdraw that question.

Is it your opinion that all the damage to the screen occurred as a result of radiant heat from the thermal heat layer?

A Yes.

Q And how did you rule out that projectiles coming out of the battery compartment that were at thermal runaway heats impacted the screen in certain areas where you see there is obvious damage to the screen?

A You don't see other materials around there burned. It is really consistent with material being heated and dripping down from above.

Q So, you are saying that if a projectile that was super heated from thermal runaway hit the screen and then bounced off it, you would expect to see damage to what other than the screen?

A Well, I don't expect that that would create damage. But, you know, there is other objects behind there. Paper. That you would have expected some of those projectiles to also hit if that's what was happening and they would ignite the paper. But you don't see you know significant damage to paper or other lightweight objects that would be easy to ignite back there.

Q What was the angle of the screen at the

time the laptop went into thermal runaway?
What is shown in the photograph or did you assume that it could possibly have been a different angle?
A I don't believe it's documented.
I think Ms. Marcellin testified she didn't think it was hanging off the desk as much. It seems reasonable that it would have been a bit more upright.
Q And if it was a bit more upright, wouldn't the screen, then, have been a barrier to the projectiles going into the armoire?
A It depends the direction the objects or the projectiles are going.
Q So, there was a hole in the top of the keyboard surface of the laptop that exposed the battery compartment, correct?
A Correct.
Q And that would be a possible avenue of exit for those projectiles?
A Yes.
Q And did you assume that that was actually a likely area where the battery contents were ejected from the laptop?
A It may have ejected from there or the

bottom of the laptop; but, yeah, that is a possible location.

Q If they ejected from the bottom of the laptop, where would they have gotten?

A I mean, it depends how far they travel on the desk and then eventually down to the floor.

Q Well, was there any --

Were there any battery contents found behind the laptop in the armoire?

A There were not.

Q So, presumably, then, the pathway to where the battery contents were found from the laptop would have to have come from the top of the laptop, right?

A That's possible.

Q Well, what other possibilities have you considered?

A That they also could have come out the bottom.

Q And if they came out the bottom of the laptop, how did they get to the place in the office where they were found?

That's what I am asking.

A They continued and rolled off the front or projected off the front of the shelf.

Q Was there physical evidence of that?
A There was some damage to the papers underneath the laptop.
Q So, under your --
If you look at Exhibits 19 and 20 under your theory, radiant heat from a thermal heat layer was sufficient to raise the temperature of the battery cells to something in the 200 degrees Celsius range but insufficient to set the papers in the armoire on fire or significantly damage the monitor that is shown there, the external monitor, from her prior laptop.
Is that your opinion?
A No. I mean, there is a few things about what you said that are incorrect.
Q Okay.
So, tell me, first of all, how did you conclude that the heat from the thermal layer was sufficient to raise the temperature of the battery cells to thermal runaway temperatures without damaging the -- setting the papers on fire or damaging the external monitor?
A So, I think when you first asked the question, you said heating them to 200 degrees Celsius. I don't believe the cells need to be heated

to 200 Celsius. But that's an area that Dr. Horn is covering.

Q Let me just stop you there.

So, you are saying that you came to your opinion without knowing what that temperature would have to be, right?

A That's not what I said.

I said that Dr. Horn is addressing that. I am saying I don't accept your statement that the batteries would have had to be heated to 200 degrees Celsius. That was a statement you made in your earlier question.

Q Okay.

So, you don't know what temperature that is; you are relying on Dr. Horn?

A Correct.

Q And you can't even ballpark what that temperature would be?

A That's not correct.

Q What ballpark are you putting it in then?

A I've said that cells can run away anywhere from --

It's going to depend on the cell, the condition of the cell, a variety of things. So, sort

of the 90 degrees Celsius to less than 200 degrees Celsius range.

Q And in that range of temperatures, they would have to get to --

That would be the internal battery temperature, correct?

A Correct.

Q In other words, the contents of the battery have to get to that temperature?

A Portions of the battery, right.

Q Right.

Well, the inside is the casings?

A Correct.

The whole battery -- that temperature, but a portion that begins going into thermal runaway and generating heat and continuing that. Or a portion that becomes damaged and the cell separator gets damaged and causes a short.

Q Right.

And that --

You are aware that thermal runaway in a battery pack can occur in one cell and then the heat from that cell can propagate other cells into thermal runaway?

A In some scenarios, yes.

Q Well, did you do something to rule that scenario out in this circumstance?

A That's something that Dr. Horn is covering.

Q I think I have Dr. Horn's --

No, I don't have it.

Do you believe in Dr. Horn's report he provided an explanation for why that didn't happen here?

A I don't recall. I know he discusses which batteries did go into thermal runaway, which batteries didn't go into thermal runaway. I don't recall if he addressed those opinions. I know he's reviewed and considered the report of -- the rebuttal report of Mr. Martin. So, he may have additional opinions about that.

Q Well, if the --

If thermal runaway occurred in a sequence here with one cell going into thermal runaway and the heat from that cell then heating the next cell in a sequence, do you agree that would be a different scenario than all of them going into thermal runaway at the same time?

A Yes. I mean, it's going to be depend on the timing, but those can be different scenarios.

But that's something that Dr. Horn is covering.
Q And I believe you did provide an opinion of how long a thermal runaway reaction would be witnessed with ejection -- venting first and then ejection of flames and battery contents.
You did provide some opinion on that or are you relying on Dr. Horn for that as well?
A I believe I quote Dr. Horn's report or summarize Dr. Horn's report when I discuss that.
Q Right.
And you said that it's a very short period of time that the battery actually in thermal runaway releases flames and releases battery contents in a matter of a few seconds?
A Correct.
That's what is in Dr. Horn's report and that's my observation from seeing tests of batteries.
Q Again, tell me about that.
You are saying that when a thermal runaway reaction occurs in an 18650 cell it typically lasts for how many seconds, in your experience?
A It's going to be depend on the specifics, but typically in the order of seconds. Not minutes.
Q How many seconds?

A I don't have a specific number.

This would be a better question for Dr. Horn.

Q So, you don't know the answer to that question?

A No.

You repeatedly ask questions that I didn't opine upon on my report that I referenced to Dr. Horn. I am telling you my understanding, but I keep on repeatedly telling you this would be a better question for Dr. Horn. I believe he is being deposed tomorrow so you can ask him those questions.

Q Well, Thursday.

A Thursday.

Q I need a break.

I am sorry.

I thought in your report you provided the opinion that it would be impossible for Ms. Marcellin to witness the ejection of battery materials because thermal runaway only takes a few seconds. I thought that was your opinion.

Is that Dr. Horn's opinion that you adopted then when you stated that?

A Let me go to that section of the report.

On page 34 of my report, I said:

"My report will discuss thermal runaway in the context of it being a potential ignition source, however, Dr. Quinn Horn's expert report discusses, in detail, basic battery overview, battery failure modes, and causes of battery thermal runaway."

Q Let's take a look at page 35, and the last paragraph. And the final sentence of that last paragraph after you say that it's your opinion that the thermal layer caused it.

You said:

"Otherwise, the thermal runaway event would have concluded before Ms. Marcellin arrived at the office."

A Correct.

Q So, in your opinion, then, the thermal runaway event was a singular event that would last seconds?

A I believe I referenced Dr. Horn's report in another area here.

Q Okay.

Go ahead and look.

A So, on page 45.

Q A different area then.

A First paragraph I say:

"Ms. Marcellin's description is consistent with a thermal runaway event, but these events are short duration and occur on the order of seconds."

So, it's referencing Quinn Horn's report. The 116. So, you know, an order of seconds means a few seconds to ten seconds roughly.

Q Okay.

And you haven't done any independent research on that but are relying on Dr. Horn's opinion that that's how long thermal runaway events last?

A That's correct. I mean, it's correct that I am relying on Dr. Horn for that. I haven't done independent analysis for this case, but I've certainly seen batteries go in thermal runaway tests and they go off in the order of seconds as described.

Q Okay.

And the order of seconds is somewhere less than 30 seconds?

A Yes. I mean, it is less than that, yes.

Q All right.

So, did you assume, then, that all of

the battery cells went into thermal runaway simultaneously to come to that conclusion that you stated in your report?

A No. That they may have or they may have gone off at thermal runaway over a relatively short duration.

Q So, in other words, what I am asking is how do you rule out the possibility that one cell went into thermal runaway that started a fire and the heat from that cell propagated to the other cells over time and so what Ms. Marcellin witnessed was one of the subsequent cells going into thermal runaway; not the first one?

How did you rule that out?

A Because that would have taken a much longer timeframe than the timeframe where the fire had started --

Had that been the cause of the fire, had the thermal runaway batteries been the cause of the fire, it would have been a much shorter timeframe than the timeframe that it would have taken for smoke to accumulate, for then fire to grow in the room long enough to accumulate enough smoke, then set off smoke detectors, create odors down at the other end of the building, to have smoke in the hallways and the

family room and then to still have batteries going off into the thermal runaway when she got to the office.

Q What temperatures would be required to begin to melt plastic and create smoke?

A What temperatures to --

Dr. Horn discusses this in his report. I want to say somewhere in 130 degrees roughly Celsius for the plastic to first be softening and then it was a couple 100 or 200 or so C range for the plastic to start flowing.

Q And does plastic that gets heated to that range release any smoke?

A Not initially. It would really just warm up. Melt. I mean, it will give off some minimal amount of smoke, but not as much smoke as if it were burning.

Q Ms. Marcellin describes to the investigators the night of the fire that it smelled like an electrical smell in the area. Not necessarily smoke.

Do you recall that?

A Whether she said that to the Allegany fire investigator?

Q I can show you, if you want.

It's Exhibit 4. Tab five.
A Yeah, I see that.
Q She smelled something electrical burning. So, she smelled an electrical smell.
Is that consistent with plastic burning, in your opinion?
A I am not exactly sure what she means by electrical smell.
Q Okay.
A I think it's some other testimony she may have -- or maybe it was in a more recent declaration that she said something smelled like burning plastic.
Q Is your opinion also based on your assumption that the smoke detector near her bedroom or near the master bedroom was the one that alerted her to the fire and it was not connected to the one that was closest to the office?
A Not necessarily. I mean, it would be a longer duration of time if that was the case.
Q Right.
But if it was connected to the smoke detector near the office then it would -- both smoke detectors would have gone off closer to the event when the fire started, correct?

A If the two smoke detectors were wired together and both would activate at the same time?
Is that what you are asking?
Q Yes.
A Then she would have heard an alarm activation earlier. She I think testified that she can already smell smoke in the bedroom when the smoke detector went off.
Q Let's go back to page 20.
A Okay.
Q So, I think what we were talking about was Figures 19 and 20.
Is it your testimony that the damage to the paper and the other monitor, the other HP monitor that is in the armoire, on the shelf above the subject laptop, that the temperatures that were reached by the thermal layer were sufficient to set the batteries and the laptop into thermal runaway, but insufficient to cause damage, significant damage, to those papers and to that monitor?
A There is two factors. There is the temperature of the hot layer, but then also with radiated heat transfer. It's the view factor. And some of those items are protected by the armoire. That's what we described in the report there. The

top of the armoire, the shelves of the armoire protect things that or partially block objects from the radiation from the hot layer whereas the HP laptop was out on that shelf not covered by those shelves, other shelves, in the top of the armoire.

Q Now, the other flat surface on the other side of the room would have been also unprotected, correct?

A Correct.

Q And you didn't find the same level of them as on that side of the room?

A So, there was melting of the other HP or softening of the other HP laptop that was on that area.

If you look at Figure 29 of my report, you could see the top of the case of the HP laptop is softened similar to how the laptop is on 20. It's just that the screen is down and the screen is closed.

Q So, the 2019 HP laptop battery pack didn't go into thermal runaway; correct?

A That's correct.

Q And it would have experienced temperatures similar to the temperatures experienced by the subject HP laptop based upon its height from

the ceiling?

A No.

Q Is that because you are saying that the closet was on fire first?

A Honestly, at some point the closet became involved in the fire and, you know, so it was --

You had hot combustible products and smoke coming from there which are closer to the armoire but then also the --

I mean, there is a few other factors. The lid was down on the newer HP laptop, which would have provided further protection of the cells. And then, also, I believe, those were --

That was an authentic HP laptop that may have been less susceptible to thermal runaway than the battery pack that was in the older lap -- notebook.

Q Explain that one.

Why did you believe that the 2019 laptop battery pack, which was basically not energized at the time, wasn't plugged in, why would the safety features on that have prevented thermal runaway from an external source?

A There is a few factors there. It

wasn't plugged in so it wasn't charging so that would make it less susceptible. But we don't know the quality of the cells in the older laptop since it was, you know, not an HP battery pack. It had cells from different manufacturers. We don't know. I think there is at least two manufacturers of the cells in there. We don't know the quality of them. We don't know if they degraded over time because of the lack of some of the protections. We just really don't know what the quality of the cells are. They are lower quality cells. They would typically be more susceptible to thermal runaway.

Q Do you have a reference for that?

In other words, have you seen any testing done on cells that are cycled multiple times or dead cells compared to highly energized cells as to the temperature and resident time it requires to provoke thermal runaway from an external source?

A I believe that's described in NFPA 921, but I also have articles that describe that.

Q Do you know --

A But again, this is an area that Quinn Horn is covering.

Q Okay.

Do you know any articles that describe

what you are just -- you said you relied upon?

A I --

Q Or are you relying on Dr. Horn?

A I believe it's in NFPA 921, I believe. I am relying on Dr. Horn. But I've seen previous research projects that show that. I can't recall the specific authors right this moment.

MS. WANEMAKER: How do you guys feel about taking a break?

MR. SCHWARZ: Now is good.

MS. WANEMAKER: Okay.

VIDEOGRAPHER: The time is 2:53 p.m. We are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 3:06 p.m. We are back on the record.

Q We were talking about the information concerning the susceptibility of different cells to go into thermal runaway and you referenced the 921.

If you turn to tab 2, and specifically the section beginning on Section 9.15, which was Exhibit 2 as well. And that's 921.

I just want to ask you some questions about this section.

A What did you say the number was?

Q 9.15. It's at the very end of chapter 9.

A Yeah.

Q Is this the section that you were referring to?

A Yes.

Q And section 9.15.1 is entitled, "Lithium-Ion Batteries," right?

A Correct.

Q And it says:

"Similar to other high-energy density fuel packages, when charged lithium-ion batteries are present during a fire they can serve as a fuel load whether they were involved in the cause of the fire or if they were attacked by a fire external to the battery."

Correct?

A Correct.

Q So, then, it says:

"Investigators may need to seek assistance of subject matter experts to perform further analysis to determine if a fire damaged battery was the cause of a fire."

And that's what you've done here; you are relying on Dr. Horn, correct?

A Correct.

Q And 9.15.1.1, it says that batteries at a higher state of charge that ignite have a higher heat release rate compared to batteries at a lower state of charge.

A Correct.

Q Now, did you make some determination that the batteries in the 2019 HP laptop were at a different state of charge than the batteries in the subject laptop?

A So, you would expect that the, you know, the batteries that were being charged overnight would be at 100 percent state of charge whereas the batteries in the 2018, you know, would be potentially at a lower state of charge.

Q Potentially, but you don't know when they were last charged, right?

A Correct.

I mean, they are also different batteries. So, you are comparing, you know, two different batteries.

I think the statement in 9.15.1.1 was more generally referring to just apples -- all being

the same if the state of charge is higher. They are going to have a higher heat release rate. And that study that --

If you go to the annex material, it references a study that was a study looking at the heat release rate of specific cells that were charged at different states of charge.

Q 9.15.1.3 discusses impact or abuse of lithium-ion batteries, right?

A Correct.

Q And it says that:

"Batteries can overheat and ignite if overcharged, undercharged, exposed to excessive heat or cold, flooded, short circuited, or physically damaged."

Did I read that correctly?

A Yes.

Q So, and that's the reason why HP, in its specification, required those protections against overcharge and overvoltage and over temperature, correct?

A Yes. I mean, that's part of the reason.

Q And without those safety devices, the risk of those conditions occurring and overheating

lithium-ion batteries would increase?

A They can, yes.

Q So, there we can go back to your report. And I believe we are on page 23 of your report. Figure 22. And that's tab 17 and Exhibit 4.

On page 23, you come to the conclusion that:

"It is probable that the fire started in or near the closet, as this area of the office experienced the most significant thermal damage and loss."

Correct?

A Correct.

Q So, you agree with Mr. Karasinski that the area of origin was likely the closet?

A Correct.

If the fire began in the office, that's likely where it started.

Q Well --

I am sorry.

Did you start your sentence by saying if the fire began in the office or did you say it is probable the fire started in or near the closet?

A So, that sentence says:

"It is probable that the fire started

in or near the closet, as this area of the office experienced the most significant thermal damage and loss."

Q That's what your report said.

What you just said before you read that sentence, you said -- you seem to be limiting that opinion to only if the fire started in the office. And I am just trying to clarify that.

Are you saying that this is conditional on some other conclusion that you say someplace else?

A I mean, I do agree that's the most likely place that it started.

Q Okay.

So, that means it's not probable that it started on the couch or any of the other places you mentioned were possible?

A Unless the testimony of Ms. Marcellin is incorrect.

As I described earlier, a big part of what rules out the couch is what I mentioned earlier in my report or maybe it's later in my report and I think your experts describe it in the rebuttal report was that the fire starting in the couch is not consistent with her testimony and her walking by the couch multiple times.

Q Okay.

In your report, though, you don't say that is based on Ms. Marcellin's testimony. You say that your conclusion that it's probable it started in or near the closet is based upon the -- that it was the area that had the most significant thermal damage and loss, correct?

A Correct.

But if you look back at the beginning of this Section 3.2 on page 19, it talks about where the -- you know, where the areas of the most burned damage are. It says near the couch and the living room and then around the office closet.

But then, I say I think the third sentence there:

"Ms. Marcellin's testimony describes a fire in the office and does not note a fire in the living room, where the couch is located. Her testimony is more consistent with the fire starting in or near the office. It is worth noting, that some portions of Ms. Marcellin's testimony about the incident are not consistent."

Q But the physical evidence that you determined based upon the amount of thermal damage

and loss makes the closet the most likely scenario for the start of the origin of fire?

A If it started in that room. Really what I was doing in this section is comparing different areas of that room. I think before the break you had discussed that, say, there is several areas of interest that warrant further inspection.

VIDEOGRAPHER: Dr. Myers, is there any way you can fix the camera? I can't see when you are talking. Thank you.

THE WITNESS: Sorry. I am trying to look down at something.

Q So, are you saying that the physical evidence that you witnessed from the photographs was not the basis of your conclusion that the fire started in the closet?

It was Ms. Marcellin's testimony?

A It's both.

Q Okay.

And the only one you mentioned was the physical evidence in this particular sentence?

A Correct.

But if you go back in the beginning of this discussion how I ruled out the other portions was based on her testimony.

Q If you turn to page 25, and under Figure 24, you also say:

"This fire pattern is also consistent with the fire spreading from the closet to the rest of the room, as noted by Mr. Karasinski."

A Correct.

Q So, the physical evidence of the amount of damage and loss in the closet plus the fire pattern both support the premise that the fire started in the closet?

A Correct.

Q And that's without even any of Ms. Marcellin's testimony, right?

A So, again, this is in a section where we are looking at the office and they talk about the fire spread in the office.

Q Right.

But the fire pattern is something that is physical evidence that you found from the photographs?

A Correct.

Q And that fire pattern is consistent with the fire spreading from the office, from the office closet, to the rest of the office as opposed

to starting someplace else in the office and spreading into the closet?

A Correct.

Q Okay.

And that further supports your conclusion that it probably started -- the fire probably started inside the closet?

A Correct.

Q And on the next page, page 26, you conclude that it's probable the fire started in the closet based upon the physical evidence and the first fuel was likely the items in the closet which were the clothing and the linens and other things that were witnessed to be burned when the fire was extinguished?

A Correct.

Q So, you come to the conclusion, then, that the fire likely -- more likely than not started in the closet and spread from the closet in the office to the rest of the office and then spread to the rest of the house?

A Correct.

Based in part on accepting Ms. Marcellin's testimony that rules out the couch.

Q And also based upon the physical

evidence that we just talked about?

A Correct.

Q So, then under sources of ignition, on page 28, you start to talk about different potential sources of ignition as if the fire --

You list the first one, you say, is the electric couch, which the fire investigators confirmed was not plugged in, but you are not accepting that, right?

A I mean, that may be the case. I just said I had not seen photographic documentation that confirms that.

Q Excluding the candle for a moment, if the couch was not energized or plugged in at the time as the investigators documented that it wasn't, is there some other way that the couch could have been the ignition source?

Excluding the candle for a minute. We will get to the candle.

A You know, there is always things like if someone was smoking and left a cigarette in there, but the testimony was that no one in the house smoked, so.

Q Was there any evidence found that anybody in the house smoked after the fire?

A Not that I am aware of.

Q Were there ashtrays or cigarette butts found?

A I didn't see those, no.

Q Okay.

Wouldn't that be something that fire investigators would look for when there is a fire of unknown origin?

A Typically. But, you know, people don't always see things. I think one of your investigators said there was no candles, but clearly there were candles.

Q Now, this table, a candle that is in a jar, I think that's what we are looking at in Figure 27?

A Correct.

Q And your other theory is that the candle could have somehow lit the couch on fire. So, that somehow the candle was lit. Somehow the flame from the candle jumped from the couch. And then, if it got knocked over, somebody straightened it out at some point so that it would be in the position that you saw it in this photograph that was taken on the night of the fire.

Is that what you were working on?

Is that your theory?

A No.

I think my point was just more generally that there was testimony that there were no candles or candles weren't used and clearly that wasn't correct because there is a candle there. So, that means that candles may be used near the couch.

Q Right.

But, in other words, that would --

The fact that the candle in the glass case is there standing upright, it wouldn't be the source of ignition of the couch unless something happened to that candle, right?

Is there some scenario that you are thinking that the flame of the candle while the candle sat in the position that it is in on the table somehow could have lit the couch on fire?

A It could have been another object above the candle that ignited it and dropped down onto the couch. But the main point is just that, you know, there was testimony that candles weren't used, but there are clearly candles that are used there. So, then, that makes you wonder why someone testified that there aren't candles if there were.

Q You can wonder all you want, but I am

asking you for evidence.

What evidence is there to support that the candle started the couch on fire?

A That candles were used near the couch.

But as I said several times, at the end of the day my opinion is that the fire is undetermined because we don't have enough information to determine the cause.

Q If the candle started the fire under this theory and the couch was the first item -- and just excluding Ms. Marcellin's testimony, that makes that improbable.

But if the fire started in the couch and then spread through a thermal layer throughout the rest of the house into the office, then what is your explanation for the fire pattern that we just talked about that shows that the fire spread from the closet into the rest of the office?

A As I described. That a hot layer ultimately ignited material in the closet and that burned and created those fire patterns.

Q And the fire patterns, though, indicate that the origin of the fire in the closet was low in the closet, right?

That's what the fire pattern shows?

A That's what it appears, correct.

Q So, you are saying that the candle somehow lit the couch on fire and then somehow created a thermal layer that spread throughout the house and went into the office.

But the thing that was the first fuel to ignite from that thermal layer was the fuel on the floor of the closet?

A Correct. There was something there that was susceptible.

The other thing with fire patterns is fire patterns appear. Fire spreads in a certain direction. But really each time a new fuel packet ignites, it's going to make a new pattern. And so, you also have to consider the ease of ignition of different fuel packages, the heat release rate of different packages. We don't have full information about all of that.

Q Well, the contents of the closet that went on fire were able to be seen. They were photographed and they were analyzed.

And you knew what they were, correct?

A We have contradicting information on that. Ms. Marcellin testified there was a compact laptop in there. We haven't seen any signs of the

compact laptop.

Q I'm sorry.

I am not asking about Ms. Marcellin's testimony right now.

I am asking about the contents of the closet that were witnessed by the investigators that you looked at photographs of.

You didn't see a photograph of the compact. That wasn't in the closet.

What was in the closet was photographed, right?

A Well, some of the material was removed from the closet prior to being photographed. So, we don't know exactly where everything was. Some of the materials were moved to the hallway, but things were documented. But you are right, there is no photographs of the compact notebook that was reportedly in the closet.

Q Right.

I am not asking now about what wasn't in the closet. I am asking you what was found in the closet and what was found in the closet was photographed, both the contents that were remaining in the closet and the contents that were removed from the closet during the firefighting that were put in

the hallway.

Do you agree with me?

A That's my understanding.

Q Okay.

Again, you weren't there, but you saw photographs of all of that and also a description of all of that, correct?

A Correct.

Q And which of the materials that were described in the photographs or in the reports of the other experts would indicate to you that they were particularly susceptible to a thermal layer much more than, for instance, paper that was located in other parts of the room that was at a higher level?

Was there gasoline or some petroleum that would be -- you know, that fumes would ignite at a lower temperature than paper would?

A I don't think anybody did testing for accelerants. At least I haven't seen any records of anybody doing testing for accelerants.

Q So, you think that's possible that an arsonist put an accelerant in the closet and didn't light it but the couch lit it from a thermal layer?

A I don't think I said that. You asked me if there was gasoline in there and I said I don't

think anybody tested for accelerants.

Q If gasoline was in there, it would have to be in some sort of container, right?

A I mean, people pour gasoline on things. It could be --

Q Well, if you pour gasoline on something, it evaporates relatively quickly, right?

A So, portions of the gasoline --

Gasoline is a multicomponent fuel that contains lightweight things, heavier weight components. And so, it doesn't all evaporate. Lightweight materials evaporate off. That's how you can detect ignitable liquids after a fire. Some of the heavier components still remain there even after a fire.

Q Did the fire pattern, in your professional view, was it consistent in a closet with an accelerant?

A Not specifically, no. I think you do see isolated areas of low burn. You know, what the couch and --

Q I --

A -- which are two different areas which is something sometimes people point to as a potential cause of arson or evidence of arson.

Q I am sorry.

I want to ask you about the closet and the burn pattern in the closet.

Is it something about that burn pattern that leads you to the conclusion that some of the items that were in the closet were soaked with an accelerant?

A That's not something I considered explicitly until you brought it up earlier. You know, you can't necessarily say fire patterns are caused by gasoline or not caused by gasoline. The way you would test that is to test for accelerants. I don't believe that was done.

Q So, you are saying that the fire pattern that you would expect to see if the first fuel was soaked in an accelerant would be the same as a fire pattern you would expect to see if the same materials were not soaked in an accelerant?

A So, NFPA 921 describes that some of the types of fire patterns that people historically attributed to evidence of there being gasoline or an accelerant really aren't a sign of that. So, I think the way you would test for an accelerant is by doing testing to determine if there is residues of accelerant. Not by explicitly looking at fire

patterns.

Q So, no one did those tests?

A Not that I am aware of, no.

Q So, the accelerant idea came from you. So, I just want to go back to it.

So, the theory that the candle somehow caught the couch on fire and then spread by thermal layer into the office and that the first fuel then was the bottom of the closet you said could have happened if there was an accelerant.

A We would have to go back at the record, but I think what you said is completely incorrect. I think you were the one that described was there gasoline poured on the material in the closet. I don't believe I am the one who brought that up.

Q So, let's go back to the question.

My question was if your theory that a candle could have somehow -- that candle that was upright on the table could have somehow spread its flame to the couch. The couch then went on fire. The heat layer created by the couch spread throughout the house into the office. And the first fuel ignited was the material on the floor of the closet.

I asked you why that would occur before other items much closer to the ceiling and, like,

paper. Why would the closet contents on the floor ignite first. Why would that be the first fuel under your candle on the couch thermal layer spread scenario?

A I said there may have been materials there that were more susceptible to ignition. I think that's when you brought up the hypothesis of gasoline, which I am not even sure would be more susceptible to ignition by radiant energy.

Q What materials that were removed from the closet and photographed would be of the type that would be more susceptible?

A I don't have that information. There is different types of fabrics that are easier to ignite than others. Different types of fabrics would burn at higher heat releases than other fabrics. That's not something I examined for this.

Q So, the answer, then, is what you postulated as possible but there was no evidence in the photographs that you looked at that would allow you to say that some substance on the floor of the closet was more susceptible to being a first fuel than anything else?

A Correct. We don't have enough information to analyze that.

Q Okay.

When you talk about the electric fireplace and the television and you were able to, looking at the photographs, decide that that was not the likely ignition source, correct?

A Correct.

Q And then, you talk about the natural gas furnace and you said you can't rule that out because based on the physical evidence you can't rule that out because nobody removed the furnace from the room?

A Correct.

Q Okay.

And you mention this blowout. Blown out. I think that you described that as some deformity of the metal in the furnace in an outward direction like gas might have exploded.

Is that what you described?

I didn't really follow it.

A So, I guess in the third complete paragraph on page 31, I reference a quote from Anthony Greenwald, a member of the interior firefighting team, that said that:

"He moved down the hall to the first room. He discovered the furnace had been

'blown out.'"

It's not clear what he meant by that. But the grill on the furnace is -- in photos -- is displaced outwards.

Q And my question is what --

You don't know what he meant by blown out, but you saw the grill that was displaced outward.

What would the mechanism of displacing that grill outward be for causing the fire in the closet?

A So, in combustion equipment, if you have a delayed ignition, you can have, you know, the build-up of excess gas and then causes, you know, somewhat of an explosion inside a piece of equipment that would blow something out, blow a connection out. So, that could have allowed combustion products or a flame to exit the furnace.

Q Does the side of the furnace that had what you are calling blowing out was the side facing the louvered door, right?

A Correct.

That's the only side we could see of the furnace. I don't know if there was damage on the other sides of the furnace.

Q If flames shot out of the furnace into the louvered door, then that would have been the first fuel, right?

The louvered door would have caught on fire?

A Or other materials that were in that direction.

Q Well, what other materials were in the direction?

The furnace was only a few inches from the louvered door when it was closed, right?

A Correct.

Q Are you postulating that there was some flammable material in between the louvered door when it was closed and the furnace?

A No.

Q So, if flames shot out of the furnace and started a fire on the louvered door, there would be evidence of fire damage on the louvered door?

A Correct.

Q And the investigators determined that there was no fire damage on the louvered door. There was only smoke and soot damage.

A I think they said there wasn't charring on the door.

Q Well, charring would be an after effect of a frank fire, correct?
A I'm sorry. I --
Q The evidence of combustion of the wood in a louvered door.
A Correct.
Q That would leave char.
So, there's no evidence of combustion of the louvered door?
A There is no char of the wood. That's correct.
Q Okay.
So, if fire shot out in the direction of the louvered door and did not set the louvered door on fire, then how did that fire get into the office closet and cause those materials on the floor of the closet to combust?
A So, we talked about this earlier. We didn't see the back side of the furnace so we don't know what may have happened on the back side of the furnace or on the sides of the furnace. And there's other mechanisms that a furnace can ignite materials nearby. But that wasn't analyzed in this case.
Q But what we are talking about is the term blowout and the deformity you found in the front

of the furnace.

Did they find a deformity anywhere else in any other direction in the furnace?

A I'm not aware of anybody looking at the other sides of the furnace.

Q Well, you looked up the model of the furnace. You have a reference to it in your materials.

Was there venting on all sides of the furnace, or just in the front?

A This is a direct vent furnace. So, by design it wouldn't be venting into the building.

Ms. Marcellin also --

Her first suspicion was that this is smoke coming from the furnace, which I am not sure why that was her first suspicion. If there had been previous problems with the furnace where smoke was coming into the house, which isn't something you would expect from a properly operating direct vent furnace.

Q How old was this furnace?

A About two years old.

Q So, it was a relatively new furnace?

A Correct.

Q Relatively modern by the standards that

we've been talking about, correct?
A Correct.
Q And there is no evidence that there was that you've seen --
You told me what you haven't seen, but there was no evidence that you have seen that suggests the furnace started a fire within the furnace compartment?
A I think by design it would be, you know -- - starting a fire inside the furnace --
Q I'm sorry.
Within the enclosure of the room that included the louvered door.
You saw no photographs of evidence of fire within that area that the furnace was located?
A The furnace is adjacent to the closet, which is one of the high areas of heavy burn.
Q I am sorry.
The closet had fire in it.
I am talking about the room that the furnace was in.
You've seen no photographs that show any evidence of fire within that room, correct?
A You know, there is certainly discoloration, heat damage to the PVC, exhaust pipes

coming from the furnace. So, there is certainly smoke and heat damage in there, but the furnace wasn't removed to fully examine that area.

Q I didn't ask you about smoke and heat damage. I asked you about fire damage. Direct fire damage.

Are there any photographs that show direct fire damage within the room that the furnace was located?

Char? Loss of material?

A So, if you look at photograph --

This is in my tab 5. I don't know what exhibit number that is but --

Q That's the Allegany Fire Report.

A So, that's HP and I am looking at photograph HP 00436.

Q Okay.

A You can see the header above that closet is heavily burned. Above that furnace room is heavily burned. You can actually see that in the top it appears that it is drywall on the inside of that closet and that's -- it appears in the top left corner of that image. It's broken through or you can see through to the wood paneling on the other side of the wall. And there is wood paneling falling down on

the top of the furnace. There appears that there is charring of the paper on the drywall in the top right corner of that back wall in that photograph.

Q Okay.

And that's all up within the top 2 feet of the ceiling and not in the direction of the office, correct?

A No. That's in the direction of the closet in the office. You can't see lower because the furnace is in the way.

Q Okay.

So, is it your opinion, then, that that damage occurred from heat that came from the furnace or damage that occurred from heat that came from the closet towards the furnace through that wall in the area of the closet that was most heavily damaged by fire?

A It's my opinion that that's an area that you have to further examine to make that determination.

Q So, you don't think it's more probable than not that the damage at the top of the photograph that's close to the ceiling above the furnace came from the heavily damaged closet behind it as opposed to it came from flames that shot out of the furnace

somehow?

You can't make that determination?

A I would have to look at --

You would have to remove the furnace and look at the totality of the closet to fully examine that.

Q Well, there is no damage -- no fire damage to anything below that level of a couple of feet below the ceiling, correct?

Everything you pointed out is within a couple of feet of the ceiling?

A When we looked at that other wall of the closet -- I think it was Figure 22 of my report -- it's burned through lower in the closet, so.

Q Right.

But the top of the closet was significantly burned. You can take a look at those pictures if you don't remember that.

A Yeah, that's correct.

Q And that would be the other side of the area of the drywall that you pointed out showed fire damage?

A Correct.

Q If you look, for instance, in the same exhibit, which is Exhibit 6, HP 463, which shows the

closet and shows the damage near the ceiling of the closet and the closet wall in that area.

That is the back of where you were looking at from the furnace, correct?

A Correct.

Q But you are saying it's equally plausible in your professional opinion that the fire started in the furnace and spread through the top of that room into the closet as the fire started in the closet and spread into the furnace room?

Equally plausible?

A No. I said to make a determination of that, I would like to pull out the furnace and be able to look at the wall behind the furnace.

Q And if you don't do that, then you consider both of those scenarios equally plausible based on the photographs that you looked at?

A I don't have an opinion one way or the other.

Q So, when you came to your opinion in your report that the fire originated in the closet, are you saying now that you are changing that opinion to say that you can't determine that it originated in the closet? It could have originated with equal plausibility in the furnace room?

A No. I think when we were talking earlier, I described the furnace would have been a possible ignition source that could have ignited material in the closet. We haven't identified any other ignition sources in the closet.

Q So, wouldn't the ignition have to happen --

In other words, the furnace couldn't shoot an ignition source through the wall into the closet. It would have to start a fire in the closet -- in the furnace room before it could spread to the closet, right?

There is no direct conduit of a flame from the furnace into the closet, is there?

A I don't know. We haven't been able to examine that whole back wall.

Q But you are saying there could have been, like, a hole in the wall that would allow the furnace to shoot flames through in the closet that no one discovered?

A I didn't say that, but, I mean, that's a possibility. No one removed the furnace to look at it.

Q But if there was a hole in the wall, couldn't you see it in the closet, too?

A You can't see the whole wall between the furnace from the closet.

Q Okay.

The next section of the report -- if you can go back to tab 17, which is Exhibit 4 -- talks about how you ruled out the HP laptop from being the ignition source?

And I think that begins on page 32.

A Are you referring to the 2019 HP laptop or the 2011?

Q No.

The 2011 you begin to discuss on page 32 of your report.

A Okay.

Q And you say that on this page 32, you refer to the figure 30 on the next page.

And you say:

"The yellow box highlights a section of the notebook that is damaged and open around the battery pack area; this could have occurred due to a combination of radiant heat from the hot ceiling layer and thermal runaway of cells. The notebook screen has some resolidified material on it, consistent with softening of plastic

around the notebook screen due to radiant heating."

Do you see that?

A Yes.

Q So, the first sentence --

I should have just stopped there.

But the first sentence talks about the yellow box.

And you say that in Figure 30 the yellow box is damaged to the top of the laptop over the battery compartment that was a combination of radiant heat and the heat from thermal runaway.

A Correct.

Q And does that fact, the yellow box, somehow prove that the thermal runaway did not occur before the radiant heat occurred?

A (No verbal response)

Q Let me ask a different question.

If one of the shells of the laptop went into thermal runaway and then ejected contents that started a fire in the closet that subsequently created a thermal heat layer, how would, in your opinion, the physical evidence on the top of the laptop look different?

A If that plastic wouldn't have been, you

know, pre-softened by the radiant heating, then I think you probably would have had a different appearance on the battery area because the batteries would have been trapped in there for longer because they would have to melt their way out.

Q What is the basis of that opinion?

In other words, have you had experience seeing what a laptop that goes into thermal runaway would look like prior to radiant heat from a thermal heat layer?

Do you have some evidence that supports that opinion you just gave?

A I've seen batteries --

I mean, I've seen laptops attacked by fire where batteries didn't go into thermal runaway. I've seen cases where batteries did go into thermal runaway but remained in the notebook.

But what I am saying is that if the sequence was different you would expect that the plastic wouldn't have been pre-softened. So, the cells would had to -- would have had to completely melt through on their own rather than melting through a pre-softened layer.

Q That's what I am trying to get at.

In other words, is that based upon your

study of this topic or based upon your own experience looking at these?

What leads you to the conclusion that it would look different?

A Just what I said. I think the laptop would look different depending on which scenario had occurred.

Q Right.

What experience do you have?

In other words, you are saying that you've compared laptops that went into thermal runaway from an external fire source to laptops that had gone into thermal runaway because of defects of the battery cells.

And from this comparison, you are able to definitively say that the pattern that would be developed would be different from one to the other?

A No.

I am saying that the pattern would look different. I don't know that we could make that determination from this specific photograph.

Q Well, you have a lot of photographs of the laptop.

Are there other photographs that would allow you to come to the opinion as to what order the

damage was caused in, whether it was thermal runaway that caused it first and then radiant heat or radiant heat and then thermal runaway?

A I think the larger piece of evidence is the description of the sequence of events that differentiates between those two.

Q And when you say the description of the sequence of events, you are talking about the testimony of Carol Marcellin?

A Correct.

Q So, in coming to the conclusion as to the sequence of events, you are relying on Carol Marcellin's testimony; not the physical evidence?

A I am relying on both.

Q Okay.

So let's just take her testimony out of it then and explain to me the basis of your opinion, what methodology you utilized, to determine that the way that laptop looks in Figure 30 is different than it would look if the batteries went into thermal runaway first?

I want to know your methodology.

A In looking at the fire patterns on the laptop.

Q I am talking about the yellow box.

That's what you highlighted in your report.
A Right.
Q The yellow box is what tells you that this went into thermal runaway after a fire attack and not -- and the radiant heat from that fire attack is what caused the thermal runaway, and not the opposite.
So, that's what I am asking you.
What inside that yellow box, that you have drawn and highlighted, allows to make that determination?
Using what methodology?
A I don't think in my report I say explicitly that that yellow box is what makes that designation.
Q Okay.
Now, if you turn --
If you look at Figure 31, that's the bottom of the laptop, right?
A Correct.
Q And the plastic on the bottom of the battery compartment is severely deformed.
Would you agree with that damage?
A Correct.
Q And that was a protected surface that

was not subject to direct radiant heat, correct?

A Correct.

Q So, the damage to the bottom of the laptop below the battery compartment is fairly similar to the damage to the top of the laptop above the battery compartment?

The plastic is mutilated.

A I don't agree with that characterization that it is mutilated. It is different. The top of the laptop you have uniform melting of a lot of material, of the keyboard, of the touch pad, of the --

Q I'm sorry.

Let me interrupt you for a second. I apologize for interrupting.

I am asking you about the yellow box. Okay? The area of the yellow box. The damage to the plastic in the area of the yellow box in Figure 30 compared to the damage to the bottom of the battery compartment in Figure 31.

Are you saying that there is much more damage or some level of different damage to the top than there is to the bottom and that the top is more severe?

A I am differentiating that the bottom is

very localized. There is no surrounding damage from radiant heat transfer. All of the heat damage there would be from the thermal runaway of the cells whereas at the top you have --

Q Let me stop you there.

A -- you have both portions.

Q So, you are agreeing that the damage to the bottom of the laptop shown in Figure 31 would have entirely been from the battery cells going into thermal runaway because radiant heat didn't get there because it is a protected area?

A Correct.

Q Okay.

And now we are saying that the damage in the yellow box, not to the keyboard, but to the area above the battery compartment in Figure 30 is a different kind of damage that shows that the plastic was softened first before by radiant heat?

Is that what you are saying?

A Right. You can see evidence of both. If you look at --

I don't know if it's the same image or not. But I think what is labeled HP 0471.

Q That's in the Allegany Fire Department Report?

A Right. Right.

Q So, let's look at that.

A You can see that it's less localized and a more gradual melting through the -- to the top of the laptop. You see both. You see melting all around that and it becomes more intense or more severe as you get closer to the area that's the yellow box.

Q Okay.

So, I am just trying to follow you.

So, you are saying that the damage to the top of the laptop above the battery compartment is of a different nature than the damage below the battery compartment on the other side of the computer?

That's what you are saying?

A Correct.

Q And the different nature is that you feel that the damage to the top surface of the battery compartment is more significant than to the lower surface?

A No. I am saying it's more uniform. You have, you know, melting all over the top. And then it becomes more severe just in that localized region where the battery comes through. But if you

look at the bottom, it's really entirely localized on that, I guess, what is the bottom right side of the laptop. In the picture it is on the left, but if the laptop was on its base, that would be the right side.

The back side where it looks like the back of the laptop has melted and flipped over, you know, lines up with the area where the batteries come through the top and are in yellow and in the other image.

Q So, the battery compartment extends for a --

Past the middle of the keyboard, right?

A Correct.

Q And if you look from the top, you are not saying that the entire top surface above the battery compartment is uniformly damaged; it's more on the right side?

A Correct.

That even outside of the battery compartment in the front near where the touch pad is, around that. That same plastic is melted.

Q Okay.

But again, we are talking about the area above the battery compartment because --

Withdraw that question.

In the area above the battery compartment, the right side of the battery compartment, above that compartment there is more damage than the left?

A Correct.

Q And you can actually see that some of the cells protruding out of the top or portions of the cells protruding out of the top of the surface of the laptop, right?

A Correct.

Q And you are saying that, that wouldn't happen if this was a thermal runaway reaction without the plastic being softened first by radiant heat?

A I am saying that makes it easier for it to happen.

Q Okay.

And so, the temperature of thermal runaway, then, when a cell goes into thermal runaway and explodes, that's not sufficient to get through the plastic that covers the battery pack?

It would need to be softened first by radiant heat?

A No. It can be enough.

Q Okay.

So, how do you use, then, that evidence

to discern whether the thermal runaway happened before or after the radiant heat?

What methodology did you use to conclude that it was radiant heat that applied first before the thermal runaway caused the damage that we see in this picture?

A As I said earlier, a large part of the evidence I am relying upon is the testimony of Ms. Marcellin and the sequence of events. The timing of the fire versus the timing that she went into the room and observed the -- or went to the room and observed the laptop going into thermal runaway.

Q Okay.

So, that's a large part, and we will put that aside. But that means there is other parts of what supports your opinion and that's the physical evidence. And that's what I am trying to get you to give me an answer to.

Is what methodology did you determine the physical evidence supports your theory of radiant heat applied first before the thermal runaway occurred?

A It's really looking at the fire pattern or looking at the melting patterns and seeing the relatively localized, you know, more localized damage

more widespread on the laptop as well as then the damage from the battery. If you look at the left side of the laptop, you know, you are getting bulging on the top whereas you don't on the bottom.

Q So, I guess that's my question.

I'm sorry if I am being obtuse.

But clearly there was radiant heat damage to the top surface of the laptop and keyboard, right?

A Correct.

Q And clearly, there was thermal runaway heat related damage to the area above the battery compartment?

A Correct.

Q So, my question is how did you make a determination of which happened first?

Your belief is that the radiant heat damage to the entire top of the laptop happened first in order to heat the battery cells to thermal runaway and I want to know how you look at that picture and can determine the order in which those two heat sources occurred?

A So, as I said, it's two things. I know you like to keep on disconnecting them, but part of it is the witness testimony from Ms. Marcellin, but

then the fire damage or the melting damage to that is also consistent with that scenario.

Q So, again, without Ms. Marcellin's testimony, tell me what is your explanation of how you can time the radiant heat thermal damage occurring before the heat damage caused by the thermal runaway?

What about either this photograph or any other photographs of the laptop can you point to and say, "I can definitively say that it had to be radiant heat first before the heat generated by the thermal runaway that caused this picture to look like it does." Or any picture that you have from Mr. Gorbett or anybody else.

A I am not doing it based on a single picture. I am doing it on the totality of the evidence, which also includes Ms. Marcellin's testimony. You can't separate that.

Q Well, we can separate it from a standpoint that there are two different items of evidence, right?

Ms. Marcellin's testimony is what it is. You testified just a little while ago that, in your opinion, the physical evidence shows that the thermal damage from the heat layer had to occur

before thermal runaway.

And I just keep asking you what is it about the appearance of this laptop in this photograph that you are relying upon to come to that conclusion?

And if you say that you can't come to that conclusion based upon looking at the picture, that's fine. And that you are relying entirely on Ms. Marcellin's testimony to time which heat source happened first, that's fine.

But I would ask you to answer the question.

Is there something about the photograph that allows you to time which happened first?

A I tried to explain this several times, and can do this again.

The differences I see are in Figure 31. You see localized melting just to the right region of the -- you know, what is in the picture is on the left region, but it would be on the right of the laptop if you set it down -- where you have significant melting and consumption of material where on the top you have less localized damage and more uniform melting over the top of the laptop, which means the combination of the radiant heat transfer

and of the additional damage caused by the thermal runaway of the battery. That damage to me is consistent with the testimony of Ms. Marcellin.

And if that's not an open question, I would like to take a break.

MS. WANEMAKER: And I believe the court reporter needed to at 4:25?

(Whereupon, a discussion was held off the record)

VIDEOGRAPHER: The time is 4:11 p.m. And we are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 4:13 p.m. We are back on the record.

Q So, to see if I can summarize where I think we just went through.

With regard to the physical evidence, you believe the damage to the bottom of the laptop compared to the damage to the top of the laptop indicates to you that the top of the laptop above the battery compartment experienced radiant heat damage before thermal runaway and, therefore, the top of the laptop has more damage than -- and more uniform damage than the bottom of the laptop?

Is that really what you are saying?

A So, as I said a few times, I think the primary determination or a large factor of the determination of the order is really Ms. Marcellin's testimony. But this burn damage, you know, does seem consistent with that. This melting damage seems consistent with that.

Q The reason it is consistent with that is you believe the damage to the top of the battery compartment visible on the keyboard side of the computer is different than the damage that's shown on the bottom of the laptop which clearly experienced no radiant heat damage, correct?

A Correct.

Q Okay.

I will leave that alone.

And Ms. Marcellin's testimony that you are relying upon, you are saying that that's based on your assumption that thermal runaway reactions only occur for a few seconds, right?

A On the order of seconds. That's based on the report of Dr. Horn; his analysis.

Q And it is also based on the assumption that the four cells that went into thermal runaway, went into thermal runaway simultaneously?

A At a similar time.

Q So, within seconds of each other?
A Within seconds. Tens of seconds.
Q And again, just so that I know, what is the basis of your opinion that all four cells went into thermal runaway within seconds of each other or tens of seconds of each other?
A It is really the testimony of --
I mean, it's the report of Dr. Horn.
Q So, you are relying on Dr. Horn's opinion that all of the cells went into thermal runaway within seconds or tens of seconds of each other?
A Correct.
Q And if that were true, if that --
If you didn't have that testimony, what else about Ms. Marcellin's testimony would allow you to determine that the thermal runaway event happened as a result of an external fire source?
Anything else about her testimony other than your assumption or Dr. Horn's opinion?
A So, the --
I mean, it's really her observations and timing of hearing a smoke alarm going off. The time that it would take for a fire to progress and cause smoke to transmit to outside of the office, to

near her, her observations that there was smoke she can smell in the bedroom. She can smell smoke. There was smoke present in the family room, in the hallway. Seeing glowing from a distance from the -- from the hallway. And then going in seeing just then the batteries going into thermal runaway.

Q Did you assume that the exploding battery cells would not create any light that would give a glowing?

A No, I didn't assume that.

Q So, the glowing could have been the explosions of the battery cells and the hot projectiles that it was omitting, correct?

A I mean, batteries releasing gases that ignite can create light, yes.

Q And the other question I had is when a combustible is first introduced to an ignition source, is it possible that smoke will be emitted before a flame actually develops?

A So, smoldering combustion can produce smoke prior to the flame.

Q Is there anything in the physical evidence that allows you to determine whether the combustibles in the closet emitted smoke before any frank flames were visible?

A I'm sorry.
Did you say any frank flames?
Q In other words, any obvious flames were visible.
A It's going to depend on the ignition, that we don't know, that there can be a generation of smoke before there is physical flame.
Q So, if a hot piece of battery component landed in the closet on these combustibles, it's possible that they could have smoldered before a flame actually developed?
A A battery going into thermal runaway may create a flame.
But you are saying a hot particle coming from a battery that went into thermal runaway, if it ignited material, made it smolder for a while?
Q Yes.
A That can happen but it's going to generate a smaller amount of smoke than, you know, if you have more involved combustion of the materials.
Q Are you aware of the temperature that can be generated inside a battery cell from thermal runaway?
A I don't have a specific number in front of me right now, but it could be quite high.

Q So, in other words, we talked about irreversible thermal runaway reactions happening somewhere in the 100 to 200 range of Celsius.

Do you agree that once thermal runaway occurs, that the temperature reaches much greater heights as much as 1,000 degrees Celsius?

A I don't have a specific number in front of me, but that's a reasonable range.

Q So, if a battery component was ejected at 1,000 degrees, depending on its mass, that would have quite a bit of heat potential, correct?

A Correct. It's going to be depend on the mass. The components of the cells tend to be thin foils that don't have a thick mass and will cool quickly.

Q But to cool quickly from 1,000 degrees Celsius still is quite a heat source even seconds after it is ejected, right?

A No, not if it's a thin foil.

Q Do you have any data that you looked at on how long the battery components that are ejected from thermal runaway induced cells, how long they stay hot enough to cause a fire?

A I mean, we see in this case, in this incident, we see components of the batteries that

were thrown away, thrown around to various areas of the room where materials that were around didn't ignite. I am looking at page --

In my report I show where various cells ignited and those are areas that there wasn't significant fire damage. Including back behind the desk or the sewing machine, two cells are found, and there is no burning back there.

There is a number of portions on the carpet on page 32 where you have various components of the battery that landed on the carpet and didn't ignite material. So. The evidence in this case is that those materials didn't ignite things.

Q The components you are talking about are the casings, right?

A It's a combination of both. The cans ended up behind the desk. But then in the --

If you look at Figure 33 of my report, it shows where various winding materials, cell can materials, ended up on the floor and it didn't ignite materials.

Q Okay.

And the areas where they landed were on carpeting, correct?

A They were on carpeting.

If you look at page HP 0472, it looks like there is a piece of material that's on a piece of paper behind the keyboard or behind -- in front of the monitor.

The diagram on page 37, Figure 33 of my report, shows some material on the armoire.

Q I'm sorry. You are giving me two different numbers and I lost you.

Are we looking at your report or are we looking at the Allegany fire photographs?

A I was looking at both.

But if you look at the Allegany fire photographs, HP 0472.

Q Okay.

Let me look at that. Don't go further.

So, 472 shows what it looks like a piece of copper material that's on paper that is below the undamaged external monitor, correct?

A Correct.

Q And did you make the assumption that that piece of copper material was a piece of battery winding?

A That's what it appears to be.

Q Was that one of the items that was collected as evidence and examined, do you know?

A I don't know.

Q And did you also make the assumption that that piece of battery winding got to that spot directly out of the laptop as opposed to coming off the ceiling or off the wall or banking off something else?

A I don't know how it got there.

I am just saying --

You were asking if materials could sustain high temperatures for a long time and ignite materials.

Q Okay.

Is there anything in any of the investigators' reports that actually visited the scene that documents that that was the landing spot for that particular piece of battery winding?

A I mean, obviously the Allegany Fire Department took a picture of that.

Q But is there anything in the report that indicates that they found it there or that it -- what its path was before it got there?

A Let me look and see.

I don't see that level of detail in the report or their photo log.

Q And would you agree with me that this

photograph that we are looking at demonstrates that the Allegany Fire Department investigators actually removed the laptop from the shelf to take this picture?

A That's correct.

(Whereupon, a discussion was held off the record)

VIDEOGRAPHER: The time is 4:27 p.m., and we are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 4:42 p.m., and we are back on the record.

Q Dr. Myers, could you turn to tab 14, which I marked as Exhibit 7?

This is an article by Sorensen, S-O-R-E-N-S-E-N, entitled, "A Study of Thermal Runaway Mechanisms in Lithium-Ion Batteries and Predictive Numerical Modeling Techniques."

I think you indicated in prior testimony today that after receiving Dr. Martin's report that you looked at some of the references that were articles, that were published articles?

A I did.

I didn't look at this article, but I did look at some of the articles.

Q Okay.

I just want to ask you to turn to the second page of the article, which is page 2 of 16.

And there is a graph there.

Do you see that?

Figure 1?

A I do.

Q So, we were talking a minute ago about the temperatures that were -- are generated by a thermal runaway reaction and this graph appears to show that, correct?

Take a minute to look at it.

A No. It looks like it's showing the rate of temperature rise versus temperature during thermal runaway.

Q Right.

So, the temperatures are on the X axis and the temperature rate of increases is on the Y axis, correct?

A Correct.

Q And so, the temperatures reached during thermal runaway after it gets to the critical point about 200 degrees Celsius, goes up into the 4 or 500 degree Celsius level, correct?

A The hottest --

VIDEOGRAPHER: Dr. Myers, you are off frame.

THE WITNESS: Sorry.

A I would have to look at this a second.

Q Sure.

A So, you know, in this test they are doing accelerating rate calorimetry or that's what it looks like they are doing based on the Reference 6 in the Figure 1 and the title of the article.

So, I mean, the highest temperatures they show here are 400 to 450 degrees Celsius. It is not clear to me if that is the temperature the cell was going to or if they were continuing to heat the cell and causing that temperature. But, you know, clearly there is data between the rate of temperature rise and temperature up to about 300 degrees Celsius. And then, the rate of temperature rise is a flat line after that. So, I'm not sure if that's just they can't measure that temperature rise anymore or what's happening.

Q Are you familiar with the temperatures that can be reached though by the internal contents of a battery that goes into thermal runaway?

A As I said earlier, I don't have a specific number in my head. But, you know, it can be

hundreds of degrees of Celsius.

Q Or up to 1,000 degrees Celsius?

A Right.

Q Take a look at Exhibit -- sorry -- tab 11, which I've marked as Exhibit 8.

This is another article that was referenced by Dr. Martin.

And my first question is whether this is one that you actually did read before your deposition?

A I did.

Q Okay. Great.

This is an article by Larsson, L-A-R-S-S-O-N, et al.

It's entitled, "Gas Explosions and Thermal Runaways during External Heating Abuse of Commercial Lithium-Ion Graphite-LiCoO2 Cells at Different Levels of Ageing."

And you had a chance to review this prior to your deposition?

A Correct.

Q And this was a study that this group of researchers took lithium-ion battery cells and, first, differentiated them by some being new, some being completely out of charge and some being cycled

through charge/discharge cycles of 100, 200, 300 cycles.

Is that how you interpret it?

A (No verbal response)

Q I think Table 3 on page 225 kind of summarizes things pretty clearly.

A Yeah. And table 3 and 4.

Some of them refer to dead cells. Like, one where the battery went dead during cycling. I am not sure what the cause of the other cells being dead were.

Q In any event, they wanted to have different cells at different -- with different levels of abuse and at different points in their life cycle, right?

A I am not sure about levels of abuse, but certainly had gone through different numbers of charge and discharge cycles.

Q Well, some of them were actually aged or stored at temperatures above what is recommended also. That was another parameter they used.

Take a look to see if I am correct on that.

A Yeah. I mean, it says stored at 60 degrees Celsius. I am not sure if that was above the

temperature recommendation or not.

Q Okay.

And 60 degrees Celsius is approximately what in Fahrenheit?

Like 115?

A I would have to do the math. It's somewhere in that range.

Q Okay.

In any event, so, what they did is they took these batteries in different characteristics as far as the cycling and the charge and the storage temperature and they put them all in a 300 degree Celsius oven, correct?

A I don't believe that's correct.

Q So, tell me what temperature the oven was?

A If you look at Table or Figure 4, it looks like the oven was at approximately room temperature and then which heated up over time.

Q To 300 degree Celsius?

A Pardon me?

Q To 300 degrees Celsius?

A In the figure 4, it was only heated to around 200 degrees Celsius. Maybe 250.

Q I'm sorry.

Which column are you relying on to say that the oven temperature was 250 degrees?

A I am looking at Figure 4.

Q Right.

But let me see if I can find the reference.

Take a look at page 222 under "General Set-Up."

Do you see where it says:

"The oven was turned on one minute after the start of the test and set to 300 Celsius"?

A Yes.

Q So, does that help you understand that the temperature got to 300 degrees Celsius?

A No.

I mean, if you read the full sentence, it says:

"The oven was turned on one minute after the start of the test and set to 300 Celsius utilizing the maximum heating rate capability of the oven."

Q Right.

So, the cells --

If you look at Table 3, the cells went

into runaway thermal runaway between 61 and 73 minutes -- or excuse me -- 59 and 73 minutes of being in the oven.

Do you agree with that?

A That's correct.

Q And so, is it your interpretation, then, that after an hour in the oven, it hadn't gotten to 300 degrees Celsius?

A So, they show one example test, Figure 4, which is Test 7, that if you look at that at --

It says major venting and thermal runaway, it shows in red. That's about sixty -- a little less than 62 minutes, which is consistent with Table 3.

For Test Number 7, it says thermal runaway occurred at 61 minutes and 43 seconds. So, you can see at that time the oven was up to about 200 degrees Celsius.

Q So --

A Again, if you look at time zero, the temperature is somewhere between probably around 25 degrees Celsius, which is about room temperature. So, over the course of the hour, the temperature in the oven is increasing from room temperature to up to about 200 degrees Celsius.

Q So, if I understand --

And you are talking about Figure 4, correct?

A Correct.

Q And Figure 4, at that 61 minutes, did a great jump with these lines?

A Correct.

Q And you are interpreting that to mean that there was a great jump in the temperature of the oven at that point or the temperature of the interior of the battery cells where the temperature gauges were placed?

A So, if you read the -- if you read the caption for Figure 4, it says T 1 through T 6 are battery surface temperature sensors. So, it's not the interior of the battery, but the surface of the temperature. And that the other two temperatures are at the top of the oven, mid and temperature of the oven top. So, the dash lines are the oven temperature and the solid lines are the battery temperature.

And so, at around 61 minutes or 62 minutes when it goes into thermal runaway, you see that the temperature of the battery goes up significantly. That the temperature of the oven just

continues gradually rising sort of like it was doing the rest of test.

Q Okay.

So, all of the batteries, though, in this oven had to be in the oven for over -- for approximately 60 minutes before thermal runaway was provoked inside the cells?

A I mean, Figure 4 just shows the results from a single test.

Q Right.

But if you look at Table 3, there is a column, the fifth column over, says thermal runaway and major venting minutes, seconds and there is numbers that range from 59 minutes, 22 seconds to 72 minutes -- 73 minutes 36 seconds.

A Correct.

Q So, that's the time that it took in the oven for the external heat source to cause thermal runaway?

A Correct.

Q Okay.

And those cells were put into the oven without any plastic coatings, right?

It was just the metal cells?

A I am not sure.

Q Well, it says the external cell temperature was measured.

Is there any indication that they didn't put the cells in without the covering that is usually covered when they are in a battery pack?

A Let me see if I can see that detail in here.

So, if you look at Figure 1, you know, this isn't an 18650 cell. So, it's a different type of cell. I can't tell if there is a plastic coating on a cell or not in that picture. It looks like they put some tape around it probably to hold the thermocouple in place on the outside of the battery. And then it's sitting on a brick.

Q Right.

And so, it wasn't put in a battery pack similar to what would be in a laptop, correct?

A No.

Q With a plastic coating?

A No. It's a different type of battery. I think it's a prismatic cell that is contained in an aluminum can.

Q Okay.

Now, once the thermal runaway --

But it's a lithium-ion battery,

correct?

A Correct.

Q Now, Table 3 also shows the extent of the thermal runaway reaction.

It says, "thermal runaway outcome time as minutes, seconds."

Do you see that?

A I see that column.

Q So, for instance, Test Number 3, the thermal runaway began at 68:16. There was a gas explosion 14 seconds later and then there was 32 seconds of fire and then 14 seconds of small flame after that.

Do you see all of that?

A I do.

Q So, that would mean that that particular reaction went on from 68:16 for 14 seconds 'til there is an explosion and for 32 seconds which would be 48 seconds total and then another 14 seconds when it gets it to a full minute and two seconds, correct?

A I am not sure if you are supposed to add all those times together or not.

Q How do you interpret that?

A It's unclear. I mean, there is a gas

explosion at 68:30. Then it says oven door fully opened. Camera still attached. Observes the -- fire. It says a 32 second fire. 40 second small flame fire above cell bank.

I am not sure what it exactly described, if those time increments are from the time of the thermal runaway or from the time of the gas explosion.

Q In any event it appears to be, at a minimum, if you want to interpret it the way you want to interpret it, which is not how I would interpret it, but that it would be 46 seconds of fire and flame, correct?

A Maybe 32 seconds.

It doesn't provide any more detail.

Q So, you are interpreting this as the minimum possible.

And I am just wondering did you have some resource that you are looking at or that you have seen that you can point me to that tells you that thermal reactions run their course in seconds?

A As I said earlier, I point to the report of Dr. Horn. And like I said, there is a few differences between these cells. These are not 18650 cells. These are larger cells than an 18650 cell.

It's a different form factor. So, it's not a one-to-one correlation to the 18650 cells.

Q How about cell number 8, which says it was 81 seconds of fire?

Do you interpret that to be something less than a minute?

A It sounds like there is 81 seconds of fire in that case. So, that sounds like it is more than a minute.

Q Okay.

So, you are relying entirely, then, not on any research that you have done, but in Dr. Horn's report did he provide the maximum time period that a thermal runaway reaction in an 18650 battery cell can last that you relied on then to form your opinion?

A I am relying on Dr. Horn's report. I have to find the exact location. I am relying on page 35 of Dr. Horn's report.

Q Are you saying the sentence:

"In my experience, thermal runaway of an 18650 battery cell completes in seconds once it's started"?

A Correct.

Q Okay.

And so, that's based on Dr. Horn's

anecdotal experience? He has no references in his report to where he got that information.

It is his personal anecdotal experience that you relied on?

A I am relying on his experience, yes.

Q Okay.

And he doesn't say how many seconds?

A He says seconds.

Q Correct.

So, that could be two seconds. It could be ten seconds. It could be 50 seconds.

Right?

A I would interpret him saying seconds to be less than a minute.

Q Okay.

And did you --

You worked with Dr. Horn, right?

He is with Exponent as well?

A I do.

Q Did you talk to him before you came to your opinion of how many seconds he says it takes to complete a thermal runaway reaction in an 18650 cell?

A I did talk to him about his report.

Q And what did he tell you that you could recall that he relied on?

In other words, did he do some kind of testing where he used a stopwatch and kept track of the cells as they went into thermal runaway?

A I don't think he specifically told me what he did, but I know he conducted a lot of testing historically of cells going into thermal runaway.

Q And did you talk to Dr. Horn about whether he was -- had an opinion as to whether the cells in a battery pack that go into thermal runaway can do that sequentially as opposed to simultaneously?

A I don't recall having that specific conversation.

Q Is it your opinion that that's possible?

A In some situations that can happen, yeah.

Q And if that situation did occur, then thermal runaway could have occurred in one cell and be occurring in a different cell until Carol Marcellin walked in, correct?

A I would refer those questions to Dr. Horn about the exact timing that he thinks would have occurred with the cells in this case.

Q But your opinion is based on whether

thermal runaway occurred before or after the radiant heat occurred based upon Carol Marcellin's observations of projectiles being ejected from the laptop, correct?

A Correct.

Q And your opinion is based on the concept that it would be impossible for the smoke alarm to have gone off and the fire to have created smoke and woken up Carol Marcellin if it started with thermal runaway because that reaction would have been long since done by the time she got to the office, right?

A Correct.

Q But if the cells went in sequence and they didn't reach thermal runaway temperatures simultaneously in each cell, and one cell created heat in order to heat up the next cell, then that would be a much more protracted time period before the last cell would be ejecting its contents, correct?

A So, I think what you are saying if four cells went off one after the other it would be longer than if all four cells went off at the same time?

Q Right.

A That's correct.

Q And so, if each took up to a minute and there was some delay in between one reaching the temperature after the other reached the temperature that's necessary for thermal runaway, then it would be difficult to predict precisely how much time would go by between the ejection of the material from the first cell and the finishing of ejection of material from the last cell?

Would you agree with that?

A As I said earlier, I would defer to Dr. Horn for the exact timing that he thinks occurred with the batteries going into runaway.

Q Well, the exact timing isn't reflected in his report, is it?

All he says is:

"In my experience battery cell completes in seconds once it has started."

A Correct.

Q He makes no opinion with regard to whether the cells all went into thermal runaway simultaneously.

A I don't see where he gives more specific information about that, no.

Q When you came on your opinion based on Dr. Horn's opinion that we just read, in his

experience "battery cell completes in seconds once it has started," did you interpret that to mean that all four cells that went into thermal runaway went into thermal runaway simultaneously?

A Not necessarily, no.

Q And so, if you didn't assume that, then over what period of total seconds did you come to the conclusion that it took for all four cells to go into thermal runaway?

A It didn't have a specific number. I would say within a minute or two.

Q Your opinion, then, is that all four cells went into thermal runaway within two minutes?

A Approximately. I don't have --

I didn't have a specific number in mind. But in a short timeframe, shorter than the timeframe for the spread of the fire and Ms. Marcellin to walk down to the room, walk away from the room, walk back to the room and observe the batteries going into thermal runaway.

Q So, I am having trouble with this.

So, you are saying whatever time it was, it was not enough time for her to do all that?

Is that what you are saying?

A No. I am saying it wasn't --

You know, it was significantly less than the time for her to do all of that.

Q What numbers are we talking about?

In other words, what is your estimate of the time it took for the smoke alarm to go off outside the office and for her to go down the hall and witness the thermal runaway reaction?

How much time are you estimating went off -- went by?

A Well, for the time -- for the smoke alarm --

The difference in time between the smoke alarm going off and her going down to the hallway?

Is that what you are asking?

Q Yeah.

Was that a minute? Ten minutes? A half hour?

A I would say a few minutes. A minute to a few minutes.

Q It could have been one minute, right?

A Yeah. I would say between -- smoke detector --

Well, you are referring to a few different things.

But the smoke detector that notified her of the fire she is describing is the smoke detector outside her bedroom that she then silenced and then went down to there. So, she discusses walking down and --

Q Do you think --

A Pardon me?

Q Do you think she walked slowly or she might have been -- had some haste in her step to find out what was going on?

What was your assumption?

A That she would have been walking a normal pace. She said the lights were out. She didn't have glasses or contacts on. I think she would have obviously not been running. She is approximately 80 years old. So, I am thinking a minute to a few minutes.

Q A few minutes like 10 minutes, 15 minutes, 20 minutes?

A Like, one to five minutes.

Q So, somewhere between one to five minutes?

A Correct.

Q And what is your estimate of how much time it would take -- assuming that the smoke alarms

were wired together and it was the smoke alarm by the office that went off -- how much time after the initiation of the lighting of the --

Well, let me ask this question.

Withdraw that question.

Does a thermal runaway reaction by itself create smoke and heat?

A A thermal runaway reaction, you know, will typically make flames or it can make flames if the gases being emitted, ignite. It doesn't typically generate any smoke.

Q Does it generate any smoke?

A Yes, it can generate smoke.

Q When the thermal runaway reaction occurs and generates flame, it can light, for instance, plastic on fire, correct?

A Depending on the duration, it can do that. We don't see burnt material near the laptop here. We don't see burnt material where it ejected from the laptop landed or ejected from the cells landed.

Q Okay.

My question was can the flames from the thermal runaway reaction in a cell cause the plastic to burn?

A In some cases it can, yes.
Q And does plastic burning create smoke?
A It can, yes.
Q So, if the thermal runaway in each cell happens sequentially, you are saying that it would be impossible for the smoke alarm to go off and Ms. Marcellin to come down and witness any of the thermal runaway reaction?
That's your opinion?
A Correct.
Q And that's based upon Dr. Horn's statement, "In my experience, thermal runaway of an 18650 battery cell completes in seconds once it has started"?
That's what you are basing that opinion on, on timing?
A And the timing for fire to grow. Produce enough smoke to, you know, first fill the room. Then spread to other portions of the building where it can activate smoke detectors. Make the observations that Ms. Marcellin that she had, that she can smell smoke in the bedroom. That she could see and observe smoke in the family room. See smoke pouring out of the office.
Q So, if I understand correctly, then,

you are saying that it would take the fire being at a high level consuming a lot of materials in order for the smoke alarm outside the office to go off?

A It would in some length of time.

And also, for her to make the observations that smoke is coming out of the room.

Q What length of time would it take for the smoke detector to be activated outside the office in your professional opinion?

A It is going to be depend on the initiation of the fire. If it's a small smoldering fire that's not putting out much smoke, it's going to take a very long time. If it's a fire that's growing more rapidly, it is going to take a smaller length of time. But, you know, I am estimating on the order of, say, three minutes to a half hour depending on really what the cause of the fire is and how long it takes for the fire to grow.

Q So, if a fire is sufficient to cause a thermal heat layer that produces radiant heat to create thermal runaway, is that fire sufficient to cause a smoke alarm to go off?

A Yes.

Q And even before it got to the level that it could produce radiant heat to cause thermal

runaway, it will set off a smoke alarm, correct?

A I am not sure I understood that question.

Q So, your scenario is that this fire had built up to such an extent that it caused a thermal heat layer to form sufficient for it to create thermal runaway in the cells.

And my question is when in that sequence of events would the smoke alarm likely go off?

Wouldn't the smoke alarm go off before the heat layer got to the extent to cause thermal runaway?

A I don't understand your question.

Q All right.

The sequence of events you have here is that the fire grew to such an extent that it either went from the mysterious candle on the couch into the office or it started somewhere in the office -- you don't know -- but it caused enough of a heat layer to then transfer the heat to the battery cells through the plastic to heat them up to get to somewhere in the 150 to 200 Celsius range?

That's your opinion, right?

A Correct.

MS. WANEMAKER: Objection to form.
You can answer.
Q Where in that sequence of events would the fire have created enough smoke to set off the smoke alarm outside the office where all this was going on?
A So, it's going to depend how smokey the fire is and the actual dynamics of the fire.
Q Well, you examined the photographs of the fire.
Are you saying that this fire was likely going on for 10 or 15 or 20 minutes creating that thermal heat layer that could then transfer that heat to the battery cells without setting off the smoke alarm?
A No. I think, as I described, there is a variety of ignition mechanisms that can start a fire. There is examples of slow smoldering fires going on for a substantial length of time before they propagate into flaming combustion or before they were witnessed. So, that can take a substantial length of time.
Q So, a slow smoldering fire you are saying was potentially the cause of a thermal heat layer that came down and transferred enough radiant

energy heat to the battery pack to cause thermal runaway?

Is that your testimony?

This was all caused by a small smoldering fire?

A No, that is not my testimony.

Q So, in order for the fire to create that much heat and thermal layer, it would have to be enough to set off the smoke alarm, right?

A It would be about that size fire where you are filling the hot layer in the room that you would set off smoke detectors.

We've had this question whether it set off the smoke detector near the office or whether it set off the smoke detector at the opposite end of the building.

Q I am asking you to assume for purposes of this question that it set off the smoke detector near the office.

Okay?

Now, let me just ask you this question.

If the smoke detector near the bedroom was independently battery powered and not connected to the other smoke detector, when she turned that one off, would it automatically turn off the one at the

office?

A No.

Q And is there any testimony that when she turned off the one smoke detector, she continued to hear another smoke detector?

A I believe there was.

She said that she couldn't turn off the other smoke detector because she couldn't turn off a circuit breaker. She would have to turn off a circuit breaker to do that. It seems like she had experience with what it would take to turn off that smoke detector.

Q You are saying her testimony said that?

A She said that in her deposition, yes.

Q Well, we will find that testimony. Thank you.

So, getting back to the question.

The smoke detector outside the office would have gone off, in your view, at approximately the same time that the heat layer was sufficient to cause thermal runaway in the battery pack?

A That's correct.

Q And that smoke detector wouldn't have gone off in the build-up to that heat layer of getting to that level?

A It could potentially. It would have been around that length -- that same length of time or that stage of the fire.

Q I don't think either you or Dr. Horn indicated the amount of time it would take for the heat layer to transfer that energy to the battery pack to cause thermal runaway.

Do you have --

Have you come up with an estimate or has Dr. Horn come up with an estimate?

A I believe Dr. Horn has.

Q What was Dr. Horn's estimate of the amount of time it would take for the thermal heat layer to transfer heat to the battery pack and cause thermal runaway?

A It's going to depend on the rate of growth of the fire and how quickly you establish that heat layer.

Q Your entire opinion, I think, depends on the timing of the thermal runaway.

So, my question is:

Have you made any estimation of how much time it would take for this particular fire based upon the combustibles in this particular room to cause heat sufficient to cause thermal runaway?

A It's really going to depend on the fire growth, scenario of the materials burning and the closet that hasn't been tested by anyone.

Q Well, then, you have no idea, then, how long it took for the fire to create enough heat to cause thermal runaway in the battery pack?

Is that what you are saying?

A No. I described this a few times.

You can have different ignition mechanisms for a fire. You can start materials that go into rabid combustion very quickly. You have fast fire growth, as I described earlier. You can have smoldering emission that takes a very long time to go into flaming emission.

Typically, when you ignite materials like this, you are looking at minutes to tens of minutes before you build up a significant hot layer and start igniting materials.

Q I wasn't asking you about every possible example.

I am talking about the fire in this room based upon the evidence you have seen based upon what was combustible.

Are you saying it would have taken --

The fire would have to be going on for

10 or 15 minutes to create the thermal heat layer, right?

A No. I said it could be from a few minutes to tens of minutes. Depending on the fire.

Q Which was it in this case?

A We weren't there. We didn't see the time rate growth of the fire.

Q And once the thermal heat layer develops, then what is the amount of time it would take the thermal heat layer to transfer enough heat into a battery cell to cause thermal runaway?

A You are looking at tens of seconds.

Q So, tens --

You believe that the thermal heat layer can push a cell into thermal runaway in ten seconds?

A I said tens of seconds.

Q Okay.

Well, how many tens of seconds?

Did you see any research on this?

A So, I've said this several times. This is something that Dr. Horn has researched more than I have. So, I don't have any numbers in front of me. You know, we have here the --

Q Is there anything in Dr. Horn's report that tells you the amount of time that he estimates

it took for the thermal heat layer to transfer heat to the battery cells to cause thermal runaway?

A Let me go back to his report.

So, on page 34 of his report near the top he describes:

"According to the HP representative, Mr. Lee Atkinson, these materials are comprised of ABS, acrylonitrile butadiene styrene, a thermoplastic polymer. While this polymer is amorphous and does not have an exact melting point, depending on the composition, the material -- temperature would likely be in the range of 85 to 115 degrees Celsius. And the process temperature working slow into molds as if melted is in the 230 to 270 degrees Celsius range. Exposure of battery packs at temperatures in these ranges for any extended period of time could absolutely initiate self-heating and ultimately thermal runaway cells. Especially if they had been previously exposed to conditions outside of specifications."

Q So, you are saying that he estimated for any extended period of time?

Is that your time estimate?

A That's what he has in his report.

You asked me what he gives for time.

Q What did you interpret that to mean in numbers?

What is "an extended period of time"?

A So --

Q Is that a scientific term?

In other words, when you do studies, do you refer to as "extended period of time" as a scientific term of how much time it would take for a reaction to occur?

A People do use that term.

Q In your published work, instead of using numbers, do you use word descriptors as vague as "an extended period of time"?

A I would have to look back and look at everything I have written and see if I've ever done that.

Q So, if you were doing an experiment and you wanted to find out how much time it took for something to happen, one of the ways you might describe that in a scientific paper would be, "It happened in an extended period of time"?

Is that what you are saying?

A I don't know whether I ever said that.
Q Well, I am saying would you say that as a scientist?
If you were trying to determine how much time it took for a certain event, a reaction to take place, would you describe it as "an extended period of time"?
A You are asking me hypotheticals that I haven't thought about.
Q So, tell me.
Your opinion is based upon his opinion, right, of the transfer of heat from the heat layer to the battery pack that can cause thermal runaway?
You relied on him?
A He has reviewed testing of batteries going into thermal runaway more recently than I have. So, I do rely on him for that. You know, the timeframe --
Q So, what we have in his report, that you found, is his description of "an extended period of time" being his time estimate, right?
A Correct.
Q So, how did you interpret "an extended period of time" when you came to your opinions based on his opinion?

A I interpreted that to mean roughly, like I said earlier, from tens of seconds to a few minutes.

Q So, "an extended period of time" is tens of seconds to two minutes?

MS. WANEMAKER: Asked and answered.

Objection based on the fact that it's been asked and answered.

COURT REPORTER: There's feedback.

(Whereupon, a discussion was held off the record)

Q Tens of seconds to how many minutes?

A To one or two minutes.

Q One or two minutes.

Okay.

Thank you.

If we can turn back to your report, then, specifically your opinion section and page 44 going over to page 45.

You with me?

A Yes.

Q You say in Opinion 2:

"The description of events provided by Ms. Marcellin, in combination with the location of the cells and debris of the

incident 2011 HP Pavilion notebook, indicate that the thermal runaway event was likely a result of radiant heat exposure from a pre-existing fire."

Did I read that correctly?

A You did.

Q And that would be radiant heat exposure from ten seconds to one to two minutes based upon what we discussed, right?

A Correct. Once the radiant heat is in both sufficient energy, yes.

Q And just to clarify, it's your opinion that the fire -- the time of the fire initiation to the time it created the radiant heat sufficient to start that tens of seconds to one to two minutes could vary anywhere from two minutes to 30 minutes, right?

A Or longer. I mean, smoldering fires sometimes take much longer to transition to flaming emission.

Q And you are saying that if it took 30 minutes, it's likely that the smoke alarm wouldn't have gone off during that 30 minute period?

A Correct.

Q Even though a thermal heat layer of

great heat was building up?

A If you just have small smoldering emission or small smoldering materials, you are not going to be generating significant heat.

Q How about smoke?

A Not much smoke either.

Q And the smoldering fire that you are envisioning is from the unknown source that you haven't -- an emission source, right?

A Correct.

Q And unknown location?

A Correct.

We talked about, you know, if you believe Ms. Marcellin's testimony about where she observed fire, then it's most likely that the fire started in the closet based on the fire patterns.

Q Okay.

Now, if you turn to the next page, you have a Subdivision C.

You say:

"There is no evidence indicating the presence of battery debris in the closet. If present, this debris likely would have withstood the heat from the fire and could have been collected during the

subsequent fire investigation."
Do you see that?
A I do.
Q And do you now know that that statement is incorrect?
A No.
Q So, you are assuming that the battery debris that was collected at the scene by all of the investigators, including Mr. Gorbett, did not occur?
A I don't recall saying that.
Q Well, you didn't talk to Mr. Gorbett, right, or did you?
A I didn't. But whether I talked to Mr. Gorbett are not, I don't recall saying what you just said.
Q Oh, I'm sorry. I thought you said you didn't recall him saying that.
So, do you agree that battery debris was, in fact, found in the closet where the fire originated?
A I am aware that it wasn't included in the initial reports by your experts. But in a rebuttal report it is now being claimed that some battery debris was found in the closet. And the only picture I have seen of that debris is in the rebuttal

report and shows material that is now at that point not in the closet but on the ground out in front of the closet saying that it had come from the closet.

Q Right.

And Mr. Karasinski also testified that all of the other investigators were involved in that process of removing the debris from the closet and going through it.

Were you aware of that?

A I haven't seen his deposition testimony, no.

Q One thing you could do is contact Mr. Gorbett and find out if Mr. Karasinski is telling the truth because he was there.

He witnessed it, right?

A I don't know whether he witnessed that or not, no.

Q Well, the best way to find out is to call him and find out, right?

A I don't know.

Q You don't know if calling him and asking him if he witnessed that would be the best way to find out if he witnessed it?

MS. WANEMAKER: He already answered the question.

A I don't know whether he saw that or observed that or not.

Q I know you don't know.

But there are ways to find out things we don't know, right?

A Potentially.

Q And one way would be to ask the person if he witnessed that. That would be one way to do that.

A Correct.

Q You could say, "Mr. Gorbett, Mr. Karasinski says that you were with him when they removed the battery debris from the closet and identified it. Is that true?"

You can ask him that question?

A I couldn't ask him that because I am not aware that that happened. I haven't seen that Mr. Karasinski said that.

Q Well, Mr. Karasinski's report says that, and you read that, correct?

A I don't see him saying that, no.

Q Well, he says that they found the battery debris in the closet and all the investigators supervised taking it out of the closet.

Withdraw that question.

A I don't believe he said that in his report. But if you can point me towards that --

Q I will withdraw the question.

So, are you assuming, then, that Mr. Karasinski made up that they found battery debris in the closet?

Are you discounting that because you think it is a fabrication?

A I didn't say that. It's quite surprising to me if he feels that that was what actually started the fire that he wouldn't have included that in his preliminary affirmative report where he is contending that debris from the battery started the fire.

Q Well, he said debris from the battery started the fire in the closet and that was the origin of the cause.

That was in his first report, correct?

A Correct.

And there is many photos in both his and Mr. Litzinger's initial reports showing all sorts of pieces of battery debris. There is pictures that they were identified as individual items with flags. They were shown for the specific items in the lab exam. But I guess the one piece that they actually

thought started the fire wasn't included as an individual item in that initial report. So, I find that a bit surprising.

Q Okay.

And it's so surprising that one thing you could do is check its accuracy with the one person that HP hired to actually be there for the investigation, right?

A Potentially.

Q And you haven't asked to do that?

A I'm sorry?

What was that?

Q You haven't asked the HP lawyers to contact the fire expert that they hired to go to evaluate the scene to find out if battery debris was, in fact, found inside the closet where the fire originated?

A No, I wasn't aware of someone saying that Mr. Gorbett had observed that and agreed that it was in the closet until you made these representations during my deposition.

Q So, what do you think?

He went out and had a cigarette while they were doing that?

Is that your assumption?

A I don't know whether or not he smokes.
Q So, you --
A I have never made an assumption that he was out smoking a cigarette. It sounds like something that you are proposing.
Q Well, what I am saying is if the presumed origin of the fire was inside the closet and HP hired Mr. Gorbett to go evaluate the origin of the fire and the cause of the fire, are you suggesting that Mr. Gorbett wouldn't stay around for the investigation of the debris in the closet?
A No, I am not.
Q Okay.
A What I said is that I am surprised if this debris was found in the closet and was believed to be what started the fire in the closet, that it wouldn't have been preserved as a specific evidence item like all the other pieces of debris that were found in areas where the debris obviously didn't start a fire.
Q And the debris that was collected, the battery debris that was on the list of materials, are you saying that this piece was not among those pieces?
A It wasn't separated as a separate piece

of material as many of these other evidence items were.

Q And under 921, fire investigators are supposed to keep notes, right?

A They are supposed to document the scene. Notes are one way of doing that.

Q Were you able to check to see if you got Mr. Gorbett's notes, as you say in your report?

A I don't have his notes, as I said earlier.

Q You said you didn't remember if you had his notes.

Did you check in the meantime and can swear under oath that you never got his notes?

A I checked and I don't have his notes.

Q Okay.

So, your answer is that you've affirmatively looked at the materials that were sent to you and what you said in your report was inaccurate and you never got his notes?

A Correct. What was listed in the materials reviewed was incorrect.

Q Okay.

And you are not interested in what Mr. Gorbett's notes say?

A They weren't provided to me. I haven't seen the notes from your experts. I haven't seen the notes from --

Q Actually, you have seen the notes --

We produced at least to HP's attorneys all photographs and all documents that were created by FRT. We also asked for Mr. Gorbett's similar records. We haven't gotten them. So, that's inaccurate.

Whether you've seen them or not is not a problem with us. It's a problem with HP's lawyers.

A What I said is not inaccurate. I have not seen your expert's notes. I haven't seen your expert's photographs other than the ones that were put in the reports.

Q So, here is my question.

In your report, one of the bases for your opinion is that no debris was found in the closet, right?

That's point C of your second opinion.

Page 45.

A Yeah.

Q You said:

"There is no evidence indicating the presence of battery debris in the closet.

If present, this debris likely would have withstood the heat from the fire and could have been collected during the subsequent fire investigation. Therefore, the ejecta from the batteries that went into thermal runaway could not have initiated a fire in the closet. To this end, the left armoire door would have at least partially shielded the closet from ejecta, consistent with these observations."

Are you assuming that that's a correct statement based upon what Mr. Karasinski's photographs and testimony has been in his report?

A So, again, I haven't seen Mr. Karasinski's testimony. I have seen his rebuttal report where he does show a picture of debris out in front of the closet that he said was taken from the closet.

Q Right.

So, my assumption is do you assume that he is not telling the truth and therefore your statement is true or do you assume that he was telling the truth and your statement is false?

A At the time I wrote my report there was

no evidence of that. He has produced new photographs and described where debris came from in his rebuttal report. So, at the time I wrote my report, that was a true statement.

Q Okay.

And now that you know what Mr. Karasinski's rebuttal report says and you haven't seen his testimony, but at least you have seen his rebuttal report and photographs, are you still sticking to your position that is stated in subparagraph C, that there was no evidence indicating the presence of battery debris in the closet?

Is that still your opinion?

A Can you wait a minute while I read his report?

So, if I accept his statement as being correct, that that came out of the material, then now there is evidence that there was battery debris in the closet. But again, as I said earlier, it's very surprising that if he felt that that debris was what started the fire, that that would have been documented in his affirmative report.

Q So, again, I am just asking are you sticking with item C, under opinion number two, as a justification for your opinion? Number two.

Or are you now going to eliminate that as one supporting item from your opinion? Number two.

A So, I think I just answered your question. That there is now evidence if you accept his representation in his report that battery material came from the closet. I haven't had an opportunity to see any more detailed photographs of it. Like I said earlier, I am surprised that if that was a piece of battery debris that was in the area of origin where it started the fire, it would have been identified as an individual object and documented and observed prior to this rebuttal report.

If you look at Mr. Litzinger's report, he has a whole section where he has pictures of 12 different items that are battery debris, but none of those are that item.

Q I think you said you read Mr. Litzinger's testimony, right?

A I have.

Q And you don't recall the part of his testimony where he described that they mark the pieces that were on the floor to prevent anyone from disturbing it. And that's what that photograph was of. Not intended to depict all of the debris that

they found.
You don't recall that testimony?
A I don't recall that specific testimony, no.
Q Is it common when you have debris like that, that might be important evidence, to mark its location and remove it before it can be disturbed so that when the investigators come in and look for further evidence, that they don't change the way that evidence was found?
A If it's important evidence, yes.
Q Okay.
So, in fact, what Mr. Litzinger did was take photographs of the battery debris that was on the carpet that was visible to everyone before everyone got into the office to do a more thorough investigation. And that's what 921 requires.
A Is that your testimony or is that a question?
Q That's a question.
A You keep saying me --
I am not clear. I don't --
Q Just put a question mark after my statements and they are questions. Real easy.
Is 921 --

Is that consistent with 921 to go in and document where physical evidence is found before the scene gets disrupted by multiple investigators?

A That's sometimes done in fire investigations, yes.

Q Okay.

And that was done long before in the course of events of the investigation.

But the picture that you are talking about was taken long before they went in and examined the contents of the closet?

Is that true?

A I didn't understand what you said.

Q Okay.

So, is it your assumption that at the time Mr. Litzinger took the picture that has the numbered cones on it of the location of the battery cells, that at that time he took the picture, they had already gone into the closet and done the investigation of the materials in the closet?

A I haven't seen the specific times of when the different pictures were taken. I didn't make an assumption.

Q You said you read Mr. Litzinger's testimony.

Didn't he say in there that that was the order of events?

A I don't recall whether he said that or not, no.

Q Okay.

So, getting back to it --

I am sorry.

I just want to nail this down and we will be done.

For item number 2, then, you have three different items of evidence that support your opinion number two. The first part is A, which is based on Ms. Marcellin's testimony. The second part is that four of the six cells went into thermal runaway. And the third part is that there was no evidence of battery debris in the closet.

Is it still your opinion that those three items of evidence support your opinion?

A So, I described earlier. It's now being represented that there was battery debris in the closet. Unfortunately, there is -- apparently no pictures taken before that was removed in the closet showing where it was in the closet, what it was near. It seems to be lightweight foils similar to what we've seen in other areas of the room that didn't

ignite material. So, I still don't see evidence that that could have ignited materials in the closet.

Q So, that's helpful.

So, you are saying that it's your opinion that that foil was insufficient to cause a fire in the closet?

A That's how it appears. The only photo we have are these photos shown right here of this.

Q And that's your opinion based upon your review of the photo?

A Correct.

Q And do you have some experience in determining whether foil of that size is capable of causing combustibles to ignite?

A So, that's described earlier today. If you look at other debris on the desk, at other portions of the room, they didn't ignite materials.

Q Okay.

So, that was what your opinion is based on, is your observations of photos of other pieces of foil that were found at the scene?

A From foil caps. Other pieces of ejecta on the scene that didn't ignite materials.

Q And so, because they didn't ignite the materials they landed on, in your view it's

impossible for the foil that was found in the closet to ignite combustibles that were in the source area of the fire as you determined it?

MS. WANEMAKER: Objection to form.

A Was that a question?

Q Yeah.

I am saying in your opinion is it that foil was incapable of starting the fire in the source area that you determined was the source area?

A It doesn't appear that that it would --

It appears that it's lightweight foil similar to other materials that were on paper, on other objects around the room, that didn't ignite materials.

Q And the one that was on paper, was the one that you showed me in the picture that was -- you determined you had no idea how it got there, right?

A I have no idea how the piece got there either.

I don't think we know how any object in the room got where it got.

Q What methodology did you use to rule out that a foil from a thermal runaway reaction would be hot enough to cause a fire?

Did you do any research on that?

A I reviewed my --

I said that it would be unlikely to ignite the materials based on reviewing the other materials that were sent around the room and didn't ignite materials.

Q But the candle would have been more likely to have lit the couch than a piece of hot metal would have been likely to light the combustibles in the closet, correct?

A A candle would certainly be more likely --

An open flame from a candle would certainly be more likely to ignite something than a piece of lightweight foil with low thermal mass, yes, I agree with that.

Q And the candle on the table not tipped over, you are saying -- and without any evidence of it ever being lit -- is a more likely ignition source than a hot piece of metal that was found in the place where the fire originated?

A I don't agree with what you are saying. I haven't said those things.

Q Okay.

Now, Opinion B or -- I'm sorry -- support for Opinion B.

You say:

"Two of those cells remained in the notebook and did not initiate a fire in the armoire area, where there was ample lightweight fuel. The other two cells found on the ground in the desk area did not ignite the surrounding carpet and were far away from the closet."

Do you see that part?

A I do.

Q Now, the carpet material, what was that made out of?

A I don't know the specific material that it was made out of.

Q Does carpet material typically have fire retardants built into it?

A It can.

Q And have you determined whether this particular carpet material had fire retardants in it?

A I have not, no.

Q And if it had fire retardants in it, would that be a significant factor as to whether the hot metal would likely cause it to flame up and start a fire?

A It could impact whether it transitioned

to flame emission or whether -- or how the fire would propagate, yes.

Q And you are saying that you weren't -- you didn't inquire as to what kind of carpet it was when you came to this conclusion?

That the fact that the carpet didn't turn on fire was your basis for saying that the ejections from the laptop couldn't have caused a fire in the closet?

A That wasn't the full basis of my opinion.

Q It was one of the bases under B here, right?

A Correct. But we also don't know what flame retardants may have been in the materials in the closet.

Q Well, you looked at the materials in the closet.

Did they look like they were flame retardant?

A You can't observe that just based on looking at things.

Q Well, you can base it on how much they burn, though, can't you?

A Materials and flame retardants can

still burn.

Q So, the fact that there are flame retardants or not flame retardants in the carpet was not a factor in your use of that fact that the carpet didn't go on fire to support your conclusion that the ejecta from the battery did not cause a fire?

Withdraw that question.

I'm sorry. That's terrible.

In B here you also say that the two cells that were found on the ground in the desk area did not ignite the carpeting and were far away from the closet.

Do you see that?

A I do.

Q Now, when you say "the two cells," you are referring to two empty cells, correct?

A I am referring to the two cans from the cells, yes.

Q So, that's without the internal windings of the cells, right?

A Correct.

Q And you don't know what happened to the internal windings of those two empty cells that were found near the desk, do you?

A I assume they were ejected into the

room.

Q And some may have been ejected into the closet?

A No.

As it is described in part C, the armoire doors would also -- and the closet door would partially block ejectiles from going into the closet.

Q So, how did the battery windings that were found in the closet get there if the armoire doors prevented it from going?

A I don't think anybody was present to see how -- whether that was in the closet or how that got into the closet. It could have gotten into the closet from being ejected from a cell. It could have gotten in the closet from firefighting efforts. There is a variety of ways.

MR. SCHWARZ: Let's take a quick break.

I think I am done.

MS. WANEMAKER: Okay. Great.

VIDEOGRAPHER: The time is 6:08 p.m.

We are going off the record.

(Whereupon, a short break was taken)

VIDEOGRAPHER: The time is 6:10 p.m.

We are going back on the record.

Q I may have asked you this, and I

apologize if I did, but on page 26 of your report you concluded that it is likely the case that first fuel for the fire was an item present in the office closet.

Is that still your opinion?

A Yes.

Q And so, the first fuel was an item --

Was it on the floor in the office closet, in your opinion?

A I don't have a specific opinion to that.

Q But you have a definitive opinion that what ignited that first fuel was not the copper windings that were found on the floor of the closet?

A That's correct.

I mean, there is a number of reasons that we have discussed related to that.

MR. SCHWARZ: That's all I have.

Thank you very much, Dr. Myers.

Looking forward to seeing you at trial.

THE WITNESS: Thank you.

VIDEOGRAPHER: The time is 6:11 p.m.

We are going off the record.

(6:11 p.m.)

T. Myers, Ph.D., CFEI

Page 308

_________ ________________________

TIMOTHY JAMES MYERS, Ph.D., CFEI

Subscribed and sworn to before me

this _____ day of _________, 2025

__________________________

NOTARY PUBLIC

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

C E R T I F I C A T E

I, Eva Kaflinski, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of April 2025.

______________________________

EVA KAFLINSKI

Jaclyn Wanemaker, Esq., Smith Sovik Kendrick & Sugent
wanemaker@smithsovik.com

04/28/2025

RE: Marcellin v HP/StaplesCASE

04/15/2025, Timothy Myers (#7232374)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at <p1steno@veritext.com>

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Marcellin v HP/Staples

Timothy Myers (#7232374)

E R R A T A S H E E T

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

PAGE______ LINE______ CHANGE______________________________

__________________________________________________________

REASON____________________________________________________

_____________________________________ __________________

Timothy Myers Date

Marcellin v HP/Staples
Timothy Myers(#7232374)

ACKNOWLEDGEMENT OF DEPONENT

I, Timothy Myers, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Timothy Myers Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:8 310:1

**0**

**00409** 68:7 88:2
**00433** 73:8
**00434** 77:10
**00436** 220:16
**00456** 88:20
**00463** 101:16 104:8
**00704** 1:14
**01378** 43:10
**01383** 48:14
**01389** 43:11
**01760** 7:18
**04/15/2025** 310:5
**04/28/2025** 310:3
**0446** 75:3
**0471** 232:23
**0472** 247:1,13

**1**

**1** 1:18 2:5 3:13 7:20 9:23 16:14 123:16 250:6 251:9 257:14 259:8
**1,000** 245:6,10 245:16 252:2
**1.3** 3:20
**10** 269:18 274:12 279:1
**100** 156:8,12 187:10 195:15 245:3 253:1
**11** 146:11 159:6 252:5
**115** 254:5 280:13
**116** 185:7
**11687** 309:22
**11:24** 67:10
**11:40** 67:8
**11:41** 67:13
**12** 3:21 4:12 123:14 296:15
**12:57** 127:9
**13** 3:14
**130** 187:8
**14** 146:8,10 249:13 260:11 260:12,17,19
**14221** 2:10
**14618** 2:5
**15** 26:7 38:4,20 41:17 67:4 269:18 274:12 279:1
**150** 273:23
**16** 4:9 9:22 250:3
**17** 4:14 8:7,13 29:17 127:16 197:5 225:5
**175** 7:17
**18** 167:13
**18650** 12:10,16 13:6 14:14 64:23 182:20 259:9 261:24 261:25 262:2 262:14,21 263:22 271:13
**1882** 2:5
**19** 173:25 174:20 178:5 189:12 199:10
**1980** 95:4
**1:21** 1:14
**1:22** 127:12
**1:57** 154:4
**1st** 6:3

**2**

**2** 3:15,17 17:16 17:17 154:7 193:20,22 221:5 250:3 283:22 299:10
**2.2** 127:21
**2.5** 46:22
**2.5.** 46:10
**20** 166:23 167:1 173:12 173:25 174:21 178:5 189:9,12 190:17 269:19 274:12 312:15
**200** 14:3 178:8 178:24 179:1 179:10 180:1 187:10 245:3 250:23 253:1 254:24 256:17 256:25 273:23
**2011** 225:10,12 284:1
**2018** 195:16
**2019** 167:7 168:7 173:15 190:20 191:20 195:10 225:9
**2020** 22:18,19 22:25 23:1 24:15,25 30:9 31:6 34:7 35:8 35:13 68:14
**2023** 22:24,25
**2024** 3:15
**2025** 1:18 6:3 308:7 309:18
**218** 2:9
**21st** 82:21 114:9
**22** 101:22 163:4 197:5 222:13 258:14
**222** 255:7
**225** 253:5
**22nd** 309:18

**23** 197:4,6
**230** 280:16
**24** 201:2
**24th** 68:14
**25** 201:1 256:21
**250** 254:24 255:2
**26** 3:19 202:9 307:1
**27** 35:7,13 204:15
**270** 280:16
**27th** 35:20
**28** 203:4
**29** 190:15
**2:53** 193:12

**3**

**3** 3:17 26:3 253:5,7 255:25 256:14 258:11 260:3,9
**3.2** 199:10
**30** 136:10 185:21 225:16 226:9 229:19 231:18 232:16 284:16,21,23 310:17
**300** 251:16 253:1 254:12 254:20,22 255:11,15,20 256:8
**31** 214:21 230:18 231:20 232:8 239:17
**32** 225:8,13,15 246:10 260:11 260:18 261:3 261:14
**33** 246:18 247:5
**34** 184:1 280:4
**35** 184:8 262:18
**36** 258:15
**37** 247:5
**3:06** 193:15
**3d** 26:21 30:18

**4**

**4** 3:18 29:16 41:11 74:4,16 127:15 188:1 197:5 225:5 250:23 253:7 254:17,23 255:3 256:10 257:2,5,14 258:8
**40** 136:10 261:3
**400** 251:11
**410** 113:7 116:25
**411** 113:13
**43** 256:16
**44** 283:18
**446** 75:6,20
**45** 51:15,21 184:24 283:19 293:21
**450** 251:11
**456** 89:14
**46** 48:20 49:5 49:10 54:14 261:12
**463** 222:25
**472** 247:16
**48** 260:19
**4:11** 240:10
**4:13** 240:13
**4:25** 240:7
**4:27** 249:8
**4:42** 249:11
**4:52** 68:15,22

**5**

**5** 3:20 42:8,8 43:9 45:25 130:16 220:12
**50** 263:11
**500** 250:23
**59** 256:2 258:14

**6**

**6** 3:20,22 42:10 68:3 116:25 127:18 145:21 145:22 222:25 251:8 257:14
**60** 11:15 51:19 253:24 254:3 258:6
**61** 256:1,16 257:5,22
**62** 256:13 257:22
**6245** 2:9
**63** 101:24,25
**68:16** 260:10 260:17
**68:30** 261:1
**6:08** 306:20
**6:10** 306:23
**6:11** 307:22,24

**7**

**7** 3:4,13,15,17 3:18,20,22 4:7 4:7,10,13 29:25 42:7 130:15,21 132:14 145:25 249:14 256:10 256:15
**70** 14:14
**72** 258:14
**7232374** 310:5 311:2 312:2
**73** 256:1,2 258:15

**77**  3:16

**8**

**8**  4:10 151:13
151:14 252:5
262:3
**80**  269:16
**81**  262:4,7
**83**  3:22
**85**  280:13

**9**

**9**  4:13 7:21
48:15 194:2
**9.15**  193:21
**9.15.**  194:1
**9.15.1**  194:7
**9.15.1.1**  195:4
195:24
**9.15.1.3**  196:8
**90**  14:2,15
73:21 180:1
**921**  3:15 17:19
18:10,11 19:4
19:7 20:1
22:13 24:1
28:15,19 29:3
29:6,11 45:7
52:5 69:12,13
79:20 81:20,23
82:7,13,13
84:17 85:2,5
121:5,14,18,19
122:6,12,20
123:4,5 138:3

192:19 193:4
193:19,22
211:19 292:3
297:17,25
298:1
**9:30**  127:25

**a**

**a.m.**  1:18 6:3
67:10,13
**ability**  141:8
**able**  38:8 60:20
75:13 78:2,18
78:21,22 81:1
81:3,5 87:18
91:15 96:7,25
97:3,8,12,18,20
100:16 105:25
106:1,6,8
131:15 140:22
141:21 142:6
145:14 165:10
207:20 214:3
223:14 224:15
228:15 292:7
**above**  1:23
15:16 16:6
73:11 76:16,25
107:19,22
108:6 117:16
130:5 152:11
159:12,13
175:12 189:15
205:18 220:18

220:19 221:23
231:5 232:16
233:12 234:15
234:24 235:1,3
237:12 240:20
253:20,25
261:4 310:6
312:7
**abs**  280:8
**absolute**
147:16
**absolutely**
280:19
**absorbance**
155:4
**abuse**  4:10
196:8 252:16
253:14,16
**accelerant**
209:22 210:18
211:7,16,18,22
211:23,25
212:4,10
**accelerants**
209:19,20
210:1 211:12
**accelerating**
11:14 251:7
**accept**  149:11
150:17 160:2
161:5 179:9
295:16 296:5
**accepting**
202:23 203:9

**accessible**
133:8,10
**accidental**
112:14
**accumulate**
186:22,23
**accumulates**
93:24
**accumulating**
147:9
**accuracy**  290:6
310:9
**accurate**  43:22
113:22,23
**acknowledge**
115:5
**acknowledge...**
312:3
**acknowledg...**
310:12
**acronym**  48:24
**acrylonitrile**
280:8
**action**  7:1
48:21 309:13
**actions**  17:14
47:6
**activate**  189:2
271:20
**activated**
150:22 272:8
**activation**
189:6

**actual** 25:6 84:18 274:8
**actually** 11:21 16:23 17:23 19:12 22:22 26:6 30:19 31:7 33:4 40:6 48:12 53:21 60:15 63:5 69:2 73:19 81:23 87:24,25 92:22 101:15 114:15 125:10 131:5,23 133:16 134:10 138:13 140:11 142:15,22 148:2,14 176:23 182:12 220:20 235:6 243:19 244:11 248:14 249:2 252:9 253:19 289:11,25 290:7 293:4
**add** 260:23
**added** 18:21
**addition** 35:8 41:9,17 157:12 157:14
**additional** 11:4 46:18 84:25 118:3 135:2 181:15 240:1
**additions** 312:6
**address** 7:16
**addressed** 21:13 181:13
**addressing** 15:2 179:8
**aderhold** 68:25
**adjacent** 61:4 80:21 91:1,4 94:3,11 99:5 105:3,23 108:25 110:16 219:16
**administer** 5:13
**administrator** 1:5,7
**adopted** 183:23
**advisement** 106:22
**affirmative** 289:12 295:22
**affirmatively** 292:18
**aged** 253:19
**ageing** 4:11 252:18
**ago** 238:23 250:8
**agree** 6:11 21:5 26:12 43:8 53:25 56:3,9 59:12 66:15,17 70:11,18 71:2 77:19 107:13 110:22 117:23 118:10 120:3 121:17 124:10 127:3 156:9 163:25 181:21 197:14 198:11 209:2 230:23 231:8 245:4 248:25 256:4 266:9 286:18 302:15,21
**agreed** 5:3,18 290:19
**agreeing** 67:18 232:7
**ahead** 116:4 184:23
**air** 157:11,15
**airspace** 162:6
**al** 252:14
**alarm** 150:1 189:5 242:23 265:8 268:5,11 268:13 270:1 271:6 272:3,22 273:1,9,11 274:5,15 275:9 284:22
**alarms** 269:25
**alerted** 188:16
**alive** 40:4
**allegany** 33:21 36:5 68:3,21 71:12,17 77:23 79:4 80:8 82:11 84:6 87:10 91:25 107:7 120:18 123:21 187:23 220:14 232:24 247:10,12 248:17 249:2
**allegation** 166:6
**allegations** 10:17
**alleged** 138:23
**allegedly** 137:4
**allotted** 310:20
**allow** 47:7 48:25,25 133:17,20 213:20 224:18 228:25 242:16
**allowed** 71:13 106:3 149:16 215:17
**allows** 114:15 126:21 230:10 239:14 243:23
**alternate** 17:8
**alternative** 56:12 82:1,8 83:6,10 84:5 85:4 100:7 107:6

**aluminum**
  259:22
**ambient**  52:24
**ambiguous**
  126:11
**amorphous**
  280:10
**amount**  60:13
  108:2 153:24
  154:20 156:24
  157:1,2 187:16
  199:25 201:8
  244:19 277:5
  277:13 279:9
  279:25
**ample**  303:4
**analysis**  33:13
  34:14 138:7
  185:16 194:23
  241:21
**analyze**  172:13
  213:25
**analyzed**
  207:21 217:23
**anecdotal**
  263:1,3
**angle**  73:22
  175:25 176:4
**angles**  71:14
**annex**  196:4
**answer**  16:2
  26:19 28:9
  29:2 35:18
  37:15 39:2

  41:7 44:4 48:4
  50:25 51:1
  58:9 61:12
  80:12 85:16
  136:12 165:16
  183:4 213:18
  236:18 239:11
  274:2 292:17
**answered**  41:6
  283:6,8 287:24
  296:4
**anthony**  214:22
**antivirus**
  127:24 128:5
  130:3
**anybody**  20:15
  112:17 203:25
  209:18,20
  210:1 218:4
  238:14 306:11
**anymore**
  251:19
**anyway**  44:20
  128:20
**apart**  151:10
**apologize**  25:24
  231:15 307:1
**apparently**
  299:21
**appear**  93:12
  94:5 132:8
  146:6 168:5
  207:12 301:10

**appearance**
  227:3 239:3
**appears**  68:13
  135:3 136:17
  144:17 146:15
  207:1 220:21
  220:22 221:1
  247:23 250:10
  261:9 300:7
  301:11
**appended**
  312:7
**appendix**  29:19
  29:20 41:11
**apples**  195:25
**appliance**
  93:23
**applicable**
  310:8
**application**
  19:1 61:21
**applied**  15:11
  21:16 50:8
  236:4,21
**apply**  18:18
  22:12 67:22
**appointed**
  18:16 21:11,11
**appreciate**  35:2
**appropriate**
  50:3
**appropriately**
  63:6

**approve**  18:14
  18:15
**approved**  46:1
**approximate**
  74:12
**approximately**
  10:13 43:3
  74:17 108:14
  254:3,18 258:6
  267:14 269:16
  276:19
**april**  1:18 6:3
  309:18
**arcing**  81:10
**area**  14:25
  21:20 38:5
  47:8 48:5
  62:23 64:1
  70:14,19,24
  72:12,14 74:18
  76:16,16 77:2
  77:3,4,5,25
  80:17 92:23
  98:8,15 102:22
  105:3 107:24
  107:25 108:23
  117:8,10 118:4
  118:6,15 119:8
  124:2 162:16
  162:23 167:5
  176:23 179:1
  184:21,25
  187:20 190:14
  192:22 197:9

197:15 198:1
199:6 219:15
220:3 221:16
221:18 222:21
223:2 225:20
227:3 231:17
231:18 232:11
232:16 233:7
234:7,24 235:1
237:12 296:10
301:2,9,9
303:4,6 305:10
**areas** 76:15,17
88:19 89:24
94:12 95:13
107:18 110:17
116:18 138:17
167:3 175:8
199:11 200:5,7
210:20,23
219:17 246:1,5
246:23 291:19
299:25
**armoire** 63:1,4
63:15,18 117:3
153:16 167:5
168:3,17,18
169:6 174:1,5
174:10,16
176:12 177:9
178:10 189:15
189:24 190:1,1
190:5 191:10
247:6 294:8

303:4 306:6,9
**arrived** 84:1
147:6 184:15
**arriving** 121:21
**arson** 111:23
112:12,13
210:25,25
**arsonist** 209:22
**article** 249:15
249:24 250:3
251:9 252:6,13
**articles** 42:4
192:20,25
249:22,22,25
**ashtrays** 204:2
**aside** 236:15
**asked** 25:10
40:16,19 41:6
106:9 130:2
145:3 178:23
209:24 212:24
220:5 281:3
283:6,8 290:10
290:13 293:7
306:25
**asking** 8:4 50:3
63:7 127:2
137:6 144:5
145:6 149:11
149:15 177:23
186:7 189:3
206:1 208:3,5
208:20,21
230:8 231:16

239:2 248:9
268:15 275:17
278:19 282:8
287:22 295:23
**aspect** 115:24
**assistance**
141:12 194:22
**association**
6:24 16:16
**assume** 8:12
13:9 42:17
53:2 87:14,15
95:4 104:3
115:14 117:24
137:7 176:3,22
185:25 243:7
243:10 267:6
275:17 294:21
294:23 305:25
**assumed** 66:6
83:12 135:6
136:25
**assuming**
135:15,17
141:22 152:4
158:6 269:25
286:7 289:4
294:12
**assumption**
85:24 92:4
94:23 113:21
114:23 135:18
135:20 137:15
137:19 141:17

152:6 161:12
188:15 241:18
241:22 242:20
247:20 248:2
269:11 290:25
291:3 294:21
298:15,23
**assumptions**
137:25 138:12
**atkinson** 280:7
**attach** 96:1
**attached**
136:19 261:2
310:11
**attack** 230:4,5
**attacked**
194:16 227:14
**attempted**
138:6
**attend** 23:2
24:20 97:18
**attended** 23:5
34:4
**attention**
160:25
**attorney** 8:3
310:13
**attorneys** 2:4,9
5:4 20:18,25
293:5
**attributable**
114:4
**attributed**
211:21

**audio** 6:10
116:2,3
**authentic**
191:15
**authorized**
5:12 44:2
**authors** 193:7
**automatically**
275:25
**available** 23:4
24:24 33:14
35:20 106:4
131:1 310:6
**avenue** 176:19
**aware** 15:8
26:16 38:21
41:15,15 53:9
120:9 180:21
204:1 212:3
218:4 244:21
286:21 287:9
288:17 290:18
**axis** 250:17,19

**b**

**b** 302:24,25
304:12 305:9
**back** 9:17
51:17 67:7,14
73:25 77:9,13
93:9 95:24
99:25 108:17
108:23 109:14
109:14 116:25

127:13 139:24
139:25 142:23
143:10,15
151:3 154:8
162:18 164:21
168:22 175:24
189:9 193:16
197:3 199:9
200:23 212:5
212:11,16
217:19,20
221:3 223:3
224:16 225:5
234:5,6 240:14
246:6,8 249:12
267:19 276:17
280:3 281:17
283:17 299:6
306:24
**backup** 97:5,22
**balance** 18:23
**ballpark**
179:17,20
**bank** 11:15
150:6,20 158:2
261:4
**banking** 151:7
248:5
**barrier** 176:11
**base** 131:12
134:3,11,24
135:3,5,10,16
136:14,19,24
137:7,13,18

173:18 234:4
304:23
**based** 13:10
33:10,14 44:10
60:21 61:6
62:24 66:7,10
66:17 70:10
74:9 95:11
96:5,12 106:24
115:9 120:20
126:7 128:19
135:20 136:16
137:24 138:11
138:21 141:18
148:17,20
155:18 188:14
190:25 199:3,5
199:25 200:25
202:11,23,25
214:9 223:17
227:25 228:1
238:15 239:7
241:17,20,22
251:8 262:25
264:25 265:2,6
266:24 271:11
277:24 278:22
278:22 282:11
282:24 283:7
284:8 285:16
294:13 299:12
300:9,19 302:3
304:21

**bases** 293:17
304:12
**basic** 184:5
**basically** 30:18
138:24 141:23
191:21
**basing** 271:15
**basis** 15:19
60:7 80:15
131:3 133:2
151:15 200:15
227:6 229:17
242:4 304:7,10
**bates** 43:10
68:4
**bathroom** 74:3
**batteries** 4:8
10:10,15,22
11:16 12:11
14:1 16:7 45:4
45:8,21 51:8
51:19 55:14
56:1 58:11
119:14,23
124:12,14,21
129:23 147:24
150:17 151:5
153:10 156:8
179:10 181:11
181:12 182:17
185:17 186:19
187:1 189:18
194:8,13 195:4
195:6,10,11,14

195:16,22,23 196:9,12 197:1 227:3,13,15,16 229:20 234:7 243:6,14 245:25 249:17 254:10 258:4 266:12 267:20 282:15 294:5
**battery** 3:20 10:20 11:8 13:21 14:9,22 15:5,17,22,23 34:17,17 42:10 43:14,16,18,24 43:25 44:1,11 44:16,23 45:13 45:14,21 46:6 46:16,17,19 47:1,6,11,24,25 48:7 49:3,14 50:17,20 51:5 51:11,12,23 52:12 53:15,15 53:21 54:2,3,6 54:9,13,15,22 55:1,5,5 56:14 57:9,14 58:23 60:3 64:4,4,20 64:24 65:3 95:10 96:20 97:5,6,22,23 117:11,14,16 118:4,5,6,7,25 123:23,24,24 124:7,7,8,10,11 124:19,25 125:3,12,13,16 126:1,2,2 129:3,6,8,11,21 129:25 148:5 148:18 149:18 151:8 155:13 155:14 175:6 176:17,23 177:8,12 178:8 178:19 180:5,9 180:10,14,22 182:5,12,13 183:19 184:6,6 184:7 186:1 190:20 191:17 191:21 192:4 194:17,24 225:20 226:11 227:3 228:14 230:22 231:4,6 231:19 232:9 232:16 233:12 233:14,20,25 234:10,16,19 234:24 235:1,2 235:20 237:2 237:12,19 240:2,21 241:8 243:8,12 244:8 244:12,15,22 245:9,21 246:11 247:21 248:3,16 251:23 252:23 253:9 257:11 257:15,16,20 257:24 259:5 259:13,16,20 259:25 262:14 262:21 264:9 266:16 267:1 271:13 273:21 274:14 275:1 275:23 276:21 277:6,14 278:6 279:11 280:2 280:17 282:13 285:22 286:7 286:18,24 288:13,23 289:5,13,15,22 290:15 291:22 293:25 295:12 295:18 296:6 296:10,16 297:14 298:17 299:16,20 305:6 306:8
**bed** 140:24 141:8,19,22 142:6,16,19,20 142:21,21,22 143:4,19,22 144:9,11,14,20 144:21 145:17 145:18,23 146:3
**bedroom** 69:18 74:3 75:21 77:16,17 95:21 96:3,19 114:17 130:17 133:6 137:16 143:11 144:1 170:11 188:15,16 189:7 243:2 269:3 271:22 275:22
**began** 69:8 158:16 197:17 197:22 260:10
**beginning** 67:23 68:7 193:21 199:9 200:23
**begins** 43:10 47:14 180:15 225:8
**belanger** 2:6
**belief** 171:10 237:17
**believe** 21:18 22:3 23:18,24 31:13 32:12,13 32:16 34:24,25 36:12 38:22 43:17 61:13,16 72:23 76:5,10 78:8 82:8

83:19,19 85:1 86:4 92:10 104:7 108:8 111:19 112:11 112:18,23,25 115:7 116:24 123:8 126:18 137:24 145:1 146:3,24 164:19 166:1 170:21 174:24 176:5 178:25 181:7 182:2,8 183:11 184:20 191:14,20 192:19 193:4,4 197:4 211:13 212:15 240:6 240:18 241:8 254:14 276:6 277:11 279:14 285:14 289:1
**believed** 81:19 165:21 291:15
**bent** 93:15
**berkeley** 8:19 8:21
**best** 287:18,22
**better** 11:5 38:12 44:7,16 53:10 145:25 183:2,10
**beyond** 64:11
**big** 198:19
**bigger** 152:24
**binder** 17:17 75:12 100:18 101:14 134:8 136:2
**bit** 69:5 176:8 176:10 245:11 290:3
**blast** 157:6
**blistering** 89:15 90:4
**block** 190:2 306:7
**blocking** 62:11 62:14
**blocks** 63:1
**blood** 309:14
**blow** 215:16,16
**blowing** 215:20
**blown** 93:7,13 93:14 94:10 214:14 215:1,6
**blowout** 93:20 214:14 217:25
**bluetooth** 131:16,18
**bmu** 64:24
**board** 53:15 102:1
**body** 69:22 70:1 142:25 143:4,19,22 144:7,15,16,18
**boiling** 156:10
**bottom** 62:22 108:14 118:14 118:21 119:7 132:14 177:1,3 177:19,20 212:9 230:19 230:21 231:3 231:19,23,25 232:8 234:1,2 237:4 240:18 240:24 241:11
**bounced** 175:15
**bowling** 156:13
**box** 130:16 225:18 226:8 226:10,14 229:25 230:3,9 230:14 231:16 231:17,18 232:15 233:8
**break** 34:25 35:3 43:5,7 66:23 67:12,17 101:5 106:14 123:10,13,15 123:16 127:8 127:11 154:6 162:21 183:15 193:9,14 200:6 240:5,12 249:10 306:17 306:22
**breaker** 38:7 276:9,10
**brian** 68:20
**brick** 259:14
**brief** 67:16
**broad** 82:2
**broader** 83:1
**broadly** 81:23
**broken** 220:23
**brought** 82:5 211:9 212:15 213:7
**brown** 102:9 102:14 146:16
**build** 158:8 215:14 276:24 278:17
**building** 30:15 76:15 150:22 151:12 152:19 152:22 157:25 158:4,8 186:25 218:12 271:19 275:16 285:1
**built** 78:2 95:4 273:5 303:16
**bulging** 237:3
**bunch** 116:20
**burn** 77:4,5 80:18 98:13,15 98:16 102:4,5 102:21 103:16 108:18 110:17 116:15,19,19

164:15 167:5 210:20 211:3,4 213:16 219:17 241:4 270:25 304:24 305:1
**burned** 88:17 94:12 101:17 102:7,10,14,16 102:22,24 103:12,13,20 104:16 105:7 105:14,14 108:13 116:14 116:16 161:16 161:23 163:5,9 163:15,22 164:4,6,9 165:1,8 172:24 172:24 175:11 199:11 202:14 206:21 220:19 220:20 222:14 222:17
**burning** 77:5 110:1 159:12 159:14 163:19 164:3 187:17 188:4,6,13 246:8 271:2 278:2
**burns** 164:19
**burnt** 104:8,12 106:11 270:18 270:19
**business** 9:1
**butadiene** 280:8
**butts** 204:2

**c**

**c** 2:1 29:19,20 41:11 48:22,23 49:11,13 72:4 74:4 187:10 285:19 293:20 295:11,24 306:5 309:1,1
**cabinet** 117:3 124:3
**california** 8:20
**call** 11:14 40:6 40:10,17 133:17,20,25 143:14 287:19
**called** 18:6 36:19 42:21 43:2 48:22 74:22 122:11 122:19
**calling** 215:20 287:21
**calorimeter** 11:14
**calorimetry** 251:7
**camera** 6:6 75:9 165:4,7 200:9 261:2
**candle** 80:21 108:24 109:3 109:11,13,17 110:4,8,12,15 110:16,18,18 111:1 112:7,8 112:11,16 116:8,10,21 139:8 157:20 168:22,25 172:15,18,19 172:23 173:5 203:13,18,19 204:13,18,19 204:20 205:6 205:10,13,15 205:16,19 206:3,9 207:2 212:6,18,18 213:3 273:18 302:6,10,12,16
**candles** 109:18 109:18,20,21 109:22 110:12 140:15,16,17 204:11,12 205:5,5,7,21,22 205:24 206:4
**cans** 246:16 305:17
**capability** 46:10,23 47:2 47:23 255:22
**capable** 133:25 300:13
**caps** 300:22
**caption** 257:14
**captured** 71:11 71:14
**carol** 1:4 116:7 229:9,12 264:20 265:2,9
**carpet** 246:10 246:11 297:15 303:7,11,15,19 304:4,6 305:3 305:4
**carpeting** 246:24,25 305:11
**case** 8:3 11:3 12:1,24 13:2 13:10,25 14:6 15:1,18 16:11 18:13 19:23 20:6 22:17,21 22:23 23:6 29:17 34:2,14 41:20 42:11,19 42:20 47:9 50:6 67:18 79:3 130:12 185:16 188:20 190:16 203:10 205:11 217:23 245:24 246:12 262:8 264:24

279:5 307:2
**cases** 10:16
  11:1 14:12
  227:16 271:1
**casing** 15:23
  64:25
**casings** 180:12
  246:15
**cat** 109:25
  128:18
**catch** 170:17
**caught** 116:11
  212:7 216:4
**causation**
  123:4
**cause** 12:21
  15:16,24 16:6
  23:22 28:24
  50:19 54:21
  55:16 59:6
  80:23 83:9,13
  84:9,18 85:7
  94:4 104:20,22
  104:24 105:1
  107:6,11 109:8
  111:4,15,16,19
  111:24 112:1,4
  119:2 120:22
  121:18 122:7
  125:19 126:9
  128:5 149:3
  150:16 153:17
  154:13,13
  155:12,14,15

170:22 172:16
173:11 186:18
186:19 189:19
194:15,24
206:8 210:25
217:16 242:25
245:23 253:10
258:18 270:24
272:17,19,22
272:25 273:12
274:24 275:1
276:21 277:7
277:14,25,25
278:6 279:11
280:2 282:13
289:17 291:9
300:5 301:24
303:23 305:6
**caused** 15:4
  56:8 57:24
  59:22 61:1
  64:15,16 76:10
  83:2 86:16
  92:11,15,18
  93:20 94:14
  100:3,8 101:4
  101:12 104:18
  105:22 106:24
  111:1 115:16
  119:8,9,20,21
  119:25 122:11
  123:24 124:8
  124:12,19,24
  125:3,6,12

126:2,25 139:9
148:18 149:18
158:25 159:12
161:11,12
165:13 170:16
184:11 211:11
211:11 229:1,2
230:6 236:5
238:6,12 240:1
273:5,20 275:4
304:8
**causes** 82:1,8
  83:6 84:5,13
  85:4,11 92:25
  94:2 111:5,9
  111:15 120:21
  126:8 180:18
  184:7 215:14
**causing** 10:20
  110:20 116:8
  118:20 215:10
  251:14 300:14
**ceiling** 61:8,8
  73:13 107:22
  108:4,6 118:19
  150:6 151:16
  155:10,21
  159:13 168:12
  168:16 191:1
  212:25 221:6
  221:23 222:9
  222:11 223:1
  225:22 248:5

**ceilings** 151:12
**cell** 3:20 14:14
  15:22 16:10
  42:10 46:16
  47:11 50:7,9
  51:5 52:2,2,6
  52:10 53:5
  56:3 58:21
  60:10,22
  133:21,22
  142:19 179:24
  179:25 180:17
  180:22,23
  181:19,20,21
  182:20 186:8
  186:10 235:18
  244:22 246:19
  251:12,14
  259:1,9,10,11
  259:21 261:4
  261:25 262:3
  262:14,21
  263:22 264:19
  264:20 265:16
  265:16,17,19
  266:7,8,16
  267:1 270:24
  271:4,13
  279:11,15
  306:14
**cells** 4:11 11:11
  12:16,22 13:6
  13:21 14:1
  15:5,25 47:8

48:1 52:12 53:3 54:13 55:1,21,25 56:8,14,23,25 57:2,9,14 58:5 58:13,13,24 59:13 60:3,8 60:20 61:2 64:18,23 65:3 65:9,12,15,21 65:21 66:18,20 119:21,23 155:13,14 178:8,20,25 179:22 180:23 186:1,10,12 191:13 192:3,4 192:7,10,11,15 192:16,16 193:18 196:6 225:23 227:21 228:14 232:3,9 235:7,8 237:19 241:23 242:4 242:10 243:8 243:12 245:13 245:22 246:4,7 252:17,23 253:8,10,13 255:24,25 257:11 258:7 258:22,24 259:4 261:24 261:25,25 262:2 264:3,6 264:9,24 265:14,22,23 266:20 267:3,8 267:13 270:20 273:7,21 274:14 280:2 280:21 283:25 298:18 299:14 303:2,5 305:10 305:15,16,18 305:20,23

**celsius** 14:3,3 48:20 49:10 51:15,20,22 54:14 156:12 178:8,25 179:1 179:11 180:1,2 187:9 245:3,6 245:17 250:23 250:24 251:11 251:16 252:1,2 253:25 254:3 254:13,20,22 254:24 255:12 255:15,21 256:8,18,22,25 273:23 280:14 280:16

**center** 75:9

**centigrade** 156:9

**ceres** 24:17 39:10

**certain** 39:9 45:2,14 46:16 47:6,11,19 48:7 70:7 122:15 130:5 153:19 175:8 207:12 282:5

**certainly** 83:7 106:6,20 116:8 124:10 185:17 219:24 220:1 253:17 302:10 302:13

**certification** 5:8

**certify** 309:5,12

**cfei** 1:21 4:13 308:3

**cfi** 4:13

**chair** 18:19 19:1

**chairs** 116:17

**chamber** 11:15

**chance** 252:19

**change** 47:20 153:22 297:9 311:4,7,10,13 311:16,19

**changed** 71:23 144:3

**changes** 18:15 71:18 310:10 312:6

**changing** 223:22

**chapter** 123:4 194:1

**char** 71:22 217:7,10 220:10

**characteristics** 254:10

**characterizati...** 54:1 56:4 120:4 231:9

**characterizing** 53:23 55:23

**charge** 11:17 46:18 47:7 48:17 49:6,14 52:6,6,13,13,17 53:6,7 54:16 55:10 59:4,5 59:14 129:13 129:19 195:5,7 195:11,15,17 196:1,7 252:25 253:1,18 254:11

**charged** 51:6 51:21 52:2 118:24 129:14 129:15 194:12 195:14,19 196:6

**charging** 131:7 133:5 134:3,15

135:1,4 136:18
192:1
**charles** 1:5,7
**charred** 91:9
105:10 106:2
146:17
**charring** 87:20
88:7,15,25
89:5,10,12
90:1,3,6,10
91:21 216:24
217:1 221:2
**chart** 48:14,16
**check** 34:25
35:3 290:6
292:7,13
**checked** 292:15
**chemicals** 10:5
10:6
**chew** 128:18
**chief** 68:20
**choosing** 27:18
41:1
**chose** 40:8
**cigarette**
203:21 204:2
290:23 291:4
**circuit** 38:7
276:9,10
**circuited**
196:15
**circumstance**
181:2

**circumstances**
14:13 52:21
53:4 54:16
**cited** 17:23
45:10
**civ** 1:14
**claimed** 286:23
**clarify** 198:8
284:12
**clear** 34:20
35:19 98:2
215:2 251:12
297:22
**clearly** 61:1
80:17 104:8
105:19 109:21
159:9 163:9
204:11 205:5
205:22 237:7
237:11 241:11
251:15 253:6
**client** 40:14
**clients** 9:8,11
9:12,12,19
**close** 106:11
128:16 156:4
221:23
**closed** 77:17
130:18 167:23
190:19 216:11
216:15
**closer** 70:24
77:6 105:11
156:20 188:24

191:9 212:25
233:7
**closest** 98:15
105:8 188:18
**closet** 77:2,3
91:2,4,5,7,9,14
94:11,13 98:12
98:22 99:1,2,8
99:9,22 101:17
102:3,5 103:8
103:12,18
104:9,16 105:3
105:11,19,22
106:12 107:17
107:19 108:1
124:3 140:8,9
140:9,13 149:2
150:4 153:6
154:11 156:21
158:7 161:13
161:14,15,18
161:19 162:25
163:7,10,21,23
164:2,24 165:1
165:8 167:5
168:13,14,15
168:16,19
169:5,5,12,25
170:17 171:9
171:10,14,16
171:17,18,19
171:22 172:4,6
172:10,12
191:4,5 197:9

197:15,23
198:1 199:5,13
200:1,16 201:4
201:9,11,25
202:2,7,11,12
202:19,19
206:18,20,23
206:24 207:8
207:19 208:6,9
208:10,13,18
208:21,22,22
208:24,25
209:22 210:17
211:2,3,6
212:9,14,23
213:1,11,22
215:11 217:16
217:17 219:16
219:19 220:19
220:22 221:9
221:15,16,24
222:5,13,14,16
223:1,2,2,9,10
223:21,24
224:4,5,10,11
224:12,14,19
224:25 225:2
226:21 243:24
244:9 278:3
285:16,22
286:19,24
287:2,3,3,7
288:13,23,24
289:6,16

290:16,20 291:7,11,15,16 293:19,25 294:7,9,18,19 295:12,19 296:7 298:11 298:19,20 299:16,21,22 299:23 300:2,6 301:1 302:9 303:8 304:9,16 304:18 305:12 306:3,6,7,9,12 306:13,14,15 307:4,9,14
**clothing** 98:19 202:13
**coating** 15:24 259:10,19
**coatings** 258:23
**coils** 78:2
**cold** 196:14
**collaborate** 27:7
**collect** 11:15
**collected** 247:25 285:25 286:8 291:21 294:3
**collecting** 84:25
**collection** 3:17 26:5
**color** 102:9,14
**column** 255:1 258:12,12 260:8
**combination** 31:21,25 64:16 119:11 126:21 159:7 225:21 226:11 239:25 246:16 283:24
**combust** 217:17
**combustible** 16:24 172:10 191:8 243:17 278:23
**combustibles** 169:24 170:16 171:22,24 243:24 244:9 277:24 300:14 301:2 302:9
**combustion** 153:4 215:12 215:17 217:4,8 243:20 244:20 274:20 278:11
**come** 15:3 56:5 66:1,3 67:7 90:19 109:12 111:14 121:9 121:12 125:3 132:10 151:25 177:13,18
186:2 197:6 202:17 228:25 234:7 239:4,6 267:7 271:7 277:9,10 287:3 297:8
**comes** 121:18 233:25
**coming** 139:23 140:1 150:12 150:25 153:2 157:11 175:6 191:9 218:15 218:18 220:1 229:11 244:15 248:4 272:6
**comment** 117:13
**commenting** 84:7,8
**commercial** 4:11 252:17
**committee** 17:4 17:6,14 18:7 18:10,13,17,18 18:19,21,23,24 19:25 20:12,17 20:20,21 21:2 21:7,24 82:13
**committees** 16:21 17:2 21:10,13,15,18
**common** 27:2 31:14 72:16
297:5
**communicate** 135:2
**compact** 137:3 207:24 208:1,9 208:17
**companies** 9:19 27:4
**company** 9:3 20:19 21:1 35:24 36:19,20 36:22,23 37:5
**compare** 115:25 138:4,5
**compared** 168:2,8 192:16 195:6 228:11 231:19 240:19
**comparing** 34:16 195:22 200:4
**comparison** 228:15
**compartment** 65:6 88:13 103:8,18,24 117:11,14,16 147:14 158:15 162:25 175:6 176:17 219:8 226:11 230:22 231:4,6,20 232:16 233:12 233:14,20

234:10,16,20 234:24 235:2,3 235:3 237:13 240:21 241:9
**competing** 120:1
**complete** 82:23 214:20 263:22 312:8
**completed** 310:17
**completely** 97:6 105:20 115:15,23 163:22 212:12 227:21 252:25
**completes** 262:21 266:17 267:1 271:13
**component** 124:19,23 125:2 244:8 245:9
**components** 14:23 34:16 55:9 58:4 93:25 123:23 124:7,9,10 125:12 126:1 210:11,14 245:13,21,25 246:10,14
**composition** 280:12
**comprised** 64:21,23 280:8
**computer** 16:5 16:5 44:12 53:22 56:19 117:2,2 124:3 124:24 128:6 128:13,21 130:7 137:3 233:15 241:10
**computers** 42:12
**conceivably** 144:2
**concentrated** 170:1
**concept** 265:7
**concern** 128:17
**concerned** 166:7
**concerning** 193:18
**concerns** 9:16
**conclude** 126:22 161:1 178:18 202:10 236:4
**concluded** 120:10 124:4 184:14 307:2
**conclusion** 13:11 56:6 65:19 66:2,4 86:18,23 88:22 89:18 111:14 118:10,11 120:7 121:11 121:13 122:7 124:13 125:5,9 125:23 126:16 132:21,25 133:3,24 137:8 145:7 149:17 149:19 173:18 186:2 197:6 198:10 199:4 200:15 202:6 202:17 211:5 228:3 229:11 239:5,7 267:8 304:5 305:5
**conclusions** 33:10 122:5
**condition** 97:11 144:1 179:25
**conditional** 198:9
**conditions** 14:4 51:10 52:24 196:25 280:22
**conducted** 6:5 6:19 24:8,9 264:5
**conduit** 224:13
**cones** 298:17
**confection** 157:11
**confidence** 122:16,19 123:1,3
**configuration** 61:22
**confirm** 95:14
**confirmed** 78:5 203:8
**confirms** 203:12
**confusing** 134:13
**connect** 96:4
**connected** 131:12,13 133:11 134:1 134:18 137:17 137:18 188:17 188:22 275:23
**connection** 96:1 131:17 134:11,11,19 215:16
**connections** 6:7 95:22
**consider** 22:9 57:12 84:2,3 84:10 92:24 93:2 105:24 112:5 118:23 129:1,5 207:15 223:16
**consideration** 56:6

**considered** 58:6 59:21 80:18 83:25 84:5 86:2 92:13 93:1 105:5 129:10 139:2 149:1,1 149:2 177:17 181:14 211:8
**considering** 84:9 138:14 150:3
**consistent** 66:9 74:8 92:21 115:24 116:8 125:18 127:4 138:8 139:12 140:4,25 144:17,18 151:6 161:4 171:1,5,6 174:7 175:11 185:3 188:5 198:24 199:19 199:23 201:3 201:23 210:17 225:25 238:2 240:3 241:5,6 241:7 256:13 294:10 298:1
**consistently** 9:15
**consulting** 9:3 9:7
**consumed** 91:10
**consuming** 272:2
**consumption** 159:10 239:22
**contact** 287:12 290:14
**contacted** 22:20 23:1 68:15
**contacts** 269:14
**contained** 259:21
**container** 210:3
**contains** 210:10
**contending** 80:16 289:13
**contents** 122:22 136:21 176:23 177:8 177:12 180:8 182:5,13 207:19 208:5 208:23,24 213:1 226:20 251:22 265:19 298:11
**context** 184:3
**continue** 6:10 47:22
**continued** 4:1 177:24 276:4
**continues** 43:10 258:1
**continuing** 180:16 251:13
**contradicting** 207:23
**contradicts** 79:4
**contrary** 142:6
**contribute** 51:13
**contributed** 169:6
**controls** 51:7
**convenient** 66:24
**conversation** 264:13
**conversations** 26:22
**cool** 245:14,16
**cooling** 47:21
**copies** 310:14
**copper** 247:17 247:21 307:13
**cord** 128:17,18
**cordless** 130:25 131:4,6,11,16 133:5 134:2,9 134:16,23 135:17,21,23 135:23 136:4,9 136:14,17
**corner** 159:18 220:23 221:3
**correct** 8:14,24 13:8,13 14:10 16:16,17 17:1 17:24,25 18:8 19:5,6 20:6,7,9 21:22 22:13,14 23:9,10,12,17 23:23,24 24:8 24:10,13,14 27:15 30:19,20 30:22 31:15,20 32:1,2 34:2,3,8 36:6,7,11,12,14 36:15,17 37:10 38:1,2,17 39:19,25 40:8 41:8 44:24,25 45:5,8,9,11,16 45:17,23 46:2 46:6,7,11,13,21 47:12,13,17 49:6,15 50:10 50:11 51:2 52:18 53:16,17 54:7,12,22,23 55:17,18 57:10 57:21,25 58:1 58:10 59:6,18 59:22 61:19 63:10,16,22,23 64:12,13 65:1

65:2,5,8,12,13 65:23 66:6 68:11,12,18 69:4,14,19,23 69:24 70:2,8 70:15,16 71:1 71:15,16,22 72:5,6,11,17 73:10,12,14 74:19 75:25 76:1,7 77:2,3,7 77:21 78:15,19 79:20,23 80:9 81:6,15 83:10 83:22,23 86:21 87:1,23 88:14 90:11 93:4,17 93:18 96:10,14 97:1,14 98:17 98:23,24 99:11 102:2,4,12 104:1 106:19 108:2 109:5,6 111:7,21 112:22 113:19 113:20 114:19 114:21,22 115:19 117:4,5 117:11 119:11 119:25 120:3,7 120:8,12,15,16 121:5 122:1,13 124:5 128:2,3 128:22 129:19 129:21 130:19 130:20,22,24 132:19,20 133:13 135:19 137:19 142:25 143:1,12 144:4 146:12,13,18 146:19,22 147:13 148:23 152:3,12,13 153:12,13 154:24 155:16 156:5,6,17,18 158:13,17,18 158:23,24 159:20,21 160:1,19,20 163:20 164:1,3 164:4,7 166:11 166:12 167:20 167:24,25 170:3,13,20 173:3,17,21 174:3,9,12,22 174:23 176:17 176:18 179:16 179:19 180:6,7 180:13 182:15 184:16 185:14 185:14 188:25 190:8,9,21,22 194:9,18,19 195:2,3,8,20 196:10,21 197:12,13,16 199:7,8 200:22 201:7,12,22 202:3,8,16,22 203:2 204:16 205:6 207:1,9 207:22 209:7,8 213:24 214:5,6 214:12 215:22 216:12,20 217:2,6,11 218:24 219:1,2 219:23 221:7 222:9,19,23 223:4,5 226:13 229:10 230:20 230:24 231:1,2 232:12 233:17 234:13,18 235:5,10 237:10,14 241:12,13 242:13 243:13 245:11,12 246:24 247:18 247:19 249:5 250:11,19,20 250:24 252:21 253:22 254:13 254:14 256:5 257:3,4,7 258:16,20 259:17 260:1,2 260:21 261:13 262:23 263:9 264:21 265:4,5 265:13,20,25 266:18 269:23 270:16 271:10 273:1,25 276:22 282:22 284:10,24 285:10,12 288:10,20 289:18,19 292:21 294:12 295:17 300:11 302:9 304:14 305:16,21 307:15 312:8

**corrections** 312:6

**correctly** 30:4 196:16 271:25 284:5

**correlation** 262:2

**couch** 72:12,14 72:15 73:9,11 73:22 76:18 78:1,1,1 79:5 80:9,16 81:7 81:10,12,12,17 81:20,21 82:4 82:5,16 83:15 83:16,17 84:7 85:13,18,21,25 86:3,5,11 88:4

107:19,22,25 108:6,6,8,11,16 108:18,25 109:7,23 110:2 110:5 114:25 115:3,10,16 116:10,14,21 116:22 139:9 149:2 157:20 157:24 158:7 158:12,23 159:3,10,12,13 159:14,15 160:8,9,24 168:25 169:16 169:21 171:23 172:15,18 198:15,20,23 198:25 199:12 199:18 202:24 203:7,14,16 204:18,20 205:7,12,17,20 206:3,4,10,13 207:3 209:23 210:21 212:7 212:20,20,21 213:3 273:18 302:7
**council** 18:20
**counsel** 7:2 310:14
**county** 68:3,21 71:13,17 77:23 82:12
**couple** 187:10 222:8,11
**course** 146:23 148:7 256:23 261:21 298:8
**court** 1:1,24 6:17,23 7:4,13 154:1 240:6 283:9
**courts** 22:7
**cover** 18:2,6 118:4,5,7
**covered** 15:23 15:23 190:4 259:5
**covering** 16:11 47:9 48:6 50:16 179:2 181:4 182:1 192:23 259:4
**covers** 142:18 142:20,21 143:3 146:6 235:20
**cpr** 143:24
**crawled** 143:11 143:13
**create** 10:24 175:18 186:24 187:5 243:8,15 244:13 270:7 271:2 272:21 273:6 275:7 278:5 279:1
**created** 162:10 206:21 207:4 212:21 226:22 265:8,16 274:4 284:14 293:6
**creating** 274:12
**credibility** 138:2,14
**credible** 139:7 149:5,16
**criminal** 122:25 123:6
**criteria** 122:15
**critical** 250:22
**ct** 11:16
**cut** 73:5
**cv** 1:14 9:23 16:13
**cycle** 253:14
**cycled** 11:11 192:15 252:25
**cycles** 253:1,2 253:18
**cycling** 253:9 254:11

**d**

**d** 3:1 4:1 5:1
**damage** 15:15 55:5 56:18,18 58:13 60:25 61:4,5,9,17 62:19,21,22,23 62:24 63:3,25 69:9 70:7,15 70:18,20,24 71:22 72:5,9 72:13 74:3,16 74:19,25,25 76:8,9,15 77:10,18,25 88:17 89:23 90:8 91:2,10 92:20 94:10,12 97:13,16 98:4 98:9 99:23 102:4,6,22 105:2,23 107:14,25 108:3 116:19 116:19 117:7 117:21 118:3,5 118:8,22 119:2 119:5,6 146:17 158:21,25 159:11,12 162:14,16 164:15 169:4 173:19,22 174:8,17 175:1 175:9,16,18,22 178:2,10 189:13,19,19 197:11 198:3 199:6,12,25 201:9 215:24 216:19,22,23

219:25 220:2,5
220:5,6,8
221:13,14,22
222:7,8,22
223:1 229:1
230:23 231:3,5
231:17,19,22
231:22 232:1,2
232:7,14,17
233:11,13,19
235:4 236:5,25
237:2,8,12,18
238:1,1,5,6,25
239:23 240:1,2
240:18,19,21
240:23,24
241:4,5,8,10,12
246:6
**damaged** 52:25
53:3 55:6
61:18 64:12
73:12 74:15
76:18,24,25
94:1 99:21,22
105:20 110:17
180:17,18
194:24 196:15
221:16,24
225:19 226:10
234:16
**damaging**
178:21,22
**dash** 257:19

**data** 11:24
245:20 251:15
**date** 7:23 23:4
35:21 39:11
311:24 312:12
**dated** 114:9
**dates** 35:21
**day** 106:5
111:4 114:11
206:6 308:7
309:18 312:15
**days** 310:17
**dead** 192:16
253:8,9,11
**deal** 29:3
**death** 69:22
**debris** 283:25
285:22,23
286:8,18,24,25
287:7 288:13
288:23 289:5
289:13,15,22
290:15 291:11
291:15,18,19
291:21,22
293:18,25
294:1,17 295:2
295:12,18,20
296:10,16,25
297:5,14
299:16,20
300:16
**deceased** 1:6,8

**decide** 27:7
28:12 214:4
**decided** 39:7
84:12 149:15
**deciding** 17:11
**decision** 26:12
**decisions** 27:12
**declaration**
41:23 139:13
139:15 140:2,3
143:8 149:9
188:12
**declare** 312:4
**decreased**
147:11
**deemed** 312:6
**defect** 124:23
**defects** 228:13
**defendants**
1:12 2:9
**defer** 27:22
266:10
**defining** 64:5
**definitely** 35:3
**definitive**
307:12
**definitively**
34:21 85:23
97:20 228:16
238:10
**deform** 16:6
**deformed**
230:22

**deformity**
214:16 217:25
218:2
**degradation**
51:24
**degraded** 192:8
**degree** 73:22
250:24 254:12
254:20
**degrees** 14:2,3
14:15,15 48:20
49:5,10 51:15
51:20,21 54:14
156:8,12 178:8
178:24 179:11
180:1,1 187:8
245:6,10,16
250:23 251:11
251:16 252:1,2
253:25 254:3
254:22,24
255:2,15 256:8
256:18,22,25
280:14,16
**delay** 266:2
**delayed** 215:13
**demarcation**
74:22 76:3,19
76:20 77:1,1
146:11,20,24
147:19 148:9
149:23 152:11
174:11

**demonstrates**
171:11 249:1
**denied**  40:17
**density**  194:11
**department**
3:22 33:21
84:7 232:24
248:18 249:2
**depend**  147:25
148:13 179:24
181:24 182:22
244:5 245:12
272:10 274:7
277:16 278:1
**dependent**  14:4
**depending**
61:22 97:11
228:6 245:10
270:17 272:16
279:4 280:11
**depends**  6:6
16:9 27:10
28:1,25 52:23
143:7 148:24
165:24 176:13
177:5 277:19
**depict**  296:25
**depicted**
137:16 164:19
174:20
**depicts**  75:18
**deponent**
310:13 312:3

**deposed**  84:23
183:11
**deposing**
310:13
**deposition**  1:17
1:21 5:8,11,15
6:4,14,19 26:4
33:19 40:2
41:24 67:23
113:1 139:12
139:16,21
143:8 145:18
149:8 150:18
174:6 252:10
252:20 276:14
287:10 290:21
**describe**  70:13
104:21 117:1
161:3 192:20
192:25 198:22
281:23 282:6
**described**  52:5
56:16 66:9
98:14 108:22
111:3 113:1,3
115:3 136:6,21
149:12 185:18
189:25 192:19
198:19 206:19
209:10 212:13
214:15,18
224:2 261:6
274:16 278:8
278:12 295:2

296:22 299:19
300:15 306:5
**describes**  84:17
85:2,9 126:15
140:3 187:18
199:16 211:19
280:5
**describing**  71:6
115:3 269:2
**description**
3:12 4:6,20
32:5 60:18
74:1 78:12
94:8 113:17
158:20 185:2
209:6 229:5,7
282:20 283:23
**descriptions**
56:19 66:10
78:24
**descriptors**
281:15
**design**  218:12
219:9
**designation**
230:15
**designed**  51:7
53:19,24 83:15
83:17
**desk**  167:7,14
167:18 168:8
173:14 176:7
177:6 246:7,17
300:16 303:6

305:10,24
**desktop**  153:15
167:22 168:1
**detail**  11:5 13:1
13:25 14:5
15:1,18 54:19
56:17 126:17
184:5 248:23
259:6 261:15
**detailed**  296:8
**details**  14:6,17
44:15 50:2
55:13
**detect**  210:13
**detector**  94:18
95:22,24 96:7
96:17,19,22
97:4,6,10,21,22
97:23 150:22
188:15,23
189:8 268:23
269:1,3 272:8
275:14,15,18
275:22,24
276:4,5,8,12,18
276:23
**detectors**  94:24
95:3,5,13,25
96:6 98:1
186:24 188:24
189:1 271:20
275:12
**deteriorate**
58:14

**deterioration** 51:12
**determination** 24:4 57:7 60:8 65:25 84:20 122:10 138:21 195:9 221:20 222:2 223:12 228:21 230:11 237:16 241:2,3
**determinations** 28:23
**determine** 83:12,14 86:15 86:25 96:7,25 97:4,8,20 99:21 104:22 139:7 166:4 172:9 194:23 206:8 211:24 223:23 229:18 236:19 237:21 242:17 243:23 282:4
**determined** 57:20 80:9 84:11,18 119:23 144:19 199:25 216:21 301:3,9,17 303:18
**determining** 23:22 52:9 300:13
**develop** 157:24
**developed** 158:17 228:17 244:11
**developing** 18:10
**develops** 243:19 279:9
**device** 54:11 83:4,9,13
**devices** 45:2,14 45:19 50:13 51:4 53:19 59:16,19 129:23 196:24
**devises** 82:13
**diagonal** 76:3,5 167:19
**diagram** 247:5
**difference** 56:22 114:3 132:3 169:15 169:17 268:12
**differences** 239:17 261:24
**different** 4:11 9:5,7,16 11:12 11:13 16:21 18:25 25:21 33:18,22 34:19 36:3,4 39:4 51:22 56:18 62:2 64:5 68:24 82:19 88:1,22 89:13 89:18 90:1 92:24 107:6 112:24 113:25 114:10 116:16 119:17 123:1,3 127:2 132:7,8 136:11 141:1 145:3 163:13 163:24 169:1,2 169:20,23 176:4 181:22 181:25 184:25 192:5 193:18 195:11,21,23 196:7 200:5 203:4 207:16 207:17 210:23 213:14,15 226:18,24 227:2,19 228:4 228:6,17,20 229:19 231:10 231:22 232:17 233:13,18 238:20 241:10 247:8 252:18 253:13,13,13 253:14,17 254:10 259:9 259:20 262:1 264:20 268:25 278:9 296:16 298:22 299:11
**differentiated** 252:24
**differentiates** 229:6
**differentiating** 231:25
**difficult** 266:5
**diligent** 86:4
**dimensions** 151:20 168:4
**dining** 70:14,19
**direct** 55:8 73:7 134:10 162:13 218:11,19 220:5,8 224:13 231:1
**direction** 176:13 207:13 214:17 216:7,9 217:13 218:3 221:6,8
**directions** 170:9
**directly** 76:11 134:18 137:17 159:13 248:4
**directs** 138:3
**disagree** 90:9 118:11,12 124:5
**disassemble** 85:21,25
**disassembled** 85:18 86:5

**discern**  236:1
**discharge**  47:7
  253:1,18
**disciplines**  9:6
**discoloration**
  76:12 88:19
  89:1,8,9,13,14
  90:5 219:25
**disconnecting**
  237:24
**discount**  79:12
**discounting**
  289:7
**discovered**
  148:11 214:25
  224:20
**discovery**
  42:11
**discredit**  138:1
**discuss**  182:9
  184:2 225:12
**discussed**
  129:11 140:15
  160:10 163:4
  170:25 171:4
  200:6 284:9
  307:17
**discusses**
  181:10 184:5
  187:7 196:8
  269:4
**discussing**
  111:5

**discussion**
  13:15 37:20
  44:8 67:16
  154:2 200:24
  240:8 249:6
  283:10
**discussions**
  13:16 39:21
**displaced**  215:4
  215:7
**displacing**
  215:9
**display**  173:25
**disregard**
  138:24 139:1
**disrupted**
  298:3
**distance**  140:10
  153:19 155:1,5
  243:4
**distances**
  153:20
**distinguish**
  136:7
**distribution**
  170:18
**district**  1:1,2
  6:17,17
**disturbed**
  297:7
**disturbing**
  296:24
**diversity**  20:19

**document**
  17:20,24 26:1
  31:22 43:9,23
  44:14 45:24
  50:1,1 68:4
  79:8,9,22 80:4
  81:24 85:2,10
  85:13 87:2
  113:5 166:3
  292:5 298:2
**documentation**
  25:3 34:16
  79:23,25 96:2
  203:11
**documented**
  82:9 104:2
  176:5 203:15
  208:16 295:22
  296:12
**documenting**
  80:3
**documents**
  7:19 18:11
  42:16,18,21,22
  43:2,11,12
  68:10 248:15
  293:6
**doing**  19:20
  22:11,22 24:2
  33:13 108:20
  200:4 209:20
  211:23 238:15
  238:16 251:7,8
  258:1 281:20

  290:24 292:6
**don**  33:25
**door**  75:4,20
  76:4,9 77:14
  77:15 87:19
  88:7,12,12,16
  88:19,24 89:6
  89:19 90:14,14
  93:12 94:19
  95:9,10 101:25
  130:17 150:9
  152:17,22
  157:6,10,16,17
  168:20 215:21
  216:2,4,11,14
  216:18,19,22
  216:25 217:5,9
  217:14,15
  219:13 261:1
  294:8 306:6
**doorjamb**
  89:15 151:24
  152:9
**doorknob**  76:6
  76:10,11
**doors**  89:2
  174:5 306:6,10
**doorway**
  152:15 156:3
  156:16,20
  167:15
**dose**  62:8 63:21
**double**  34:24
  35:2

**dr** 6:14 8:1 13:1,4 14:5 15:1,12,17 16:11 22:15 44:7,15 48:5 50:4,16,21 53:10 54:18 55:11,12 56:20 60:2 65:14 66:3 67:21 68:1 71:8 75:8 130:12 179:1,8 179:15 181:3,5 181:7 182:1,7 182:8,9,16 183:2,9,11,22 184:4,20 185:11,15 187:7 193:3,5 195:2 200:8 241:21 242:8,9 242:20 249:13 249:20 251:1 252:7 261:23 262:12,16,18 262:25 263:17 264:7,22 266:10,25 271:11 277:4 277:10,11,12 279:21,24 307:19
**drastically** 47:20
**drawer** 109:19 140:17 168:2
**drawings** 151:17
**drawn** 230:10
**dripped** 76:22
**dripping** 174:18 175:12
**driveway** 143:16,16
**dropped** 205:19
**drove** 143:14 143:15
**drywall** 99:14 220:21 221:2 222:21
**due** 57:3 124:22 149:3 158:7 225:21 226:1
**duly** 7:10 309:8
**duplicate** 18:3
**duration** 15:10 156:22 185:4 186:6 188:20 270:17
**dusts** 16:24
**dynamics** 274:8

**e**

**e** 1:5,7 2:1,1 3:1 4:1 5:1,1 249:16,16 309:1,1 311:3 311:3,3
**earlier** 35:21 51:17 106:4 129:11 140:15 171:4 179:12 189:6 198:19 198:20 211:9 217:18 224:2 236:7 251:24 261:22 266:10 278:12 283:2 292:10 295:19 296:9 299:19 300:15
**earliest** 93:11 97:25
**early** 23:2
**ease** 207:15
**easier** 213:14 235:14
**easy** 175:23 297:24
**eat** 162:21
**edits** 17:11 18:12
**edwards** 68:25
**effect** 5:14 156:15 217:1
**efforts** 306:15
**either** 11:2 24:20 38:5 44:21 54:25 56:9 81:12 94:15 113:16 115:15 122:4 139:8 142:12 145:11,13,14 161:15 162:12 238:8 273:17 277:4 285:6 301:19
**ejecta** 294:5,10 300:22 305:6
**ejected** 176:24 176:25 177:3 226:20 245:9 245:18,21 265:3 270:19 270:20 305:25 306:2,14
**ejectiles** 306:7
**ejecting** 147:24 265:19
**ejection** 182:4 182:5 183:19 266:6,7
**ejections** 304:8
**electric** 72:25 78:1 203:7 214:2
**electrical** 80:24 81:10 94:17 108:15 187:20 188:3,4,8
**electricity** 49:1

**elements** 80:25 108:22,23
**eliminate** 296:1
**emission** 278:13,14 284:20 285:3,9 304:1
**emissivity** 155:3
**emitted** 243:18 243:24 270:10
**empirical** 10:21
**empty** 305:16 305:23
**enabled** 53:21 54:6,11
**enclosed** 64:25
**enclosure** 219:12
**ended** 246:17 246:20
**ends** 93:25
**energized** 84:8 84:12 191:22 192:16 203:14
**energy** 63:21 119:13 153:24 155:11 168:18 169:23 194:11 213:9 275:1 277:6 284:11
**engineering** 9:2 9:6
**entered** 140:10
**entire** 63:17 76:15 234:15 237:18 277:19
**entirely** 50:20 60:2 133:18 232:9 234:1 239:8 262:11
**entities** 27:3
**entitled** 19:4 29:20 127:21 194:7 249:16 252:15
**entrance** 75:22
**entranceway** 152:10
**entry** 158:3
**environmental** 52:23
**envision** 52:22
**envisioning** 125:18 285:8
**equal** 49:10,17 52:14,19 53:8 223:24
**equalize** 152:16
**equally** 52:1 223:6,11,16
**equipment** 11:13 27:9,25 28:23 215:12 215:15
**err** 84:24
**errata** 310:11 310:13,17
**eruptions** 140:1
**escape** 152:1
**especially** 280:21
**esq** 2:6,6,7,10 310:1
**establish** 277:17
**estate** 1:5,7
**estimate** 10:17 30:11 268:4 269:24 277:9 277:10,12 281:1 282:21
**estimated** 280:24
**estimates** 279:25
**estimating** 268:8 272:15
**estimation** 277:22
**et** 252:14
**eva** 6:23 309:3 309:23
**evaluate** 58:17 290:15 291:8
**evaluated** 55:19
**evaluating** 22:16 83:16 129:6
**evaluation** 10:25 56:11 88:21,23 89:17
**evaporate** 210:11,12
**evaporates** 210:7
**event** 55:1 56:13 57:24 79:1 184:14,18 184:18 185:3 188:24 242:17 253:12 254:9 261:9 282:5 284:2
**events** 60:18,19 147:17 148:1,8 148:15,16 149:12,25 160:3,12,19 185:4,12 229:5 229:8,12 236:9 273:9,16 274:3 283:23 298:8 299:2
**eventually** 47:16 51:13 64:18 116:11 168:19 169:4 169:11 177:6
**evidence** 3:17 26:5 41:1 57:13,15,23,23

58:2 82:16 91:6 94:6 95:20 96:12,23 100:4,10,12 102:14 104:17 104:21 105:21 106:24 110:15 110:24 111:1 116:1,6,9,12 138:4,4,6 140:4 148:20 149:16,19 162:13 163:14 163:18 164:8 164:12 171:1,7 171:10 172:22 173:1,4,23 178:1 199:24 200:14,21 201:8,20 202:11 203:1 203:24 206:1,2 210:25 211:21 213:19 214:9 216:19 217:4,8 219:3,6,14,23 226:23 227:11 229:4,13 232:20 235:25 236:8,17,20 238:17,21,24 240:17 243:23 246:12 247:25 278:22 285:21 291:17 292:1 293:24 295:1 295:11,18 296:5 297:6,9 297:10,11 298:2 299:11 299:15,18 300:1 302:17

**evidentiary** 80:15

**exact** 30:10 168:4 169:14 262:17 264:23 266:11,13 280:11

**exactly** 40:7 98:10 188:7 208:14 261:5

**exam** 81:17 289:25

**examination** 3:3 7:24 26:17 34:5 53:13 82:17 85:6 309:7,9

**examine** 92:23 138:5 164:17 164:23 220:3 221:19 222:6 224:16

**examined** 7:11 25:8 27:18 28:22 34:6 53:12 91:12 93:22 105:18 164:10 213:17 247:25 274:9 298:10

**example** 142:1 256:9 278:20

**examples** 274:18

**exceeding** 48:1

**exceeds** 47:11 48:20 49:5

**except** 5:19 38:7 67:20 77:2

**excess** 156:14 215:14

**excessive** 196:14

**excluding** 203:13,18 206:11

**excuse** 256:2

**exhaust** 219:25

**exhausting** 168:14

**exhibit** 3:12 4:6 7:20,21 9:22 9:23 16:14 17:17 25:21,22 26:3 29:16 37:23 41:11 42:8,8 43:9 45:25 48:13 68:2 116:25 127:15 188:1 193:22 197:5 220:13 222:25 222:25 225:5 249:14 252:4,5

**exhibits** 3:9 4:3 101:6 174:20 178:5

**existed** 137:1,7

**existence** 24:24

**existing** 57:1,3 57:5,8 284:4

**exit** 176:20 215:18

**exiting** 153:8 168:15,19,19

**expect** 61:3 118:22 129:15 168:25 175:15 175:17 195:13 211:15,17 218:19 227:19

**expectation** 33:12

**expected** 63:20 66:9 175:19

**experience** 115:22 135:21 156:4 182:21 227:7 228:1,9 262:20 263:1,3 263:5 266:16 267:1 271:12 276:11 300:12

**experienced** 190:23,24 197:10 198:2 240:21 241:11
**experiment** 281:20
**expert** 1:22 3:18 21:19,23 22:1,4,8 56:22 184:5 290:14
**expert's** 293:13 293:14
**expertise** 11:5 20:13 21:2,6 21:22 22:6 23:14,22 44:10
**experts** 34:1 37:18 39:5,13 39:21 66:1 140:12 194:22 198:22 209:11 286:22 293:2
**explain** 49:8 191:19 229:17 239:15
**explanation** 181:8 206:16 238:4
**explicitly** 71:11 211:9,25 230:14
**explode** 123:25 124:8 125:13 126:3
**exploded** 214:17
**explodes** 235:19
**exploding** 243:7
**explosion** 3:15 19:5,18 215:15 260:11,18 261:1,8
**explosions** 4:10 19:15 58:22 243:12 252:15
**exponent** 8:10 8:16,23,25 11:2,6 263:18
**exposed** 14:14 52:25 117:11 176:16 196:13 280:22
**exposure** 57:5 280:17 284:3,7
**expressed** 122:19
**extended** 280:19,25 281:6,10,16,24 282:6,20,23 283:4
**extending** 174:6
**extends** 234:10
**extent** 107:14 150:15 153:1 168:21 172:11 260:3 273:5,12 273:17
**external** 4:10 11:22 12:15,21 13:21 14:14 15:4,9 54:25 56:7,12 57:16 57:22 60:4 124:11 125:5 126:23 129:8 149:17 178:11 178:22 191:24 192:18 194:16 228:12 242:18 247:18 252:16 258:18 259:1
**externally** 56:1
**extinguish** 107:23
**extinguished** 147:5 202:15
**extinguisher** 139:25 151:4
**extremes** 58:15

**f**

**f** 2:6 5:1 309:1
**fabrication** 289:8
**fabrics** 213:14 213:15,16
**fac** 141:3
**faces** 102:25
**facility** 26:21
**facing** 215:20
**fact** 32:3 45:6 63:11 79:21 85:20 116:10 129:5 141:24 142:5 163:21 164:14 173:19 205:10 226:14 283:7 286:19 290:16 297:13 304:6 305:2,4
**factor** 59:21,23 59:24 60:16,23 60:25 61:7 62:25 138:13 153:21 155:4 189:23 241:2 262:1 303:22 305:4
**factors** 51:12 52:4,9,23 56:18,21 58:18 60:11,15 141:4 189:21 191:11 191:25
**facts** 13:10 138:8 145:11 149:19
**fahrenheit** 254:4
**failed** 82:14,15

**fails** 310:19
**failure** 57:14 184:6
**fairly** 9:15 57:11 231:4
**falling** 220:25
**false** 294:24
**familiar** 8:8 12:3,7,10,20 17:20 23:13 24:18 43:18 44:11,21 45:1 45:18 46:12,21 46:25 121:18 121:19,20 130:13 134:22 136:5,6,9,11 251:21
**familiarity** 23:15 43:20 135:23
**family** 35:25 36:2 158:1,9 160:7 187:1 243:3 271:23
**far** 40:5 153:15 169:10 177:5 254:11 303:8 305:11
**faraci** 2:4
**fast** 278:11
**feature** 49:4
**features** 191:23
**february** 22:18 22:19 23:3 30:9 31:6 35:7 35:13 82:21 114:9
**feedback** 283:9
**feel** 156:24 157:1,6,17 193:8 233:19
**feels** 289:10
**feet** 74:4,16 140:24 151:13 151:14 221:5 222:9,11
**felt** 160:15 295:20
**fet** 48:22,23 49:11,13
**fi** 117:7
**field** 19:21 86:8
**fields** 21:12
**fifth** 258:12
**fight** 107:21
**figure** 101:22 130:16 145:21 145:22,25 146:11 159:6 163:4 166:14 167:13 190:15 197:5 201:2 204:14 222:13 225:16 226:9 229:19 230:18 231:18,20 232:8,16 239:17 246:18 247:5 250:6 251:9 254:17 254:23 255:3 256:9 257:2,5 257:14 258:8 259:8
**figures** 173:25 189:12
**file** 43:1,12
**filed** 6:16 139:13
**filing** 5:7
**fill** 271:18
**filling** 275:11
**final** 121:9,11 121:12,15,21 122:1,3,4,11,20 125:8 184:9
**finally** 143:11
**find** 40:7 73:6 75:13 79:1 88:15 91:6,20 98:21,25 100:14 101:20 111:18 116:9 128:11 135:7 143:22 163:1 190:10 218:2 255:5 262:17 269:9 276:15 281:21 287:13 287:18,19,23 288:4 290:2,15
**finding** 31:19
**fine** 239:8,10
**fingertips** 14:7
**finished** 128:13
**finishing** 266:7
**fire** 3:15,22 13:7 16:15 18:7,10 19:4 19:17,20,25 20:13,21,22 21:9,22 22:1,4 22:6,8,11,16 23:16,19 24:2 24:3,7,13,23 25:7 26:11,17 27:2,12,17,21 28:5,11,14,19 28:21 29:4,12 30:8,9 31:5,14 31:17 32:19 33:5,21 34:6 36:5,19 37:1,8 39:8 53:14,22 54:7,25 56:18 56:24 57:1,3,6 57:8,16,22 60:13,14,15,24 63:3 68:3,14 68:21 69:8 71:12,22 72:5 73:12 74:3,16 74:18 76:10 77:15,22 79:4

| | | | |
|---|---|---|---|
| 80:8,17 81:20 | 119:25 120:4 | 169:25 170:5 | 215:10 216:5 |
| 82:9 83:2,5,9 | 120:14,18,22 | 170:17,22,24 | 216:18,19,22 |
| 83:13,21 84:4 | 122:8,11 | 171:11,14,22 | 217:2,13,15,15 |
| 84:5,6,10,18 | 123:21 124:11 | 171:24 172:6 | 219:7,10,15,19 |
| 85:2,3,7 86:3,4 | 124:17,18 | 172:11,17,18 | 219:23 220:5,5 |
| 86:9,14,15,16 | 125:5,9,10,19 | 172:20 173:2 | 220:8,14 |
| 87:11 90:15,21 | 125:21,21 | 173:11,14,23 | 221:17 222:7 |
| 91:25 92:1,11 | 126:9,18,23 | 178:10,21 | 222:21 223:7,9 |
| 92:15,18 93:20 | 129:8,16 | 186:9,16,18,20 | 223:21 224:10 |
| 93:23 94:5,10 | 130:19 131:24 | 186:22 187:19 | 226:21 227:15 |
| 94:15 97:13 | 132:11 138:15 | 187:24 188:17 | 228:12 229:23 |
| 98:4,9 99:20 | 139:9,23,25 | 188:25 191:4,6 | 230:4,5 232:24 |
| 99:23 100:3,8 | 140:6,8,12 | 194:13,15,16 | 236:10,23 |
| 101:4,12 | 141:10 143:18 | 194:24,25 | 238:1 242:18 |
| 102:15 103:6 | 145:7 146:23 | 197:8,17,22,23 | 242:24 245:23 |
| 103:16 104:19 | 147:5,7,8,11,13 | 197:25 198:7 | 246:6 247:10 |
| 104:23,24 | 148:1,11,14 | 198:23 199:17 | 247:12 248:17 |
| 105:20,22 | 149:1,2,17 | 199:17,20 | 249:2 260:12 |
| 106:24 107:6,7 | 150:4,5,5 | 200:2,15 201:3 | 261:3,3,4,12 |
| 107:12,14,16 | 151:1,4 152:4 | 201:4,9,10,17 | 262:4,8 265:8 |
| 107:21,25 | 153:3,6 154:11 | 201:19,23,24 | 267:17 269:2 |
| 108:8,12 109:8 | 157:20,22,24 | 202:6,10,14,18 | 270:16 271:17 |
| 109:9,20,24 | 158:6,16 | 203:5,7,25 | 272:1,11,12,13 |
| 110:15 111:2,4 | 159:11,15 | 204:6,7,18,24 | 272:17,18,19 |
| 111:15,16,20 | 160:5,6,8,24 | 205:17 206:3,6 | 272:21 273:4 |
| 111:24 112:3,9 | 161:11,12 | 206:9,13,16,17 | 273:17 274:4,8 |
| 113:4,4,10,11 | 162:9,13,16,24 | 206:21,22,23 | 274:8,10,11,18 |
| 114:11,25,25 | 164:18 165:13 | 206:25 207:3 | 274:23 275:5,7 |
| 115:4,10,11,15 | 165:19,20,22 | 207:11,12,12 | 275:10 277:3 |
| 115:16,22 | 166:3,5,7,8,10 | 207:20 210:13 | 277:17,23 |
| 116:9,11,23 | 166:11,15 | 210:15,16 | 278:1,5,10,12 |
| 117:1 118:8,17 | 167:23 168:13 | 211:10,14,17 | 278:21,25 |
| 118:22 119:2 | 168:24 169:4 | 211:20,25 | 279:4,7 284:4 |
| 119:16,20,22 | 169:10,13,21 | 212:7,20 | 284:13,13 |

285:7,15,15,16
285:24 286:1
286:19 289:11
289:14,16
290:1,14,16
291:7,9,9,16,20
292:3 294:2,4
294:7 295:21
296:11 298:4
300:6 301:3,8
301:24 302:20
303:3,16,19,21
303:24 304:1,7
304:8 305:5,6
307:3
**firefighter**
109:13
**firefighters**
38:7 94:9
107:20 144:7
147:6
**firefighting**
208:25 214:23
306:15
**firemen** 143:17
**fireplace** 72:25
214:3
**fires** 10:20
19:15 23:22,23
94:3 110:20
274:18 284:18
**first** 7:10 9:24
16:22 18:5
20:3 22:15

30:6 41:11
69:17,20 93:6
94:9 128:20,21
128:24 139:22
140:25 143:21
143:23 147:1,8
147:23 151:11
154:10 161:14
161:17,24
167:1 171:24
172:20 178:17
178:23 182:4
185:1 186:13
187:9 191:4
202:11 203:6
206:10 207:6
211:15 212:8
212:22 213:2,2
213:22 214:24
216:3 218:14
218:16 226:5,7
229:2,21
232:18 235:13
235:21 236:4
236:21 237:16
237:18 238:11
239:10,14
243:17 252:8
252:24 266:7
271:18 289:18
299:12 307:2,7
307:13
**fit** 165:4

**five** 10:18 18:3
49:12 68:1
188:1 269:20
269:21
**fix** 200:9
**flags** 289:23
**flame** 80:22
108:25 204:19
205:15 212:20
215:18 224:13
243:19,21
244:7,11,13
260:12 261:4
261:13 270:15
302:12 303:23
304:1,15,19,25
305:2,3
**flames** 159:3
182:5,13 216:1
216:17 221:25
224:19 243:25
244:2,3 270:9
270:9,23
**flaming** 274:20
278:14 284:19
**flammable**
124:1 216:14
**flat** 62:6 63:10
63:12,12 190:6
251:17
**flipped** 234:6
**flooded** 196:14
**floor** 74:5,16
76:13,16,16

77:6 98:16,20
108:4 140:21
140:22 141:19
141:21 142:14
142:15 145:2,9
145:13,14
153:24 177:6
207:8 212:23
213:1,21
217:16 246:20
296:23 307:8
307:14
**flow** 49:1
**flowing** 187:11
**flying** 142:19
**foam** 16:21
**focused** 160:25
**foil** 245:19
300:5,13,21,22
301:1,8,11,23
302:14
**foils** 245:14
299:24
**fold** 19:9,14
**follow** 82:14
126:14 214:19
233:10
**followed** 19:17
**follows** 7:12
24:1
**foot** 155:9,9
**force** 5:13
93:15

**foregoing** 312:5
**form** 3:17 5:19 16:1 20:14 26:5,18 32:24 35:17 37:14 39:1,23 44:3 48:3 58:8 61:11 67:20 80:11 84:14 85:15 121:7 165:15 262:1 262:15 273:6 274:1 301:4
**forming** 147:9 151:7
**forms** 155:9
**forth** 22:13 309:8
**forward** 307:20
**found** 69:18 75:16 95:19 96:9 98:19 107:9 141:1 142:16,23 143:18 171:2 177:8,12,22 201:20 203:24 204:3 208:21 208:22 217:25 246:7 248:20 282:20 286:19 286:24 288:22 289:5 290:16 291:15,19 293:18 297:1 297:10 298:2 300:21 301:1 302:19 303:6 305:10,24 306:9 307:14
**four** 8:7 9:15 65:20 68:24 69:2 77:22 78:8,10 91:24 120:18 241:23 242:4 265:21 265:23 267:3,8 267:12 299:14
**fours** 99:18
**frame** 251:2
**frank** 217:2 243:25 244:2
**frequently** 134:10
**front** 73:18 157:16,18 177:24,25 217:25 218:10 234:20 244:24 245:7 247:3 279:22 287:2 294:18
**frt** 24:17 36:10 39:10 293:7
**fuel** 46:1,3 118:24,25 161:14,17,24 194:12,14 202:12 207:6,7 207:13,16 210:9 211:16 212:8,22 213:2 213:22 216:3 303:5 307:2,7 307:13
**fuels** 124:2 172:1
**full** 84:21,22 150:15 163:16 167:1 207:17 255:17 260:20 304:10
**fuller** 113:17
**fully** 129:15 220:3 222:5 261:1
**fumes** 209:16
**function** 49:24 59:13 157:3
**functions** 59:3 59:3
**furnace** 72:24 76:19 87:19,20 88:7,13,18,23 88:24 89:16 90:13,14,15,22 91:1,3,11,13,21 91:23 92:3,6,7 92:10,11 93:2 93:7,10,12,17 93:23 94:2,4 94:19 99:4,24 100:2,8 101:4 101:12,17 102:19 103:1,3 103:7,8,14,15 103:17,21,21 103:22,24 104:18 105:4,9 105:11,15,22 105:24 106:24 139:8 149:3 161:11,12,23 162:9,10,10,14 162:18,24 163:8,15,19,23 164:6,9,20,23 165:2,9,13,21 166:8 214:8,10 214:16,25 215:3,18,19,24 215:25 216:1 216:10,15,17 217:19,21,21 217:22 218:1,3 218:5,7,10,11 218:15,17,20 218:21,23 219:7,8,10,15 219:16,21 220:1,2,8,19 221:1,10,13,15 221:23,25 222:4 223:4,8 223:10,13,14

223:25 224:2,8
224:11,14,19
224:22 225:2
**further** 5:18
28:23 29:13
69:6 167:4
191:13 194:23
200:7 202:5
221:19 247:15
297:9 309:12

**g**

**g** 2:6
**galler** 33:25
47:9 50:3
53:12 54:18
60:2 65:14
130:12
**galler's** 54:3
**garage** 143:23
**gas** 4:10 87:18
93:17,23,24
214:8,17
215:14 252:15
260:10,25
261:7
**gases** 11:15
16:22 243:14
270:10
**gasoline** 209:15
209:25 210:2,4
210:6,8,9
211:11,11,21
212:14 213:8

**gauges** 46:1,4
257:11
**general** 15:13
29:2 76:20
121:6 255:7
**generally** 19:13
19:19 42:16
48:6 54:1
58:11 71:25
76:24 195:25
205:4
**generate**
155:10 244:19
270:11,12,13
**generated**
119:9 159:19
238:11 244:22
250:9
**generates**
270:15
**generating**
180:16 285:4
**generation**
244:6
**generically**
44:12,13
**geometry** 73:16
**getting** 59:13
156:19 168:12
168:18 237:3
276:17,25
299:6
**give** 169:14
187:15 236:18

243:9
**given** 9:14
309:10 312:9
**gives** 266:22
281:3
**giving** 247:7
**glass** 205:10
**glasses** 269:14
**glean** 34:13
**globally** 62:17
**glow** 112:22
**glowing** 107:22
139:23 150:25
243:4,9,11
**go** 6:12 9:17
13:6 14:15
15:5,17 16:8
25:21 35:14,14
35:20,21 38:14
38:16 52:7,18
53:5 56:8 60:8
69:5 77:9
78:21 93:9
99:25 108:12
116:4 119:21
123:18 124:12
124:25 126:25
140:5,7 150:17
152:1,16,25
156:2 158:2
168:22 181:11
181:12 183:24
184:23 185:17
185:18 189:9

190:21 193:19
196:4 197:3
200:23 212:5
212:11,16
225:5 227:15
227:16 247:15
264:9 266:6
267:8 268:5,6
271:6 272:3,22
273:9,11
278:11,13
280:3 290:14
291:8 298:1
305:5
**goes** 52:10 98:3
119:1 155:9
227:8 235:18
250:23 251:23
257:23,24
**going** 6:2 8:3
14:1 25:23,25
27:23 44:19
45:6 47:22
55:9 58:5 67:1
67:11 68:2
73:25 77:13
106:13 119:1
122:13 123:14
125:16 127:10
129:12 147:25
148:13 151:5,8
152:22 153:2
154:5 155:1,10
158:3 162:20

168:16 176:12 176:14 179:24 180:15 181:19 181:22,24 182:22 186:12 187:1 193:13 196:2 207:14 232:9 236:12 240:11 242:23 243:5,6 244:5 244:12,18 245:12 249:9 251:13 264:6 266:12 267:20 268:13,13 269:10 272:10 272:12,14 274:6,7,12,19 277:16 278:1 278:25 282:16 283:19 285:4 287:8 296:1 306:7,10,21,24 307:23
**good** 6:1 8:1 20:16 67:2 123:20 133:12 193:10
**gorbett** 23:11 24:1,6 26:12 26:17 30:3,7 30:25 31:4 32:11,15,18 33:3 35:8,14 36:16,25 37:8 37:17 38:22 39:8 40:4,21 71:12 82:14 83:7,24 85:12 91:15,25 97:19 100:20,25 101:3 106:6,25 107:15 116:20 120:10 162:23 165:12 238:14 286:9,11,14 287:13 288:11 290:19 291:8 291:10
**gorbett's** 23:13 32:9 34:22 35:4 40:25 41:18 71:8,8 79:25 80:7 86:12 100:16 100:21 166:1 166:14 292:8 292:25 293:7
**gotten** 141:18 150:7 177:4 256:8 293:8 306:13,15
**gradual** 157:8 233:4
**gradually** 258:1
**graduate** 8:19
**graduation** 8:22
**graph** 250:4,10
**graphite** 4:11 252:17
**great** 252:12 257:6,9 285:1 306:19
**greater** 48:21 49:9,10 54:14 158:22 245:5
**greatest** 107:13
**greenwald** 214:22
**greg** 23:11 30:3 34:22 35:4
**grew** 273:17
**grill** 215:3,7,10
**ground** 140:25 287:2 303:6 305:10
**group** 39:7 42:21 87:15 252:22
**grouped** 98:1
**groups** 18:25
**grow** 186:22 271:17 272:18
**growing** 153:3 272:13
**grown** 154:25
**growth** 60:14 147:8 150:5 277:17 278:2 278:12 279:7
**guess** 128:17 130:22 214:20 234:2 237:5 289:25
**guide** 3:15,15 19:4,16
**guideline** 18:13 19:20
**guidelines** 69:13
**guys** 193:8

**h**

**h** 311:3
**half** 64:11 268:18 272:16
**halfway** 174:6
**hall** 159:18 214:24 268:6
**hallway** 38:6 74:2,13 75:3 76:21 77:11 94:18 97:14,17 114:21 150:25 153:8 158:2 168:20 170:6 170:11 208:15 209:1 243:4,5 268:14
**hallways** 186:25
**hand** 140:5 153:3 309:18

**handwritten**
113:13,19,23
114:3,10
**hanging** 102:1
176:7
**happen** 150:20
161:6 181:8
224:7 235:12
235:15 244:18
264:16 281:22
**happened** 40:7
50:7 57:9
81:25 142:15
143:3,9 148:14
148:21,21,22
170:21 173:2
205:13 212:10
217:20 236:1
237:16,18
239:10,14
242:17 281:24
288:17 305:22
**happening**
159:8 175:21
245:2 251:20
**happens** 59:17
59:20 271:5
**hard** 93:24
94:17 95:9,17
96:8,18,20,23
**haste** 269:9
**head** 12:25
30:11 155:21
157:16 251:25

**header** 220:18
**heading** 16:14
**hear** 101:8
144:25 276:5
**heard** 6:8 189:5
**hearing** 242:23
**heat** 11:22
12:15,21 13:11
13:22 14:14
15:4,9 47:15
50:8 56:7,12
57:5 61:8,18
61:20,22,25
62:2,9,12,14,20
62:21,21 63:21
70:15,24 72:5
77:18 94:2
118:18,19,20
119:8,9,12
124:18 125:14
125:15 128:6
150:16 152:16
152:24 153:9,9
153:17,19,23
153:25 154:13
154:20 155:10
155:11,14,23
155:24 156:4,7
156:7,25 157:2
157:2,6,17,23
158:16 159:18
161:23 162:9,9
162:10 168:7,8
168:9,11 169:1

169:15,17,25
170:15,16,18
174:16 175:2,3
178:6,6,18
180:16,22
181:20 186:10
189:23 195:6
196:2,6,14
207:16 212:21
213:16 219:25
220:2,4 221:13
221:14 225:22
226:12,12,16
226:22 227:9
227:10 229:2,3
230:5 231:1
232:2,2,10,18
235:13,22
236:2,4,21
237:7,12,17,19
237:21 238:5,6
238:11,11,25
239:9,25
240:21 241:12
245:11,17
251:13 258:18
265:2,17,17
270:7 272:20
272:20,25
273:6,12,20,21
273:22 274:13
274:14,24
275:1,8 276:20
276:24 277:6

277:13,14,18
277:25 278:5
279:1,8,10,10
279:14 280:1,1
282:12,12
284:3,7,10,14
284:25 285:1,4
285:24 294:2
**heated** 56:1
81:12 91:4,7
119:1 124:11
125:2,14,16
149:17 161:22
175:12,14
178:25 179:10
187:12 254:19
254:23
**heating** 4:10
10:4 61:2
64:17 78:2
80:25 108:22
108:22,22
119:12 151:7
164:16 178:24
181:20 226:2
227:1 252:16
255:21 280:20
**heats** 175:7
**heavier** 210:10
210:14
**heavily** 76:25
94:12 110:17
220:19,20
221:16,24

**heavy** 91:2 102:21 139:23 219:17
**height** 74:12 151:11,17,23 152:9,10,15 158:3 168:1,2 174:7 190:25
**heights** 245:6
**held** 1:23 44:8 154:2 240:8 249:6 283:10
**help** 48:13 51:10 73:2 86:25 141:9 255:14
**helped** 143:18
**helpful** 300:3
**helps** 51:11
**hemphill** 68:20
**hereinbefore** 309:8
**hereto** 312:7
**hereunto** 309:17
**high** 160:22 167:5 194:11 219:17 244:25 248:10 272:2
**higher** 52:6 122:24 129:13 171:11,18 172:12 195:5,5 196:1,2 209:14 213:16
**highest** 122:18 251:10
**highlighted** 230:1,10
**highlights** 225:18
**highly** 192:16
**hired** 32:18 40:13 290:7,14 291:8
**historically** 11:10 69:15 133:21 211:20 264:6
**hit** 31:12 92:14 92:22 153:24 175:14,20
**hitting** 92:20
**hold** 259:12
**holds** 18:13
**hole** 64:3 73:6 101:15 176:15 224:18,24
**hollowell** 1:6,6 1:8 35:25 69:18,21 140:21 142:5 142:23 143:19 144:20 145:8
**hollowell's** 70:1 141:8
**home** 26:8 30:19 31:5 38:5,19 39:9 71:25 72:1 116:18
**homes** 133:21
**honestly** 191:5
**hooked** 131:10 131:23 132:5
**hope** 84:4
**horizontal** 63:14,17 64:6
**horn** 13:1 14:5 15:1,12,17 16:11 44:7,15 47:9 48:6 50:4 50:16 53:10 54:19 55:11,12 56:21 60:2 65:15 66:3 130:12 179:1,8 179:15 181:3 182:1,7 183:3 183:9,11 185:15 187:7 192:23 193:3,5 195:2 241:21 242:8 261:23 263:17 264:7 264:23 266:11 277:4,10,11 279:21
**horn's** 13:4 50:21 181:5,7 182:8,9,16 183:22 184:4 184:20 185:6 185:11 242:9 242:20 262:12 262:16,18,25 266:25 271:11 277:12 279:24
**hospital** 113:10
**hot** 61:7 64:17 74:25 118:18 118:19 147:9 150:5,11,14 151:7 152:18 153:1,7 155:2 155:20 157:11 157:15 158:8 160:9 168:15 189:22 190:3 191:8 206:19 225:22 243:12 244:8,14 245:23 275:11 278:17 301:24 302:7,19 303:23
**hottest** 250:25
**hour** 123:14 256:7,23 268:18 272:16
**house** 72:21 73:17,18 83:1 90:16,24 92:14 92:20,21,24 94:9,24 95:3,4 109:25 110:17

114:16 133:18 143:11,13 147:13 152:2 152:17 202:21 203:22,25 206:15 207:5 212:22 218:18
**hp** 1:11 6:16 23:9 24:8 26:17 30:8 31:6 32:18 34:1,17 35:15 36:16 40:14,16 40:20 42:10,16 42:18,21 43:2 43:10,11,12,16 43:23 44:2 47:24 48:13 49:23 53:20 54:2 58:22 68:4,6 73:5,8 75:3,24 77:10 83:8,8,13,22 86:16 87:1,3 88:2,20 101:14 101:15 104:7 117:1 118:2 120:22 123:23 124:7 125:20 125:21 126:1 126:10,18 129:21 166:4,5 167:8,22 168:9 173:15 174:15 189:14 190:3 190:12,13,16 190:20,25 191:12,15 192:4 195:10 196:18 220:15 220:16 222:25 225:6,9 232:23 247:1,13 280:6 284:1 290:7,13 291:8 310:4 311:1 312:1
**hp's** 164:18 293:5,11
**huh** 48:18 63:9
**humans** 109:23
**hundred** 18:3 87:7
**hundreds** 30:12 85:17 100:6 107:3 136:22 252:1
**hypotheses** 148:25
**hypothesis** 119:15 120:22 121:2,4,8,8,10 121:15,21 122:1,3,4,12,20 125:1,8 126:9 213:7
**hypothesized** 85:11
**hypotheticals** 282:8

**i**

**iaai** 4:13
**idea** 14:16 37:12 40:19 86:17 212:4 278:4 301:17 301:18
**identical** 53:2
**identification** 7:22
**identified** 104:7 224:4 288:14 289:23 296:12
**identify** 28:22 29:12
**ignitable** 210:13
**ignite** 90:21 94:1 175:21,24 195:5 196:12 207:7 209:16 213:2,15 217:22 243:15 246:3,12,13,20 248:10 270:10 278:15 300:1 300:14,17,23 300:24 301:2 301:13 302:3,5 302:13 303:7 305:11
**ignited** 80:21 80:22,25 90:15 124:1 148:5 169:13 205:19 206:20 212:23 224:3 244:16 246:5 300:2 307:13
**ignites** 93:25 158:7 207:14
**igniting** 158:5 278:18
**ignition** 86:13 90:17,20,23 98:21 99:1,6 109:1 114:25 161:19 162:2 166:16 172:1 184:4 203:3,5 203:17 205:12 207:15 213:6,9 214:5 215:13 224:3,5,6,9 225:7 243:17 244:5 274:17 278:9 302:18
**image** 77:10 220:23 232:22 234:9
**images** 30:15 71:9
**imbalance** 58:21 60:10,22

**immediately**
8:18
**impact** 62:25
83:14 130:3
196:8 303:25
**impacted** 55:6
62:19 175:7
**implemented**
129:24
**importance**
51:4
**important**
24:13 52:9
82:16 297:6,11
**impossible**
183:18 265:7
271:6 301:1
**improbable**
206:12
**inaccurate**
292:20 293:9
293:12
**inartfully**
154:10
**incapable**
301:8
**inch** 64:10
**inches** 64:11
216:10
**incident** 54:3
127:22 167:6
174:14 199:23
245:25 284:1

**incidents** 10:3
**include** 19:2
42:4 82:11
**included** 123:7
219:13 286:21
289:12 290:1
**includes** 238:17
**including** 37:8
39:7,8 53:14
246:6 286:9
**incompatible**
10:6
**inconsistences**
115:5,20
**inconsistencies**
110:13 138:9
138:18,24
139:15,18
140:14,19
142:8
**inconsistency**
118:8 137:24
138:22 140:20
142:5
**inconsistent**
110:14 112:25
114:5 132:17
133:1 137:9,12
139:11 140:11
141:3 142:13
142:18 145:11
160:11
**incorrect** 49:21
115:19 142:1

145:15 161:6
178:15 198:18
212:12 286:5
292:22
**increase** 155:14
197:1
**increases**
250:18
**increasing**
256:24
**increments**
261:6
**independent**
33:13 66:18
97:22 185:10
185:16
**independently**
79:16,17 81:2
81:3,5 275:23
**indicate** 127:23
206:22 209:11
284:2
**indicated** 61:17
74:21 80:8
249:19 277:5
**indicates**
240:20 248:20
**indicating**
285:21 293:24
295:11
**indication**
259:3
**individual**
30:14 86:9

105:15 289:23
290:2 296:12
**individually**
1:4
**induced** 245:22
**industrial** 9:12
9:16,19
**industry** 9:10
45:19
**information**
11:6 19:3,10
19:14 28:12
33:14,15 57:2
79:2 84:22,24
84:25 115:19
129:2 131:21
131:23 136:4
193:17 206:7
207:17,23
213:13,25
263:2 266:23
**initial** 286:22
289:21 290:2
**initially** 169:3
169:8,9,22
187:14
**initiate** 280:20
303:3
**initiated** 61:3
116:22 294:7
**initiation** 270:3
272:11 284:13
**inner** 104:15

**inquire** 304:4
**inside** 50:7 87:21 88:8,15 107:17 156:20 165:7 180:12 202:7 215:15 219:10 220:21 230:9 244:22 258:7 290:16 291:7
**insights** 33:4
**inspected** 24:17 39:10 94:20
**inspection** 23:2 23:3,5 24:9,12 24:17,23 25:4 26:8 27:1,10 27:14,19 30:2 30:25 31:5,10 33:24 35:7 37:20 38:20,24 40:7 82:6,21 91:19 93:3 97:19 106:4,5 167:4 172:4 200:7
**inspections** 26:23 27:6,22
**inspectors** 27:3
**installed** 95:15
**instance** 54:5 76:17 79:24 139:11,20 150:18 209:13 222:24 260:9 270:16
**insufficient** 178:9 189:19 300:5
**insulation** 94:2
**insurance** 20:19 21:1 27:4 35:24 36:20,22 82:14 120:14
**intact** 104:14 105:20
**intended** 32:20 45:2 47:25 50:13 55:8 58:21,23 129:24 296:25
**intense** 233:6
**intensity** 147:11,13
**intentionally** 112:9
**interest** 27:24 83:9,15 167:3 200:7
**interested** 7:1 40:24 41:3 82:24 83:6 292:24 309:15
**interests** 39:5 83:1
**interior** 103:17 214:22 257:10 257:16
**internal** 14:9 14:22 55:1,4,9 56:13 57:14,24 58:3,4 124:22 129:7 180:5 251:22 305:19 305:23
**internally** 57:9
**internet** 6:7
**interpret** 68:16 124:16 125:20 125:22 133:15 145:24 253:3 260:24 261:10 261:11,11 262:5 263:13 267:2 281:4 282:23
**interpretation** 17:13 256:6
**interpreted** 133:19 283:1
**interpreting** 257:8 261:16
**interrupt** 44:5 123:12 231:14
**interrupting** 231:15
**interview** 113:9 113:14
**interviewed** 78:4 114:6
**introduced** 243:17
**investigate** 37:8 78:18,20 78:22 86:10,15 87:3 105:25
**investigated** 10:3,14,19 37:2 81:9,14 89:20 94:5,15
**investigating** 35:9
**investigation** 19:18 20:13,22 20:23 21:9,22 22:2,5,7,8 23:19 24:8,13 26:14 27:2 29:5,13 30:8 31:17 32:20 33:21 35:15,16 36:5 37:12 68:3,14,21 69:8 70:6 79:3 81:8,22 82:23 84:19 86:7 87:4 91:16 97:19 112:5 117:1 121:25 165:25 166:2 286:1 290:8 291:11 294:4 297:17 298:8 298:20

**investigations**
  3:15 10:10
  18:7,10 19:5
  19:21,25 22:12
  24:2,4 36:19
  37:1 44:23
  122:25 298:5
**investigator**
  23:5,8,9,17
  26:11 27:17
  28:12,19,21
  29:1,11 32:19
  39:8 82:15
  83:18 86:4
  92:2 115:23
  120:14 145:8
  164:18 165:19
  165:20 187:24
**investigators**
  19:14 20:5
  27:7,13 31:15
  33:20 35:24,25
  36:1,4 68:25
  69:3 71:12
  77:22 78:8,10
  79:5,21 80:8
  81:19 82:3,11
  82:12 84:4,10
  86:9 87:11
  89:20 91:25
  96:9,16 99:20
  107:7,8,16
  109:20 113:4
  119:16,22

  120:5,18
  123:21 187:19
  194:21 203:7
  203:15 204:7
  204:10 208:6
  216:21 248:14
  249:2 286:9
  287:6 288:24
  292:3 297:8
  298:3
**involved**  10:10
  16:4 17:1
  20:22 26:12
  39:16 118:24
  134:17 191:6
  194:15 244:20
  287:6
**involvement**
  22:16
**involving**  10:4
  12:16
**ion**  4:8,11
  10:10,14,20,21
  11:8 12:11
  14:1 16:7
  44:23 45:4,8
  45:13,21
  118:25 194:8
  194:12 196:9
  197:1 249:17
  252:17,23
  259:25
**ironing**  102:1

**irreversible**
  47:15 245:2
**isolated**  210:20
**issue**  53:9
  86:18
**issues**  20:22
  21:9 50:17
  109:16 129:7
  130:12 141:2
  142:17
**item**  29:25
  30:17 33:23
  206:10 290:2
  291:18 295:24
  296:2,17
  299:10 307:3,7
**items**  24:15
  26:7,13 27:8
  27:13,18 28:22
  29:12 34:19
  38:4,19,21
  39:9 41:2,9,12
  41:17 81:24
  172:12 189:24
  202:12 211:6
  212:25 238:20
  247:24 289:23
  289:24 292:1
  296:16 299:11
  299:18

  **j**

**j**  3:13,18

**jackie**  67:6
**jaclyn**  2:10
  310:1
**james**  1:21 3:4
  7:9,15 308:3
**january**  68:14
**jar**  110:18
  204:14
**jason**  4:13
**jersey**  1:25
**jessica**  1:6
**jls**  1:14
**job**  1:15
**josh**  2:7
**judgment**
  55:21 57:12
  59:22
**jump**  257:6,9
**jumped**  109:7
  109:11 204:20
**justification**
  295:25

  **k**

**kaflinski**  6:23
  309:3,23
**karasinski**  4:13
  20:5 21:21
  36:10 37:18
  42:1 82:12
  92:1 95:16
  107:8 119:17
  120:6 197:14
  201:6 287:5,13

288:12,18 289:5
**karasinski's** 20:8 40:1 288:19 294:13 294:16 295:7
**keep** 48:6 51:7 51:23 55:23 56:4 58:12 183:10 237:24 239:2 292:4 297:21
**kendrick** 2:8 310:1
**kept** 264:2
**key** 31:12
**keyboard** 62:1 62:7,15,20 63:8,19 64:1,8 64:11 117:8,17 174:17 176:16 231:11 232:15 234:12 237:8 241:9 247:3
**keys** 63:11
**kind** 99:15 232:17 253:5 264:1 304:4
**kitchen** 70:14 70:19,25 72:8 73:23 139:24 170:10
**knew** 97:10 207:22
**knocked** 109:13,24,25 110:1,5 112:15 173:5 204:21
**know** 8:5 11:11 12:8,25 13:25 14:18 15:14 16:9 17:11 18:25 20:20 22:7 24:3 25:3 26:15,21 29:2 30:10,11 33:9 35:8,16 36:1 38:25 39:3,15 39:18,22 40:2 40:5,9,10,11,12 40:22 42:20,22 42:24 43:4 44:6 48:23 51:13 53:25 56:1,16,22,23 62:18,23 75:15 75:17 76:4,22 76:25 77:10 78:9 80:13,19 80:24 81:25 82:22 83:14 84:3,6,15,19,24 85:12 86:22 87:2 91:2,17 91:18,19 92:5 93:11 94:11 99:16 100:5 101:14,16 102:17 104:11 106:8 109:22 110:22 113:24 114:6 115:6,9 118:18,24 120:17 122:24 124:9 125:17 130:4,5,11 138:9,22 140:6 142:12,17 145:11,17 147:4,7,25 149:5 150:19 155:18 157:10 157:15 158:2 159:10 160:7 160:11 162:17 162:21 163:3 165:17 168:11 168:15,20 169:3,5 173:22 175:18,22 179:14 181:10 181:13 183:4 185:7 191:6 192:2,4,5,7,8 192:10,21,25 195:14,16,18 195:22 199:11 203:20 204:9 205:20 208:14 209:16 210:20 211:10 215:6 215:13,14,24 217:20 219:10 219:24 220:12 224:15 227:1 228:20 229:22 232:22 233:23 234:7 236:25 237:3,20,23 239:19 241:4 242:3 244:6,19 247:25 248:1,7 251:6,14,25 259:8 264:5 268:1 270:8 271:18 272:15 273:20 279:23 282:1,17 285:13 286:4 287:16,20,21 288:1,3,3,5 291:1 295:6 301:20 303:13 304:14 305:22
**knowing** 179:5
**knowledge** 13:5,19,23 15:13,19 20:21 21:9,12,16,20 38:18 51:3 55:8 66:18

**l**

**l** 5:1,1 252:14
**lab** 10:23 33:24 81:17 289:24

**labeled**  232:23
**laboratories**
  28:13
**laboratory**
  8:20 24:16,23
  25:8 26:8,13
  27:9,14,18,25
  28:23 29:4,13
  34:4 38:19,24
  39:10 53:13
  81:22 82:5,17
  85:6 86:7
**lack**  55:19 58:3
  59:19 192:9
**landed**  244:9
  246:11,23
  270:20,21
  300:25
**landing**  248:15
**landline**  131:10
  131:13 132:5
  132:18,23
  133:3,14,16,18
  134:1,19
  135:12 136:20
  137:10,11,17
**landlines**
  133:21
**lange**  2:4
**language**  85:9
  93:10
**lap**  191:17
**laptop**  15:15
  42:12 43:16

44:12 47:25
49:4 54:7
60:25 61:4,6
61:10,17,23
62:3,7,15,18
63:1,2,7,25
65:7 75:24
83:22 87:3
117:2,18 118:2
118:6,14,21,22
118:23 119:6,7
119:23 120:23
123:23 124:7
124:14 125:10
125:20,21
126:1,10,18,25
130:1,7 140:1
147:24 150:16
153:10,16,17
154:20 155:11
156:8 159:19
166:4,6,10,16
167:22 168:8
168:10 173:15
176:1,16,24
177:1,4,9,12,13
177:21 178:3
178:12 189:16
189:18 190:4
190:13,16,17
190:20,25
191:12,15,21
192:3 195:10
195:12 207:25

208:1 225:6,9
226:10,19,24
227:8 228:5,23
229:19,24
230:19 231:4,5
231:10 232:8
233:5,12 234:3
234:4,6 235:9
236:12 237:1,3
237:8,18 238:9
239:3,21,24
240:18,19,20
240:23,24
241:11 248:4
249:3 259:17
265:4 270:18
270:20 304:8
**laptops**  45:22
  227:14 228:11
  228:12
**large**  236:7,14
  241:2
**larger**  38:9
  134:24 229:4
  261:25
**larsson**  252:13
**lasts**  182:21
**lawrence**  8:19
**lawyers**  290:13
  293:11
**layer**  61:7,18
  61:21 63:21
  64:17 74:25
  118:19 147:9

147:18 148:5,8
148:17 149:22
150:8,11,15
151:7,25
152:15,18
153:1,7,14
154:12,19
155:2,9,20,23
155:23 157:23
158:8,16 159:2
159:9,17 160:9
160:18,23
168:9,15
169:22 170:5
171:21 175:3
178:6,18
184:11 189:17
189:22 190:3
206:14,19
207:4,7 209:12
209:23 212:8
212:21 213:3
225:22 226:22
227:10,23
238:25 272:20
273:6,12,20
274:13,25
275:8,11
276:20,24
277:6,14,18
278:17 279:1,8
279:10,14
280:1 282:12
284:25

**layout** 114:16
**leading** 19:20
**leads** 114:20 211:5 228:3
**learned** 129:2
**leave** 217:7 241:15
**leaving** 127:25
**led** 60:19 74:2 125:16 133:23
**lee** 280:7
**left** 72:8 74:14 75:22 128:21 128:22 144:2 167:19 203:21 220:22 234:3 235:4 237:2 239:20 294:8
**legal** 6:22,24 310:23
**length** 272:4,7 272:14 274:19 274:21 277:2,2
**lens** 165:7
**level** 44:10 59:5 62:24 76:6 116:15 118:18 118:19 122:19 147:11 148:8 149:23 150:5 151:25 152:15 153:2 154:12 168:7,9 171:11 171:12,17,18 171:19,24 190:10 209:14 222:8 231:22 248:23 250:24 272:2,24 276:25
**levels** 4:11 59:14 76:19,24 123:1,3 169:1 252:18 253:13 253:16
**liable** 172:15
**licoo2** 4:11 252:17
**lid** 191:12
**lied** 115:15
**life** 253:14
**light** 102:9,13 110:9 124:1 129:1 209:23 243:8,15 270:15 302:8
**lighting** 270:3
**lightning** 92:23 93:1
**lights** 269:13
**lightweight** 175:23 210:10 210:12 299:24 301:11 302:14 303:5
**likelihood** 160:22
**likely** 52:1,7,17 53:5 54:21 55:16,22 57:8 57:20 62:1 92:17 112:6 122:22 150:13 161:2,5,16 166:22 171:13 176:23 197:15 197:18 198:12 200:1 202:12 202:18,18 214:5 273:9 274:12 280:13 284:3,22 285:15,23 294:1 302:7,8 302:11,13,18 303:23 307:2
**limit** 45:3,20
**limited** 96:13 104:13,15 105:13
**limiting** 198:6
**limits** 18:24
**line** 68:17 74:22,24 76:2 76:3,5,19,20,25 77:1 146:16,20 146:24 147:19 148:9 149:23 152:11 174:10 251:17 311:4,7 311:10,13,16 311:19
**lined** 103:18
**linens** 202:13
**lines** 98:3 146:11 234:7 257:6,19,20
**liquids** 210:13
**liquified** 16:22
**list** 8:6 9:18 19:12 33:23 38:3,4 41:12 42:15 203:6 291:22
**listed** 21:23 41:10 42:16 46:4 79:2 292:21
**listing** 20:4
**lit** 110:4,8,10 110:11 172:21 204:18,19 205:17 207:3 209:23 302:7 302:18
**liter** 11:15
**literature** 14:21 42:4
**lithium** 4:8,11 10:10,14,20,21 11:8 12:11 14:1 16:7 44:23 45:4,8 45:13,21 118:25 194:8

194:12 196:9 197:1 249:17 252:17,23 259:25
**little** 63:3 69:5 103:18 134:13 151:14 238:23 256:13
**litzinger** 36:10 37:18 41:25 92:1 297:13 298:16
**litzinger's** 289:21 296:14 296:19 298:24
**living** 70:24 72:3,4,8,10,16 72:21 76:18 77:24 110:4 112:21 114:21 114:24 150:24 158:1,15,17,20 158:21,22 170:5 171:23 199:12,18
**llp** 2:4
**load** 194:14
**localized** 159:11 232:1 233:3,24 234:1 236:25,25 239:18,23
**locally** 169:6
**located** 72:15 88:13 94:18 108:16,21 117:16 118:6 130:19 135:6 167:6,8,16 173:16 199:19 209:13 219:15 220:9
**location** 126:24 177:2 262:17 283:25 285:11 297:7 298:17
**locations** 108:20
**log** 248:24
**long** 8:10 123:19 150:1 157:3 182:3 185:12 186:22 245:21,22 248:10 265:11 272:13,17 278:5,13 298:7 298:10
**longer** 186:16 188:20 227:4 265:22 284:18 284:19
**look** 9:17 25:11 25:16 27:25 28:4 32:15 38:24 43:4,6 45:24 48:12,13 51:17 56:21 65:10,11 66:18 71:5,13 73:1,8 75:1,2,3,12 76:21 77:9 78:23 79:18 80:1,2,10,20,23 82:18 84:12 85:14 86:8,13 99:22,25 100:16,20,21 101:5,17 102:14,16,19 104:6 106:1,13 106:17 113:3,7 113:16 116:25 121:15 123:10 132:6 142:20 145:21 146:14 159:4 162:20 163:2 171:25 178:5 184:8,23 190:15 199:9 200:12 204:7 220:11 222:3,5 222:17,24 223:14 224:22 226:24 227:9 228:4,6,19 229:20 230:18 232:21 233:2 234:1,14 237:2 237:20 238:12 246:18 247:1 247:12,15 248:22 249:24 249:25 250:12 251:4 252:4 253:22 254:17 255:7,25 256:10,20 258:11 259:8 281:17,17 296:14 297:8 300:16 304:19
**looked** 13:1,25 14:5 15:1,18 27:23 28:13 32:23,25 33:15 33:18,21 34:10 34:12 36:25 41:16 43:14 44:14 49:25 54:19 55:12 70:3 79:2 80:1 81:17 88:11 96:21 100:4,24 107:16 120:11 130:3 158:19 158:20 162:15 162:22 164:21 165:2 208:7 213:20 218:6 222:12 223:17 245:20 249:21 292:18 304:17
**looking** 25:12 31:19 34:10,18

37:13 44:15 62:17 71:3 72:7 77:14 82:19 83:4 90:13 95:21 97:9 99:1 100:9,12,15,17 100:18 101:13 101:23 102:11 110:25 117:7 117:21 145:16 165:8 167:19 196:5 201:16 204:14 211:25 214:4 218:4 220:15 223:4 228:2 229:23 236:23,24 239:7 246:3 247:9,10,11 249:1 255:3 261:19 278:16 279:12 304:22 307:20
**looks** 11:5 76:3 76:5,6,12 102:9 132:7 145:17 146:16 146:17 229:19 234:5 247:1,16 250:13 251:8 254:18 259:11
**loose** 96:4
**loss** 197:11 198:3 199:7 200:1 201:9 220:10
**lost** 97:5 154:1 247:8
**lot** 8:9 9:11 30:16 47:21 50:22 60:25 79:18 84:25 92:15 137:5 157:17 228:22 231:11 264:5 272:2
**louver** 88:19,23
**louvered** 87:19 88:6,12 90:14 93:12 215:21 216:2,4,11,14 216:18,19,22 217:5,9,14,14 219:13
**louvers** 88:17 89:2,6 93:15
**low** 77:4,5 80:17 116:19 153:7,9 154:13 206:23 210:20 302:14
**lower** 48:8 76:20,24 77:5 77:10 88:19 89:2,6 102:3,6 108:11,17,21 116:15 147:10 153:2 171:12 171:17,19 172:10 192:11 195:6,17 209:17 221:9 222:14 233:21
**lowering** 147:9
**lowest** 98:13,16 146:25 171:24
**luckey** 36:6,9 39:7,15 69:1 78:9,14 82:20 87:11 113:9 120:19
**luckey's** 88:22
**lunch** 123:14
**lying** 115:18,18 115:21,21

**m**

**machine** 246:7
**made** 17:11 18:25 27:12 55:21 57:7 58:12 65:25 81:12 83:4,11 99:13 103:22 103:25 104:1,4 137:25 138:13 144:9,11,13 145:23 146:4 179:11 244:16 277:22 289:5 290:20 291:3 303:12,14 312:5
**main** 205:20
**maintain** 18:23 51:11 58:23
**major** 142:4 256:11 258:13
**make** 24:4 28:23 38:9 50:22 57:11 84:20 119:4 133:17,20 138:21 192:2 195:9 207:14 221:19 222:2 223:12 228:20 230:10 237:15 247:20 248:2 270:9,9 271:20 272:5 298:23
**makes** 18:20 200:1 205:23 206:11 230:14 235:14 266:19
**making** 26:13 49:3 59:21 133:25
**malfunctioned** 124:24
**management** 44:1 45:15 46:6,17 47:1 47:24 53:15

54:15 64:4,24
**mankoff**  2:7
**manufacturers**
43:24 192:5,6
**marcellin**  1:4
6:15 36:2
41:24 56:20
60:12 78:4
95:8 96:17,18
109:17 110:4,9
110:10 112:2
112:15,20
113:9 114:5,24
116:7 127:24
128:12 131:2
143:10 144:2
147:23 148:10
148:23 150:19
156:16 159:23
167:21 171:3,5
176:6 183:19
184:15 186:11
187:18 198:17
207:24 218:13
229:9 236:9
237:25 240:3
264:21 265:9
267:18 271:7
271:21 283:24
310:4 311:1
312:1
**marcellin's**
60:18 128:8,19
132:17 137:8

138:1,14
141:20 149:4
155:18 185:2
199:3,16,22
200:17 201:14
202:24 206:11
208:3 229:13
238:3,17,22
239:9 241:3,16
242:16 265:2
285:14 299:13
**marcelo**  2:17
6:21
**mark**  50:24
68:2 101:5
296:22 297:6
297:23
**marked**  7:20
9:21,22 16:13
17:17 25:19
26:3 29:16
42:8 43:9
45:25 73:4
127:15 249:14
252:5
**marks**  144:16
**marriage**
309:14
**martin**  41:25
42:1,3 181:15
252:7
**martin's**
249:20

**mass**  159:10
245:10,13,14
302:14
**massachusetts**
7:18
**master**  69:18
114:17 170:11
188:16
**material**  25:2
76:22,23,24
91:4,7 103:25
124:1 161:16
162:1 175:11
196:4 206:20
208:12 212:14
212:23 216:14
220:10 224:4
225:24 231:11
239:22 244:16
246:12 247:2,6
247:17,21
266:6,7 270:18
270:19 280:12
287:1 292:1
295:17 296:7
300:1 303:11
303:13,15,19
**materials**  8:5
24:22,24 25:7
28:4,13 29:4
29:21,25 34:5
38:6 42:2,15
53:13 119:3
158:5 172:3,6

175:10 183:20
208:15 209:9
210:12 211:18
213:5,10 216:6
216:8 217:16
217:22 218:8
244:20 246:2
246:13,19,20
246:21 248:9
248:11 272:2
278:2,10,15,18
280:7 285:3
291:22 292:18
292:22 298:20
300:2,17,23,25
301:12,14
302:3,4,5
304:15,17,25
**math**  254:6
**matter**  6:15
182:14 194:22
309:15
**matterport**
30:16,17,21
33:1,2,16
37:17 71:6,9
71:13,16,19,21
72:1 78:25
80:5 87:8
114:12 151:17
151:21
**matthew**  2:6
**maximum**
147:12 255:21

262:13
**mckay** 1:6
**mean** 13:23 17:5 39:15 53:8 55:4,4,25 71:24 79:15 80:4 83:11 85:8 92:15 93:8 112:24 115:5 118:16 122:2,21 124:9 124:10,20,21 124:23 125:1 125:20 126:12 129:10 130:22 132:12 133:16 133:19 140:18 144:14 147:15 152:18 153:1 154:25 156:19 163:18 172:23 177:5 178:14 181:24 185:14 185:22 187:15 188:19 191:11 195:21 196:22 198:11 203:10 210:4 224:21 227:14 242:8 242:22 243:14 245:24 248:17 251:10 253:24 255:17 257:8 258:8 260:16 260:25 267:2 281:4 283:1 284:18 307:16
**meaning** 93:14 98:15 121:5
**means** 21:19 42:17 46:13,15 53:1 77:5 85:21,23 98:15 111:18 132:21 185:8 188:7 198:14 205:7 236:15 239:25
**meant** 215:2,6
**measure** 251:19
**measured** 259:2
**mechanism** 81:11 157:21 215:9
**mechanisms** 4:7 81:11 108:15 116:22 217:22 249:17 274:17 278:10
**media** 6:13
**meet** 44:1
**meetings** 18:14
**melt** 15:21 16:4 187:5,15 227:5 227:22
**melted** 76:23 234:6,21 280:16
**melting** 190:12 227:22 231:11 233:4,5,23 236:24 238:1 239:18,22,24 241:5 280:11
**member** 16:18 16:20 17:3,9 18:17 214:22
**members** 17:7 17:8,8,14 20:17,20
**memory** 31:18
**mention** 112:16 130:25 160:23 214:14
**mentioned** 1:23 99:4 108:24 114:8 198:16 198:20 200:20
**metal** 16:24 103:15,16,19 214:16 258:24 302:8,19 303:23
**metals** 16:24
**meteor** 92:14 92:20,22
**method** 112:8
**methodology** 19:17,20 22:12 24:1 28:20 69:13 121:25 229:18,22 230:12 236:3 236:19 301:22
**methods** 121:7
**meyers** 6:15 8:1 9:23
**microprocess...** 46:5
**mid** 257:18
**middle** 234:12
**migrate** 150:20
**mind** 165:18 267:16
**minimal** 187:16
**minimum** 261:10,17
**minus** 41:17
**minute** 203:18 250:8,12 255:10,19 260:20 262:6,9 263:14 266:1 267:11 268:17 268:19,21 269:17 284:23 295:14
**minutes** 67:4 123:15 182:24 256:2,2,13,16 257:5,22,23 258:6,13,14,15 258:15 260:6 267:13 268:17 268:19,20

269:17,18,18
269:19,19,20
269:22 272:16
274:12 278:16
278:17 279:1,4
279:4 283:3,5
283:12,13,14
284:8,15,16,16
284:22
**missed** 92:2
115:15
**misunderstood**
96:15
**mixture** 20:17
**model** 130:10
135:25 136:13
218:6
**modeling** 4:8
249:18
**modern** 218:25
**modes** 184:6
**molds** 280:15
**moment** 38:13
193:7 203:13
**monitor** 47:5
178:10,11,22
189:14,14,20
247:4,18
**month** 51:20
**morning** 6:1
8:1 68:15
113:10
**mounted** 95:13
97:11

**move** 37:4
84:12 88:1
170:6,7,8
**moved** 71:25
81:7 208:15
214:24
**mu06062** 3:20
**multicompon...**
210:9
**multiple** 59:3
108:19 135:16
136:22 138:11
148:25 192:15
198:25 298:3
**mutilated**
231:7,9
**myers** 1:21 3:4
3:13,18 7:9,15
22:15 42:8
67:21 68:1
75:8 127:14
200:8 249:13
251:1 307:19
308:3 310:5
311:2,24 312:2
312:4,12
**mysterious**
273:18

**n**

**n** 2:1 3:1 4:1
5:1 249:16,16
252:14

**nafi** 4:13
**nail** 299:8
**name** 6:20 7:14
8:2 23:11 37:5
**named** 142:9
**narrative** 68:7
68:13 73:25
77:13
**natick** 7:17
**national** 8:20
16:15
**natural** 214:7
**nature** 9:1
233:13,18
**near** 72:12,14
84:18 91:13
95:9,10,21,22
96:3,7,17,19,22
96:22 107:19
107:19 109:22
116:10 123:24
124:7,9,11
125:12 126:2
147:15 150:14
156:22 157:3
159:14 162:16
168:15 188:15
188:16,23
197:9,23 198:1
199:5,12,20
205:7 206:4
223:1 234:20
243:1 270:18
275:14,19,22

280:4 299:23
305:24
**nearby** 217:23
**neat** 146:5
**neatly** 142:22
**necessarily**
58:15 82:8
97:2 124:14
141:24 147:16
187:21 188:19
211:10 267:5
**necessary**
10:24 12:4
13:5,20 15:21
29:14 172:14
266:4 312:6
**need** 27:8 28:13
28:22 58:17
105:24 178:25
183:15 194:21
235:21
**needed** 240:7
**nefco** 36:19
37:1 39:8
82:15 92:1
120:14
**never** 32:11
34:21 35:4,19
78:14 91:11,23
102:19 120:10
143:10 144:21
145:8,9,13
164:23 172:21
291:3 292:14

292:20
**new** 1:2,25,25 2:5,10 6:18 7:11 24:17 207:13,14 218:23 252:24 295:1 309:4
**newer** 167:21 191:12
**nfpa** 3:15 17:6 17:19 18:11 24:1 45:7 79:20 82:7 84:17 85:2 121:19 123:5 138:3 192:19 193:4 211:19
**night** 113:4,10 129:14 132:11 134:1 172:21 173:2 187:19 204:24
**non** 142:2
**normal** 109:14 269:13
**norton** 127:24 128:5 130:3
**notary** 1:24 7:10 308:12 309:4 312:13 312:19
**note** 6:4 69:20 93:5 113:18,19 113:22,23 115:8,10,11 199:17 310:10
**notebook** 9:22 25:24 68:2 127:25 130:7 167:6,7,16 174:14,19 191:18 208:17 225:19,23 226:1 227:17 284:1 303:3
**notebooks** 130:4
**noted** 115:11 123:3,5 201:5 312:7
**notes** 30:2,25 31:4,8,11,13,15 31:18,22,25 32:3,10,11,14 32:17 33:24 34:10,11,12,13 34:18,22 35:4 41:18 53:12 80:7,10,13,14 85:14 86:21,24 113:13 114:3,4 114:9,10 292:4 292:6,8,9,12,14 292:15,20,25 293:2,3,4,13
**notice** 1:23 20:3 83:20 160:24 166:5
**notified** 269:1
**noting** 199:21
**number** 9:5 17:2 30:10 33:18,22 35:23 36:3,4 48:15 50:16 51:24 60:11 73:6 78:25 91:3 92:24 93:22 94:4 112:24 139:10 141:1 183:1 193:25 220:13 244:24 245:7 246:9 251:25 256:15 260:9 262:3 267:10,15 295:24,25 296:2 299:10 299:12 307:16
**numbered** 298:17
**numbers** 12:25 14:6,8,20 43:10 68:5 73:5 247:8 253:17 258:14 268:3 279:22 281:5,15
**numerical** 4:8 249:18

**o**

**o** 5:1 249:16 252:14
**oath** 5:13 32:10 34:21 39:24 40:3 292:14
**object** 26:18 83:3 85:15 110:1 205:18 296:12 301:20
**objection** 16:1 20:14 32:24 35:17 44:3 48:3 58:8 61:11 80:11 84:14 165:15 274:1 283:7 301:4
**objections** 5:19 67:19
**objects** 61:1,6 62:11,14 63:1 63:2 71:24 72:25 85:1 102:19 116:15 150:13 151:8 153:20,21 155:3 173:23 175:18,23 176:13 190:2 301:13
**observation** 54:4 120:20

126:7 182:17
**observations** 31:23 33:10 40:25 56:20 60:12 65:18 74:9 242:22 243:1 265:3 271:21 272:6 294:11 300:20
**observe** 267:19 271:23 304:21
**observed** 15:15 60:15 70:20,25 93:6 94:7 98:4 98:8 118:3,5 138:16 147:24 162:15 236:11 236:12 285:15 288:2 290:19 296:13
**observes** 261:2
**obtain** 33:3
**obtuse** 237:6
**obvious** 175:9 244:3
**obviously** 39:4 80:23 82:25 84:7 138:8 144:14 156:21 248:17 269:15 291:19
**occur** 15:11 50:6 51:16 159:16 180:22 185:5 212:24 226:15 238:25 241:19 264:18 281:12 286:9
**occurred** 34:6 50:8 60:19 64:18 93:20 147:23 148:2 161:8 162:3 175:2 181:18 221:13,14 225:21 226:16 228:7 236:22 237:22 256:16 264:19,24 265:1,2 266:11
**occurring** 10:17 119:12 196:25 238:6 264:20
**occurs** 47:10 182:20 245:5 270:15
**october** 24:15 34:7
**odors** 186:24
**office** 38:5,6 72:16,22 74:2 74:15 75:22 76:22 94:19 95:9 96:8,18 98:4,8,12 112:22 114:18 114:21 115:11 124:2 126:25 130:18 132:18 132:24 133:15 135:9,11,13 136:21,23 137:4,11,11,21 139:22,24,25 140:5,7 148:23 149:23,24 151:1,2,4,24 152:10,12,23 153:8 154:21 155:19 157:24 158:4,5,8 159:17,19,24 160:6,18,25 167:4,14,15 168:24 169:2,7 169:18,22,24 170:1,6,12,14 170:16,19 173:15 174:1,8 174:11 177:21 184:15 187:3 188:18,23 197:10,17,22 198:2,7 199:13 199:17,21 201:16,17,24 201:25,25 202:1,20,20 206:15,18 207:5 212:8,22 217:16 221:7,9 242:25 265:11 268:6 270:2 271:24 272:3,8 273:19,19 274:5 275:14 275:19 276:1 276:18 297:16 307:3,8
**officer** 5:12,15
**offices** 9:4,5
**oftentimes** 11:3 84:17
**oh** 25:17,20 75:15 137:13 140:20 286:16
**okay** 8:15 9:13 9:20 10:12 12:18 13:3,17 17:15 21:4,25 22:10 28:2,8 28:18 29:15,24 30:13 33:2 35:1,5 37:6,22 42:6 44:18 49:16,22 56:10 57:4 59:25 62:5 64:9 66:5 66:16,22 67:5 68:9 70:22 73:24 75:23 77:8,12 78:13 87:9,25 88:5 90:2,7,12 101:19 103:10

103:23 110:23 111:11,22 112:10 113:2,5 113:15 114:1 121:23 123:9 123:17 127:5 130:14 131:14 131:20 138:19 141:16 142:3 142:11 145:5 146:7,9 149:10 151:22 161:9 171:15 178:16 179:13 184:22 185:9,19 188:9 189:10 192:24 193:11 198:13 199:1 200:19 202:4 204:5 209:4 214:1,13 217:12 220:17 221:4,11 225:3 225:14 229:15 230:16 231:17 232:13 233:9 234:22 235:16 235:24 236:13 241:14 246:22 247:14 248:12 250:1 252:12 254:2,8 258:3 258:21 259:23 262:10,24 263:6,15 270:22 275:20 279:17 283:15 285:17 290:4 291:13 292:16 292:23 295:5 297:12 298:6 298:14 299:5 300:18 302:23 306:19

**old** 218:21,22 269:16

**older** 191:17 192:3

**omitting** 243:13

**once** 47:14,19 49:5 114:7 123:18 150:10 152:14 154:25 155:8 169:24 170:14 245:4 259:24 262:22 266:17 267:1 271:13 279:8 284:10

**ones** 52:12 134:17 293:14

**onstar** 143:14

**ooo** 7:7

**open** 80:22 108:25 152:17 157:15,17 225:19 240:4 302:12

**opened** 261:2

**opening** 117:15 150:8 152:22 157:5,10 164:25 165:5 173:10

**operated** 11:12 95:10 96:20 97:7,23

**operating** 48:7 51:8 58:12,14 218:19

**opine** 183:8

**opinion** 15:3 50:5,14,19 52:11 54:20 55:16 57:2 64:14 66:6,7,7 66:12,14,15 90:15 107:12 109:2,10,12 111:17 119:5 122:16 125:15 132:10 141:23 142:7 145:10 148:4,17,20,22 151:15 168:6 170:23,23 172:16 173:11 175:1 178:13 179:5 182:3,6 183:18,21,22 184:10,17 185:12 188:6 188:14 198:7 206:6 221:12 221:18 223:7 223:18,20,22 226:23 227:6 227:12 228:25 229:17 236:16 238:24 242:4 242:10,20 262:15 263:21 264:8,14,25 265:6 266:19 266:24,25 267:12 271:9 271:15 272:9 273:24 277:19 282:11,11,25 283:18,22 284:12 293:18 293:20 295:13 295:24,25 296:2 299:11 299:17,18 300:5,9,19 301:7 302:24 302:25 304:11 307:5,9,10,12

**opinions** 15:13 50:21 56:23 115:17,21 181:13,16 282:24

**opportunity** 296:8

**opposed** 201:25 221:24 248:4 264:10
**opposite** 230:7 275:15
**options** 54:24 54:25 55:3 122:6
**order** 18:3 44:1 54:24 57:11,19 132:11 139:20 140:2 141:6 160:18 166:9 182:23 185:5,7 185:18,20 228:25 237:19 237:21 241:3 241:20 265:17 272:2,15 275:7 299:2
**ordinary** 67:19
**organization** 17:9
**origin** 23:23 28:24 80:19 86:3,13 91:12 119:21 121:18 125:10 197:15 200:2 204:8 206:23 289:17 291:7,8 296:11
**originally** 23:2
**originated** 223:21,23,24 286:20 290:17 302:20
**outcome** 7:1 260:5 309:15
**outdoors** 73:18
**outlet** 96:3
**outside** 50:8 73:20 234:19 242:25 259:13 268:6 269:3 272:3,8 274:5 276:18 280:23
**outward** 214:16 215:8 215:10
**outwards** 215:4
**oven** 157:6,12 157:15,18 254:13,15,18 255:2,10,19,22 256:3,7,17,24 257:10,18,19 257:19,25 258:5,5,18,22 261:1
**overcharge** 58:20 60:5,10 60:21 129:4 196:20
**overcharged** 196:13
**overheat** 123:25 124:8 125:13 126:3 129:18 148:18 196:12
**overheated** 124:24
**overheating** 46:19 129:23 196:25
**overlapping** 116:2,3
**overnight** 195:14
**overseas** 9:5
**overview** 184:6
**overvoltage** 58:20 60:5,10 60:22 129:3 196:20
**own** 33:13 60:21 124:14 124:22 227:22 228:1
**owned** 134:23

**p**

**p** 2:1,1 5:1
**p.m.** 127:9,12 127:25 154:4,7 193:12,15 240:10,13 249:8,11 306:20,23 307:22,24
**p1-7232374** 1:15
**p1steno** 310:15
**pace** 269:13
**pack** 43:25 50:20 53:21 54:22 64:4,20 129:3,6,8,25 148:5,18 149:18 180:22 190:20 191:17 191:21 192:4 225:20 235:20 259:5,16 264:9 275:1 276:21 277:7,14 278:6 282:13
**packages** 194:12 207:16 207:17
**packet** 207:13
**packs** 45:21 49:3 280:17
**pad** 62:3,7 64:2 64:8 231:12 234:20
**page** 3:3,12 4:6 4:20 9:24 16:12,14 18:1 18:2,5,6 20:3 38:15,16 48:13 48:14,16 77:9 88:1,2 113:6 113:12 127:18 130:15,21 132:14 146:8

146:10 166:23 167:1 173:12 174:2 184:1,8 184:24 189:9 197:4,6 199:10 201:1 202:9,9 203:4 214:21 225:8,12,15,16 246:3,10 247:1 247:5 250:3,3 253:5 255:7 262:18 280:4 283:18,19 285:18 293:21 307:1 311:4,7 311:10,13,16 311:19
**pages** 3:14,16 3:17,19,21,22 4:9,12,14 16:13 18:3,4 19:11 26:6 31:4 42:25 43:3
**paint** 89:15 90:5
**paneling** 99:15 99:18,22 146:16,17 162:6,6 220:24 220:25
**paper** 118:3 175:19,21,22 189:14 209:13 209:17 213:1 221:2 247:3,17 281:23 301:12 301:15
**papers** 178:2,9 178:21 189:20
**paragraph** 9:25 125:7 132:14 167:1 184:9,10 185:1 214:21
**parameter** 253:21
**pardon** 254:21 269:7
**part** 16:5 24:13 28:15 62:15 64:6 65:17 80:24 81:11 102:3 104:9 105:8,8 108:5 108:11,17 125:4,7 156:21 157:10,14 172:10 196:22 198:19 202:23 236:7,14 237:24 296:21 299:12,13,15 303:9 306:5
**partially** 128:17 190:2 294:9 306:7
**participants** 6:7
**particle** 244:14
**particular** 43:8 87:11 130:9 200:21 248:16 260:17 277:23 277:24 303:19
**particularly** 144:8 209:12
**parties** 5:5 6:11 35:23 36:4 79:22 82:19 91:18 309:13
**parts** 62:16 82:5 139:6 147:24 152:17 169:2,7,17,23 209:14 236:15
**party** 6:25 83:2 83:14,17,20
**past** 66:21 234:12
**path** 248:21
**pathway** 177:11
**pattern** 61:15 61:17 201:3,10 201:19,23 206:16,25 207:14 210:16 211:3,4,15,17 228:16,19 236:23
**patterns** 60:24 140:23 145:16 206:21,22 207:11,12 211:10,20 212:1 229:23 236:24 285:16
**pavilion** 42:11 44:2 49:4 75:24 174:15 284:1
**people** 9:4 18:12 20:21,24 21:1,5 26:22 37:7 82:25 84:23 92:23 94:9 133:22 204:9 210:4,24 211:20 281:13
**percent** 195:15
**percentage** 18:24
**perform** 9:7 143:24 194:23
**perimeter** 51:9 51:22
**period** 8:12 182:12 262:13 265:18 267:7 280:19,25 281:6,10,16,24 282:7,20,24 283:4 284:23

**peripherals** 45:22
**permission** 40:17
**person** 11:4 18:21 25:9,11 78:21,23 88:23 89:21 288:7 290:7
**person's** 19:2
**personal** 70:6 263:3
**personally** 37:21
**petroleum** 16:22 209:15
**ph.d.** 1:21 308:3
**phase** 147:8
**phases** 147:7
**phd** 8:22
**phenomena** 19:15
**phone** 130:17 131:1,4,7,11,22 131:25 132:4 132:10,18,22 133:5,15,16,17 133:18,19,20 133:21,25,25 134:3,11,25 135:23 136:5 136:14,18 137:11,16,21 138:12 142:19
**phones** 131:16 133:22 134:10 134:16,23 135:2,17,21,24 136:9
**photo** 134:7 248:24 300:7 300:10
**photograph** 30:18 32:6 73:2 75:4 85:20 88:20 89:5,18 101:21 101:24,25 103:4,11 104:6 104:25 107:2,4 107:5 131:25 132:4,7,16 133:24 134:2 135:22 136:1,3 136:13,17 142:24 144:3 162:18 163:14 164:5 165:14 176:2 204:23 208:8 220:11 220:16 221:3 221:22 228:21 238:8 239:4,13 249:1 296:24
**photographed** 85:19 86:1 207:21 208:11 208:13,23 213:11
**photographic** 203:11
**photographs** 7:19 25:4,12 26:20 30:2,7 31:22 32:1,4 32:23,25 33:16 33:24 34:19 70:10,17 71:3 71:7,8,9,11,15 71:17 73:4 74:10 77:20 78:17,23,24 79:7 80:2,3,4,5 85:17 87:5,7 88:21 91:20 96:6,13,14,21 99:1 100:17,17 100:20,22 101:2,11,14 107:3,14,15 110:25 114:13 120:11 140:23 158:19 162:15 167:13 171:2 174:1 200:14 201:21 208:7 208:17 209:6 209:10 213:20 214:4 219:14 219:22 220:7 223:17 228:22 228:24 238:9 247:10,13 274:9 293:6,14 294:14 295:1,9 296:8 297:14
**photos** 30:14 30:16 37:19 100:6 101:13 215:3 289:20 300:8,20
**phrase** 169:20
**physical** 25:1,6 26:7 41:1 94:6 116:1,9 140:4 171:6,10 178:1 199:24 200:13 200:21 201:8 201:20 202:11 202:25 214:9 226:23 229:13 236:16,20 238:24 240:17 243:22 244:7 298:2
**physically** 53:12 196:15
**picked** 118:2
**picking** 27:13
**picture** 73:9 75:2,17 76:13 104:14,17 109:4 131:6,9 135:7 136:24 137:3,5,6,20

144:10 146:14
159:4 164:25
165:7,22
166:16 167:17
167:18 234:3
236:6 237:20
238:12,13,16
239:7,19
248:18 249:4
259:11 286:25
294:17 298:9
298:16,18
301:16
**pictures**  36:25
37:13,16 65:11
65:12 69:25
70:3,5 79:19
87:22 88:11
93:11 95:12
97:25 99:21
100:1 106:10
106:11,16,25
116:21 136:23
143:5 162:22
164:19 172:5
222:18 289:22
296:15 298:22
299:22
**piece**  215:15
229:4 244:8
247:2,2,17,21
247:21 248:3
248:16 289:25
291:23,25

296:10 301:18
302:7,14,19
**pieces**  149:13
289:22 291:18
291:24 296:23
300:20,22
**pipes**  219:25
**place**  1:24 6:11
35:15 58:16
69:17 172:20
177:21 198:12
259:13 282:6
302:19
**placed**  38:6
143:14 257:12
**places**  96:1
198:15
**plaintiff**  1:22
140:12
**plaintiff's**  3:11
4:5 7:20,21
**plaintiffs**  1:9
2:4 8:3 42:18
42:23 83:1
**plastic**  15:22
15:23 16:4
64:25 65:4
125:16 155:12
174:18 187:5,9
187:11,12
188:5,13
225:25 226:25
227:20 230:21
231:7,18

232:17 234:21
235:13,20
258:23 259:10
259:19 270:16
270:24 271:2
273:22
**plausibility**
223:25
**plausible**  223:7
223:11,16
**play**  27:23 28:5
**played**  41:1
**please**  6:4 7:4
139:19
**plenty**  172:5
**plugged**  78:3
79:6,9,11,13
80:9,16 81:2
88:4 99:3
127:25 128:22
131:4 134:5
191:22 192:1
203:8,14
**plus**  201:9
**point**  23:5
47:19 49:19
59:11 69:21
105:7 146:25
147:10,18
156:10,12
169:5 170:17
172:24 191:5
204:22 205:3
205:20 210:24

238:9 250:22
257:10 261:20
261:22 280:11
287:1 289:2
293:20
**pointed**  222:10
222:21
**pointing**
137:23
**points**  253:14
**polymer**  280:9
280:10
**porch**  73:19
**portable**
130:16
**portion**  17:19
102:6 104:13
104:15 105:13
108:10 130:23
180:15,17
**portions**  20:22
72:1 81:21
108:21 115:6,7
152:19,21
180:10 199:22
200:24 210:8
232:6 235:7
246:9 271:19
300:17
**position**  63:14
109:15 204:22
205:16 295:10
**possibilities**
124:6 177:16

**possibility** 83:25 105:21 186:8 224:22
**possible** 80:19 82:1 84:9 85:3 85:7,10 95:14 111:6,12,15,24 112:1 158:11 165:3 176:19 177:1,15 198:16 209:21 213:19 224:3 243:18 244:10 261:17 264:15 278:20
**possibly** 176:3
**postponed** 23:3
**postulate** 157:21
**postulated** 213:19
**postulating** 216:13
**potential** 10:19 45:3,20 52:14 60:3 92:12,16 94:4 99:5 103:9 104:20 111:5 112:4 165:21 184:3 203:4 210:24 245:11
**potentially** 165:4 195:16 195:18 274:24 277:1 288:6 290:9
**pour** 210:4,6
**poured** 212:14
**pouring** 271:24
**power** 59:16,20 97:5
**powered** 275:23
**practice** 128:12
**pre** 7:20 57:1 227:1,20,23 284:4
**precise** 32:5
**precisely** 266:5
**predict** 266:5
**predictive** 4:8 249:18
**preference** 78:7
**preliminary** 84:20 289:12
**premise** 154:14 201:10
**premises** 35:9
**prepared** 4:13
**preparing** 68:11 128:9
**presence** 285:22 293:25 295:12
**present** 2:16 7:2 35:16 53:21 109:21 194:13 243:3 285:23 294:1 306:11 307:3
**presented** 8:5 20:6
**preserved** 291:17
**presumably** 177:11
**presumed** 291:7
**pretty** 253:6
**prevent** 45:3,15 46:18 47:25 50:13 51:12,24 53:20,24 55:9 55:20,24 56:2 58:4,16,22 296:23
**prevented** 191:23 306:10
**preventing** 51:5 58:20 59:13
**previous** 139:15 193:5 218:17
**previously** 280:22
**primarily** 34:18
**primary** 17:9 34:15,17 241:2
**principal** 16:20 17:3,7,8 18:17 20:4
**prior** 8:16,18 53:1 82:21 172:4 178:12 208:13 227:9 243:21 249:19 252:20 296:13
**prismatic** 259:21
**probable** 111:13,15,19 120:21 126:8 149:20 197:8 197:23,25 198:14 199:4 202:10 221:21
**probably** 63:6 136:10 145:9 162:21 202:6,7 227:2 256:21 259:12
**problem** 293:11,11
**problems** 218:17
**procedure** 28:11
**proceed** 70:13
**process** 8:9 121:25 157:8 280:14 287:7

**processer** 130:5
**produce** 153:16 243:20 271:18 272:25
**produced** 42:11,18,23 43:23 100:22 293:5 295:1
**produces** 272:20
**producing** 47:15 153:4
**product** 86:16
**production** 4:18 42:16,22 43:1,2,12
**products** 153:4 191:8 215:17
**professional** 3:13 23:16 32:19 210:17 223:7 272:9
**professor** 23:18
**profile** 3:13
**progress** 242:24
**progression** 152:23
**projected** 177:25
**projectile** 175:13
**projectiles** 175:6,20 176:12,14,20 243:13 265:3
**projects** 193:6
**propagate** 180:23 274:20 304:2
**propagated** 186:10
**properly** 218:19
**properties** 16:10 51:25
**propose** 18:12
**proposing** 291:5
**protect** 190:2
**protected** 98:20 108:5,9 118:15 119:8 140:23 145:19 189:24 230:25 232:11
**protection** 16:15 48:17 54:6 129:4,17 130:2,4 191:13
**protections** 129:20,22 130:7 192:9 196:19
**protocol** 91:19
**protracted** 265:18
**protruding** 235:7,8
**prove** 83:8 226:15
**provide** 19:10 30:7 31:5 43:24 47:21 153:9 182:2,6 261:15 262:13
**provided** 14:21 32:14,16 113:17 158:21 181:8 183:17 191:13 283:23 293:1
**provides** 19:14 19:16 134:19 136:3 167:13
**providing** 126:17 150:12
**provoke** 11:22 192:18
**provoked** 12:15 258:7
**public** 1:24 7:11 308:12 309:4 312:19
**published** 249:22 281:14
**pull** 117:2 142:7 168:2 223:13
**pulled** 98:19 142:22
**punching** 73:6
**purchased** 167:21
**purpose** 19:7 19:12 59:15 137:22
**purposefully** 112:2
**purposes** 11:25 275:17
**pursuant** 1:22
**purview** 166:14
**push** 279:15
**pushed** 93:11 93:16
**pushing** 93:25
**put** 12:4 13:12 13:20 15:22 19:25 20:15 25:23 50:24 58:16 83:20 100:23 107:1,2 107:3,9 109:14 109:18 134:25 143:18 148:6 153:10 159:19 160:22 163:13 166:5 208:25 209:22 236:15 254:12 258:22 259:4,12,16 293:15 297:23

**putting**   179:20
  272:12
**pvc**   219:25

**q**

**quality**   6:5,6
  51:11 58:23
  192:3,7,10,11
**question**   12:6
  20:16 27:20
  28:17 29:7
  44:7,16 46:20
  50:23,24,24
  53:10 89:11
  126:20 127:3
  131:3 133:2
  147:21 148:7
  154:9 169:19
  174:25 178:24
  179:12 183:2,5
  183:11 212:16
  212:17 215:5
  226:18 234:25
  237:5,15
  239:12 240:4
  243:16 252:8
  270:4,5,23
  273:3,8,14
  275:13,18,21
  276:17 277:21
  287:25 288:15
  288:25 289:3
  293:16 296:5
  297:19,20,23

  301:5 305:7
**questions**   8:4
  44:20 145:4
  183:7,12
  193:23 264:22
  297:24
**quibbling**
  49:18
**quick**   306:17
**quickly**   161:18
  210:7 245:15
  245:16 277:17
  278:11
**quinn**   184:4
  185:6 192:22
**quite**   244:25
  245:11,17
  289:9
**quote**   182:8
  214:21

**r**

**r**   2:1 5:1 249:16
  252:14 309:1
  311:3,3
**rabid**   278:11
**radiant**   61:2,8
  61:18,20,22,25
  62:2,9,11,14,20
  62:21 63:21
  64:17 118:18
  118:20 119:8
  119:13 125:14
  125:15 153:9

  153:19,23,23
  153:25 155:11
  155:24 156:4,7
  168:7,8,11,18
  169:1,23 175:2
  178:6 213:9
  225:22 226:1
  226:12,16
  227:1,9 229:2
  229:2 230:5
  231:1 232:2,10
  232:18 235:13
  235:22 236:2,4
  236:20 237:7
  237:17 238:5
  238:11 239:25
  240:21 241:12
  265:1 272:20
  272:25 274:25
  284:3,7,10,14
**radiated**
  154:20 189:23
**radiation**
  148:18 150:12
  157:12,14
  190:3
**raging**   160:24
**raise**   178:7,19
**range**   48:7 51:9
  51:22 58:12
  122:21 156:10
  178:9 180:2,3
  187:10,13
  245:3,8 254:7

  258:14 273:23
  280:13,17
**ranges**   280:18
**ranging**   14:2
**rapidly**   272:14
**rate**   11:14
  195:6 196:2,6
  207:16 250:14
  250:18 251:7
  251:15,17
  255:21 277:16
  279:7
**rates**   11:17
**rather**   227:22
**rays**   25:4
**reach**   14:23
  47:19 90:14
  122:2,4,5
  124:13 149:16
  149:23 154:12
  173:10 265:15
**reached**   86:22
  119:16 147:19
  148:4 189:17
  250:21 251:22
  266:3
**reaches**   122:15
  147:10 150:15
  245:5
**reaching**
  121:15 122:1
  266:2
**reaction**   47:15
  47:17 48:2

56:15 182:3,20 235:12 250:10 260:4,17 262:14 263:22 265:10 268:7 270:6,8,14,24 271:8 281:12 282:5 301:23
**reactions** 10:6 10:14 12:14 14:24 241:18 245:2 261:21
**read** 20:8 30:4 36:13 49:20,23 67:21 196:16 198:5 252:9 255:17 257:13 257:13 266:25 284:5 288:20 295:14 296:18 298:24 310:9 312:5
**reading** 10:7 50:1 66:13
**reads** 49:2
**real** 297:24
**really** 13:18 19:9 20:17,19 20:25 23:6 27:10 28:1,25 41:13 61:5 74:13 82:2 107:18 142:14 142:16 148:24 153:20 155:5 159:7 161:7 162:17 175:11 187:14 192:9 200:3 207:13 211:22 214:19 234:1 236:23 240:25 241:3 242:7,22 272:17 278:1
**reason** 33:7 40:18 106:23 196:18,23 241:7 310:11 311:6,9,12,15 311:18,21
**reasonable** 165:19 176:8 245:8
**reasonably** 165:20
**reasons** 307:16
**rebuttable** 42:1
**rebuttal** 4:13 139:14 151:19 181:14 198:22 286:23,25 294:16 295:2,7 295:9 296:13
**recall** 15:6 31:8 34:15,18 36:21 43:13 53:18 68:18 100:6 117:19 134:21 137:2,20 154:16 164:22 181:10,13 187:22 193:6 263:25 264:12 286:10,14,17 296:21 297:2,3 299:3
**recalling** 142:10
**receipt** 310:18
**receive** 62:8 63:20
**received** 34:21 35:4 100:25
**receiving** 249:20
**recent** 149:8 188:11
**recently** 14:19 282:16
**receptacle** 134:18
**recitation** 113:8
**recited** 14:8
**recliner** 81:13
**reclining** 108:20
**recognized** 19:19 23:21
**recollection** 32:12 72:20 73:3 76:14 141:14,15
**recollections** 115:24
**recommend** 69:14
**recommendat...** 18:20 254:1
**recommended** 81:21 253:20
**recommends** 69:16 85:5
**record** 6:2,12 7:3,14,16 34:23 42:9 44:9 67:11,14 67:16 100:23 123:19 127:10 127:13 154:3,5 154:8 193:13 193:16 212:11 240:9,11,14 249:7,9,12 283:11 306:21 306:24 307:23 309:9
**recorded** 6:9 6:14 33:1 87:8
**recording** 6:6 6:10
**records** 209:19 293:8
**red** 256:12
**refer** 130:16 136:15 143:8

146:11 225:16 253:8 264:22 281:10
**reference** 69:6 192:13 214:21 218:7 251:8 255:6
**referenced** 37:1 42:3 183:8 184:20 193:19 252:7 310:6
**references** 196:5 249:21 263:1
**referencing** 185:6
**referred** 117:3 135:8,10,12 139:4
**referring** 12:14 58:10 64:7 98:7 110:25 117:22,25 118:17 126:4 134:16 135:16 136:25 139:4 143:7 146:10 146:21 194:5 195:25 225:9 268:24 305:16 305:17
**reflect** 32:3
**reflected** 266:13
**refresh** 73:2
**refute** 100:13
**regard** 10:21 11:7 12:19 14:21 37:23 65:15 94:24 166:16 240:17 266:19
**regardless** 154:19
**region** 140:23 145:19 150:23 233:25 239:18 239:20
**related** 6:25 17:10 21:9 50:17 57:13 109:16 139:7 237:12 307:17 309:12
**relatively** 61:21 62:8 63:12,20 144:17 146:5 146:15 186:5 210:7 218:23 218:25 236:25
**release** 187:13 195:6 196:2,6 207:16
**releases** 182:13 182:13 213:16
**releasing** 243:14
**relevant** 50:14
**reliable** 138:10 142:2
**reliant** 50:21
**relied** 19:17 60:1 65:14,18 66:3 193:1 262:15 263:4 263:25 282:14
**rely** 31:18 66:1 153:19 282:17
**relying** 13:4 15:12 50:18 66:14 132:9 179:15 182:7 185:11,15 193:3,5 195:2 229:12,14 236:8 239:4,8 241:17 242:9 255:1 262:11 262:16,17 263:5
**remain** 210:14
**remained** 227:17 303:2
**remaining** 208:23
**remark** 70:23
**remember** 34:10 36:23,24 37:3,5 106:15 222:18 292:11
**remnants** 65:15
**remotely** 6:20
**remove** 26:13 92:3,6,6 144:7 222:4 297:7
**removed** 24:16 25:7 26:8 27:8 27:14 28:5,14 38:4,19 53:14 69:22,22 70:1 91:11,23 92:10 102:19 142:25 143:4,19,22 144:15,18 164:23 172:3 208:12,24 213:10 214:10 220:3 224:22 249:3 288:13 299:22
**removing** 287:7
**repeat** 35:11 57:17
**repeatedly** 183:7,10
**rephrase** 134:12
**replace** 95:6
**replaced** 95:5
**report** 3:18 13:14 17:24 20:6,8 25:18

29:16,17 32:9 41:19 42:1 56:17,20 65:20 66:8,13 68:4,8 68:11 74:22 78:9,12 80:1 82:20 101:10 101:22 104:21 107:1,4,10 108:24 111:3 114:9 115:2,8 115:12 120:25 127:15,19 128:9 130:15 132:13,15 137:23 139:4 159:6 160:10 161:3 163:5 166:24 173:12 181:7,14,15 182:8,9,16 183:8,17,25 184:1,2,5,21 185:7 186:3 187:7 189:25 190:15 197:4,5 198:4,21,21,22 199:2 220:14 222:13 223:21 225:4,13 230:1 230:13 232:25 241:21 242:8 246:4,18 247:6 247:9 248:19 248:24 249:21 261:23 262:13 262:16,18 263:2,23 266:14 279:24 280:3,4 281:2 282:19 283:17 286:23 287:1 288:19 289:2 289:12,18 290:2 292:8,19 293:17 294:14 294:17,25 295:3,3,7,9,15 295:22 296:6 296:13,14 307:1

**reported** 107:20

**reportedly** 208:18

**reporter** 1:24 6:23 7:4,13 154:1 240:7 283:9 309:3

**reports** 3:22 33:20,20 36:13 37:17 39:13 92:19 136:22 139:14 151:19 209:10 248:14 286:22 289:21 293:15

**represent** 17:18 42:9

**representation** 39:12 296:6

**representations** 290:21

**representative** 280:6

**representatives** 20:18

**represented** 65:16 299:20

**representing** 6:21 82:25 83:3

**requested** 68:20 91:17 100:23,24

**requests** 4:18 17:12

**require** 20:12 21:8 130:9 136:18 141:11 158:14

**required** 12:21 13:12 15:9,14 15:16 16:3 47:24 187:4 196:19 312:13

**requirement** 46:8,15 153:18

**requirements** 18:22

**requires** 21:6 136:14 192:17 297:17

**research** 10:21 13:10 92:22 128:4 185:11 193:6 262:12 279:19 301:25

**researched** 279:21

**researcher** 8:19

**researchers** 252:23

**reserved** 5:20 67:19

**resident** 12:4 12:20 13:6,20 192:17

**residents** 34:6

**residues** 211:24

**resolidified** 225:24

**resource** 261:19

**respect** 67:17

**respective** 5:5

**responded** 69:1 107:21

**responders** 93:6 140:25 143:23

**response** 35:6 226:17 253:4

**responsible**
16:24
**rest** 90:16,23
104:1 152:1
201:5,25
202:20,21
206:15,18
258:2
**restricted**
38:23
**result** 54:10
56:25 59:15
175:2 242:18
284:3
**results** 47:16
258:8
**resume** 9:23
19:2
**retain** 81:24
82:15 85:6,10
**retained** 22:19
22:20 23:9
24:22 81:18
82:4,9 83:8,12
**retardant**
304:20
**retardants**
303:16,19,21
304:15,25
305:3,3
**return** 310:13
310:17
**revealed** 70:6
71:21

**reverse** 141:5
158:6
**reversed** 140:2
**review** 19:1
25:10 30:19
38:13 41:14,22
68:11 70:10,17
71:7 74:9
77:20 79:22
80:4 86:21
89:5 96:6
100:5 128:8
138:7,7 252:19
300:10 310:7
**reviewed** 11:1
11:7,25 12:23
13:14 14:18
24:3 25:1,3,6
26:20,20 29:21
30:1,21,24
31:13 32:9,11
37:16,17 41:13
41:19,23,24,25
42:2 53:11
56:17 65:9,17
66:8,15 85:17
86:23 95:12
114:12 181:14
282:15 292:22
302:1
**reviewing** 31:8
57:1 302:3
**revises** 82:13

**revision** 3:20
**right** 16:18,25
17:10 18:7
21:7 23:11
24:11 31:24
32:6 39:18
40:14 41:7
46:1 48:2,10
54:25 55:2,10
58:7 59:10
60:11 62:9
65:7,24 70:25
71:20,24 72:9
73:22 74:14
75:21 79:19
80:6 84:13
85:13,22 86:18
88:5 89:3 92:8
98:5 100:4,15
100:18 102:8
102:11 103:1,8
104:9 105:6
106:7 114:13
114:20 115:13
116:11 117:17
121:1,3 122:5
122:9,17 126:5
126:19 127:20
128:25 131:8
132:2 133:9,12
134:4 135:14
137:20 141:24
143:20,25
148:3 152:2,17

152:23 155:25
156:11 157:16
158:12 159:25
160:13,16,21
162:6,19
163:11 164:11
164:15 167:11
167:18,19
170:7,9 171:20
172:8,20,25
173:16 174:2
177:14 179:6
180:10,11,19
182:10 185:24
188:21 193:7
194:8 195:19
196:9 201:14
201:18 203:9
205:8,13
206:24 208:4
208:11,16,19
210:3,7 215:21
216:3,11 221:2
222:15 224:12
228:8 230:2,19
232:20 233:1,1
234:2,4,12,17
235:2,9 237:9
238:21 239:18
239:20 241:19
244:25 245:18
246:15 250:16
252:3 253:15
255:4,23

258:10,23
259:15 263:12
263:17 265:12
265:24 268:21
273:15,24
275:9 279:2
282:12,21
284:9,17 285:9
286:12 287:4
287:15,19
288:5 290:8
292:4 293:19
294:20 296:19
300:8 301:17
304:13 305:20
**rise** 250:14
251:16,17,19
**rising** 258:1
**risk** 196:25
**rivera** 2:17
6:21
**road** 2:5
**rochester** 2:5
**role** 18:9 27:13
27:17,23 28:6
41:1 86:10,13
86:14 87:3
165:25 166:2
**roles** 82:19
86:9
**rolled** 177:24
**roof** 92:21
**room** 56:19
60:24 61:1

69:20,25 70:6
70:14,19,24
72:3,4,9,10,17
72:21,23 75:22
76:18 77:24
110:4 112:21
114:21,24
116:17 140:11
146:15 150:7
150:13,15,24
152:5 156:1,2
156:20 157:4
158:1,1,9,15,17
158:20,21,22
159:9 160:7
162:14 165:9
169:18 170:5
171:23 173:15
173:20,20
186:22 187:1
190:7,11
199:13,18
200:3,5 201:5
209:14 214:11
214:25 219:12
219:20,23
220:8,19 223:9
223:10,25
224:11 236:11
236:11 243:3
246:2 254:18
256:22,24
267:18,19,19
271:19,23

272:6 275:11
277:24 278:22
299:25 300:17
301:13,21
302:4 306:1
**roughly** 9:4
13:25 185:8
187:8 283:1
**route** 114:16
**rule** 60:20
87:18 90:18
175:5 181:1
186:8,14 214:8
214:9 301:22
**ruled** 22:7 82:3
85:13 94:14
111:9 200:24
225:6
**rules** 198:20
202:24
**ruling** 60:2
120:20 126:7
**run** 179:22
261:21
**runaway** 4:7
10:4,14,20,24
11:8,22 12:14
12:22 13:7,12
13:21 14:2,15
14:23 15:5,17
15:24 16:9
44:24 45:4,13
45:15,20 47:10
47:14,16,20

48:9 50:6,14
50:20 51:5,14
51:16 52:1,7,8
52:10,15,18
53:6,20,25
54:21 55:10,17
55:20,25 56:2
56:8,14,24,25
57:3,25 58:3,5
58:17,22 59:6
59:9,15,22
60:4,9,21 61:3
64:15,18 65:21
66:12,19,21
119:1,10,14,19
119:22,24
124:13,15,19
124:22,25
125:3,6,17
127:1 129:7,12
148:6 149:18
150:17 151:6,9
153:11,17
154:14 155:15
159:20 175:7
175:14 176:1
178:20 180:15
180:21,24
181:11,12,18
181:20,23
182:3,13,20
183:20 184:2,7
184:13,18
185:3,12,17

186:1,5,9,12,19
187:2 189:18
190:21 191:16
191:24 192:12
192:18 193:19
225:23 226:12
226:15,20
227:8,15,17
228:12,13
229:1,3,21
230:4,6 232:3
232:10 235:12
235:18,18
236:1,5,12,21
237:11,19
238:7,12 239:1
240:2,22
241:18,23,24
242:5,11,17
243:6 244:12
244:15,23
245:2,4,22
249:17 250:10
250:15,22
251:23 256:1,1
256:12,16
257:23 258:6
258:12,19
259:24 260:4,5
260:10 261:7
262:14,20
263:22 264:3,6
264:9,19 265:1
265:10,15

266:4,12,20
267:3,4,9,13,20
268:7 270:6,8
270:14,24
271:4,8,12
272:21 273:1,7
273:13 275:2
276:21 277:7
277:15,20,25
278:6 279:11
279:15 280:2
280:21 282:13
282:16 284:2
294:6 299:14
301:23
**runaways**  4:10
252:16
**running**  83:20
128:1,5,21
130:3 269:15

**s**

**s**  1:4 2:1 5:1,1
249:16,16
252:14,14
311:3
**safe**  51:8,8
58:12
**safety**  45:2,14
45:19 49:4
50:13 51:4
53:19,24 54:1
54:11 55:8,20
55:24 56:2,6

58:3,11,20
59:2,16,19
129:23 191:23
196:24
**sat**  143:16
205:16
**saw**  65:12
70:14 87:4,7
88:17 109:5
112:22 117:7
139:22,23
140:1 204:23
209:5 215:7
219:14 288:1
**saying**  27:11
31:10 32:8,10
32:22 37:3,11
43:2 55:7 60:1
60:17,17 61:25
66:11 78:7
81:24 82:10
83:24 85:5
88:25 89:1,4,7
89:17,23,25
90:1 91:24
92:9,17 96:5
102:13,21
104:25 106:17
107:24 111:8
111:12 114:2,7
123:2,6 124:20
126:22 134:9
140:12 144:12
145:22 151:24

154:18 155:8
156:23 160:4
161:22 165:10
170:2 175:13
179:4,9 182:19
191:3 197:21
198:9 200:13
207:2 211:14
223:6,22
224:17 227:18
228:10,19
231:21 232:14
232:19 233:11
233:16,22
234:15 235:11
235:14 240:25
241:17 244:14
248:8 262:19
263:13 265:21
267:22,24,25
271:5 272:1
274:11,24
276:13 278:7
278:24 280:24
281:25 282:2
284:21 286:10
286:14,17
287:3 288:21
290:18 291:6
291:23 297:21
300:4 301:7
302:17,21
304:3,7

**says** 9:25 16:15 30:5,24 46:22 48:16,20 49:7 49:8,9 50:2 68:19,24 69:7 72:4 74:1 77:14 78:11 85:8,8 87:14 87:17 88:10 94:16 98:7,11 98:18,24 115:9 117:6 120:19 121:21 125:25 126:6 140:6 194:10,20 195:4 196:11 197:24 199:12 253:24 255:9 255:18 256:11 256:15 257:14 258:12 259:1 260:5 261:1,3 262:3 263:8,21 266:15 288:12 288:19,22 295:7
**scan** 26:21
**scanned** 11:16
**scenario** 24:18 103:9 148:25 149:20 151:6 154:11 158:6 158:10 159:22 161:2,7,10,21 162:3 168:13 169:12 181:2 181:22 200:1 205:14 213:4 228:6 238:2 273:4 278:2
**scenarios** 180:25 181:25 223:16
**scene** 24:7,9,12 25:7 26:17,22 27:8 28:5,14 29:4,12 30:2,8 30:24 31:10 32:20 33:5 37:2,8 40:25 53:14 71:18 78:19,20,23 81:4 82:4 83:18 84:1 87:3 89:20 96:24 106:1 107:9 166:3 248:15 286:8 290:15 292:6 298:3 300:21 300:23
**scenes** 26:24 27:1
**schedule** 32:21
**scheduled** 23:2 35:19,21
**schwarz** 2:6 3:4 7:25 8:2 38:10 66:25 67:3,6,9,22 123:16,18 127:7 134:14 154:1 193:10 306:17 307:18
**scientific** 9:3,6 121:7 281:8,11 281:23
**scientist** 282:3
**scope** 19:12
**screen** 6:9 25:23 62:1,18 62:22 63:18 117:9,17 174:19 175:2,8 175:9,15,16,25 176:11 190:18 190:18 225:24 226:1
**screened** 73:19
**scroll** 26:6
**sealing** 5:7
**seat** 108:14,23
**second** 9:24 74:3 77:16,17 132:14 145:6 166:25 167:7 167:16 231:14 250:3 251:4 261:3,3 293:20 299:13
**seconds** 48:21 49:6,11,12 182:14,21,23 182:25 183:21 184:19 185:5,7 185:8,8,18,20 185:21 241:19 241:20 242:1,2 242:2,5,6,11,11 245:17 256:16 258:13,14,15 260:6,11,12,12 260:17,18,19 260:19,20 261:12,14,21 262:4,7,21 263:7,8,10,11 263:11,13,21 266:17 267:1,7 271:13 279:12 279:15,16,18 283:2,5,12 284:8,15
**section** 45:7,10 45:12 46:1,22 48:19 68:8 121:16,20 127:21,23 183:24 193:21 193:21,24 194:4,7 199:10 200:4 201:15 225:4,18 283:18 296:15
**sections** 17:23

**see** 10:7 26:1 31:1,2 45:25 61:5 68:17 69:10 71:25 72:2 73:7 74:6 76:9,12,23 77:10 78:6,11 87:24,25 88:5 88:9,10,18,25 89:1,12,14,15 89:23 90:1,3,4 90:5,6,8 91:22 94:10,21 95:22 95:23,25 96:4 96:12,23 98:6 99:2,23 102:6 102:18 104:14 104:14 105:13 105:16,17 106:2 113:8 114:15,16 115:1 118:22 126:13 134:7 136:1,24 137:3 137:5,6 140:7 140:8 144:14 144:15 150:25 163:16 165:1 169:4 175:8,10 175:16,22 188:2 190:16 200:9 204:4,10 208:8 210:20 211:15,17 215:23 217:19 220:18,20,24 221:9 224:25 225:1 226:3 232:20 233:3,5 233:5 235:6 236:6 239:17 239:18 240:15 245:24,25 248:22,23 250:5 253:22 255:5,9 256:17 257:23 259:6,6 260:7,8,14 266:22 270:18 270:19 271:23 271:23 279:6 279:19 281:18 286:2 288:21 292:7 296:8 300:1 303:9 305:13 306:12

**seeing** 37:3 137:20 155:5 164:22 182:17 227:8 236:24 243:4,5 307:20

**seek** 194:21

**seem** 198:6 241:4

**seems** 124:25 176:8 241:5 276:10 299:24

**seen** 6:8 35:22 37:19,19,25 39:12 40:1 66:20 79:7 86:10 92:20 93:12 96:2 97:25 136:9 160:8,15 167:14 185:17 192:14 193:5 203:11 207:20 207:25 209:19 219:4,5,6,22 227:13,14,16 261:20 278:22 286:25 287:10 288:17 293:2,2 293:4,10,13,13 294:15,16 295:8,8 298:21 299:25

**sees** 151:5

**self** 10:4 280:20

**send** 82:16

**sending** 123:25

**sense** 46:9 47:1 47:23

**sensing** 46:23

**sensors** 54:9 257:15

**sent** 292:18 302:4 310:14

**sentence** 87:10 88:3 125:25 126:6,13,13,14 126:15 133:7 184:9 197:21 197:24 198:6 199:15 200:21 226:5,7 255:17 262:19

**sentences** 126:21

**separate** 30:17 36:1 126:12 238:18,19 291:25

**separated** 155:6 291:25

**separator** 180:17

**sequence** 147:17 148:1 148:14,16 149:12,25 150:3 160:3,12 160:19 181:19 181:21 227:19 229:5,8,12 236:9 265:14 273:9,16 274:3

**sequentially** 170:4 264:10 271:5

**series** 42:12 46:3

**seriously** 86:2

**serve** 21:19 194:14
**served** 16:20 19:24
**set** 22:12 72:21 112:3 125:10 125:21 168:24 169:25 171:21 171:24 172:11 178:9 186:23 189:17 217:14 239:21 255:8 255:11,20 273:1 274:4 275:9,12,13,15 275:18 309:8 309:17
**setting** 178:21 274:14
**several** 138:17 140:19 142:8 167:3 200:6 206:5 239:15 279:20
**severe** 52:8 61:4 105:2 231:24 233:7 233:24
**severely** 64:12 116:16 230:22
**sewing** 75:22 173:14 246:7
**share** 25:23

**sheet** 8:8 35:22 310:11
**shelf** 63:15,18 117:2 153:16 177:25 189:15 190:4 249:3
**shells** 226:19
**shelves** 190:1,5 190:5
**sheridan** 2:9
**shielded** 63:3 294:9
**shoot** 224:9,19
**short** 67:12 127:11 154:6 180:18 182:11 185:4 186:6 193:14 196:14 240:12 249:10 267:16 306:22
**shorter** 186:20 267:16
**shorthand** 309:3
**shot** 216:1,17 217:13 221:25
**show** 25:22 87:20 88:7 103:11 131:9 140:23 187:25 193:6 219:22 220:7 246:4 250:11 251:11 256:9 294:17

**showed** 70:15 74:16 77:17 91:21 107:25 108:2 118:7 222:21 301:16
**showing** 131:25 134:2 162:18 167:17 250:13 289:21 299:23
**shown** 70:19 89:19 107:14 134:5 162:23 176:2 178:11 232:8 241:10 289:24 300:8
**shows** 75:20 101:11,16,25 110:19 145:22 145:25 146:2 163:5 164:2,6 174:16 206:17 206:25 222:25 223:1 232:17 238:24 246:19 247:6,16 256:12 258:8 260:3 287:1
**shut** 59:16,20 130:6
**side** 62:1,3 72:5 72:8,9 74:14 77:24 84:24 91:21 99:8,11 99:23 102:10

102:18,20,24 102:25 103:2 117:17 130:18 142:21,23 144:13 145:23 158:22 162:1 163:6,7,8,10,12 163:15,16,19 163:22,23,23 164:2,6,9,20 165:1,2 170:1 173:9,19,20 190:7,11 215:19,20,23 217:19,20 220:24 222:20 233:14 234:2,4 234:5,17 235:2 237:3 241:9
**sides** 62:22 74:4 163:24 215:25 217:21 218:5,9
**sign** 35:22 67:21 211:22 310:12
**signature** 309:22
**signed** 5:11,14 78:11 310:20
**significant** 72:13 74:25 77:25 105:23 116:18 118:25

119:2 139:14
140:10 150:7
150:12 153:22
154:25 156:24
160:5,6,9
164:2,15 169:4
175:22 189:19
197:10 198:2
199:6 233:20
239:22 246:6
278:17 285:4
303:22
**significantly**
73:12 116:14
152:11 158:22
178:10 222:17
257:25 268:1
**signs** 36:25
37:3 87:20
88:7 110:20
207:25
**silenced** 269:3
**similar** 108:2
168:5,12,21
169:24 174:10
190:17,24
194:11 231:5
241:25 259:17
293:7 299:24
301:12
**simultaneously**
186:2 241:24
264:11 265:16
266:21 267:4

**single** 83:3
138:22 238:15
258:9
**singular** 184:18
**site** 24:16 72:4
**sitting** 110:19
167:22 259:14
**situation** 28:1
28:25 264:18
**situations**
264:16
**six** 8:11 64:23
299:14
**sixty** 256:12
**size** 60:13
153:3 275:10
300:13
**skin** 157:2
**sleep** 128:1
**sleeping** 96:19
110:6
**slightly** 113:24
**slow** 152:23
274:18,23
280:15
**slowly** 269:8
**small** 260:12
261:3 272:11
275:4 285:2,3
**smaller** 135:1,4
244:19 272:14
**smell** 150:23,24
187:20 188:4,8
189:7 243:2,2

271:22
**smelled** 112:21
187:19 188:3,4
188:12
**smith** 2:8 310:1
**smithsovik.c...**
310:2
**smoke** 60:13
70:7,15 71:22
77:18 94:18,24
95:3,4,12,22,24
95:25 96:6,7
96:17,18,22
97:4,6,10,21,21
97:23 98:1
112:21 139:23
140:8 147:8
150:1,5,7,8,20
150:22,23,24
152:14 155:20
158:1,1 168:19
174:5,7 186:21
186:23,23,25
187:5,13,16,16
187:21 188:15
188:22,23
189:1,7,7
191:9 216:23
218:15,17
220:2,4 242:23
242:25 243:1,2
243:3,18,21,24
244:7,19 265:7
265:9 268:5,10

268:13,22
269:1,2,25
270:1,7,11,12
270:13 271:2,6
271:18,20,22
271:23,23
272:3,6,8,12,22
273:1,9,11
274:4,5,15
275:9,12,14,15
275:18,22,24
276:4,5,8,12,18
276:23 284:22
285:5,6
**smoked** 203:23
203:25
**smokes** 291:1
**smokey** 274:7
**smoking**
203:21 291:4
**smolder** 244:16
**smoldered**
244:10
**smoldering**
243:20 272:11
274:18,23
275:5 278:13
284:18 285:2,3
285:7
**soaked** 211:6
211:16,18
**soften** 16:5
**softened**
190:17 227:1

227:20,23
232:18 235:13
235:21
**softening**
174:17 187:9
190:13 225:25
**software**
127:24 128:5
**solid** 99:15
257:20
**solutions** 6:22
6:24 310:23
**somebody**
31:12 109:13
204:21
**somebody's**
79:18
**someplace**
198:10 202:1
**somewhat** 63:3
89:25 154:10
215:15
**soot** 71:22
145:18,20
146:17 174:5,8
216:23
**sorensen**
249:15
**sorry** 25:15,17
25:20 35:10
44:5 75:5,11
75:15 101:8,9
103:5,13 116:5
144:22 183:16

197:20 200:11
208:2 211:1
217:3 219:11
219:18 231:13
237:6 244:1
247:7 251:3
252:4 254:25
286:16 290:11
299:7 302:24
305:8
**sort** 10:25
13:10 76:3
141:5 158:5
167:18 179:25
210:3 258:1
**sorts** 289:21
**sounds** 68:18
123:20 262:7,8
291:4
**source** 13:11,22
15:4,10 57:16
60:4 81:20
86:13 90:17,20
90:23 92:12,18
98:21,25 99:5
109:1 114:25
118:25 126:24
129:9 165:21
166:15,17
169:16 184:4
191:24 192:18
203:17 205:12
214:5 224:3,9
225:7 228:12

239:9 242:18
243:18 245:17
258:18 285:8,9
301:2,8,9
302:18
**sources** 11:22
12:15 92:16
118:24 203:3,5
224:5 237:22
**south** 2:5
**sovik** 2:8 310:1
**space** 51:9,23
167:14
**spare** 75:20
130:17 133:6
**sparks** 123:25
**speaking**
123:11
**speaks** 81:23
**special** 21:19
21:21,23 22:1
22:4
**specialized**
21:20
**specific** 14:17
23:6 50:17
53:9,24 68:17
85:9 93:9
121:5 130:11
134:7 183:1
193:7 196:6
228:21 244:24
245:7 251:25
264:12 266:23

267:10,15
289:24 291:17
297:3 298:21
303:13 307:10
**specifically**
12:24 36:21
44:6 54:8
58:16 69:16
90:6 128:7
193:20 210:19
264:4 283:18
**specification**
3:20 42:10
43:15,15,19
44:12 46:9
48:19 49:2
53:20 196:19
**specifications**
43:25 280:23
**specifics** 55:13
182:23
**specifies** 82:7
**speculate**
165:18 166:18
**spelled** 132:13
**spot** 248:3,15
**spread** 90:16
90:23 91:5,7
103:7 118:9
126:24 159:17
162:25 169:22
171:12 201:17
202:19,20
206:14,17

207:4 212:7,19
212:21 213:3
223:8,10
224:11 267:17
271:19
**spreading**
201:4,24 202:2
**spreads** 90:21
207:12
**stability** 16:8
**staff** 18:19
**stage** 277:3
**stamped** 68:4
**standard** 17:12
18:15 19:13
28:11 45:14
122:24 123:7
**standards**
18:12,20 45:19
218:25
**standing**
205:11
**standpoint**
238:20
**staples** 1:11
6:16 36:3
311:1 312:1
**staplescase**
310:4
**start** 14:1
22:22 48:2
83:5 93:23,24
152:8,19 153:2
158:3 166:10

166:11 171:17
187:11 197:21
200:2 203:4
224:10 255:11
255:20 274:17
278:10,18
284:15 291:20
303:23
**started** 56:14
56:24 82:9
83:5,22 85:1,3
109:8 110:15
113:5 115:4
119:20 124:17
124:18 125:21
126:18 127:24
139:22 140:12
147:1 148:1
150:4 153:6
157:24 158:12
159:15 161:24
166:4,7,8
169:21 170:6
170:24 171:11
171:14,16
172:18 173:14
173:24 186:9
186:17 188:25
197:8,18,23,25
198:7,12,15
199:4 200:3,16
201:11 202:6,7
202:10,18
206:3,9,13

216:18 219:7
223:8,9 226:21
262:22 265:9
266:17 267:2
271:14 273:19
285:16 289:11
289:14,16
290:1 291:16
295:21 296:11
**starting** 112:9
149:1,2 153:5
154:11 168:13
198:23 199:20
202:1 219:10
301:8
**starts** 48:14
94:3 152:5,16
158:7
**state** 1:25 7:11
7:14,16 11:17
51:3,8 52:5,6
52:12 53:6
129:13 132:15
133:4 195:5,7
195:11,15,17
196:1 309:4
**stated** 61:13,16
112:19 120:24
183:23 186:3
295:10
**statement** 4:13
43:22 49:18
50:23,25 69:7
78:7 79:4,12

94:16 124:16
125:4 140:11
142:12 179:9
179:11 195:24
271:12 286:4
294:13,23,24
295:4,16
**statements**
33:19 50:22
83:11 84:22
112:25 115:6
127:3,4 138:5
145:10 297:24
**states** 1:1 6:17
19:22 88:6
196:7
**stating** 34:20
**station** 131:7
131:12,17
133:5 134:3,15
134:24 135:3,5
135:10,16
136:15,18,19
136:25 137:7
137:13,18
**stations** 135:1
135:4
**stay** 245:23
291:10
**steel** 103:22
**stenographic**
7:3
**step** 269:9

**stephen** 2:6
**steve** 8:2 38:8
**steven** 67:15
**sticking** 295:10 295:24
**stipulated** 5:3 5:18
**stipulations** 67:18,19
**stop** 49:13 129:18 139:17 179:3 232:5
**stopped** 226:6
**stopwatch** 264:2
**storage** 98:12 254:11
**stored** 51:19,19 52:3,14 53:5 253:20,24
**straightened** 109:14 204:21
**street** 7:17
**struck** 92:23
**studded** 162:5
**student** 8:19
**studied** 27:9
**studies** 10:23 11:11,18,20,21 12:13 281:9
**studs** 99:14
**study** 4:7 196:3 196:5,5 228:1 249:16 252:22
**styrene** 280:9
**subcomponent** 93:10
**subdivision** 285:19
**subject** 43:16 168:9 189:16 190:25 194:22 195:12 231:1
**subparagraph** 295:11
**subscribed** 308:6 312:14
**subsequent** 129:2 186:12 286:1 294:4
**subsequently** 226:21
**subset** 42:24
**substance** 99:16 213:21
**substantial** 151:1 274:19 274:21
**sufficient** 15:22 15:24 178:7,19 189:17 235:19 272:19,21 273:6 276:20 277:25 284:11 284:14
**sufficiently** 150:16 154:13 155:11,15
**sugent** 310:1
**suggest** 95:20
**suggesting** 291:9
**suggests** 164:16 219:7
**sugnet** 2:8
**suite** 2:5,9
**sum** 125:8
**summarize** 182:9 240:15
**summarized** 120:19
**summarizes** 253:6
**super** 175:14
**supervised** 288:24
**supplied** 100:19
**support** 57:15 81:25 100:10 100:13 101:3 101:11 164:12 201:10 206:2 299:11,18 302:25 305:5
**supported** 107:6
**supporting** 57:23,24 58:2 104:18 296:2
**supports** 94:7 104:25 125:4,8 202:5 227:11 236:16,20
**supposed** 28:21 35:14 95:6 149:5,7 260:22 292:4,5
**sure** 8:8 9:2 11:10 19:11 28:16 38:10 66:25 67:3,6,9 73:19 91:1 105:14 117:12 119:4 134:14 136:8 144:5 147:20 152:3 168:11 188:7 213:8 218:15 251:5,18 253:10,16,25 258:25 260:22 261:5 273:2
**surface** 62:6,10 62:15,20 63:7 63:10,13,17,19 63:25 64:3,6 99:19 117:15 153:15 168:7 176:16 190:6 230:25 233:19 233:21 234:15 235:8 237:8 257:15,16
**surprised** 9:18 291:14 296:9

**surprising**
  289:10 290:3,5
  295:20
**surrounding**
  174:18 232:1
  303:7
**susceptibility**
  193:18
**susceptible**
  129:12 161:19
  162:2 172:1
  191:16 192:2
  192:12 207:10
  209:12 213:6,9
  213:12,22
**suspected**
  165:12
**suspicion**
  218:14,16
**sustain** 248:10
**swear** 7:4
  292:14
**switch** 48:25
**swore** 39:24
**sworn** 5:12,14
  7:10 308:6
  309:8 312:14
**symmetrical**
  61:21 62:8
**system** 30:16
  44:1 46:6,17
  47:1,16,25
  49:24 53:15
  54:15 64:4,24

**systems** 45:15
  51:23 53:24
  54:2 55:8,14
  55:20,24,24
  56:2,7 58:4,11
  58:15,20 59:2

**t**

**t** 5:1,1 257:14
  257:14 309:1,1
  311:3,3
**tab** 9:22 17:16
  25:16 29:17
  42:7 68:1
  127:16 188:1
  193:20 197:5
  220:12 225:5
  249:13 252:4
**table** 51:17
  110:19,21
  204:13 205:16
  212:19 253:5,7
  254:17 255:25
  256:14 258:11
  260:3 302:16
**take** 6:11 27:24
  31:15,18 32:5
  38:13 48:13
  66:23 73:1,8
  75:1,2,3 81:21
  100:25 106:10
  106:21 113:3
  114:17 116:20
  127:7 141:5

  151:10 157:19
  184:8 222:17
  229:16 240:5
  242:24 249:3
  250:12 252:4
  253:22 255:7
  269:25 272:1,7
  272:13,14
  274:21 276:11
  277:5,13,23
  279:10 281:11
  282:6 284:19
  297:14 306:17
**taken** 1:22 5:16
  30:15 34:5
  37:16 39:9
  48:22 67:12
  71:19 114:11
  127:11 142:24
  144:3 151:20
  154:6 164:25
  165:14,22
  166:15 186:15
  186:21 193:14
  204:23 240:12
  249:10 278:24
  294:18 298:10
  298:22 299:22
  306:22
**takes** 30:16
  47:6 183:20
  263:21 272:18
  278:13

**talk** 33:3 40:11
  40:21 86:20
  123:19 201:16
  203:4 214:2,7
  263:20,23
  264:7 286:11
**talked** 78:14
  86:23 120:10
  120:13 142:18
  149:3 162:17
  203:1 206:17
  217:18 245:1
  285:13 286:13
**talking** 11:18
  11:20 14:10
  51:14 64:10
  76:2 82:22
  87:15 120:2
  121:14 137:14
  143:9 154:15
  189:11 193:17
  200:10 217:24
  219:1,20 224:1
  229:8,25
  234:23 246:14
  250:8 257:2
  268:3 278:21
  298:9
**talks** 45:8,12
  51:18 79:21
  121:14 199:10
  225:6 226:7
**tape** 259:12

**team** 68:3,15
68:21 69:8
117:7 214:23
**technical** 9:6
17:2,4,6,12
18:6,9,13,17
19:25 20:12
21:7,10,12
**techniques** 4:8
249:18
**technology**
6:20
**television** 214:3
**tell** 8:25 10:9
11:6 30:6 31:3
35:3 38:14
39:16 44:20
48:24 55:19
56:11 60:7
64:19 103:4
110:24 113:6
122:14 131:15
136:12 139:18
163:12 178:17
182:18 238:4
254:15 259:10
263:24 282:10
**telling** 183:9,10
287:13 294:22
294:24
**tells** 230:3
261:20 279:25
**temp** 48:16

**temperature**
15:9,14,21
46:9,17,23
47:1,5,11,12,23
48:9,20 49:5,9
51:9 52:24
54:5,9,11
58:21 59:4,14
60:5,9,22
129:3 130:6
155:1,2 156:15
157:13 178:7
178:19 179:5
179:14,18
180:6,9,14
189:22 192:17
196:20 209:17
235:17 244:21
245:5 250:14
250:14,18
251:12,14,15
251:16,17,19
254:1,12,15,19
255:2,15
256:21,22,23
256:24 257:9
257:10,11,15
257:17,18,20
257:21,24,25
259:2 266:3,3
280:12,15
**temperatures**
10:24 12:3,20
13:5,19,24

14:2,10,22
15:16 16:3,6
48:1,8 51:14
51:16,18 59:7
59:8 130:9
178:20 180:3
187:4,6 189:16
190:24,24
248:10 250:9
250:17,21
251:10,21
253:20 257:17
265:15 280:18
**ten** 10:18 95:7
185:8 263:11
268:17 279:15
284:8
**tend** 245:13
**tens** 242:2,6,11
278:16 279:4
279:12,13,16
279:18 283:2,5
283:12 284:15
**term** 217:25
281:8,11,13
**terminology**
121:5
**terms** 123:13
**terrible** 305:8
**test** 121:8
211:12,12,23
251:6 255:11
255:20 256:9
256:10,15

258:2,9 260:9
**tested** 11:12,17
16:7 210:1
278:3
**testified** 7:12
8:6,13 95:8,16
109:17 110:11
112:20 128:23
143:15 176:6
189:6 205:23
207:24 238:23
287:5
**testimony** 8:6
9:14 29:9
33:19 41:24
50:12 58:19,25
61:9 63:24
95:11 115:9,20
116:1,7 128:9
128:20 132:9
132:17 135:22
137:9,12 138:7
138:10,15,18
138:25 139:1,2
139:5,6,11,12
139:16 140:15
141:2,13,20,25
142:2 147:4
149:4,6,6,13
150:18 155:19
160:2,3,11
161:4,5,6
171:2,5 188:10
189:13 198:17

198:24 199:3 199:16,19,22 200:17,25 201:14 202:24 203:22 205:4 205:21 206:11 208:4 229:9,13 229:16 236:8 237:25 238:4 238:18,22 239:9 240:3 241:4,16 242:7 242:15,16,19 249:20 275:3,6 276:3,13,15 285:14 287:11 294:14,16 295:8 296:19 296:22 297:2,3 297:18 298:25 299:13 309:10 310:9,18 312:8

**testing** 11:2,7,9 11:16 192:15 209:18,20 211:24 264:2,5 282:15

**tests** 182:17 185:17 212:2

**thank** 38:12 67:24 127:6 200:10 276:16 283:16 307:19 307:21

**theoretical** 159:22

**theoretically** 83:8 167:23

**theories** 83:10 94:7 120:1 157:19 158:11

**theorizing** 162:24

**theory** 57:15,21 58:3 81:25 83:21,25 84:3 90:22 93:19 100:2,7,10,13 101:3,11 103:6 104:18 110:3 112:11,12 115:16 139:8 153:5,6,7,12 162:8 166:11 168:23 170:25 172:15 178:6 204:17 205:1 206:10 212:6 212:17 236:20

**thermal** 4:7,10 10:4,14,24 11:8,22 12:4 12:14,21 13:6 13:12,21 14:15 14:23 15:5,15 15:17,24 16:8 44:23 45:3,13 45:15,20 47:10 47:14,16,20 48:9 50:6,14 50:20 51:5,13 51:16 52:1,7,8 52:10,14,18 53:5,20,25 54:21 55:10,16 55:20,25 56:2 56:8,14,18,24 56:25 57:3,25 58:5,16,22 59:6,8,15,22 60:3,9,20 61:3 61:18,20 62:19 63:21 64:15,17 65:21 66:12,19 66:21 89:23 90:8 119:1,9 119:13,19,21 119:24 124:12 124:15,19,22 124:25 125:3,6 125:17 126:25 129:7,12 147:18 148:5,6 148:8,17 149:18,22 150:17 151:5,8 151:25 152:14 153:10,14,17 154:12,14,19 155:8,15 157:23 158:16 159:2,9,11,16 159:20 160:18 160:23 168:9 169:22 170:5 170:15 171:21 175:3,7,14 176:1 178:6,18 178:20 180:15 180:21,23 181:11,12,18 181:19,23 182:3,12,19 183:20 184:2,7 184:11,13,17 185:3,12,17 186:1,5,9,12,19 187:2 189:17 189:18 190:21 191:16,23 192:12,18 193:19 197:11 198:3 199:6,25 206:14 207:4,7 209:12,23 212:7 213:3 225:23 226:12 226:15,20,22 227:8,9,15,16 228:11,13 229:1,3,20 230:4,6 232:3 232:10 235:12 235:17,18 236:1,5,12,21 237:11,19

238:5,7,12,25 239:1 240:1,22 241:18,23,24 242:5,10,17 243:6 244:12 244:15,22 245:2,4,22 249:16 250:10 250:15,22 251:23 252:16 256:1,11,15 257:23 258:6 258:12,18 259:24 260:4,5 260:10 261:7 261:21 262:14 262:20 263:22 264:3,6,9,19 265:1,10,15 266:4,20 267:3 267:4,9,13,20 268:7 270:6,8 270:14,24 271:4,7,12 272:20,21,25 273:5,7,12 274:13,24 275:1,8 276:21 277:7,13,15,20 277:25 278:6 279:1,8,10,11 279:14,15 280:1,2,21 282:13,16 284:2,25 294:6 299:14 301:23 302:14

**thermocouple** 259:13

**thermoplastic** 280:9

**thick** 245:14

**thin** 245:14,19

**thing** 32:22 34:15,17 43:6 70:23 102:11 158:12 207:6 207:11 287:12 290:5

**things** 17:10,13 25:4 33:19,22 37:4,4 76:25 78:25 79:22 108:20 124:21 137:6 139:10 139:16,21 140:2,3 143:22 150:19 151:16 159:8 168:17 178:14 179:25 190:2 202:13 203:20 204:10 208:15 210:4 210:10 237:23 246:13 253:6 268:25 288:4 302:22 304:22

**think** 8:7 16:15 19:9 20:20,24 25:18 31:7 32:15 35:24 36:2,5,22 40:16,20 42:2 46:22 47:8 49:20 50:2,5 54:8 56:22 65:20 69:15,16 82:7,18 84:2,9 85:3,9,18,23 92:19 95:3 96:15 98:14 100:11 101:15 101:21 102:5 107:21 109:19 112:15 114:10 115:2,4 118:17 121:6 122:11 126:17 127:15 128:23 130:2 140:18 144:7 144:13,20 145:25 146:10 147:18,22 154:18 156:1 159:6,7 161:3 161:25 163:4 165:6,13,24 166:5,13 171:13 173:7 176:6,7 178:23 181:5 188:10 189:6,11 192:6 195:24 198:22 199:14 200:5 204:10,14 205:3 209:18 209:21,24 210:1,19 211:22 212:12 212:13 213:7 214:15 216:24 219:9 221:21 222:13 224:1 225:8 227:2 228:5 229:4 230:13 232:23 240:16 241:1 249:19 253:5 259:21 264:4 265:21 269:6,8 269:14 274:16 277:4,19 289:8 290:22 296:4 296:18 301:20 306:11,18

**thinking** 123:13 205:15 269:16

**thinks** 264:23 266:11

**third** 16:14 199:14 214:20 299:15

**thorough** 297:16

**thought** 64:7 131:1 166:18 183:17,21 282:9 286:16 290:1
**thousand** 9:3
**three** 95:3 272:16 299:10 299:18
**threw** 143:3
**throwing** 142:18
**thrown** 142:20 146:6 246:1,1
**thursday** 183:13,14
**time** 1:23 5:20 8:9,12 15:10 53:22 54:7 60:14 66:24 67:2,10,13,20 68:18 71:17,18 77:15 81:8 95:5 109:23 127:9,12 128:24 129:15 131:24 132:5 132:22 139:13 143:3 145:17 147:5,15,16,23 148:10 150:11 150:14,23 151:1 154:4 155:17,19 156:24 160:3,5 163:2 166:5 167:23 176:1 181:23 182:12 186:11 188:20 189:2 191:22 192:8,17 193:12,15 203:14 207:13 238:5 239:9,14 240:10,13 241:25 242:24 248:10 249:8 249:11 254:19 256:17,20 258:17 260:5 261:6,6,7 262:13 265:11 265:18,23 266:5 267:22 267:23 268:2,5 268:8,10,12 269:25 270:2 272:4,7,13,15 274:19,22 276:20 277:2,5 277:13,23 278:13 279:7,9 279:25 280:19 280:25 281:1,3 281:6,10,11,16 281:21,24 282:5,7,21,21 282:24 283:4 284:13,14 294:25 295:3 298:16,18 306:20,23 307:22 310:19
**timeframe** 169:14 186:16 186:16,20,21 267:16,17 282:18 310:8
**timeline** 127:22
**times** 8:7,13 10:13,18 11:12 12:4,20 13:6 13:20 28:3 50:16 105:12 128:21 192:15 198:25 206:5 239:15 241:1 260:23 278:8 279:20 298:21
**timing** 60:19 181:25 236:9 236:10 242:23 264:23 266:11 266:13 271:16 271:17 277:20
**timothy** 1:21 3:4,13,18 6:14 7:9,15 308:3 310:5 311:2,24 312:2,4,12
**tipped** 173:5 302:16
**tipping** 110:20
**title** 251:9
**today** 8:4 249:20 300:15
**together** 20:1 95:17 98:1 189:2 260:23 270:1
**told** 15:20 106:3 219:5 264:4
**tomorrow** 183:12
**took** 69:25 87:7 101:3 106:25 107:15 143:5 164:19 248:18 252:23 254:10 258:17 266:1 267:8 268:5 278:5 280:1 281:21 282:5 284:21 298:16 298:18
**top** 12:25 30:11 62:10,18,20 68:19 118:19 118:21 119:6 153:16 155:21 167:17 176:15 177:13 190:1,5 190:16 220:20 220:22 221:1,2 221:5,22

222:16 223:8 226:10,23 231:5,10,22,23 232:4 233:4,12 233:19,23 234:8,14,15 235:7,8 237:4 237:8,18 239:23,24 240:19,20,22 241:8 257:18 257:19 280:5
**topic** 21:17 228:1
**total** 260:19 267:7
**totality** 222:5 238:16
**touch** 62:2,7 64:1,8 231:12 234:20
**toward** 62:1 74:14 170:8
**towards** 168:16 170:11 221:15 289:2
**track** 264:2
**trail** 67:20
**trailer** 77:16
**trained** 165:20
**transcript** 310:6,20 312:5 312:8
**transfer** 61:8 118:20 153:19 189:23 232:2 239:25 273:21 274:13 277:6 277:14 279:10 280:1 282:12
**transferred** 274:25
**transferring** 155:24
**transition** 284:19
**transitioned** 303:25
**transmit** 242:25
**trapped** 227:4
**travel** 177:5
**traveling** 150:7 152:19
**travels** 152:21
**trial** 5:20 307:20
**tried** 239:15
**trip** 49:12
**trouble** 267:21
**true** 9:9 13:18 14:20 20:11 38:3 52:22 74:20 95:20 115:16 242:14 288:14 294:23 295:4 298:12
309:9 312:8
**trust** 149:5
**trusting** 149:7
**truth** 287:14 294:22,24
**try** 11:21 45:15 45:19 75:9 166:14
**trying** 29:23 32:5 63:5 75:11 140:18 154:9 159:4 198:8 200:11 227:24 233:10 236:17 282:4
**turn** 9:21 16:12 17:16 18:1 29:19 42:7 48:22 49:11 54:15 59:4,7 68:1,6 113:7 127:14,18 146:8 166:23 193:20 201:1 230:17 249:13 250:2 275:25 276:7,8,9,11 283:17 285:18 304:7
**turned** 49:6 81:12 157:20 255:10,19 275:24 276:4
**turning** 46:18 49:13
**tv** 72:25
**twenty** 8:11 9:4
**two** 16:13,22 19:9,14 26:6 48:21 49:5,11 52:11 54:25 55:3 64:11 65:21 66:1 87:22 95:2 99:17 107:18 116:18 119:18 120:1 122:6 124:6 126:21 127:3,4 136:7 145:3 151:16 159:8 163:24 189:1,21 192:6 195:22 210:23 218:22 229:6 237:21,23 238:20 246:7 247:7 257:17 260:20 263:10 267:11,13 283:5,13,14 284:8,15,16 295:24,25 296:3 299:12 303:2,5 305:9 305:15,16,17 305:23

**type** 8:17 11:9 12:10 70:20 89:13 131:22 136:4,5,8,13 213:11 259:9 259:20
**types** 9:8 11:13 13:20 18:25 136:11 211:20 213:14,15
**typewritten** 113:18,22 114:4,8
**typical** 151:16
**typically** 17:7 21:8,14,15 27:7 31:16 32:3 48:8 52:19 80:3 81:16 84:20 86:6 95:6 108:21 128:12 129:11 131:11 131:18,19 134:24 141:11 147:3,7 182:20 182:23 192:11 204:9 270:9,11 278:15 303:15
**typo** 31:7,11 34:9 41:18
**typos** 41:12

**u**

**u** 5:1
**uh** 48:18 63:9
**ultimately** 124:12 206:20 280:20
**unburned** 105:8
**unclear** 260:25
**undamaged** 76:6 247:18
**under** 14:13 27:9,25 28:19 28:20,22 29:17 32:10 34:21 39:24 40:3 52:13,17 53:4 53:6 54:16 55:10 106:21 118:4 121:4,25 122:6,12,20 123:4 149:19 159:22 166:11 178:4,5 201:1 203:3 206:9 213:2 255:7 292:3,14 295:24 304:12
**undercharged** 196:13
**underneath** 117:15 178:3
**understand** 27:20 28:9,16 39:6 119:4 147:20 255:14 257:1 271:25 273:14 298:13
**understanding** 23:25 26:9 40:15 42:13 54:17 64:19 73:16 91:11 95:2,11 99:17 130:8 141:7 143:2,21 162:7 164:22 183:9 209:3
**understood** 273:2
**undertook** 31:6
**undetermined** 104:23 107:12 111:4,16 122:8 170:23 172:17 206:7
**uneven** 170:18
**unfortunately** 299:21
**uniform** 61:10 63:20,20,25 170:15 231:10 233:22 239:24 240:23
**uniformly** 234:16
**unilaterally** 27:12
**unintentional** 10:5
**unique** 116:17
**unit** 6:13 134:25
**united** 1:1 6:16 19:22
**university** 8:20 23:19
**unknown** 119:20 125:10 126:23,23,24 204:8 285:8,11
**unprotected** 190:8
**unusual** 117:7 117:21 119:6
**upright** 109:4 110:19 176:9 176:10 205:11 212:19
**use** 109:17 131:18 132:4 140:16 235:25 236:3 281:13 281:15 301:22 305:4
**used** 19:16 34:14 44:2 47:2,4,5 121:7 138:24 149:19 205:5,7,21,22

206:4 253:21 264:2 310:20
**using** 6:20 11:22 56:4 128:13 230:12 281:15
**usual** 67:17
**usually** 31:21 32:7 259:5
**utilized** 229:18
**utilizing** 255:21

**v**

**v** 310:4 311:1 312:1
**vague** 281:15
**valeri** 68:25
**variations** 62:24
**variety** 9:7,11 17:13 51:10 52:9 56:17,21 122:25 123:2 124:20 136:10 179:25 274:17 306:16
**various** 11:17 16:10 17:14 27:3 60:15 147:7 171:25 246:1,4,10,19
**vary** 284:16
**vendor** 49:3
**vent** 218:11,19
**venting** 182:4 218:9,12 256:11 258:13
**verbal** 35:6 226:17 253:4
**verified** 79:5,13 88:4
**verify** 78:3 79:16,17 81:2 81:3,5 97:12 310:9
**veritext** 6:21,24 310:14,23
**veritext.com** 310:15
**version** 149:6
**versus** 6:15 52:2 57:14,23 62:16 97:6,22 136:5 236:10 250:14
**video** 6:10,14
**videographer** 2:17 6:1,22 67:10,13 75:8 127:9,12 154:4 154:7 193:12 193:15 200:8 240:10,13 249:8,11 251:1 306:20,23 307:22
**view** 61:7 62:13 62:25 142:4 144:10 145:25 153:21 155:4 159:1 171:7 189:23 210:17 276:19 300:25
**viewing** 136:16
**virtual** 1:17 6:20
**virtually** 6:5
**visible** 140:9 144:15 241:9 243:25 244:4 297:15
**visited** 248:14
**visiting** 33:4
**voltage** 51:10 59:5,14
**volume** 152:24
**vote** 17:10,14
**votes** 18:14

**w**

**wait** 31:9 295:14
**waived** 5:9
**walk** 30:19 159:24 160:16 160:17 267:18 267:18,19
**walked** 112:21 114:24 115:9 151:4 160:23 264:21 269:8
**walking** 74:14 139:22 198:24 269:5,12
**walks** 151:3
**wall** 72:15,16 72:24 73:11,13 73:17,21,22 91:4,8,9,12,13 91:21 99:5,7,9 99:12,15,18,23 101:16 102:7 102:10,15,18 102:22,25 103:3,7,12,13 103:15,17,21 103:22 104:8 104:15 105:10 105:10,14,16 105:16,17,17 105:23 106:2 106:11,11 108:5,9,10 134:18 159:14 161:13,17,20 161:22,24 162:1,4,5 163:5,15,16,19 164:6,9,14,16 164:20 165:1,2 165:8,9,23 220:25 221:3 221:15 222:12 223:2,14 224:9

224:16,18,24
225:1 248:5
**walls** 74:15
94:3,12 99:13
99:21 104:1
105:19 174:8
174:11
**wanemaker**
2:10 16:1
20:14 26:18
32:24 35:17
37:14 38:8,11
39:1,23 41:6
44:3 46:20
48:3 58:8
61:11 67:1,4,7
67:15,24 80:11
84:14 85:15
101:7 106:21
123:11,17,20
134:12 165:15
193:8,11 240:6
274:1 283:6
287:24 301:4
306:19 310:1,2
**want** 25:22
33:9,11 38:14
40:20 48:12,15
50:2 51:20
87:15 121:16
123:12 151:10
187:8,25
193:23 205:25
211:2 212:5

229:22 237:20
250:2 261:10
261:10 299:8
**wanted** 43:25
49:24 91:16
253:12 281:21
**warm** 187:15
**warrant** 167:4
200:7
**waste** 8:9
**water** 156:11
156:13
**wax** 173:9
**way** 24:4 38:25
39:3 46:18
49:2,23,23
68:16 72:20
75:9 79:14
85:24 95:15
96:25 104:22
150:21 163:13
169:20 170:7
170:24 200:9
203:16 211:12
211:23 221:10
223:18 227:5
229:19 261:10
287:18,22
288:7,8 292:6
297:9 309:14
**ways** 91:3
93:22 94:4
281:22 288:4
306:16

**we've** 9:21
11:10 43:9
45:25 219:1
275:13 299:25
**weigh** 54:24
57:22
**weighs** 18:19
**weight** 124:2
210:10
**went** 24:7
32:19 35:14
37:12 56:23,25
57:2 60:3,20
65:21 66:12
69:3,17 95:18
95:18 97:15
119:24 124:14
124:21 128:1
129:6 139:24
139:25 143:10
144:7 150:1,8
156:1 176:1
186:1,9 189:8
207:5,20
212:20 226:19
228:11 229:20
230:4 236:10
236:11 240:16
241:23,24
242:4,10
244:15 253:9
255:25 260:17
264:3 265:14
265:22,23

266:20 267:3,3
267:13 268:8,9
269:4 270:2
273:18 290:23
294:5 298:10
299:14
**western** 1:2
**wheelchair**
141:9
**whereof** 309:17
**wick** 172:23
**widespread**
61:5 237:1
**williamsville**
2:10
**winding** 246:19
247:22 248:3
248:16
**windings**
305:20,23
306:8 307:14
**window** 75:21
76:21 77:11
**winton** 2:5
**wired** 94:17
95:1,9,17,17
96:8,18,20,23
97:21 189:1
270:1
**wireless** 131:12
131:19
**wirelessly**
137:18

**wires** 94:17 96:3,4 98:21 98:25
**wiring** 80:24 95:14,21 96:2 96:22
**wish** 38:23
**withdraw** 12:6 169:19 174:25 234:25 270:5 288:25 289:3 305:7
**withstood** 285:24 294:2
**witness** 1:22 3:3 6:8 7:5 33:19 60:12 75:11 84:22 138:5 144:16 145:16 183:19 200:11 237:25 251:3 268:7 271:7 307:21 309:7,10,17 310:8,10,12,19
**witnessed** 182:4 186:11 200:14 202:14 208:6 274:21 287:15,16,22 287:23 288:8
**witnesses** 115:23
**woke** 138:15
**woken** 265:9
**wonder** 205:23 205:25
**wondering** 261:18
**wood** 99:17 217:4,10 220:24,25
**wooden** 87:19 88:6,12
**worcester** 7:17
**word** 121:4,6 281:15
**words** 27:21 56:5 59:12 64:21 94:25 99:9 122:18 131:21 133:23 137:15 144:6 148:4,19 180:8 186:7 192:14 205:9 224:8 227:7,25 228:10 244:3 245:1 264:1 268:4 281:9
**work** 8:17 9:5,9 22:23 50:18 51:23 281:14
**worked** 131:5 263:17
**working** 8:16 11:3 29:1 69:9 132:10,22,23 133:3 138:13 152:7 204:25 280:15
**worst** 159:13
**worth** 199:21
**wrap** 128:16
**wrapped** 65:4
**wrapper** 155:13
**writing** 128:9
**written** 82:20 281:18
**wrong** 31:12 32:13 89:4 101:23 122:14
**wrote** 32:9 41:19 65:20 294:25 295:3

**x**

**x** 1:3,13,16 3:1 4:1 25:4 250:17

**y**

**y** 250:18
**yeah** 11:1 19:22 20:16 23:20 29:8 35:12 47:18 59:23 71:7 75:7 128:23 129:10 130:24 156:12 177:1 188:2 194:3 222:19 253:7 253:24 264:17 268:16,22 293:22 301:6
**years** 8:7,11 9:15 95:7 134:23 136:10 218:22 269:16
**yellow** 225:18 226:8,10,14 229:25 230:3,9 230:14 231:16 231:17,18 232:15 233:8 234:8
**york** 1:2,25 2:5 2:10 6:18 7:11 24:17 309:4

**z**

**zero** 256:20

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116


(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.



DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.