UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL S. MARCELLIN, individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, deceased,<br><br>  Plaintiffs,<br><br>   v.<br><br>HP, INC., and STAPLES, INC.,<br><br>  Defendants. | Civ. No. 1:21-cv-00704-JLS-HKS |

**PLAINTIFFS' COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiffs provide the following counter-statement of undisputed material facts pursuant to Local Rule 56 in opposition to Defendants' motion for summary judgment (Dkt. 68) and in support of Plaintiffs' Cross-Motion for Partial Summary Judgment:

**FACTS REGARDING THE INCIDENT**

1. In the early morning hours of January 24, 2020 seventy-eight year-old Plaintiff Carol Marcellin ("Plaintiff") was awakened by the smoke alarm at the home she shared with Charles Hollowell ("Decedent") located at 192, Bells Brook Road, Ceres, NY. (Dkt. 66-6, 124:2-125:2; Schwarz Dec., Ex. A, p. HP00410).[1]

2. Leaving Decedent who was sleeping next to her, she got out of bed to investigate. She first silenced the smoke alarm in the hallway outside her bedroom, and then proceeded down the

---

[1] All exhibit references ("Ex.") are to exhibits to the Declaration of Stephen G. Schwarz, in opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Partial Summary Judgment and Plaintiffs' Cross-Motion to Exclude Expert Testimony, unless otherwise designated.

1

hallway to the kitchen, through the kitchen and into the living room passing the living room couch on her left. She then noticed a glow that appeared to be coming from the office. (*Id.*).

3. Plaintiff proceeded to the doorway of the office where she saw her HP Pavillion laptop, which was located on a shelf in an armoire she used as a desk, spewing smoke and flaming projectiles that were shooting in all directions. (*Id.*).

4. The prior evening, Plaintiff left the laptop plugged in and running when she went to bed as she was downloading an update to her anti-virus software and it was proceeding slowly. This was the first time in her memory she had ever left her laptop plugged in and running. She had always previously shut it down and unplugged it as she had a cat and did not want the cat to chew the cord. Dkt. 66-6, 121:6-122:4; 150:5-9).

5. After seeing the smoke and projectiles coming from the HP laptop, she returned to the kitchen, again passing the couch in the living room, and retrieved a fire extinguisher. She then retraced her steps with the fire extinguisher and returned to the office. When she arrived back the laptop was still ejecting flaming projectiles and she determined the fire extinguisher was not going to extinguish the laptop. (Dkt. 66-6, 124:2-125:7; Ex. A, p. HP00410).

6. Decedent was disabled and required a wheelchair for ambulation, but was capable of getting in and out of his own wheelchair. When she returned Decedent was on the floor and seemed dazed. Smoke was increasing and she was unable to lift him up to get into his wheelchair. (Dkt. 66-6, 125:9-127:7).

7. By this point the smoke in the room was getting thicker. She was unable to locate her cell phone and her landline receiver was in the office. She decided to crawl out to her car and use OnStar from her car to call for help. (*Id*, 127:9-128:4; 167:12-19; 204:3-9).

8. When she got into her car she was unable to get a signal from OnStar. She then drove her car down the road until she got a signal and called OnStar. The OnStar operator then in turn called 911. (Id., 127:9-128:4).

9. By the time Plaintiff returned to the house and the first responders arrived, the house was in flames and she was unable to reenter. After the fire was controlled, Decedent was found in the bedroom lying face down on the bed, having managed to crawl up off the floor. He was pronounced dead at the scene. (Ex. A, p. HP00409-410).

## FIRE INVESTIGATION

10. At approximately 5 am on January 24, 2020 four investigators from the Alleghany County Fire Investigation Team (ACFIT) arrived at Plaintiff's home. The lead investigator was Jeff Luckey. After the ACFIT investigators performed their investigation of the scene, Luckey went to the Emergency Room at Olean General Hospital at approximately 9:00 am and was able to interview Plaintiff. His notes of that interview were first handwritten and later transcribed into his official typewritten report. (Ex. A., pp HP00409- HP00411).

11. The ACFIT final report of the incident was signed by Luckey on February 21, 2020. The ACFIT concluded as follows:

"Based upon our observation and ruling out other probable causes it is our hypothesis that the cause of the fire is the HP laptop. The HP laptop battery or components near the battery caused the battery to overheat and explode, sending sparks and flammable material that ignited light weight fuels in the office area of the computer cabinet or closet."

(*Id.*, at HP00410).

12. On February 27, 2020 a joint scene inspection was scheduled and carried out by all interested parties, which included the home owners insurance company, Farmers Insurance, Plaintiffs in this case, Defendant HP and Defendant Staples. One or more fire investigators participated for each of the interested parties. HP sent Gregg Gorbett, of Fire Dynamics Analysis as its representative. Jeff Luckey of ACFIT was also present for that inspection and provided background to the other investigators based upon his Team's prior investigation. (Karazinski Dec., ¶ 3).

13. The investigators for all interested parties conducted a thorough investigation of the fire scene, took hundreds of photographs and concluded, similar to the ACFIT, that the office closet was the

3

likely origin of the fire. Fragments from the battery cells collected from throughout the office, the subject laptop, a newer HP laptop that was also in the office, pieces of carpeting from the office and the closet and other items, including the circuit breaker were labeled, bagged and removed for a subsequent laboratory inspection. (Karazinski Dec., ¶¶ 3-6).

14. The laboratory inspection occurred at the FRT laboratory in Sodus Point, NY on October 30, 2020. Donald Galler, representing HP and an expert in this case attended and participated in that laboratory inspection and took photographs. (Karazinski Dec., ¶ 7; Ex. G, 40:12-22).

15. Upon inspection, it was determined that the battery pack in the subject laptop was not the original equipment battery pack sold with the laptop even though it was marked with an HP serial number. (Ex. F, p. 20;.Dkt. 67-3, p. 14).

16. The thermal damage to the subject laptop was not uniform but concentrated in the area above and below the battery compartment, and further concentrated more on one side of the battery compartment than the other. (Ex. G, 80:17-81:4; 82:19-84:6; Dkt. 67-5, pp. 6-7). This thermal damage pattern is consistent with thermal runaway occurring from inside the cell due to a lack of safety functions including overcharge, overvoltage and overtemperature systems. (Ex. G, 95:12-97:34); Dkt. 67-5, pp. 6-7).

**THERMAL RUNAWAY**

17. *Thermal runaway* of a lithium-ion battery refers to a chemical process within the battery cell where a cell begins to generate more heat than it can dissipate. The process can start when the internal cell temperature reaches between 90 – 100 degrees Celsius. After that point, the cell temperature increases gradually at a rate of approximately one degree per minute, until the internal cell temperature reaches between 190 and 200 degrees Celsius. Up until this second threshold, the reaction can be reversed by cooling the battery cell. Once the temperature exceeds this threshold, however, the reaction cannot be stopped and the rate of temperature increase becomes exponential. This can result in a venting of flammable gases, rupture of the battery cell

4

can and ejection of the hot internal battery components at temperatures of over 600 degrees C (over 1100 degrees F). (Ex. N, H, Dkt. 67-3 1-11; Ex. G, 113:20-114:13

18. Li-ion *battery* thermal runaway can be caused by exposure to excessive temperatures, internal shorts due to *cell* defects, external shorts due to faulty wiring, a surge in the charging or discharging current, or mechanical damage to the cell that can lead to internal shorts and heat generation. (Dkt. 67-3, pp. 11-13; Ex. K, 251:21-252:3; Ex. L, 61:13-79:12).

19. Because thermal runaway reactions can lead to catastrophic outcomes, by the year 2000 manufacturers of lithion-ion battery packs and manufacturers of peripheral devices that are powered by lithium ion battery packs, require safety protections to prevent conditions that can lead to thermal runaway, including overcharge, overvoltage, overtemperature and cell balancing features. (Ex. L, 20:13-22:11; Dkt. 67-3, pp. 10-13; Ex. O pp. 30-38);

## THE SUBJECT LAPTOP AND BATTERY PACK

20. The subject HP Pavillion laptop was purchased by Plaintiff sometime prior to March of 2011 from Staples. It was manufactured by HP and sold sometime after December of 2010. (Dkt. 69-1).

21. Plaintiff registered the warranty for the laptop in March of 2011 and thereafter HP retained her name, address and email address. (Dkt. 69-3).

22. The subject laptop had a projected useful life that exceeded the projected useful life of the battery pack that came with it, making it foreseeable and likely that Plaintiff would at some point require a replacement battery. (Ex. I; Ex. G 150:24-152:24; Dkt. 67-3, p. 13; Ex. O, 126:10-15).

23. The battery specification from HP that set forth the requirements that its battery manufacturer vendors would have to meet to be used with the subject model laptop, specified certain specifically identified microprocessors referred to as "fuel gauges" that were approved for its battery management systems (BMS). A total of eight approved fuel gauges were identified, six

5

manufactured and sold by Texas Instruments. (Exhibit G, pp. 133-137; Dkt. 67-3 pp. 15-16; Ex. L, 136:15-140:4).

24. The HP battery specification required the BMS to provide safety functions to prevent overcharge/discharge, over current, over temperature reverse charge, cell imbalance and short circuit protection. It also required that the BMS have a redundant system to stop charging when any of these conditions exceeded specified limits. A FET was required, which is a switch that would disconnect power to the battery pack when these limits were exceeded, but would be reset when the condition abated. A secondary fuse system was also required if a higher threshold of abnormality was reached. Once the fuse was blown, the battery pack would become inoperable and would need to be replaced. Control of these safety features and the FET and fuses was provided by the Fuel Guage. (Ex. G 138:2-139:25; Dkt. 67-3 pp. 11:13).

25. The HP specification also required a secondary safety system where the temperature of the battery cells would be monitored and information transferred directly to the internal controller of the laptop bypassing the Fuel Guage. The system was designed so that if the temperature of a battery cell or cells exceeded 46 degrees C the computer controller itself would shut off power to the battery pack preventing overheating. (Dkt. 67-3 pp. 11-13; Ex. G 144:11-145:18).

26. The safety functions required for the BMS under the specification for overcharge, overvoltage, overtemperature and cell balance are all intended to prevent thermal runaway while the battery cells are charging (Ex. G, 135:21-137:4; 140:1-141:21; Dkt. 67-3 pp. 11-13)

27. The HP specification did not require the battery vendor to provide an authentication system in its BMS or program its HP Pavillion laptops such that they could identify the battery pack as an unauthorized battery pack and prevent it from working or provide an onscreen warning. HP did provide this function in any of its laptops until 2019 when it instituted an onscreen warning system when an unauthorized battery pack was installed. (Ex. O, 105:6-108:12).

6

## THE UNAUTHORIZED THIRD-PARTY BATERY PACK

28. At the laboratory examination by the experts for the parties on October 24, 2020 if not before, it was determined that the BMS on the battery pack in the subject laptop at the time of the event lacked all of the safety functions required under the HP specification. It had a Texas Instruments Fuel Gauge, but the overtemperature, overcharge, overvoltage and cell balance features of the Fuel Gauge were not enabled. Additionally, the redundant overtemperature safety function that was intended to allow the laptop controller itself to shut power to the charger was not enabled and there was no temperature monitoring system whatsoever. (Dkt. 67-3, pp. 16,17; Ex. F, p. 40; Ex. E, pp. 25-28).

## KNOWLEDGE OF THE SALE OF COUNTERFEIT BATTERY PACKS LACKING ESSENTIAL SAFETY FEATURES

29. In 2005, five years prior to the manufacture of the subject laptop, Texas Instruments published an Application Report, warning of the dangers associated with "cheap replacement batteries and peripherals, which may not have the safety and protection circuits required by the original equipment manufacturer." The Application Report warned:

> These counterfeit batteries may violate both mechanical and electrical safety requirements related to short-circuit protection, charge safety, and other specifications. It is usually impossible for the consumer to determine the quality without making a purchase and possibly learning the hard way. This can lead to a potentially dangerous situation for end-users. Adding simple and effective authentication technology to the portable system allows the OEMs to ensure customer satisfaction and to protect their businesses. More importantly, safety is guaranteed throughout the life of the product.

This Application Report described the pros and cons of several available authentication systems from simple form fit (e.g. he unique form of the battery pack having to be duplicated to fit in the device) to the most sophisticated system using the SHA-1

7

algorithm which generates a unique 162 bit code each time it is utilized which has to be matched by the same unique code generated in the Fuel Gauge of the battery pack to allow the device to function with that battery pack. (Ex. I).

30. Because of the need to replace battery packs during the useful life of devices powered by lithium-ion battery cells, this opened a lucrative market for counterfeiters to sell replacement battery packs without safety devices at reduced prices. (Ex. I; Ex. G, 154:10-56:13; Dkt. 67-3, pp. 13-16).

31. Texas Instruments is a leader in the field and Application Reports such as the 2005 Application Report are generally given credence within the industry. (Ex. G. 147:11-148:8).

32. The Texas Instruments Fuel Gauges approved for use by HP in its specification for the HP Pavillion series laptops all provided this SHA-1 algorithm authentication capability. However, HP chose not to utilize it in the subject laptop or any laptop it manufactured at least until 2018. (Dkt. 67-3 pp. 15-16; Ex. G, 169:8-170:5).

33. HP corporate representative Lee Atkinson testified that he became aware sometime around 2016 that counterfeit battery packs lacking the safety functions required by HP were being widely sold and were causing fires and explosions. (Ex. O, 90:21-91:9; 94:12-95:6; 146:22-148:5).

34. Atkinson also testified that he contacted David Pipho of HP's quality assurance department to inform him of this discovery. (Ex. O, 99:9-101:1).

35. Pipho, who was produced by HP only after losing a motion for a protective order to prevent his deposition, admitted at his deposition that HP was aware of the widespread

8

     sale of counterfeit battery packs without required safety functions for at least ten years prior to his deposition in mid-2024. (Ex. P, 32:24-33:19).

36. HP's expert, Donald Galler testified that he was retained to investigate laptop fires resulting from thermal runaway reactions in the battery packs in between 20 and 30 separate instances and determined that in approximately half of those matters the battery packs at issue were counterfeits that lacked required safety functions which was the cause of the thermal runway reaction in each case. (Ex. G, 38:4-18).

37. HP's expert, Donald Galler testified further, that the first of these cases was investigated approximately ten years prior to his deposition (circa 2015), and each time he made the discovery that a counterfeit battery pack had caused a fire in an HP laptop he advised HP of that finding. (Ex. G ,38:20-39:10).

38. In spite of this knowledge dating back to 2014 or 2015, HP never advised warranty registrants for any of its previously sold laptops of the dangers of purchasing unauthorized battery packs that may lack essential safety functions or provide information on how to distinguish counterfeit battery packs that were fraudulently labeled as HP battery packs from authorized HP battery packs. (Ex. O, 105:6-106:6, 107:11-108:12).

DATED: June 9, 2025
        Rochester, New York

                FARACI LANGE, LLP

                /s/ Stephen G. Schwarz
                Stephen G. Schwarz, Esq.
                Joshua M. Mankoff, Esq.
                1882 South Winton Road
                Suite 1
                Rochester, New York 14618
                Telephone: (585) 325-5150
                Facsimile: (585) 325-3285
                Email: sschwarz@faraci.com
                Email: jmankoff@faraci.com

                *Attorneys for Plaintiffs*