UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL S. MARCELLIN, individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, deceased,<br><br>                Plaintiffs,<br><br>  v.<br><br>HP, INC., and STAPLES, INC.,<br><br>                Defendants. | **Civ. No. 1:21-cv-00704-JLS-HKS** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ..............................................................................................1

STATEMENT OF FACTS .......................................................................................................1

FIRE INVESTIGATION ..........................................................................................................2

THERMAL RUNAWAY ..........................................................................................................4

THE SUBJECT LAPTOP AND BATTERY PACK .................................................................5

THE UNAUTHORIZED THIRD-PARTY BATTERY PACK .................................................6

KNOWLEDGE OF THE SALE OF COUNTERFEIT UNAUTHORIZED BATTERY PACKS LACKING ESSENTIAL SAFETY FEATURES ............................................................7

ARGUMENT .............................................................................................................................9

    POINT I ..............................................................................................................................10

        DEFENDANTS HAVE FAILED TO ESTABLISH A PRIMA FACIE CASE OF ENTITLEMENT TO SUMMARY JUDGMENT ON ANY OF PLAINTIFFS' THREE LIABILITY CLAIMS AND EVEN IF THEY HAD, PLAINTIFFS HAVE DEMONSTRATED ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT ..................................................................................................................10

            A.   <u>Design Defect</u>.................................................................................................10

            B.   <u>Product Liability Failure to Warn</u>................................................................13

            C.   <u>Negligent Breach of Post-Manufacture Duty to Warn</u> ................................14

    POINT II .............................................................................................................................16

        PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF THE CAUSE OF THE FIRE .................................................................................16

CONCLUSION ........................................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) ............................................... 9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................... 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................................. 9

*Cover v. Cohen*, 61 N.Y.2d 261 (1984) ............................................................................... 10, 14, 15

*DeCaro v. Somerset Industries, Inc.*, 228 A.D.3d 1107 (2024) ...................................................... 14

*DiMura v. City of Albany*, 239 A.D.2d 828 (3d Dept. 1997) ......................................................... 14

*Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020) ............................................................................... 9

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219 (2d Cir. 1994) ..................... 9, 10

*LaScala v. QVC*, 201 A.D.3d 798 (2d Dept. 2022) ......................................................................... 14

*M.H. v. Bed Bath & Beyond Inc.*, 156 A.D.3d 33 (1st Dept. 2017) ........................................... 10, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) ........................................ 9

*Moscatiello v. Wyde True Value Lumber & Supply Corp.*, 168 A.D.3d 833 (2d Dept. 2019) ....... 14

*Palmatier v. Mr. Heater Corporation,* 163 A.D.3d 1192 (3d Dept. 2018) ..................................... 13

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S 133 (2000) .................................................... 9

*Repka v. Arctic Cat, Inc.*, 20 A.D.3d 916 (4th Dept. 2005) ............................................................ 14

*Taggart v. Time Inc.*, 924 F.2d 43 (2d Cir. 1991) ............................................................................. 9

*Vasquez v. Ridge Tool Pattern Co.*, 205 A.D.3d 657 (1st Dept. 2022) .......................................... 14

*Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102 (1983) .............................................................. 11

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ................................................................................... 9

**OTHER SOURCES**

Fed. R. Civ. P. 56(a) ......................................................................................................................... 9

## PRELIMINARY STATEMENT

Defendants have moved for summary judgment dismissing Plaintiffs claims but have failed to submit admissible evidence entitling them to such relief. Plaintiffs have cross-moved for partial summary judgment seeking a finding from the Court that there is no question of fact for the jury to decide on the issue of the origination of the fire being Defendant HP's laptop and the battery pack that went into thermal runaway.

## STATEMENT OF FACTS

In the early morning hours of January 24, 2020, seventy-eight-year-old Plaintiff Carol Marcellin ("Plaintiff") was awakened by the smoke alarm at the home she shared with Charles Hollowell ("Decedent") located at 192, Bells Brook Road, Ceres, NY. (PCSUMF ¶ 1).[1] Leaving Decedent who was sleeping next to her, Plaintiff got out of bed to investigate. She first silenced the smoke alarm in the hallway outside her bedroom, and then proceeded down the hallway to the kitchen, through the kitchen and into the living room passing within a few feet of the living room couch on her right. She then noticed a glow that appeared to be coming from the office. (PCSUMF ¶ 2). Plaintiff proceeded to the doorway of the office where she saw her HP Pavillion laptop, which was located on a shelf in an armoire she used as a desk, spewing smoke and flaming projectiles that were shooting in all directions. (PCSUMF ¶ 3).

The prior evening, Plaintiff left the laptop plugged in and running when she went to bed as she was downloading an update to her anti-virus software, and it was proceeding slowly. This was the only time in her memory she had ever left her laptop plugged in and running. She had always previously shut it down and unplugged it as she had a cat and did not want the cat to chew the cord. (PCSUMF ¶ 4).

---

[1] Plaintiffs Counterstatement of Undisputed Material Facts submitted herewith.

1

After seeing the smoke and projectiles coming from the HP laptop, she returned to the kitchen, again moving directly past the couch in the living room, and retrieved a fire extinguisher. She then retraced her steps with the fire extinguisher and returned to the office. When she arrived back the laptop was still ejecting flaming projectiles, and she determined the fire extinguisher was not going to extinguish the laptop. (PCSUMF ¶ 5). Plaintiff then returned to her bedroom and attempted to wake up decedent. Decedent was disabled and required a wheelchair for ambulation. He was normally capable of getting in and out of his own wheelchair, but when she returned Decedent seemed dazed. When she tried to get him into his wheelchair, he fell to the floor, and she was unable to get him up. (PCSUMF ¶ 6).

By this point, the smoke in the room was getting thicker. She was unable to locate her cell phone, and her landline receiver was in the office. She decided to crawl out to her car and use OnStar from her car to call for help. (PCSUMF ¶ 7). When she got into her car, she was unable to get a signal from OnStar. She then drove her car down the road until she got a signal and called OnStar. The OnStar operator then in turn called 911. (PCSUMF ¶ 8). By the time Plaintiff returned to the house and the first responders arrived, the house was in flames, and she was unable to reenter. After the fire was controlled, Decedent was found in the bedroom lying face down on the bed, having managed to crawl up off the floor. He was pronounced dead at the scene. (PCSUMF ¶ 9).

**FIRE INVESTIGATION**

At approximately 5:00 am on January 24, 2020, four investigators from the Alleghany County Fire Investigation Team (ACFIT) arrived at Plaintiff's home. The lead investigator was Jeff Luckey. After the ACFIT investigators performed their investigation of the scene, Luckey went to the Emergency Room at Olean General Hospital at approximately 9:00 am and was able

2

to interview Plaintiff. His notes of that interview were first handwritten and later transcribed into his official typewritten report. (PCSUMF ¶ 10).

The ACFIT final report of the incident was signed by Luckey on February 21, 2020. The ACFIT concluded as follows:

> Based upon our observation and ruling out other probable causes it is our hypothesis that the cause of the fire is the HP laptop. The HP laptop battery or components near the battery caused the battery to overheat and explode, sending sparks and flammable material that ignited light weight fuels in the office area of the computer cabinet or closet.

(PCSUMF ¶ 11).

On February 27, 2020, a joint scene inspection was scheduled and carried out by all interested parties, which included the homeowner's insurance company, Farmers Insurance, Plaintiffs in this case, Defendant HP, and Defendant Staples. One or more fire investigators participated for each of the interested parties. HP sent Gregg Gorbett, of Fire Dynamics Analysis as its representative. Jeff Luckey of ACFIT was also present for that inspection and provided background to the other investigators based upon his Team's prior investigation. (PCSUMF ¶ 12).

The investigators for all interested parties conducted a thorough investigation of the fire scene, took hundreds of photographs, and concluded, similar to the ACFIT, that the office closet was the likely origin of the fire. Fragments from the battery cells collected from throughout the office, the subject laptop, a newer HP laptop that was also in the office, pieces of carpeting from the office and the closet and other items, including the circuit breaker were labeled, bagged, and removed for a subsequent laboratory inspection. (PCSUMF ¶ 13).

The laboratory inspection occurred at the FRT laboratory in Sodus Point, NY, on October 30, 2020. Donald Galler, representing HP and an expert in this case attended and participated in that laboratory inspection and took photographs. (PCSUMF ¶ 14). Upon inspection, it was

3

determined that the battery pack in the subject laptop was not the original equipment battery pack sold with the laptop even though it was marked with an HP serial number. (PCSUMF ¶ 15).

The thermal damage to the subject laptop was not uniform but concentrated in the area above and below the battery compartment, and further concentrated more on one side of the battery compartment than the other. (PCSUMF ¶ 16). This thermal damage pattern is consistent with thermal runaway occurring from inside the cell due to a lack of safety functions including overcharge, overvoltage, and overtemperature systems. (PCSUMF ¶ 16).

### THERMAL RUNAWAY

*Thermal runaway* of a lithium-ion battery refers to a chemical process within the battery cell where a cell begins to generate more heat than it can dissipate. The process can start when the internal cell temperature reaches between 90 – 100 degrees Celsius. After that point, the cell temperature increases gradually at a rate of approximately one degree per minute, until the internal cell temperature reaches between 190 and 200 degrees Celsius. Up until this second threshold, the reaction can be reversed by cooling the battery cell. Once the temperature exceeds this threshold, however, the reaction cannot be stopped, and the rate of temperature increase becomes exponential. This can result in a venting of flammable gases, rupture of the battery cell can, and ejection of the hot internal battery components at temperatures of over 600 degrees C (over 1100 degrees F). (PCSUMF ¶ 17).

Lithium-ion battery thermal runaway can be caused by exposure to excessive temperatures, internal shorts due to cell defects, external shorts due to faulty wiring, a surge in the charging or discharging current, or mechanical damage to the cell that can lead to internal shorts and heat generation. (PCSUMF ¶ 18).

Because thermal runaway reactions can lead to catastrophic outcomes, manufacturers of lithium-ion battery packs and manufacturers of peripheral devices that are powered by lithium-ion battery packs, require safety protections to prevent conditions that can lead to thermal runaway, including overcharge, overvoltage, overtemperature, and cell balancing features. (PCSUMF ¶ 19).

### THE SUBJECT LAPTOP AND BATTERY PACK

The subject HP Pavillion laptop was purchased by Plaintiff sometime prior to March of 2011 from Staples. It was manufactured by HP and sold sometime after December of 2010. (PCSUMF ¶ 20). Plaintiff registered the warranty for the laptop in March of 2011 and thereafter HP retained her name, address, and email address. (PCSUMF ¶ 21). The subject laptop had a projected useful life that exceeded the projected useful life of the battery pack that came with it, making it foreseeable and likely that the laptop would at some point require a replacement battery. (PCSUMF ¶ 22).

The battery specification from HP that set forth the requirements that its battery manufacturer vendors would have to meet to be used with the subject model laptop, specified certain specifically identified microprocessors referred to as "fuel gauges" that were approved for its battery management systems (BMS). A total of eight approved fuel gauges were identified, six manufactured and sold by Texas Instruments. (PCSUMF ¶ 23). The HP battery specification required the BMS to provide safety functions to prevent overcharge/discharge, over current, over temperature, reverse charge, cell imbalance, and short circuit protection. It also required that the BMS have a redundant system to stop charging when any of these conditions exceeded specified limits. A FET was required, which is a switch that would disconnect power to the battery pack when these limits were exceeded but would be reset when the condition abated. A secondary fuse system was also required if a higher threshold of abnormality was reached. Once the fuse was

5

blown, the battery pack would become inoperable and would need to be replaced.  Control of these safety features and the FET and fuses were provided by the Fuel Guage.  (PCSUMF ¶ 24).

The HP specification also required a secondary safety system where the temperature of the battery cells would be monitored and information transferred directly to the internal controller of the laptop bypassing the Fuel Guage.  The system was designed so that if the temperature of a battery cell or cells exceeded 46 degrees C, the computer controller itself would shut off power to the battery pack preventing overheating.  (PCSUMF ¶ 25).  The safety functions required for the BMS under the specification for overcharge, overvoltage, overtemperature, and cell balance are all intended to prevent thermal runaway while the battery cells are charging.  (PCSUMF ¶ 26).

The HP specification did not require the battery vendor to provide an authentication system in its BMS or program its HP Pavillion laptops such that they could identify the battery pack as an unauthorized battery pack and prevent it from working or provide an onscreen warning.  HP did not provide this function in any of its laptops until 2018 when it instituted an onscreen warning system when an unauthorized battery pack was installed.  (PCSUMF ¶ 27).

### THE UNAUTHORIZED THIRD-PARTY BATTERY PACK

At the laboratory examination by the experts for the parties on October 30, 2020, if not before, it was determined that the BMS on the battery pack in the subject laptop at the time of the event lacked all of the safety functions required under the HP specification.  It had a Texas Instruments Fuel Gauge, but the overtemperature, overcharge, overvoltage, and cell balance features of the Fuel Gauge were not enabled.  Additionally, the redundant overtemperature safety function that was intended to allow the laptop controller itself to shut power to the charger was not enabled and there was no temperature monitoring system whatsoever.  (PCSUMF ¶ 28).

6

**KNOWLEDGE OF THE SALE OF COUNTERFEIT UNAUTHORIZED
BATTERY PACKS LACKING ESSENTIAL SAFETY FEATURES**

In 2005, five years prior to the manufacture of the subject laptop, Texas Instruments published an Application Report, warning of the dangers associated with "cheap replacement batteries and peripherals, which may not have the safety and protection circuits required by the original equipment manufacturer." The Application Report warned:

> These counterfeit batteries may violate both mechanical and electrical safety requirements related to short-circuit protection, charge safety, and other specifications. It is usually impossible for the consumer to determine the quality without making a purchase and possibly learning the hard way. This can lead to a potentially dangerous situation for end-users. Adding simple and effective authentication technology to the portable system allows the OEMs to ensure customer satisfaction and to protect their businesses. More importantly, safety is guaranteed throughout the life of the product.

This Application Report described the pros and cons of several available authentication systems from simple form fit (e.g. the unique form of the battery pack having to be duplicated to fit in the device) to the most sophisticated system using the SHA-1 algorithm which generates a unique 162 bit code each time it is utilized which has to be matched by the same unique code generated in the Fuel Gauge of the battery pack to allow the device to function with that battery pack. (PCSUMF ¶ 29).

Because of the need to replace battery packs during the useful life of devices powered by lithium-ion battery cells, this opened a lucrative market for counterfeiters to sell replacement battery packs without safety devices at reduced prices. (PCSUMF ¶ 30).

Texas Instruments is a leader in the field and Application Reports such as (TI 2005) are generally given credence within the industry. (PCSUMF ¶ 31). The Texas Instruments Fuel Gauges approved for use by HP in its specification for the HP Pavillion series laptops all provided

7

this SHA-1 algorithm authentication capability.  However, HP chose not to utilize it in the subject laptop or any laptop it manufactured at least until 2018.  (PCSUMF ¶ 32).

HP corporate representative, Lee Atkinson, testified that he became aware sometime around 2016 that counterfeit battery packs lacking the safety functions required by HP were being widely sold and were causing fires and explosions.  (PCSUMF ¶ 33).  Atkinson also testified that he contacted David Pipho of HP's quality assurance department to inform him of this discovery.  (PCSUMF ¶ 34).  Pipho, who was produced by HP only after losing a motion for a protective order to prevent his deposition, admitted at his deposition that HP was aware of the widespread sale of counterfeit battery packs without required safety functions for at least ten (10) years prior to his deposition in mid-2024.  (PCSUMF ¶ 35).

HP's expert, Donald Galler, testified he was retained to investigate laptop fires resulting from thermal runaway reactions in the battery packs in between 20 and 30 separate instances and determined that in approximately half of those matters the battery packs at issue were counterfeits that lacked required safety functions which was the cause of the thermal runway reaction in each case.  (PCSUMF ¶ 36).  Galler testified further, that the first of these cases was investigated approximately ten (10) years prior to his deposition (circa 2015), and each time he made the discovery that a counterfeit battery pack had caused a fire in an HP laptop he advised HP of that finding.  (PCSUMF ¶ 37).

In spite of this knowledge dating back to 2014 or 2015, HP never advised warranty registrants for any of its previously sold laptops of the dangers of purchasing unauthorized battery packs that may lack essential safety functions or provide information on how to distinguish counterfeit battery packs that were fraudulently labeled as HP battery packs from authorized HP battery packs.  (PCSUMF ¶ 38).

8

**ARGUMENT**

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id.*; *see also Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing a court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "mere conclusory allegations, speculation or conjecture," *Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, *Anderson*, 477 U.S. at 252. At the same time, a court must resolve all ambiguities, "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S 133, 150 (2000), and "eschew credibility assessments," *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Thus, a court's duty in

9

reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## POINT I

### DEFENDANTS HAVE FAILED TO ESTABLISH A PRIMA FACIE CASE OF ENTITLEMENT TO SUMMARY JUDGMENT ON ANY OF PLAINTIFFS' THREE LIABILITY CLAIMS AND EVEN IF THEY HAD, PLAINTIFFS HAVE DEMONSTRATED ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT

Plaintiffs alleged three liability claims against defendants. First, Plaintiffs alleged the subject laptop was defectively designed because it lacked an available battery authentication system that would have prevented the non-OEM battery pack that went into thermal runaway from operating the laptop. Second, Plaintiffs alleged the subject laptop was defective because it lacked proper warnings of the dangers of replacing the original battery pack with a non-authorized battery pack. Third, Plaintiffs alleged HP was negligent and breached its post-manufacture duty to warn of the dangers it learned of the consequences of using an unauthorized battery pack after the sale of the subject laptop years before the fire. Consequently, Defendants are not entitled to summary judgment dismissing any of these claims.

### A. Design Defect

"In a strict products liability action based upon design defect, whether the product as marketed was reasonably safe for its intended use is determined by whether a reasonable person with knowledge of the potential for injury of the product and of the available alternatives, balancing the product's risks against its utility and costs and against the risks, utility and cost of the alternatives, would have concluded that it should not have been marketed in the condition that it was." *Cover v. Cohen*, 61 N.Y.2d 261, 266-67 (1984). To succeed, the plaintiff must show that the manufacturer or seller breached its duty to market safe products by marketing a product that

10

was not reasonably safe in its design. Additionally, the plaintiff must prove that the defective design was a substantial factor in causing his or her injury. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983); *M.H. v. Bed Bath & Beyond Inc.*, 156 A.D.3d 33, 35 (1st Dept. 2017).

Plaintiffs have submitted admissible evidence through the Declaration of Steve Martin, Ph.D., and his attached report in this case. Dr. Martin, who is a highly experience expert on lithium-ion batteries, has provided admissible opinions that it was known prior to the time of the manufacture of the subject laptop that lithium-ion batteries could suffer what are called "thermal runaway" reactions, which can lead to explosions and fires. (*See* Dkt. 66-5, pp. 7-11). Because of this risk, certain protections were required to prevent conditions that could provoke these reactions, such as overcharge, overvoltage, cell imbalance, and overtemperature conditions. (*Id.* at pp. 11-13).

HP's specification for the subject laptop required these protective systems. (*Id.* at pp. 15-16). Dr. Martin opines that for years prior to the manufacture of this laptop, it was known in the industry that replacement battery packs were being manufactured by third parties to work as replacements for original equipment manufacturer's battery packs, that lacked these safety features. (*Id.* at pp. 21-22). He supports this opinion with an Application Report published by Texas Instruments in 2005. (Schwarz Dec., Ex. I). Dr. Martin points out that this was a particular risk in laptop computers manufactured in the 2010 era because the useful life of the laptop was likely to far exceed useful life of the battery pack requiring consumers to buy replacement battery packs. (Dkt. 66-5, p. 21). These dangerous non-OEM battery packs were likely to be sold at lower prices than OEM authorized replacements, and it was impossible for a typical consumer to appreciate the risk of buying and using one of these non-OEM battery packs. (*Id.*; Schwarz Dec. Ex. I).

11

The Texas Instruments Application Report relied upon by Dr. Martin discusses these risks and offered solutions by way of battery authentication systems that were programed into microprocessors TI sold, referred to as "fuel gauges," that were used as components of battery management systems for these lithium-ion battery packs used to power devices such as laptops. (Schwarz Dec. Ex. I). These fuel gauges also provided the safety protections mentioned above to prevent thermal runaway reactions. These battery authentication systems would prevent non-OEM battery packs from working in laptops if the manufacturer of the laptop enabled this technology. The most sophisticated and secure of these systems utilized what is called the SHA-1 algorithm. (*Id.*).

The HP specification for the subject laptop authorized eight different fuel gauges that were approved for use in the battery pack for this device. (PCSUMF ¶ 23). Six of the eight approved fuel gauges were manufactured by TI and these fuel gauges all offered the SHA-1 algorithm battery authentication capability that could be used by a laptop manufacturer to prevent non-OEM battery packs from working in their devices. HP chose not to implement a battery authentication system in the subject laptop. As a result, the replacement battery pack in the laptop at the time of the fire was able to operate the laptop. This replacement battery pack lacked the safety devices designed to prevent thermal runaway, and on the night of January 24, 2020, when Plaintiff left the computer running to download upgrades to her antivirus software one of the cells in the laptop went into thermal runaway due to overcharge, overtemperature, or overvoltage. The heat from this cell caused three adjacent cells to go into thermal runaway with all four cells ejecting their internal copper battery windings as flaming projectiles throughout the room.

Dr. Martin provided the opinion that the failure for HP to use this readily available technology to prevent the use of an unauthorized battery pack lacking safety features to prevent

12

thermal runaway made the subject laptop not reasonably safe for its intended purpose. (Dkt. 66-5, p. 24). He also testified had the SHA-1 authentication system been enabled, the non-OEM battery pack that went into thermal runaway would not have worked in the subject laptop and therefore, the fire would not have occurred. (*Id.* at pp. 23-24).

Defendants' expert, Mr. Galler, stated in his report that a battery authentication system, if installed, could have been easily defeated by a counterfeit battery manufacturer, but at his deposition he backed off that opinion indicating defeating such a system would be difficult and that successfully doing so was only "possible." (Schwarz Dec., Ex. G, 197:18-207:2, 211:5-9, 290:12-291:5). Thus, a question of fact clearly exists for a jury to determine if the subject laptop was marketed in a condition that was not reasonably safe for its intended purpose because it lacked a battery authentication system.

### B. Product Liability Failure to Warn

Plaintiffs also alleged the subject laptop was defective because it lacked proper warnings about the dangers of replacing original battery packs with unauthorized battery packs. The owners' manual did recommend the use of HP authorized replacement battery packs but did not properly describe the potential consequences of not doing so, nor did it provide adequate information for the consumer to distinguish an unauthorized battery pack from an HP authorized one. (*See* Dkt. 69:4-5). The unauthorized battery pack in the subject laptop at the time the cells exploded had counterfeit HP markings suggesting it was HP authorized. (*See* Dkt. 66-5, p. 14).

To establish a failure to warn claim, a plaintiff must prove that the product did not contain adequate warnings regarding its use. This can involve either a complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient. *Palmatier v. Mr. Heater Corporation,* 163 A.D.3d 1192, 1193 (3d Dept. 2018). The plaintiff must also show the

13

inadequacy of the warnings was the proximate cause of his or her injuries. This means demonstrating the absence or inadequacy of the warnings was a substantial cause of the harm suffered. *Moscatiello v. Wyde True Value Lumber & Supply Corp.*, 168 A.D.3d 833 (2d Dept. 2019). "Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Vasquez v. Ridge Tool Pattern Co.*, 205 A.D.3d 657, 659 (1st Dept. 2022) (internal quotation marks and citations omitted); *DeCaro v. Somerset Industries, Inc.*, 228 A.D.3d 1107 (2024). "Issues regarding the adequacy of instructions or warnings are generally inappropriate for summary judgment relief" *LaScala v. QVC*, 201 A.D.3d 798, 800 (2d Dept. 2022) (internal quotation marks, ellipsis, and citations omitted), see *DiMura v. City of Albany*, 239 A.D.2d 828, 829 (3d Dept. 1997), but rather are "a question of fact to be determined at trial." *Repka v. Arctic Cat, Inc.*, 20 A.D.3d 916, 918 (4th Dept. 2005) (internal quotation marks and citation omitted).

Therefore, it is up to the jury to determine the adequacy of HP's warnings, which did not describe the extent of the harm that could occur by purchasing a non-OEM authorized replacement battery pack or provide instructions on how to determine whether a replacement battery pack was in fact OEM-authorized.

### C. Negligent Breach of Post-Manufacture Duty to Warn

Finally, Plaintiffs alleged HP negligently breached its duty to provide post-manufacture warnings. "Although a product may be reasonably safe when manufactured and sold and involve no then known risks of which warnings need be given, risks thereafter revealed by user operation, and brought to the attention of the manufacturer or vendor, may impose upon one or both a duty to warn." *Cover v. Cohen*, 61 N.Y.2d 261, 275 (1984). "The nature of the warning to be given

and to whom it should be given likewise turn upon a number of factors, including the harm that may result from use of the product without notice, the reliability and any possible adverse interest of the person, if other than the user, to whom notice is given, the burden on the manufacturer or vendor involved in locating the persons to whom notice is required to be given, the attention which it can be expected a notice in the form given will receive from the recipient, the kind of product involved and the number manufactured or sold, and the steps taken, other than the giving of notice, to correct the problem." *Cover*, 61 N.Y. 2d at 277 (citations omitted).

In the present case, HP witness Atkinson, a witness produced by HP pursuant to a notice pursuant to Rule 30(b)(6) to testify on behalf of the corporation, admitted HP was aware of the dangers of unauthorized battery packs that lacked necessary safety devices to prevent thermal runaway, including fire and explosion, and that such dangerous unauthorized battery packs were in widespread use at least five (5) years before his deposition in 2022. (PCSUMF ¶¶ 33-34). Another HP witness, David Pipho, whom Atkinson contacted upon the discovery of these dangerous battery packs, testified that HP had been aware of these dangers back as far as 2014. (*Id.* ¶ 35).

After Plaintiffs filed a motion to compel, HP finally produced its warranty records concerning the subject laptop indicating that HP had Plaintiff's name, address, email address, and phone number since 2011 when she registered the laptop warranty. (Dkt. 69-3). Thus, HP had knowledge of the grave dangers posed by unauthorized battery packs and the means to contact Plaintiff to share this information for years before the night of the fire in this case. This evidence precludes summary judgment on the breach of a post-manufacture duty to warn claim.

Accordingly, questions of fact exist regarding each of Plaintiffs' claims precluding summary judgment.

15

## POINT II

### PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF THE CAUSE OF THE FIRE

Defendants have not established a prima facie case on the cause of the fire and thus, summary judgment is precluded on this issue as well. Moreover, as set forth in detail in Plaintiffs' Cross-Motion to preclude the opinions of Defendants' experts Horn and Myers, which is incorporated herein by reference, there is no admissible evidence supporting a cause of the fire in this case other than a thermal runaway reaction in one of the cells of the subject laptop computers that resulted in the ejection of flaming internal battery cell copper windings which landed in the office closet and started the fire. Plaintiffs have submitted the report and rebuttal report of Jason Karasinski opining that the ejected battery materials from the subject laptop cells that went into thermal runaway caused the fire. (Dkt. 66-13, 66-15). This conclusion was also reached by the Alleghany County Fire Investigation Team that arrived at the scene of the fire shortly after it was extinguished. (PCSUMF ¶ 11).

The unsupported, speculative, and ipse dixit opinions of Defendants' experts Horn and Myers do not demonstrate a triable issue of fact on this issue for the reasons set forth in detail in Plaintiffs cross-motion and in the Declaration of Mr. Karasinski submitted herewith.

### CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment must be denied and Plaintiffs' Cross-Motion for Partial Summary Judgment establishing the cause of the fire should be granted, together with such other and further relief as this Court deems just and proper.

DATED:  June 9, 2025
           Rochester, New York

                              FARACI LANGE, LLP

                              /s/Stephen G. Schwarz
                              Stephen G. Schwarz, Esq.
                              Joshua M. Mankoff, Esq.
                              1882 South Winton Road, Suite 1
                              Rochester, New York  14618
                              Telephone: (585) 325-5150
                              Facsimile: (585) 325-3285
                              Email: sschwarz@faraci.com
                              Email: jmankoff@faraci.com

                              *Attorneys for Plaintiffs*