UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAROL S. MARCELLIN, individually, and as Co-Administrator of the Estate of Charles E. Hollowell, deceased, and JESSICA HOLLOWELL-McKAY, as Co-Administrator of the Estate of Charles E. Hollowell, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>HP, INC., and STAPLES, INC.,<br><br>Defendants. | **Civ. No. 1:21-cv-00704-JLS** |

**MEMORANDUM OF LAW IN OPPOSITION TO
MOTION TO PRECLUDE**

Defendants HP Inc. and Staples, Inc. hereby submit this memorandum of law in opposition to the plaintiffs' motion to preclude the reports and testimony of defendants' experts Donald Galler, M.S., P.E., Quinn C. Horn, Ph.D., P.E., and Tim Myers, Ph.D., P.E., CFEI under Rule 702 of the Federal Rules of Evidence.

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................... 4

LEGAL STANDARDS ............................................................................................ 9

ARGUMENT ........................................................................................................... 9

1. Galler's opinions concerning battery authentication are reliably supported by testing and industry standards ................................................................................................. 9

3. Galler's opinion that there is no scientific explanation for the missing Compaq testified to by Marcellin is uncontroverted ................................................................................... 11

4. Horn's opinion that there was no battery remnant in the closet is consistent with the photographic evidence, and plaintiffs have adduced no contrary evidence, including the claimed battery remnant itself ............................................................................................... 13

5. Horn analyzed each of the six cells to establish that they were the victim and not the cause of the fire ........................................................................................................................ 14

6. Myers properly concluded the cause of the fire was undetermined under NFPA 921 because, while possible ignition sources had been identified, there is insufficient evidence to determine the cause of the fire ................................................................................................... 18

CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ...................... 9, 14

*Cullen v. Vill. of Pelham Manor*, 2008 U.S. Dist. LEXIS 109037, at *57-58 (S.D.N.Y. Nov. 25, 2008) (Seibel, J.) ............................................................................................. 9, 14

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993) ........................ 3, 9, 14, 19, 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 530 (6th Cir. 2004) ........ 11

**Rules**

Federal Rule of Evidence 702 ........................................................................ 10, 15, 21

## SUMMARY OF ARGUMENT

Plaintiffs' *Daubert* motion does not make sense on its face. On one hand, they decry the opinions of Dr. Tim Myers, Ph.D., P.E., CFEI for reaching a different opinion in December 2024 than the plaintiffs' fire expert did on the day of the fire scene inspection in January 2020, without regard for any evidence adduced in the nearly 5 years of discovery that followed. This amounts to an admission that the plaintiffs' expert, not the defendants', reached a preconceived opinion on the cause of the fire on his first day of work, and never wavered from it.[1]

On the other hand, they accuse Dr. Quinn C. Horn, Ph.D., P.E of having a preconceived outcome on the cause of the fire, and contend that his opinion should be stricken because of it–of course, plaintiffs point to nothing in the record which demonstrates or proves this alleged preconceived outcome. The intellectual inconsistency of plaintiffs' positions lays bare their cynical strategy: kick up enough dust on *Daubert* issues with the hope that it will distract from the clear and undeniable scientific deficiencies in their own expert's opinions.  The Court should reject this cynical effort.

Indeed, it bears emphasis that the plaintiffs' motion, in seeking preclusion of reliable, scientifically validated opinions, misstates the opinions and testimony of Galler, Horn, and

---

[1] It bears emphasis that NFPA 921 warns against reaching opinions prior to reviewing all information and data as it can create expectation bias. *See* NFPA 921 (2024) § 4.3.9 Expectation Bias ("Expectation bias is a phenomenon that occurs when investigator(s) reach a particular conclusion based on expectations without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner, the investigator(s) uses the premature determination to influence analysis and investigative processes, including suggestive questioning of witnesses, which in turn might influence conclusions in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.")

Myers as set forth in the record. First, Galler's opinions concerning battery authentication were supported by valid testing and industry standards, and his opinion that there is no explanation for the missing Compaq remains uncontroverted by any record evidence. Second, Horn's opinion that there was no battery remnant in the closet is consistent with the photographic evidence, and the plaintiffs have not adduced anything–including the claimed battery remnant itself–that would call the reliability of his opinion into question. Horn's opinion was further based upon an analysis of each of the six cells involved to establish that they were the victim of the fire and not its cause. Third, Myers' conclusion that the cause of the fire was undetermined was proper given the identification of possible ignition sources and the insufficient evidence to determine which of them caused the fire. The plaintiffs' motion to preclude should be denied.

## BACKGROUND

In February of 2020, Myers was contacted about being retained to investigate the fire in this case, and was originally scheduled to attend a site inspection in early February. Dkt. # 80 at 22-23. However, the inspection was postponed to a later date on which Myers was not available, so HP retained another investigator, Greg Gorbett, to attend the site inspection that went forward on February 27, 2020. *Id.* at 23.

Contrary to plaintiffs' unsupported allegation that Gorbett "concluded, like all the other investigators who inspected the fire scene, that the fire was caused by a thermal runaway reaction in one of the cells of the subject laptop," plaintiffs have adduced no record evidence about what, if anything, Gorbett concluded on that day. Dkt. # 71-2 at 6. Plaintiffs point to the declaration of his expert Jason Karasinski, CFEI, in support of this allegation. However, Karasinski never specifically attributed any such statements or conclusions to Gorbett, stating only that "all interested parties agreed that the office was the room of origin." Dkt. # 70-1 at ¶ 4. This is consistent with his deposition testimony, which also did not attribute any statements or

conclusions to Gorbett, other than that the room of origin was the office. *See* Dkt. # 66-12 at 260. Karasinski, in his declaration, then alludes to a "consensus" among the investigators at the site inspection–but, does not attribute any of the stated claims to Gorbett. *See* Dkt. # 70-1 at ¶ 6 ("it was the consensus of the investigators at the scene inspection that four of the cells in the subject laptop had experienced thermal runaway reactions that caused the ejection of the internal cell contents including the fragment of internal cell windings found in the closet. This fragment produced enough thermal energy to cause ignition of the closet combustible materials.").

Further, Gorbett himself kept notes on the date of his inspection, that were produced to the plaintiffs but these were not filed with this Court in support of the plaintiffs' motion. The notes contradict the plaintiffs' assertion. *See* Ex. A to Levites Decl. Specifically, Gorbett's notes indicate that, contrary to plaintiffs' allegation, Gorbett considered other possible causes for the fire. First, Gorbett noted that the local fire investigators stated "Charles & Carol were **possibly** in same B.R.," indicating that, in fact, the initial investigation cast doubt on Marcellin's testimony that she was asleep at the time of the fire. *Id.* at 2 (emphasis added). Second, Gorbett noted that the local fire investigators "thought was couch → then focused on hallway." *Id.* Again, this note indicates that the initial investigation by Gorbett did in fact consider alternative causes of the fire. Third, Gorbett noted that the individually lettered evidence items included "remains of batteries & CFL lightbulb w/in office." *Id.* at 5. Notably, plaintiffs' phantom "remnant" was **not** an individually lettered item in evidence. In other words, if plaintiffs are to be believed, the single most important piece of evidence in the case that everyone allegedly had a "consensus on" was not segregated and was not given its own evidence letter.  Plaintiffs' story is not credible. However, other remnants were. This whole story concocted on the fly by plaintiffs is preposterous.

A laboratory inspection on October 30, 2020 was attended by the parties, and HP was represented by its expert Galler. Galler had separately tested the operability of unauthorized notebook batteries in computers manufactured by Apple, Dell, and Lenovo around the time of the manufacture of the subject HP notebook by purchasing the comparator notebooks, locating replacement batteries sold at a fraction of the cost of original equipment manufacturer (OEM) batteries from Amazon.com, and installing those batteries in the respective notebooks. Dkt. # 77-1 at 18, Dkt. # 78 at 177. Galler testified that each of the computers functioned normally and did not display an on-screen warning, so they either had no authentication, or the authentication had been defeated. Dkt. # 78 at 186.

The laboratory examination concerned "[t]he items removed from the fire scene, including the subject laptop and the remains of the battery cells" which plaintiffs allege were "carefully inspected and photographed, with some items examined by x-ray and CT scan." Dkt. # 71-2 at 9. Yet plaintiffs omit that the item they **now** contend is the key piece of evidence, an alleged battery remnant that plaintiffs contend caused the fire, was not carefully inspected, was not photographed to scale, was not examined by x-ray, and was not examined by CT scan. Again, this demonstrates that this is an 11th hour concoction by plaintiffs. To date, the only evidence concerning the alleged battery remnant are random scene photographs of the burnt debris that was allegedly removed from the office closet after the fire:



Litzinger P2270265.JPG, Dkt. # 66-15 at 16



Litzinger P2270266.JPG, Dkt. # 66-15 at 16



HP01849, Dkt. # 71-2 at 21



HP01850, Dkt. # 71-2 at 21

Defendants' expert Horn testified in his deposition that the first two of these photographs did not apparently depict a battery remnant, and in the absence of any further documentation or laboratory examination of the alleged remnant, there was no evidence that the alleged remnant was actually a part of a notebook battery. Dkt. # 80-1 at 174, 178, 184, 187-8, 333-4. Specifically, Horn testified that in order to reach the conclusion that the alleged remnant is a battery cell from the HP notebook, the remnant would have to be analyzed to confirm it is a battery cell remnant and that it came from the HP notebook. Dkt. # 80-1 at 333. Plaintiffs, who

bear the burden of proof in this case, have not done so to date.[2]

Further, Horn testified there were additional appliances in the closet that could have produced the metal fragment that plaintiffs allege is a battery remnant. Dkt. # 80-1 at 335. Consistent with this, plaintiffs' expert Litzinger testified that his review of the closet debris included at least four other appliances, specifically two electric lamps, an electric blanket, and a thermally damaged appliance that was never able to be identified. *See* Dkt. # 66-14 at 134-147. Indeed, in addition to these four appliances, Marcellin testified repeatedly and answered in sworn discovery that a Compaq computer with a replacement battery "was in the closet in the office at the time of the incident." *See* Dkt. # 66-6 at 93-94 (Marcellin Tr. I); Dkt. # 66-7 at 10 (Marcellin Tr. II) ("Q: And the Compaq was in the closet at the time of the fire? A: Yes, it was. Q: And that had the replacement battery that you bought online in it? A: Yes. Q: So after the fire it would have been in the closet, right? A: Yes. Q: You didn't remove it from the closet? A: No."); Dkt. #42-2 at 4 (Pl.'s Resp. To Req. for Production) ("The 1990s vintage Compaq computer was destroyed in the fire and is no longer in the possession of Plaintiffs so it cannot be produced"). Most recently, she reiterated this testimony in a statement sworn out on December 28, 2024. Dkt. # 66-18, ¶ 7 ("The closet in the office was used as a linen closet and to store a plug in vacuum and some other odds and ends including an old Compaq laptop I had purchased in the early 1990s and hadn't used for many years.") This is consistent with the opinions of her experts. *See* Dkt. #, 66-13 at 13 (Karasinski Rept. I, *citing* Marcellin Tr. I at 93-94) ("She confirmed it was in the closet on the floor at the time of the incident"). This is also consistent with the repeated representations of her counsel. *See* Dkt. 39-2 at 3 ("The 1990s vintage Compaq computer was destroyed in the fire and is no longer in the possession of Plaintiffs so it cannot be produced");

---

[2] The evidence is in the possession of the plaintiffs' experts.

Ex. B to Levites Decl. ("I can assure you with complete confidence that the battery she purchased whenever she purchased it was in the Compaq in the closet when it was destroyed in the fire.").

Horn has also stated that, on reviewing the third and fourth photographs of the alleged remnant in connection with this motion, the photographs do not depict a battery remnant, due to the mesh texture in the alleged remnant depicted in the foreground, which is inconsistent with battery remains. *See* Ex. C to Levites Decl, ¶¶ 7-10. Plaintiffs' expert Karasinski (notably not a battery expert), looking at the same photographs–without any laboratory testing, or indeed physical examination of the alleged remnant, **which remains in plaintiffs' possession**–disagrees with Horn's conclusion. Plaintiffs now argue that because Karasinski (not a battery expert) disagrees with Horn (a battery expert), the Court should preclude Horn. This is not the proper basis for granting a *Daubert* motion, and the motion should be denied.

## LEGAL STANDARDS

"Disagreement concerning the correctness of an expert's conclusions is not a proper basis for granting a *Daubert* motion." *Cullen v. Vill. of Pelham Manor*, 2008 U.S. Dist. LEXIS 109037, at *57-58 (S.D.N.Y. Nov. 25, 2008) (Seibel, J.), *citing Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993).

## ARGUMENT

### 1. Galler's opinions concerning battery authentication are reliably supported by testing and industry standards

Galler opined that battery authentication was not an industry standard at the time of the

9

manufacture of the HP notebook in this case. Among other things, his opinion was based on a test of three other manufacturer's notebooks with unauthorized batteries he purchased from Amazon, all of which worked without issue. None failed to operate normally and none displayed an on-screen warning. Plaintiffs make a strained argument in respect of the reliability of this test. Specifically, Plaintiffs argue that Galler's test is somehow unreliable because it might be possible that Galler, who "made every effort to obtain batteries which [he] expected were not authorized by the computer vendors" could have in fact accidentally purchased authentic, authorized battery packs. Dkt. # 71-2 at 13; Dkt. # 78 at 186. Plaintiffs misstate Galler's testimony by omitting that his efforts to obtain unauthorized packs included purchasing "the cheapest available battery pack." Dkt. # 78 at 186. Plaintiffs do not suggest in seeking to preclude Galler how such a pack–a battery pack sold at a fraction of the cost of an OEM battery on an third-party online retailer–could somehow actually be an authentic pack.

Importantly, Galler's efforts to confirm they were unauthorized batteries also included examining "the labeling on the battery. So, clearly, if I take a battery out of a laptop and it says "Apple" on it and put something in it that says nothing on the outside or it says "Ninja" battery. Then I know it's not an Apple battery. I mean, I don't have to take it apart to know that." *Id.* Although this logically follows and therefore is unassailably reliable, plaintiffs, however, seem to actually argue that Galler was required to dissemble and analyze the cut-rate and visibly third-party batteries with no manufacturer markings in order for his test to be reliable.[3] This is not what Rule 702 requires, and the motion should be denied.

Galler also opined that it was more likely than not that even if authentication had been used, it would have been defeated by counterfeiters. Plaintiffs claim that because Galler

---

[3] Of course, disassembly of the battery pack would, itself, render the testing invalid.

conceded at deposition SHA-1 authentication was harder than other forms of authentication to defeat, his opinion that a counterfeiter more likely than not would have defeated SHA-1 authentication should be precluded. Dkt. # 71-2 at 11. This claim fails for two reasons.

First, obviously, the latter argument does not follow from the former statement: SHA-1 authentication could indeed be harder to defeat than other forms of authentication, but still more likely than not to be defeated. By way of analogy, a closed and unlocked door may be more secure than an open doorway, but a determined intruder may gain access through either.

Second, the plaintiffs cited to the Court in opposing the defendants' motion for sanctions the case of *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 387 F.3d 522, 530 (6th Cir. 2004), which directly supports Galler's opinion. In *Lexmark*, the plaintiff printer manufacturer, which manufactured a microchip using SHA-1 authentication in its printer cartridges to prevent them from being re-filled by third parties, sought to enjoin the defendant counterfeiter. That counterfeiter made a microchip that "breaks Lexmark's secret code (the authentication sequence)" and sold those microchips to "third-party cartridge remanufacturers, permitting them to replace Lexmark's chip with the SMARTEK chip on refurbished Prebate cartridges. These recycled cartridges are in turn sold to consumers as a low-cost alternative to new Lexmark toner cartridges." Thus, *Lexmark* establishes that SHA-1 based authentication schemes **had in fact already been defeated by counterfeiters in 2004**, just as Galler opined and testified**.** Thus, *Lexmark* further demonstrates that Galler's opinion is reliable. The motion should be denied.

### 3. Galler's opinion that there is no scientific explanation for the missing Compaq testified to by Marcellin is uncontroverted

As recited above, plaintiffs' two depositions, sworn discovery responses, sworn affidavit, expert reports, and statements by counsel all repeatedly reaffirmed that Marcellin had a Compaq computer that was in her office closet at the time of the fire. Plaintiffs' counsel even

stated on the record that their experts had located the Compaq computer. Dkt. # 66-9 at 56 ("MR. LEVITES: After the fire, after the fire. We know there's no Compaq now. No one has it, so-- MR. SCHWARZ: Well, actually, that's not an accurate statement. You're at your fire expert, as our fire expert did, find the Compaq. And if your fire expert had been an expert in this case, instead of bringing in somebody from Exponent, they would know that. And you can go into that with Mr. Karasinski, who has pictures of it.").

However, notwithstanding plaintiffs' counsel's representation on the record, plaintiffs' experts Karasinski and Litzinger now testify they never found any sign of the Compaq computer. *See* Dkt. # 66-12 at 29-30 ("we did not find any physical evidence of a Compaq computer in the closet, period, as she suggested"); Dkt. # 66-14 at 219-220 ("Per her, I believe it was her deposition she said it was in the closet. There was nothing in the closet. There is no older laptop in the closet, or in the hallway debris that was collected for inspection."). This was despite their expectation that they would find it because the temperatures in the fire would only damage, but not destroy the Compaq. *See id.*

Despite all this, plaintiffs now make the extraordinary claim that Galler's opinion that the Compaq would not have been incinerated in the closet–an opinion with which plaintiffs' **own experts agree**–should be precluded because "the most likely explanation is that Marcellin or Hollowell had disposed of that computer before the fire and she had forgotten that fact." Dkt. # 71-2 at 17-18. This is based on an absurd interpretation of Mr. Galler's opinion. Mr. Galler is opining that the temperatures of a fire are not so significant as to cause a computer to evaporate. This is a scientific fact that plaintiffs' own experts agree with.  The fact that the computer could not have been destroyed in the fire is a problem because her counsel represented that the Compaq computer (allegedly containing an aftermarket battery) was located and photographed by her

experts during Martin's deposition **taken only three months ago.** Thus, the question remains: where is it?

Plaintiffs, misstating Galler's testimony, suggest that the Galler opined the Compaq had nothing to do with the fire, so his opinion is irrelevant. Dkt. # 71-2 at 14. However, Galler actually testified that he was unable to determine whether the Compaq had anything to do with the fire, because it was never found. *See* Dkt. # 78 at 284-5. Equally, plaintiffs suggest, without citing to any record evidence, that the "most likely explanation" is that she (and her counsel) were simply mistaken about the location of the Compaq, repeatedly over the course of three years, across two depositions, written discovery responses, and a supplemental affidavit. Dkt. # 71-2 at 17-18. In other words, plaintiffs are contending the opinion of Galler should be precluded because he offered an opinion, citing the actual record evidence, and opined consistent with plaintiffs' experts that the fire would not have destroyed the Compaq if it were in the closet. This is "through the looking glass" argument and should be disregarded. Galler's opinion should be admitted.

**4. Horn's opinion that there was no battery remnant in the closet is consistent with the photographic evidence, and plaintiffs have adduced no contrary evidence, including the claimed battery remnant itself**

During his deposition, Horn reviewed two photographs taken by plaintiffs' expert Litzinger, and denied they depicted a battery remnant. Dkt. # 80-1 at 174, 178, 184, 187-8, 333-4. He also testified that there was no other evidence to support the allegation that the depicted remnant was a piece of copper winding from a lithium ion battery, let alone a copper winding from a battery that was in the HP notebook in this case. Dkt. # 80-1 at 336. Indeed, even today, in the face of the defendants' motion to preclude the plaintiffs' expert Martin, plaintiffs have not performed any laboratory testing or physical examination of the alleged remnant, which remains in plaintiffs' possession.

After Horn's deposition, the defendants produced additional photographs to plaintiffs, two of which depicted the same alleged remnant. *See* Dkt. # 66-15 at 16, Dkt. # 71-2 at 2. As is apparent from comparing the two sets of photographs, the only obvious difference between them is that Litzinger did not use the camera flash, and Gorbett did. Indeed, plaintiffs characterize the latter photographs as "identical" to the former. Dkt. # 71-2 at 21. Horn testified he reviewed Gorbett's photographs in preparing his report. Dkt. # 80-1 at 95. Horn has further stated that upon further review of the Gorbett photographs, his opinion that there is no evidence of battery remnants in the closet has not changed. Ex. C to Levites Decl. at ¶¶ 7-9. Horn further stated that the mesh material more clearly visible in these photographs further supports his opinion, because that material is inconsistent with a lithium ion battery copper winding. *Id.* ¶ 10.

Thus, there is a disagreement between Karasinski and Horn, both of whom reviewed the same identical photographs. It is worth noting in this regard that Karasinski is **not** a battery expert and Horn is. Thus, the accusation that, because Horn disagrees with Karasinski, Horn was somehow "ignoring the evidence found in the closet" is improper and unsupported by the record. Dkt. # 71-2 at 19. "Disagreement concerning the correctness of an expert's conclusions is not a proper basis for granting a *Daubert* motion." *Cullen, supra* at *57-58, *citing Amorgianos, supra* at 266. Moreover, if anyone in this case has the expertise to identify the internal parts of a battery it is Dr. Horn and not Mr. Karasinski. The plaintiffs' *Daubert* motion should be denied.

**5. Horn analyzed each of the six cells to establish that they were the victim and not the cause of the fire**

As with Galler, plaintiffs ascribe opinions to Horn that he never offered. First, without citation to Horn's report or testimony, plaintiffs claim that concerning Horn's conclusion that an external fire caused the thermal runaway here, Horn offered "the opinion that cell contents are *only* ejected when thermal runaway is provoked in this manner." Dkt. # 71-2 at 22 (emphasis

original). However, Horn never offered this opinion, and repeatedly stated this during his deposition by way of explanation and qualification.

Horn stated that the "vast majority of the internal defects that result in a -- in a -- in a thermal runaway instant in an 18650 cell, do not result in the ejection of -- of -- of --of contents, either through a crimp release or a can rupture. The -- and the reason for that is the -- the venting mechanism is highly effective and specifically designed to release the gases at the rates that they're being generated at when a cell has an internal defect." Dkt. # 80-1 at 81. When asked by plaintiffs' counsel, "any time you see ejection of internal contents, it virtually has to be external heat, it can't be any fault within the battery that caused that. Is -- is that your conclusion that you reached just by knowing that?", Horn rejected the premise again and answered, "No, sir. You've got to look at the design of the pack, and how many cells, and how thermal the thermal propagation could -- could -- could, you know, you know, how it could progress through the battery pack, you know, and -- and -- and other evidence." *Id.* at 82-3.

And that analysis–reviewing the pack design, the number of cells, and how thermal propagation could progress throughout the battery pack–is exactly what Horn methodically undertook in his report and in his deposition, as required under Rule 702. In his report, Horn detailed the evidence in support of his opinion that the battery cells were the victim and not the cause of the fire. Of the six cells in the battery pack, Cells 1 and 2 "still had large fractions of the cell wrapper adhered to the cell cans, were still tabbed externally in their parallel configuration, and, based on the limited photographs of 2D X-ray imaging available for review, appeared to have almost entirely intact electrodes internally." Dkt. # 77 at 31. Because these cells "did not experience thermal runaway", they are ruled out "as potential initiators of the fire." *Id.* at 32.

Cells 5 and 6, which were found in the back corner of the office, "clearly experienced an

energetic failure," but "the fact they that were found across the room, with other cell components in disparate locations, suggest that the notebook housing was already compromised at the time these cells experienced thermal runaway (thus enabling their escape due to the mechanical forces acting on them during thermal runaway)." *Id.* Thus, "it is likely that these cells were victims of the fire or at least failed subsequent to the initiation of the event." *Id.* at 33.

The cans of cells 3 and 4 were found in the battery pack region of the notebook, and cell 4 "still still had purple wrapper residue on the surface of the cell can, indicating that the cell ejected its contents, and their thermal mass, quickly enough such that the cell surface temperatures did not reach a point where the wrapper was consumed. Wrapper consumption would be expected if the fire was initiating in that cell" *Id.*

Plaintiffs not only misstate Horn's opinion, they misstate his publications. In his deposition, Horn cited one such publication, which is included as a section in Linden's Handbook of Batteries[4], which plaintiffs' expert Martin testified is a "summary of nearly all battery chemistries, the histories of batteries, the histories of different kinds of batteries, and then a very long summary of nearly all aspects of batteries" that he owns and reads. Dkt. # 66-9 at 74-75. Horn stated that this was supportive of his opinion that it was "far more likely than not that it was an external heat source that caused the thermal runaway rather than some internal overcharge, over voltage-type situation." Dkt. # 80-1 at 260.

Plaintiffs quote from Horn's publication and claims it contradicts, rather than supports Horn's opinion–but plaintiffs carefully omitted from their recitation the following sentence of the quoted section. The omitted language in bold below shows precisely why Horn's theory of

---

[4] Dr. Horn is one of the authors of a chapter in the Handbook of Batteries on "Methodologies for Battery Failure Analysis."

external fire attack is supported by the physical evidence, that is, four of the six cells ejected

their windings:

> In cases where a catastrophic failure induces rapid thermal runaway (e.g., from a puncture to a cell in a pack from an external source, external heating of the battery pack, or overcharge of the cell), the initiating cell may be the most heavily damaged cell. Maximum damage occurs to the initiating cell here because the shorting and subsequent thermal runaway are so rapid they often result in ejection or partial ejection of the cell windings. **Neighboring cells are heated more gradually before going into thermal runaway and may not experience the same level of internal damage as the initiating cell.**

Dkt. 80-2 at 9 (emphasis added); *compare* Dkt. # 71-2 at 24 (omitting bolded language). As

Horn's publication demonstrates, in the scenario of an internal cell fault–that is, shorting–causing

thermal runaway, neighboring cells will be heated more gradually and will not show the same

amount of damage. Here, four of the six cells went into thermal runaway and all ejected their

contents entirely and had consistent damage. Per Horn, this is evidence that the whole pack was

exposed to a thermal event. On the other hand, as Horn testified, if a single cell goes into thermal

runaway but does not eject its contents–the opposite of what was found here–that scenario is

more likely to initiate a fire that cascades to the other cells in the pack. Dkt. # 80-1 at 257. Horn

further elaborated in his testimony on the "evidence in totality" on this issue ,which also included

that an energetic ejection of cell contents is as loud as a gunshot, and Marcellin woke up from

the fire alarm, not a gunshot-like sound. Thus, her testimony that she was woken by a fire alarm,

not a gunshot-like sound, then went to the office where she saw "projectiles" coming out of the

notebook, is consistent with an external fire attack, rather than an internal cell fault. Plaintiffs'

mischaracterization of Horn's opinions and testimony is of a piece: when they do not like

testimony, they claim the expert said something else, much like when Marcellin does not like a

fact in her story, she just changes it.

**6. Myers properly concluded the cause of the fire was undetermined under NFPA 921 because, while possible ignition sources had been identified, there is insufficient evidence to determine the cause of the fire**

Again, plaintiffs' narrative is at variance with the facts in the record: Myers testified he was contacted in this matter to conduct a site examination in early February 2020, and was only unavailable to proceed with the rescheduled examination that took place on February 27, 2020. Dkt. # 80 at 23. Myers then began work on the case in 2023. *Id.* His report was disclosed on December 6, 2024. Dkt. # 76. Accordingly, to suggest that Myers was "tasked with inventing other possible ignition sources" is not only improper, it is incorrect. Dkt. # 71-2 at 28.

Importantly, plaintiffs here have adduced no actual record evidence that Gorbett "concluded that the fire began in the office closet ignited by the cell winding eject day one of the battery cells that was found in the debris in the closet," contra Myers' conclusion. *Id., citing* Dkt. # 70-1 ¶ 6. Instead, he only repeatedly cites the declaration of Karasinski, who attributes no such statements or conclusions to Gorbett, and only states that "it was the consensus of the investigators." Dkt. # 70-1 ¶ 6. For all of plaintiffs' repeated insinuations at Myers' deposition that Gorbett's notes reflected just such a conclusion and HP concealed them, *see* Dkt. # 80 at 32-5, 80, 85-86, 292-3, it bears repeating that Gorbett's notes do not–which may be the reason plaintiffs never filed them with the motion. *See* Ex. A to Levites Decl. In fact, Gorbett made notes about other possible causes, including the couch, Marcellin being awake, and the CFL bulb in the office. Ex. A to Levites Decl. at 2, 5. This is consistent with NFPA 921, which, as Myers testified, provides that it is "typically too preliminary to make a determination about something like this before you have the full information" so it is necessary to "document both what you think started the fire and possible alternative causes." Dtk. # 80 at 84-5. Thus, for the plaintiffs to criticize Myers for a lack of certainty regarding the plaintiffs' "consensus" position on day 1 of a multi-year investigation is inconsistent with the accepted principles of fire investigation.

Indeed, as Myers further set forth in his report, Section 19.7.4 of NFPA 921 requires that "if the level of certainty is only "possible" or "suspected", the fire cause is undetermined." Dkt. 76 at 49. Here, Myers opines that "while possible ignition sources had been identified, there is insufficient evidence to determine the cause of the fire." *Id.* That is, even though there were multiple potential causes, they could not be ruled out such so that a single cause was more likely than not. Accordingly, given that uncertainty, it was appropriate under NFPA 921 to list the cause as undetermined. Karasinski's disagreement with this conclusion and opposing opinion that the fire cause was the HP notebook and battery is not a proper basis for a *Daubert* motion. *See Cullen, supra* at 57-8.

Plaintiffs seem to misapprehend the distinction between a disagreement and scientific reliability throughout. Myers noted the couch as a potential ignition source because it was one of two areas of unusually low burn in the house, the only other one being the closet. Dkt. # 80 at 116. The couch was never moved from its location or further analyzed in any way. While Karasinski ruled out the couch as a possible ignition source because he credited Marcellin's testimony that she walked past the couch when she woke up that night[5], Dkt. # 71-2 at 29, Myers was unable to rule out the couch on that basis alone, because there were "inconsistencies in her statements so you don't know what portions you can believe and what portions you can't." Dkt. # 80 at 115. Again, disagreement–not *Daubert*.

Plaintiffs again mischaracterize Myers' testimony: he never "conceded that the furnace couldn't have caused the fire because there was no char observed on the wooden louvered door inches from the vent on the furnace he had claimed was deformed in one of the photographs."

---

[5] Karasinski's basing his opinion on Marcellin's testimony seems entirely inconsistent with Plaintiffs' repeatedly trying to explain away every problem with their case by blaming the memory problems of Marcellin.

Dkt. # 71-2, *citing* Dkt. # 80 at 214-221. Actually, in the extended discussion in the cited testimony, Myers testified repeatedly that there was evidence of fire damage, *see e.g.* Dkt. # 80 at 220-21:

> You can see the header above that closet is heavily burned. Above that furnace room is heavily burned. You can actually see that in the top it appears that it is drywall on the inside of that closet and that's -- it appears in the top left corner of that image. It's broken through or you can see through to the wood paneling on the other side of the wall. And there is wood paneling falling down on the top of the furnace. There appears that there is charring of the paper on the drywall in the top right corner of that back wall in that photograph.

That is, Myers testified at length about the physical evidence he reviewed–together with the note from the fire investigators that the furnace door was "blown out" and Marcellin's testimony that she suspected the furnace–that prevented him from ruling out the furnace, which was never moved from its location or further analyzed. Karasinski, looking at the same evidence, concluded "there was no fire damage." Dkt. # 66-12 at 210. And, after receiving Myers' report, long after the close of discovery and the plaintiffs' two depositions, Karasinski sent a list of supplemental questions to Marcellin that included "Did you see any fire at the furnace while passing that room in the hallway at any point before exiting the property"?[6] Dkt. # 66-17 at 1. Unsurprisingly, Marcellin's sham affidavit dated shortly thereafter stated, contrary to her deposition testimony, that she "passed the door behind which the furnace was located and decided to look there first as a possible source. When I opened the door there was no smoke around the furnace." Dkt. # 66-18 at 1. Plaintiffs argue that because Myers disagrees with her expert on these matters, he should be precluded, but that does not approach the reliability standard set forth in Federal Rule of Evidence 702 or *Daubert*.

---

[6] Karasinski going back to Marcellin to get more information in December of 2024 disproves plaintiffs' recently concocted "consensus" story.

Plaintiffs' mischaracterization continues by arguing that Myers included a photograph of the hallway debris in his report, so he cannot offer the opinion that there is no evidence of battery remnants in the closet. Dkt. # 71-2 at 31. However, Myers actually testified that the only picture he had seen of the alleged battery remnant "is in the rebuttal report and shows material that is now at that point not in the closet but on the ground out in the front of the closet saying that it had come from the closet." *Id.* at 287. He further testified he had not seen any pictures that "were taken before that was removed in the closet showing where it was in the closet, what it was near." *Id.* at 299. Indeed, consistent with this, in the only photographs of the condition of the office closet before everything was removed, the alleged battery remnant is not visible. Specifically, in the photographs highlighted by plaintiffs, the alleged battery remnant is near the spools of thread and melted plastic stool in the closet debris that were spread out by the investigators in the hallway, whereas in photographs taken before this, the alleged battery remnant is not visible:



Levites Decl. Ex. D. As Myers testified, to date plaintiffs have come forward with no evidence that the alleged battery remnant was even in the closet. Dkt # 80 at 300-1. To the contrary, Myers testified that battery windings were found in multiple areas of the room where there was no fire, which indicates that battery windings would not ignite all materials. *Id.* at 301-302. Plaintiffs have not shown that a battery winding (if it actually existed in the closet) was a competent ignition source that was able to ignite materials in the closet.

The plaintiffs' habit of wrongly summarizing Myers testimony concludes with a final attempted swipe: the specious claim that as to the opinion that the notebook damage was consistent with a fire attack, not an internal fault, Myers "could only state his subjective opinion without any factual basis." Dkt. # 71-2 at 29. Actually, in the extended discussion in the cited testimony, Myers testified repeatedly that there was physical evidence of fire damage, *see e.g.* Dkt. # 80 at 239–40:

> A I tried to explain this several times, and can do this again. The differences I see are in Figure 31. You see localized melting just to the right region of the -- you know, what is in the picture is on the left region, but it would be on the right of the laptop if you set it down -- where you have significant melting and consumption of material where on the top you have less localized damage and more uniform melting over the top of the laptop, which means the combination of the radiant heat transfer and of the additional damage caused by the thermal runaway of the battery. That damage to me is consistent with the testimony of Ms. Marcellin.

The gravamen of plaintiffs' motion then, once more, is that he simply disagrees with Myers' conclusions, which Myers amply supported in his report and testimony. Equally, plaintiffs do not address Myers' opinion concerning a further still potential source of ignition– the only tripped electrical breaker, #4, which was never traced or collected.  Dkt # 76 at 42.

## CONCLUSION

For the foregoing reasons, the motion to preclude should be denied.

Respectfully Submitted,
HP INC.,
STAPLES, INC.,
By their attorneys,


*Ben Levites*

Respectfully submitted,
Benjamin H. Levites, 5557046
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
blevites@coughlinbetke.com

Jaclyn S. Wanemaker
Smith Sovik Kendrick & Sugnet P.C.
6245 Sheridan Drive
Suite 218
Williamsville, NY 14221
315-474-2911
Fax: 315-474-6015
Email: jwanemaker@smithsovik.com


## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to all counsel of record on Monday, June 30, 2025.

*Ben Levites*

Benjamin Levites