UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

CAROL S. MARCELLIN, individually, and )
as Co-Administrator of the Estate of Charles )
E. Hollowell, deceased, and JESSICA )
HOLLOWELL-MCKAY, as Co- )
Administrator, of the Estate of Charles E. )
Hollowell, deceased, )
                                              )
       Plaintiffs, )
                                              )
       v. )               Case No. 1:21-cv-00704-GWC
                                              )
HP, INC., and STAPLES, INC., )
                                              )
       Defendants. )

## ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DEFENDANTS' MOTION TO STRIKE
### (Docs. 67, 68, 71, 73, 85)

This is a personal injury case in which Plaintiffs Carol Marcellin and Jessica Hollowell-McKay have filed suit against Defendants HP, Inc., (HP) and Staples, Inc. (Staples), the manufacturer and retailer, respectively, of an HP Pavilion DV6 Laptop computer purchased by Marcellin in 2011. Their claims concern a fire that broke out at Marcellin's Ceres, New York residence on January 24, 2020, injuring Marcellin and killing her partner Charles Hollowell. Ms. Marcellin and Ms. Hollowell-McKay are co-administrators of Mr. Hollowell's Estate. Plaintiffs allege the house fire occurred after cells in the laptop's lithium-ion battery experienced "thermal runaway," causing them to expel flaming components that ignited paper stored in a closet of the home's office. They seek to recover under theories of negligence and strict products liability, claiming (1) manufacturing and (2) design defects in the HP laptop, (3) that HP failed to warn of unreasonable dangers associated with the laptop's use, and (4) that HP negligently breached a

1

post-manufacture duty to warn of such dangers. HP has moved for summary judgment on all of the plaintiffs' claims. Plaintiffs have cross-moved for summary judgment on the issue of the fire's cause. Defendants have further moved to strike as untimely this cross-motion for summary judgment. This order addresses these motions in turn.

## FACTS

The following facts are not in dispute unless otherwise noted. Carol Marcellin purchased an HP Pavilion dv6-3200 laptop computer from Staples shortly after February 7, 2011. (Doc. 68-2 ¶ 1.) She registered the warranty for the laptop with HP on March 5, 2011, under her own name, address, and email address. (Doc. 83-1 ¶ 21.) The laptop as sold was packaged with a User Guide, which contained the following warning: "To reduce potential safety issues, use only the battery provided with the computer, a replacement battery provided by HP, or a compatible battery purchased from HP," (Doc. 69-4 at 11), as well as a Notebook Essentials manual which contained a similar warning and a Maintenance Guide listing authorized HP replacement batteries. (Doc. 68-2 ¶¶ 7–8.)

HP's specifications required that batteries authorized for use in Pavilion laptops be equipped with battery management systems (BMS) including safety features that operate to prevent overcharge, overvoltage, and imbalance of the battery's cells. (Doc. 83-1 ¶ 26.) These features were designed to reduce the risk of thermal runaway, a chemical reaction in which lithium-ion battery cells generate more heat than they can dissipate. (*Id.*) The reaction begins when the battery cell's internal cell temperature exceeds 90–100° Celsius, and becomes irreversible when the internal cell temperature reaches 200° Celsius. (*Id.* ¶ 17.) Thermal runaway can occur due to overcharge of the battery's cells or mechanical damage to the cells

2

from an external heat source. (*Id.* ¶ 18.) Thermal runaway reactions can cause the battery cell to rupture and eject its internal components at temperatures in excess of 600° Celsius. (*Id.* ¶ 17.)

HP's BMS systems required that batteries installed in its laptops be manufactured with certain microprocessors called "fuel gauges." Eight different types of fuel gauges were approved by HP for use in authorized Pavilion batteries. Six of these fuel gauges were manufactured by Texas Instruments, and were compatible with various authentication systems. (Doc. 83-1 ¶ 23.) These systems would allow the device in which the battery was installed to verify that the installed battery was authorized for use in the device. One such system, which was implemented in some portable electronic devices at the time of the HP laptop's manufacture, employed a Secure Hash Algorithm 1 (SHA-1). Under SHA-1 authentication, the host device can automatically query the installed battery to determine whether it is authorized for use in the device. The host device can be programmed to cease operating if the installed battery is incapable of SHA-1 authentication. In this way, SHA-1 authentication reduces the risks of using unauthorized batteries in the host device. (*See* Doc. 66-5 at 14–16.)

David Pipho, an engineer in HP's quality assurance department, testified in deposition that by 2014, the company knew that unauthorized batteries lacking the safety features described above were being used in its laptops, and considered incorporating authentication systems into its laptops in response. (Doc. 82 at 32–33.) HP later retained Donald Galler, an electrical engineer and expert witness in this case, to investigate numerous incidents of laptop fires that resulted after an unauthorized battery experienced thermal runaway. (*See* Doc. 78 at 26–35.) HP did not program Pavilion laptops with SHA-1 or similar battery authentication systems until 2019. (Doc. 83-1 ¶ 27.) HP has never issued post-manufacture warnings regarding the risk of fire from

3

the use of unauthorized batteries to registrants of warranties for Pavilion laptops, such as Carol Marcellin. (*Id.* ¶ 38.)

Marcellin denies replacing the battery of the HP laptop she purchased in 2011 and has no knowledge that any other individual ever did so. (Doc. 66-8 ¶ 13.) In 2015, Marcellin made a purchase in the amount of $16.17 from an online electronics retailer. She originally testified that this purchase was for a replacement battery for a different laptop manufactured by Compaq. (Doc. 42-1 ¶ 13.) She later revised this testimony based on her belief that the amount of the purchase was too small to have been for a replacement battery. (Doc. 70 ¶ 6.) Marcellin stated that she did purchase and install a replacement battery in the Compaq laptop (Doc. 66-6 at 100), but she has no records to confirm this purchase. (Doc. 66-8 at 17.) According to Marcellin, she had stored the Compaq laptop in the office closet of her residence, where it was destroyed by the fire.

On the night of January 19, 2020, Marcellin left the HP laptop powered on and charging on an armoire in the office of her home while it downloaded an anti-virus software update. (Doc. 83-1 ¶ 4.) She testified that this was the first instance in which she had left the laptop charging overnight. (*Id.*) Shortly after 4:00 a.m. on the morning of January 24, she was awoken by a smoke alarm located in the hallway outside her bedroom. (*Id.* ¶ 1; Doc. 66-6, 168–69.) She left the bedroom, where Mr. Hollowell remained asleep, and proceeded to silence the smoke alarm and search for the source of the smoke. (Doc. 66-6 at 124.) The home's furnace was located behind a door in the hallway. Marcellin opened the door and determined the furnace was not the source of the smoke. (Doc. 66-18 ¶ 2.) She proceeded down the hallway toward the office. (Doc. 66-6 at 124.) Marcellin originally testified to having first seen "the glow of the fire" emanating from the office, retreating to the kitchen to retrieve a fire extinguisher, then

4

returning to the doorway of the office, where she observed the laptop emitting flaming projectiles or "fireballs" toward the ceiling. (*Id.*) In a subsequent declaration, she stated she witnessed these flaming projectiles *before* returning to retrieve the fire extinguisher. (Doc. 66-18 at 1–2.)

The office had a linen closet to the left of the doorway, where Marcellin testified she stored the Compaq laptop. (*Id.* ¶ 7.) Upon reaching the office doorway, she detected no smoke or heat from the closet. (*Id.* ¶ 4.) She did not enter the room due to the flaming projectiles emitted from the HP laptop, and did not attempt to use the fire extinguisher to quell the blaze. (*Id.* ¶¶ 5–6.) She then returned the bedroom, where she discovered that Hollowell had fallen while trying to get out of the bed. (Doc. 66-6 at 126.) Marcellin tried and failed to lift Hollowell into his wheelchair. (*Id.* at 127.) She was unable to find her cell phone to call for emergency assistance. (*Id.* at 167.)

Marcellin managed to escape by crawling to the home's elevator and taking it down to the garage floor, at which point she drove her car approximately 1.5 miles from the house before using her OnStar service to reach emergency operators. (*Id.* at 127–28.) Per the report of the Alleghany County Fire Investigation Team (ACFIT), after first responders controlled the fire, EMS personnel attempted lifesaving procedures to revive Hollowell. He was then transported to Olean General Hospital, where he was pronounced dead early on the morning of January 24. (Doc. 74 at 13.)

Later that morning, ACFIT investigators inspected the scene of the fire. The scene included the damaged remains of the HP laptop. Lead investigator Jeff Luckey interviewed Marcellin at Olean General Hospital later that day. (*Id.*) ACFIT's final report, signed by Luckey on February 21, 2020, came to the following conclusion regarding the source of the fire:

5

> Based upon our observation and ruling out other probable causes it is our hypothesis that the cause of the fire is the HP laptop. The HP laptop battery or components near the battery caused the battery to overheat and explode, sending sparks and flammable material that ignited light weight fuels in the office area of the computer cabinet or closet.

(*Id.* at 14.)

On February 27, 2020, representatives of both parties conducted a scene inspection of Marcellin's home. Jason Karasinski, Plaintiffs' fire expert in this case, and Greg Gorbett, a fire investigator retained by HP, attended the inspection along with representatives from Marcellin's home insurer, Farmers Insurance, and Jeff Luckey of ACFIT. (Doc. 83-1 ¶ 12.) The investigators took photographs of the scene and collected and labeled fragments and debris from the office. (*Id.* ¶ 13.) Karasinski's report states that the investigators present concluded, in accordance with the ACFIT report, that the office was the fire's likely origin and the HP laptop its likely source of ignition. (Doc. 70-1 ¶ 4.)

Karasinski and HP's battery expert Donald Galler examined evidence collected from the scene inspection at a subsequent investigation conducted at the Fire Research & Technology (FRT) laboratory in Sodus Point, New York on October 30, 2020. (*Id.* ¶ 7.) Both Galler and Dr. Steve Martin, a battery expert retained by Plaintiffs who later reviewed the evidence from the laboratory investigation, concluded that the battery installed in the HP laptop at the time of the fire was not the original battery, nor a replacement authorized by HP. (Doc. 77-1 at 16; Doc. 67-3 at 6.) Markings on the circuit board indicated the battery was manufactured in 2015, years after the laptop was manufactured. (Doc. 67-3 at 6.) The installed battery lacked the safeguards against overcharge and overvoltage required of those authorized by HP. (*Id.* at 17.)

6

It is undisputed that the scene inspection revealed no evidence of the Compaq laptop, which Marcellin testified was stored on the floor of the office closet on the night of the fire. (Doc. 66-6 at 94.) To this day, the Compaq laptop has never been found.

The parties' experts disagree as to the nature of other evidence recovered at the February 2020 scene inspection, and as to the conclusions that can be drawn from that evidence. Dr. Martin, concluded that "[t]he fire at issue in this case was caused by cell overcharge or overvoltage causing one or more cells in the battery pack to reach excessive temperatures and prompting a thermal runaway reaction." (Doc. 67-3 at 22.) Karasinski reached the same conclusion:

> Based on the totality of the investigation, the cause of the fire was a failure of the HP Pavilion laptop system, to include the battery pack. This failure resulted in the ejection of hot battery material that ignited combustibles located within the room of origin, to include the office closet.

(Doc. 66-13 at 45.)

In contrast, Dr. Quinn Horn, whom HP has retained as their fire expert in place of Greg Gorbett, produced a report which arrives at the following conclusion: "While the subject battery pack was of unknown origin and lacked protection features that could prevent abuse of the included battery cells, the evidence is consistent with the subject battery pack experiencing thermal runaway due to external heat attack from the fire." (Doc. 77 at 32.)

These divergent theories about the cause of the fire result from the parties' disagreement over both the evidence adduced in this case and the general nature of the thermal runaway process in lithium-ion battery cells. Crucially, the parties disagree as to whether a component of one of the batteries' cells was found in the office closet at the February 2020 scene inspection. Dr. Horn, having reviewed the photographs taken by Gorbett, opined that "no winding remnants

7

from the cells that experienced thermal runaway in the Subject Notebook were found in the closet during the scene inspection." (*Id.* at 35.) Karasinski, in his rebuttal report, claims that two of Gorbett's photographs show a fragment of one of the cell's copper windings on the floor of the office closet. (Doc. 66-15 at 16.) In a subsequent declaration, Dr. Horn testified that the material of this fragment "has a textured, mesh pattern that is not consistent with a copper foil from a lithium-ion battery, and is not consistent with the shape of an electrode winding assembly," and opined that the photographs "do not depict a copper foil from a lithium-ion battery cell." (Doc. 92-4 at 3.) As both parties agree that the fire originated in the office closet, the presence of cell components in that closet would support Plaintiffs' theory that a thermal runaway reaction of one of the cells was the cause of the fire; the absence of any cell components in that closet supports HP's position that the outbreak of fire in the closet was caused by a different ignition source.

The parties' experts also disagree as to the nature of the thermal damage to the laptop's housing. Dr. Horn concluded that damage to the plastic housing of the notebook suggested exposure to radiant heat from a thermal gas layer emanating from the office ceiling, itself the result of a pre-existing fire. (Doc. 77 at 34.) Dr. Martin's rebuttal report contends that the limited damage to the upper portion of the laptop, in contrast with severe thermal damage to the battery pack itself, cannot be explained by an external fire source, and thus is consistent only with the theory that the fire originated with the thermal runaway reaction of the battery's cells. (Doc. 67-5 at 6–7.)

In addition, the parties' experts disagree over (1) the propensity of lithium-ion cells experiencing thermal runaway due to overcharging to eject their contents and (2) the length of

8

time it took for the thermal runaway reactions to unfold on the night of the fire. (*Compare* Doc. 77 *with* Doc. 66-5.)

I. MOTIONS TO EXCLUDE EXPERT TESTIMONY (Docs. 67, 71)

A. LEGAL STANDARD

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflect a reliable application of the principles and methods to the facts of the case.

The Supreme Court has ruled that the district's court's "gatekeeping" function under Rule 702 is to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining whether a witness qualifies as an expert, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Rutledge v. Walgreen Co.*, WL 2015284 at *9 (2d Cir. July 13, 2026) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). When making this determination, "[t]he words 'qualified as an expert by knowledge, skill, experience, training or education' must be read in light of the liberalizing purpose" of Rule 702. *United States v. Brown*, 776 F.2d 397, 400 (2d. Cir. 1985). Accordingly, "[e]xperts need not conduct studies of their own in order to opine on a topic." *Rutledge*, WL 2015284 at 9* (quoting *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016).

9

In assessing the reliability of an expert's testimony, the district court may consider "(1) whether a theory or technique could be, and has been, tested; (2) whether it has been subjected to peer review; (3) its error rate; and (4) its degree of acceptance within the relevant scientific community." *Id*. at 593–94. But "the test of reliability is flexible," and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). In some cases "the relevant reliability concerns may focus upon personal knowledge or experience" of the expert at issue. *Id*. at 149. In determining whether a witness qualifies as an expert, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Rutledge v. Walgreen Co.*, WL 2015284 at *9 (2d Cir. July 13, 2026) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)). When making this determination, "[t]he words 'qualified as an expert by knowledge, skill experience, training or education' must be read in light of the liberalizing purpose" of Rule 702. *United States v. Brown*, 776 F.2d 397, 400 (2d. Cir. 1985).

In undertaking the Rule 702 inquiry, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of these conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d. Cir. 2002). That said, "conclusions and methodology are not entirely distinct from one another," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), and thus "when an expert opinion based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

10

As the Second Circuit has clarified, though, "[t]his is not to suggest an expert must back his or her opinion with published studies that unequivocally support his or her conclusions." *Amorgianos*, 303 F.3d at 266. Where an expert's testimony is otherwise reliable, "lack of textual support may go to the weight, not the admissibility" of that testimony. *Id.* (citation and internal quotations omitted). Consistent with the liberal thrust of the Federal Rules of Evidence, "[a] minor flaw in an expert's reasoning or slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Instead, the district court "should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)).

B.  ANALYSIS

1.    HP's Motion to Exclude the Testimony of Dr. Steve Martin (Doc. 67)

Plaintiffs assert that the HP laptop lacked a battery authentication system that would have prevented the laptop from operating with an unauthorized battery pack, and that this defective design was the proximate cause of the fire. To prevail on this claim, Plaintiffs must show that (1) the fire resulted when the replacement battery pack's cells experienced thermal runaway, and (2) a feasible alternative design existed at the time of the laptop's manufacture which would have prevented the fire's occurrence. In support, Plaintiffs have disclosed expert reports produced by their expert Dr. Martin.

Martin's initial report concluded, based on his prior experience with lithium-ion battery cells of the type present in the replacement battery pack and evidence collected from the February 27, 2020, inspection of Ms. Marcellin's home, that the fire was caused "by cell overcharge or overvoltage causing one or more cells in the [replacement] battery pack to reach excessive temperatures and prompting a thermal runaway reaction." (Doc. 66-5 at 22.) In

11

support of this opinion, Martin's second report cited a peer-reviewed scientific study which exposed lithium-ion battery cells to external heating to determine the conditions under which cells experience thermal runaway. (*See* Doc. 67-5.)

Dr. Martin's first report concluded that the HP laptop was defectively designed because it "lacked any battery authentication system or other design that would have prevented the user from unknowingly operating the subject laptop with an unauthorized battery pack." (Doc. 66-5 at 24.) Citing a 2005 publication by Texas Instruments, a manufacturer of microprocessors used in the production of lithium-ion batteries authorized for use in HP laptops, Martin's report identified various battery authentication systems both (1) in use in various portable electronic devices in 2010, the year of the HP laptop's manufacture and (2) compatible with replacement battery packs authorized for use in the HP laptop. (*Id.* at 13–15.) Martin concluded that a design that implemented one of these systems would have prevented the laptop from operating with an unauthorized battery pack. Martin's report additionally described two other alternative designs which he believed could have prevented the fire: a system which would have automatically disconnected power if the battery pack's thermistor malfunctioned, and a design which would have required users to take the laptop to a qualified service provider in order to replace the original battery pack. (*Id.* at 24–25.)

In moving to exclude Martin's testimony, HP first contends that Martin is unqualified to offer expert testimony in this case because he has "no education, training, or professional experience in notebook computer design or manufacture," and has not published peer-reviewed studies specifically regarding notebook computers. (Doc. 67-1 at 6.)

The court rejects this argument. Martin has more than four decades' experience researching the design, properties, and manufacture of lithium-ion batteries, and is experienced

12

as a consultant in cases concerning fires and explosions resulting from the failure of lithium-ion batteries. His report evidences a thorough understanding of battery authentication systems, including the interface between battery components and host devices. To accept HP's argument against Dr. Martin's qualifications would require a standard for the specificity of expertise incompatible with the "liberalizing purpose" of Rule 702. *Brown*, 776 F.2d at 400.

Next, HP contends that Martin's opinion as to the fire's cause should be excluded because it is based on his misinterpretation of the scientific study cited in his rebuttal report. In his rebuttal report, Martin opined that, in order for an external fire source to have provoked the replacement battery cells into thermal runaway, the laptop would need to have been exposed to a thermal gas layer "in excess of 300 C (572 F) for a period of over an hour." (Doc. 67-5 at 3.) HP argues this opinion is "at variance" with the results of an "oven test" in which lithium-ion battery cells were exposed to extreme external heat sources. Those results were reported in "Gas explosions and thermal runaways during external heating abuse of commercial lithium-ion graphice-LiCoO2 cells at different levels of aging," by Fredrik Larsson, et al., an article published in Journal of Power Sources and cited in Martin's rebuttal report. (*See* Doc. 66-16.) In contrast to Plaintiff's position, HP asserts that the battery cells entered thermal runaway due to an external fire source. It argues that Martin's opinion diverges from the results of the Larsson study as to the intensity of an external fire necessary to induce thermal runaway. (Doc. 67-1 at 11–14.)

As this case demonstrates, it is common for opposing experts to disagree. In this case, Martin traces the cause of the fire to a thermal runaway process that originates within a replacement battery that fell short of HP's standards. Martin concludes that HP's design was faulty because it did not include safeguards to recognize and disable an unsafe replacement.

13

HP's expert Dr. Horn agrees that the HP computer experienced thermal runaway, but he attributes the problem to overheating from an external source—a house fire sparked by some other cause.

Both sides rely on the Larsson study of thermal runaway in computer batteries. The experiment involved heating various batteries in an oven. The batteries entered "Stage II thermal runaway" between 188-205° Celsius. (Doc. 67-6 at 7, Table 4.) Neither side takes issue with the experimental results. They simply draw different conclusions.

Martin notes that the batteries used in the experiment were placed in the oven without the protection afforded by the cover of the laptop and other insulating material. He estimated that it would take prolonged exposure of 300° Celsius to raise the battery temperature enough to provoke thermal runaway in the laptop due to the protection of the cover and other insulating elements. He concluded that the house fire was neither hot enough nor lasted long enough to cause the explosion of the laptop Ms. Marcellin observed when she looked into the home office. He believes that the fire started inside the computer.

Horn believes that the house fire caused the thermal runaway. He also relies on the 190° Celsius starting point for thermal runaway. He notes that the plastic exterior of the laptop had a melting point of 230- 270° Celsius, the point at which the material can be poured into a mold. Since the plastic had melted, the temperature on the outside of the computer must have been in that range and hot enough to trigger thermal runaway on the inside.

Both opinions fall broadly within the range of plausible reconstructions of the origin of the fire. The experts differ over issues such as how much protection the batteries received from the structure of the computer. Martin believes enough that it would take a longer and hotter fire than is likely to have occurred by the time Ms. Marcellin discovered the fire to cause thermal

14

runaway. Horn believes that the heat from a more limited external fire would have been transferred to the batteries, raising their temperature to 190° Celsius and causing thermal runaway at a relatively early stage. Martin describes the battery as the cause of the fire; Horn as a victim.

As the Advisory Committee on the Rules of Evidence has discussed, "[i]t will often occur that experts come to different conclusions based on contested sets of facts. Where that is so the [rule] does not necessarily require exclusion of either side's experts." Fed. R. Civ. P. 702 committee note to 2023 amendment. Here, the dispute between Martin and Horn does not require the exclusion of either expert. Rather, the dispute raises issues of fact and credibility that can only be resolved at trial.

Finally, HP seeks to exclude Martin's opinion that the HP laptop was defectively designed because it lacked a system to authenticate an installed battery or prevent users from operating the laptop with an unauthorized battery. (Doc. 66-5 at 24.) HP argues: (1) that Martin's report does not identify other laptop manufacturers who had implemented the battery authentication systems discussed in his report as of 2010; (2) that Martin has not tested an exemplar of his proposed alternative design; and (3) that Martin's proposed alternative design goes unsupported by "any peer-reviewed article." (Doc. 67-1 at 15.) In support of this argument, HP relies on *Zaremba v. GMC*, 360 F.3d 355 (2d. Cir. 2004), a case in which the Second Circuit upheld the exclusion of an expert's proposed alternative design of the roof of a Pontiac Trans Am, after the district court found the expert had not tested an exemplar of his design, subjected the design to peer-review, or identified any similar design in use by the automotive design community. In addition, HP suggests that, because Martin "refused to opine whether any

15

alternate design concerning an on-screen warning would even change . . . Marcellin's behavior," his design defect should be excluded. (Doc. 67-1 at 17.)

In contrast to the expert in *Zaremba*, Martin has not proposed an alternative design of the product's hardware created from scratch. Instead, he proposed the addition of different battery authentication systems to the HP laptop as manufactured in 2010. These authentication systems were either a) in use by competing notebook manufacturers like Apple, (Doc. 66-5 at 26), or b) implemented in other portable electronic devices and compatible with Texas Instrument-manufactured gas gauges already in use by HP's battery vendors in 2010. (*Id.* at 25.) While testing an exemplar of an alternative design may support the reliability of its expert proponent, *Daubert* does not impose a fixed requirement that an alternative design be tested in order for the expert opinion proposing it to be admissible—especially when an expert identifies a design already in market use. *Colon ex. rel. Molina v. BIC USA, Inc.*, 199 F. Supp.2d 53, 76 (S.D.N.Y. 2001). HP contends that some (though not all) of Martin's proposed alternative designs had not been implemented in laptop computers, specifically, as of 2010. But to exclude Martin's opinion on this basis would again require a standard of specificity for expert testimony at odds with the both the liberalizing purpose of the Federal Rules and the flexible nature of the *Daubert* inquiry.

> 2. Plaintiffs' Motion to Exclude Testimony of Drs. Quinn Horn and Chad Myers (Doc. 71)

Both parties agree that on the night of the fire, the unauthorized replacement battery installed in the HP laptop experienced a thermal runaway event. As discussed in the order denying HP's motion for sanctions and to strike the rebuttal reports of Plaintiffs' expert witnesses, however, the parties dispute whether the thermal runaway event was the cause of the incident fire, or whether thermal runaway occurred as a result of a pre-existing fire. (*See*

16

Doc. 101.) Dr. Quinn Horn, HP's battery expert, has opined that thermal runaway was induced by the heat of an external, pre-existing fire source, and thus that the replacement battery was not the cause of the fire. (Doc. 77 at 32.) HP's fire expert Dr. Chad Myers' report, meanwhile, concludes that evidence from the February 27, 2020, scene inspection of Marcellin's Ceres, New York home was insufficient to determine the cause of the fire under National Fire Protection Association (NFPA) 921 forensic investigation standards. (Doc. 76 at 48.)

Plaintiffs contest the reliability of three premises of Dr. Horn's theory of the fire. First, Horn denies that a fragment of debris found in the office closet was the ejected winding of one of the replacement battery's cells, an opinion at odds with that of Plaintiffs' fire expert Jason Karasinski. (Doc. 92-4 at 3.) Second, based on his own publication on battery failure, Horn opines that lithium-ion battery cells tend not to eject their contents unless exposed to an external heat source. (Doc. 80-1 at 81.) Finally, Horn offered his opinion that thermal runaway events tend to conclude in a matter of seconds, which, given Marcellin's testimony that she witnessed "fireballs" being expelled from the laptop only after being awakened by the home's smoke alarm, suggested to Horn that the fire was already in progress by the time the laptop's battery malfunctioned. (Doc. 77 at 36.) Plaintiffs similarly take issue with Dr. Myers' conclusion, based on Horn's opinions and Myers' application of NFPA standards, that the cause of the fire cannot be determined from the evidence of the scene inspection. (*See* Doc. 76.)

While Plaintiffs purport to take issue with the methodology behind Drs. Horn's and Myers' reports—characterizing both experts as having offered *ipse dixit* opinions untethered to the evidence gathered at the February 2020 scene inspection—their principal objection appears to be the incompatibility of these experts' conclusions with those of their own. Both sides have retained similarly credentialed experts who have submitted reports based on the same physical

17

evidence, often applying the same standards of forensic analysis, and arrived at reasonable if incompatible theories of the fire's cause. A judgment of the relative merits of these theories is properly left for the jury, not for the district court in exercising its gatekeeping function under *Daubert*. Plaintiffs' motion to exclude the testimony of Drs. Horn and Myers is DENIED.

      3.      Plaintiffs' Motion to Exclude the Testimony of Dr. Donald Galler (Doc. 71)

Plaintiffs have also moved to exclude three opinions of Dr. Donald Galler, an electrical engineer retained by HP to provide expert testimony in this case, under Federal Rule of Evidence 702.

First, Galler opined that battery authentication systems identified by Plaintiff's expert Dr. Martin were not generally employed by manufacturers of notebook computers in 2010, the year of the HP laptop's manufacture. (Doc. 77-1 at 20.) Galler based this opinion on the results of a test of 2010-vintage laptops made by Dell, Apple, and Lenovo. Each operated when installed with replacement batteries made by off-brand manufacturers, leading Galler to conclude that the laptops were not equipped with systems that would prevent the laptops from functioning with an unauthorized battery pack.

Plaintiffs contest the reliability of Galler's methodology, arguing (1) that Galler failed to ensure the tested laptops were in fact manufactured in 2010, and (2) that Galler unjustifiably assumed that the replacement batteries used in the test were not in fact authorized for use in the tested laptops. As with the testimony of Drs. Horn and Myers, Plaintiffs are free to attack the credibility of this opinion before a jury. But Galler is qualified to opine on the availability and functionality of battery authentication systems, and his opinion is a plausible and relevant

18

extrapolation from experimental data. Plaintiffs would hold Galler's testimony to the sort of rigid methodological standards that *Daubert* and its progeny explicitly reject.

Second, Plaintiffs move to exclude Galler's opinion that counterfeit battery manufacturers would be able to "defeat" the battery authentication systems contemplated in Martin's report, such that even if HP had implemented such a system into its laptops, that system would not suffice to prevent the laptops from operating with unauthorized replacement batteries. (Doc. 77-1 at 20.) Plaintiffs point to deposition testimony in which Galler admits this opinion derives not from empirical research, but his estimate of the technological sophistication of counterfeit battery manufacturers. (Doc. 71-2 at 16–17.) That admission is insufficient to justify excluding Galler's testimony. The opinion in question concerns a counterfactual hypothesis; it is not, in other words, the type of claim conducive to experimental verification or peer-reviewed study. Galler considered whether the authentication system (that was not installed) could be fooled by counterfeit batteries (that he never tested). His prediction (yes) falls within the range of engineering judgments that he is qualified to make. Since his opinion is untested and theoretical, it can certainly be subjected to cross-examination. The fact that he cannot point to empirical testing data in support may undermine the weight of his opinion, but does not, standing alone, render this opinion inadmissible.

Last, Plaintiffs move to exclude Galler's opinion that the Compaq laptop, which Marcellin testified was stored in the office closet at the time of the fire, "would not have burned up to the point of complete disappearance." (Doc. 77-1 at 20.) The February 2020 scene inspection revealed no remnants of the Compaq laptop, and Plaintiffs' experts do not dispute Galler's opinion on this point. Plaintiffs thus contend that this opinion should be excluded not as

19

unreliable but as irrelevant, as both parties agree the Compaq laptop played no role in the origin of the fire.

The mystery of the Compaq laptop does, however, bear on the causal element of Plaintiffs' failure to warn claims. The parties agree that an unauthorized replacement battery was installed in the HP laptop at the time of the fire. Plaintiffs assert that (1) the fire would have been prevented had the manuals packaged with the HP laptop contained warnings that spoke to the specific risks of operating the laptop with an unauthorized battery, and (2) the fire likewise would have been prevented had HP issued a post-manufacture warning to Marcellin, as a warranty registrant of one of its laptops, of those risks. Marcellin has testified to purchasing a replacement battery, albeit for a different laptop. The fact that that laptop cannot be located naturally raises questions about what happened to the replacement battery Marcellin testified to purchasing. It could be, for instance, that Marcellin was mistaken as to which laptop she installed the replacement battery in, and this fact, if true, would implicate the likelihood that additional or post-manufacture warnings could have prevented the fire.

Accordingly, Plaintiffs' motions to exclude Galler's opinions is hereby DENIED.

20

II.   MOTIONS FOR SUMMARY JUDGMENT (Docs. 68, 73)

A.  LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, courts must examine all evidence in the light most favorable to the nonmoving party, *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d. Cir. 2003), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2004). When the non-movant bears the burden of proof, summary judgment is warranted if that party "fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The non-movant "may not rely on 'speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Asante-Addae v. Sodexo, Inc.*, 631 F. App'x 68, 68 (2d Cir. 2016) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)).

B.     HP's Motion for Summary Judgment (Doc. 68)

HP has moved for summary judgment on all four of Plaintiffs' claims. The court considers this motion with respect to each claim in turn, in accordance with the substantive New York state law applicable in this case.

1.   Manufacturing Defect

To prove a strict liability manufacturing defect, "the plaintiff must show that a specific product unit was defective as a result of some mishap in the manufacturing process itself,

21

improper workmanship, or because defective materials were used in construction, and that the defect was the cause of plaintiff's injury." *Oden v. Boston Sci. Corp.*, 330 F. Supp. 3d 877, 890 (E.D.N.Y. 2018) (citation and internal quotation marks omitted).

Plaintiffs claimed in their complaint that the HP laptop was not reasonably safe for its intended use owing to a manufacturing defect which allowed the lithium-ion battery to overcharge, leading to the thermal runaway event they allege caused the incident fire. (Doc. 1, 3) To date, though, Plaintiffs have not developed this theory in their filings with the court, nor introduced evidence supporting the existence of such a defect. In amended responses to HP's interrogatories disclosed on May 14, 2024, Plaintiffs stated they were not asserting a manufacturing defect claim at the time, but suggested they may seek leave to amend their complaint to include such a claim after further discovery. (Doc. 66-8 at 14.) They have not done so to date, and nor have they addressed the original manufacturing defect claim in their memoranda opposing HP's motion for summary judgment. "[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed abandonment of the unmentioned claims." *Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014). Such is the situation here. As Plaintiffs have not met their burden with respect to their manufacturing defect claim, Defendants' motion for summary judgment on this claim is GRANTED.

2.    Design Defect

Under New York law, "[a] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer." *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d. Cir. 1997) (citations omitted). In order to establish a prima facie claim of a design defect, a plaintiff must show that "(1) the product as

22

designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 83 (S.D.N.Y. 2001) (citations omitted).

Here, Plaintiffs claim the HP laptop was unreasonably unsafe for its intended or reasonably foreseeable use owing to "a design defect which allowed the lithium-ion battery to overcharge, ignite, and cause the fire," leading to the injuries to Plaintiff Marcellin and the death of decedent Charles Hollowell. (Doc. 1 at 4.) HP has moved for summary judgment on this claim. As their memorandum in support of this motion acknowledges, the report disclosed by Plaintiffs' expert Dr. Martin includes opinions tending to support all three elements of their design defect claim. Martin asserts the risks of overcharge from the use of unauthorized battery packs in HP laptops, proposes an alternative design which would have prevented the laptop from operating with such battery packs, and opines that this design would have prevented the incident fire. (*See* Doc. 66-5.)

As HP's motion to preclude Dr. Martin's report has been denied, that report remains part of the factual record in this case. Taken as true, it established the Plaintiffs' prima facie case of a design defect. As such, HP's motion for summary judgment on Plaintiffs' design defect claim is DENIED.

3.    Failure to Warn

Under New York law, a warning defect occurs "when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm." *McCarthy*, 119 F.3d at 154 (citation omitted). To establish a prima facie claim of a warning defect, a plaintiff must show that "(1) the manufacturer had a duty to warn; (2) the manufacturer breached the duty to warn in

23

a manner that rendered the product defective, i.e., reasonably certain to be dangerous; (3) the defect was the proximate cause of the plaintiff's injury; and (4) the plaintiff suffered loss or damage." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d. 657, 672 (E.D.N.Y. 2013). Additionally, while a product may not inhere known risks which require a warning at time of manufacture, "risks thereafter revealed by user operation, and brought to the attention of the manufacturer or vendor, may impose upon one or both a duty to warn." *Cover v. Cohen*, 61 N.Y.2d 261, 275 (1984). Under New York law, "The elements of negligence claims based in … [a] failure to warn [theory is] the same as those under strict liability." *Miccio v. ConAgra Foods, Inc.*, 224 F. Supp. 3d 200, 208 (W.D.N.Y. 2016).

> The existence of a duty to warn is determined by factors including:
>
> [T]he harm that may result from the use of the product without notice, the reliability and any possible adverse interest of the person, if other than the user, to whom notice is given, the burden on the manufacturer or vendor involved in locating the persons to whom notice is required to be given, the attention which it can be expected a notice in the form given will receive from the recipient, the kind of product involved and the number manufactured or sold, and the steps taken, other than the giving of notice, to correct the problem.

*Id.* at 277. New York law imposes a presumption that a warning will be heeded if given, but "where a defendant can show, via specific facts, that any given warning would have been futile—either because any such warnings would not have been heeded or because the injury would have occurred, regardless of the given warnings—a defendant will have successfully rebutted the heeding presumption." *Id.* (citations and internal quotation marks omitted).

Plaintiffs have brought both strict liability and negligent post-manufacture failure-to-warn claims. They allege that Marcellin's injuries and Hollowell's death resulted from HP's failure to adequately warn of unreasonable risks associated with the laptop's use, and from HP's negligent breach of its post-manufacture duty to warn consumers of reasonably foreseeable risks of battery

24

overcharge and fire resulting from the use of unauthorized batteries. (Doc. 1 at 5–8.) HP has moved for summary judgment on both claims.

With respect to the strict liability claim, the parties do not dispute that three user manuals packaged with the HP laptop included warnings regarding the use of unauthorized replacement batteries. The accompanying User Guide, for instance, advises customers to "use only the battery provided with the computer, a replacement battery provided by HP, or a compatible battery purchased from HP." (Doc. 69-4 at 11.) HP contends that these warnings were not defective, citing the testimony of their expert, Dr. Sala, that the warnings "were reasonable and adequate in terms of format, content, and location, and were consistent with the scientific literature and guidance documents." (Doc. 68-1 at 13.) HP claims summary judgment is warranted because Plaintiffs "have not presented any evidence or expert testimony to refute" Dr. Sala's opinion. (*Id.*) Alternatively, HP argues that, because Marcellin denies having replaced the laptop's battery, Plaintiffs have failed to introduce any evidence as to when or by whom the battery was replaced. As such, they contend that Plaintiffs' claim as to the inadequacy of the included warnings must necessarily depend on speculation as to the ability of the unknown individual who replaced the battery to read and understand those warnings.

The included warnings are part of the factual record in this case. Contrary to Dr. Sala's opinion, Plaintiffs assert that those warnings "did not properly describe the potential consequences" of using the laptop with an unauthorized battery pack, and did not "provide adequate information for the consumer to distinguish an unauthorized battery pack from an HP authorized one." (Doc. 83-3 at 13.) Dr. Martin's report both describes one such consequence of using the laptop with an unauthorized battery—the risk of overcharge-induced thermal runaway—and asserts: (1) that users would likely need to replace the battery pack at some point

25

in the laptop's useful life; (2) that there existed at the time of the laptop's manufacture a market for unauthorized batteries; and (3), that overcharge of the unauthorized battery installed in the laptop was the cause of the fire. (*See* Doc. 66-5 at 21–24.)

Plaintiffs have thus made out a prima facie case that the included warnings were inadequate and that this warning defect caused the Plaintiffs' injuries. Contrary to HP's claims, this case does not necessarily require speculation as to the unknown individual who replaced the battery. A reasonable jury may find, in light of the text of the included warnings, that a warning more explicit as to the risks of unauthorized batteries would have caused Marcellin to take additional efforts to install an authorized one in the laptop. Alternatively, a reasonable jury could find the warnings inadequate to prevent *any* user from operating the laptop with an unauthorized battery. In either event, the adequacy of the warnings remains a genuine issue of material fact for the jury in this case to decide.

With respect to the negligent post-manufacture failure to warn claim, HP emphasizes the undisputed fact that Marcellin denies ever replacing the laptop's battery. They argue this fact rebuts the presumption, under New York law, that a warning, if given, will be heeded, and proves that any additional warning would been futile "because, as far as Marcellin [was] concerned, the battery was never replaced and thus there would have been nobody to warn." (Doc. 91 at 7-8.) As with their argument regarding the strict liability claim, HP reads too much into the mystery of the replacement battery's installation. That Marcellin denies replacing the battery does not mean that she would have ignored an additional warning. It is now clear that she does not recall replacing the battery. But someone did, because the replacement was manufactured years after she purchased the laptop. Whether it was Ms. Marcellin (who has forgotten) or her late partner, a visiting friend or a relative, plaintiffs remain free to argue that the person who purchased the

26

replacement battery did not receive an adequate warning. Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could find that HP's failure to issue additional warnings constituted a breach of its duty to inform users of unreasonable risks associated with the use of its laptops, and that this breach was the proximate cause of the fire.

Accordingly, HP's motion for summary judgment on both the Plaintiffs' failure to warn claims is DENIED.

C.      Plaintiffs' Motion for Partial Summary Judgment on Causation and HP's Motion to Strike (Docs. 73, 85)

In opposing HP's motions for summary judgment on the above claims, Plaintiffs have filed a cross-motion for summary judgment on the issue of the fire's cause. HP has moved to strike this motion as untimely under Federal Rule of Civil Procedure 6(b)(1)(A). Per the sixth amended scheduling order of February 25, 2025, the deadline for dispositive motions was set for May 12, 2025. Plaintiffs did not file their cross-motion for summary judgment until June 9, 2025. (Doc. 73.) HP argues that Plaintiffs have offered no reason for this delay, and further that their delay in filing prejudiced HP and its codefendant Staples. (Doc. 85-2 at 3.)

Plaintiffs contend that their delay in filing the motion was the result of HP's delayed response to Plaintiffs' request to HP's counsel, made on January 3, 2025, to produce the photographs and notes taken by Greg Gorbett at the February 2020 inspection of Marcellin's home. (Doc. 90, 3.) According to Plaintiffs, HP did not produce those documents until April 28, 2025. (*Id.* at 4.) Plaintiffs contend that their motion to exclude the testimony of Drs. Horn and Myers, and the cross-motion for summary judgment on which that motion to exclude is based, were both filed

27

pursuant to their review of Gorbett's notes and photographs, which they determined demonstrated the unreliability of Horn's and Myers' testimony. (*Id.*)

Given the reasons Plaintiffs offer for their delay, and the court's denial of their motion to exclude Drs. Horn and Myers testimony as well as its disposition of their cross-motion for summary judgment below, any prejudice to HP resulting from Plaintiffs' delay is *de minimis.* Their motion to strike Plaintiffs' cross-motion for summary judgment is DENIED.

In support of their cross-motion for summary judgment, Plaintiffs cite the report of their own expert Jason Karasinski, as well as the investigation conducted by ACFIT, which concluded that the fire resulted when the replacement battery's cells experienced thermal runaway, causing them to eject flaming components into the office closet and igniting lightweight fuel stored there. As mentioned above, HP has disclosed expert reports authored by Drs. Horn and Myers which conclude, to the contrary, that the battery cells experienced thermal runaway only after and as a result of an external fire source. For reasons stated above, Plaintiffs' motion to exclude those reports under Rule 702 has been denied. The cause of the fire remains an issue of genuine dispute. Plaintiffs' cross-motion for summary judgment on this issue is DENIED.

Dated this 23rd day of July, 2026.

Geoffrey W. Crawford, Judge
United States District Court

28